Steven T. Lovett, OSB No. 910701
steve.lovett@stoel.com
Rachel C. Lee, OSB No. 102944
rachel.lee@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380
Facsimile: 503.220.2480

Daniel F. Katz (*pro hac vice*)
dkatz@wc.com
David S. Kurtzer-Ellenbogen (*pro hac vice*)
dkurtzer@wc.com
Rachel Rodman (*pro hac vice*)
rrodman@wc.com
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: 202.434.5000
Facsimile: 202.434.5029

Attorneys for Defendant Intel Corporation

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| In re INTEL CORP. CPU MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No.: 3:18-md-2828-SI |
| This Document Relates to All Actions | DEFENDANT INTEL CORPORATION'S CORRECTED MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b) *Oral Argument Requested* |

<u>**TABLE OF CONTENTS**</u>

TABLE OF AUTHORITIES ..................................................................................................... iv

LR 7-1 CERTIFICATION ........................................................................................................1

MOTION ..................................................................................................................................1

LEGAL MEMORANDUM .......................................................................................................1

    INTRODUCTION .............................................................................................................1

    BACKGROUND ...............................................................................................................4

        A.     Intel's CPUs. .................................................................................4

        B.     The Known Research Regarding Cache-Timing Side Channels. ...............6

        C.     The New Class of Side Channel Vulnerabilities:  Spectre, Meltdown, and Foreshadow. ......................................................................8

        D.     Intel's Marketing Statements. ...................................................................9

        E.     The Named Plaintiffs. ...............................................................................10

    STANDARD OF REVIEW ...............................................................................................12

    ARGUMENT ...................................................................................................................13

    I.       PLAINTIFFS LACK STANDING. ......................................................................13

        A.     A Risk of Future Hacking Is Too Speculative To Qualify as Injury In Fact. .....................................................................................................14

        B.     Plaintiffs Have Not Plausibly Alleged Overpayment. ...............................16

        C.     Plaintiffs Have Not Sufficiently Alleged Diminished Performance In Their Own Devices. .............................................................................18

        D.     No Plaintiff Has Standing To Seek Injunctive Relief. ...............................19

    II.      PLAINTIFFS FAIL TO STATE ANY NATIONWIDE CLAIM. .........................19

        A.     Plaintiffs Fail To State an Implied Warranty Claim (Count I). .................19

            1.     Plaintiffs Have Not Pleaded the Vertical Privity Requirement. ...................................................................20

            2.     Intel CPUs Are Fit for Their Ordinary Purpose. ................21

3.     Intel's Products Are Not Mislabeled.................................22

B.     Plaintiffs Fail To State a Claim for Consumer Fraud (Counts II–VII).....................................................................................................22

1.     Plaintiffs Fail To State a Claim for Fraud by Affirmative Misrepresentation (Counts IV–VI). ..............23

2.     Plaintiffs Fail To State a Claim for Fraud by Concealment or Omission (Counts II, IV, V, VI).............28

a.     Plaintiffs Fail To Allege that Intel Concealed or Suppressd Information About the Risk of Side Channels. ..............29

b.     Plaintiffs Fail To Allege a Duty To Disclose on Intel's Part. ...........................30

c.     Plaintiffs Fail To Allege Reliance..............34

3.     Plaintiffs Fail To State a "Constructive Fraud" Claim Because They Have Not Alleged a Fiduciary or Confidential Relationship with Intel (Count III). ..........36

4.     Plaintiffs' Common-Law Fraud Claims (Counts II–III) Are Foreclosed By the Economic Loss Rule..............36

5.     Plaintiffs Fail To State a Claim for Unjust Enrichment or Quasi-Contract (Count VII). .....................38

C.     Plaintiffs Fail To Allege an "Unlawful" or "Unfair" Business Practice Under the UCL (Count V). .........................................38

III.     PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATIONS OF THE CONSUMER PROTECTION LAWS OF OTHER STATES (COUNTS VIII–LXIV)..................................................................................................40

A.     Plaintiffs Do Not Allege Any Deceptive Trade Practice. .........................41

B.     Plaintiffs Do Not Allege Any Unfair Trade Practice................................45

C.     Plaintiffs Do Not Allege Any Unconscionable Trade Practice. ................46

D.     Certain Entity Plaintiffs Lack Statutory Standing. ....................................46

CONCLUSION.....................................................................................................46

APPENDIX.............................................................................................. Appendix-1

**<u>TABLE OF AUTHORITIES</u>**

**FEDERAL CASES**

*Apodaca v. Whirlpool Corp.*, 2013 WL 6477821 (C.D. Cal. Nov. 8, 2013) ................................25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................12

*Astrium S.A.S. v. TRW, Inc.*, 197 F. App'x 575 (9th Cir. 2006) ....................................................36

*Audigier Brand Mgmt. v. Perez*, 2012 WL 5470888 (C.D. Cal. Nov. 5, 2012) ...........................37

*Ave. Lofts Condo. Owners Ass'n v. Victaulic Co.*, 24 F. Supp. 3d 1010 (D. Or. 2014) ...................................................................................................................................45

*Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033 (N.D. Cal. 2014)......................................................39

*Baltazar v. Apple, Inc.*, 2011 WL 3795013 (N.D. Cal. Aug. 26, 2011) ........................................21

*Beecher v. Google N. Am. Inc.*, 2018 WL 4904914 (N.D. Cal. Oct. 9, 2018)..............................27

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................................................12

*Bernardi v. JPMorgan Chase Bank, N.A.*, 2012 WL 2343679 (N.D. Cal. June 20, 2012) ...................................................................................................................................38

*Birdsong v. Apple, Inc.*, 590 F.3d 955 (9th Cir. 2009)........................................................... passim

*Cahen v. Toyota Motor Corp.*, 147 F. Supp. 3d 955 (N.D. Cal. 2015)....................................15, 17

*Cahen v. Toyota Motor Corp.*, 717 F. App'x 720 (9th Cir. 2017)........................................ passim

*Chiles v. Ameriquest Mortg. Co.*, 551 F. Supp. 2d 393 (E.D. Pa. 2008) .....................................43

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ...............................................13, 14, 15, 16

*Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008) ......................................20, 21

*Dana v. Hershey Co.*, 180 F. Supp. 3d 652 (N.D. Cal. 2016) .................................................28, 31

*Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152 (9th Cir. 2012).................................................38

*Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908 (C.D. Cal. 2010) ....................................35

*Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843 (N.D. Cal. 2012) .......................23, 24, 25, 38

*Elias v. Hewlett-Packard Co.*, 2014 WL 493034 (N.D. Cal. Feb. 5, 2014) .................................33

*Freeman v. Time, Inc.*, 68 F.3d 285 (9th Cir. 1995) ....................................................................27

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001) ................................................................42

*FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010) ....................................................45

*FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972) ............................................45

*Gen. Signal Corp. v. MCI Telecomms. Corp.*, 66 F.3d 1500 (9th Cir. 1995) ............19

*Gerald Duncan Auto Sales, Inc. v. Russell*, 181 B.R. 616 (M.D. Ala. 1995) ............46

*Gray v. Toyota Motor Sales, U.S.A.*, 2012 WL 313703 (C.D. Cal. Jan. 23, 2012) ...............30, 33

*Hadley v. Kellogg Sales Co.* (*Hadley I*), 243 F. Supp. 3d 1074 (N.D. Cal. 2017) ......................39

*Hadley v. Kellogg Sales Co.* (*Hadley II*), 273 F. Supp. 3d 1052 (N.D. Cal. 2017) ...............20, 22

*Harrison v. Leviton Mfg. Co.*, 2006 WL 2990524 (N.D. Okla. Oct. 19, 2006) ...........................45

*Helton v. Am. Gen. Life Ins. Co.*, 946 F. Supp. 2d 695 (W.D. Ky. 2013) ..................44

*Herron v. Best Buy Co.*, 924 F. Supp. 2d 1161 (E.D. Cal. 2013) ...........................32, 33

*Hoey v. Sony Elecs. Inc.*, 515 F. Supp. 2d 1099 (N.D. Cal. 2007) .........................31, 33

*In re Arris Cable Modem Consumer Litig.*, 2018 WL 288085 (N.D. Cal. Jan. 4, 2018) ................................................................25, 27, 38

*In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353 (S.D.N.Y. Jul. 15, 2016) ................................................................44

*In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014) ............................12

*In re Premera Blue Cross Cust. Data Sec. Breach Litig. (Premera I)*, 198 F. Supp. 3d 1183 (D. Or. 2016) ................................................................33

*In re Sony Gaming Networks & Cust. Data Sec. Breach Litig.*, 903 F. Supp. 2d 942 (S.D. Cal. 2012) ................................................................26, 27

*Jarlstrom v. City of Beaverton*, 2014 WL 5462025 (D. Or. Oct. 27, 2014) .................15

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) ...............................23, 25, 41

*Kent v. Hewlett-Packard Co.*, 2010 WL 2681767 (N.D. Cal. July 6, 2010) ...............21

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) ........................12

*Krottner v. Starbucks Corp.*, 628 F.3d 1139 (9th Cir. 2010) .................................15

*Ladore v. Sony Comput. Entm't Am., LLC*, 75 F. Supp. 3d 1065 (N.D. Cal. 2014) ....................34

*Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267 (C.D. Cal. 2016) ...................17, 18, 34, 40

*Lozano v. AT&T Wireless Servs. Inc.*, 504 F.3d 718 (9th Cir. 2007) ...........................39

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ...................................................13, 18

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ...................................19

*McCoy v. Nestle USA, Inc.*, 173 F. Supp. 3d 954 (N.D. Cal. 2016) ............................32

*Morgan v. Harmonix Music Sys., Inc.*, 2009 WL 2031765 (N.D. Cal. Jul. 7, 2009)....................31

*Multifamily Captive Grp., LLC v. Assurance Risk Mgrs., Inc.*, 629 F. Supp. 2d 1135 (E.D. Cal. 2009) ........................................................37

*Myers v. BMW of N. Am., LLC*, 2016 WL 5897740 (N.D. Cal. Oct. 11, 2016) ...........................28

*Noll v. eBay Inc.*, 2013 WL 2384250 (N.D. Cal. May 30, 2013) .....................................34, 35, 36

*Oestreicher v. Alienware Corp.*, 322 F. App'x 489 (9th Cir. 2009)..............................31

*Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964 (N.D. Cal. 2008)..........................24, 29, 38

*Pardini v. Unilever U.S., Inc.*, 961 F. Supp. 2d 1048 (N.D. Cal. 2013) .......................40

*Rasmussen v. Apple Inc.*, 27 F. Supp. 3d 1027 (N.D. Cal. 2014) .................................29

*Reilly v. Ceridian Corp.*, 664 F.3d 38 (3d Cir. 2011) .................................................14

*Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101 (N.D. Cal. 2016) ........................23

*Salameh v. Tarsadia Hotel*, 726 F.3d 1124 (9th Cir. 2013)...........................................47

*Sanders v. Apple Inc.*, 672 F. Supp. 2d 978 (N.D. Cal. 2009) ..........................29, 32, 38

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ........................................................13

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998).......................................19

*Stewart v. Electrolux Home Prods., Inc.*, 304 F. Supp. 3d 894 (E.D. Cal. 2018)..............23, 29, 37

*Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075 (N.D. Cal. 2017) .....................32

*Swearingen v. Healthy Beverage, LLC*, 2017 WL 1650552 (N.D. Cal. May 2, 2017) .....................................................27

*Tidenberg v. Bidz.com, Inc.*, 2009 WL 605249 (C.D. Cal. Mar. 4, 2009).....................36

*Tietsworth v. Sears, Roebuck & Co.*, 720 F. Supp. 2d 1123 (N.D. Cal. 2010)..............22

*Warth v. Seldin*, 422 U.S. 490 (1975) .................................................................13, 18

*WeBoost Media S.R.L. v. LookSmart Ltd.*, 2014 WL 2621465 (N.D. Cal. June 12, 2014) ...........................................................................................................................37

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ...............................................................14

*Williamson v. Apple, Inc.*, 2012 WL 3835104 (N.D. Cal. Sept. 4, 2012)......................26

*Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136 (9th Cir. 2012)............................28, 31

*Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117 (C.D. Cal. 2010).........................23

*Zepeda v. PayPal, Inc.*, 777 F. Supp. 2d 1215 (N.D. Cal. 2011)..................................23

## STATE CASES

*Bardin v. DaimlerChrysler Corp.*, 39 Cal. Rptr. 3d 634 (Ct. App. 2006) ....................40

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527 (Cal. 1999)...........38

*Colgan v. Leatherman Tool Grp., Inc.*, 38 Cal. Rptr. 3d 36 (Ct. App. 2006)..............26

*Daugherty v. Am. Honda Motor Co.*, 51 Cal. Rptr. 3d 118 (Ct. App. 2006), *as modified* (Nov. 8, 2006) ...............................................................................................33

*In re Tobacco II Cases*, 207 P.3d 20 (Cal. 2009) .......................................................27

*Paul v. Providence Health Sys.-Or.*, 273 P.3d 106 (Or. 2012)....................................45

*Prakashpalan v. Engstrom, Lipscomb & Lack*, 167 Cal. Rptr. 3d 832 (Ct. App. 2014), *as modified on denial of reh'g* (Feb. 27, 2014) ...........................................36

*Robinson Helicopter Co., Inc. v. Dana Corp.*, 102 P.3d 268 (Cal. 2004) ..............36, 37

*Seely v. White Motor Co.*, 403 P.2d 145 (Cal. 1965) (en banc)...................................36

*Yates Bros. Motor Co. v. Watson*, 548 S.W.3d 662 (Tex. App. 2018) .........................46

## STATUTES

73 Pa. Cons. Stat. § 201-2.............................................................................................43

73 Pa. Cons. Stat. § 201-9.2..........................................................................................46

815 Ill. Comp. Stat. 510/3.............................................................................................40

Cal. Com. Code § 2314............................................................................................19, 22

California False Advertising Law (FAL), Cal. Bus. & Prof. Code § 17500 *et seq.* .............. passim

California Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq.* .................................................................................................................... passim

Consumers Legal Remedies Act (CLRA), Cal. Civ. Code § 1750 *et seq.*............................ passim

Federal Trade Commission Act, 15 U.S.C. § 45 .................................................................42, 45

Fla. Stat. § 501.211 ....................................................................................................................41

Haw. Rev. Stat. § 481A-4 ...........................................................................................................40

Ind. Code § 24-5-0.5-10(b) ........................................................................................................46

Me. Stat. tit. 10, § 1213..............................................................................................................40

Minn. Stat. § 325D.45 ................................................................................................................40

Miss. Code Ann. § 75-24-5 .........................................................................................................43

Miss. Code Ann. § 75-24-15 .......................................................................................................46

Neb. Rev. Stat. § 59-1602 ...........................................................................................................43

Neb. Rev. Stat. § 87-303 .............................................................................................................40

N.Y. Gen. Bus. Law § 349...........................................................................................................41

Ohio Rev. Code Ann. § 4165.02 .................................................................................................43

Tex. Bus. & Com. Code § 17.50..................................................................................................41

Wis. Stat. § 100.18......................................................................................................................43

## OTHER AUTHORITIES

Fed. R. Civ. P. 9(b) ....................................................................................................23, 25, 38, 41

Fed. R. Civ. P. 12(b)(6)...............................................................................................................12

*In re Cliffdale Assocs.*, 103 F.T.C. 110, 1984 WL 565319 (1984)................................................42

*In re Int'l Harvester Co.*, 104 F.T.C. 949, 1984 WL 565290 (1984) ......................................42, 43

Restatement (Third) of Torts: Products Liability §§ 1, 21 (Am. Law Inst. 1998)........................34

Pursuant to LR 7-1(a), undersigned counsel for Intel Corporation certifies that the parties discussed this motion in good faith via telephone conference on October 18, 2018, and were unable to reach a resolution.

## MOTION

Defendant Intel Corporation respectfully moves the Court for an order dismissing this consolidated action with prejudice pursuant to Federal Rule of Civil Procedure 12(b). For the reasons stated in the accompanying Legal Memorandum, the Court lacks subject-matter jurisdiction, Fed. R. Civ. P. 12(b)(1), and the Consolidated Class Action Allegation Complaint (Docket No. 115) ("Complaint") fails to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6). Oral argument is requested.

## LEGAL MEMORANDUM

### INTRODUCTION

The Complaint charts a change in course for Plaintiffs. The products-liability claims (strict liability and negligence) that featured prominently in the individual complaints are gone altogether. That is not surprising, given that such claims require personal injury or property damage, neither of which is, or could be, alleged here. Gone too are all claims for breach of express warranty, because Intel has never promised that it had the ability to anticipate every future discovery in the area of cybersecurity. Now this MDL is principally a consumer-fraud case couched in the language of products liability, in which Intel is alleged to have misled the public for decades about its supposedly defective product design by stating (for example) that its processors had "cutting-edge security." Compl. ¶ 217. Intel's purported misrepresentations, however, are not remotely actionable: Plaintiffs merely identify a handful of advertisements, none of which any Plaintiff allegedly saw, and each of which was accompanied by the express

statement (mentioned nowhere in the Complaint) that "*[n]o computer system can be absolutely secure.*"[1] And because, as is discussed in detail in the Complaint, Intel never promised perfect security and was open about the existence of security vulnerabilities in its products, Plaintiffs have failed to identify any plausible omission or act of concealment.

Plaintiffs concede that the new class of security vulnerabilities that gave rise to this litigation were "discovered" and "identified" for the first time in 2017 and 2018. Compl. ¶¶ 255, 266, 279. As a result, Plaintiffs focus on elements of processor architecture that have been in place for decades, like shared cache memory, which has been widely known to be subject to "side channels" when functioning as designed. (The recent discovery was not the existence of those side channels, but rather the ability to exploit them in a previously unknown way that circumvents other forms of protection.) Plaintiffs allege that Intel knew of the risks of side channels and concealed them. But as the Complaint describes, the supposed "defects" Plaintiffs cite were disclosed and discussed in the public domain throughout the putative class period, not only in "more than a decade of research papers" on a subject that has attracted "large public interest," but also in Intel's own patent applications, public reference manuals, and white papers. *See* Compl. ¶¶ 215, 232, 242–243, 285, 288–289; Ex. 2 (Onur Aciiçmez et al., *Predicting Secret Keys Via Branch Prediction* (2007) (cited at Compl. ¶ 238)), at 2. Thus, a products-liability theory without any injury has turned into a consumer-fraud theory without any fraud—Plaintiffs' principal theory cannot get out of the starting gate, defeated by their own allegations.

The Complaint has many other failings, too:

---

[1] *See, e.g.*, Ex. 1 (Intel, Top Reasons to Modernize Your Agency (2016), https://www.intel.com/content/dam/www/public/us/en/documents/sales-briefs/modernize-with-6th-gen-core-vpro-brief.pdf (last visited Oct. 19, 2018) (cited at Compl. ¶ 217 n.54)). All exhibits are to the Declaration of Steven T. Lovett In Support of Defendant Intel Corporation's Motion to Dismiss. These documents are all either proper subjects of judicial notice or incorporated into the Complaint by reference. *See infra* p. 12 (Standard of Review).

*First*, all named Plaintiffs lack Article III standing because they fail to allege a cognizable injury in fact. The risk that Plaintiffs may be hacked in the future is too speculative to suffice; Plaintiffs admit that they have deployed patches for the newly discovered vulnerabilities, and do not allege any reported exploit using these methods. That necessarily means that neither purported expenses (*e.g.*, personnel time and costs) incurred to address that speculative risk, nor claims of overpayment in light of that speculative risk, can support standing either. Of the 95 named Plaintiffs, only one alleges any performance impact at all on its devices associated with patches for Spectre, Meltdown, or Foreshadow, and that Plaintiff's allegations are far too vague and attenuated to support subject-matter jurisdiction.

*Second*, there has been no breach of the implied warranty of merchantability. Plaintiffs are not in privity with Intel, which alone is fatal to such claims under California law. Moreover, Plaintiffs allege no facts to show that Intel CPUs are unfit for their ordinary purpose of computing. There also is no allegation that any named Plaintiff has suffered a data breach, nor any allegation that any named Plaintiff has stopped using her computer out of fear for her security. Indeed, five named Plaintiffs bought their devices *after* the recently discovered security vulnerabilities became public knowledge, which itself defeats any claim that Intel's CPUs are unfit for ordinary computing purposes.

*Third*, Plaintiffs fail to plead facts sufficient to state a claim for violation of any state statute or for common law fraud, whether under California law (for a putative nationwide class) or under 57 other alleged state-law causes of action that they plead in the alternative. Plaintiffs plead no actionable misrepresentation by Intel at all, let alone any misrepresentation on which any Plaintiff relied. Nor do Plaintiffs plead any omission of a material fact that Intel was under a duty to disclose. On the contrary, the Complaint establishes on its face that Intel repeatedly and

openly disclosed security risks in its products, as well as its strategies to address those risks. No reasonable consumer would have understood that Intel's chips were impervious to every potential security threat, as Plaintiffs suggest Intel promised. And Plaintiffs' conclusory allegations of unfair, unlawful, and unconscionable conduct, all of which are purely duplicative of their fraud claims, do not salvage these counts. The common-law fraud claims also fail under the economic loss rule because no Plaintiff alleges personal injury or property damage.

*Fourth*, Plaintiff's unjust enrichment claim also fails, because it too sounds in fraud, and where fraud claims fail, an unjust enrichment claim based on the same factual allegations cannot be sustained.

For all of these reasons, the Complaint should be dismissed.

## BACKGROUND

### A.      Intel's CPUs.

Intel designs and manufactures microprocessors, which are integrated circuits that perform all the functions of a computer's central processing unit, or CPU. Compl. ¶ 136.[2] In 1995 Intel introduced the first commercially viable microprocessor to use out-of-order execution, speculative execution, and branch prediction. *Id.* ¶¶ 168–169. These architectural features, which allow the processor to make more efficient use of processing and memory resources and therefore to deliver superior performance, *see id.* ¶¶ 170–180, have been widely adopted across the industry, *see id.* ¶ 182.

As microprocessors have increased in complexity and performance, cybersecurity threats and cybersecurity research have advanced alongside. And where more advanced designs capture

---

[2] The facts in this Background section are taken from the allegations of the Complaint, which are assumed true for purposes of this motion only; from other sources incorporated in the Complaint; and from facts subject to judicial notice.

efficiencies through the sharing of resources, *see, e.g.*, *id.* ¶¶ 198, 199, 205, 209 (explaining that shared cache design contributes to improved performance and power consumption), those same enhancements may present new security risks. As Plaintiffs acknowledge, "any time a resource is shared, there is a possibility information can leak." *Id.* ¶ 235. Intel has publicly noted—as Plaintiffs also acknowledge—that if developers want to enhance security, they must devote system resources to security functions, with a corresponding impact on computing performance. *See id.* ¶ 215 (Intel "explained" that "when encryption is turned on, performance will degrade"); *see also id.* ¶ 200 (citing Intel Technology Journal, where Intel architects publicly described the tradeoff between performance and other design considerations: in designing the Core architecture, "[a]ll design decisions [we]re weighed against performance impact").

The discovery of "new vulnerabilities," which are reported by researchers to technology companies "on a regular basis," followed by the development of "mitigation techniques," *see* Ex. 4 (Ralf Hund et al., *Practical Timing Side Channel Attacks Against Kernel Space ASLR* (2013) (cited at Compl. ¶ 240 n.69)), at 1, is a fact of life in our connected world, as any smartphone user knows. Intel regularly discloses new security vulnerabilities, with dozens of security advisories published on its website (a source that Plaintiffs repeatedly cite, *see, e.g.*, Compl. ¶ 217), dating back to 2007.[3] The United States Computer Emergency Readiness Team ("US-CERT"), an organization within the Department of Homeland Security, does the same.[4] The

---

[3] *See* Ex. 5 (Intel Product Security Center Advisories, https://www.intel.com/content/www/us/-en/security-center/default.html (last visited Oct. 19, 2018)). Intel has asked the Court to take judicial notice only that this information appears on its website.

[4] Ex. 18 (U.S. Computer Emergency Readiness Team, Bulletins, https://www.us-cert.gov/ncas/bulletins (last visited Oct. 19, 2018)) (providing weekly updates on newly-discovered security vulnerabilities). The week before Spectre and Meltdown were publicly disclosed in January 2018, US-CERT disclosed 15 high-severity vulnerabilities. Ex. 19 (U.S. Computer Emergency Readiness Team, Vulnerability Summary for the Week of December 25, 2017, https://www.us-cert.gov/ncas/bulletins/SB18-001 (Jan. 1, 2018)).

Complaint documents Intel's security efforts in developing and weighing solutions to new security threats that have arisen over time, *see, e.g.*, Compl. ¶ 212, as far back as 1982. For example, Intel implemented "privilege levels" and "virtual memory" to regulate programs' access to system resources. *See id.* ¶¶ 142–145.

**B.** **The Known Research Regarding Cache-Timing Side Channels.**

The term "side channel" in computer security refers to a theoretical method—whether actually exploited by anyone or not—of obtaining protected information through the observation of physical aspects of a system. *See* Compl. ¶ 225. A "timing side channel" may exist whenever any set of operations takes a varying amount of time—for example, a "cache timing side channel" results from the fact that accessing data in the cache is faster than accessing other memory. *Id.* ¶ 227. So long as it takes more time for the processor to do one thing than to do another, in principle an observer may compare the timing of those two actions and try to learn something through that comparison. *Id.* ¶ 226. By definition, side channels involve observation of a normally functioning computer. Timing-based side channels could be eliminated if every action was forced to take exactly the same amount of time to complete, but then every action could be no faster than the slowest one. Microprocessor designers and researchers have therefore worked for many years on various strategies to balance security against performance, based on the known and potential risks identified to that point.

Plaintiffs describe the history of that research. *See id.* ¶¶ 231–254. As Plaintiffs acknowledge, cache-timing side channels were well known as far back as the early 1990s, *id.* ¶ 231, through public research papers available to anyone, including the sophisticated manufacturers (such as Dell, HP, Apple, Microsoft, Sony, and others) that purchased Intel's processors and installed them in devices ultimately sold to Plaintiffs, *see id.* ¶¶ 15–126. Plaintiffs outline at length "more than a decade" of such papers, *id.* ¶ 242, and note that

"discussions of the fundamental problems that underlie the vulnerabilities appear in literature from the early- to mid-1990s," *id.* ¶ 231. For example, in 2005, researchers published an article "describ[ing] several software side-channel attacks based on inter-process leakage through the state of the CPU's memory cache[,]" including "manipulat[ing] the state of the cache" to "observe the execution time of the subsequent" process. Ex. 6 (Dag Arne Osvik et al., *Cache Attacks and Countermeasures: the Case of AES* (2005) (cited at Compl. ¶ 234 n.65)), at 1, 9.

The titles alone of the articles that Plaintiffs cite show how extensively this issue was explored:

- Ex. 3 (Thomas Ristenpart et al., *Hey, You, Get Off of My Cloud: Exploring Information Leakage in Third-Party Compute Clouds* (2009) (cited at Compl. ¶ 212 n.50)), at 1 (highlighting potential risk of side channel attacks that "might penetrate the isolation between VMs . . . and violate customer confidentiality").

- Ex. 4 (Hund et al., *Practical Timing Side Channel Attacks Against Kernel Space ASLR* (cited at Compl. ¶ 240 n.69)), at 13 (discussing "timing-based side channel attack[s] against kernel space ASLR" that arise from the "fact that parts of the hardware (such as caches and physical memory) are shared between both privileged and non-privileged mode").

- Ex. 7 (Zhenghong Wang et al., *Covert and Side Channels due to Processor Architecture* (2006) (cited at Compl. ¶ 236)) (highlighting side channel that exists when processor speculatively executes past an exception).

- Ex. 8 (Yuval Yarom et al., *FLUSH+RELOAD: a High Resolution, Low Noise, L3 Cache Side-Channel Attack* (2013) (cited at Compl. ¶ 239)), at 1 (identifying side-channel attack that "targets the Last-Level Cache" such that "the attack program and the victim do not need to share the execution core").

Plaintiffs also concede Intel's own expansive public activity regarding these issues, including published white papers and patent filings examining the risks of cache-timing side channel attacks and proposing approaches to address them. Compl. ¶¶ 215, 232, 243, 285, 288, 289. Intel also designed hardware features—including the AES-NI set of cryptography instructions—that were specifically intended to address side channels. *See id.* ¶ 215.

As the research papers cited by Plaintiffs acknowledge, side-channel mitigations are "typically either impractical . . . , application-specific, or insufficient for fully mitigating the

risk." Ex. 3 (Ristenpart et al. (cited at Compl. ¶ 212 n.50)), at 12. Moreover, anticipating "*all possible side-channels*" is "a tall order, especially in light of the deluge of side channels observed in recent years." *Id.*; *see also* Ex. 4 (Hund et al. (cited at Compl. ¶ 240 n.69)), at 12 (describing potential mitigations and noting that several "would significantly degrade system performance").

### C. The New Class of Side Channel Vulnerabilities: Spectre, Meltdown, and Foreshadow.

In June 2017, Intel learned that a previously unknown side-channel vulnerability, which came to be known as "Spectre," had been discovered. Compl. ¶ 279.[5] Two related vulnerabilities, now known as "Meltdown" and "Foreshadow," were discovered in July 2017 and January 2018, respectively. *Id.* ¶¶ 255, 266. In concept, these vulnerabilities may allow a malicious hacker to exploit the speculative execution feature of Intel's processors to infer sensitive information. *Id.* ¶¶ 255–256, 266, 280; *see id.* ¶¶ 225–226. Speculative execution has been a bedrock feature of microprocessors, both Intel's and others', since 1995, *id.* ¶¶ 168, 169, 182—*i.e.*, throughout the period of time in which the exhaustive research that Plaintiffs describe was conducted. But Plaintiffs do not allege that anyone (including the many sophisticated researchers whose papers Plaintiffs summarize) identified this particular class of side channel vulnerabilities before the June 2017 discovery of Spectre. The Spectre vulnerability is present in virtually all modern microprocessors. *Compare id.* ¶¶ 265, 278 (alleging Intel's competitors are not vulnerable to Meltdown and Foreshadow), *with id.* ¶¶ 279–282 (no such allegation for Spectre).

---

[5] The Complaint omits entirely the Google researcher (Jann Horn) who discovered this new class of vulnerability, as well as Google Project Zero ("GPZ"), the team of researchers to which Horn belongs, who work full-time on these sorts of issues. Whatever the tactical reason for that striking omission, the activity of Horn and GPZ features expressly in individual complaints consolidated into this MDL, including those filed by Interim Lead Plaintiffs' Counsel. *See, e.g.*, *Bernstein* Compl. ¶ 26 & n.8 (Case No. 3:18-cv-00670-SI).

"[A]fter Intel learned of Meltdown and Spectre," it and others, including Microsoft, worked to develop and roll out patches. *Id.* ¶¶ 299–301. Plaintiffs allege that these mitigations can impair CPU performance under certain conditions, *see id.* ¶¶ 303–314, but concede that "how much the system is impacted depends on the characteristics of the application being tested," *id.* ¶ 313. Plaintiffs do not allege any actual exploitation has taken place using this new class of side channel vulnerabilities since they were publicly revealed in January 2018.

Patches were made available for Meltdown and Spectre in early 2018, *see id.* ¶ 299, and more recently for Foreshadow as well, *see id.* ¶ 309. While patches were being developed, Intel and other industry participants followed the principles of "coordinated disclosure" (sometimes called "responsible disclosure"), pursuant to which newly discovered security vulnerabilities are not publicly disclosed until mitigations are available. *See* Ex. 9 (Lipp et al., *Meltdown* (2018) (cited at Compl. ¶ 264)), at 15 (acknowledging Intel's responsible disclosure process and Intel's "professional handling" of issues surrounding the discovery of Spectre and Meltdown). Plaintiffs' cited research notes the importance of "responsible vulnerability disclosure." Ex. 10 (Jang et al., *Breaking Kernel Address Space Layout Randomization with Intel TSX* (2016) (cited at Compl. ¶ 252)), at 12.

### D. Intel's Marketing Statements.

In its advertisements, Intel consistently has reminded shoppers that "No computer system can be absolutely secure." *See, e.g.*, Ex. 1 (cited at Compl. ¶ 217 n.54). The same disclaimer appears on every one of the web pages cited at Compl. ¶¶ 217–219, nn.54–59. Exs. 1, 13–17. Plaintiffs repeatedly cite those advertisements—but omit any mention of that language. Instead, Plaintiffs focus on generalized marketing statements, such the ability of one Intel processor to "protect the OS kernel," Compl. ¶ 216, or another processor's "cutting-edge security," helping consumers feel "safe and secure at home" with "hardware-based security features to *help* keep

[their] system[s] and data free from malware, hacking, viruses, and prying eyes," *id.* ¶ 217 (emphasis added). The Complaint also cites a statement in a brochure regarding Intel's authentication technology that Intel CPUs are "secure to the core" and that they "'stand out' by 'extending protection outside the operating system and into the hardware layer.'" *Id.* ¶ 218.

With respect to performance, Plaintiffs allege that Intel implemented its "Intel Inside" campaign to "condition[] consumers to look to Intel for superior performance and reliability." *Id.* ¶ 189. And the Complaint cites a statement from an Intel PowerPoint presentation that described Intel's "Core" microarchitecture as "[d]esigned for efficiency and optimized performance across a range of market segments and power envelopes." *Id.* ¶ 195.

### E. The Named Plaintiffs.

The Complaint consolidates the claims of 95 named Plaintiffs. The large majority are individuals who purchased laptops or other devices (such as tablets or desktop computers) manufactured by Dell, HP, Apple, Microsoft, Sony, Lenovo and others. *See generally* Compl. ¶¶ 15–126. Some others are corporate entities, including medical-service providers and providers of computing services. *See, e.g.*, *id.* ¶¶ 36–38, 103. One is a municipality. *Id.* ¶ 100. Some of these entity Plaintiffs allege a legal obligation (for example, under Health Insurance Portability and Accountability Act regulations) to maintain certain data securely. *See, e.g.*, *id.* ¶ 66.

No named Plaintiff alleges that she purchased any CPU directly from Intel. No named Plaintiff alleges any actual hack or data breach associated with the Spectre, Meltdown or Foreshadow vulnerabilities. No named Plaintiff alleges an inability to use her device normally since this new class of security vulnerabilities was discovered, or since the associated patches were applied. The named Plaintiffs allege, in identical or near-identical language, that they have applied "the patches released to date." *See generally id.* ¶¶ 15–126. But 94 of the 95 named

Plaintiffs make no allegation of any performance reduction on their devices; the one exception (DK Systems, LLC) alleges nothing more specific than that it "has experienced performance degradation on various Intel-based systems, including reduced speed." *Id.* ¶ 122.

Instead, the named Plaintiffs allege, in identical or near-identical language, that they "expected the[ir] processor[s] to function as Intel advertised and represented and to adequately secure stored data from exploits." *See generally id.* ¶¶ 15–126. They allege that if they had known then what they know now, they "would not have bought" their devices, "or would have paid less for [them]." *Id.*[6] But multiple named Plaintiffs purchased their devices months *after* January 2018, when (as Plaintiffs acknowledge, *id.* ¶ 279), the "public" became "aware" of this new class of side channel security vulnerabilities. *See id.* ¶ 15 (James Simms bought his Dell laptop in April/May 2018); *id.* ¶ 22 (Christopher Gulley bought his HP laptop in February 2018); *id.* ¶ 24 (Gloria Park bought her Dell laptop in May 2018); *id.* ¶ 82 (Ronald Moreno bought his Dell desktop in June 2018); *id.* ¶ 111 (Matthew Ficarelli bought his Dell laptop in April 2018). None of these named Plaintiffs—not even Gloria Park and Ronald Moreno, who incontrovertibly were aware of these security vulnerabilities when they made their purchases, *having already*

---

[6] No named Plaintiff alleges what alternative computing device she would have purchased. As the Court knows, 6/15/18 Tr. (Docket No. 107) at 13–14, substantially similar litigation is pending against both AMD and Apple (which uses Arm-based processors). In the AMD litigation, the plaintiffs—represented by lead counsel that also serves on the Interim Plaintiffs' Steering Committee in this MDL—allege that "all of the processors manufactured and sold by AMD since 1995 are defective," and that "[h]ad [they] known about the defective nature of AMD processors, they would not have purchased or leased" them. Ex. 11 (*Hauck* Compl.) ¶¶ 67, 143. In the Apple (Arm) litigation, the plaintiffs—whose lead counsel, too, is present in this MDL, having filed the *Dean* and *Rinn* individual actions consolidated for pre-trial proceedings—likewise allege that had they "known of the facts concealed by Apple concerning the Defects, [they] would not have purchased the iDevices or would have paid less for" them. Ex. 12 (*In re Apple Processor Litig.* Compl.) ¶ 128.

*sued Intel by that time*[7]—alleges that she paid less because of these publicly-disclosed security issues.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While the Court must accept all well-pleaded allegations in the complaint as true and draw reasonable inferences in favor of the plaintiff, it should not credit legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Whether the complaint states a plausible claim is "context-specific," requiring the Court "to draw on its judicial experience and common sense." *Id.* at 679.

In addition to the allegations of the Complaint and facts subject to judicial notice, the Court may consider, "in [their] entirety," documents incorporated into the Complaint by reference. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051, 1058 n.10 (9th Cir. 2014). This rule "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). Here, the Complaint relies on various Intel advertisements, as well as published articles about computer security. Intel has attached those materials, where relevant, as exhibits to this motion. By separate motion, Intel is also requesting that the Court take judicial notice of similar allegations against AMD and against Apple (related to Apple's use of Arm microarchitectural designs), and of the fact that certain

---

[7] Ms. Park sued Intel in February 2018, *see Park* Compl. ¶ 13 (Case No. 3:18-cv-00696-SI), then bought the laptop noted above in May. Mr. Moreno sued Intel in May 2018, *see Blau* Compl. ¶ 28 (Case No. 3:18-cv-00820-SI), then bought the desktop noted above a month later, in June.

information is publicly disclosed on one of Intel's website pages (where Plaintiffs have cited to many other such pages) and on the US-CERT website.

## ARGUMENT

## I. PLAINTIFFS LACK STANDING.

The Complaint should be dismissed for lack of subject-matter jurisdiction because none of the named Plaintiffs alleges a cognizable injury. At the pleading stage, a plaintiff bears the burden of clearly alleging facts showing an injury in fact caused by the challenged conduct. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To satisfy the injury-in-fact requirement, the plaintiff must demonstrate an injury that is both "particularized" and "concrete." *Id.* at 1545. For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way," and cannot be generalized or undifferentiated. *Id.* at 1548. For an injury to be "concrete," it must be "'real,' and not 'abstract,'" *id.* at 1548–49 (citations omitted), meaning it cannot merely be "speculative" or "possible," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis and internal quotation marks omitted). To satisfy the causation requirement, Plaintiffs must plead "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (alterations in original) (citation and internal quotation marks omitted). These requirements apply equally in the class action context, where named plaintiffs "must allege and show that they personally have been injured." *Warth v. Seldin*, 422 U.S. 490, 502 (1975).

Plaintiffs allege three types of injury here: a risk of future hacking (or the costs allegedly required to mitigate such risk), economic loss, and risk of performance degradation. None is sufficient to confer standing on the facts alleged. And because no named Plaintiff alleges any

anticipated injury from a continuing or imminent future violation of law by Intel, Plaintiffs

cannot establish standing to seek injunctive relief either.

A.    A Risk of Future Hacking Is Too Speculative To Qualify as Injury In Fact.

Plaintiffs allege harm because vulnerabilities in Intel's CPUs may "allow attackers to

steal sensitive data, including passwords and banking information."  Compl. ¶ 294.  But

Plaintiffs do not allege that any of *their* data has been stolen or that any of *their* CPUs have been

hacked—in fact, they do not allege *any* malicious exploitation of the Spectre, Meltdown, or

Foreshadow vulnerabilities by anyone in the real world.  The most Plaintiffs say is that they face

a future risk of being hacked, and have taken steps to mitigate that risk.  That does not constitute

an injury in fact for Article III standing.

The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly*

*impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not

sufficient."  *Clapper*, 568 U.S. at 409 (alteration in original) (quoting *Whitmore v. Arkansas*, 495

U.S. 149, 158 (1990)); *see Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) (holding

"allegations of hypothetical, future injury" from data breach, without allegations of actual data

misuse, did not establish standing).  Accordingly, the Ninth Circuit has affirmed dismissal for

lack of subject-matter jurisdiction when a plaintiff alleges that a device presents hypothetical

security risks but no theft or hacking has actually occurred.  *See Cahen v. Toyota Motor Corp.*,

717 F. App'x 720, 723 (9th Cir. 2017) (affirming dismissal where plaintiffs "[did] not allege that

any of their vehicles ha[d] actually been hacked," even though the plaintiffs alleged that hacking

was an "imminent eventuality," and that the defendants knew "for a long time about these

security vulnerabilities" yet "nonetheless marketed their vehicles as safe" (internal quotation

marks omitted)).[8]  *Cahen*, like *Clapper*, rests on the premise that Article III standing does not

exist when the risk of harm is speculative.  *See Cahen*, 717 F. App'x at 723; *see also Cahen v.*

*Toyota Motor Corp.*, 147 F. Supp. 3d 955, 972 (N.D. Cal. 2015) (underlying district court

opinion; dismissing case for lack of standing where plaintiffs failed to allege a credible risk of

future identity theft sufficient for injury in fact, and nowhere alleged theft, malicious breach, or

widespread accidental publication of sensitive personally identifying information).

It is now more than nine months after the public disclosure of Spectre and Meltdown, yet

the Complaint alleges no hack of *anyone* based on those vulnerabilities.  Nor will any Plaintiff be

injured in the future unless a criminal actor (i) figures out, at some point, not only how to exploit

these complex security vulnerabilities outside of the lab but also how to circumvent the patches

that the named Plaintiffs have applied, *see* Compl. ¶¶ 15–126 (alleging implementation of

"patches released to date"); (ii) targets one of the named Plaintiffs specifically; (iii) manages to

extract not just random bits of information from a named Plaintiff's cache, but specific

confidential information; and (iv) uses the information obtained to commit identity fraud.  This

theory of standing, which "relies on a highly attenuated chain of possibilities," is insufficient as a

matter of law.  *Clapper*, 568 U.S. at 410; *see also Jarlstrom v. City of Beaverton*, 2014 WL

5462025, at *3 (D. Or. Oct. 27, 2014) (for Article III standing, a plaintiff must allege conduct

that creates "a credible threat of imminent injury *to him*").

---

[8] The Ninth Circuit's decision in *Krottner v. Starbucks Corp.*, 628 F.3d 1139 (9th Cir. 2010), is
instructive on this point.  There, the court recognized standing where an unsecured laptop
containing a plaintiff's unencrypted personal data had been *stolen*, but noted that "if no laptop
had been stolen," the threat of harm necessary for standing would be "far less credible."  *Id.* at
1143.  That is precisely the situation here—Plaintiffs do not allege that any bad actor has
exploited the alleged vulnerabilities in the real world, meaning that any threat of harm is purely
speculative.  And even *Krottner* pre-dates by three years the Supreme Court's further tightening
of future-injury standing in *Clapper*.

A few named Plaintiffs that are enterprises or governmental entities claim to have incurred "time and costs" in connection with activity such as "increase[d] monitoring" of their devices, or to "implement mitigation and remedial measures." *See, e.g.*, Compl. ¶¶ 38, 63, 69. But a plaintiff "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 402. "If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id.* at 416.

**B.      Plaintiffs Have Not Plausibly Alleged Overpayment.**

Next, Plaintiffs allege that if they had only known of the purported defects in Intel's CPUs, they "would not have bought" products containing those CPUs "or would have paid less for" those devices. Compl. ¶¶ 15–126. But Plaintiffs plead no facts establishing an economic loss sufficient for standing. *Cahen*, 717 F. App'x at 723; *Birdsong v. Apple, Inc.*, 590 F.3d 955, 958 (9th Cir. 2009).

*Cahen* is again instructive. There, the plaintiffs sued multiple automobile manufacturers on the premise that "their vehicles are vulnerable to being hacked because their vehicles' computer systems lack security," resulting in those vehicles being "worth less than what they paid for them due to these hacking vulnerabilities." 717 F. App'x at 723. The Ninth Circuit held that the plaintiffs' overpayment theory of injury was "not credible," as the "plaintiffs have not, for example, alleged a demonstrable effect on the market for their specific vehicles based on documented recalls or declining Kelley Bluebook values . . . [n]or have they alleged a risk so immediate that they were forced to replace or discontinue using their vehicles, thus incurring out-of-pocket damages." *Id.* (alterations in original) (internal quotation marks omitted). The Ninth Circuit added that "[n]early 100% of cars on the market include wireless technologies that could pose vulnerabilities to hacking or privacy intrusions." *Id.* (alterations in original) (internal

quotation marks omitted). Thus, the Ninth Circuit concluded, "plaintiffs have only made conclusory allegations that their cars are worth less and have not alleged sufficient facts to establish Article III standing." *Id.* at 723–24; *see also Cahen*, 147 F. Supp. 3d at 971 (same holding).

Similarly, in *Birdsong*, the plaintiffs argued that their iPods were defective because the absence of certain safety features caused users to face "an unreasonable risk of noise-induced hearing loss." 590 F.3d at 956. The plaintiffs claimed no physical injury but instead argued, as here, that this alleged defect made the iPods worth less than what they paid. *Id.* at 961. The Ninth Circuit held that "the alleged loss in value does not constitute a distinct and palpable injury that is actual or imminent because it rests on a hypothetical risk of hearing loss to other consumers who may or may not choose to use their iPods in a risky manner." *Id.*; *see also Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267, 1283 (C.D. Cal. 2016) (rejecting economic loss as basis for standing when plaintiffs "have pled only a conjectural and hypothetical injury").

*Cahen* and *Birdsong* apply fully here. Just as in those cases, Plaintiffs' allegations of economic injury are speculative. Plaintiffs do not and cannot allege a "demonstrable effect on the market," *Cahen*, 717 F. App'x at 723, because their allegations of security vulnerabilities "rest[] on a hypothetical risk," *Birdsong*, 590 F.3d at 961—and moreover, one that is present in "[n]early 100% of [CPUs] on the market," *Cahen*, 717 F. App'x at 723 (first alteration in original); *see* Ex. 11 (*Hauck* Compl.) ¶¶ 67, 143; Ex. 12 (*In re Apple Processor* Compl.) ¶ 128. Indeed, the Complaint itself demonstrates the implausibility of Plaintiffs' allegations of overpayment, where no named Plaintiff is alleged to have discontinued use of the devices at issue, where five named Plaintiffs purchased such devices *after* the Spectre and Meltdown side

channel security vulnerabilities were publicly disclosed, and where two of those five bought new devices with Intel processors even after suing Intel. *See supra* note 7 and accompanying text.

### C. Plaintiffs Have Not Sufficiently Alleged Diminished Performance In Their Own Devices.

The Complaint alleges that the mitigations developed by Intel and others cause diminished CPU performance, but acknowledges that "[e]xactly how much the system is impacted depends on the characteristics of the application being tested." Compl. ¶¶ 313–314. Indeed, 94 out of 95 named Plaintiffs allege no performance impact on their own devices at all. The one remaining named Plaintiff, DK Systems, LLC, alleges nothing more than that it has "experienced performance degradation on various Intel-based systems, including reduced speed." *Id.* ¶ 122.[9] These vague allegations, and the Complaint's generalized allegations of theoretical performance degradation, *id.* ¶¶ 303–314, are insufficient as a matter of law to confer standing where no named Plaintiff has made plausible, personal allegations of injury, *see Lujan*, 504 U.S. at 560.

Article III mandates that "[a] federal court's jurisdiction . . . can be invoked only when the plaintiff *himself* has suffered some threatened or actual injury resulting from the putatively illegal action." *Warth*, 422 U.S. at 499 (emphasis added) (internal quotation marks omitted). After all, "that other people were injured does not establish any particularized injury as to *these* Plaintiffs." *Lassen*, 211 F. Supp. 3d at 1280. This is particularly so when the nature of an injury concededly is dependent upon the circumstances of a particular user, as is the case here. *See* Compl. ¶ 313; *see also, e.g.*, *Birdsong*, 590 F.3d at 960–61 (no standing where "plaintiffs merely

---

[9] Gloria Park and Christopher Gulley purchased new devices *after* January 2018 because their earlier devices "became unusable" (Mr. Gulley) or had "increasing performance problems" (Ms. Park), in each case for unspecified reasons. Compl. ¶¶ 22, 24. As noted previously, Ms. Park had already sued Intel by that time. *See supra* note 7.

assert[ed] that *some* iPods have the 'capability' of producing unsafe levels of sound," but did not allege that their own iPods had done so (emphasis added) (citation omitted)).

### D. No Plaintiff Has Standing To Seek Injunctive Relief.

Standing to seek injunctive relief against Intel would require Plaintiffs to plausibly allege that they will be injured by a continuing violation or imminent future violation of law. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108–09 (1998). Plaintiffs' "expect[ation] that Intel will continue to misrepresent or conceal defects," Compl. ¶ 329, is not based on any supporting factual allegations. Intel has never promised that its products are impervious to attack—to the contrary, Intel commonly discloses new vulnerabilities that have come to its attention. *See* Ex. 5 (Intel Product Security Center Advisories); *see also infra* Section II.B.1. There is no basis for an injunction here.

## II. PLAINTIFFS FAIL TO STATE ANY NATIONWIDE CLAIM.

Plaintiffs assert seven counts under California law on behalf of a putative nationwide class. Compl. ¶ 127. For the reasons described below, all of these claims fail.[10]

### A. Plaintiffs Fail To State an Implied Warranty Claim (Count I).

Plaintiffs first assert that Intel violated the implied warranty under California law that goods sold pursuant to a contract are "merchantable." *See* Cal. Com. Code § 2314(1). As a threshold matter, however, Plaintiffs have not even attempted to allege privity of contract, an essential element of such a claim. Moreover, for a product to be not merchantable, it must either

---

[10] For purposes of this motion, Intel analyzes those counts under California law, but reserves all of its choice-of-law arguments, *see Gen. Signal Corp. v. MCI Telecomms. Corp.*, 66 F.3d 1500, 1505 (9th Cir. 1995) (recognizing that choice-of-law issues may be deferred to a later stage of the litigation), including that the consumer protection claims of non-California residents are not governed by California law, *see Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) (consumer protection claims "governed by the consumer protection laws of the jurisdiction in which the transaction took place").

(1) lack "even the most basic degree of fitness for ordinary use," *Birdsong*, 590 F.3d at 958 (internal quotation marks omitted), or (2) fail to conform to express "promises or affirmations" on its packaging, *Hadley v. Kellogg Sales Co.* (*Hadley II*), 273 F. Supp. 3d 1052, 1096 (N.D. Cal. 2017) (internal quotation marks omitted). Plaintiffs do not plead facts to satisfy these requirements either. No Plaintiff alleges discontinuing use of her device, and several Plaintiffs bought computers with Intel chips *after* the widespread public disclosure of Spectre and Meltdown. Nor does the Complaint identify any false labeling, or indeed any packaging at all of Intel's CPUs, almost all of which are alleged to have been acquired through purchases of assembled devices such as laptops and tablets with those CPU components pre-installed. For each of these independent reasons, the Court should dismiss Count I.

### 1. Plaintiffs Have Not Pleaded the Vertical Privity Requirement.

Under the California Commercial Code, "a plaintiff asserting breach of warranty claims must stand in vertical contractual privity with the defendant. A buyer and seller stand in privity if they are in adjoining links of the distribution chain." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) (citation omitted). "[A] consumer . . . who buys from a retailer is not in privity with a manufacturer." *Id.* A component manufacturer like Intel is even further removed.

Most of the named Plaintiffs allege that they purchased personal computers, tablets or servers containing Intel CPUs that were manufactured by companies such as HP, Dell, Apple, or Microsoft. *See generally* Compl. ¶¶ 15–126. Plaintiffs do not say where they purchased those devices, whether from those manufacturers or from distributors or retailers (such as Best Buy). A small subset of the named Plaintiffs allegedly purchased Intel CPUs to incorporate into custom-built systems, as opposed to buying a fully integrated system. *See, e.g.*, *id.* ¶ 16. But no Plaintiff alleges making a purchase *directly from Intel*, as opposed to through a retailer or

distributor.  Plaintiffs therefore fail to allege facts that satisfy the privity requirement under California law.  Plaintiffs plainly are aware of this requirement:  They contend that they need not plead privity because Intel "knew that its CPUs would be purchased by consumers" and knew that they would be "incorporated into machines by device manufacturers for the ultimate use by consumers."  *Id.* ¶ 339.  But there is no such "knowledge" exception to the privity requirement under California law.  *See Clemens*, 534 F.3d at 1024 (identifying list of exceptions—not including "knowledge"—and admonishing plaintiffs that "a federal court sitting in diversity is not free to create new exceptions").

### 2.  Intel CPUs Are Fit for Their Ordinary Purpose.

For an implied-warranty claim to survive a motion to dismiss, the plaintiff must plausibly allege that the product at issue has manifested a problem so grievous that it lacks "even the most basic degree of fitness for ordinary use."  *Birdsong*, 590 F.3d at 958 (internal quotation marks omitted).  Courts strictly apply this standard, including in the digital-device context.  For example, one court dismissed a California implied-warranty claim regarding a laptop that allegedly "routinely locked up and froze each morning on a cold boot" due to a defective motherboard, because plaintiffs were not "forced to abandon the use of their computers completely" and no user had actually lost data.  *Kent v. Hewlett-Packard Co.*, 2010 WL 2681767, at *4 (N.D. Cal. July 6, 2010) (internal quotation marks omitted).  And another held that an iPad that could not be used outdoors, owing to an alleged tendency to overheat, was nevertheless merchantable, because it was not "unfit for use *everywhere* and under all conditions."  *Baltazar v. Apple, Inc.*, 2011 WL 3795013, at *4 (N.D. Cal. Aug. 26, 2011).  In both of these cases, the implied-warranty claim was dismissed at the pleading stage.

The allegations here are equally deficient.  To begin with, several named Plaintiffs allege that they purchased Intel-based computers after public disclosure of Meltdown and Spectre, and

two made their purchases even after suing Intel. *See supra* note 7. If "allegations of continued use" of a product despite manifestation of a defect "belie [a] claim that it failed to serve its ordinary purpose," *Tietsworth v. Sears, Roebuck & Co.*, 720 F. Supp. 2d 1123, 1142 (N.D. Cal. 2010), then it should be dispositive when a plaintiff freely chooses, with knowledge of the supposed defect, to buy the product.

Equally telling is what Plaintiffs do not allege—namely, any facts that show Intel's processors are not fit for computing. No named Plaintiff claims to have suffered any data breach or exploit. No named Plaintiff alleges performance degradation rendering a device unusable. And no named Plaintiff alleges that she has stopped using her computer or any of its functions because of security or performance concerns stemming from these vulnerabilities. Plaintiffs' allegations fall far short of establishing that Intel CPUs are not fit for their ordinary purpose.

### 3. Intel's Products Are Not Mislabeled.

Plaintiffs allege that "the Intel CPUs are not adequately labeled because the labeling failed to disclose the Defects." Compl. ¶ 344. But the Complaint cites no representations in the product packaging at all, let alone any that are false. *See* Cal. Com. Code § 2314(2)(f) (an implied warranty claim based on mislabeling requires false "promises or affirmations of fact"). Because a mislabeling claim must be based on an affirmative representation, *see Hadley II*, 273 F. Supp. 3d at 1096, and Plaintiffs have alleged none, this implied warranty claim fails.

### B. Plaintiffs Fail To State a Claim for Consumer Fraud (Counts II–VII).

Plaintiffs' six remaining nationwide counts all sound in fraud. Each is built on the identical allegation that Intel misrepresented the security of its CPUs and failed to disclose to consumers "material facts," including "that in designing its CPUs, Intel failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its

CPUs were vulnerable to such attacks."[11]  The elements of these claims vary slightly, but all fail because Plaintiffs fail to plead (i) actionable misrepresentations, concealment or omission; (ii) a duty to disclose; and (iii) reliance.  Without these allegations, Plaintiffs cannot state a claim for fraud.[12]

### 1. Plaintiffs Fail To State a Claim for Fraud by Affirmative Misrepresentation (Counts IV–VI).

Plaintiffs allege that affirmative representations made by Intel regarding the security of its CPUs violate three California consumer-protection statutes—the CLRA[13] (Count IV), the UCL (Count V), and the FAL (Count VI).  Compl. ¶¶ 374, 376 (Count IV); *id.* ¶¶ 384, 387 (Count V); *id.* ¶ 393 (Count VI).[14]  But the statements identified in the Complaint are not

---

[11] Compl. ¶ 353 (Count II, fraud by concealment and omission); *id.* ¶ 361 (Count III, constructive fraud); *id.* ¶ 376 (Count IV, violation of the California Consumers Legal Remedies Act (CLRA)); *id.* ¶ 387 (Count V, violation of the California Unfair Competition Law (UCL)); *id.* ¶ 393 (Count VI, violation of the California False Advertising Law (FAL)); *id.* ¶ 400 (Count VII, Unjust Enrichment).

[12] Rule 9(b)'s particularity requirement applies to all of Plaintiffs' fraud-based claims.  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (applying Rule 9(b) to CLRA and UCL claims); *Stewart v. Electrolux Home Prods., Inc.*, 304 F. Supp. 3d 894, 907 (E.D. Cal. 2018) (applying Rule 9(b) to omission-based claims); *Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1122 (C.D. Cal. 2010) (applying Rule 9(b) to FAL claims).

[13] The CLRA applies only to consumer transactions, *see* Cal. Civ. Code § 1770(a), and it defines a "[c]onsumer" as an "individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes," *id.* § 1761(d).  The CLRA claims of nine named Plaintiffs do not qualify and should be dismissed for this independent reason:  ITIS; Schwartz Eye Associates; Kottemann Orthodontics; Alliance Healthcare System; Artesia General Hospital; the City of New Castle; Zog, Inc.; Hibbits Insurance; and DK Systems. Compl. ¶¶ 27, 36, 60, 66, 86, 100, 103, 107, 120; *see Zepeda v. PayPal, Inc.*, 777 F. Supp. 2d 1215, 1222 (N.D. Cal. 2011) (plaintiffs who used PayPal for business purposes are not "consumers").

[14] The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code § 1770(a).  The UCL prohibits any "unlawful, unfair or fraudulent business act or practice."  *Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1117 (N.D. Cal. 2016) (internal quotation marks omitted).  And the FAL prohibits any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."  *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 853 (N.D. Cal. 2012)

misrepresentations at all, have not been pleaded with the requisite particularity, and would not have deceived a reasonable consumer.  Moreover, Plaintiffs have failed to allege their reliance on any alleged affirmative misrepresentation by Intel.  For these reasons, Plaintiffs' affirmative-misrepresentation claims in Counts IV, V, and VI should be dismissed.

     ***i. Plaintiffs fail to allege any actionable misrepresentation.***  The only supposed misrepresentations alleged are in paragraphs 195 and 216–219 of the Complaint, which include, by way of example:

- Intel's Core microarchitecture is "[d]esigned for efficiency and optimized performance across a range of market segments and power envelopes."  Compl. ¶ 195.

- The Haswell generation vPro is able to "protect the OS kernel."  *Id.* ¶ 216.

- The Skylake generation has "cutting-edge security," such that consumers would be "safe and secure at home," "knowing all of [their] pictures, videos, and personal files [were] securely stores [*sic*] at home," because of "hardware-based security features that help keep [their] system[s] and data free from malware, hacking, viruses, and prying eyes." *Id.* ¶ 217; Exs. 1, 15.

- The headline "Secure to the core" in a product brochure, which also stated that Intel CPUs "extend[] protection outside the operating system and into the hardware layer."  *Id.* ¶ 218; Ex. 16.

- Intel CPUs have "hardware-enabled security capabilities" to help protect "against evolving and modern threats."  *Id.* ¶ 219; Ex. 17.

Such "general advertisements" are not actionable as a matter of law.  *See Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 854–55 (N.D. Cal. 2012) (statements such as "ultra-reliable" and "packed with power" say "nothing about the specific characteristics or components of the computer"); *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 973 (N.D. Cal. 2008) (statements of product superiority such as "faster, more powerful, and more innovative," "higher

---

(quoting Cal. Bus. & Prof. Code § 17500).  "The standard for all three statutes is the 'reasonable consumer' test[.]"  *Id.* at 854 (citation omitted).  Because they rely on the same standards, "courts often analyze these three statutes together."  *Id.*

performance," and "longer battery life" are "non-actionable" (internal quotation marks omitted)), *aff'd*, 322 F. App'x 489 (9th Cir. 2009); *Apodaca v. Whirlpool Corp.*, 2013 WL 6477821, at *5 (C.D. Cal. Nov. 8, 2013) ("exceptionally durable" not actionable (brackets and internal quotation marks omitted)). Not only are the quoted Intel statements not actionable standing alone, but every one of the advertisements that Plaintiffs cite also expressly stated that "No computer system can be absolutely secure." *See* Exs. 1, 13–17 (cited at Compl. ¶¶ 217–219 & nn.54–59).

*ii. **Plaintiffs fail to satisfy the requirements of Rule 9(b).*** None of the statements alleged in the Complaint are actionable. But even if they were, no Plaintiff alleges where, when, or how she was exposed to any of these statements, as Rule 9(b) requires. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009). The plaintiff in *Kearns* alleged that Ford misrepresented its inspection program for certified pre-owned cars. *Id.* at 1122. He claimed exposure to these misstatements via Ford's "national marketing campaign," dealership marketing materials, and sales staff. *Id.* at 1125–26. The Ninth Circuit held that these allegations failed to comply with Rule 9(b), because Kearns did not allege what specific misstatements *he* encountered, how they were conveyed to him, when he was exposed to them, and which ones he relied on in making his purchase. *Id.* at 1126. So too here: Plaintiffs allege misrepresentations by Intel, but do not say if, how and when they saw any of them. *See In re Arris Cable Modem Consumer Litig.*, 2018 WL 288085, at *8–9 (N.D. Cal. Jan. 4, 2018) (complaint fails under Rule 9(b) when it identifies alleged misstatements but does not connect them to plaintiffs).

*iii. **A reasonable consumer would not be deceived by these alleged misrepresentations.*** The test under the CLRA, FAL and the "fraudulent" UCL prong is a "reasonable consumer" test, meaning that Intel's allegedly misleading statements are judged from the viewpoint of an "ordinary consumer acting reasonably under the circumstances." *Elias*, 903 F. Supp. 2d at 854

(quoting *Colgan v. Leatherman Tool Grp., Inc.*, 38 Cal. Rptr. 3d 36, 48 (Ct. App. 2006)). Plaintiffs must allege that "a significant portion of the general consuming public" could be misled, and not just "some few consumers viewing [the seller's statements] in an unreasonable manner." *In re Sony Gaming Networks & Cust. Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 967–68 (S.D. Cal. 2012) (internal quotation marks omitted).

Ordinary consumers are well aware that security vulnerabilities in digital devices are a fact of life; anyone who owns a smartphone or other computing device is aware of the existence of viruses, hackers, and security updates. Intel's website publicly lists more than a hundred such updates, *see* Ex. 5 (Intel Product Security Center Advisories), and US-CERT informs the public of new vulnerabilities weekly, *see* Exs. 18–19 (US-CERT Bulletins). It is not plausible that the generic statements Plaintiffs cite, such as "cutting-edge security," or "hardware-enabled security capabilities," would mislead reasonable consumers into believing that Intel promised protection against all vulnerabilities that might be discovered in the future. Courts commonly dismiss claims at the pleadings stage where a claimed misrepresentation would not have misled a reasonable consumer. For example, where Apple marketed the glass housing of an iPhone as "ultradurable," "20 times stiffer and 30 times harder than plastic," and "comparable in strength to sapphire crystal," the court still dismissed fraud claims because a reasonable consumer understands that glass may break if dropped. *Williamson v. Apple, Inc.*, 2012 WL 3835104, at *1, *6 (N.D. Cal. Sept. 4, 2012) (internal quotation marks omitted). The same is true here: A reasonable consumer would not construe the statement "cutting-edge security" as a promise that Intel's CPUs would be impervious to any side channel security vulnerability yet to be discovered.

That conclusion is cemented by Intel's unambiguous disclaimer. Where the Sony PlayStation Network's Privacy Policy included a disclaimer that "there is no such thing as perfect security," for example, the court dismissed UCL, FAL and CLRA claims that Sony had "misrepresented the quality of its Network Security." *Sony Gaming*, 903 F. Supp. 2d at 968 (internal quotation marks omitted). Intel's disclaimer—"No computer system can be absolutely secure," *see* Exs. 1, 13–17 (cited at Compl. ¶¶ 217–219 & nn.54–59)—is materially identical to Sony's. *See also Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) (reasonable person would not be deceived by advertisement text that was qualified by disclaimer); *Swearingen v. Healthy Beverage, LLC*, 2017 WL 1650552, at *3 (N.D. Cal. May 2, 2017) (plaintiffs could not have relied on allegedly misleading terminology on packaging where the same materials incorporated website statements that explained the term). As a matter of law and common sense, no reasonable consumer would have been misled in the manner Plaintiffs claim by the advertisements that Plaintiffs identify.

*iv.* ***Plaintiffs fail to allege actual reliance on any affirmative misrepresentation by Intel.*** "[P]laintiffs in misrepresentation cases must allege that *they actually read* the challenged representations to state a claim." *Beecher v. Google N. Am. Inc.*, 2018 WL 4904914, at *2 (N.D. Cal. Oct. 9, 2018) (emphasis added) (internal quotation marks omitted). Demonstrating actual reliance "requires a plaintiff to establish that 'the defendant's misrepresentation or nondisclosure was an immediate cause of the plaintiff's injury-producing conduct.'" *Arris*, 2018 WL 288085, at *7 (quoting *In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009)). Here, no Plaintiff alleges that she saw, let alone relied upon, *any* of Intel's purportedly misleading statements. The misrepresentation claims in Counts IV, V, and VI should be dismissed for this independent reason. *Beecher*, 2018 WL 4904914, at *2.

### 2. Plaintiffs Fail To State a Claim for Fraud by Concealment or Omission (Counts II, IV, V, VI).

Plaintiffs contend that Intel violated the same three statutes—the CLRA (Count IV), UCL (Count V), and FAL (Count VI)[15]—and committed common law fraud by concealment and omission (Count II), through its alleged failure to disclose "that in designing its CPUs, Intel failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks."[16] These causes of action have three elements: (1) that the defendant "concealed or suppressed a material fact," (2) that the defendant was "under a duty to disclose the fact" to the plaintiff, and (3) that the plaintiff relied on the omission or concealment. *Myers v. BMW of N. Am., LLC*, 2016 WL 5897740, at *7 (N.D. Cal. Oct. 11, 2016) (internal quotation marks omitted).[17] Plaintiffs fail to allege these elements.

In contending that Intel failed to disclose that its CPUs were vulnerable to "attacks," Plaintiffs cannot be referring to Spectre, Meltdown, and Foreshadow specifically. Plaintiffs concede that those side-channel vulnerabilities were "identified" or "discovered" no earlier than April 2017, Compl. ¶¶ 255, 266, 279, long after most named Plaintiffs bought their devices, and a seller cannot commit fraud by omitting facts it does not know. *See Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1145 (9th Cir. 2012) (dismissing CLRA and UCL fraud claims where

---

[15] Claims based on omissions under the FAL, though, require "at least *some* affirmative misrepresentation." *Dana v. Hershey Co.*, 180 F. Supp. 3d 652, 669 (N.D. Cal. 2016), *aff'd*, 730 F. App'x 460 (9th Cir. 2018).

[16] Compl. ¶ 353 (Count II); *id.* ¶ 376 (Count IV); *id.* ¶ 387 (Count V); *id.* ¶ 393 (Count VI).

[17] The core elements of a claim for omission-based fraud are the same under common law as they are under the California consumer statutes. *See Myers*, 2016 WL 5897740, at *7 ("[The] elements [of a common law fraud by concealment claim] are essentially identical to those for a claim of active concealment under the CLRA and the UCL fraud prong." (internal quotation marks omitted)).

plaintiff failed to "allege [defendant's] knowledge of a defect").[18]  Rather, Plaintiffs appear to

contend that Intel failed to disclose that its processors are subject to side-channel vulnerabilities

more generally.  *See, e.g.*, Compl. ¶ 353 (alleging Intel did not disclose that it "failed to take

measures to protect confidential information from attacks by unauthorized users while knowing

that its CPUs were vulnerable to such attacks").  But this argument is dispatched by Plaintiffs'

own allegations, because the Complaint itself points to numerous sources where Intel and others

publicly discussed the risk of side channels and cache vulnerabilities.  Plaintiffs also fail to

identify any legal duty to disclose that Intel breached, nor have they alleged reliance on any

omission.  For all these reasons, the omission-based fraud claims (Counts II, IV–VI) must be

dismissed.

### a.    Plaintiffs Fail To Allege that Intel Concealed or Suppressed Information About the Risk of Side Channels.

To plead an omission or concealment claim with the required degree of particularity, a

plaintiff must allege that the defendant "concealed or suppressed a material fact," *Sanders v.

Apple Inc.*, 672 F. Supp. 2d 978, 985 (N.D. Cal. 2009), and must "describe the content of the

omission and where the omitted information should or could have been revealed," *Stewart v.

Electrolux Home Prods., Inc.,* 304 F. Supp. 3d 894, 907 (E.D. Cal. 2018) (internal quotation

---

[18] Nor can Plaintiffs be arguing that Intel's liability stems from its decision not to disclose
Spectre, Meltdown and Foreshadow immediately.  First, Plaintiffs' concern for "protecting
consumers' sensitive data from unauthorized access," Compl. ¶ 8, plus the presence of several
HIPAA-regulated Plaintiffs, *id.* ¶¶ 36, 60, 66, 86, 107, eviscerates any claim of a legal duty to
disclose vulnerabilities publicly before mitigations are available.  Second, a duty to disclose
exists only as to *material* facts, *i.e.*, those a reasonable consumer would deem "important in
determining how to act in the transaction at issue," *Rasmussen v. Apple Inc.*, 27 F. Supp. 3d
1027, 1033 (N.D. Cal. 2014) (internal quotation marks omitted), or that would cause a
reasonable consumer to "behave[] differently," *Oestreicher*, 544 F. Supp. 2d at 971.  Here,
Plaintiffs acted no differently even after they knew about Spectre and Meltdown.  *See, e.g.*, *supra*
note 7 (Gloria Park purchased new Intel device *after filing complaint*).  Plaintiffs cannot
demonstrate that these vulnerabilities were material to reasonable consumers when they
themselves did not consider them material in making post-disclosure purchasing decisions.

marks omitted). Here, though, the Complaint trumpets that Intel has repeatedly and publicly

acknowledged potential side-channel attack risks. For example, Intel:

- Published an article regarding the "fundamental security challenge facing cloud computing," namely "the ability of an unauthorized user to launch a 'side-channel' attack." Compl. ¶ 212. In that publication, Intel cited another article noting expressly how cache memory "appear[s] to be particularly conducive" to timing-based side channels. *Id.* ¶ 212 n.50.

- Published a white paper regarding a new encryption standard adopted to "help[] prevent software side-channel attacks" while avoiding too great a "performance penalty." *Id.* ¶ 215. This white paper expressly described the possibility of timing-based side channels, and outlined Intel's strategy in response to that potential avenue of attack, namely the diversion of certain cryptographic calculations away from the memory cache. *Id.* ¶ 232.

- Published a brochure emphasizing how cyber-attacks were "moving down the computing stack, traversing from software to hardware, threatening devices in homes, cars, businesses, networks and cloud." *Id.* ¶ 219.

- Published patent filings regarding "[n]ew mitigations to side channel attacks" that "are needed to deter attempts to subvert the security of a computer system," explaining that "[s]ide channel attacks are also possible when two applications share the same cache," proposing a solution that would "prevent a so-called side channel attack in which an attacker program and a victim program . . . both use the same physical cache," and noting that "[o]ther exploits that use" the same type of "information leakage" as "side-channel attacks" may be "readily envisioned." *Id.* ¶ 243.

Intel's record of frequent and unambiguous public statements regarding the risks of side-channel

attacks forecloses any omission claim. Plaintiffs cannot, in the same sentence, claim that both

Intel "hid" and "acknowledged" the same information—*i.e.*, "the security risks caused by cache

side-channel timing attacks." *Id.* ¶ 243. Accordingly, Plaintiffs' claims of fraudulent

concealment or omission cannot stand.

### b. Plaintiffs Fail To Allege a Duty To Disclose on Intel's Part.

Even if Plaintiffs had identified any material facts that Intel failed to disclose, they would

also need to allege facts showing a duty on Intel's part to disclose that information. *See Gray v.*

*Toyota Motor Sales, U.S.A.*, 2012 WL 313703, at *8 (C.D. Cal. Jan. 23, 2012), *aff'd*, 554 F.

App'x 608 (9th Cir. 2014).  No "broad obligation to disclose" exists; rather, Plaintiffs must plead

circumstances giving rise to such a duty.  *Wilson*, 668 F.3d at 1141.  They have not done so here.

    ***i.  Plaintiffs have not alleged that Intel's chips pose a safety risk.***  The general rule

when there is no affirmative misrepresentation at issue is that "defendants are only under a duty

to disclose a known defect in a consumer product when there are safety concerns associated with

the product's use."  *Morgan v. Harmonix Music Sys., Inc.*, 2009 WL 2031765, at *4 (N.D. Cal.

July 7, 2009); *see Dana v. Hershey Co.*, 180 F. Supp. 3d 652, 664 (N.D. Cal. 2016) ("[T]he

weight of authority limits a duty to disclose under the CLRA to issues of product safety, unless

disclosure is necessary to counter an affirmative misrepresentation.").  "There is no authority that

provides that the mere sale of a consumer electronics product in California can create a duty to

disclose any defect that may occur during the useful life of the product."  *Hoey v. Sony Elecs.

Inc.*, 515 F. Supp. 2d 1099, 1105 (N.D. Cal. 2007).[19]  Here, Plaintiffs allege that every CPU

manufactured by Intel for more than a decade is defective, but they nowhere allege (nor could

they) "that the design defect caused an unreasonable safety hazard," *Wilson*, 668 F.3d at

1142-43, or "pose[s] a threat to [their] own safety or the safety of others," *Oestreicher v.

Alienware Corp.*, 322 F. App'x 489, 493 (9th Cir. 2009) (dismissing fraudulent-omission claims

under the CLRA, UCL, and common law).

    ***ii.  Plaintiffs have not alleged a fiduciary relationship, exclusive knowledge, active

concealment, or any half-truth.***  Plaintiffs also have not pleaded facts showing any of the other

limited circumstances courts have recognized as triggering a duty to disclose—that is, when:

"(1) the defendant is in a fiduciary relationship with the plaintiff; (2) the defendant has exclusive

---

[19] This "bright-line limitation on a manufacturer's duty to disclose is sound policy, given the difficulty of anticipating exactly what information some customers might find material to their purchasing decisions."  *Dana*, 180 F. Supp. 3d at 664.

knowledge of material facts not known to the plaintiff; (3) the defendant actively conceals a material fact from the plaintiff, or (4) the defendant makes partial representations but also suppresses some material facts." *Sanders*, 672 F. Supp. 2d at 986.

Plaintiffs allege no facts even suggesting a fiduciary relationship between themselves and Intel. And having recited the extensive public research on side-channel issues dating back to 1995, *see* Compl. ¶¶ 231–253, Plaintiffs cannot contend that Intel had exclusive knowledge of those issues. In *Herron v. Best Buy Co.*, 924 F. Supp. 2d 1161 (E.D. Cal. 2013), for example, the court dismissed omission claims regarding allegedly defective laptop batteries where the plaintiff purchased his laptop nine months after the public dissemination of information in a periodical criticizing the tests that the manufacturer used. *Id.* at 1175. Here, Plaintiffs identify (among other things) a 1995 book discussing Intel's microarchitecture and "explain[ing] that caches may be used as covert timing channels to leak sensitive information," Compl. ¶ 231, as well as a 2006 research paper arguing that software-based solutions may leave "[a]ll current processors with caches . . . vulnerable," *id.* ¶ 237. As Plaintiffs' authorities note, "the cache itself has been known for a long time [as] a crucial security risk of modern CPU's [*sic*]," Ex. 2 (Aciiçmez et al. (cited at Compl. ¶ 238)), at 2, and "[c]ountermeasures for the cache side channels" were "extensively discussed" back in 2002, Ex. 3 (Ristenpart et al. (cited at Compl. ¶ 212 n.50)), at 12, 13.[20]

---

[20] Courts rejecting exclusive-knowledge arguments have not required information to have been distributed directly to consumers, packaged with a product, or expressly advertised; disclosure in the public domain is sufficient. In *Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075 (N.D. Cal. 2017), *aff'd*, 731 F. App'x 719 (9th Cir. 2018), for example, the court rejected duty-to-disclose claims about alleged "slavery, forced labor and human trafficking" by the defendant's suppliers precisely because "numerous paragraphs" of the complaint described "public disclosures" of those labor conditions. *Id.* at 1084, 1087 (internal quotation marks omitted); *see also McCoy v. Nestle USA, Inc.*, 173 F. Supp. 3d 954, 967 (N.D. Cal. 2016)

Plaintiffs similarly allege nothing that constitutes active concealment, which requires more than "merely failing to own up to the truth," "making an affirmative misrepresentation," or "omitting to disclose material information." *In re Premera Blue Cross Cust. Data Sec. Breach Litig.* (*Premera I*), 198 F. Supp. 3d 1183, 1193–94 (D. Or. 2016).  Active concealment requires an affirmative act "to suppress information in the public domain or obscure consumers' ability" to discover it.  *Gray*, 2012 WL 313703, at *10.  Here, far from suppressing public-domain information on side-channel risks and the trade-offs between performance and security, Intel published widely on these topics.  *See supra* Section II.B.2.a.  As in *Premera I*, Plaintiffs plainly fail to allege "what [Intel] did that constitutes active concealment, beyond merely . . . omitting to disclose material information."  198 F. Supp. 3d at 1194.  Plaintiffs also fail to allege any "affirmative acts on the part of [Intel] in hiding, concealing or covering up the matters complained of."  *Herron*, 924 F. Supp. 2d at 1176 (internal quotation marks omitted).

Plaintiffs have also failed to plead any misleading partial representation.  "[P]artial representation claims require affirmative representations," *Elias v. Hewlett-Packard Co.*, 2014 WL 493034, at *6 n.6 (N.D. Cal. Feb. 5, 2014), where a defendant "does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead," *Herron*, 924 F. Supp. 2d at 1177 (internal quotation marks omitted).  As discussed above, the affirmative representations by Intel that Plaintiffs cite are nonactionable statements of generalized opinion, accompanied by clear disclaimers.  *See supra* Section II.B.1; *see also Daugherty v. Am. Honda Motor Co.*, 51 Cal. Rptr. 3d 118, 126 (Ct. App. 2006), *as modified* (Nov. 8, 2006) (where information allegedly omitted is not "contrary to a representation actually made," there can be no misleading partial representation); *Hoey*, 515 F. Supp. 2d at 1104 (dismissing claim where

---

(dismissing exclusive-knowledge claim where plaintiff expressly acknowledged industry publications discussing the issue), *aff'd*, 730 F. App'x 462 (9th Cir. 2018).

plaintiff failed to allege "any representation by Sony that the subject computers had any characteristic they do not have or [were] of a standard or quality they are not").

       ***iii.  Plaintiffs cannot rely on an alleged design defect to create a duty to disclose under consumer-fraud law.***  Finally, the theory that Intel had a duty to disclose that its CPUs could have been designed to be more secure against side channels—that is, that they could have struck a better balance between security and performance, *see* Compl. ¶¶ 283–292 (faulting Intel for not adopting alternative designs discussed in patent filings and published literature)—fails for a further independent reason.  The underlying premise of that theory—that Intel's products are defective because a better mousetrap was possible—sounds in products liability.  But such a products-liability claim cannot be stated absent personal injury or property damage, *see* Restatement (Third) of Torts: Products Liability §§ 1, 21 (Am. Law Inst. 1998); *see also, e.g.*, *Ladore v. Sony Comput. Entm't Am., LLC*, 75 F. Supp. 3d 1065, 1075 (N.D. Cal. 2014).  And a consumer fraud plaintiff cannot "rely on products liability standards for a design defect to prove that a properly-functioning product is defective for purposes of establishing a duty to disclose under consumer fraud law." *Lassen*, 211 F. Supp. 3d at 1286.  If the rule were otherwise, every seller would have "to disclose that the product lacked all other safer alternative design features," which "goes far beyond the primary purpose of consumer fraud law." *Id.* at 1288.  Thus, Plaintiffs cannot plead a consumer fraud claim simply by alleging a failure by Intel to disclose that it *could have* created a more secure CPU architecture.

       Because Plaintiffs have pleaded no facts showing any of the circumstances under which a duty to disclose may arise, their omission-based claims must fail.

### c.      Plaintiffs Fail To Allege Reliance.

       Omission-based claims under the CLRA, UCL, FAL, and common law, like affirmative-misrepresentation claims, require reliance. *See Noll v. eBay Inc.*, 2013 WL 2384250, at *4 (N.D.

Cal. May 30, 2013).  To establish reliance in the omissions context, a plaintiff must plead how, if the allegedly omitted material had been disclosed, she would have been aware of it and behaved differently.  *See Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 919 (C.D. Cal. 2010).  Where a plaintiff alleges fraud by omission or concealment but does not allege the pre-purchase review of "any brochure, website, or promotional material that might have contained a disclosure," she cannot state a claim that any nondisclosures were fraudulent.  *See id.* at 919–20.  Plaintiffs' assertion that they would not have purchased Intel products or would have paid less for them is thus "conclusory and unsupported by any facts," *Cahen*, 717 F. App'x at 723, particularly because the issue of cache-timing side channels associated with speculative execution exists in all CPUs, regardless of manufacturer, *see id.*; Ex. 11 (*Hauck* Compl.), ¶ 14; Ex. 12 (*Apple Processor* Compl.), ¶ 2; 6/15/18 Tr. (Docket No. 107) at 13–14.

Plaintiffs' theory appears to be that if Intel had disclosed that its processors might be subject to side channel security vulnerabilities (again putting aside the Complaint's discussion of the white papers, patent filings, and other publications from Intel and others on these issues dating back to 1995),  the industry-leading OEMs—HP, Dell, Microsoft, Apple, etc.—that bought Intel's processors to install in Plaintiffs' devices would have bought those processors for less, and then sold those devices to Plaintiffs for less.[21]  But five of these purportedly injured owners of Intel processors bought their devices *after* "the public" became "aware" of Spectre and Meltdown in January 2018.  Compl. ¶ 279; *supra* note 7 and accompanying text.  Plaintiffs' actions "belie[] their allegations that they would not have [bought Intel processors, or would have paid less] had they known" of the issue earlier.  *Noll*, 2013 WL 2384250, at *4.  Plaintiffs

---

[21] Alternatively, perhaps Plaintiffs contend they would have bought different devices with processors made by AMD, or made by Apple using Arm designs—but both of those manufacturers are now defending against the same overpayment/design defect theory.

have not pleaded reliance, and given the facts, they cannot plead reliance. *See id.* (dismissing for failure to plead reliance where plaintiffs "continued to keep and/or place . . . listings even after discovering" the alleged fraud). Counts II, IV, V, and VI should be dismissed.

### 3. Plaintiffs Fail To State a "Constructive Fraud" Claim Because They Have Not Alleged a Fiduciary or Confidential Relationship with Intel (Count III).

The Complaint also includes a claim for constructive fraud, but that "unique species of fraud" requires a fiduciary or confidential relationship between Plaintiffs and Intel. *See Prakashpalan v. Engstrom, Lipscomb & Lack*, 167 Cal. Rptr. 3d 832, 854 (Ct. App. 2014) (internal quotation marks omitted), *as modified on denial of reh'g* (Feb. 27, 2014). Ordinary consumer transactions do not create such a relationship. *See Tidenberg v. Bidz.com, Inc.*, 2009 WL 605249, at *9 (C.D. Cal. Mar. 4, 2009) (dismissing constructive fraud claim with prejudice because "[t]he Court is not aware of any legal or equitable duty that arises during an everyday transaction between consumer and merchant").

### 4. Plaintiffs' Common-Law Fraud Claims (Counts II–III) Are Foreclosed By the Economic Loss Rule.

Plaintiffs' common-law fraud claims (Counts II and III) fail for the additional reason that the damages claimed are only for economic loss, and not personal injury or property damage. Under California's economic loss rule, a distinction must be drawn "between tort recovery for physical injuries and warranty recovery for economic loss." *Seely v. White Motor Co.*, 403 P.2d 145, 151 (Cal. 1965) (en banc). Put simply, where a consumer's complaint is that the product she purchased "is not working properly" and the damages claimed are economic loss rather than personal injury or property damage, there is no liability in tort. *Robinson Helicopter Co. v. Dana Corp.*, 102 P.3d 268, 272 (Cal. 2004) (internal quotation marks omitted); *accord Astrium S.A.S. v. TRW, Inc.*, 197 F. App'x 575, 577 (9th Cir. 2006) (California law bars fraud claims under the

economic loss rule where "there is no showing that people or property were placed at risk or that [the plaintiff] was exposed to 'personal damages' beyond economic losses").

*Stewart v. Electrolux Home Products* is directly on point. In that case, the plaintiff claimed economic losses based on allegations that the defendant fraudulently concealed that a self-cleaning oven was defective. The court dismissed the claim because the "alleged damage is limited to purely economic loss." 304 F. Supp. 3d at 902. As in *Stewart*, Plaintiffs fail to allege that they suffered any "personal injury," *id.* at 904, or that the defect caused any "damage to other property," *id.* at 902.[22]

The economic loss rule is similarly dispositive of Plaintiffs' common-law fraud claims here, which assert nothing more than that Intel misrepresented, or failed to disclose, the qualities and characteristics of its microprocessors, with damages limited to alleged economic losses. *See* Compl. ¶¶ 357, 368. Under these circumstances, *all* tort claims are barred, and the Court therefore should dismiss the common-law fraud claims (Counts II–III).[23]

---

[22] *See also WeBoost Media S.R.L. v. LookSmart Ltd.*, 2014 WL 2621465, at *6 (N.D. Cal. June 12, 2014) (fraudulent concealment claims were "barred by the economic loss rule"); *Audigier Brand Mgmt. v. Perez*, 2012 WL 5470888, at *6 (C.D. Cal. Nov. 5, 2012) (dismissing fraudulent concealment claim where plaintiff failed to allege damages "beyond [its] economic losses"); *Multifamily Captive Grp., LLC v. Assurance Risk Mgrs., Inc.*, 629 F. Supp. 2d 1135, 1145–46 (E.D. Cal. 2009) (dismissing fraud claims pursuant to economic loss rule).

[23] There are two exceptions to the economic loss rule for fraud claims, but neither applies here. The first exception requires a "special relationship" between the plaintiff and defendant. *Stewart*, 304 F. Supp. 3d at 903. No such "special relationship" is alleged to exist here between Intel and the named Plaintiffs, ordinary consumer owners of devices containing an Intel CPU. The second exception is "narrow in scope and limited to a defendant's affirmative misrepresentations on which a plaintiff relies and which expose a plaintiff to liability for personal damages *independent of plaintiff's economic loss*," based on "intentional and affirmative misrepresentations that *risk[] physical harm to persons.*" *Robinson*, 102 P.3d at 274–76 & n.7 (emphases added). Plaintiffs have not alleged any such "intentional and affirmative misrepresentation" risking "physical harm" here.

5. **Plaintiffs Fail To State a Claim for Unjust Enrichment or Quasi-Contract (Count VII).**

Because Plaintiffs' unjust enrichment claim sounds in fraud, it fails for the same reasons as Counts II through VI. *Compare* Compl. ¶ 353 (common law fraud allegations: "Intel concealed material information related to the CPUs"), *with id.* ¶ 400 (unjust enrichment allegations: Intel "concealed and/or failed to disclose material facts to Class members"). A claim for unjust enrichment cannot stand alone under California law as an independent claim for relief; it "depend[s] upon the viability of the Plaintiffs' other claims." *Sanders*, 672 F. Supp. 2d at 989. Where Plaintiffs' fraud claims fail, they have "no basis for [their] unjust enrichment claim," *Oestreicher*, 544 F. Supp. 2d at 975 (dismissing unjust enrichment claim sounding in fraud), which in any event does not satisfy Rule 9(b). *Arris*, 2018 WL 288085, at *10.[24]

C. **Plaintiffs Fail To Allege an "Unlawful" or "Unfair" Business Practice Under the UCL (Count V).**

Plaintiffs' claims under the "unlawful" and "unfair" prongs of the UCL are deficient because Plaintiffs identify nothing independently unlawful or independently "unfair" in Intel's conduct separate and apart from the deficient allegations that undergird their claims sounding in fraud.

*First*, for conduct to be "unlawful" under the UCL, it "must violate another 'borrowed' law." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) (citation omitted). In such case, the UCL makes that conduct "independently actionable." *Elias*, 903 F. Supp. 2d at 858–59 (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 539–40 (Cal. 1999)). Because Plaintiffs cannot state a claim under the borrowed law they identify (the CLRA

---

[24] As "quasi-contract" is "synonymous with [a claim] for unjust enrichment" under California law, *Bernardi v. JPMorgan Chase Bank, N.A.*, 2012 WL 2343679, at *3 (N.D. Cal. June 20, 2012), Count VII fails however it is labeled.

and California common law, Compl. ¶ 386, discussed *supra* Section II.B), their claims under the "unlawful" prong of the UCL also fail.

*Second*, a business practice is "unfair" under the UCL if it "violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to customers which outweighs its benefits." *Hadley v. Kellogg Sales Co.* (*Hadley I*), 243 F. Supp. 3d 1074, 1104 (N.D. Cal. 2017) (citation omitted).

California law is unsettled as to the appropriate standard under this prong of the UCL. Some courts use a traditional balancing test, comparing the harm to the consumer to the utility of the defendant's practice. *Lozano v. AT&T Wireless Servs. Inc.*, 504 F.3d 718, 735 (9th Cir. 2007). Other courts use a "tethering" test, requiring that the underlying public policy invoked by the plaintiff be "tethered to specific constitutional, statutory, or regulatory provisions." *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1051 (N.D. Cal. 2014) (internal quotation marks omitted).[25] But "[r]egardless of the test," if the allegedly "unfair" business practice "overlap[s] entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive if the claims under the other two prongs of the UCL do not survive." *Hadley I*, 243 F. Supp. 3d at 1105.

The "unfair" practices that Plaintiffs allege can be boiled down to two propositions: Intel allegedly (1) designed products that traded some degree of security for some degree of performance, and (2) did not disclose that it had done so. *See* Compl. ¶ 384. If the argument is that such practices are deceptive, then Plaintiffs' unfairness claims "overlap entirely with" their nonviable deception claims, and should be dismissed accordingly. *See Hadley I*, 243 F. Supp. 3d

---

[25] While some California courts have applied yet another test (based on the FTC Act), the Ninth Circuit has rejected the use of that third test by the federal courts absent a clear directive from the California Supreme Court. *Lozano*, 504 F.3d at 736.

at 1105.  And if the alleged unfairness is not about Intel's claimed deception, the claim still fails,

because in that case this is a products-liability claim in disguise.  If it were actionably "unfair" to

design a product that balances safety and utility (versus maximizing safety at all performance

costs), or to fail to disclose all safety features that conceivably could have been incorporated into

a design, the law of unfair trade practices would swallow products-liability law, by allowing a

"defective design" claim without personal injury, property damage, or even breach of warranty.

*See Lassen*, 211 F. Supp. 3d at 1288; *see also Bardin v. DaimlerChrysler Corp.*, 39 Cal. Rptr. 3d

634, 645–46 (Ct. App. 2006) (dismissing unfair trade practice claim where plaintiff alleged that

exhaust pipe's design fell short of industry standards for durability, but did not allege injury,

deception, or breach of warranty).  Plaintiffs' claim under the "unfair" prong therefore should be

dismissed.

## III. PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATIONS OF THE CONSUMER PROTECTION LAWS OF OTHER STATES (COUNTS VIII-LXIV).

Plaintiffs assert claims in the alternative under the consumer-protection statutes of

forty-eight other states (all states but Massachusetts) plus the District of Columbia and the

United States Virgin Islands.[26]  Compl. ¶ 320.  The factual allegations and theories of liability

are the same as under Counts IV–VI (the CLRA, UCL, and FAL claims).  *Compare* Compl.

¶ 376 (California), *with, e.g.*, *id.* ¶¶ 501, 859, 927 (Florida, Pennsylvania, and Texas).  The

---

[26] The annexed Appendix describes key features of the statutes invoked in these 57 counts. Because no named Plaintiff is domiciled in the U.S. Virgin Islands, Counts LVIII and LIX should be dismissed for lack of standing.  *See Pardini v. Unilever U.S., Inc.*, 961 F. Supp. 2d 1048, 1061 (N.D. Cal. 2013) (dismissing consumer protection claims under the laws of states with no resident named plaintiff).  Also, because certain statutory claims provide for injunctive relief only, and the named Plaintiffs for those jurisdictions have not alleged any future harm that must be avoided, those claims should be dismissed for the same reasons discussed above, *see supra* Section I.D.  This applies to Haw. Rev. Stat. § 481A-4 (Count IXX (*i.e.*, XIX)); 815 Ill. Comp. Stat. 510/3 (Count XXII); Me. Stat. tit. 10, § 1213 (Count IXXX (*i.e.*, XXIX)); Minn. Stat. § 325D.45 (Count XXXIII); and Neb. Rev. Stat. § 87-303(a) (Count XXXVIII).

statutes at issue vary in their details, interpretation, and application. For purposes of this motion to dismiss, though, each requires a wrongful commercial practice (using terms such as "deceptive," "unfair," or "unconscionable"), as well as causation and resulting harm. As with the California consumer protection claims, Plaintiffs have failed to allege facts showing any wrongful trade practice on Intel's part, whether styled as deceptive, unfair, or unconscionable. These claims thus fail for the same reasons as Counts IV–VI.

A.      **Plaintiffs Do Not Allege Any Deceptive Trade Practice.**

Plaintiffs' allegations of deceptive conduct fall into two categories: alleged affirmative misrepresentations and alleged deceptive omissions of material fact, *see, e.g.*, Compl. ¶¶ 500, 782, 926. The Complaint does not succeed on either theory.

*First*, Plaintiffs have identified no affirmative misrepresentations by Intel, as the few security-related marketing statements they quote are all nonactionable. *See supra* Section II.B.1. In addition, every consumer-protection statute requires a causal link between the unlawful trade practice and the claimed harm. *See, e.g.*, Tex. Bus. & Com. Code § 17.50(a) ("producing cause"); Fla. Stat. § 501.211(2) ("loss as a result of a violation"); N.Y. Gen. Bus. Law § 349(h) ("injur[y] by reason of any violation"). A plaintiff cannot claim to be injured by a statement when she does not allege facts demonstrating (1) that she personally was aware of the statement before buying a device, *or* (2) that the statements affected the market price of the device. Finally, as discussed above, none of Plaintiffs' affirmative-misrepresentation claims satisfy Rule 9(b), *see supra* Section II.B.1, which applies to fraud-based claims under any cause of action, *see also Kearns*, 567 F.3d at 1125. For each of these independent reasons, the Court should dismiss all deceptive trade practice claims based on affirmative misrepresentations.

*Second*, Plaintiffs do not allege facts showing any actionable omission. While the various states have developed their own rules for determining when a seller's omission rises to

the level of actionable deception, for purposes of evaluating whether a claim is stated at all,

Plaintiffs have not satisfied the requirements of any jurisdiction.  Each of the states at issue falls

into one of the categories set forth below.

*i.  Implied Misrepresentation States*.  Twenty-seven states track Section 5(a) of the

Federal Trade Commission Act, *see* 15 U.S.C. § 45(a)(1) (prohibiting "unfair or deceptive acts or

practices in or affecting commerce"), and give substantial weight to the FTC's definition of

"unfair or deceptive acts or practices" in interpreting their "Little FTC Acts."  *See* Appendix

(chart of state laws).  To be deceptive within the meaning of the FTC Act, a representation or

omission must be both material *and* "likely to mislead consumers acting reasonably under the

circumstances."  *See FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001).  The FTC has established a

dividing line between deceptive and non-deceptive omissions—that is, between omissions that

are, and are not, likely to mislead reasonable consumers.  *See In re Int'l Harvester Co.*, 104

F.T.C. 949, 1984 WL 565290, at *86–87 (1984).  *International Harvester* explained that an

omission can be deceptive in two situations:  first, when the seller "tell[s] only half the truth, and

[] omit[s] the rest," *id.* at *86, and second, when the seller remains silent "under circumstances

that constitute an implied but false representation," *id.* at *87.

Both of these forms of deceptive omission require an implied misrepresentation by the

seller.  In each case, the seller must be responsible for the consumer's material and false belief,

either because the seller caused the belief, or because of the circumstances of the sale that are

under the seller's control.[27]  By contrast, "pure omissions" not accompanied by an implied

---

[27] *See also In re Cliffdale Assocs.*, 103 F.T.C. 110, 1984 WL 565319, at *45 n.4 (1984) (FTC
Deception Policy Statement, in Appendix:  "Not all omissions are deceptive, even if providing
the information would benefit consumers.").  Although violations of "ordinary consumer
expectations as to the irreducible minimum performance standards of a particular class of good"
qualify, *Int'l Harvester*, 1984 WL 565290, at *87, this "irreducible minimum performance"

misrepresentation are not actionable deception, *see id.* at *87, even though pure omissions may "lead to erroneous consumer beliefs if [the] consumer had a false, pre-existing conception which the seller failed to correct." *Id.* In other words, the seller does not have a "duty to correct" all consumer misconceptions for which it cannot fairly be held responsible. And because nothing in the Complaint establishes that Intel promoted any half-truths, or otherwise *caused* consumers to believe anything untrue about its products, *see supra* Section II.B, Plaintiffs have not identified any implied misrepresentation attributable to Intel. They have therefore failed to state a claim for deceptive omission under the laws of the twenty-six states that follow the FTC's lead. *See* Appendix.[28]

 **ii. *No Actionable Omission States*.** In three states—Mississippi, Pennsylvania, and Wisconsin—a deceptive trade practice claim requires an affirmative misrepresentation.[29] Any omission-based claim under the law of these three states (Counts XXXIV, L, and LXIII) should therefore be dismissed.

 **iii. *Duty to Disclose States*.** Seven states require Plaintiffs to allege a common-law duty to disclose in order to make out an omission-based deceptive trade practice claim. *See* Appendix. Plaintiffs here have not alleged any of the grounds establishing a common-law duty to disclose. *See supra* Section II.B.2.b.

---

standard is functionally congruent with the "basic degree of fitness for ordinary use" standard for an implied-warranty claim, which Plaintiffs have not satisfied. *See supra* Section II.A.2.

[28] The same also goes for Nebraska, with statutory text that is substantively identical to the FTC Act, *see* Neb. Rev. Stat. § 59-1602, and which has no clear law on omissions. Absent contrary authority, it is reasonable to conclude that Nebraska would follow the majority rule.

[29] *See* Miss. Code Ann. § 75-24-5 (enumerating deceptive practices; omissions do not appear); 73 Pa. Cons. Stat. § 201-2(4) (same; catchall subsection (xxi) covering "any other fraudulent or deceptive conduct" requires deception by "actions" or "words," *see Chiles v. Ameriquest Mortg. Co.*, 551 F. Supp. 2d 393, 399 (E.D. Pa. 2008)); Wis. Stat. § 100.18(1) (covering only false advertising). The second Ohio statute cited, the Ohio Deceptive Trade Practices Act (Count XLVII), also covers representations only. *See* Ohio Rev. Code Ann. § 4165.02(A).

*iv*. **Intent States.** In fourteen states, an omission is actionable only if it is coupled with an intent to deceive, or an intent that consumers rely on the seller's silence. *See* Appendix. Nothing in the Complaint can yield any plausible inference that Intel intended consumers to believe that its CPUs were more secure than they actually are. To the contrary: Plaintiffs expressly allege facts inconsistent with that claim, including that the architectural features Plaintiffs claim to be design defects were expressly discussed in Intel's developer reference guides and in patent filings. *See* Compl. ¶¶ 231–253; *see also supra* Section II.B.2.a (discussing Intel's extensive public record of disclosures). Further, in all of the security-related advertisements Plaintiffs cite, Intel included the disclaimer that "No computer system can be absolutely secure." *See supra* Section II.B.1. This disclaimer undermines any argument that Intel *intended* to mislead consumers on the subject of security. The claims under the laws of this subset of states should be dismissed.

*v*. **Reliance States.** Eleven states have a reliance requirement—either traditional common-law reliance, or reliance as a component of causation—in deceptive omission cases. *See* Appendix. As explained above, no named Plaintiff has alleged reliance. *See supra* Sections II.B.1, II.B.2.c.

*vi*. **Kentucky** *(Count XXVI).* Kentucky requires privity of contract for a consumer protection claim, *see Helton v. Am. Gen. Life Ins. Co.*, 946 F. Supp. 2d 695, 702 (W.D. Ky. 2013), which is not present here, *see supra* Section II.A.1; Compl. ¶ 52.

*vii*. **Oklahoma** *(Count XLVIII (Compl. ¶¶ 830–840, labeled as Count XLIII)).* Oklahoma requires either a manifested defect personally experienced by the consumer, or some actual injury beyond loss of benefit of the bargain. *See In re Gen. Motors LLC Ignition Switch Litig.*,

2016 WL 3920353, at *36–37 (S.D.N.Y. July 15, 2016) (citing *Harrison v. Leviton Mfg. Co.*, 2006 WL 2990524, at *5 (N.D. Okla. Oct. 19, 2006)).  Neither is present here.  *See* Compl. ¶ 95.

 ***viii.  Oregon*** *(Count XLIX)*.  The Oregon unlawful trade practice statute covers only final consumer goods and does not reach component suppliers like Intel, *see Ave. Lofts Condos. Owners' Ass'n v. Victaulic Co.*, 24 F. Supp. 3d 1010, 1016 (D. Or. 2014), and also requires an "ascertainable loss of money or property," *see Paul v. Providence Health Sys.-Or.*, 273 P.3d 106, 115 (Or. 2012) (internal quotation marks omitted), neither of which has been plausibly alleged here, *see* Compl. ¶¶ 96–97.

 **B.** **Plaintiffs Do Not Allege Any Unfair Trade Practice.**

 Like California's UCL, some state consumer-protection statutes allow consumers to bring an action for "unfair" as well as for "deceptive" trade practices.  Twenty-one out of twenty-five states that recognize such a distinct cause of action follow the FTC's definition of an "unfair" trade practice.  *See* Appendix; *see also FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010) (defining an unfair practice as one that "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition" (quoting 15 U.S.C. § 45(n)) (internal quotation marks omitted)).  Three follow the FTC's earlier "Cigarette Rule," *see* Appendix, a multifactor test that considers consumer injury, whether the practice at issue violates some public policy, and whether it is "immoral, unethical, oppressive, or unscrupulous," *see FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972) (internal quotation marks omitted).[30]  But under either standard, Plaintiffs' unfairness claims fail: as discussed above, *see supra* Section II.C, they

---

[30] Wyoming has no clear authority defining "unfair."  *See* Appendix.

are either repackaged deception claims or repackaged products-liability claims. Either way, they should be dismissed.

### C. Plaintiffs Do Not Allege Any Unconscionable Trade Practice.

A smaller subset of state consumer-protection statutes also proscribe "unconscionable" trade practices. While the definition of "unconscionable" varies from state to state, some form of gross misconduct on the seller's part is required, similar to what is required to prove a contract unconscionable. *See, e.g.*, *Yates Bros. Motor Co. v. Watson*, 548 S.W.3d 662, 671 (Tex. App. 2018); Ind. Code § 24-5-0.5-10(b); *Gerald Duncan Auto Sales, Inc. v. Russell*, 181 B.R. 616 (M.D. Ala. 1995) (Alabama law). No matter the precise standard for unconscionability, Plaintiffs' allegations fail to meet it; the little space they devote to unconscionability consists of bare legal conclusions. *See, e.g.*, Compl. ¶¶ 602, 814. Any unconscionable trade practice claims should therefore be dismissed.

### D. Certain Entity Plaintiffs Lack Statutory Standing.

Plaintiffs City of New Castle and Zog, Inc. are citizens of Pennsylvania, and Plaintiff Alliance Healthcare System is a citizen of Mississippi. Compl. ¶¶ 66, 100, 103. They allege the purchase and use of devices containing Intel processors for business purposes. *See id.* But the consumer protection statutes of Pennsylvania and Mississippi grant a private right of action only to individuals who have purchased the goods at issue "primarily for personal, family or household purposes." 73 Pa. Cons. Stat. § 201-9.2(a); Miss. Code Ann. § 75-24-15(1). The claims under those statutes (Counts XXXIV and L) should be dismissed for lack of statutory standing.

### CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety with prejudice. Denial of leave to amend is appropriate where further amendment would be futile.

*See, e.g.*, *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013).  Here, the deficiency of the Complaint is clear from the facts it alleges, rather than the facts it fails to allege.  Under such circumstances, amendment would serve no purpose.

DATED:  October 25, 2018.  Respectfully submitted,

STOEL RIVES LLP

/s/ Steven T. Lovett
Steven T. Lovett, OSB No. 910701
steve.lovett@stoel.com
Rachel C. Lee, OSB No. 102944
rachel.lee@stoel.com
Telephone:  503.224.3380

WILLIAMS & CONNOLLY LLP

Daniel F. Katz (*pro hac vice*)
dkatz@wc.com
David S. Kurtzer-Ellenbogen (*pro hac vice*)
dkurtzer@wc.com
Rachel Rodman (*pro hac vice*)
rrodman@wc.com
Telephone: 202.434.5000

Attorneys for Defendant Intel Corporation

**APPENDIX: CHART OF GROUNDS TO DISMISS COUNTS VIII–LXIV**

| State | Deceptive Trade Practice *(grounds to dismiss omission-based claims)* | | | | | Unfair Trade Practice† |
| | *Follows FTC Definition* | *Requires Separately Alleged Duty to Disclose* | *Requires Intent to Deceive or Intent that Others Rely* | *Requires Reliance* | *Other (see body of motion)* | |
| --- | --- | --- | --- | --- | --- | --- |
| AK | •[1] | | •[2] | | | PS |
| AL | •[3] | | | | | — |
| AR | | | •[4] | •[5] | | — |
| AZ | •[6] | | •[7] | | | — |
| CO | | | •[8] | | | — |
| CT | •[9] | •[10] | | | | PS |
| DC | •[11] | | | | | PS |
| DE | | •[12] | •[13] | | | — |
| FL | •[14] | | | | | PS |

---

† *PS = Follows FTC definition (see citations under "Follows FTC Definition" column); CR = "Cigarette Rule"; — = No separate cause of action for unfair trade practices.*

[1] Alaska Stat. § 45.50.545.

[2] Alaska Stat. § 45.50.471(b)(12).

[3] Ala. Code § 8-19-6.

[4] Ark. Code Ann. § 4-88-108(2).

[5] Ark. Code Ann. § 4-88-113(f).

[6] Ariz. Rev. Stat. § 44-1522(C).

[7] Ariz. Rev. Stat. § 44-1522(A).

[8] Colo. Rev. Stat. § 6-1-105(1)(u).

[9] Conn. Gen. Stat. § 42-110b(b).

[10] *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1118–19 (N.D. Cal. 2015) (citing *Kenney v. Healey Ford-Lincoln-Mercury, Inc.*, 730 A.2d 115, 117 (Conn. App. Ct. 1999)).

[11] D.C. Code § 28-3901(d).

[12] *Murphy v. Berlin Constr. Co.*, 1999 WL 41633, at *3 (Del. Super. Ct. Jan. 22, 1999).

[13] Del. Code Ann. tit. 6, § 2513(a).

[14] Fla. Stat. § 501.204(2).

| State | Deceptive Trade Practice (grounds to dismiss omission-based claims) | | | | | Unfair Trade Practice[†] |
| | Follows FTC Definition | Requires Separately Alleged Duty to Disclose | Requires Intent to Deceive or Intent that Others Rely | Requires Reliance | Other (see body of motion) | |
|---|---|---|---|---|---|---|
| GA | ●[15] | | | | ●[16] | PS |
| HI | ●[17] | | | | ● | PS |
| IA | | | ●[18] | | | PS[19] |
| ID | ●[20] | | | | | — |
| IL | ●[21] | | | | ● | PS |
| IN | | | | | ●[22] | — |
| KS | | ●[23] | ●[24] | | | — |
| KY | | | | | ● | — |
| LA | ●[25] | ●[26] | | | | PS |
| MD | ●[27] | | ●[28] | ●[29] | | PS |
| ME | ●[30] | | | | ● | PS |

[15] Ga. Code Ann. § 10-1-391(b).

[16] *Tiismann v. Linda Martin Homes Corp.*, 637 S.E.2d 14, 16–17 (Ga. 2006).

[17] Haw. Rev. Stat. § 480-2(b).

[18] Iowa Code § 714H.3.

[19] Iowa Code § 714.16(n).

[20] Idaho Code § 48-604(1).

[21] 815 Ill. Comp. Stat. 505/2.

[22] Ind. Code § 24-5-0.5-4(a).

[23] *In re Motor Fuel Temperature Sales Practices Litig.*, 867 F. Supp. 2d 1124, 1138–40 (D. Kan. 2012).

[24] *Id.* at 1140–41.

[25] La. Stat. Ann. § 51:1406(4) (exempting from coverage "[a]ny conduct which complies with section 5(a)(1) of the Federal Trade Commission Act").

[26] *Green v. Guidry*, 2012 WL 5507286, at *6 (E.D. La. Nov. 14, 2012).

[27] Md. Code Ann., Com. Law § 13-105.

[28] Md. Code Ann., Com. Law § 13-301(9).

[29] *Hoffman v. Stamper*, 843 A.2d 153, 191 (Md. Ct. Spec. App. 2004), *rev'd in part on other grounds*, 867 A.2d 276 (Md. 2005).

[30] Me. Stat. tit. 5, § 207.

| State | Deceptive Trade Practice (grounds to dismiss omission-based claims) | | | | | Unfair Trade Practice† |
|---|---|---|---|---|---|---|
| | Follows FTC Definition | Requires Separately Alleged Duty to Disclose | Requires Intent to Deceive or Intent that Others Rely | Requires Reliance | Other (see body of motion) | |
| MI | | | | •[31] | | — |
| MN | | •[32] | •[33] | | • | — |
| MO | | •[34] | | | | CR[35] |
| MS | | | | | • | — |
| MT | •[36] | | | | | PS |
| NC | •[37] | | | •[38] | | PS |
| ND | | | •[39] | | | — |
| NE | | | | | • | CR[40] |
| NH | •[41] | | | | | PS |
| NJ | | | •[42] | | | — |
| NM | •[43] | | | | | — |
| NV | •[44] | | | | | — |

[31] *In re OnStar Contract Litig.*, 278 F.R.D. 352, 376–78 (E.D. Mich. 2011), *appeal denied*, No. 12-101 (6th Cir. Mar. 16, 2012).

[32] *Graphic Commc'ns Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*, 850 N.W.2d 682, 695–96 (Minn. 2014).

[33] Minn. Stat. § 325F.69(1).

[34] *DePeralta v. Dlorah, Inc.*, 2012 WL 4092191, at *6–7 (W.D. Mo. Sept. 17, 2012).

[35] Mo. Code Regs. Ann. tit. 15, § 60-8.020.

[36] Mont. Code Ann. § 30-14-104(1).

[37] *Johnson v. Phoenix Mut. Life Ins. Co.*, 266 S.E.2d 610, 620–21 (N.C. 1980), *overruled in part on other grounds by Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 374 S.E.2d 385 (N.C. 1988).

[38] *Pearce v. Am. Def. Life Ins. Co.*, 343 S.E.2d 174, 180 (N.C. 1986) (describing implicit reliance component in statute's causation element).

[39] N.D. Cent. Code § 51-15-02.

[40] *Raad v. Wal-Mart Stores, Inc.*, 13 F. Supp. 2d 1003, 1011 (D. Neb. 1998).

[41] N.H. Rev. Stat. Ann. § 358-A:13.

[42] N.J. Rev. Stat. § 56:8-2.

[43] N.M. Stat. Ann. § 57-12-4.

[44] Nev. Rev. Stat. § 598.0955(1)(a) (exempting from coverage "[c]onduct in compliance with the orders or rules of, or a statute administered by" a federal agency).

| State | Deceptive Trade Practice *(grounds to dismiss omission-based claims)* | | | | | Unfair Trade Practice† |
|---|---|---|---|---|---|---|
| | *Follows FTC Definition* | *Requires Separately Alleged Duty to Disclose* | *Requires Intent to Deceive or Intent that Others Rely* | *Requires Reliance* | *Other (see body of motion)* | |
| NY | •[45] | | | | | — |
| OH | •[46] | | | | | PS |
| OK | | | | | • | CR[47] |
| OR | | | | | • | — |
| PA | | | | •[48] | • | — |
| RI | •[49] | | | | | PS |
| SC | •[50] | | | | | PS |
| SD | | | | •[51] | | — |
| TN | •[52] | | | | | PS |
| TX | | | •[53] | •[54] | | — |
| UT | •[55] | | | | | — |
| VA | | | •[56] | •[57] | | — |
| VT | •[58] | | | | | PS |

[45] N.Y. Gen. Bus. Law § 349(d) (exempting from coverage any practice that "complies with the rules and regulations of, and the statutes administered by, the federal trade commission [*sic*]").

[46] Ohio Rev. Code Ann. § 1345.02(c).

[47] Okla. Stat. tit. 15, § 752(14).

[48] *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004).

[49] 6 R.I. Gen. Laws § 13.1-3.

[50] S.C. Code Ann. § 39-5-20(b).

[51] *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1014 (C.D. Cal. 2015) (citing *Nw. Pub. Serv. v. Union Carbide Corp.*, 236 F. Supp. 2d 966, 973–74 (D.S.D. 2002)).

[52] Tenn. Code Ann. § 47-18-115.

[53] Tex. Bus. & Com. Code § 17.46(b)(24).

[54] Tex. Bus. & Com. Code § 17.50(a)(1)(B).

[55] Utah Code Ann. § 13-11-2(4).

[56] *Padin v. Oyster Point Dodge*, 397 F. Supp. 2d 712, 722 (E.D. Va. 2005).

[57] *Key v. Lewis Aquatech Pool Supply, Inc.*, 58 Va. Cir. 344, at *3 (Va. Cir. Ct. 2002).

[58] Vt. Stat. Ann. tit. 9, § 2453(b).

| State | Deceptive Trade Practice *(grounds to dismiss omission-based claims)* | | | | | Unfair Trade Practice[†] |
|---|---|---|---|---|---|---|
| | *Follows FTC Definition* | *Requires Separately Alleged Duty to Disclose* | *Requires Intent to Deceive or Intent that Others Rely* | *Requires Reliance* | *Other (see body of motion)* | |
| WA | ●[59] | ●[60] | | | | PS |
| WI | | | | | ● | — |
| WV | ●[61] | | ●[62] | | | PS |
| WY | | | | ●[63] | | Unclear[64] |

---

[59] Wash. Rev. Code § 19.86.920.

[60] *Steele v. Extendicare Health Servs., Inc.*, 607 F. Supp. 2d 1226, 1233–34 (W.D. Wash. 2009) (holding that sellers have no duty to disclose information that is otherwise available in the public domain).

[61] W. Va. Code R. § 46A-6-101(1).

[62] W. Va. Code R. § 46A-6-102(7)(M).

[63] Wyo. Stat. Ann. § 40-12-108(a).

[64] No authority on point; word "unfair" appears only in catchall provision of Wyoming Consumer Protection Act. Wyo. Stat. Ann. § 40-12-105(a)(xv).