1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF OREGON

3
     IN RE: INTEL CORP. CPU         ) Case No. 3:18-md-02828-SI
4    MARKETING, SALES PRACTICES,    )
     AND PRODUCTS LIABILITY         )
5    LITIGATION                     ) February 19, 2019
                                    )
6    This Document Relates to All   )
     Actions.                       ) Portland, Oregon
7    _____   )

8

9

10

11

12

13

14                          (Motion Hearing)

15                      TRANSCRIPT OF PROCEEDINGS

16              BEFORE THE HONORABLE MICHAEL H. SIMON

17                 UNITED STATES DISTRICT COURT JUDGE

18

19

20

21

22

23

24

25

```
1                          APPEARANCES

2   FOR THE PLAINTIFFS:       Mr. Christopher Seeger
                              Mr. Christopher Ayers
3                             Mr. David Buchanan
                              Seeger Weiss, LLP
4                             55 Challenger Road, Sixth Floor
                              Ridgefield Park, NJ 07660
5
                              Ms. Rosemary Rivas
6                             Levi & Korsinsky, LLP
                              44 Montgomery Street, Suite 650
7                             San Francisco, CA 94104

8

9   FOR THE DEFENDANT:        Mr. Daniel Katz
                              Mr. Thomas S. Chapman
10                            Ms. Susanna Rychlak Allen
                              Williams & Connolly, LLP
11                            725 12th Street, NW
                              Washington, D.C. 20005
12

13

14

15

16

17

18

19

20

21

22  COURT REPORTER:           Dennis W. Apodaca, CSR, RMR, RDR
                              United States District Courthouse
23                            1000 S.W. Third Ave., Room 301
                              Portland, OR  97204
24                            (503) 326-8182

25
```

```
 1                      (February 19, 2019)

 2                   (P R O C E E D I N G S)

 3          (Open court:)

 4          THE CLERK:  Your Honor, this is the time set for oral

 5  argument in MDL case 18-2828-SI, Intel Corp. CPU Marketing,

 6  Sales Practices, and Product Liability Litigation.

 7          Could I have counsel in court, beginning with

 8  plaintiff, please identify yourself for the record.

 9          MR. SEEGER:  Good morning, Your Honor.  Chris Seeger

10  for plaintiffs.  With me is Chris Ayers and Dave Buchanan from

11  Seeger Weiss.

12          MS. RIVAS:  Good morning, Your Honor.  Rosemary Rivas

13  for the plaintiffs.

14          THE COURT:  Good morning.

15          THE CLERK:  And for Intel.

16          MR. KATZ:  Dan Katz on behalf of Intel Corporation.

17          THE COURT:  Good morning.

18          MR. CHAPMAN:  Good morning, Your Honor.

19  Thomas Chapman also for Intel.

20          THE COURT:  Good morning.

21          MS. ALLEN:  Good morning, Your Honor.  Susanna Allen

22  for Intel.

23          THE COURT:  Good morning.

24          All right.  We are here on two motions.  I have read

25  all of the pleadings.  I have re-read the consolidated
```

1    complaint.  I have read a number of the cases that both sides

2    have cited.  The motions before us are Defendant Intel's

3    motion, or really corrected motion to dismiss, Docket 141.  And

4    relatedly, Intel's motion to take judicial notice, Docket 139.

5            I have no particular thoughts on the best way to

6    proceed in this oral argument, and so I look forward to counsel

7    telling me what you all think would be best.  Let me tell you

8    in terms of timing, I have allocated as much time for this

9    argument as it reasonably needs.  To the extent that you want

10   to go past the lunch hour, I would like to take a modest,

11   reasonable lunch break.  To the extent that you think that it

12   needs to go into the afternoon, I have a 30-minute criminal

13   matter scheduled at 2:00 p.m.

14           Is that right, Mary, and is that still on?

15           THE CLERK:  Yes.

16           THE COURT:  Okay.  Then I'll have to make sure I can

17   handle from 2:00 to 2:30.  If you don't want to take that long,

18   you don't have to.

19           But how do you all think would be the best way to

20   proceed?  Let me start by asking the movant.

21           Mr. Katz.

22           MR. KATZ:  Your Honor, frankly, depending on the

23   Court's questioning, I wouldn't think that we would have to go

24   past the lunch break.  I'm prepared to proceed now.

25           THE COURT:  That's fine.  You certainly don't need to

1    repeat everything that is in the briefs, because I have read

2    all of the briefs several times.  But that said, I look forward

3    to your arguments.

4            Mr. Seeger or Ms. Rivas, is there anything that

5    either of you wish to say very briefly before we begin with the

6    substance of the arguments?

7            MR. SEEGER:  I think for the plaintiffs' side of it,

8    we probably would need 40 minutes together, depending on what

9    Mr. Katz says.

10           THE COURT:  All right.  Well, take what you need.  I

11   do urge everyone to speak slowly, and I look forward to your

12   comments.

13           Mr. Katz.

14           MR. KATZ:  Thank you, Your Honor.

15           Now that plaintiffs have abandoned their affirmative

16   misrepresentations claims, this case presents an even more

17   compelling case for dismissal than the similar cases that were

18   brought against AMD and Apple.

19           I want to start with standing, Your Honor.  First,

20   with the basics:  Standing, of course, requires the plaintiffs

21   to plead a concrete and particularized injury as to themselves,

22   but in this case not a single one pleads an actual or imminent

23   hack, any market value decline of their devices, discontinued

24   use of their devices, or any specific performance impact.

25           The standing in this case is based on alleged

 1    overpayment at the time of sale.  In other words -- and I think

 2    critically for this entire argument, it is based on a loss of

 3    benefit of the bargain here.  So, of course, Cahen is the key

 4    Ninth Circuit case.  Legally and factually, it's on all fours

 5    with this one because plaintiffs alleged overpayment for a

 6    defective computer system in their vehicles that they alleged

 7    was vulnerable to malicious hacking; and like here, the

 8    potential hack was only demonstrated in a controlled

 9    environment.

10         The Court held in that case that the injury was

11    speculative.  There were no allegations to support any market

12    value decline, like lower Kelley Blue Book values or product

13    recall.  There was no allegation that any plaintiffs had been

14    forced to discontinue using their vehicles.  The Ninth Circuit

15    noted, of critical importance, that the alleged defect impacted

16    nearly 100 percent of the cars on the market.  Of course, in

17    this case it is indisputable that the entire market has been

18    impacted.  In the cases against AMD and Apple, the chips there,

19    like here, are all alleged to be unmerchantable.

20         THE COURT:  How would that analysis fare under the

21    Eighth Circuit's opinion in Kuhns?  I don't know if you are

22    familiar with Kuhns v. Scottrade.  That was essentially like a

23    database problem.  In that case, on standing, the

24    Eighth Circuit said that Kuhns alleged that a bargained for and

25    expected protection of his personal identifying information;

1    that Scottrade breached the contract when it failed to provide

2    promised reasonable safeguards; and that Kuhns suffered actual

3    injury in the diminished value of his bargain.

4            Then it goes on to say, "Whatever the merits of

5    Kuhns' contract claim and his related claims for breach of

6    implied contract and unjust enrichment, he has Article III

7    standing to assert them."

8            That's Kuhns v. Scottrade at 868 F.3d 711 at 716.

9    That's an Eighth Circuit decision from 2017.

10           MR. KATZ:  Well, first of all, of course, Your Honor,

11   Cahen, that analysis is the controlling case.  And second, what

12   I would say is that case is not applicable here because you are

13   not dealing with a product defect case.  There are multiple

14   cases that we cite that say that there is no defect here

15   because of the way it's defined, such as Lassen v. Nissan that

16   involved the same overpayment theory as here.  It is based on a

17   defective product design.

18           THE COURT:  But now you are getting into the merits

19   of the case, right?  And that may very well be a persuasive

20   12(b)(6) argument or elsewhere, but they said, based upon what

21   they obtained, what they purchased, that they've not gotten the

22   benefit of their bargain.  There is unjust enrichment to the

23   defendant.  That's what they allege.  We will talk about it

24   soon enough on the 12(b)(6).

25           But why isn't that sufficient for standing?

1          MR. KATZ:  Your Honor, the Lassen v. Nissan case is a

2   standing case.  Birdsong is to the same effect, which is the

3   controlling Ninth Circuit authority, one of the seminal cases.

4   There, the plaintiffs alleged that they had standing because

5   there was lack of an iPod safety feature and that was part of

6   their benefit of the bargain.

7          But the Ninth Circuit held that that loss, under

8   Ninth Circuit law, is hypothetical because it was alleged as to

9   the plaintiffs themselves that they suffered a hearing loss,

10  but more importantly, an additional safety feature wasn't part

11  of the bargain to begin with.  So that was considered not a

12  merits question.  It was considered a standing question.  And

13  the case was thrown out on that basis.

14         Lassen is to the same effect.  There is no basis to

15  assert that consumers bargained for an additional safety

16  feature.  Therefore, the case was dismissed based on standing.

17         THE COURT:  And that's what I'm having a difficulty

18  following, because I understand the argument that the consumers

19  didn't bargain for a safety feature, but that seems to me a

20  merits argument.  Maybe it is addressed at 12(b)(6); maybe it

21  can be dealt with on plausibility issues.  But I don't

22  understand why that allegation is sufficient for standing.

23         What really is the teaching from Lassen and Birdsong

24  on that point?

25         MR. KATZ:  On that point it's that you take a

1    situation, just like you said in the Eighth Circuit, where the

2    consumer comes in and says, "Look, you can play this for

3    extended periods of time at very high volume, and that subjects

4    us to a real risk of hearing loss, and you should have designed

5    the product differently, because that was part of the bargain

6    under a benefit-of-the-bargain theory.  We wouldn't have bought

7    it or we would have paid less."

8         The Ninth Circuit said that that does not get you

9    over the bar for standing, because there is no evidence that

10   you bargained for that particular feature.  We will talk later

11   about what that means in terms of a no-harm product liability

12   case.  But consistently, at least in the Ninth Circuit, these

13   issues have been addressed in the standing context.

14        I would also cite the Court to the case of Azoulai v.

15   BMW, which is a Northern District case from 2017.  That case

16   applied Birdsong and Lassen and said that there was no standing

17   relating to BMW's automatic door-shutting feature, even though

18   all plaintiffs in that case had their fingers literally crushed

19   in the BMW doors.

20        The Court said that lack of a sensor was not part of

21   the bargain.  What you have there is an effort to recast a

22   no-harm product liability case into a consumer fraud case, and

23   you can't seek benefit-of-the-bargain damages.  You don't have

24   standing because there is no bargaining for that additional

25   safety feature.

1        Now, what the Court said is they could have pled

2    standing if they pled that they were physically injured,

3    because they have manifest physical injuries.  But what all of

4    those cases stand for in the Ninth Circuit is that you actually

5    don't have standing if you haven't pled a plausible defect.

6    The Ninth Circuit and the District Courts have been very

7    vigilant about that, when you take a no-harm product liability

8    case and try to convert it into a benefit-of-the-bargain case.

9        You have to remember here, Your Honor, it is even

10    more extreme, because the plaintiffs say that this defect has

11    existed since 1995.  That's in paragraph 4 of their complaint

12    and the opposition at 3.  So what they say, "We don't like your

13    product design.  You should have been at a different place on

14    the continuum between safety and security.  We haven't suffered

15    any tangible injury."

16        They are suing for people who bought in 2006 and

17    dumped their computer in a landfill in 2011.  That's the very

18    essence of a claim where no one has suffered concrete harm.

19    Birdsong is just a continuation of all the Supreme Court

20    precedent, leading up to, of course, Spokeo and Clapper that

21    you have to really allege a palpable injury.

22        You cited a database case that I would submit is not

23    consistent with Birdsong, if interpreted that way, but also I

24    think it is important to recognize what it is that the

25    plaintiffs are claiming.  They're saying that their case isn't

```
 1   based on any fear of an actual hack.  They say that their case
 2   isn't based on whether or to what extent any particular
 3   plaintiff was impacted in terms of performance.  It's based
 4   purely on their contention that since 1995 that they don't like
 5   Intel's product design and Intel should have made a different
 6   decision on that continuum.
 7            So at least all of the cases I cited to you,
 8   including Birdsong, Lassen, and Azoulai treat this as a
 9   standing issue, and I think this Court should do the same.
10            I also think that Judge Davila got it right in
11   In re Apple Processor, because he applied Cahen to say there's
12   no injury in fact.  There was no allegation in that case, just
13   like here, about the decline of value of iDevices.  There is no
14   allegation about any plaintiff discontinuing using the device.
15   There is nothing about any plaintiff personally experiencing
16   specifically any performance impact.
17            I would submit to you that this case is even more
18   compelling for dismissal because the plaintiffs expressly state
19   to the Court in their opposition at page 12 that they are not
20   basing their case on the performance impact of any patches.
21            In keeping with that approach, Your Honor, 94 of 95
22   plaintiffs in this case say absolutely nothing about the
23   performance impact whatsoever.  Only one -- that's
24   DK Systems -- does so vaguely.
25            So here, I think it is even more extreme than that,
```

1    Your Honor, from a standing perspective because the plaintiffs

2    actually plead facts that negate any price impact from the

3    disclosure of the vulnerability.  Five plaintiffs bought in

4    2018, and they don't allege that they paid less.  They allege

5    that after all of the information was in the public domain

6    starting on January 2nd, that they actually overpaid,

7    completely negating any allegation that there was harm here.

8            With respect to the plaintiffs' cases, Your Honor,

9    that they cite and principally rely on for standing, they are

10   dealing with cases where the products have actually

11   malfunctioned, and there is some nonspeculative injury; for

12   example, In Re:  Toyota Unintended Acceleration.  In that case

13   you are talking about specific allegations of unintended

14   acceleration.  So the product was not operating as designed.

15   It led to fatal accidents, recalls, lower Kelley Blue Book

16   values.  That's the sort of case where there is clearly

17   standing.

18           None of that is pled here.  When you look at the

19   facts in these cases and the lengths that the plaintiffs went

20   to plead concrete injury:  17,900 cases reported, even five

21   Toyota mechanics, recalls, fines by the National Highway

22   Transportation & Safety Board to the tune of $16.4 million.

23   None of that is true here.

24           The In Re Chrysler Gearshift case is another case

25   they cite, where the car wouldn't properly go into park, and

1    that led to 300 complaints of cars moving unattended, at least

2    one death, many injuries, recalls, extreme depreciation.

3    That's the stuff of which standing is made.

4              The case that they principally rely on, Your Honor,

5    in addition to the car cases, is Hinojas v. Kohl's, a

6    Ninth Circuit case which I'm sure you are familiar with from

7    2013, that predated Cahen.  That case is completely

8    distinguishable, because, first of all, it is not a product

9    defect case.  Second of all, it involved a fabricated price, an

10   economic injury, that the Cahen court said was not speculative

11   and directly ascertainable.  That was in fact the

12   District Court decision.

13             Your Honor, unless you have any further questions on

14   standing, I'll move on to implied warranty, but I think the law

15   is quite clear in the Ninth Circuit.  I think Judge Davila got

16   it right.  I think it is on all fours with Cahen for all the

17   reasons I said, including the market-wide impact; the

18   speculative harm; no allegation of market impact; and actually

19   allegations that negate market impact since, once the

20   information was out there, people are saying they still

21   overpaid.

22             I would also highlight to the Court, not only are

23   there five people who bought in 2018, there are two people who

24   are named plaintiffs who bought after they filed suit, after

25   having advice of counsel, after saying, "We wouldn't have

```
 1   bought a device with an Intel processor, or we would have paid
 2   less."  They still buy and come in and say they still overpaid.
 3   I think that's very, very important for the Court to keep in
 4   mind in assessing the complaint that has been brought.
 5           Regarding the implied warranty claim, first of all, I
 6   know that Judge Koh didn't reach this and the Hauck case went
 7   right to merchantability, but there is no vertical privity
 8   here.
 9           THE COURT:  By the way, I know that one of the
10   responses to the question I'm about to ask is they didn't plead
11   third-party beneficiary.  They didn't; I get that.  If they
12   had, isn't the direction that at least California law is going
13   on vertical privity to be more open to arguments of third-party
14   beneficiary claims, at least when it is pled?
15           MR. KATZ:  I don't think that's right, Your Honor.
16   The way I would respond to it is this:  There are some federal
17   District Court cases, and I think those are the cases that you
18   may be referring to, that indicate that there is a third-party
19   beneficiary exception.  However, I would cite the Court to
20   In re Seagate Tech., a Northern District case from 2017.  The
21   Court there said that no California case has applied a
22   third-party beneficiary exception to a consumer claim against a
23   product manufacturer.
24           And we searched for one, Your Honor, and did not find
25   any California Court of Appeals case, and certainly no
```

1   California Supreme Court case, that applied it in that fashion.

2   The In re Seagate court said that it would be hard to imagine a

3   more thorough nullification of the Clemens case than that.

4          THE COURT:  Although what was the product in Seagate?

5   I thought that's where the manufacturer supplied to a dealer

6   who then sold to the consumer; whereas here we have a

7   manufacturer of a component selling to a manufacturer of a

8   computer who then sells to the consumer.

9          Is that difference to a third-party beneficiary

10  analysis?

11         MR. KATZ:  I don't think that's a difference.

12  Your Honor, I would say, here, many of the plaintiffs are two

13  steps removed, because of Intel selling to HP, selling to

14  Best Buy, selling to a consumer, so a two step --

15         THE COURT:  But the third-party beneficiary analysis

16  would run from Intel to the assembler and manufacturer of the

17  computer?

18         MR. KATZ:  Right.  And I don't think it makes

19  particularly any difference that there is another step in the

20  chain.  But I think what is important is that Clemens from

21  2008, which I know Your Honor is familiar with, that was

22  obviously a consumer purchasing a car from a dealer and was

23  held not to be in privity with the manufacturer.

24         The Ninth Circuit said that the California courts

25  have painstakingly set out the exceptions to the privity

1    requirement, and certainly a third-party beneficiary exception

2    specifically wasn't one of them.

3            Where this all emanates from, where the District

4    Courts say there is such an exception, they get from Gilbert

5    Financial, which is a Court of Appeals case from '78.  That

6    involved a roofing subcontractor that stepped into the shoes of

7    the general contractor for the part of the project that related

8    to the roof, and it was held that you could maintain a claim

9    against the subcontractor, but interestingly the Court said in

10   that case that it didn't need to decide the issue of privity

11   per se in that case because there was such a direct contractual

12   connection between the subcontractor and the homeowner.

13           THE COURT:  It's probably an unfair question, but if

14   you are right on the requirement of privity and it is that

15   clear, why didn't Judge Koh address it in Hauck v. AMD?

16           MR. KATZ:  The reason why she may not have addressed

17   it, just from reading her opinion, Your Honor, is because it is

18   just so clear in this case that there's no breach of the

19   implied warranty of merchantability; that it is such a

20   slam-dunk decision that she just went right to it and didn't

21   address the privity requirement.

22           THE COURT:  And I assume you feel the same way in

23   this case?

24           MR. KATZ:  I do.  I'll address that in a minute.  I

25   just want to make a couple more quick points about privity.

1    Let's even assume the exception applied.  Aside from the

2    plaintiffs not saying specifically in their complaint that they

3    are relying on a third-party beneficiary exception, they at

4    least would have to plead what contract they claim they're the

5    beneficiaries.

6            They cite the case In re Carrier IQ from the

7    Northern District in 2015, and that implied warranty claim was

8    dismissed because nothing was alleged about an underlying

9    contract.  The cases that they rely on for their privity

10   argument, they say because Intel was marketing, that's what

11   created the privity.  But the cases that they cite don't say

12   that, like Luong v. Subaru, Northern District from 2018, that

13   was a case where the plaintiffs alleged that Subaru was the

14   direct seller.  Because they made the allegation that Subaru

15   was the direct seller, the Court said, "We're not going to

16   dismiss it on the grounds of privity."

17           In the Cardinal Health case, that was, again, a very

18   specific contractual situation where Tyco was a successor

19   corporation.  It was held that Tyco succeeded to the

20   predecessor; and therefore, there was a contractual

21   relationship and the link wasn't broken by the sale of a

22   business.  But that's far afield from what we have here

23           THE COURT:  Is it really far afield?  Here is what

24   I'm thinking.  I don't watch television that much, but when I

25   do, I do notice some of these Intel commercials.  Since I can't

1   carry a tune, I can't do that little jingle.  But I know they

2   are marketing directly to consumers to want to select a

3   computer that has Intel inside.  They put the label on there so

4   that the consumer will know whether they are or are not getting

5   a computer with Intel inside.  So even though they are not

6   selling processors to end-users, they sure look like they are

7   marketing.

8          What's the implication of that?

9          MR. KATZ:  Certainly Intel is marketing.  I would

10  agree with you, and I would concede that.  But I really don't

11  think that that plays into the vertical privity analysis.  I

12  haven't seen any case.  I haven't even seen a District Court

13  case that said simply because you market, that would create

14  privity; that that's part of the analysis.

15         Even the District Court cases that say there's a

16  third-party beneficiary exception, at least require, like

17  In re Carrier IQ, that you point to a specific contract.  I

18  don't think just simply by marketing and ads being put out

19  there that you then blow through the privity requirement.  I

20  would say if that was the case, then there is really nothing

21  left whatsoever of Clemens v. DaimlerChrysler.

22         I would come back to that, in Clemens, it did

23  painstakingly lay out the exceptions recognized by the

24  California courts, third-party beneficiaries is one of them,

25  and as I said, Your Honor, I was not able to locate any case

1    where there is a California state court that says that that's
2    one of the exceptions.
3              THE COURT:  But Clemens didn't address a situation of
4    a manufacturer marketing directly to the consumer, and I wonder
5    if that is another basis to find an exception to vertical
6    privity requirements.
7              MR. KATZ:  Well, you're talking about, in Clemens v.
8    DaimlerChrysler, a car manufacturer, and there are a lot of car
9    cases.  Car manufacturers certainly are all over the airwaves
10   advertising to consumers.  Clemens said that a consumer
11   purchasing a car from a dealer is not in privity with the
12   manufacturer.  So I think that that would have been apparent,
13   and I haven't seen any case citing advertising as the linchpin
14   of the analysis.
15             Moving on to the merchantability, the standard is
16   that the product has to lack even the most basic degree of
17   fitness for ordinary use.  That's Birdsong.
18             Hauck said, and I think this is important,
19   Your Honor, that the alleged defect in that case -- and
20   Judge Koh analyzed, whether it is 20 years of serious security
21   vulnerabilities, whether it is vulnerabilities created by AMD's
22   design, which is the same as our case, or Spectre, there is no
23   allegation that there is a compromise of safety; that
24   processors are rendered inoperable; that functionality is
25   drastically reduced.

1          Judge Koh specifically analyzed a 5 to 30 percent

2    slowdown after patching and said that that doesn't render the

3    processors unfit for their ordinary purpose.  The complaint

4    here at paragraphs 298, 303, and 306 also cite this same up to

5    30 percent impact.

6          But I think it is also critical, Your Honor, to note,

7    in addition to Judge Koh's analysis, think about it:  The

8    alleged defect here has existed since 1995.  So the implied

9    warranty standard can't possibly be met.  I don't see how it

10   can be seriously contended that the defect, as defined in this

11   case, that since 1995 that all Intel processors have lacked

12   even the most basic degree of fitness for ordinary use; that

13   the processors all that time have been computing properly; all

14   that time there has been no hack reported.

15         How can it be said that they lack even the most basic

16   degree of fitness?  I would go even further and say, with

17   respect to the defect and the vulnerability, there hadn't even

18   been any kind of proof of concept demonstrated in a lab to

19   maliciously exploit speculative execution.

20         As for the named plaintiffs bringing it up to the

21   present time, we are batting 95 for 95 on continued use because

22   all of them say that they applied a patch, plus you have five

23   plaintiffs, including two with advice of counsel, buying in

24   2018.  I would submit that it defies common sense to think that

25   consumers are buying products after knowing that they are going

1    to be patched and knowing there are these vulnerabilities, that

2    somehow they are buying a product that lacks even the most

3    basic degree of fitness for ordinary use.

4           We cite other multiple cases that show that there is

5    a very high bar set on the implied warranty of merchantability.

6    It means not even meeting the minimum standard of quality.

7    Kent v. Hewlett-Packard, a motion to dismiss, they're

8    frequently granted.  Just like Judge Koh granted the motion to

9    dismiss, it was granted in Kent v. Hewlett-Packard for a laptop

10   that routinely locked up, froze on a cold boot, because there

11   was no data lost, and there was no allegation that anyone was

12   forced to stop using the computer.

13          Baltazar v. Apple is another example from the

14   Northern District where a motion to dismiss was granted, and it

15   was alleged that outside, in the sunlight, iPads overheated and

16   shut down.  The Court held that they're not unfit for use

17   anywhere.

18          So what I would lastly emphasize about

19   merchantability about the clear and sharp distinction between

20   the analysis that Judge Koh went through in Hauck and those

21   other cases that I just discussed and the plaintiffs' cases,

22   they are all cases where the product drastically malfunctioned

23   or completely failed, like In re Nexus 6P Products Liability.

24   That's one of their featured cases.  There was a total failure

25   of those phones.  There was data lost.  It was alleged in the

1    complaint that the phone is essentially an expensive

2    paperweight.  You don't have anything like that here.

3            In re Carrier IQ was a software installed by phone

4    carriers that actively transmitted in realtime, even when not

5    using the network, while using a WiFi network, data readable by

6    third parties in unencrypted form operating a hundred percent

7    of the time.

8            Isip v. Mercedes-Benz, another case that they cite.

9    That's a car that smells, lurches, clanks, emits noise over an

10   extended period of time.  I agree that just because a car will

11   go from point A to point B doesn't mean it's basically fit.

12   But if there is a severe malfunction like that, such that no

13   reasonable person is going to use it -- another example that's

14   given is a bed with mold.  You can still sleep in it, but

15   no one wants to sleep in a bed with mold.  That makes sense.

16           They also cite Roberts v. Electrolux; that lint

17   accumulation in a dryer can cause fires.  Maybe it will still

18   dry clothes, but it will really dry them.  It might burn them

19   up.  But we are obviously not talking about anything like that

20   here.

21           So Judge Koh analyzed it from every angle no

22   matter -- she had some difficulty about exactly what the defect

23   was, but analyzed the situation we have here, a defect that

24   goes back 20 years, and it relates to the design of the

25   processor; it's not as secure as it is supposed to be.  Clearly

1    Intel's processors are fit for use, and all of the plaintiffs

2    here demonstrate that.

3            Going to duty to disclose, Your Honor -- if we get by

4    standing, that's a central issue in the case.  I would like to

5    go into a little more detail about Wilson v. Hewlett-Packard

6    because there is the contention that Wilson v. Hewlett-Packard

7    is not good law anymore in the Ninth Circuit related to the

8    standard for a duty to disclose at the threshold level.

9            Of course, in Wilson v. Hewlett-Packard, there's no

10   duty to disclose in a pure omission case unless there is an

11   unreasonable safety hazard.  I would like to review with the

12   Court why Wilson is clearly still good law and binding on this

13   Court.

14           THE COURT:  You're certainly welcome to do that, but

15   I've read Hodsdon a few times, and there seems to be reluctance

16   by the Ninth Circuit to unabashedly confirm that Wilson is

17   still good law.  So I assume that after you tell me why Wilson

18   is still good law, you'll give me an alternative argument.

19           MR. KATZ:  I will.  In fact, Your Honor, I don't want

20   to be defensive about it.  I'll explain why this Court is bound

21   by Wilson, but I also think that they don't come within a

22   country mile of proving that there is a central functional

23   defect in Intel processors that goes back to 1995.

24           THE COURT:  And that strikes me as an easier argument

25   for you to make than the argument that either I'm bound by

1   Wilson or Wilson is still good law, especially after Hodsdon.

2   But you are welcome to make both.

3           MR. KATZ:  I want to take a quick crack at it, if

4   that's okay.

5           THE COURT:  Of course.

6           MR. KATZ:  First of all, Your Honor, Hodsdon

7   explicitly said that we have no occasion in this case to

8   consider whether later state court cases have effectively

9   overruled Wilson.

10          They said that what they are going to proceed to do

11  is apply plaintiffs' test of central functional defect.  The

12  Court went on to say that, of course, plaintiff couldn't state

13  a claim, because whether there is human trafficking in the

14  supply chain, as reprehensible as that is, it is not a central

15  functional defect of a chocolate bar.

16          So, first of all, Your Honor, a Ninth Circuit panel

17  can't overturn the decision of a previous Ninth Circuit panel,

18  unless it's clearly inconsistent with intervening higher

19  authority.

20          Collins and Rutledge, which are the two cases we are

21  talking about, are not intervening higher authority for two

22  reasons:  First of all, Hodsdon itself noted that with respect

23  to the six District Courts of Appeal, they don't even bind each

24  other, and they are certainly not binding on the Ninth Circuit.

25          And second, post-Rutledge, which is second in time of

1    the two cases.  That's a 2015 case.  Collins v. eMachines is

2    2011.  The Ninth Circuit twice reaffirmed the Wilson standard.

3    Daniel v. Ford Motor Company in 2015, which was about five

4    months after Rutledge, said that Wilson's safety hazard is

5    still the standard.

6              THE COURT:  Was that published or unpublished?

7              MR. KATZ:  I believe it is a published decision.

8    Daniel v. Ford Motor Company is cited by both us and the

9    plaintiffs.  It is a published decision that also talks about

10   how there are two sub-elements of reliance, a later argument.

11   Then in 2017, in Williams v. Yamaha, the Ninth Circuit again

12   reaffirmed Wilson v. Safety Hazard Standards.  So, therefore,

13   Rutledge isn't an intervening authority of any kind.

14             Then, also, Your Honor, taking two of plaintiffs'

15   cases, Sloan v. General Motors, the Northern District in

16   2017 -- that's cited in the opposition at 8.  The Court there

17   held it was bound to follow Wilson and not Rutledge, noting

18   that Williams v. Yamaha postdated Rutledge.

19             In addition, the plaintiffs cite Lusson v. Apple in

20   their opposition at page 36.  The District Court there said

21   that the Court is bound by Wilson Safety Hazard until the

22   California Supreme Court clearly states that the law is

23   otherwise.

24             So what I think it takes, Your Honor, for this Court

25   not to be bound by Wilson is either a decision of the

1    California Supreme Court, or, of course, en banc Ninth Circuit

2    or U.S. Supreme Court.  Otherwise, the Wilson standard of

3    safety hazard is still the law here.

4           Also, very briefly, before I turn to central

5    functional defect, there are a few other things that I think

6    the Court should consider.  First of all, Hodsdon itself said

7    that Collins and Rutledge are somewhat vague about the tests

8    for determining whether a defendant has a duty to disclose

9    under what circumstances.

10          Hodsdon noted that Rutledge can be interpreted to

11   mean any one of three different things.  That's how clear it

12   was.  One of the things is that if there is a central

13   functional defect, that that standard only applies if the

14   defect arises within the warranty period.

15          Hodsdon read Collins as standing for the proposition

16   only that central functional defect applies within the warranty

17   period.  Of course, we are not dealing with a warranty here.

18   So for that reason, the central functional defect, if Rutledge

19   is read that way, it doesn't apply.

20          In addition --

21          THE COURT:  Although I assume we're now going to turn

22   to there's no central functional defect here.  But if there

23   were, whatever that might mean, but if there were, it would be

24   present from the moment the product is sold, which is within

25   the warranty period.

1          MR. KATZ:  The plaintiffs are not relying on that.

2    There is no express warranty here --

3          THE COURT:  Right.

4          MR. KATZ:  -- to plaintiffs.

5          THE COURT:  Right.  I just don't think that aspect of

6    Rutledge is really where the guts of this dispute is.

7          MR. KATZ:  Yeah, I think that's right, Your Honor.

8    But I'd also say that I think there are really good policy

9    reasons to follow the safety hazard standard.  Daugherty v.

10   American Honda has been a very seminal case.  That's the case

11   that Wilson relied on and articulated a policy reasons behind

12   the safety hazards standard.

13         Another case, Bardin, which is relied on by the

14   Ninth Circuit in Hodsdon, also articulates why it is important

15   to have a very high bar on duty to disclose, and I'm going to

16   get to that in a minute with respect to central functional

17   defect, because California, of course, has no broad obligation

18   to disclose.

19         And in a pure omission case, what Wilson discusses

20   and what Bardin discusses, and what Daugherty discusses is that

21   broadening the duty to disclose will eviscerate the limitations

22   imposed by product liability law and warranty law and

23   essentially make warranties perpetual; that the issue of safety

24   hazard, that's something that is dealt with at the product

25   liability law level because it is imposing strict liability on

1    a manufacturer to take care not to injure people.

2            But in the consumer fraud context, we only have a

3    limited duty to disclose.  And the reason for that, especially

4    in a design defect case like this, there's no limiting

5    principle on it, Your Honor.  I mean, what would Intel have to

6    disclose?  Every time they make a design decision, where

7    they're finely calibrating on the speed security continuum --

8            THE COURT:  And you know that's one of the questions

9    I'm going to ask plaintiffs' counsel.

10           MR. KATZ:  And it is something that the Ninth Circuit

11   and the California Court of Appeals was very, very concerned

12   with, in setting that line, in Daugherty and Bardin.  I mean,

13   Bardin was a case that said that we can recover under consumer

14   fraud law because Chrysler installed an exhaust system made out

15   of tubular steel instead of cast iron, and the tubular steel

16   was inferior, less durable, less expensive, and unlikely to

17   last the useful life of the car.

18           Of course, the Court there held, and Hodsdon cited it

19   with approval in discussing the unfair prong of the UCL that

20   you don't have a case, and granted a motion to dismiss because

21   you didn't bargain for any particular type of steel to be used

22   in the exhaust system.

23           I think that that case is on all fours with this one

24   here because there was no warranty.  Chrysler made no

25   representations about the durability of the exhaust system,

1    just like the plaintiffs here aren't relying on any affirmative

2    misrepresentation, which I think is very key here that they're

3    proceeding on a pure omission theory.

4           So with respect to central functional defect, the

5    standard is that the product essentially must be incapable of

6    use by any consumer, like a computer chip that corrupts a hard

7    drive or a laptop screen that goes dark.  And, of course, where

8    Hodsdon got those examples were directly from Rutledge, the

9    computer chip that corrupts the hard drive; and, in Collins,

10   the laptop screen that goes dark.

11          So I think when the Ninth Circuit talks about a

12   defect that impairs a product to the extent that it is

13   incapable of use by any consumer, what they're talking about is

14   that we are going to look at what the defect does to the

15   product in an overall fashion.

16          For example, you could see a case where, just like in

17   the implied warranty context -- let's say an air conditioner;

18   you can't stop it from emitting mold.  That car is going to be

19   incapable of use, even though one might argue that an air

20   conditioner isn't like the central function of a car.

21          I would say that if you look at the cases,

22   particularly Judge Koh's analysis in Hauck, the language used

23   in discussing central functional defect is a lot like the

24   language that's used in discussing implied warranty.  And it

25   has to be a very high bar, because the policy considerations

1    that I just discussed that are set out in Daugherty and Wilson

2    still apply.  Even if it is central functional defect, it has

3    to be a very high bar.  So why can't the test possibly be met

4    here?

5              Again, Your Honor, this defect is alleged to exist

6    since 1995.  So we are saying that Intel processors, since

7    1995, have been incapable of use by any consumer?  There's no

8    allegation that any data was corrupted.  There is no allegation

9    that they didn't compute properly.  There is no allegation that

10   anybody hacked; that any type of hack had even been developed;

11   even a proof of concept in a lab with respect to the defect as

12   they define it here.

13             THE COURT:  Let me ask you this:  It is probably

14   hypothetical -- at least we don't have any evidence in this

15   case yet -- although it may or may not be consistent with some

16   allegations.  Let's assume that there was a design feature put

17   in in 1995 that the designer assumed would never cause a

18   problem because there is no way that anyone would have a key to

19   exploit it.

20             Then technology advances, and 25 years later someone

21   develops a key to exploit it and that makes -- this is where we

22   are really going to get very hypothetical and probably

23   counter-factual, but that now makes it very unsafe to use this

24   product, to use the processor, because the key has now been

25   developed.

1            The fact that it has been in existence since 1995

2       doesn't mean that we don't have a serious defect.  I mean, we

3       just didn't have a defect that could be exploited until now.

4       But now that the key has been developed 25 years after the

5       product was introduced, that would make the product inoperable.

6       I know you're going to say, "This is not inoperable."  And

7       that's why this is a hypothetical.

8            But doesn't the fact that 25 years later this key has

9       now been developed that can make the product inoperable mean

10      that something that wasn't a defect when it first came out 25

11      years ago now is?

12           MR. KATZ:  I think you have to judge it by what

13      decisions were being made at the time that the product is

14      developed, and maybe you'll revisit that decision.

15           No, I don't think that is the right analysis.  I

16      think the analysis is the manufacturer making a reasonable

17      design choice.  And when they are making the reasonable design

18      choice, is it foreseeable that the product -- because of

19      that -- is going to drastically malfunction or completely fail?

20      I think that's what you're positing, and that's the kind of

21      case that they cite.  If you're positing that the design is

22      developed at a time when you know that it is going to be very

23      simple for people to hack and you're not going to have any

24      security whatsoever, such that the product is malfunctioning,

25      then you are in "central functional defect" land.

1          But if a manufacturer is making a design decision to

2     balance security and speed, like Intel did here in a certain

3     way, the courts are very clear in the Ninth Circuit that that's

4     not actionable.

5          The Bardin v. DaimlerChrysler is cited in Hodsdon.

6     The design choice, even though when Chrysler baked in tubular

7     steel into an exhaust system, they knew that it wouldn't be as

8     durable.  They knew that it was likely to fail arguably within

9     the useful life of the car.  But the Court said that design

10    decision is one for Chrysler to make, and so you can't recast a

11    no product liability/no injury case into a consumer fraud case.

12    I'm not sure if that's what you are trying to posit.  I think

13    there's a big difference.

14         So the cases they cite, they are all cases where the

15    product either completely failed or drastically malfunctioned

16    again; the same infirmity in their analysis in the implied

17    warranty context.  Their featured case is Beyer v. Symantec

18    from the Northern District in 2018.  But in that case you are

19    talking about Norton Symantec software, where the only purpose

20    was security.  It was alleged that the product ab initio

21    drastically malfunctioned, including causing data corruption.

22    And on top of that, the product actually made the computer less

23    secure.  So that's a reasonable decision by Judge Chen to let

24    that go forward.

25         The Norcia v. Samsung case, a very short decision,

1  they also rely on.  That actually involved affirmative

2  misrepresentation, despite the fact that it was labeled an

3  omission case.  That was one where Samsung allegedly programmed

4  the phones to fool benchmarking apps. and overstate the

5  performance.  That was the misrepresentation side of the case,

6  so that basically the product didn't work as represented.  We

7  are not talking about that here when we are talking about a

8  design decision, an infirmity of which is allegedly that Intel

9  didn't properly balance speed and security back in 1995.

10       So for there to be any bar, Your Honor, on duty to

11  disclose, which California has said has to be set at a very

12  high level, whether you're applying the safety hazard standard

13  or the central functional defect standard doesn't come close to

14  being met.

15       So I would like to turn now to the LiMandri factors,

16  and the plaintiffs are only relying on two.  First, we will

17  talk about actual knowledge, and there's no duty to disclose.

18  So in talking about the LiMandri factors, the plaintiffs are

19  not really entirely clear in this discussion about what the

20  defect is.  Their opposition brief at page 28 said, "Had the

21  plaintiffs known about Spectre, Meltdown, and Foreshadow and

22  the patches that would reduce performance, they would not have

23  bought the products or paid less."

24       Your Honor, in some of the individual descriptions of

25  named plaintiffs they talk about how if people had known about

1    these patches, they wouldn't have bought or paid less.  That

2    flies in the face of what they claim the defect is.  But let's

3    just assume for a moment the defect is Spectre, Meltdown, and

4    Foreshadow.  Well, there, the omission claim fails because, as

5    Wilson and Hauck say, the actual defect at the time of sale is

6    required and alleging "should have known" is insufficient, and

7    the plaintiffs say that Spectre wasn't discovered until

8    mid-2017 and the others later, and so there was no actual

9    knowledge.  So that's a problem.

10             But now let's talk about exclusive knowledge, where

11   there is a big debate about what that standard is.  So if it's

12   not Spectre/Meltdown, if it is what they say in paragraph 2 of

13   the complaint, that it is the design choice that goes back to

14   1995, they can't demonstrate that Intel had exclusive knowledge

15   triggering a duty to disclose, because the way the cases that

16   we rely on and interpret that is "exclusive knowledge" means

17   information is not available to the public.  I think it is

18   important to go back to the source, because there is a dispute

19   in District Courts in California over whether it is a superior

20   knowledge standard or an exclusive knowledge standard.

21             It all goes back to the case of Goodman v. Kennedy,

22   which is a 1976 decision of the California Supreme Court, and

23   we would submit that that case articulates an exclusive

24   knowledge standard.

25             THE COURT:  You know, let's assume it is exclusive.

1    Looking at LiMandri itself, it phrases it as "when the

2    defendant has exclusive knowledge of material facts not known

3    or reasonably accessible to the plaintiff."

4            How do I unpack that analytically in the following

5    respect:  I think that if it is exclusive knowledge, it is not

6    exclusive to Intel, from what I have seen here, because it was

7    widely known among computer scientists based upon the papers

8    that were presented.  However, does that make it reasonably

9    accessible to a consumer plaintiff?  Well, based upon my

10   experience about a week and a half ago, it's not reasonably

11   accessible to a typical plaintiff.

12           So analytically how do I evaluate this?  If it is not

13   exclusive to Intel, because it's reasonably well-known among

14   computer architecture scientists and experts, and they are

15   debating the pros and cons, and they are writing about this and

16   talking about this at conferences, but it is not reasonably

17   accessible to the plaintiff, how do I deal with this aspect of

18   the LiMandri factor even assuming exclusivity is the measure?

19           MR. KATZ:  I don't know of any case that says that

20   because the information that a defendant is deemed to have

21   exclusive knowledge of is complicated -- this is complicated

22   stuff -- that that somehow changes the analysis.  I think that

23   what the cases are getting at, though, like I said, is the

24   information out in the public, or is it solely internal?  We

25   cite a legion of cases that talk about that, like Andren v.

1    Alere, I think, answers your question because there --

2              THE COURT:  Which case?

3              MR. KATZ:  Andren v. Alere, the Southern District

4    case from 2016.  The Court there held that there was no

5    exclusive knowledge because there were some published studies

6    and a letter posted on the FDA website about a medical testing

7    device.  People were complaining about the malfunctioning of a

8    medical testing device.  There, that was deemed sufficient.

9              In Herron v. Best Buy, what we were talking about

10   there, that had to do with a laptop battery life in Toshiba

11   laptops.  There was a cite to only one article in Newsweek nine

12   months before the plaintiff purchased the Toshiba laptop from

13   Best Buy talking about the MMO7 test for batteries not being

14   sufficient and misstating the battery life.  That was deemed

15   sufficient for Best Buy to not have exclusive knowledge.

16             THE COURT:  Is there an analogy here that is apt --

17   there is definitely an analogy here -- whether it is apt or

18   not, I would like your advice -- on the doctrine of fraud in

19   the market or an efficient market hypothesis?  Because if I

20   conclude that if the test is exclusive and the technological

21   details were well-known and debated among computer architecture

22   specialists, even if it is not reasonably accessible to a

23   plaintiff or to an ordinary consumer, the marketplace knows

24   this information; and therefore, it doesn't satisfy that second

25   factor of LiMandri?

```
 1            MR. KATZ:  Yeah, I think that's a good analogy.  I
 2   would say to Your Honor, look at who the consumers bought the
 3   products from.  The companies that were buying chips directly
 4   from Intel are sophisticated technology companies, like Dell,
 5   Lenovo, HP.  They're all certainly aware of this research.
 6   They go to the same conferences.  Your Honor, it is not just
 7   limited to academics publishing papers and scientists
 8   publishing papers.  We are also talking about multiple patent
 9   applications that they cite.  At least --
10            THE COURT:  Which also are not accessible to the
11   typical consumer, but I get your point.
12            MR. KATZ:  But is that any different than tests
13   published on the FDA website that an ordinary consumer goes on
14   the FDA website?  What the Courts are looking to, is it really
15   exclusive, or is the information out there in the public
16   domain?  I would like to buy M&M's, but I didn't necessarily
17   know about human trafficking in the supply chain in the
18   Ivory Coast, which McCoy v. Nestle said that's sufficient for
19   there to be notice of knowledge.  Then there's Sud v. Costco
20   about human trafficking in the Thai fishing industry for
21   prawns.
22            THE COURT:  Sure.  I'm just trying to figure out how
23   I explain my understanding of the LiMandri factor in the phrase
24   "reasonably accessible to the plaintiff."
25            MR. KATZ:  I think that has to be understood in the
```

1  sense that it is reasonably accessible in the public domain;

2  that it doesn't necessarily mean that a particular plaintiff

3  has to have read it.  In all of the cases, the plaintiff said,

4  "I wasn't aware of the Newsweek article.  I wasn't aware of the

5  letter on the FDA website."  But otherwise, Your Honor, unless

6  you have a reasoned principle, like whether the information is

7  in the public domain, then you basically don't have any other

8  LiMandri factors.

9       You're always going to be able to posit, in any

10  technology case, for example, that the manufacturer has

11  knowledge that a typical consumer may not have.  But I haven't

12  seen, as a limiting principle, that we look at how complex the

13  issue is and then judge the factor that way.  Otherwise, the

14  other LiMandri factors basically are written out of existence.

15       And I must say, Your Honor, we searched high and low.

16  I'm not aware of any case where the disclosure and discussion

17  in the public domain was this widespread; that the plaintiffs

18  recount over paragraph after paragraph after paragraph in their

19  complaint where a defendant was deemed to have exclusive

20  knowledge of the issue.

21       Your Honor, you can go back to the Goodman v. Kennedy

22  case, the facts of that case, that involved an attorney that

23  gave advice to his client about the complicated issue of stock

24  registration, and third-party buyers of the stock allege that

25  the attorney had a duty to disclose properly the registration

1    infirmities because that would have impacted their decision to

2    purchase.  There, the California Supreme Court held that the

3    attorney did not have exclusive knowledge of the stock

4    registration requirements in a transaction that the attorney

5    himself handled.

6         I would argue that if the standard was lower, if it

7    was like some kind of hybrid exclusive knowledge/superior

8    knowledge, it's not within the realm of the understanding of an

9    ordinary layperson, the decision in the Goodman v. Kennedy case

10   would have come out the other way.

11        THE COURT:  And as I understand the plaintiffs'

12   allegations, and tell me if you understand them the same way,

13   and we will hear from plaintiff later, but if we're talking

14   about exclusive knowledge of the sort that was only learned

15   and/or discovered after the Google Project Zero information was

16   disclosed -- first of all, it wasn't exclusive to Intel if it

17   was discovered by Google Project Zero, but if that's the sort

18   of information that they are talking about, to that degree of

19   granularity and specificity, there's no allegation in the

20   consolidated amended complaint now that Intel knew about that

21   before it was disclosed more generally in 2017.

22        Is that how you read the complaint?

23        MR. KATZ:  That's right.  That's right.  They're

24   saying that, in the complaint, it was discovered.

25        THE COURT:  Right.

1        MR. KATZ:  I think of "discover" to me -- that's why

2   we set this out in my brief.  I opened with if they're talking

3   about that was really the defect, then there's no actual

4   knowledge.  That's what Judge Koh talked about.

5        THE COURT:  And if they were to allege that that is

6   something that Intel knew about before it was disclosed

7   publicly or before it was even discovered by Google's

8   Project Zero, that may be intellectually interesting, but

9   that's not what is alleged in the complaint.

10       MR. KATZ:  It's certainly not alleged in the

11  complaint, and then, also, "should have known" is not the

12  standard.

13       THE COURT:  I agree with that.  Hypothetically, if

14  there would someday be a case that says, "You knew about this

15  back then and didn't tell anybody," that may fit within the

16  exclusive knowledge, even if it wasn't generally known even

17  within the technical community, but that's not what they've

18  alleged in this case.

19       MR. KATZ:  Right.  That's right.  They could.  But

20  what you're talking about here, like we have been saying, is

21  this design choice that goes back to 1995, and the complaint is

22  literally trumpeting how this was so openly discussed:  In so

23  many articles, books warning about the caches being vulnerable

24  to side-channel attacks, about speculation-based side-channel

25  vulnerabilities, and the like.

1          If that's what they are claiming the design choice

2    is, then it is out in the open.

3          THE COURT:  Sure.  So the only thing that really

4    might not have been out in the open until Google Project Zero

5    was that there was a proof of concept shown where, under

6    laboratory conditions, yes, these things that were out in the

7    open could actually be exploited.

8          Am I right?

9          MR. KATZ:  Right -- that's what happened.  Right,

10   there was a proof of concept, but the disclosure obligation

11   didn't change because the plaintiffs say that the defect isn't

12   Spectre or Meltdown; it's this design choice.

13         And that design choice didn't change.  It is on the

14   same continuum from the time that Intel baked it into their

15   processors in 1995 all the way to the present.

16         THE COURT:  Well, what do you do with a circumstance

17   where that design choice might not have been an issue if nobody

18   assumed that it could ever be exploited, and it wasn't until

19   either Google did the proof of concept, showing it could be

20   exploited, that it showed that there was a defect, so we didn't

21   know it was a defect until there was evidence that it could be

22   exploited?

23         MR. KATZ:  Your Honor, first of all, I would like to

24   make clear that we take issue with the characterization of it's

25   a defect.

1          THE COURT:  Of course.

2          MR. KATZ:  You're right.  What happened is what

3   ordinarily happens, which is that once it is disclosed, Intel

4   and the industry -- bless you --  (Pause.)

5          THE COURT:  Okay.

6          MR. KATZ:  -- immediately swooped into action.  They

7   developed patch mitigation, and they rolled them out to protect

8   people under the responsible disclosure principle.

9          Your Honor, that's no different than what happens

10  with respect to Microsoft Patch Tuesday and any other number of

11  security vulnerabilities that occur with respect to

12  technological devices.  If we are in a world where any time a

13  security vulnerability is discovered, then all of a sudden we

14  are running off and suing and saying that that's some kind of

15  defect, there would be no end to it.

16          And that's what reasonable consumers know.  They know

17  that someone someday may discover that there is a

18  vulnerability, and then the technology company, hopefully, will

19  be able to go mitigate it with a patch.  That's why we have

20  updates to our iPhones in the middle of the night.  It is a

21  very common occurrence.

22          But it is counter-factual because what we're talking

23  about here, as I opened my presentation with, the

24  benefit-of-the-bargain theory relating to an alleged defect

25  that has existed in continuous form since 1995.

1            Then they are trying to travel under one other

2    LiMandri factor.  That's active concealment.

3            THE COURT:  And I don't even see where that is

4    alleged, so maybe we will wait and hear what plaintiffs say

5    that's alleged, unless you want to tell me where.

6            MR. KATZ:  No, I don't --

7            THE COURT:  Then we will see how they say --

8            MR. KAT:  -- I mean, they are trying to rely on our

9    truthful disclaimer to say that that's somehow active

10   concealment.  Your Honor's Premera decision --

11           THE COURT:  Yeah.  That can't be active concealment,

12   but we will wait and hear what they say, if they do want to

13   pursue active concealment, what is the active concealment?

14   Then by all means, you'll have an opportunity to rebut and

15   respond.

16           MR. KATZ:  Then coming to a conclusion on the duty to

17   disclose issue, I want to talk very briefly about reliance.

18   One thing that really quite took us aback is the notion that

19   plaintiff was espousing the opposition that there is only one

20   element of reliance, even though they cite Daniel v. Ford Motor

21   Company.  Reliance, clearly under Ninth Circuit law, requires

22   pleading both exposure and materiality.  The standard stated

23   that plaintiff must show that she would have been aware of the

24   limited information and behaved differently.

25           No plaintiff here alleges viewing any Intel ad.

1    There is no response whatsoever to Intel's 9(b) argument, so

2    they don't respond on the procedure or the substance, and so

3    they haven't met the exposure element.

4         THE COURT:  Yeah, although exposure can be

5    derivative, can't it?  Theoretically if one could show that

6    there was some exclusive knowledge that the computer

7    manufacturers didn't know -- Lenovo, HP, Dell -- and had they

8    known about it, they would have done something differently.

9    Isn't that the sort of derivative reliance that a plaintiff

10   could benefit from?

11        MR. KATZ:  That's not quite how I understand the

12   exposure inquiry.  The exposure inquiry is that a specific

13   plaintiff -- here, each of the 95 named plaintiffs -- come

14   forward and say what channel through which they would have

15   received the information they allege was omitted.

16        THE COURT:  Right.  But I think derivative reliance

17   can be -- one of those channels would have been an intermediate

18   party in the manufacturing chain.

19        MR. KATZ:  Well, could be, but they don't plead that.

20        THE COURT:  Agree.

21        MR. KATZ:  And that's actually Daniel v. Ford Motor

22   Company.  In Daniel v. Ford Motor Company, the exposure element

23   was met because the plaintiffs said they got information when

24   they went to the car dealership that the car dealership in turn

25   had gotten from the manufacturer.  That's how the exposure

1   element was met --

2           THE COURT:  I thought there was another line of

3   exceptions -- and I could be wrong -- but I thought that there

4   another line of exception to the exposure requirement that is

5   derivative reliance; that somebody else -- and again, I have

6   not seen this pled -- but someone else who would have been

7   exposed had this information been disclosed would have taken

8   corrective steps either by further disclosing it to the

9   consumer or by fixing some problem along the way.

10          MR. KATZ:  Yeah, I'm not familiar, Your Honor, with

11  that line of cases.  But what I would say there is that, as we

12  previously discussed, then all of those manufacturers would

13  have been privy to all of this massive information that was in

14  the public domain and would have been well able to disclose

15  that to people.

16          THE COURT:  Right.

17          MR. KATZ:  So I don't think they're relying on that.

18          Finally, on materiality -- and I want to be quick to

19  add that I don't think you even remotely get here, because if

20  we are right on either safety hazard or central functional

21  defect, these other issues, like exposure and materiality,

22  they're moot because they don't state a claim at the threshold.

23          But with respect to materiality, we would submit no

24  reasonable consumer would think that tech products are

25  invulnerable.  They all know that patching is a fact of life;

1   that there are going to be new security vulnerability

2   discovered by clever people like the people at Google

3   Project Zero and then they will be dealt with.

4          I would also say -- and Judge Davila does this in a

5   number of his decisions applying common sense -- that

6   disclosing to a consumer the design decision that they are

7   talking about in 1995; that this is a decision that we made on

8   speed versus security; and by the way, it is only theoretical;

9   no one has even demonstrated it in a lab; we don't know how

10  this could be exploited, but your processor is going to be

11  really fast; and by the way, everyone else in the industry is

12  using speculative execution and branch prediction, that that

13  would have impacted the decision of any reasonable consumer.

14         And then --

15         THE COURT:  It would have supported my

16  mother-in-law's continued comment, "That's why I don't want to

17  buy a computer"?

18         MR. KATZ:  It could, Your Honor.

19         Then we have, with respect to the materiality

20  analysis, five plaintiffs that bought in 2018, when all of the

21  information that was claimed to have been admitted is known,

22  and they are still going out and buying the computers.  That

23  demonstrates that it wasn't material at all; and two with the

24  advice of counsel are going out and buying yet another device

25  with an Intel chip.  Of course, even today the chips of other

1    competitors are also vulnerable to cache timing/side-channel

2    attacks.  So when you wrap that all up, when they are talking

3    about this design choice that was omitted, it is not at all

4    material.

5            That's why we also point to that these

6    vulnerabilities are disclosed routinely.  Intel is not trying

7    to hide anything.  Intel discloses dozens and dozens of

8    vulnerabilities on their website.  They have been doing it

9    since 2007, and that's in Exhibit 5 to request for judicial

10   notice.  US-CERT., in the week before Spectre/Meltdown, they

11   disclosed 15 high-severity vulnerabilities and 217 in all, and

12   that just ties into this is just a fact of life that reasonable

13   consumers know about; that these security vulnerabilities are

14   ubiquitous.

15           THE COURT:  So on the judicial notice question, you

16   do want me to take judicial notice of the content of what's on

17   those websites?

18           MR. KATZ:  Your Honor, I want the Court to take

19   judicial notice just of the fact that security vulnerabilities

20   are a routine aspect of modern existence, and I think

21   Your Honor can find that from other sources.  But just the fact

22   that US-CERT disclosed 217 vulnerabilities in total, 15 of high

23   severity, just in the week before, and Intel, just on its

24   public website, which the plaintiffs cite to as a source, that

25   they disclose it, that's really the only sense in which we are

1    asking Your Honor to take notice of it.  It is just a fact that

2    these exist and reasonable consumers know about them.

3            Courts, in the Ninth Circuit, they do routinely apply

4    these principles in deciding at the motion to dismiss stage

5    that there is no materiality.  We cite the Apple Device

6    Performance Litigation, where Judge Davila said that reasonable

7    consumers know that increasing complexity of software puts

8    strain on the hardware, and that, in turn, leads to battery

9    degradation.

10           We cite to Williamson v. Apple, where all kinds of

11   representations were made about the hardness of the glass in

12   the iPhone screen, and the Court held that a reasonable

13   consumer knows that an iPhone, when dropped, that glass can

14   break, even if it has been reinforced.

15           On the change of behavior point, my last point on

16   materiality, Noll v. eBay, I think that's an important case to

17   judge the five plaintiffs who bought after knowing all of the

18   information.  Noll v. eBay is a Northern District case from

19   2013.  There is no reliance where the behavior didn't change,

20   and that behavior there involved eBay's Good Till Canceled

21   listing policy, where people said, "Had we known there was

22   going to be a recurring charge every 30 days if our item hadn't

23   been sold, we wouldn't have signed up for the Good Till

24   Canceled process," and then after bringing their case, they

25   continued to sign up.  That was the dispositive feature on the

1    decision on lack of materiality, and I think that we are on all

2    fours there --

3              THE COURT:   I understand your point there.

4              Back to judicial notice, though, I have read,

5    frankly, several times Judge Koh's decision in Hauck.  I have

6    read Judge Davila's decision in Apple Processor.  Those are

7    legislative facts, the analysis, and the reasoning that they

8    have.  But you want me to take judicial notice of the

9    complaints.  What am I supposed to do with the complaints

10   that's proper within the framework of judicial notice?  You

11   also mention in your reply that I should take notice of the

12   amended complaint in Hauck.  What am I supposed to do with

13   that?

14             MR. KATZ:   Judge, I think that request is not as

15   important anymore now that we have the decisions in the two

16   cases, of course, but it was really just the fact that this is

17   an industry-wide issue.  It is being alleged that their

18   processors are unmerchantable.  It is alleged that AMD is

19   subject to Spectre.  In Apple, it is subject to Spectre and

20   Meltdown.

21             We are not asking you to reach a conclusion as to

22   whether that's true.  I think that's also inherent in the

23   complaint that has been filed in this case.  We didn't know why

24   the plaintiffs were really objecting, because they've stood in

25   this court and told the Court about AMD being subject to

1    Spectre.  That was, I think, one of the reasons given by some

2    of the lawyers to be appointed to the steering committee here.

3             THE COURT:  Well, just to keep things, not simple,

4    but at least sort of clean, since I have read the District

5    Courts' decisions in Hauck and Apple Processor, and I'm allowed

6    to, as a legislative fact, or rather for other purposes, any

7    objection from Intel if I were to deny from the bench the

8    motion to take judicial notice, 139, just to keep things clean?

9             MR. KATZ:  Yes.  I think it would be sufficient to

10   just rely on the decisions.

11            THE COURT:  Okay.

12            Mary, I am denying from the bench Intel's motion to

13   take judicial notice, Docket 139.  I'm not going to write about

14   it.

15            MR. KATZ:  Your Honor, what I have just gone through,

16   that's the meat of the presentation.  I'm happy if Your Honor

17   wants me to, but I think that it is sort of a corner case to

18   talk about the economic loss rule that only applies to common

19   law fraud, the Robinson Helicopter case, or their constructive

20   fraud claim.  I'm, frankly, not sure why they brought those

21   causes of action.  I can address them really briefly.  It's

22   Your Honor's pleasure.

23            THE COURT:  There do seem to be some exceptions to

24   economic loss doctrine.  Let me find it.  Judge Koh just wrote

25   about that a few months ago in a very interesting decision.

1    Yes.   Arena Restaurant v. Southern Glazer's Wine.   It does seem

2    to me that there exceptions in fraud cases, or alleged fraud

3    cases, to the economic loss rule.   One of the more meaningful

4    ones, I guess, is where there is an independent duty that is

5    independent really of the terms of the contract.   That's

6    really, I think, what we have here.

7           Now, you are going to say that there is no duty to

8    disclose for all of the reasons you've described.   But to the

9    extent that there is or might be a duty to disclose, then that

10   is a duty that's independent from the terms of the contract;

11   and thus, an exception to economic loss doctrine.

12          Am I right?

13          MR. KATZ:   First of all, let me start with this:   My

14   understanding is that the exception to the economic loss rule

15   stated in the California Supreme Court's decision in

16   Robinson Helicopter, and that says that if there has been an

17   affirmative representation and it expose to the plaintiff to

18   liability independent of economic loss, that that's an

19   exception to the rule.   The way that the rule is implicated

20   here in this case is because -- and I think this is

21   important -- plaintiffs are proceeding under a

22   benefit-of-the-bargain theory of damages.

23          While we are on the subject of Judge Koh, Judge Koh

24   said in Hauck -- she actually applied the economic loss rule to

25   bar the negligence claim against AMD.

1          THE COURT:  Right.

2          MR. KATZ:  So I think if we are talking about her

3     reasoning, that's just a classic application of the economic

4     loss rule.  I don't think there is any exception that goes

5     beyond Robinson Helicopter.  I think the most salient cases are

6     cases that proceed under a benefit-of-the-bargain theory where

7     there has been an alleged concealment.

8          The other case that we cite that's right on point is

9     Stewart v. Electrolux, which is a 2018 case from the

10    Eastern District.  That dismissed a fraudulent concealment

11    claim because the alleged damages for the self-cleaning oven

12    were only for economic loss, and there's no difference in this

13    case.  There is no allegation that there is harm to other

14    property.  There is no allegation that any plaintiff has been

15    exposed to some liability that's independent of pure economic

16    harm that's plausible in this case.

17         THE COURT:  Well, Judge Koh's analysis was economic

18    loss doctrine in the context of negligence.  Fraud, I think, is

19    different.  Robinson Helicopter was 2004 from the

20    California Supreme Court.  There is a year-later decision in

21    California.  I believe it is Butler Rupp v. Lourdeaux where the

22    Court states exceptions have been permitted only where a breach

23    of duty causes a physical injury, a covenant of good faith and

24    fair dealing is breached in an insurance contract, or an

25    employee was wrongfully discharged in violation of fundamental

1   public policy, or a contract was fraudulently induced.

2           So I do think when you get into this fraudulent

3   inducement issue, it is another California-recognized exception

4   to the economic loss doctrine, which even Robinson Helicopter

5   says, is primarily to avoid the merging of law and contract.

6   Well, fraud has always been an exception to that doctrine, I

7   believe.

8           MR. KATZ:   Yeah.   And I don't think that applies

9   here.   There is not an allegation --

10          THE COURT:   Fair enough.

11          MR. KATZ:   -- as I read it, because the plaintiffs

12  here are pleading a benefit-of-the-bargain theory, that when we

13  are applying the economic loss, which is to maintain the

14  division between tort and contract, that the analysis is the

15  same, really, whether it is negligence that's being pled or

16  fraud by omission is being pled.   I think that's the teaching

17  of Stewart v. Electrolux.   There, I believe the allegation was

18  made that there was a potential fire hazard, even with respect

19  to these self-cleaning ovens, and that could expose the

20  plaintiff to liability for other economic loss.   That was

21  deemed to be not plausible/too attenuated, and the complaint

22  was dismissed, because really what the plaintiffs were getting

23  at there was economic harm/loss of benefit of the bargain based

24  on an omission theory relating to a defective product.   And I

25  don't think you can have a case that's more on all fours with

1    Stewart v. Electrolux than this case.

2              THE COURT:  I thought the plaintiffs -- obviously

3    their implied warranty sounds in contract and warranty.  But I

4    thought their unjust enrichment claim more sounded in fraud,

5    and this is where we go to duty to disclose, and I understand

6    your arguments about duty to disclose.  But to the extent that

7    sounds in fraud, then I didn't see that as being barred by

8    economic loss doctrine.

9              MR. KATZ:  You mean the unjust enrichment claim?

10             THE COURT:  Yes.

11             MR. KATZ:  I think that's separate.  I don't think

12   unjust enrichment applies here.  I mean, this is very narrow in

13   this case, because common law fraud and constructive fraud

14   cases should be dismissed for all of the reasons that we talked

15   about, because of all those duty issues and the LiMandri

16   factors that apply to those.  This is just like extra, extra

17   ground for dismissal that only applies to the common law and

18   constructive fraud cases.

19             THE COURT:  But I thought that any claim that sounds

20   in fraud, especially a fraudulent inducement type of theory,

21   would not necessarily be subject to dismissal under economic

22   loss doctrine, as California has interpreted it --

23             MR. KATZ:  It might not be.  But just on the facts

24   alleged here, it is, just as Judge Koh found.  I would say it

25   is here, because they are not alleging -- they're alleging

1    economic harm.

2              THE COURT:  But Judge Koh threw out a negligence

3    claim, and they are not alleging a negligence claim here.

4              MR. KATZ:  But even if they are not alleging a

5    negligence claim, they are still not alleging anything in their

6    benefit-of-the-bargain theory beyond economic harm, and so

7    that's why the rule applies.

8              THE COURT:  No, but if the economic harm came as a

9    result of fraud, then the economic loss rule has that

10   exception.

11             Am I wrong?

12             MR. KATZ:  I guess I don't read it that way.  I read

13   it that -- in Robinson, there has to be, first of all, an

14   affirmative misrepresentation.  But second, it has to expose

15   the person to liability independent of the economic loss.  You

16   have to state what that is.  In Robinson Helicopter, it was

17   liability that would potentially come from accidents and from

18   government action because defective clutches were provided.

19             THE COURT:  Right.  But I'm looking at the

20   post-Robinson decision from California, and that's Butler Rupp

21   from 2005, and it seems to both explain -- maybe expand -- but

22   certainly explain the Robinson Helicopter case, and that's

23   where the exceptions to the economic loss rule are in the four

24   areas I've described.  The first three, I don't think are

25   applicable, but the fourth one is fraudulent inducement.

1          MR. KATZ:  Right.  And there is no fraudulent

2     inducement theory.

3          THE COURT:  Fair enough.  But then I'm not going to

4     worry about economic loss doctrine so much as decide whether or

5     not there really is a viable allegation of fraud.

6          MR. KATZ:  I think, Your Honor, you'll never get to,

7     hopefully, economic loss because, as we've said, you haven't

8     had a safety hazard pled.  You haven't had a central functional

9     defect pled.  You haven't satisfied either of the LiMandri

10    factors.  There is no materiality.

11         You've to get through all of those issues before you

12    even consider whether you have to apply the economic loss rule.

13    We would submit there definitely isn't a fraudulent inducement

14    claim.  It is a benefit-of-the-bargain claim.  So it is

15    controlled by the rationale of Stewart v. Electrolux.  I didn't

16    read any decision of the California Supreme Court at all

17    revisiting the explication of the doctrine as it applies to our

18    case.

19         With regard to the constructive fraud case, that's,

20    of course, a special species of fraud.  Tidenberg said that

21    ordinary consumer transactions don't apply, and the plaintiffs

22    rely on this case of Frye v. The Wine Library where you had a

23    direct relationship where there was a wine wholesaler that was

24    acting as an agent for a purchaser of expensive wine and

25    advising and acting on the plaintiff's behalf, creating a

1    relationship of trust and confidence.  Certainly nothing like

2    that exists in our case, or you wouldn't have constructive

3    fraud as a special species of fraud.

4            THE COURT:  What's your view on the unjust enrichment

5    claim?  Sometimes unjust enrichment is just a remedies theory

6    for a cause of action, but other times and other circumstances

7    it is viewed as an independent cause of action.

8            How does that fit into this?

9            MR. KATZ:  I think the way that it fits in here is it

10   is controlled by Oestreicher v. Alienware that says basically

11   if your unjust enrichment claim, the foundation of it is a

12   fraud claim, the fraud claim fails, then the unjust enrichment

13   claim fails because there is no enrichment that is unjust.

14   And for all of the reasons that I've talked about today,

15   because there is no fraud, there is no duty, and all of those

16   other reasons, and that is really the only basis for the unjust

17   enrichment claim, it's not viable either.  So I think that's

18   how that plays out.

19           The cases that they cite, like Astiana or ESG, those

20   are cases where there was some underlying tort cause of action

21   found that was viable on which to base an unjust enrichment

22   claim.  But where you don't have that, then that claim goes

23   out.

24           For a similar reason, the UCL unfair prong claim,

25   that's simply based on the nonviable fraud claims.  Under

```
1    Hadley v. Kellogg, that claim also can be dismissed.  I would
2    also point to Hodsdon, which says that there is nothing unfair
3    about not disclosing something that one has no duty to
4    disclose.  That's something that's frequently repeated in both
5    the California cases and the federal cases.
6            The unlawful prong claim is only based on the
7    bar loss.  So that brings me to the conclusion of all of the
8    nationwide claims, and I can speak to the state claims if you
9    want me to.
10           THE COURT:  I don't think we need to get into that
11   now.
12           Let me ask for timing -- first of all, Dennis, do you
13   want a break?
14           THE COURT REPORTER:  I do.
15           THE COURT:  Since I think you are done with your
16   opening presentation --
17           MR. KATZ:  Yes.
18           THE COURT:  -- why don't we do this -- will this work
19   for everybody?  Let's take a 15-minute recess now.  Then we
20   will pick up with plaintiffs' response.  Depending on timing,
21   we will go straight into Intel's reply or take a break then.
22   We will work through the lunch hour, but that way we will be
23   done at some point, my guess is, before one o'clock-ish, give
24   or take.
25           Will that work for everybody?
```

1          MR. SEEGER:  That sounds fine.

2          THE COURT:  Okay.  Let's take a 15-minute recess.

3          (Recess.)

4          (Open court; proceedings resumed:)

5          MR. SEEGER:  Judge, what we are trying to do to

6    simplify our response to the motions to dismiss is we did a

7    PowerPoint.  I'm not beholden to this.  If you want to take me

8    off track and ask questions -- I thought it would be easier.

9          THE COURT:  Fine to both.  Yes, we will start there,

10   and I will feel free to take you off track.

11         MR. SEEGER:  Also, Judge, just so you know, Rosemary

12   and I broke up the argument, if that's okay.

13         THE COURT:  Absolutely.

14         MR. SEEGER:  I'm going to give you a general overview

15   of the facts alleged in the case to make sure we're all really

16   clear --

17         THE COURT REPORTER:  Mr. Seeger, I need you to slow

18   down.

19         MR. SEEGER:  Then I'm going to address standing and

20   fraud and omissions as it relates to the UCLR, FLA, UCL claims,

21   common law fraud, and constructive fraud.

22         Is that pace okay?  It is going to take a little

23   longer than I thought because I have to slow down.

24         THE COURT:  We will be here all week.  That's fine.

25         MR. SEEGER:  I'll do my best.  It is the New Yorker

1    in me.

2              THE COURT:  And then what will Ms. Rivas address?  If

3    you do overview, standing, fraud and omissions, what will

4    Ms. Rivas be talking about?

5              MR. SEEGER:  She is going to do unjust enrichment,

6    the affirmative misrepresentations, and the state law, to the

7    extent you want to go into state law.

8              MS. RIVAS:  Actually I'll be doing the implied

9    warranty of merchantability, the UCL, the fraudulent and

10   unlawful prongs, and then the unjust enrichment.

11             THE COURT:  Very good.  Thank you.

12             MR. SEEGER:  Those too.

13             So, Your Honor, we start from the premise that the

14   central function of every CPU is enforcing security privileges

15   and restrictions.  CPU engineers work very hard to restrict

16   memory access by unauthorized actors.  These are sort of basic

17   concepts.  I've blown up each statement I make or references to

18   the complaint.  Some of those, I will read; some, I won't.  But

19   they are all in the PowerPoint in front of you.

20             Intel repeatedly acknowledged that security is an

21   essential function of CPUs.  We have allegations in the

22   complaint that say they represented these CPUs were secure to

23   the core.  Again, designed to give the consumer device/Intel

24   inside comfort in that fact.

25             Intel asserted that its processors stand out by

1    extending protection outside the operating system and into the

2    hardware layer.  That's critical to this case, Your Honor,

3    because despite all of the vulnerabilities we just heard from

4    Mr. Katz, most of what he is really talking about are software

5    vulnerabilities -- the slide -- well, we are not supposed to be

6    talking about tech base, so I'll put it aside.  But there was a

7    discussion about this then.

8            But the hardware layer is what we are really focused

9    on in this case.  These are hardware defects.

10           So, as designed, Intel's CPUs permit unauthorized

11   access by programs to protected memory secrets.  That's Flaw 1.

12   That's the transient instructions coming in and Intel's CPUs

13   delivering real values/real secrets to transient instructions.

14           I have to distinguish right now this case from the

15   AMD case.  AMD does not have Meltdown and Foreshadow.  They

16   don't have a Flaw 1 issue.  They do have a Spectre issue.

17   That's critical.  Although even in the Apple case, where there

18   is an allegation that the Apple chips in the Apple iPhones and

19   iPads have a Meltdown issue, they do not have a Foreshadow

20   issue.  And I am going to talk a little bit and distinguish

21   those cases as we go on, but we have the complaint references

22   here.

23           I just went over this.  This basically on this

24   slide -- as designed, they permit unauthorized access to

25   programs to protected memory secrets.  It is Flaw 1.  Here is

1    from -- we have shown this before.  Here is our outline of what

2    the real defects in the case are.  These are in paragraphs 222

3    and 223 of the complaint.

4           Flaw 1 we discussed.  Flaw 2 is what we referred to

5    as an incomplete undo, where the processors speculatively

6    execute instructions, but when speculative execution is wrong,

7    the values remain in the cache, making it very easy for a

8    side-channel attack to come in and pick it up.

9           Again, here is just a quick slide on what the

10   differences are between the Intel case and the AMD case.  In

11   Intel, you get the real value, when a malicious actor sends out

12   a transient instruction, that will ultimately be wiped out.  It

13   will ultimately be denied.  Intel allows the CPUs to deliver a

14   real value -- a secret -- photos, bank account information,

15   even when speculative execution is wrong.  It allows it to

16   happen.  AMD doesn't have that issue.

17          Now I'm not going to go into these.  These were the

18   demonstrations you've seen before about how the values go to

19   transition instructions, and then even when the instructions

20   are wiped out, they leave the secrets in the cache.

21          Intel was aware that its CPUs allowed unauthorized

22   program instructions to access protected secrets.  We have that

23   in the complaint.  We've referenced the complaints, 246 and

24   256.  And I won't go into this.  It is a lot to read.  But

25   again, it is a restatement in the complaint.  It is an

1    allegation in the complaint as to exactly how these defects

2    come about.

3          And they were aware that they were designed, which

4    allowed secrets to be placed into the cache by unauthorized

5    users presented substantial security risk to consumers.  While

6    they hid that information from the consuming public, these

7    vulnerabilities pose a severe security threat in various patent

8    filings that we have gone and read again -- again, not

9    something a consumer would go and look at.  You can see that

10   Intel is concerned about this.

11         I want to make something else very clear, Your Honor.

12   There was discussion earlier about what we say in the complaint

13   about when the defects occurred.  Flaw 1, we believe, came --

14   we have no discovery in the case, so again, subject to that.

15   Flaw 1, we believe, arose around 2006 when Intel decided go to

16   this multi-core processors.  It might have been in there from

17   1995 in Flaw 2.  We don't know that for sure.  We know they are

18   there now, but we believe it was 2006.

19         We also have alleged that Intel was aware that its

20   hardware design could be used to leak privileged information

21   and even claimed knowledge and awareness of means to modify its

22   chip designs to prevent such attacks.  We see that in the

23   patent filings.  Why they were never implemented, we will find

24   out in discovery, but we have alleged those details.  It's very

25   important.

1          THE COURT:  So what do you contend Intel should have

2     disclosed in 2006?

3          MR. SEEGER:  Well, I mean -- it is clear that Intel

4     knew at that point that they had what we refer to as a

5     "leaky cache."  It is clear that they understood in 2006 that

6     speculative execution, when it goes wrong, was still going to

7     get real values.  It was still going to get real secrets.  At

8     that point in time you would think that there would have been a

9     focus on either disclosure or correcting the problem early.

10    But they didn't do that.  They touted -- we believe what was

11    going on is there was a chip war mostly between AMD and Intel,

12    and Intel had touted its computers and its processors as being

13    the fastest.

14         THE COURT:  I understand.  What should they have

15    disclosed to avoid what you now contend is their liability for

16    omissions?

17         MR. SEEGER:  Okay.  So they understood that there

18    were the defects there.  I think at that point in time we've

19    alleged that they understood that there was this thing called a

20    side-channel attack.  If you remember, the way we characterized

21    the side channel attack, it's making the information available

22    for the malicious actor to come in with the side channel and

23    take the information out.  So we believe those two things put

24    together, that a responsible chip manufacturer would have made

25    consumers either aware of these defects or corrected them

1    immediately.

2         THE COURT:  So assuming that they didn't correct them

3    immediately because they had their own reasons, probably

4    performance-related, you're saying that if they are not going

5    to correct them, they should have disclosed that there was

6    vulnerability to side-channel attack creating potential

7    exposure --

8         MR. SEEGER:  Of your secrets.

9         THE COURT:  -- of secrets.

10        Now, wasn't that known by the computer architecture

11   community outside of Intel based upon a number of the articles

12   and papers and conferences that you have cited and referred to

13   in the complaint?

14        MR. SEEGER:  We don't think so, Your Honor.  I'll

15   tell you what we think might have been known at that point in

16   time, and I think we have to look at this at different points

17   in time.  But we don't think there was any knowledge by anyone

18   outside of Intel about Flaw 1; that is, returning real values

19   to transient instructions.

20        Now, maybe people who study this stuff at the

21   academic level and maybe the company internally in their patent

22   filings were focused on that, but we don't think there was

23   anybody outside of Intel that was aware of that.  We think,

24   once again, without discovery in this case, what supports that

25   is the fact that no other chip manufacturer has the problem

1    with Flaw 1, the real values to transient instructions, that

2    Intel has today.

3            Now, when Intel says that this is an industry-wide

4    problem, they must be referring to Spectre, which is what we

5    call the Flaw 2 design, the incomplete undo, because, yes, it

6    does look like there is an industry issue with Spectre, but not

7    with Meltdown, not to the extent that Intel has it, and clearly

8    not with Foreshadow.

9            By the way, Your Honor, if I could just make one

10   little point which we think is important.  We've spent a lot of

11   time since the case has started talking about Spectre.  While

12   we were talking about Spectre in June, Meltdown was coming into

13   the picture.  Since June, we've now learned about Foreshadow,

14   and there are variants there.

15           Intel pushes out patches that they tell their

16   consuming public to download, and each of those patches have an

17   impact on performance.  We don't know what's around the corner.

18   Until this is corrected, the patches don't fix the problem.  I

19   have a slide on this.  I don't know if it is coming up next.

20           Intel itself has acknowledged that it is a hardware

21   problem, and they have promised to design and ship out a new

22   CPU.  It hasn't happened yet.  But that's where the fix has to

23   occur.  Otherwise, there will be -- with the new variants that

24   are coming and the new exploits that we will be learning about,

25   people will be downloading patches, and they will continue

1    having an impact on performance in the future.

2             I have a few slides, which I'll go through very

3    quickly which deal with the patches and the mitigations that's

4    recommended by Intel.

5             THE COURT:  If I want to write down what specifically

6    should have been disclosed about Flaw 1, not Flaw 2, but

7    Flaw 1, could you articulate that once more for me so I can

8    write it down precisely?  What should have been disclosed about

9    Flaw 1, given that they chose to leave that flaw in place?

10            MR. SEEGER:  Again, I'm not a marketing person.  I

11   don't write disclosure letters.

12            THE COURT:  No, but you're claiming liability by

13   omission.  I want to know specifically what was omitted that

14   should not have been omitted.

15            MR. SEEGER:  I think what specifically should have

16   been omitted is that Intel's computers, like others, has

17   out-of-order execution, speculative execution.  But what they

18   don't have is that while those things are -- that secrets that

19   are in the computer's memory could be made available to

20   malicious attackers using certain kinds of attacks,

21   side-channel attacks.

22            THE COURT:  But doesn't that describe both Flaw 1 and

23   Flaw 2?

24            MR. SEEGER:  No, because Flaw 1 and Flaw 2 are the

25   defects that allow side-channel attacks to be successful.  They

1    are not themselves side-channel attacks.

2         THE COURT:  So this omission that you've just

3    described is the same omission that was at stake in the Hauck

4    case and the Apple case, right?

5         MR. SEEGER:  I don't think so, Your Honor.  I did not

6    think a Flaw 1 allegation was made in either one of those

7    cases.

8         THE COURT:  So articulate for me what is the omission

9    that makes this case different from the Hauck case and the

10   Apple Processor case.  What is the omission here that is at

11   issue that they should have disclosed that shows this case is

12   different from either the Hauck or the Apple Processor cases?

13        MR. SEEGER:  I mean, now is a good time to do it.  I

14   will first answer your question, but I think now is a good time

15   to talk about what was going on in those cases and maybe the

16   points that were missed by the plaintiffs in those cases.

17        But yeah, what we put in our complaint is --

18        THE COURT:  Which paragraph are you referring to?

19        MR. SEEGER:  I'm now looking at paragraph 408g.

20        MS. RIVAS:  It is from the complaint.  That's through

21   all of the causes of action.

22        THE COURT:  You said paragraph 408?

23        MR. SEEGER:  No.  I'm sorry.  It is from the -- I

24   think it is from our brief.

25        MS. RIVAS:  No, it is from the complaint.

1          MR. SEEGER:  It is 408g.

2          THE COURT:  One moment.  Let me get to that.

3          All right.  So 408g reads, "Concealing and/or failing

4   to disclose material facts, including but not limited to:  That

5   in designing its CPUs, Intel failed to take measures to protect

6   confidential information from attacks by unauthorized users

7   while knowing its CPUs were vulnerable to attacks."

8          So I guess if that's what the claim is, are you

9   telling me that you've alleged also that failure to disclose,

10  that information that was not disclosed, was not known

11  generally among the computer architecture experts outside of

12  Intel and that somehow that particular failure is different

13  from what was at issue in the Hauck v. AMD case and the Apple

14  Processor case?

15         MR. SEEGER:  Right.  And just to remind Your Honor,

16  in the Hauck case, the Court's problem with the complaint in

17  that case is they didn't allege defect.  This is what the Court

18  said -- that they alleged 20 years of vulnerabilities, but they

19  didn't specifically allege defect.  I don't think there is any

20  doubt that in this case we have specifically alleged the

21  defects.

22         THE COURT:  And the defect that you are specifically

23  alleging, to be precise, is what?

24         MR. SEEGER:  It is in paragraph 222 of our complaint.

25         THE COURT:  One moment.  Let me get there.

1              All right.  I am at 22.  What's the defect?

2              MR. SEEGER:  What we've alleged -- and I'm

3      paraphrasing because I don't have the exact complaint.  If you

4      read what's in front of you while I say this, I think you will

5      see.  The first half of the paragraph discusses what we call

6      Flaw 1, which is Intel processors allowed program instructions

7      to have unauthorized access to protected data.

8              The second half of the paragraph, I believe, lays out

9      what we've now called Flaw 2, and that's incomplete undo.

10     Intel processors speculatively execute instructions.  But when

11     speculation is wrong, the effects of those instructions are not

12     completely unknown.

13             Now, I know I just paraphrased the paragraph in front

14     of you, but that's what we alleged.

15             THE COURT:  All right.  So now -- you don't need to

16     read that.  I would just like to know, so it can end up in an

17     opinion and order, what's the defect?

18             MR. SEEGER:  So the specific defect is that -- I

19     mean, I don't know if I can describe it any better than I have.

20             THE COURT:  You're welcome to phone a friend, but

21     somebody has got to be able to articulate for me what the

22     alleged defect is.

23             MR. SEEGER:  Other than what I have said, so I

24     haven't done it obviously.

25             THE COURT:  Then you can repeat it, and I'm going to

1   take it down word for word.

2               MR. SEEGER:  Okay.

3               THE COURT:  So you were first directing me to 222.

4               MR. SEEGER:  Yes.

5               THE COURT:  Then you were paraphrasing it.  What you

6   said doesn't match up that closely with what's in 222.  So now

7   I just want you to tell me, from plaintiffs' perspective,

8   what's the alleged defect?

9               MR. SEEGER:  Your Honor, if I could, I'm going to

10  pull up paragraph 222, and I will walk through it and point out

11  which aspects of it relate to what we have identified as the

12  first defect and then the second, if that's okay.

13              THE COURT:  Okay.

14              MR. SEEGER:  Because I just think it is important.

15              THE COURT:  Take your time.

16              MR. SEEGER:  Paragraph 222 in the complaint reads --

17  I'll go to the second sentence, because the first one talks

18  about Intel sacrifices.

19              "Specifically, and as explained here, Intel's

20  implementation of Dynamic Execution created security

21  vulnerabilities within its CPUs, rendering them defective.  For

22  example, Intel undermined the security of its processors by

23  implementing, that's out-of-order execution and speculative

24  execution in a way that (i) created windows of time during

25  which an unauthorized user could have the processor make

1   unnecessary or unauthorized memory access to copies of

2   sensitive or privileged information."  We have referred to that

3   as the first flaw, Flaw 1.  That's Meltdown and Foreshadow.

4   That's returning secrets to the transient instruction, in

5   English.

6          Then the second part of that, "(ii ) allowed that

7   information (or critical data about the location or contours of

8   that information) to remain in the CPUs' caches after the

9   mistaken or unauthorized access, (for example, an exception)

10  was discovered."  That is what we have referred to as Flaw 2.

11  That's Spectre, Meltdown, and Foreshadow.

12         THE COURT:  And the plaintiffs' allegations are that,

13  in order to avoid liability under an omission theory, if Intel

14  was not going to shut down or fix these flaws, then you're

15  saying they should have disclosed that, as you say, "By

16  implementing out-of-order execution and speculative execution,"

17  and the way that they've done it, "Intel created windows of

18  time during which an unauthorized user could have used the

19  processor to make unnecessary or unauthorized memory accesses

20  to copies of sensitive or privileged information."

21         So that's what they should have disclosed.  You are

22  telling me that's what you are alleging that they have not --

23  that was not generally known, at least among computer

24  architecture experts, and that's the first basis of the failure

25  to disclose or the first defect that was not adequately

1    disclosed?

2            MR. SEEGER:   Correct, Your Honor.

3            Then to just try to answer it -- I am going to take

4    another stab at what would the warning be.   They could have

5    said, "Our chips expose user information to unauthorized

6    program instructions after the program is determined not to be

7    authorized."

8            They could say, "Our chips do it differently than

9    AMD, so you have a problem.   We may all have this issue, but

10   this could be a problem and that your secrets could be

11   revealed," because at that point in time I think most consumers

12   were choosing between Intel and AMD, the two leaders in the

13   field.

14           Your Honor, from here, unless you have any more

15   questions on that point, I'm going to quickly go through,

16   again, on the facts, the mitigations.   There are multiple

17   mitigations needed.   By the way, I think an issue that goes to

18   the materiality of the defect is that Intel is telling all

19   users of Intel chips that they must download these patches.   It

20   is to fix a problem that related to what we have identified as

21   a defect.

22           I'm going to skip to standing, because that's what we

23   will get into some of the cases that I think Your Honor may

24   want to discuss.

25           Your Honor, from our perspective -- we understand

1    that Intel's contention is that the claim that consumers

2    overpaid for devices containing Intel chips is not sufficient

3    for Article III standing.  We obviously don't agree.  We have

4    got a number of cases -- Hinojos and some that we have spoken

5    about.  In re Chrysler-Dodge-Jeep Ecodiesel Marketing case for

6    overpaying for goods on account of a manufacturer's

7    misrepresentations or omissions satisfies the injury in fact

8    causation requirements.

9          We allege plaintiffs' CPUs suffer core defect or

10   central defects, we could call them, because that relates to

11   other tests we will be talking about, reflecting Intel's design

12   decisions to gain performance at the expense of user security.

13   That's unauthorized access, Flaw 1, and incomplete undo, Flaw 2

14   that we just discussed.  And these are our allegations in the

15   complaint that support that.

16         Some of the discussion with Mr. Katz earlier almost

17   sounded like summary judgment type issues, because we think a

18   lot of these issues are fact issues that have been discussed.

19         Let me speak briefly about some of the cases.  The

20   biggest case they rely on standing is Birdsong case.  The

21   problem with Birdsong, from their perspective -- and there are

22   many problems with it.  One, it involves an iPod where the

23   plaintiffs in that case claimed could cause hearing problems.

24   The Court really kind of looked at that, I believe, in reading

25   that case, almost like a silly case; you could just turn the

1    volume down on the iPod.  There was no defect there that

2    related to the central function of the iPod in question.  The

3    risk that they talked about was purely speculative.

4          So, again, it is kind of a silly kind of case -- and

5    I don't mean silly in the sense that Mr. Katz is silly.  It is

6    kind of a silly case, though, because I don't think it really

7    applies here at all.  It is a consumer misuse case.  People

8    were hurting their ears -- some people, not even all.  It

9    wasn't even an allegation that everybody suffered ear injury.

10   Some users kept their iPods up too loud and hurt themselves.

11         The other case that they rely upon is the Cahen case.

12   Again, that's a case that involved Toyota cars that had

13   electronic control unit.  Now, the Court, when you look through

14   that case, says that almost every car on the road has these

15   electric control units in them.  And even though there is this

16   theoretical risk of hacking, I think you have to look at that.

17   And there is language in the opinion, although I'm not saying

18   that the judge in that case said it was the most important

19   language, but the hacking we are talking about is driving

20   information.  It is almost -- it's not secrets.  It's not

21   photos.  It's not letters.  It's not your account information.

22   So the people in this case bought a car, and at the end of the

23   day they had a car with this speculative risk of hacking --

24   your driving information.  I just don't think the Court bought

25   that this was really a central function of what people were

1    purchasing.

2            THE COURT:   It wasn't hacking that some nefarious

3    entities could take over your car and cause an accident; it was

4    just that they would know where you were?

5            MR. SEEGER:   There is a mention of that in the case.

6    Again, the Court refers -- I think the plaintiffs alleged that,

7    and the Court said it was a speculative risk.  I don't remember

8    from the case if there was any conclusion as to whether that

9    was a real risk or that really happened.

10           THE COURT:   Well, since we only have a proof of

11   concept here on Flaw 1 or Flaw 2, how is this not a speculative

12   risk?

13           MR. SEEGER:   Here is the biggest problem that they

14   have with that argument, and, this, we do allege in the

15   complaint.   There is no fingerprint that's left behind for any

16   of these exploits.   We don't know -- you wouldn't know it,

17   Your Honor, if you had been hacked by some malicious actor who

18   opens up an Amazon account.   Let's say you are on Amazon.   They

19   open up an Amazon account.   They now have access to the system,

20   and they send in a malicious code, which then starts running on

21   all the computers that are on the Amazon system.   You just

22   wouldn't even know if you had been hacked.   I know we are not

23   supposed be referencing science today.   I think we can for our

24   own use.   I am not using anything they said.   But

25   Professor Conte had explained that there would be no

1    fingerprint left behind, and we alleged that in the complaint

2    as well.

3              THE COURT:  Assuming that's accurate, though, how

4    does that take us out of the range of speculative risk?  How

5    are you going to prove that there is a non-speculative risk?

6              MR. SEEGER:  I think the best way to prove it is by

7    Intel's conduct.  Intel is telling everybody who has their

8    chips to download patches.  Those patches impact the very thing

9    that made them famous and rich; it's the speed of their

10   processors.  Why would Intel interfere with this processing

11   speed of their computers if they thought that there was really

12   no risk here; if this was only a proof of concept?  It kind of

13   stretches the imagination a little bit.

14             So Intel clearly believes there is an issue here.

15   Intel's patents' applications suggest they thought there was an

16   issue here.  I mean, I think that's the best answer I have.

17             THE COURT:  Is there an inconsistency in your

18   position that standing comes from an overpayment and also your

19   position that this is a core or fundamental defect, because if

20   something really seemed to me to be a core or fundamental

21   defect, I wouldn't buy the product or expect anyone would buy

22   the product.  But if someone would buy the product, but at a

23   lower price, then it doesn't seem to be a core defect or a

24   fundamental defect that basically affects the ability of the

25   thing to operate at all.

1              Is there an inconsistency there?

2              MR. SEEGER:  I don't see it.

3              THE COURT:  Why not?

4              MR. SEEGER:  There is interesting language in the

5    Hinojos case, which addresses that, I believe.  I think that's

6    the case where they say that price is a very important factor.

7    It determines the status of a product.  It suggests a lot of

8    things about it.

9              Now, I'm not saying -- I don't think we've alleged

10   that with a lower price, we would have bought these chips.  I

11   think what we've said is they didn't get what they paid for,

12   and so we've overpaid for them in that respect.  I don't know

13   what the price point is where our plaintiffs would accept the

14   defect.  It may be some price point, but it is not what they

15   purchased the product for.

16             THE COURT:  I thought the theory of an overpayment

17   is:  We bought something, and we paid X dollars for it, but had

18   we known its true features, we would have only paid Y, and that

19   delta between X and why is our overpayment.  Now, if we really

20   do have a fundamental or core defect, we wouldn't have even

21   paid Y.  I'm not going to buy a car that doesn't work, no

22   matter how cheap it is.

23             MR. SEEGER:  Well, you are not going to buy a car

24   that doesn't work, and I guess your point is you wouldn't buy a

25   computer chip that doesn't protect your security because that

1    doesn't work either, so then the overpayment is the full price

2    for what they purchased.

3              THE COURT:  By the way, let's get to it now then.

4    Why do we have a certain number of plaintiffs who purchased

5    these computers with these chips after knowing of the flaws and

6    even a few after filing a lawsuit?

7              MR. SEEGER:  I'm a little befuddled by that too,

8    because I think Mr. Katz has made a little too much of that.

9    First of all, from our understanding of what our plaintiffs did

10   in this case, they still have the defective computers, but they

11   went out on their own and covered.  They bought a new computer.

12   So I guess the question is --

13             THE COURT:  With the same flaws.

14             MR. SEEGER:  Well, this is what I'm saying -- this

15   issue about with the advice of counsel, I'm not really clear

16   what Mr. Katz is talking about there.

17             But we do have a handful of consumers who went out

18   and bought another computer, because they don't know what the

19   defect is.  They do not understand exactly what's going on, and

20   I don't think they have an understanding of what the

21   distinction is between an Intel chip and an AMD chip.

22             They may believe that this is the best they're going

23   to get, but they are replacing their older computers because --

24   one thing I also have to point out, the older computers are

25   more impacted by the patches than the newer ones.  And you are

1    going to be more impacted if you don't have PCID.  I don't know

2    if you remember the discussion about that.

3              THE COURT:  I remember the discussion of it; I don't

4    remember what it is.

5              MR. SEEGER:  I actually wrote it down somewhere.  I

6    forget.  It is something-ID, but I forgot what the acronym

7    stands for.  But it is an added level of protection for your

8    computer.  Those computers seem to be -- if you implement the

9    PCID, and you download the patches, your performance is still

10   impacted, but not as greatly as computers that don't have PCID,

11   which is probably half the class in this case.

12             THE COURT:  So the consumer class -- putting aside

13   some of the entities, does the basic consumer class even notice

14   the difference in performance?  Do we know yet?

15             MR. SEEGER:  Yeah, they do.  Are you going to notice

16   it if you are just maybe doing one thing.  But many people open

17   up various programs on their computer and have them going at

18   the same time.  In that instance, after these patches are

19   downloaded, we believe that you would notice an impact.  So a

20   lot of people -- and I don't mean this in a pejorative way,

21   because a number of people are kind of computer geeks.  Many of

22   our clients are, and they really pay attention to boasting

23   about performance.  They want the fastest chip.  They want the

24   most efficient computer.  They want to be able to run many

25   programs at one time or to want stream video while they have

1    other things going on.  Yeah, there are impacts on it.

2            THE COURT:  I have no idea whether this will or will

3    not have an impact if we ever get to class certification, but

4    I'm going to utter those words right now so I can find this

5    conversation again down the road.

6            MR. SEEGER:  I understand, Your Honor.

7            On the standing issue, look, other than just to

8    summarize that when a manufacturer sells a defective product

9    which causes consumers to be misled at the point of sale -- and

10   that's what we believe.  We believe they knew about the

11   defects.  It wasn't disclosed at the time they sold it to the

12   consumers, the consumers didn't know.  Because of that, they

13   paid more, and they got less than they believed they were

14   purchasing, and the consumer suffered.

15           Your Honor, at this point, I would slide on down --

16           THE COURT:  Do you want to briefly address standing

17   to seek injunctive relief.  I know Mr. Katz didn't mention it,

18   but it is in their brief.

19           Do you want to respond to that?

20           MR. SEEGER:  Yes.  I think our position is the

21   injunctive relief would be providing the notice that we are

22   talking about to the consuming public about their chips and the

23   defects.

24           THE COURT:  But the notice is now out there, right?

25   The information is now out there.  So what more injunction

1   would be appropriate?  Or to be more precise, why is there

2   standing to get future injunctive relief?

3          MR. SEEGER:  Your Honor, I guess I would have to

4   disagree slightly with the "notice is out there" concept.  We

5   talk to consumers all the time.  They are totally not aware of

6   what's happening.  They are not up on the latest trade

7   publications about Spectre, Meltdown, and Foreshadow, and if

8   they see those words, they wouldn't totally understand them.  I

9   think a lot of people think that this is the kind of software

10  hacking that you get or the vulnerabilities that come from

11  software programs, and that's if they even had a basic

12  understanding.

13         I can tell you -- and this means nothing other

14  than my -- not that it is important to Your Honor.  But when I

15  first got involved in the case, the learning curve here for me

16  was extremely high.  So when you talk about whether a consumer

17  understands this problem right now, I really doubt it.

18         THE COURT:  So then if a consumer would have been

19  told at the time of purchase that these processors, by

20  implementing out-of-order execution and speculative execution,

21  do so in a way that creates a window of time during which an

22  unauthorized user could have the processor make unnecessary or

23  unauthorized memory accesses to copies of sensitive or

24  privileged information -- and I'm quoting from the complaint at

25  paragraph 222i, would that have made a bit of difference to a

1   consumer; and if not, how is it material?

2          MR. SEEGER:  Well, that does relate to our issue on

3   the injunctive relief because we believe that if notice --

4   again, if notice is going to be provided, it should be provided

5   in a way that a consumer would understand.  I don't think a

6   consumer understands anything you just read, Your Honor.  But I

7   think a consumer would understand that your secrets may be

8   susceptible to various exploits that take advantage of defects

9   in the Intel CPUs.

10         THE COURT:  Now, if we're going to -- and this is

11  what is making it difficult, taking a consumer protection

12  environment case or context on a fraud claim -- what should the

13  consumer have been told?  That's what I asked you a few moments

14  ago.  The answer you gave me was paragraph 222.  I think we now

15  both agree that had a consumer been told that, it wouldn't have

16  meant one thing to that consumer.

17         Now what you are saying is, "Well, what they really

18  should have been told is that no computer is free from

19  vulnerability; every computer can be hacked."  Okay, fine.

20  They were told that.  Everybody knows that.  So then you go to,

21  "No, they should have been told a little bit more so that a

22  normal consumer would understand it and be motivated by it."

23         But when I asked what that would be, and you gave me

24  the 222, now we both agree that no consumer would understand

25  that, except a subclass of technology specialists.

1          MR. SEEGER:  Yes.  Your Honor, I apologize for being

2     confusing on this.  I actually did -- I have it in front of me

3     now.  I said something a little bit different, so do you want

4     me to say it?

5          THE COURT:  Whatever you want; whatever you want.

6          I'm just trying to understand what Intel should have

7     done under plaintiffs' theory to avoid liability, and I'm not

8     going to accept simply, "Oh, they never should have put the

9     product in the market in this fashion."  I think they are

10    entitled put a product in the market that balances performance

11    with security, theoretical vulnerability.

12         I'm hearing you say, "Well, then they at least should

13    have disclosed that."  Okay.  What precisely should they have

14    disclosed?  Then when I thought we had made progress, and you

15    told me what they should have disclosed, we then ended up in a

16    situation where "but no consumer would have understood that."

17         MR. SEEGER:  No consumer would understood paragraph

18    222.  I also did earlier -- I read something, which I thought

19    notice -- I guess could be what notice would look like.  If you

20    remember, I was reading language that said our chip exposes

21    users to unauthorized program instructions after the program

22    determines it not to be authorized.

23         Other chip companies do it differently and more

24    securely.  No competitor is going to say something like that.

25    But other chip companies do -- and I'm doing this on the fly,

1    because I didn't anticipate this question.

2            THE COURT:  You didn't anticipate that I would be

3    asking what is the specific omission that they should have

4    disclosed?

5            MR. SEEGER:  I did.  But when I pointed you to 222,

6    and I said "Flaw 1" and "Flaw 2," I wasn't connecting with you.

7    I think you were looking for some more of a "give it to me in

8    plain English."

9            THE COURT:  Well, yeah, because I'm thinking if this

10   is a consumer protection, because it is not a personal injury

11   case.  It's a case where you are saying the consumers bought a

12   product without being given adequate information.  I understand

13   that there is no allegation of an affirmative

14   misrepresentation.  I don't think I've seen any allegation of

15   active concealment, but I'll let somebody talk about that if

16   you want to.  So it's an omissions case.

17           So that makes me want to ask, what should have been

18   disclosed to avoid omissions liability?

19           MR. SEEGER:  I think the answer -- and I hope this

20   doesn't sound like I'm trying to oversimplify it -- would be

21   Intel prides itself on processing speed.  "We have figured out

22   a way to make our processors faster than everybody else.  The

23   problem in doing that, we have sacrificed some chip security,

24   and you should understand that we do things a little

25   differently than other chip manufacturers.  And some of your

1    secrets could be made available to an attacker using a certain

2    kind of attack, although we haven't seen a lot of it," I mean,

3    even something like that.

4            I think that a purchaser of a computer would look at

5    that and say to themselves, "I want to know."  That would be

6    important information.

7            THE COURT:  Are you saying that you have alleged or

8    can allege that Intel knew about that before it was disclosed

9    in 2017 by Google Project Zero?

10           MR. SEEGER:  And we absolutely allege that in the

11   complaint.  We allege it by pointing to their patents that

12   anticipate the problem we are now talking about.  We do it by

13   talking about White Papers that were available to the company.

14   We referenced manuals that go back -- Intel manuals to

15   programmers that go back to 2014, maybe 2012, discussing this

16   particular problem.  Yes, we absolutely allege in the

17   complaint, and I think very clearly, that Intel knew about it

18   before 2017.

19           THE COURT:  And for purposes of both standing as well

20   as basic whether the computer is fit for its ordinary purpose

21   or there is a fundamental flaw, how does one distinguish

22   between, yes, they knew of that as a theoretical vulnerability,

23   and even until 2017 there hadn't even been a laboratory proof

24   of concept, and as of right now there is a laboratory proof of

25   concept, but we don't know if it ever has been done or even

1    could be done beyond this proof of concept.

2              How does the law decide at what stage this

3    theoretical vulnerability has to be disclosed and what's the

4    extent of the required disclosure?

5              MR. SEEGER:  I think that what the law should look at

6    is what Intel knew and when they knew it, and we don't have

7    that discovery.  We have just alleged that in the complaint,

8    but we believe we have adequately alleged that -- we have

9    reason to believe that Intel knew -- and not should have

10    known -- knew of the potential defects well in advance of 2017.

11    And we think that's when the issue should have come to light.

12              THE COURT:  What I'm struggling with is to

13    understand, when you say "defects," what I'm hearing from Intel

14    is that these were -- and even maybe from you -- is that these

15    were certainly theoretical flaws that may or may not be able to

16    be exploited.  And now as of 2017 we have some analysis that

17    shows, yeah, under the right circumstances, they could be

18    exploited, but we don't know how likely those circumstances

19    are.

20              At what stage does the law say your failure to

21    disclose all of that is actionable?  How do we decide that?

22              MR. SEEGER:  I think that the answer to that,

23    Your Honor, is when Intel became aware that these defects could

24    be exploited, they had an obligation to inform the consuming

25    public of it.  The reason is -- and it doesn't relate to

1    whether we know for sure somebody has been hacked.  As I said,

2    our allegations right now, and we believe the discovery is

3    going to show that there is no fingerprint here, and these

4    hackings could be going on all over the place, and you wouldn't

5    know.

6              But what we do know about this case is that Intel is

7    requiring everybody with an Intel chip to download protections

8    that disable core functions of its microarchitecture.  Just one

9    example of why this is important, Your Honor:  Hyperthreading.

10   That is a core feature of a processing chip.  One of their

11   recommendations is basically to disable that so you can't run

12   multiple programs.  I mean, that's a core feature of their

13   product.  Once it is disabled, the impact will be substantial.

14   We've alleged up to 30 percent performance --

15             THE COURT:  Let me go to something you said about a

16   minute ago, and that was when they knew about it, they had a

17   duty to disclose to the consuming public.

18             Is there a distinction between a duty to disclose it

19   to the end users in terminology that your end users might be

20   able to understand versus simply to disclose it to the

21   marketplace?  In other words, to disclose it to the

22   manufacturers:  The Dells, the Lenovos, the HPs, to the

23   academic community, to the professional industry conferences?

24   If they disclose it there, why isn't that sufficient, given

25   that the likelihood of an individual consumer understanding

1    that doesn't seem to be particularly plausible to great.

2            MR. SEEGER:  And here is why:  Because they chose to

3    market their important component part directly to the consuming

4    public.  They took their case to them, and I can give you an

5    analogy to another area of the law, not totally on one point,

6    but it is just one way to think about it.

7            When pharmaceutical companies advertise directly to

8    consumers, they take the doctor out of the picture.  In most

9    personal injury cases, the doctor reading a label is a defense.

10   In most courts they lose that defense when they take their case

11   directly to the consuming public.  I think that's a very

12   analogous situation right there.  If the component part

13   manufacturer is saying, "Buy a computer with Intel inside,

14   because we are the best, we are the fastest, we are the

15   greatest," that's who you need to be communicating with.  You

16   can't start the discussion and end it when you feel like it,

17   which is, "Oh, and by the way, we won't tell you about our

18   defects; we will just tell Dell," which there is no evidence

19   that they did.  I am just working on the hypothetical.

20           THE COURT:  All right.

21           MR. SEEGER:  Your Honor, I will move on to consumer

22   fraud, if that's okay, and then that will leave time for

23   Rosemary.  I have taken up a lot of time.

24           So Intel says we can't make a claim for fraud by

25   omission.  I believe that we have adequately alleged that.

1    Plaintiffs' claims under the CLRA, FAL, and the fraudulent

2    prong of the UCL are governed by the reasonable consumer

3    standard, which looks to whether a defendant's practices would

4    deceive an objective, reasonable consumer.  Whether a

5    reasonable consumer is likely to be deceived is a question of

6    fact, Your Honor.

7              The CLRC, FAL, and UCL claims may be based on

8    misrepresentations by omissions.  There is plenty of law on

9    that.  Hodsdon is one of them.

10             The elements of a fraudulent omission claim under

11   these statutes, are the same as common law fraud.

12             THE COURT:  So when I analyze those statutes, under a

13   theory of omissions, do we then also implicate the Wilson

14   standard for the duty to disclose, which seems to require some

15   safety defect?

16             MR. SEEGER:  Your Honor, I think that the current law

17   in the Ninth Circuit is pretty clear, and it is stated in

18   Hodsdon, which is that the defect has to be material, meaning

19   it would have to be something that's important to the consumer,

20   and it has to relate to a central function.

21             Then you need one of the LiMandri factors, which

22   we've alleged two.  I heard you in questioning Mr. Katz -- I

23   think you were a little on the wall with regard to one of the

24   factors that we alleged, active concealment.

25             THE COURT:  Yeah.  Where is the active concealment?

1   I must have missed it.

2           MR. SEEGER:  Your Honor, it is not that you missed

3   it.  We have it in our -- I'll point you to the complaint.

4           THE COURT:  Are you saying it is the statement that

5   there is no such thing as perfect security?

6           MR. SEEGER:  No.

7           THE COURT:  Then you can tell me what's the active

8   concealment.

9           MR. SEEGER:  If you don't mind, I'll skip ahead.

10          THE COURT:  Okay.

11          MR. SEEGER:  Active concealment is on page 49 of the

12  PowerPoint we gave up to you.  We've alleged Intel actively

13  concealed that its CPUs gave unauthorized program instructions,

14  access to protected data, and failed to completely undo

15  mis-speculation.  So that does relate to the defect, but that

16  would be -- our view is they actively concealed that

17  information.

18          THE COURT:  One moment.  Here is what I understand to

19  be active concealment, and I base this in part on my Premera

20  opinion, plus the cases in there, that you actually have to do

21  something that, if you will, send someone looking in the wrong

22  direction, on a wild goose chase; or if there's a vulnerability

23  or defect here, you have to cover it up and disguise it so they

24  won't see it.  That's my understanding of what active

25  concealment is.  It requires one of those two:  Either go look

1    somewhere else, or I'm going to cover up the concealment.  You

2    can have either one.

3              What did they do here that fits within that

4    description?

5              MR. SEEGER:  I think what we are alleging fits more

6    in -- advertising their product as secure to the core; one of

7    the safest; that our safety protections extend into the

8    hardware.  Those kind of representations, I think, were, in our

9    view, active concealment.

10             THE COURT:  I might understand it if you said,

11   "That's a misrepresentation or a half-truth," although then we

12   would be getting into a little bit of the law on puffery and

13   objectively verifiable or refutable statements.

14             Where is the concealment part?  If they say that

15   their processors are among the safest in the world, okay, maybe

16   that's not really true.  It is a little puffed.  Maybe it is a

17   half-truth.  Okay.  But where is the active concealment?  Where

18   are they making it more difficult for someone to learn what the

19   omission is or what the defect is?

20             MR. SEEGER:  Okay.  Your Honor, if the question is

21   what have they affirmatively done to make it more difficult to

22   find it, I would say we probably have not alleged that in the

23   complaint in a way that would answer the question.

24             THE COURT:  Okay.  And I'll agree with that.

25             MR. SEEGER:  I think that if you wanted us to, we

1    could probably -- I think maybe even after we get some

2    discovery, we might need for that.

3              THE COURT:  Okay.  Then move on to active

4    concealment.

5              MR. SEEGER:  I mean, for the purpose of -- we only

6    need one of the LiMandri factors --

7              THE COURT:  I agree.

8              MR. SEEGER:  -- so why fight on the second one?

9              THE COURT:  Okay.

10             MR. SEEGER:  But exclusive knowledge of the defects,

11   I think we've discussed that.  We've alleged in the complaint

12   that the defects -- that they knew about them; that they had

13   exclusive knowledge concerning the hardware design; deferred

14   privilege checks; permitted unauthorized memory access, and

15   thus compromised security to achieve it.

16             THE COURT:  So where's the evidence and/or plausible

17   allegation that they had the exclusive knowledge, in light of

18   all of the things that were said to the academic conferences,

19   the White Papers, and even the patent filings?

20             MR. SEEGER:  That they had exclusive knowledge?

21             THE COURT:  Yes.

22             MR. SEEGER:  Well, first of all, nobody has access --

23   as far as I know, to this day, nobody has access to their

24   algorithms and the information that they have.  I think that

25   what the academic community does is they kind of try to

1    reverse-engineer this.   In terms of exclusive knowledge -- more

2    importantly, only Intel knew about Flaw 1.   Flaw 2, maybe -- if

3    you look at the papers, I think they are focused more on when

4    speculation execution is undone.   They don't undo the values

5    that they put in the cache.   But Flaw 1, I don't think any of

6    those papers that we allege in our papers, or anything that

7    Mr. Katz has said, indicates that somebody else knew about that

8    other than Intel.

9                THE COURT:   Okay.

10                MR. SEEGER:   I could go into the duty to disclose,

11    Your Honor.

12                Do you want me to go through that?

13                THE COURT:   Well, one of the threshold points on the

14    duty to disclose is the central functional defect.

15                MR. SEEGER:   Right.

16                THE COURT:   And let me tell you this and figure out,

17    how do I apply this?   I'm not going to make myself a witness in

18    this case, but I'll say this:   Okay, I've now gone through

19    your -- both sides' tutorial.   I probably now understand what

20    the alleged defect and flaw is better than anybody other than

21    the technical people out there in the industry.

22                Let me rephrase this.   The lawyers in this case

23    understand it much better than I do.   The technical people in

24    the industry understand it much better than I do.   I probably

25    understand it now better than your average typical consumer,

1   not your specialized technology geek, but your typical

2   consumer.

3          Now that I understand it, if my computer crashes and

4   dies or I lose it or something, would I have the slightest

5   hesitation buying a new one?  No.

6          What do I do with that fact?

7          MR. SEEGER:  I'm surprised you say that, Your Honor,

8   to be honest with you.

9          THE COURT:  Maybe I'm just wrong and maybe I don't

10  really understand the flaw.  I see the theoretical

11  vulnerability here.  And maybe it is also because now that I

12  live my life as a federal judge, everything that I do out in

13  the community I assume the news media is watching.  By the way,

14  I know they are not.  But everything I do I assume could end up

15  front page news, and I act accordingly.  So I now lead a very

16  boring life.

17         But I assume that we are vulnerable being hacked in

18  the courthouse.  And notwithstanding our security measures

19  here, there is a theoretical possibility that we can be hacked

20  here, and I could be hacked at home on my computer at home.  I

21  just live with it.  I deal with it.  I, frankly, ignore it.

22         So how does this flaw show that there is a central

23  functional defect with this product?

24         MR. SEEGER:  Your Honor, first off, I'm actually not

25  surprised -- and I know that you're trying to trigger some

1    discussion here.  I wonder if you really would go out and buy

2    another Intel computer knowing that AMD doesn't have a Meltdown

3    and Foreshadow problem, and you're going to pretty much get

4    similar performance.  I'm not questioning you on that so --

5            THE COURT:  Let me ask a really basic fundamental

6    question and show how little I know.

7            Are Intel processor chips in Apple MacBooks?

8            MR. SEEGER:  They are, yes.

9            THE COURT:  Okay.  Because my kids recommended an

10   Apple MacBook for my home computer and said that's the best to

11   work with, and I think I remember seeing one of those little

12   Intel logos on that.  That computer has worked out just fine

13   for me, and I really do think if I were to lose that computer

14   or it were to break for reasons that have nothing to do with

15   this case, I would probably buy a new one, just the same kind.

16           MR. SEEGER:  Well, you say it has worked out fine for

17   you, but I don't think you would feel that way, Your Honor, if

18   you found out that your bank account information and your

19   Social Security number and your password are sitting with

20   somebody else, who might have come in through one of these

21   exploits.

22           THE COURT:  I agree.  But there are also so many

23   other ways in which it could have come in too.  I get a call

24   probably every two or three days telling me that they're either

25   from Microsoft security, that my computer has been hacked, and

1    I need to log into this particular website, and they will fix

2    it for me.

3              MR. SEEGER:  But can I separate that out a little

4    bit?

5              THE COURT:  Yes.

6              MR. SEEGER:  So you have got one instance where you

7    have bad guys out there trying to get people's information, and

8    they figure out all kinds of ways to do that.  That's a problem

9    that we all have.  But in this case you have a computer chip

10   manufacturer who planted the defects, put the defects in the

11   chip so that they could make a faster processing system,

12   knowing that those defects were problematic at the time.

13   That's our allegation in the complaint.

14              Look, this is a pre-discovery case --

15              THE COURT:  Yeah, I understand.

16              MR. SEEGER:  But we believe these allegations will be

17   borne out.

18              THE COURT:  What does the law tell me in terms of how

19   I define a central functional defect so I can then look at the

20   fact in this case and say do we have an allegation of a central

21   functional defect?

22              MR. SEEGER:  I think it goes to really what the core

23   feature in a product; you know, an engine in the car that we

24   talked about, BMW, where the engine had issues.  It smelled.

25   It gave off all kind of sounds.  That sounds like something

1   that relates to an engine in a car.  It sounds to me like it

2   would be a central function.  I could see a court saying that's

3   a central function.

4        THE COURT:  And I find that true with my computer.

5   My computer still does all the things I want it to do.

6        MR. SEEGER:  I think of it like this:  I'm staying at

7   a hotel a couple of blocks away.  I lock my door.  There is a

8   safe there.  I put my watch in the safe.  I assume that when I

9   do that, it's safe.  I don't think that there are going to be

10  people from the hotel who are going to come in, know the code,

11  and take my stuff.

12       I think that's a pretty important feature.  Security

13  in a CPU, security in a computer chip, is really everything.

14  So why would anybody knowingly put their most private

15  information into a computer's memory knowing somebody can

16  access through the CPU and get it?

17       THE COURT:  So following up your analogy to the hotel

18  room, and I think it makes sense.  One would normally think of

19  the central functional purpose of a hotel room to give you a

20  good, clean place to sleep at night.  But if you knew that this

21  particular hotel had rampant theft going on either from

22  employees or from outsiders that they let in so that you had

23  heard so much about people breaking into rooms, or when the

24  guest isn't there, stealing stuff from them, you wouldn't use

25  that hotel anymore.

1          MR. SEEGER:  That's correct.

2          THE COURT:  Okay.  So security in that respect could

3     be a central functional defect for that hotel.

4          But now what do we do with the fact that people

5     continue to buy Intel chips and Intel processors, and, if

6     anything, it looks like their sales are going up?

7          MR. SEEGER:  Your Honor, grant the injunctive relief

8     we asked for, we will get notice out to the consumers, and we

9     will see if that's true.  I really do not believe to my essence

10    that a consumer who understands that there is another computer

11    chip manufacturer that doesn't have this Flaw 1 problem of

12    returning real values -- remember, AMD returns a dummy value to

13    transient instructions.  And when speculation is wiped out, the

14    real value stays where it is.  Nobody has access to it.  This

15    company has a whole big problem with this.

16         So I have a hard time believing consumers, if they

17    really knew, wouldn't make the right choice in that situation.

18    In any event, Your Honor, in the complaint we have at this

19    point, that's what we allege.

20         THE COURT:  So what you are telling me is you have

21    alleged central functional defect.  Whether or not you can get

22    past summary judgment and whether or not you can persuade a

23    jury that this flaw or these flaws is essential functional

24    defect remains to be seen, but you are telling me you've

25    adequately alleged it.

1              MR. SEEGER:  I believe we have.

2              THE COURT:  I understand.

3              MR. SEEGER:  On reliance, as you know, in the

4    Ninth Circuit, if it is a material omission, reliance is

5    presumed.  In any event, I believe we've alleged adequately in

6    the complaint that had our consumers known this information, it

7    would have been important to them, and I believe that's how

8    materiality is generally defined; information that would have

9    been important to the consumer.  They would have paid less or

10   not purchased at all.

11             Then on the constructive fraud, Your Honor, I think

12   the big issue here is you've heard our arguments on omission,

13   reliance, damages.  The big issue is the confidential

14   relationship.  Intel says we haven't pled it.  We

15   believe that -- well, we don't believe -- the cases say that a

16   confidential relationship is a fact issue, whether or not one

17   has been created, and so it is not really appropriate for a

18   motion to dismiss.

19             THE COURT:  But tell me what facts have you alleged

20   that would plausibly show a confidential relationship exists?

21             MR. SEEGER:  Well, again, it is not on the screen

22   here.  And on the screen we are showing you the complaint

23   references that we believe answer the question you just asked.

24   But in addition to that, and this is also in the complaint, it

25   is the fact that this company chose to take this marketing

campaign directly to the consumers.  It was all designed to

create comfort and to believe that their chips were the fastest

and as secure as anyone else.  In addition to that, we put

allegations in the complaint that say plaintiffs were

vulnerable to Intel; reasonably relied upon it to make full

disclosure regarding the security of its CPUs.

THE COURT:  I am worried about the implications of

that argument so that when a manufacturer markets to consumers

and tries to persuade consumers of certain things and allegedly

or arguably the manufacturer doesn't tell the consumers

everything, that might be sufficient to create a fact issue on

whether or not there is a confidential relationship between

that manufacturer and that consumer, the implications of that

worries me, because there are a lot of legal consequences to

being in a confidential relationship with someone that would be

very different from normally the situation of an arm's length

seller and buyer.

MR. SEEGER:  I understand --

THE COURT:  Anything you can say to make me feel more

comfortable.

MR. SEEGER:  Yeah, I can.  I think it really depends

on what the information is that is withheld.  It depends on

what type of relationship that has been created between a

manufacturer of a product and an ultimate buyer.  "Secure to

the core," Your Honor, is a pretty powerful statement.

1          I think companies have to be held accountable for

2     what they say to the public.  There is puffing and then

3     there's -- that's not a puffery statement, in my view.  That's

4     at least saying, at a minimum, that your secrets are as

5     protected with us as anyone else.

6          THE COURT:  But as I read in your memo in opposition,

7     you've abandoned the theory of affirmative misrepresentation.

8          MR. SEEGER:  I know, but for the most part -- I don't

9     want to preempt anything that Rosemary has to say.  I am really

10    trying to respond to the question that you are asking about the

11    confidential relationship, and I think it starts with the

12    marketing campaign to consumers.

13         THE COURT:  I have no problem holding speakers

14    responsible for affirmative misrepresentations, assuming they

15    dot the I's and cross the T's, and they really are

16    misrepresentations.  But saying then that those

17    misrepresentations create a confidential relationship with all

18    the legal baggage that that would bring along still gives me

19    concern.

20         Okay.  Where do you want to go next?

21         MR. SEEGER:  I'm just trying to -- I think the Frye

22    case -- and to be honest with you, I have to tell you I was

23    really impressed with Mr. Katz's ability to remember all of

24    those cases and all the details on them.  I was going to

25    compliment him about it outside in the hallway, but I will do

1   it here.

2          I don't remember all of the details of the Frye case,

3   but I do remember that in that case there is a pretty adequate

4   discussion of what -- the fact that the confidential

5   relationship is a question of fact.  I believe there it was

6   representations made by wine sellers to purchasers of wine,

7   which I don't think are any -- I think if the Court in that

8   case found a confidential relationship, I think it we would

9   be --

10         THE COURT:  But wasn't that the case where they

11  promised "sign up with us, and we won't give your information

12  to anybody else."  And in exchange for that signing up, people

13  gave some confidential information to the defendant.  I thought

14  that the issue there was a confidential relationship was

15  developed because I said to you, "You give me your confidential

16  information, and I will protect thus and such," and that was at

17  least a fact issue of whether we had a confidential

18  relationship.  We don't have that here, do we?

19         MR. SEEGER:  So thank you for reminding me of the

20  fact pattern, Your Honor.  I was looking for my notes on it.  I

21  think it was a very similar situation.  By telling consumers

22  that this computer chip is secure to the core, that you're as

23  safe as others, people are trusting that manufacturer of the

24  CPU with their secrets.  Now, they're not uploading them in the

25  same way that you would to the wine club, or whoever the

1    defendant was.

2            THE COURT:  Right.

3            MR. SEEGER:  There is a difference in that respect.

4    But they are still being trusted to protect people's most

5    private information, their account information, passwords, and

6    all of that stuff.

7            THE COURT:  When I buy a door lock from a hardware

8    manufacturer, I hope it will work.  I hope it will be secure.

9    But I'm not entering into a confidential relationship with that

10   manufacturer.

11           MR. SEEGER:  No.  But if you buy a safe from a safe

12   manufacturer, and you put your jewels in the safe, you don't

13   expect somebody to just come along, turn it once, and open it

14   up.

15           THE COURT:  I totally agree.  But I'm still not

16   entering into a confidential relationship with the manufacturer

17   of the safe.

18           MR. SEEGER:  Well, I mean, it would depend on what

19   the safe manufacturer said to you to get you to buy the safe.

20           THE COURT:  "We have got the best safes around.

21   They're impervious."  I might sue them for breach of implied

22   warranty, breach of express warranty, breach of contract,

23   fraud.  But I still haven't entered into a confidential

24   relationship with them.

25           MR. SEEGER:  Well, I also think, and what we've

1    alleged in the complaint, it goes beyond that.  It was the

2    withholding of this material information about the product.

3              THE COURT:  Okay.

4              MR. SEEGER:  Your Honor, I'm going to hand it off.

5              THE COURT:  Very good.

6              THE COURT REPORTER:  Judge, I need a break.

7              THE COURT:  How much time do you want?

8              THE COURT REPORTER:  Ten minutes.

9              THE COURT:  All right.  So we'll take a ten-minute

10   recess.  Then we will pick up with implied warranty and

11   Ms. Rivas.

12             (Recess.)

13             (Open court; proceedings resumed:)

14             THE COURT:  Picking up where we left off -- and

15   either of you can answer this or both of you.  Picking up where

16   we left off, when I was telling you about sort of my reaction

17   about still using Intel processors in my computer, and you

18   expressed some surprise, it seems to me a more realistic and

19   appropriate legal test is, what are the plaintiffs doing?  I

20   don't think I saw in the amended complaint an allegation that

21   now that the plaintiffs know about this flaw, they are no

22   longer using their computers that have the Intel processors.

23             What does that absence do to the element that

24   requires basically a core functional defect?

25             MR. SEEGER:  I don't think it does anything,

1    Your Honor.  The reason I say that is because, remember, all of

2    these people, like everyone else who has an Intel chip, are

3    being told to download patches.  I think they feel safe right

4    now.  Just like, Your Honor -- I am just using you because

5    you've talked about your computer.  You may have downloaded all

6    of the patches --

7                THE COURT:  Not intentionally.  Whatever those --

8                MR. SEEGER:  But you are okay with the performance

9    impact, because to you personally what you are doing, you know,

10   you notice it, but you are not crazy about it.  My point is,

11   though, I think that all of the -- I think that the consumers

12   are doing what they are being told.  They are downloading

13   patches, and they think that's what they have got to live with,

14   just like when you get those updates on your iPhone.

15               THE COURT:  So what does that do to this argument of

16   central functional defect?

17               MR. SEEGER:  It doesn't change it.

18               THE COURT:  Why is there a central functional defect?

19   It is like, well, before the community knew about this problem,

20   the community didn't know about this problem, or we didn't know

21   about the proof of concept.  Now that we do, there are patches.

22   The patches slowed things down.  Nobody is stopping using their

23   computer, or at least the plaintiffs haven't alleged that

24   they're stopping using their computers or that they can't use

25   their computers.

1              So where is the central functional defect?

2              MR. SEEGER:  First of all, it is a two-part answer.

3    The central defect is the fact that the CPUs aren't secure.

4    They fixed that, right?  They say they fixed it.  We don't

5    think it is fixed.  We think the only fix is really a hardware

6    fix.

7              But they say we have mitigated that problem with the

8    patches, and so maybe that's not the big problem, and right now

9    the big problem is that everybody who is downloading those

10   patches do not have the processing speed that they were told

11   they would get when they bought the best.

12             Now, can I do this by way of -- for a little bit?  I

13   believe it is the Chrysler-Jeep Ecodiesel case, a case that I'm

14   very familiar with.  It was the Volkswagen clean diesel case.

15   I want to do this by example of that because I think in that

16   case they're cars.

17             The problem was they had cheat devices.  You could

18   drive it like a car.  You could brake like a car.  You could

19   speed up.  But when the cheat device kicked in, it polluted.

20   What people were sold in those cases were a car that was

21   supposed to be green.  It was supposed to be clean.  And they

22   didn't get what they paid for.  I think that was important in

23   the Chrysler-Jeep Ecodiesel case.  There is no opinion in the

24   Volkswagen clean diesel case because it settled, clearly.

25             So again, the concept of central function kind of has

1    to relate to:  What is the consumer expecting when they are

2    buying the product?  I can't believe that a consumer who buys

3    an Intel CPU thinks that by getting the best processor on the

4    market that they are open to these security defects.  Or they

5    will fix their defects, but now you don't have the Intel

6    processing speed that you thought you bought.  So the consumer

7    is hurt either way.

8          THE COURT:  Well, they may be hurt.  But are they

9    hurt by a "central functional defect," as that phrase has been

10   defined in the law?  They may not have gotten the full value of

11   what they were hoping to get.  I get that.

12         But to the extent that a plaintiff has to prove a

13   central functional defect, either as part of a duty to

14   disclose, or as we will get to in implied warranty, how are we

15   giving any real meaning to that phrase if we say, "Well, it's

16   slower than you were hoping for.  The process is slower than

17   what you were hoping for, but you are still using it.  You are

18   still buying new ones."

19         MR. SEEGER:  Here is the answer to that, Your Honor,

20   and I could probably scroll through the cases and find some

21   language before we are out of here today.  But in the one

22   instance -- so there could be more than one central function to

23   something.  In the one instance, it's security.  So while

24   they're unfixed, unmitigated, and unrepaired, there's a

25   security defect that does go to -- is a central feature of a

1    CPU, which is processing and security.  I don't think any

2    consumer thinks otherwise.

3            Then they have patches that come along and fix it,

4    and now they've impacted the central function of processing

5    speed, which is exactly what they thought -- anybody who buys

6    an Intel chip, who is told buy "Intel Inside," believes that

7    they are getting a state-of-the-art/top-of-the-line processors.

8            THE COURT:  I get, to the extent that you are saying

9    there that they are not getting what they paid for, I

10   understand that allegation.  But I don't see how that satisfies

11   the element of central functionality, because they're still

12   willing to use their patched processor.  They are still working

13   with it as a computer.  Nobody has alleged, "Based upon these

14   flaws and/or these slowdowns or these diminutions in

15   performance, I'm no longer using my computer with Intel

16   inside."  I could see why they might be upset; why they might

17   say that they didn't get what they paid for.

18           But how is it a central functional defect if they are

19   still using it?

20           MR. SEEGER:  Your Honor, I think that you look at the

21   sale at the time -- you look at the product at the time the

22   consumer buys.  It is the point of sale.  The central function

23   of a CPU when they bought it was processing speed and security.

24   I don't mean to repeat myself, but I think it is really

25   important.  I think this is a point-in-time question.  So when

1    they bought their Intel CPUs, they believed that they were the

2    best processing speed and they were secured.  They didn't get

3    security.  Now they are getting patches to fix that central

4    function, and those patches are causing a problem.  So I'm

5    taking a crack at this from another way.  I can tell from your

6    face that you are not sure.

7            THE COURT:  I'm struggling with what both sides have

8    said.  Sometimes I completely agree with what both sides have

9    said -- not on the same point usually -- and other times I am

10   skeptical about what both sides have said.  And I am still

11   struggling with this.  I will assure you, I'm not ruling from

12   the bench.

13           MR. SEEGER:  One last thought:  I know in many

14   respects I am referring to a case that you are not going to

15   find a written opinion on what I am about to say, so I

16   apologize for that, but I do think it is instructive.  And if

17   we are struggling, I think it is a good example to think about.

18           But the Volkswagen case is a very good one.  The

19   argument could be made you still have a car.  The car is

20   polluting, but you still have a car that does everything a car

21   does.  And there's a company that ultimately agreed to buy back

22   cars and modify them.  And cars that were modified that

23   impacted performance, consumers got cash on top of it.  I

24   understand that I am referring to a settlement and not

25   something that is going to necessarily help you.

1           THE COURT:  And maybe that's one of the reasons why

2   that case settled.  If the plaintiffs in that case had to prove

3   that the non-pollution feature was a central functional aspect,

4   could they do it?  I don't know.  And maybe that uncertainty

5   led to settlement.

6           MR. SEEGER:  I think we clearly could have done that

7   because it was such a big part of the campaign and the reason

8   why those people bought those cars.  They did want a green car.

9   People buy Intel for a reason.

10          THE COURT:  Okay.  Thank you.

11          Ms. Rivas, welcome and thank for your patience.

12          MS. RIVAS:  Your Honor --

13          MR. SEEGER:  Your Honor, I'm sorry.

14          THE COURT:  I'm letting you fight this one out.  I'm

15  staying out of it.

16          MR. SEEGER:  I am sorry to Rosemary, Your Honor, but

17  you got my head spinning.  There was an opinion just issued

18  last week.  I didn't send it in because I didn't recognize it.

19  It is in the Mercedes BlueTEC Litigation, Judge Linares,

20  District of New Jersey, and the allegation that involves

21  Mercedes cars with this diesel problem.  The allegation there

22  of standing.  The Third Circuit doesn't have this central

23  function test, I think, the way the Ninth Circuit does.  I

24  think that's a case that would be very helpful.

25          THE COURT:  Thank you, Mr. Seeger.

1              Ms. Rivas.

2              MS. RIVAS:  Your Honor, just to add to a little bit

3    of this dialogue, the law doesn't require that you throw your

4    car away or that you stop using your car or that you stop using

5    your device, if it's an iPhone that you pay now $1,000, or

6    whatever.  That's not what the law requires.  And as Mr. Seeger

7    said, these products have multiple functions, multiple-function

8    central functions.

9              So I'll now go back to my argument.  I just wanted to

10   say that.

11             We prepared some slides, but I'm obviously not going

12   to go through all of them, because during your discussion with

13   defense counsel, you honed on a few things.  One, the

14   third-party beneficiary requirement --

15             THE COURT:  And where have you pled that in the

16   complaint?

17             MR. SEEGER:  Well, that's what I'm going to get to.

18             THE COURT:  Okay.

19             MR. SEEGER:  Your Honor, I think In re Sony Vaio

20   Notebook Trackpad Litigation -- the cite is 2010 WL 4262191.

21   The Court said that you can't get away with just making legal

22   conclusions, and you can draw reasonable inferences.  And

23   that's what the Court did with regard to the third-party

24   beneficiary.

25             THE COURT:  So which contract does plaintiff contend

1    they are a third-party beneficiary to?  Oh, I just ended a

2    sentence with a preposition.

3            MS. RIVAS:  You can infer from the allegation that

4    Intel has asked the OEMs to include on all computers the label

5    "Intel Inside."  You can infer that there is a contract there,

6    I think.

7            Beneficial?  Does it benefit the consumers?  I think

8    you can infer that as well.  If Your Honor thinks that we can't

9    infer that from what we have, I think we can amend, and we can

10   certainly include those allegations.

11           THE COURT:  Therefore, for a third-party beneficiary

12   analysis, do we have to get down the line of whether someone is

13   an incidental or intended third-party beneficiary?

14           MS. RIVAS:  I think incidental is enough, but I think

15   here the consumers are more than incidental.  I think that

16   Intel is selling its chips to the OEMs, to retailers who sell

17   the chips, precisely so that they go to consumers.  They are

18   not selling them so that Best Buy can use them on their

19   computers.  It is intended so that the consumers will buy them

20   and use them.  I think that's why you can infer that and why it

21   is even more than incidental, Your Honor.

22           THE COURT:  Would it create a problem under this

23   theory if a contract between an OEM and Intel contains a

24   provision that this contract does not create any third-party

25   beneficiaries?

1           MS. RIVAS:  I don't think it would, Your Honor.  I do

2    think that all the cases on this issue, third-party

3    beneficiary, they haven't examined it as closely as you're

4    asking.  They haven't asked, "Well, what does the contract

5    say?"  From what I know, none of the cases say exactly that.

6    But I think a party could just put boilerplate in, and you have

7    to look at whether it really does benefit the consumer or not,

8    and I think there is case law to support that.

9           THE COURT:  Okay.  So let's assume you get past the

10   vertical privity issue.  How do you state a claim for implied

11   warranty?

12          MS. RIVAS:  It kind of connects with what you've been

13   talking about with Mr. Seeger.  I want to go through some

14   principles that I have been able to discern from the cases when

15   you are looking at is a product fit for the ordinary purpose of

16   its use.

17          One of the principles is you have to consider what

18   the reasonable consumer would think.  That's the Carrier IQ

19   case.  That's the case where it was the mobile devices -- and

20   this is an industry-wide issue, because I was on that case.  It

21   was an industry-wide issue basically that the wireless phone

22   manufacturers were putting software on all the phones so that

23   any data, like texts and calls would get transmitted to third

24   parties.

25          The Court there looked at what a reasonable

1    consumer's expectation is and said that a phone is not just for

2    calling and texting.  It is to do -- one of the things that a

3    consumer would expect is that would be done privately and that

4    you wouldn't send that information off to a third-party.  So

5    that's the first principle.

6            The second principle is that a defect does not have

7    to render a product completely useless.  And that's important,

8    because in Carrier IQ the phones weren't rendered completely

9    useless, and people continued to use them.  But that didn't

10   have any bearing on whether the implied warranty of

11   merchantability was breached.

12           And an example -- I think it was defense counsel gave

13   this -- was a moldy bed.  You can still sleep in a moldy bed,

14   but a consumer wouldn't expect it to be moldy, and it just goes

15   against the argument that you would drill down the purpose to

16   its basic essence.

17           That goes into my third principle, and I've probably

18   already said it.  But when you are looking at what's the

19   purpose, you don't reduce it to its bare minimum.  So with a

20   car, a car's purpose isn't just to provide transportation from

21   A to B.  The purpose of a car is to provide safe and reliable

22   transportation, and that is how the Courts have looked at it.

23           THE COURT:  And so if we apply that here, I get that

24   even if a car runs, if you know it is unsafe, you are not going

25   to want to drive it.  Even if a bed that's moldy can support

1    your body while sleeping, you are not going to want to sleep in

2    it.  I get it.  And you're probably right; it would get back to

3    what would a reasonable consumer think and want.

4          How do I deal with my skepticism that a reasonable

5    consumer who was aware of, especially Flaw 1 would say, "I

6    don't want an Intel chip."  Now, maybe the skepticism comes in

7    by you telling me, "Well, we've pled it.  It is plausible.  If

8    we can't create a genuine issue on that, we will lose at

9    summary judgment.  If we can create a genuine issue, but we

10   can't persuade a jury, we will lose at jury trial.  But we have

11   pled it, and that's good enough."

12         Is that right?  And now, how has the landscape

13   changed under a plausibility framework?

14         MS. RIVAS:  I guess I'm not understanding your

15   question, Your Honor.

16         THE COURT:  Well, we talked about the 18 people or so

17   that bought new computers.  I understand Mr. Seeger's response,

18   "Well, yeah, now that the patch is out."  I think I'm beginning

19   to understand the basic vulnerability here, but I just don't

20   see how it is analogous to a moldy bed or an unsafe car or even

21   a smelly car.  It is a theoretical risk that bad guys can get

22   into my computer through a side channel.

23         MS. RIVAS:  Your Honor, I think you are assuming that

24   it is theoretical, and I don't blame you for saying that,

25   because defendants have said that I don't know how many times.

1    That's in dispute whether it is theoretical or not.

2            I would also say that, by all indication, it is not

3    theoretical.  They are redesigning their chips.  They're

4    changing the hardware.  They have issued all of these patches.

5    They've worked with industry members to roll out these patches.

6    They're telling people that you need to download these patches.

7            THE COURT:  How is that probative that it is not

8    theoretical?  It is like if they've discovered a theoretical

9    way to exploit the security in the chip, and they want to

10   prevent it, fine, good.  But how does the fact that they are

11   trying to prevent it from being exploited in any way probative

12   on the issue that at this time it is not anything more than

13   theoretical?

14           MS. RIVAS:  I think it is highly probative.

15           THE COURT:  How?

16           MS. RIVAS:  Because the industry and a company just

17   doesn't take action for whatever reason, and they don't just

18   redesign their chips because it is theoretical.

19           Look at the car case with the hacking.  The industry

20   hasn't changed the way their electronic systems are working.

21   They haven't changed it, and that was a speculative risk that

22   the Court found, but you don't hear the industry doing anything

23   about that risk.

24           I would also say that the massive performance impact

25   indicates that it is not -- well, not massive -- but there is a

1    dispute as to what it is.  But the performance impact, they're

2    redesigning all of their chips, they are issuing all these

3    patches, even though that's impacting these chips.  It is

4    impacting all sorts of companies that use their servers and

5    whatnot.

6            THE COURT:  So your argument, if I understand it

7    correctly, is that, among other things, because the patches and

8    the corrections are having a significant degradation of

9    performance, as plaintiff alleges, they would not be incurring

10   those degradations of performance if it wasn't more than a

11   merely speculative or theoretical risk?

12           MS. RIVAS:  Yes, Your Honor.  We don't have a smoking

13   gun at this point -- and we may never get one -- but we haven't

14   gone through discovery.

15           THE COURT:  I think Mr. Seeger may have mentioned

16   that.

17           MR. SEEGER:  Many times.  (Laughter.)

18           MS. RIVAS:  So at this point it is a factual dispute

19   that shouldn't be resolved on the pleadings, Your Honor.

20           I will also say that the fact that -- and maybe I'm

21   repeating myself -- but the fact that they are redesigning

22   their chips lends itself to our position that these chips

23   weren't fit to provide safe computing.

24           Going back to the purpose, the purpose isn't just for

25   computing.  People use computers to store confidential

1   information.  People use computers to compute safely and

2   securely, and I think if we were to do a survey of consumers,

3   we would find that's what consumers' reasonable expectations

4   are.  In fact, all of the alleged plaintiffs have alleged that

5   in the complaint.  And it isn't just the plaintiffs that expect

6   the chips in the CPUs to be secure, it's even Intel.

7           These statements that I'm about to read are available

8   through the link at paragraph 318 in our complaint.  But what

9   Intel says is, "Protecting our customers' data and ensuring the

10  security of our product are top priorities at Intel.  Intel has

11  a long history of focusing on security.  At Intel, security has

12  been one of our highest priorities.  For years we have built

13  security into every product we create and worked to deliver

14  breakthrough security technologies."

15          That all indicates that part of the purpose and the

16  fabric of a CPU is that it's secure.

17          THE COURT:  So those statements are not offered as

18  evidence of an affirmative misrepresentation, but instead as

19  evidence that the security is part of the central functionality

20  of the chips?

21          MS. RIVAS:  Yes, Your Honor.

22          THE COURT:  All right.  I understand.  I hear you.

23          MS. RIVAS:  Now, the AMD case, apart -- Mr. Seeger

24  kind of went through a few of the distinctions with that case.

25  But one of the things that I thought, and with all due respect

1    to Judge Koh, that was wrong, when she was considering the
2    defect, I thought she conflated the defect with the performance
3    impact of mitigation.  The defect, as defense counsel said
4    earlier, is the defect at the time of purchase.  The mitigation
5    wasn't available at the time of purchase.  But the defects --
6    the two defects, Flaws 1 and 2, were present at the time, and
7    that is a security -- that is a security risk.
8             THE COURT:  I think the plaintiffs have filed another
9    amended complaint, right?
10            MS. RIVAS:  That's correct.
11            THE COURT:  Have they specifically articulated in
12   Hauck v. AMD what the defect is now in their new amended
13   complaint?
14            MS. RIVAS:  I believe they have, Your Honor.
15            THE COURT:  What do they say?  And then the next
16   question is going to be:  Is that the same as the defect in
17   this case, or is it different?  And if it is different, how do
18   they differ?
19            MS. RIVAS:  Their defect -- I don't know how they
20   define it in the complaint.
21            THE COURT:  I think it is attached to one of
22   defendant's replies.
23            MS. RIVAS:  It's Spectre that's at issue, not
24   Meltdown and not Foreshadow.
25            THE COURT:  So how would you articulate the defect in

1    this case?

2              MS. RIVAS:  Technically, giving you the technical

3    jargon, I would have to explain what's in paragraph 22 -- in my

4    plain English, when the computer processes are accessing

5    memory, they leave protected information that could be

6    available to malicious actors.

7              THE COURT:  And you're saying that was not well known

8    in the industry?

9              MS. RIVAS:  The microarchitecture that Intel

10   employed, no.

11             THE COURT:  The defect as you've just articulated it.

12             MS. RIVAS:  That's my plain English.

13             THE COURT:  Isn't that something that has been known

14   in the microarchitecture industry for quite a long time?

15             MS. RIVAS:  I think people know in the industry that

16   there are vulnerabilities.  But when a company knows of a

17   specific vulnerability, I don't think that's an excuse to say,

18   "Well, people know there are vulnerabilities."  It is just like

19   if you -- if someone went to an amusement park and got on a

20   defective Ferris wheel, and they had signed away that they had

21   agreed that they assumed all risks, but the company knew of a

22   particular risk with regard to that Ferris wheel, I don't think

23   that would absolve the amusement park.

24             THE COURT:  No.  But wouldn't it show that you

25   wouldn't be able to satisfy the third LiMandri factor of a

1    defendant having exclusive knowledge of material facts not

2    known or reasonably accessible to the plaintiff?

3                MS. RIVAS:  Your Honor, I think we've been over this,

4    and I think Mr. Seeger explained it.  But only Intel knew about

5    this particular issue with the unauthorized access from its

6    program instructions.  That's something only Intel knew.  It is

7    something very specific that the public did not know about.

8                THE COURT:  Then how did Google Project Zero figure

9    it out?

10                MS. RIVAS:  Google Project -- my understanding, in

11    basic plain English, is that they figured out the exploits, but

12    they did not pinpoint it to Intel's microarchitecture.

13                THE COURT:  Say that again one more time.

14                MS. RIVAS:  Google and the other industry members

15    figured it out -- figured out the exploits -- but they didn't

16    pinpoint it to the microarchitecture that we have identified.

17                THE COURT:  So the industry figured out what the

18    vulnerability was and how to exploit it but didn't necessarily

19    know all of the details of why that vulnerability existed?

20                MS. RIVAS:  Exactly.

21                THE COURT:  But still, just the existence of that

22    vulnerability, doesn't that defeat the third LiMandri factor of

23    the exclusive knowledge and material facts, because when both

24    you and Mr. Seeger were explaining to the defect, it was this

25    vulnerability?

1              MS. RIVAS:  No, Your Honor.  I think there's a

2    disconnect.  I think generally academics and researchers know

3    that there are vulnerabilities, but their microarchitecture

4    that led to those vulnerabilities, they don't know about that.

5              THE COURT:  Well, I agree with that, but they figured

6    out the defect.  What you're saying Intel should have disclosed

7    was the existence of the defect.  You are not saying that Intel

8    should have disclosed all of the proprietary details of how

9    their microarchitecture worked.  You're saying they should have

10   disclosed the defect.

11             MS. RIVAS:  Well, the plaintiffs, with consultation

12   from experts, were able to pinpoint the reason and the

13   microarchitecture that provided the ability for the exploits to

14   happen.

15             MR. SEEGER:  Can I help on this, Your Honor?

16             THE COURT:  Sure.

17             MR. SEEGER:  Nobody outside of Intel understood what

18   we call Flaw 1, the fact that real values are being delivered

19   to transient instructions.  Side-channel attacks have been

20   known about, you've heard, for years, for decades, and they

21   operated in various ways.

22             Our allegations -- hopefully the complaint is clear

23   on this -- basically Intel made it easier for those side

24   channels to come in and take the information.  Flaw 1 is

25   peculiar to Intel.  That wasn't identified -- as far as we

1    know, that was not identified by the Google Project Zero, but

2    it was a fact that it was the success of the exploits.

3           THE COURT:  I thought when it was disclosed, the

4    Meltdown and Foreshadow vulnerabilities -- who disclosed that?

5    I thought that came from the Google Project Zero folks.  No?

6           MR. SEEGER:  I have to correct one thing before I get

7    the answer from Chris.  They never exposed the defect.  It was

8    the success of these exploits.

9           THE COURT:  The vulnerability.

10          MR. SEEGER:  The vulnerability.

11          (Pause in proceedings.)

12          MR. SEEGER:  They disclosed both of them, Meltdown

13   and Spectre.  Foreshadow came later.  I want to make sure of

14   the timing.

15          THE COURT:  So the industry figured out and knew the

16   vulnerability.  For a long time they had known about

17   side-channel vulnerability generally.  In 2017, it became

18   public that there were certain types of vulnerabilities that

19   might not have been known before.  What you are saying is that

20   within the exclusive knowledge of Intel was how the

21   microarchitecture worked that allowed that specific

22   vulnerability.

23          MR. SEEGER:  And that makes Meltdown and Foreshadow

24   successful with them in a way that it doesn't with other chip

25   manufacturers.

1          THE COURT:  Okay.

2          MS. RIVAS:  Just to finish up on the implied warranty

3    of merchantability.  Again, we think that Judge Koh, and I say

4    this with all due respect, that she conflated the defect with

5    the damages, and she considered whether the 30 percent

6    performance impact that the plaintiff alleged there, she

7    considered that to be the defect and then went on to determine

8    that that basically was de minimis.  We think that's a factual

9    issue, and that that's disputed.

10         THE COURT:  What's the factual issue?  Whether it is

11   de minimis or whether the defect is the performance

12   degradation?

13         MS. RIVAS:  Whether it is de minimis.

14         THE COURT:  Okay.

15         MS. RIVAS:  And she determined it was de minimis.

16   Then she said -- and this was the gist of it -- this doesn't

17   render the product unfit for its ordinary purpose of use.

18         So I would like to turn now to the UCL claim.  The

19   UCL claim, in particular the unfair business practices claim.

20   Whether a practice is unfair is generally a question of fact,

21   unless the Court can determine on the face of the complaint

22   that it is not unfair, and the reason for that is because the

23   Courts employ a balancing test, so to speak, and the test that

24   they employ is that they determine that a practice isn't fair

25   if the harm to the consumer from the practice is greater than

1    the utility of the practice.  And employing that test requires

2    a weighing of the evidence that we would obtain through

3    discovery.

4            My point here is that our unfair business practice

5    claim is not based on the fraudulent conduct.  We have -- in

6    particular, I have identified certain paragraphs that define

7    what the unfair business practices are, paragraph 384, "Intel

8    knowingly designed, developed, manufactured, and sold CPUs with

9    material defects that result in security risks, compromising

10   confidential information and a patched slowdown CPU so that

11   consumers do not receive the benefit of their bargain.  Intel

12   put profits over safety of consumer data by permitting

13   instruction execution without first performing and enforcing

14   the appropriate memory access checks as a means to increase

15   practice or performance."  That's also paragraph 384c.

16           "Intel failed to take steps to secure CPU

17   architecture from cache side-channel attacks."  That's

18   paragraph 384d.

19           So those are the unfair practices that we are

20   alleging.  They are distinct from the fraudulent conduct.  So

21   the claim for unfair business practices does not rise and fall

22   based on whether the fraud claims succeed or not.

23           Now I would like to move into the unjust enrichment

24   claim.  A quasi-contract unjust enrichment claim for

25   restitution is obviously recognized under California law

1              THE COURT:  As a remedy or as a cause of action?

2              MS. RIVAS:  As a cause of action under Astiani.

3              THE COURT:  And what are the elements?

4              MS. RIVAS:  I have it right here.  "To allege unjust

5    enrichment as an independent cause of action, a plaintiff must

6    show that the defendant received and unjustly retained a

7    benefit at the plaintiff's expense."  That's cited in the

8    ESG Capital Partners v. Stratos case.  And as you can see,

9    Your Honor, that doesn't depend on whether the defendant

10   committed fraud or showing that the defendant committed fraud

11   or violated some other law.

12             THE COURT:  But they must have received it and

13   retained it unjustly.  So what are the elements of receiving

14   and retaining something unjustly?

15             MS. RIVAS:  Well, you'd have to look at the equities

16   of the case, Your Honor.

17             THE COURT:  What are the factors?

18             MS. RIVAS:  While the factors consider whether the

19   defendant did something, maybe it was either an unfair

20   practice, maybe it was through a mistake, maybe somebody gave

21   them something by mistake.  It's also putting a product out

22   there that's defective.  That could be unjust.

23             I would say that reading -- I went back and read the

24   claim for unjust enrichment, and it does speak to being based

25   on fraudulent conduct.  I would submit to the Court that, based

1    on the allegations in the complaint, we can state a separate

2    claim for unjust enrichment that's independent of the fraud,

3    and I would like to go over some allegations that I think would

4    support that.

5              "At the expense of security and to gain an advantage

6    over its rival AMD, Intel knowingly designed CPUs to allow the

7    unauthorized access of confidential information."  That's

8    paragraphs 2 to 3, 5, 8.

9              "The Meltdown/Foreshadow exploits, due to the

10   security flaws in the Intel CPUs, are exclusive to Intel."

11   That's paragraph 315.

12             "The patches Intel has rolled out dramatically reduce

13   the performance of the CPUs and take away functionality and do

14   not fix the defects."  Those are paragraphs 297, 303 to 314;

15   306 to 307.

16             "Had plaintiff known that in designing the CPUs Intel

17   failed to take adequate measures to secure stored data,

18   plaintiff would not have bought the products contained in

19   Intel's CPUs or would have paid less for them."  That's

20   paragraph 400.

21             THE COURT:  How is that consistent?  This is the same

22   thing I asked Mr. Seeger.  I'm having trouble with that.  If it

23   is so bad that a reasonable consumer wouldn't have bought it,

24   okay, I get that.  I'm not going to buy a moldy mattress no

25   matter how cheap it is.  But if your alternative is, "or they

1    would have paid less for it," then it just seems to me, well,

2    then there's a tradeoff between security and price and security

3    and price and performance, and they're all different factors,

4    and so be it.

5             I don't see how it is consistent to say that someone

6    would either not pay for this had they known the real security

7    flaw here, or "the defect," as you put it; or maybe they would

8    have insisted on getting a bigger discount.  I don't see how

9    those are consistent.

10            MS. RIVAS:  They are consistent.  Well, I don't think

11   they are inconsistent.  I mean, I'm trying to come up with

12   real-world analogies.

13            Your Honor is obviously struggling with the fact that

14   people are still using them now that they are patched and that

15   some people bought them again.  I would say that, you know --

16   again, going back to my analogy, the requirement in the law

17   isn't that you stop using it, especially if it is patched.

18            The fact that they bought the product again, maybe

19   they bought it for a different reason.  But I think materiality

20   and reliance and those issues, you just don't have to show that

21   one factor caused you to rely on buying the product.  You could

22   buy a product for a whole host of reasons.  Two may be

23   material; one may be material.  I don't think the fact that

24   someone bought it again is fatal to these claims.

25            THE COURT:  Let me ask you this question, and I'll

1    make this purely hypothetical.  I have no idea how Intel makes

2    its decisions.  So whether this is a decision made at product

3    development or by its board, I don't know.

4              But assume the right decision-makers at Intel are

5    having a discussion, maybe in 2006, give or take, and they're

6    exploring what they believe is a theoretical possibility of a

7    flaw that later turns out to be what we know and refer to as

8    Meltdown or Foreshadow, and somebody says, "Well, that's just

9    theoretical.  It will take a lot of sophistication and

10   equipment and technology to be able to possibly exploit it, and

11   then everything else would have to line up in place, and we

12   think it is very unlikely it will ever be exploited.  And if we

13   were to totally eliminate that possibility, it would reduce

14   processing speed."

15             And somebody else says, "And processing speed is one

16   of the most important things that we have, that we offer, that

17   our customers really want."

18             And they say, "Okay.  We are going to decide on this

19   balance to go with processing speed over theoretical security

20   risk."

21             Now, putting aside sort of how they market it and

22   sort of the deception areas that you've described, is that

23   decision that they've just made, as I described, unjust, or

24   would that support a theory of unjust enrichment?

25             MS. RIVAS:  I would say that it is unjust, especially

1    when, for example -- just giving you an example -- someone

2    bought an i7 chip, and it turned into an i5, and they paid more

3    money for that i7 chip than they did for the i5.  That means

4    that Intel benefited from the overpayment -- from the

5    payment -- or a consumer paying more for that i7 chip than they

6    would have.

7              THE COURT:  So if you were at this meeting as Intel's

8    general counsel, and you heard this discussion, "Some people

9    talk about this vulnerability that can show a potential of

10   unauthorized access, but your technology experts there say that

11   they think it is unlikely, a number of things would have to

12   line up before it can be implemented.  It's very unlikely.  But

13   if we do completely eliminate that risk, then that would

14   adversely affect our processing speed."

15             Somebody else at the meeting says, "And processing

16   speed is really what helps us differentiate ourselves, and so I

17   recommend we go with processing speed and accept this security

18   flaw."

19             You, as the general counsel, would tell them, "No,

20   you can't do that.  That's an unjust decision.  You have to err

21   on the side of eliminating all theoretical possible security

22   flaws no matter what it does to processing speed"?  That's the

23   advice you would give them.

24             MS. RIVAS:  I don't think that's correct, because

25   they are redesigning the chips now, so they are now willing to

1    compromise speed.  So to me, if they are willing to redesign

2    the chips and compromise speed because of this vulnerability,

3    then they should have made that decision at the outset.

4             THE COURT:  Now, what if they made that decision

5    before they knew of the proof of concept that the

6    Google Project Zero team revealed?

7             MS. RIVAS:  Well, if they are getting an unfair

8    advantage, and I'm sure they know what their competitors are

9    doing or have an idea what their competitors are doing, I think

10   that's unfair in the market.  It's unfair for competition to

11   gain an advantage over another competitor and to not give

12   consumers that choice and to not fully inform consumers of

13   their choice.

14            THE COURT:  But now we are back to informing

15   consumers.  You're telling me that they could make that choice

16   as long as they adequately disclosed that.  So the choice

17   itself isn't an unjust choice.  It is the choice coupled with

18   not giving an adequate disclosure of the choice --

19            MS. RIVAS:  If I may go back one step, and then I'll

20   answer that question.  If I was their general counsel, I would

21   tell them, "You know what, you could do that, but you are going

22   to be sued, and you are probably going to have to refund or pay

23   damages."  That's what I would tell them.

24            THE COURT:  Even if we disclose everything.

25            MS. RIVAS:  Now, that's the other issue --

1          THE COURT:  I'm trying to isolate the decision.   Is

2     the decision itself an unjust decision, or is it the

3     combination of making the decision that way but not giving the

4     disclosure?

5          MS. RIVAS:  I think they are independent.

6          THE COURT:  And that's why I'm trying to figure out:

7     Why is the decision independently unjust if there is an

8     adequate disclosure?

9          MS. RIVAS:  I think what you are saying is that the

10    company has the choice of making the disclosure or not making

11    the disclosure and just keeping it to themselves.

12         THE COURT:  No.  I'm saying that you have to balance

13    security versus performance.  How you choose to balance that is

14    not inherently just or unjust.  Where the problem may come in

15    is if you misrepresent how you balance that, but that's

16    inconsistent with what you said in the very beginning, how this

17    idea of how the unjust enrichment theory is different from and

18    separate from basically the fraud and deception aspect of the

19    case.  That's what I'm trying to understand.

20         MS. RIVAS:  Okay.  I'm trying to follow Your Honor,

21    and I apologize if I'm not.  It is different than the

22    disclosure case, because we could have filed this case based

23    solely on the unjust enrichment claim, and Your Honor would

24    have analyzed it under the authorities.  We didn't have to

25    bring distinct claims.  Just like we brought the implied

1    warranty of merchantability claim, again, that could serve the

2    basis of the unjust enrichment claim.  It is unjust for a

3    defendant to put a product out there that's not fit for its

4    ordinary purpose.  So you don't need -- you don't need the

5    fraud part of it or the disclosure part of it.

6            Going back to the disclosure, what would that

7    disclosure be?  I mean, there was dialogue about that, but

8    there are various things that could have been disclosed.  "We

9    prioritized speed over security.  As a result, unlike others,

10   it's possible for programs to get unauthorized access to secret

11   information.  We don't know whether that's happened.  Can't

12   detect it.  However, if we have to patch, you'll experience

13   material performance loss.  If that happens, our chips will

14   experience about three times more of a performance" -- I mean,

15   that's just something, you know, that we've thought about, and,

16   you know, obviously it would depend on how the case goes.  And

17   we would formulate exactly what they knew and exactly what they

18   should have disclosed.  But I think at the outset we state a

19   claim for that disclosure -- for the nondisclosure

20   omission-based claims, and we state a claim for unjust

21   enrichment.

22           THE COURT:  Do you know agree that to state a claim

23   for failure to disclose, a plaintiff must articulate what

24   should have been disclosed and when it should have been

25   disclosed?

1          MS. RIVAS:  No.  I think you have to show there are

2    material facts that weren't disclosed, and how you articulate

3    what the disclosure could have been to the consumer, I think

4    can be refined.  But I think we have alleged the material facts

5    here that should have been disclosed.

6          THE COURT:  Okay.

7          MS. RIVAS:  That's all I have, Your Honor, unless you

8    have more questions.

9          THE COURT:  Thank you, Ms. Rivas.

10          Anything further from plaintiffs?

11          All right.

12          Rebuttal.

13          MR. KATZ:  Your Honor, I think I covered everything

14    in my presentation this morning.  Unless you have any

15    questions, I don't have anything to add.

16          THE COURT:  Okay.  Then I would say surrebuttal

17    within the scope, but that takes care of that.  (Laughter.)

18          MR. SEEGER:  Here is my surrebuttal:  I have nothing

19    to add.

20          THE COURT:  All right.  I'm going to take this under

21    advisement.

22          I do appreciate the outstanding written and oral

23    advocacy, as always, in this case, and you have given me an

24    awful lot to think about.  The judicial notice motion, that's

25    gone.  The motion to dismiss is taken under advisement.  I

1    can't give you a good estimate of when I expect to get you a

2    decision.  I will turn to it responsibly.

3             I will say this, though, and we talked about this at

4    the end of our technology session.  This case will resolve at

5    the trial court level, either by me dismissing the complaint at

6    the 12(b)(6) stage or at the Rule 56 stage, or by a jury

7    decision, or by settlement.  It is going to be resolved in one

8    of those four ways, I think, and I suppose, theoretically, by

9    some type of standing issue.

10            All right.  You'll continue your excellent advocacy

11   as we go through standing motion to dismiss, summary judgment,

12   and trial, I'm certain.  With respect to a possible settlement,

13   and I am going to stay out of those discussions as much as I

14   can, except for occasionally prodding you to have those

15   discussions.  I think it will take an awful lot of creativity

16   if this case is ever going to settle to figure out how to

17   settle it.

18            Some cases are easier to see how it can be settled.

19   Whether both sides are willing to get there, that remains to be

20   seen, and maybe they do and maybe they don't.  If they don't,

21   it either gets resolved in motion practice or by a jury.

22            This one is not one of those cases, I think.  This

23   one will take a great deal of creativity and thought to even

24   try to see if there is a possible way or mechanism or structure

25   of settling this dispute.  My guess is that you probably

1  already know that.

2         I will only say that I am really glad that people as

3  experienced and talented and smart as you all are on both sides

4  of this case to give that some thought, and all I will do is

5  occasionally keep prodding you to multitask.  As the processors

6  involved in this case do, you can work on more than one

7  transaction at the same time.

8         So as I work on the pending motion, as you work on

9  thinking about discovery, I encourage you also to think about,

10 if this case could possibly settle, what might a settlement

11 look like?  Then you can figure out, can we ever get there?  If

12 so, fine.  If not, fine.  But give that some thought.  As long

13 as you are all here, and there is no snow storm on its way, I

14 encourage you to use this time to speak with each other.  But

15 as with the last time, that's not a court order.  It is just

16 encouragement.

17        Safe travels.  The matter is under advisement.

18        (Court adjourned.)

19

20

21

22

23

24

25

1

2

3                                      --oOo--

4

5              I certify, by signing below, that the foregoing is a

6    correct transcript of the record of proceedings in the

7    above-entitled cause.  A transcript without an original

8    signature, conformed signature, or digitally signed signature

9    is not certified.

10
     /s/ Dennis W. Apodaca                      March 4, 2019
11   DENNIS W. APODACA, RDR, RMR, FCRR, CRR              DATE
     Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

MR. CHAPMAN: [1] 3/17
MR. KAT: [1] 43/7
MR. KATZ: [61] 3/15 4/21 5/13 7/9 7/25 8/24 14/14 15/10 15/17
16/15 16/23 18/8 19/6 23/18 24/2 24/5 25/6 26/25 27/3 27/6
28/9 31/11 35/18 36/2 36/25 37/11 37/24 39/22 39/25 40/9
40/18 41/8 41/22 42/1 42/5 43/5 43/15 44/10 44/18 44/20 45/9
45/16 46/17 47/17 49/13 50/8 50/14 51/12 52/1 53/7 53/10 54/8
54/10 54/22 55/3 55/11 55/25 56/5 57/8 58/16 135/12
MR. SEEGER: [115] 3/8 5/6 58/25 59/4 59/10 59/13 59/18
59/24 60/4 60/11 64/2 64/16 65/7 65/13 67/9 67/14 67/23 68/4
68/12 68/18 68/22 68/25 69/14 69/23 70/1 70/17 70/22 71/1
71/3 71/8 71/13 71/15 73/1 76/4 76/12 77/5 78/1 78/3 78/22
79/6 79/13 80/4 80/14 81/5 81/19 82/2 83/1 83/25 84/16 85/4
85/18 86/9 87/4 87/21 89/1 89/20 90/15 91/1 91/5 91/8 91/10
92/4 92/19 92/24 93/4 93/7 93/9 93/19 93/21 94/9 94/14 95/6
95/23 96/7 96/15 97/2 97/5 97/15 97/21 98/5 98/25 99/6 99/25
100/2 100/20 101/17 101/20 102/7 102/20 103/18 104/2 104/10
104/17 104/24 105/3 105/24 106/7 106/16 107/1 108/18 109/19
110/12 111/5 111/12 111/15 112/16 112/18 118/16 123/14
123/16 124/5 124/9 124/11 124/22 135/17
MS. ALLEN: [1] 3/20
MS. RIVAS: [50] 3/11 60/7 68/19 68/24 111/11 112/1 113/2
113/13 113/25 114/11 116/13 116/22 117/13 117/15 118/11
118/17 119/20 119/22 120/9 120/13 120/18 120/22 121/1 121/8
121/11 121/14 122/2 122/9 122/13 122/19 122/25 123/10 125/1
125/12 125/14 127/1 127/3 127/14 127/17 129/9 130/24 131/23
132/6 132/18 132/24 133/4 133/8 133/19 134/25 135/6
THE CLERK: [3] 3/3 3/14 4/14
THE COURT REPORTER: [4] 58/13 59/16 105/5 105/7
THE COURT: [224]

$

$1,000 [1] 112/5
$16.4 [1] 12/22
$16.4 million [1] 12/22

'

'78 [1] 16/5

-

--oOo [1] 138/3

/

/s [1] 138/10

0

07660 [1] 2/4

1

100 [1] 6/16
1000 [1] 2/23
12 [5] 7/20 7/24 8/20 11/19 136/6
12th [1] 2/11
139 [3] 4/4 50/8 50/13
141 [1] 4/3
15 [2] 47/11 47/22
15-minute [2] 58/19 59/2
17,900 [1] 12/20
18 [1] 116/16
18-2828-SI [1] 3/5
19 [2] 1/5 3/1
1976 [1] 34/22
1995 [16] 10/11 11/4 20/8 20/11 23/23 30/6 30/7 30/17 31/1
33/9 34/14 40/21 41/15 42/25 46/7 63/17

2

20 [3] 19/20 22/24 69/18
20005 [1] 2/11
2004 [1] 52/19
2005 [1] 55/21
2006 [6] 10/16 63/15 63/18 64/2 64/5 130/5

2007 [1] 15/21
2008 [1] 15/21
2010 [1] 112/20
2011 [2] 10/17 25/2
2012 [1] 86/15
2013 [2] 13/7 48/19
2014 [1] 86/15
2015 [3] 17/7 25/1 25/3
2016 [1] 36/4
2017 [13] 7/9 9/15 14/20 25/11 25/16 34/8 39/21 86/9 86/18
86/23 87/10 87/16 124/17
2018 [7] 12/4 13/23 17/12 20/24 32/18 46/20 52/9
2019 [3] 1/5 3/1 138/10
217 [2] 47/11 47/22
22 [2] 70/1 121/3
222 [10] 62/2 69/24 71/3 71/6 71/10 71/16 83/14 83/24 84/18
85/5
222i [1] 82/25
223 [1] 62/3
246 [1] 62/23
25 [4] 30/20 31/4 31/8 31/10
256 [1] 62/24
28 [1] 33/20
297 [1] 128/14
298 [1] 20/4
2:00 [1] 4/17
2:00 p.m [1] 4/13
2:30 [1] 4/17
2nd [1] 12/6

3

30 [2] 48/22 88/14
30 percent [3] 20/1 20/5 125/5
30-minute [1] 4/12
300 [1] 13/1
301 [1] 2/23
303 [2] 20/4 128/14
306 [2] 20/4 128/15
307 [1] 128/15
314 [1] 128/14
315 [1] 128/11
318 [1] 119/8
326-8182 [1] 2/24
36 [1] 25/20
384 [1] 128/4
384c [1] 126/15
384d [1] 126/18
3:18-md-02828-SI [1] 1/3

4

40 [1] 5/8
400 [1] 128/20
408 [1] 68/22
408g [3] 68/19 69/1 69/3
4262191 [1] 112/20
44 [1] 2/6
49 [1] 91/11

5

503 [1] 2/24
55 [1] 2/4
56 [1] 136/6

6

650 [1] 2/6
6P [1] 21/23

7

711 [1] 7/8
716 [1] 7/8
725 [1] 2/11

**868 [1]** 7/8

**9**

**94 [1]** 11/21
**94104 [1]** 2/7
**95 [4]** 11/21 20/21 20/21 44/13
**97204 [1]** 2/23

**A**

**ab [1]** 32/20
**ab initio [1]** 32/20
**aback [1]** 43/18
**abandoned [2]** 5/15 102/7
**ability [3]** 77/24 102/23 123/13
**able [12]** 18/25 38/9 42/19 45/14 70/21 80/24 87/15 88/20 114/14 121/25 123/12 130/10
**about [158]**
**above [1]** 138/7
**above-entitled [1]** 138/7
**absence [1]** 105/23
**absolutely [4]** 11/22 59/13 86/10 86/16
**absolve [1]** 121/23
**academic [4]** 65/21 88/23 93/18 93/25
**academics [2]** 37/7 123/2
**acceleration [2]** 12/12 12/14
**accept [3]** 78/13 84/8 131/17
**access [20]** 60/16 61/11 61/24 62/22 70/7 72/1 72/9 74/13 76/19 91/14 93/14 93/22 93/23 98/16 99/14 122/5 126/14 128/7 131/10 134/10
**accesses [2]** 72/19 82/23
**accessible [9]** 35/3 35/9 35/11 35/17 36/22 37/10 37/24 38/1 122/2
**accessing [1]** 121/4
**accident [1]** 76/3
**accidents [2]** 12/15 55/17
**accordingly [1]** 95/15
**account [7]** 62/14 74/6 75/21 76/18 76/19 96/18 104/5
**accountable [1]** 102/1
**accumulation [1]** 22/17
**accurate [1]** 77/3
**achieve [1]** 93/15
**acknowledged [2]** 60/20 66/20
**acronym [1]** 80/6
**act [1]** 95/15
**acting [2]** 56/24 56/25
**action [11]** 42/6 50/21 55/18 57/6 57/7 57/20 68/21 117/17 127/1 127/2 127/5
**actionable [2]** 32/4 87/21
**Actions [1]** 1/6
**active [15]** 43/2 43/9 43/11 43/13 43/13 85/15 90/24 90/25 91/7 91/11 91/19 91/24 92/9 92/17 93/3
**actively [3]** 22/4 91/12 91/16
**actor [3]** 62/11 64/22 76/17
**actors [2]** 60/16 121/6
**actual [7]** 5/22 7/2 11/1 33/17 34/5 34/8 40/3
**actually [15]** 10/4 12/2 12/6 12/10 13/18 32/22 33/1 41/7 44/21 51/24 60/8 80/5 84/2 91/20 95/24
**ad [1]** 43/25
**add [4]** 45/19 112/2 135/15 135/19
**added [1]** 80/7
**addition [6]** 13/5 20/7 25/19 26/20 100/24 101/3
**additional [3]** 8/10 8/15 9/24
**address [8]** 16/15 16/21 16/24 19/3 50/21 59/19 60/2 81/16
**addressed [3]** 8/20 9/13 16/16
**addresses [1]** 78/5
**adequate [5]** 85/12 103/3 128/17 132/18 133/8
**adequately [6]** 72/25 87/8 89/25 99/25 100/5 132/16
**adjourned [1]** 137/18
**admitted [1]** 46/21
**ads [1]** 18/18
**advance [1]** 87/10

**advances [2]** 13/9 14/9
**advantage [4]** 83/8 128/5 132/8 132/11
**adversely [1]** 131/14
**advertise [1]** 89/7
**advertising [3]** 19/10 19/13 92/6
**advice [7]** 13/25 20/23 36/18 38/23 46/24 79/15 131/23
**advisement [3]** 135/21 135/25 137/17
**advising [1]** 56/25
**advocacy [2]** 135/23 136/10
**affect [1]** 131/14
**affects [1]** 77/24
**affirmative [10]** 5/15 29/1 33/1 51/17 55/14 60/6 85/13 102/7 102/14 119/18
**affirmatively [1]** 92/21
**afield [2]** 17/22 17/23
**after [28]** 12/5 13/24 13/24 13/25 20/2 20/25 23/17 24/1 25/4 31/4 38/18 38/18 39/15 48/17 48/24 72/8 73/6 79/5 79/6 80/18 84/21 93/1
**afternoon [1]** 4/12
**again [28]** 17/17 25/11 30/5 32/16 45/5 60/23 62/9 62/25 63/8 63/8 63/14 65/24 67/10 73/16 75/4 75/12 76/6 81/5 83/4 100/21 107/25 122/13 125/3 129/15 129/16 129/18 129/24 134/1
**against [6]** 5/18 6/18 14/22 16/9 51/25 115/15
**agent [1]** 56/24
**ago [5]** 31/11 35/10 50/25 83/14 88/16
**agree [14]** 18/10 22/10 40/13 44/20 74/3 83/15 83/24 92/24 93/7 96/22 104/15 110/8 123/5 134/22
**agreed [2]** 110/21 121/21
**ahead [1]** 91/9
**air [2]** 29/17 29/19
**airwaves [1]** 19/9
**Alere [2]** 36/1 36/3
**algorithms [1]** 93/24
**Alienware [1]** 57/10
**all [128]** 1/6 3/24 3/25 4/7 4/19 5/2 5/10 6/4 6/19 7/10 9/18 10/3 10/19 11/7 12/5 13/8 13/9 13/16 14/5 16/3 19/9 20/11 20/13 20/13 20/22 21/22 23/1 24/6 24/16 24/22 26/6 28/23 32/14 34/21 37/5 38/3 39/16 41/15 41/23 42/13 43/14 45/12 45/13 45/25 46/20 46/23 47/2 47/3 47/11 48/10 48/17 49/1 51/8 51/13 53/25 54/14 54/15 55/13 56/1 56/16 57/14 57/15 58/7 58/12 59/15 59/24 60/19 61/3 68/21 69/3 70/1 70/15 73/18 75/7 75/8 76/21 77/25 79/9 82/5 87/21 88/4 89/20 93/18 93/22 97/8 97/9 97/25 98/5 100/10 101/1 102/17 102/23 102/24 103/2 104/6 105/9 106/1 106/5 106/11 107/2 112/12 113/4 114/2 114/22 117/2 117/4 118/2 118/2 118/4 119/4 119/15 119/22 119/25 121/21 122/19 123/8 125/4 129/3 131/21 135/7 135/11 135/20 136/10 137/3 137/4 137/13
**allegation [32]** 6/13 8/22 11/12 11/14 12/7 13/18 17/14 19/23 21/11 30/8 30/8 30/9 39/19 52/13 52/14 53/9 53/17 56/5 61/18 63/1 68/6 75/9 85/13 85/14 93/17 97/13 97/20 105/20 109/10 111/20 111/21 113/3
**allegations [15]** 6/11 12/13 13/19 30/16 39/12 60/21 72/12 74/14 88/2 97/16 101/4 113/10 123/22 128/1 128/3
**allege [18]** 7/23 10/21 12/4 12/4 38/24 40/5 44/15 69/17 69/19 74/9 76/14 86/8 86/10 86/11 86/16 94/6 99/19 127/4
**alleged [64]** 5/25 6/5 6/6 6/15 6/19 6/24 8/4 8/8 17/8 17/13 19/19 20/8 21/15 21/25 30/5 32/20 40/9 40/10 40/18 42/24 43/4 43/5 49/17 49/18 51/2 52/7 52/11 54/24 59/15 63/19 63/24 64/19 69/9 69/18 69/20 70/2 70/14 70/22 71/8 76/6 77/1 78/9 86/7 87/7 87/8 88/14 89/25 90/22 90/24 91/12 92/22 93/11 94/20 99/21 99/25 100/5 100/19 105/1 106/23 109/13 119/4 119/4 125/6 135/4
**allegedly [3]** 33/3 33/8 101/9
**alleges [2]** 43/25 118/9
**alleging [10]** 34/6 54/25 54/25 55/3 55/4 55/5 69/23 72/22 92/5 126/20
**Allen [2]** 2/10 3/21
**allocated [1]** 4/8
**allow [2]** 67/25 128/6
**allowed [6]** 50/5 62/21 63/4 70/6 72/6 124/21
**allows [2]** 62/13 62/15
**almost [4]** 74/16 74/25 75/14 75/20
**along [4]** 45/9 102/18 104/13 109/3

already [2] 115/18 137/1
also [42] 3/19 9/14 10/23 11/10 13/22 20/4 20/6 22/16 23/21 25/9 25/14 26/4 27/8 27/14 33/1 37/8 37/10 40/11 46/4 47/1 47/5 49/11 49/22 58/1 58/2 59/11 63/19 69/9 77/18 79/24 84/18 90/13 95/11 96/22 100/24 104/25 117/2 117/24 118/20 126/15 127/21 137/9
alternative [2] 23/18 128/25
although [8] 15/4 26/21 30/15 44/4 61/17 75/17 86/2 92/11
always [3] 38/9 53/6 135/23
am [22] 41/8 49/9 49/12 50/12 51/12 55/11 61/20 70/1 73/3 76/24 89/19 101/7 102/9 106/14 110/10 110/14 110/15 110/24 111/16 136/13 137/2
Amazon [4] 76/18 76/18 76/19 76/21
AMD [20] 5/18 6/18 16/15 49/18 49/25 51/25 61/15 61/15 62/10 62/16 64/11 69/13 73/9 73/12 79/21 96/2 99/12 119/23 120/12 128/6
AMD's [1] 19/21
amend [1] 113/9
amended [5] 39/20 49/12 105/20 120/9 120/12
American [1] 27/10
among [7] 35/7 35/13 36/21 69/11 72/23 92/15 118/7
amusement [2] 121/19 121/23
analogies [1] 129/12
analogous [2] 89/12 116/20
analogy [6] 36/16 36/17 37/1 89/5 98/17 129/16
analysis [20] 6/20 7/11 15/10 15/15 18/11 18/14 19/14 20/7 21/20 29/22 31/15 31/16 32/16 35/22 46/20 49/7 52/17 53/14 87/16 113/12
analytically [2] 35/4 35/12
analyze [1] 90/12
analyzed [5] 19/20 20/1 22/21 22/23 133/24
and/or [4] 39/15 69/3 93/16 109/14
Andren [2] 35/25 36/3
angle [1] 22/21
another [19] 12/24 15/19 19/5 21/13 22/8 22/13 27/13 45/2 45/4 46/24 53/3 73/4 79/18 89/5 96/2 99/10 110/5 120/8 132/11
answer [13] 68/14 73/3 77/16 83/14 85/19 87/22 92/23 100/23 105/15 107/2 108/19 124/7 132/20
answers [1] 36/1
anticipate [3] 85/1 85/2 86/12
any [64] 5/23 5/24 6/11 6/13 10/15 11/1 11/2 11/14 11/15 11/16 11/20 12/2 12/7 13/13 14/25 15/19 18/12 18/25 19/13 20/18 25/13 26/11 28/21 29/1 29/6 29/13 30/7 30/8 30/10 30/14 31/23 33/10 35/19 37/12 38/7 38/9 38/16 42/10 42/12 43/25 46/13 50/6 52/4 52/14 52/19 56/16 65/17 69/19 70/19 73/14 76/8 76/15 85/14 94/5 99/18 100/5 103/7 108/15 109/1 113/24 114/23 115/10 117/11 135/14
anybody [7] 30/10 40/15 65/23 94/20 98/14 103/12 109/5
anymore [3] 23/7 49/15 98/25
anyone [6] 21/11 30/18 65/17 77/21 101/3 102/5
anything [16] 5/4 22/2 22/19 47/7 55/5 76/24 83/6 94/6 99/6 101/19 102/9 105/25 117/12 117/22 135/10 135/15
anywhere [1] 21/17
apart [1] 119/23
Apodaca [3] 2/22 138/10 138/11
apologize [3] 84/1 110/16 133/21
apparent [1] 19/12
Appeal [1] 24/23
Appeals [3] 14/25 16/5 28/11
APPEARANCES [1] 2/1
Apple [19] 5/18 6/18 11/1 11/21 21/13 25/19 48/5 48/10 49/6 49/19 50/5 61/17 61/18 61/18 68/4 68/10 68/12 69/13 96/7 96/10
applicable [2] 7/12 55/25
application [1] 52/3
applications [2] 37/9 77/15
applied [7] 9/16 11/11 14/21 15/1 17/1 20/22 51/24
applies [9] 26/13 26/16 50/18 53/8 54/12 54/17 55/7 56/17 75/7
apply [9] 24/11 26/19 30/2 48/3 54/16 56/12 56/21 94/17 115/23
applying [3] 33/12 46/5 53/13
appointed [1] 50/2
appreciate [1] 135/22

appropriate [4] 82/1 100/17 105/19 126/14
approval [1] 28/19
apps [1] 33/4
apt [2] 36/16 36/17
architecture [6] 35/14 36/21 65/10 69/11 72/24 126/17
are [277]
area [1] 89/5
areas [2] 55/24 130/22
aren't [2] 29/1 107/3
Arena [1] 51/1
arguably [2] 32/8 101/10
argue [2] 29/19 39/6
argument [21] 3/5 4/6 4/9 6/2 7/20 8/18 8/20 17/10 23/18 23/24 23/25 25/10 44/1 59/12 76/14 101/8 106/15 110/19 112/9 115/15 118/6
arguments [5] 5/3 5/6 14/13 54/6 100/12
arises [1] 26/14
arm's [1] 101/16
arose [1] 63/15
around [3] 63/15 66/17 104/20
art [1] 109/7
article [4] 7/6 36/11 38/4 74/3
articles [2] 40/23 65/11
articulate [6] 67/7 68/8 70/21 120/25 134/23 135/2
articulated [3] 27/11 120/11 121/11
articulates [2] 27/14 34/23
as [124] 4/8 4/9 5/21 7/15 7/16 8/8 11/8 12/14 18/25 19/13 19/22 20/10 20/20 22/25 22/25 23/24 24/14 24/14 26/15 30/11 32/7 33/6 34/4 35/1 38/12 39/11 42/23 45/11 47/24 49/14 49/21 50/6 53/11 54/7 54/22 54/24 55/8 56/4 56/7 56/17 56/24 57/3 57/7 59/20 61/10 61/21 61/24 62/5 63/1 64/4 64/12 71/11 71/19 72/3 72/10 72/15 73/20 76/8 77/2 80/10 80/10 86/19 86/20 86/22 86/24 87/16 88/1 90/11 91/5 92/6 93/23 93/23 95/12 100/3 101/3 101/3 102/4 102/5 102/6 103/22 103/23 108/9 108/13 108/14 109/13 112/6 113/8 114/3 114/3 118/1 118/9 119/17 119/18 120/3 120/16 121/11 123/25 123/25 126/14 127/1 127/1 127/2 127/5 127/8 129/7 130/7 130/23 131/7 131/19 132/16 132/16 134/9 135/23 136/11 136/13 136/13 137/2 137/3 137/5 137/8 137/8 137/12 137/13 137/15
ascertainable [1] 13/11
aside [4] 17/1 61/6 80/12 130/21
ask [8] 14/10 28/9 30/13 58/12 59/8 85/17 96/5 129/25
asked [7] 83/13 83/23 99/8 100/23 113/4 114/4 128/22
asking [6] 4/20 48/1 49/21 85/3 102/10 114/4
aspect [5] 27/5 35/17 47/20 111/3 133/18
aspects [1] 71/11
assembler [1] 15/16
assert [2] 7/7 8/15
asserted [1] 60/25
assessing [1] 14/4
assume [13] 16/22 17/1 23/17 26/21 30/16 34/3 34/25 95/13 95/14 95/17 98/8 114/9 130/4
assume we're [1] 26/21
assumed [3] 30/17 41/18 121/21
assuming [5] 35/18 65/2 77/3 102/14 116/23
assure [1] 110/11
Astiana [1] 57/19
Astiani [1] 127/2
attached [1] 120/21
attack [5] 62/8 64/20 64/21 65/6 86/2
attacker [1] 86/1
attackers [1] 67/20
attacks [11] 40/24 47/2 63/22 67/20 67/21 67/25 68/1 69/6 69/7 123/19 126/17
attention [1] 80/22
attenuated [1] 53/21
attorney [4] 38/22 38/25 39/3 39/4
authorities [1] 133/24
authority [4] 8/3 24/19 24/21 25/13
authorized [2] 73/7 84/22
automatic [1] 9/17
available [8] 34/17 64/21 67/19 86/1 86/13 119/7 120/5 121/6

**A**

**Ave [1]** 2/23
**average [1]** 94/25
**avoid [5]** 53/5 64/15 72/13 84/7 85/18
**aware [13]** 37/5 38/4 38/4 38/16 43/23 62/21 63/3 63/19 64/25
65/23 82/5 87/23 116/5
**awareness [1]** 63/21
**away [5]** 98/7 112/4 112/21 121/20 128/13
**awful [2]** 135/24 136/15
**Ayers [2]** 2/2 3/10
**Azoulai [2]** 9/14 11/8

**B**

**back [22]** 18/22 22/24 23/23 33/9 34/13 34/18 34/21 38/21
40/15 40/21 49/4 86/14 86/15 110/21 112/9 116/2 118/24
127/23 129/16 132/14 132/19 134/6
**bad [3]** 97/7 116/21 128/23
**baggage [1]** 102/18
**baked [2]** 32/6 41/14
**balance [6]** 32/2 33/9 130/19 133/12 133/13 133/15
**balances [1]** 84/10
**balancing [1]** 125/23
**Baltazar [1]** 21/13
**banc [1]** 26/1
**bank [2]** 62/14 96/18
**bar [9]** 9/9 21/5 24/15 27/15 29/25 30/3 33/10 51/25 58/7
**bar loss [1]** 58/7
**Bardin [5]** 27/13 27/20 28/12 28/13 32/5
**bare [1]** 115/19
**bargain [20]** 6/3 7/3 7/22 8/6 8/11 8/19 9/5 9/6 9/21 9/23 10/8
28/21 42/24 51/22 52/6 53/12 53/23 55/6 56/14 126/11
**bargained [3]** 6/24 8/15 9/10
**bargaining [1]** 9/24
**barred [1]** 54/7
**base [3]** 57/21 61/6 91/19
**based [23]** 5/25 6/2 7/16 7/20 8/16 11/1 11/2 11/3 35/7 35/9
40/24 53/23 57/25 58/6 65/11 90/7 109/13 126/5 126/22 127/24
127/25 133/22 134/20
**basic [12]** 19/16 20/12 20/15 21/3 60/16 80/13 82/11 86/20 96/5
115/16 116/19 122/11
**basically [13]** 22/11 33/6 38/7 38/14 57/10 61/23 77/24 88/11
105/24 114/21 123/23 125/8 133/18
**basics [1]** 5/20
**basing [1]** 11/20
**basis [6]** 8/13 8/14 19/5 57/16 72/24 134/2
**batteries [1]** 36/13
**battery [3]** 36/10 36/14 48/8
**batting [1]** 20/21
**be [172]**
**bearing [1]** 115/10
**became [2]** 87/23 124/17
**because [114]** 5/1 6/5 7/12 7/15 8/4 8/8 8/18 9/5 9/9 9/24 10/3
10/10 11/11 11/18 12/1 13/8 15/13 16/11 16/17 17/8 17/10
17/14 18/13 20/21 21/10 22/10 23/6 24/13 27/17 27/25 28/14
28/20 28/24 29/25 30/18 30/24 31/18 34/4 34/15 34/18 35/6
35/13 35/20 36/1 36/5 36/19 39/1 41/11 42/22 44/23 45/19
45/22 49/24 51/20 52/11 53/12 53/22 54/13 54/25 55/18
56/7 57/13 57/15 59/23 61/3 65/3 66/5 67/24 70/3 71/14 71/17
73/11 73/22 74/10 74/17 75/6 77/19 78/25 79/8 79/18 79/23
80/21 81/12 83/3 85/1 85/9 85/10 89/2 89/14 95/11 96/9 101/14
103/15 106/1 106/4 106/9 107/15 107/24 109/11 111/7 111/18
112/12 114/20 115/8 116/25 117/16 117/18 118/7 122/23
125/22 131/24 132/2 133/22
**bed [6]** 22/14 22/15 115/13 115/13 115/25 116/20
**been [73]** 6/13 6/17 9/13 10/6 10/13 14/4 19/12 20/13 20/14
20/18 27/10 30/7 30/10 30/24 31/1 31/4 31/9 40/20 41/4 41/17
43/23 44/17 45/6 45/7 45/13 45/14 46/21 47/8 48/14 48/23
49/23 51/16 52/7 52/14 52/22 53/6 63/16 64/8 65/15 67/6 67/8
67/14 67/16 74/18 76/17 76/22 82/18 83/13 83/15 83/18 83/21
85/17 86/23 86/25 88/1 96/25 100/7 100/9 100/17 101/23 108/9
114/12 114/14 119/12 121/13 122/3 123/19 124/19 134/8
134/24 134/24 135/3 135/5

before [23] 3/4 4/25 5/5 6/25 9/5 13/25 14/8 20/18 40/7 47/10 47/23
56/11 58/23 62/1 62/18 86/8 86/18 106/19 108/21 124/6 124/19
131/12 132/5
**befuddled [1]** 79/7
**begin [2]** 5/5 8/11
**beginning [3]** 3/7 116/18 133/16
**behalf [2]** 3/16 56/25
**behaved [1]** 43/24
**behavior [3]** 48/15 48/19 48/20
**behind [3]** 27/11 76/15 77/1
**beholden [1]** 59/7
**being [21]** 18/18 31/13 33/14 36/13 40/23 49/17 49/25 53/15
53/16 54/7 64/12 84/1 85/12 95/17 101/15 104/4 106/3 106/12
117/11 123/18 127/24
**believe [35]** 25/7 52/21 53/7 53/17 63/13 63/15 63/18 64/10
64/23 70/8 74/24 78/5 79/22 80/19 81/10 81/10 83/3 87/8 87/9
88/2 89/25 97/16 99/9 100/1 100/5 100/7 100/15 100/15 100/20
101/2 103/5 107/13 108/2 120/14 130/6
**believe that [1]** 100/15
**believed [2]** 81/13 110/1
**believes [2]** 77/14 109/6
**believing [1]** 99/16
**below [1]** 138/5
**bench [3]** 50/7 50/12 110/12
**benchmarking [1]** 33/4
**Beneficial [1]** 113/7
**beneficiaries [2]** 17/5 18/24 113/25
**beneficiary [15]** 14/11 14/14 14/19 14/22 15/9 15/15 16/1 17/3
18/16 112/14 112/24 113/1 113/11 113/13 114/3
**benefit [18]** 6/3 7/22 8/6 9/6 9/23 10/8 42/24 44/10 51/22 52/6
53/12 53/23 55/6 56/14 113/7 114/7 126/11 127/7
**benefit-of-the-bargain [9]** 9/6 9/23 10/8 42/24 51/22 52/6 53/12
55/6 56/14
**benefited [1]** 131/4
**Benz [1]** 22/8
**best [18]** 4/5 4/7 4/19 15/14 36/9 36/13 36/15 59/25 77/6 77/16
79/22 89/14 96/10 104/20 107/11 108/3 110/2 113/18
**Best Buy [1]** 15/14
**better [5]** 70/19 94/20 94/23 94/24 94/25
**between [15]** 10/14 16/12 21/19 53/14 62/10 64/11 73/12 78/19
79/21 86/22 88/18 101/12 101/23 113/23 129/2
**Beyer [1]** 32/17
**beyond [4]** 52/5 55/6 87/1 105/1
**big [8]** 32/13 34/11 99/15 100/12 100/13 107/8 107/9 111/7
**bigger [1]** 129/8
**biggest [2]** 74/20 76/13
**bind [1]** 24/23
**binding [2]** 23/12 24/24
**Birdsong [9]** 8/2 8/23 9/16 10/19 10/23 11/8 19/17 74/20 74/21
**bit [9]** 61/20 77/13 82/25 83/21 84/3 92/12 97/4 107/12 112/2
**blame [1]** 116/24
**bless [1]** 42/4
**blocks [1]** 98/7
**blow [1]** 18/19
**blown [1]** 60/17
**Blue [2]** 6/12 12/15
**BlueTEC [1]** 111/19
**BMW [3]** 9/15 9/19 97/24
**BMW's [1]** 9/17
**board [2]** 12/22 130/3
**boasting [1]** 80/22
**body [1]** 116/1
**boilerplate [1]** 114/6
**Book [2]** 6/12 12/15
**books [1]** 40/23
**boot [1]** 21/10
**boring [1]** 95/16
**borne [1]** 97/17
**both [20]** 4/1 24/2 25/8 43/22 55/21 58/4 59/9 67/22 83/15
83/24 86/19 94/19 105/15 110/7 110/8 110/10 122/23 124/12
136/19 137/3
**bought [31]** 9/6 10/16 12/3 13/23 13/24 14/1 33/23 34/1 37/2
46/20 48/17 75/22 75/24 78/10 78/17 79/11 79/18 85/11 107/11

**B**

**bought...** [12] 108/6 109/23 110/1 111/8 116/17 128/18 128/23 129/15 129/18 129/19 129/24 131/2
**bound** [5] 23/20 23/25 25/17 25/21 25/25
**brake** [1] 107/18
**branch** [1] 46/12
**breach** [6] 7/5 16/18 52/22 104/21 104/22 104/22
**breached** [3] 7/1 52/24 115/11
**break** [7] 4/11 4/24 48/14 58/13 58/21 96/14 105/6
**breaking** [1] 98/23
**breakthrough** [1] 119/14
**brief** [4] 33/20 40/2 68/24 81/18
**briefly** [6] 5/5 26/4 43/17 50/21 74/19 81/16
**briefs** [2] 5/1 5/2
**bring** [2] 102/18 133/25
**bringing** [2] 20/20 48/24
**brings** [1] 58/7
**broad** [1] 27/17
**broadening** [1] 27/21
**broke** [1] 59/12
**broken** [1] 17/21
**brought** [4] 5/18 14/4 50/20 133/25
**Buchanan** [2] 2/3 3/10
**built** [1] 119/12
**burn** [1] 22/18
**business** [5] 17/22 125/19 126/4 126/7 126/21
**Butler** [2] 52/21 55/20
**buy** [27] 14/2 15/14 36/9 36/13 36/15 37/16 46/17 77/21 77/21 77/22 78/21 78/23 78/24 89/13 96/1 96/15 99/5 104/7 104/11 104/19 109/6 110/21 111/9 113/18 113/19 128/24 129/22
**buyer** [2] 101/17 101/24
**buyers** [1] 38/24
**buying** [10] 20/23 20/25 21/2 37/3 46/22 46/24 95/5 108/2 108/18 129/21
**buys** [3] 108/2 109/5 109/22

**C**

**CA** [1] 2/7
**cache** [7] 47/1 62/7 62/20 63/4 64/5 94/5 126/17
**caches** [2] 40/23 72/8
**Cahen** [7] 6/3 7/11 11/11 13/7 13/10 13/16 75/11
**calibrating** [1] 28/7
**California** [24] 14/12 14/21 14/25 15/1 15/24 18/24 19/1 25/22 26/1 27/17 28/11 33/11 34/19 34/22 39/2 51/15 52/20 52/21 53/3 54/22 55/20 56/16 58/5 126/25
**California Supreme** [1] 52/20
**California-recognized** [1] 53/3
**call** [5] 66/5 70/5 74/10 96/23 123/18
**called** [2] 64/19 70/9
**calling** [1] 115/2
**calls** [1] 114/23
**came** [5] 31/10 55/8 63/13 124/5 124/13
**campaign** [3] 101/1 102/12 111/7
**can** [67] 4/16 8/21 9/2 20/10 20/15 22/14 22/17 26/10 28/13 31/9 38/21 44/4 44/17 47/21 48/13 56/23 58/1 58/8 63/9 67/7 70/16 70/19 70/25 76/23 81/4 82/13 83/19 86/8 89/4 91/7 92/2 95/19 97/3 97/19 98/15 99/21 99/22 101/2 101/25 105/15 107/12 110/5 112/22 113/3 113/5 113/8 113/9 113/9 113/18 113/20 115/13 115/25 116/9 116/21 123/15 125/21 127/8 128/1 131/9 131/12 135/4 136/14 136/18 137/6 137/11 137/11
**can't** [23] 9/23 17/25 18/1 20/9 24/17 29/18 30/3 32/10 34/14 43/11 44/5 88/11 89/16 89/24 106/24 108/2 112/21 113/8 116/8 116/10 131/20 134/11 136/1
**Canceled** [2] 48/20 48/24
**Capital** [1] 127/8
**car** [39] 12/25 13/5 15/22 19/8 19/8 19/9 19/11 22/9 22/10 28/17 29/18 29/20 32/9 44/24 44/24 75/14 75/22 75/23 76/3 78/21 78/23 97/23 98/1 107/18 107/18 107/20 110/19 110/19 110/20 110/20 111/8 112/4 112/4 115/20 115/21 115/24 116/20 116/21 117/19
**car's** [1] 115/20
**Cardinal** [1] 17/17

**carried** [2] 23/7 46/19
**Carrier** [5] 17/6 18/17 22/3 114/18 115/8
**carriers** [1] 22/4
**carry** [1] 18/1
**cars** [8] 6/16 13/1 75/12 107/16 110/22 110/22 111/8 111/21
**case** [213]
**cases** [65] 4/1 5/17 6/18 7/14 8/3 10/4 11/7 12/8 12/10 12/19 12/20 13/5 14/17 14/17 17/9 17/11 18/15 19/9 21/4 21/21 21/21 21/22 21/24 24/8 24/20 25/1 25/15 29/21 32/14 32/14 34/15 35/23 35/25 38/3 45/11 49/16 51/2 51/3 52/5 52/6 54/14 54/18 57/19 57/20 58/5 58/5 61/21 68/7 68/12 68/15 68/16 73/23 74/4 74/19 89/9 91/20 100/15 102/24 107/20 108/20 114/2 114/5 114/14 136/18 136/22
**cash** [1] 110/23
**cast** [1] 28/15
**causation** [1] 74/8
**cause** [11] 22/17 30/17 57/6 57/7 57/20 74/23 76/3 127/1 127/2 127/5 138/7
**caused** [1] 129/21
**causes** [4] 50/21 52/23 68/21 81/9
**causing** [2] 32/21 110/4
**central** [50] 23/4 23/22 24/11 24/14 26/4 26/12 26/16 26/18 26/22 27/16 29/4 29/20 29/23 30/2 31/25 33/13 45/20 56/8 60/14 74/10 75/2 75/25 90/20 94/14 95/22 97/19 97/20 98/2 98/3 98/19 99/3 99/21 106/16 106/18 107/1 107/3 107/25 108/9 108/13 108/22 108/25 109/4 109/11 109/18 109/22 110/3 111/3 111/22 112/8 119/19
**CERT** [2] 47/10 47/22
**certain** [8] 32/2 67/20 79/4 86/1 101/9 124/18 126/6 136/12
**certainly** [13] 4/25 14/25 16/1 18/9 19/9 23/14 24/24 37/5 40/10 55/22 57/1 87/15 113/10
**certification** [1] 81/3
**certified** [1] 138/9
**certify** [1] 138/5
**chain** [4] 15/20 24/14 37/17 44/18
**Challenger** [1] 2/4
**change** [5] 41/11 41/13 48/15 48/19 106/17
**changed** [3] 116/13 117/20 117/21
**changes** [1] 35/22
**changing** [1] 117/4
**channel** [16] 40/24 40/24 44/14 47/1 62/8 64/20 64/21 64/22 65/6 67/21 67/25 68/1 116/22 123/19 124/17 126/17
**channels** [2] 44/17 123/24
**Chapman** [2] 2/9 3/19
**characterization** [1] 41/24
**characterized** [1] 64/20
**charge** [1] 48/22
**chase** [1] 91/22
**cheap** [2] 78/22 128/25
**cheat** [2] 107/17 107/19
**checks** [2] 93/14 126/14
**Chen** [1] 32/23
**chip** [31] 29/6 29/9 46/25 63/22 64/11 64/24 65/25 78/25 79/21 79/21 80/23 84/20 84/23 84/25 85/23 85/25 88/7 88/10 97/9 97/11 98/13 99/11 103/22 106/2 109/6 116/6 117/9 124/24 131/2 131/3 131/5
**chips** [28] 6/18 37/3 46/25 61/18 73/5 73/8 73/19 74/2 77/8 78/10 79/5 81/22 96/7 99/5 101/2 113/16 113/17 117/3 117/18 118/2 118/3 118/22 118/22 119/6 119/20 131/25 132/2 134/13
**chocolate** [1] 24/15
**choice** [19] 31/17 31/18 32/6 34/13 40/21 41/1 41/12 41/13 41/17 47/3 99/17 132/12 132/13 132/15 132/16 132/17 132/17 132/18 133/10
**choose** [1] 133/13
**choosing** [1] 73/12
**chose** [3] 67/9 89/2 100/25
**Chris** [3] 3/9 3/10 124/7
**Christopher** [2] 2/2 2/2
**Chrysler** [8] 12/24 28/14 28/24 32/6 32/10 74/5 107/13 107/23
**Chrysler-Dodge-Jeep** [1] 74/5
**Chrysler-Jeep** [2] 107/13 107/23
**Circuit** [33] 6/4 6/14 6/24 7/9 8/3 8/7 8/8 9/1 9/8 9/12 10/4 10/6 13/6 13/15 15/24 23/7 23/16 24/16 24/17 24/24 25/2 25/11 26/1

**Circuit...** [10] 27/14 28/10 29/11 32/3 43/21 48/3 90/17 100/4 111/22 111/23
**Circuit's** [1] 6/21
**circumstance** [1] 41/16
**circumstances** [4] 26/9 57/6 87/17 87/18
**cite** [24] 7/14 9/14 12/9 12/25 14/19 17/6 17/11 20/4 21/4 22/8 22/16 25/19 31/21 32/14 35/25 36/11 37/9 43/20 47/24 48/5 48/10 52/8 57/19 112/20
**cited** [9] 4/2 10/22 11/7 25/8 25/16 28/18 32/5 65/12 127/7
**citing** [1] 19/13
**claim** [54] 7/5 10/18 14/5 14/22 16/8 17/4 17/7 24/13 34/2 34/4 45/22 50/20 51/25 52/11 54/4 54/9 54/19 55/3 55/3 55/5 56/14 56/14 57/5 57/11 57/12 57/12 57/13 57/17 57/22 57/22 57/24 58/1 58/6 69/8 74/1 83/12 89/24 90/10 114/10 125/18 125/19 125/19 126/5 126/21 126/24 126/24 127/24 128/2 133/23 134/1 134/2 134/19 134/20 134/22
**claimed** [3] 46/21 63/21 74/23
**claiming** [3] 10/25 41/1 67/12
**claims** [13] 5/16 7/5 14/14 57/25 58/8 58/8 59/20 90/1 90/7 126/22 129/24 133/25 134/20
**clanks** [1] 22/9
**Clapper** [1] 10/20
**class** [4] 80/11 80/12 80/13 81/3
**classic** [1] 52/3
**clean** [6] 50/4 50/8 98/20 107/14 107/21 107/24
**cleaning** [2] 52/11 53/19
**clear** [15] 13/15 16/15 16/18 21/19 26/11 32/3 33/19 41/24 59/16 63/11 64/3 64/5 79/15 90/17 123/22
**clearly** [11] 12/16 22/25 23/12 24/18 25/22 43/21 66/7 77/14 86/17 107/24 111/6
**Clemens** [7] 15/3 15/20 18/21 18/22 19/3 19/7 19/10
**clever** [1] 46/2
**client** [1] 38/23
**clients** [1] 80/22
**close** [1] 33/13
**closely** [2] 71/6 114/3
**clothes** [1] 22/18
**CLRA** [1] 90/1
**CLRC** [1] 90/7
**club** [1] 103/25
**clutches** [1] 55/18
**Coast** [1] 37/18
**code** [2] 76/20 98/10
**cold** [1] 21/10
**Collins** [5] 24/20 25/1 26/7 26/15 29/9
**combination** [1] 133/3
**come** [20] 14/2 18/22 23/21 33/13 39/10 44/13 55/17 62/8 63/2 64/22 82/10 87/11 96/20 96/23 98/10 104/13 109/3 123/24 129/11 133/14
**comes** [3] 9/2 77/18 116/6
**comfort** [2] 60/24 101/2
**comfortable** [1] 101/20
**coming** [5] 43/16 61/12 66/12 66/19 66/24
**comment** [1] 46/16
**comments** [1] 5/12
**commercials** [1] 17/25
**committed** [2] 127/10 127/10
**committee** [1] 50/2
**common** [8] 20/24 42/21 46/5 50/18 54/13 54/17 59/21 90/11
**communicating** [1] 89/15
**community** [7] 40/17 65/11 88/23 93/25 95/13 106/19 106/20
**companies** [7] 37/3 37/4 84/23 84/25 89/7 102/1 118/4
**company** [15] 25/3 25/8 42/18 43/21 44/22 44/22 65/21 86/13 99/15 100/25 110/21 117/16 121/16 121/21 133/10
**compelling** [2] 5/17 11/18
**competition** [1] 132/10
**competitor** [2] 84/24 132/11
**competitors** [3] 47/1 132/8 132/9
**complaining** [1] 36/7
**complaint** [61] 4/1 10/11 14/4 17/2 20/3 22/1 34/13 38/19 39/20 39/22 39/24 40/9 40/11 40/21 49/12 49/23 53/21 60/18 60/22

**complaints** [4] 13/1 49/9 49/9 62/23
**completely** [11] 12/7 13/7 21/23 31/19 32/15 70/12 91/14 110/8 115/7 115/8 131/13
**complex** [1] 38/12
**complexity** [1] 48/7
**complicated** [3] 35/21 35/21 38/23
**compliment** [1] 102/25
**component** [1] 15/7 89/3 89/12
**compromise** [3] 19/23 132/1 132/2
**compromised** [1] 93/15
**compromising** [1] 126/9
**compute** [2] 30/9 119/1
**computer** [50] 6/6 10/17 15/8 15/17 18/3 18/5 21/12 29/6 29/9 32/22 35/7 35/14 36/21 44/6 46/17 65/10 69/11 72/23 78/25 79/11 79/18 80/8 80/17 80/21 80/24 83/18 83/19 86/4 86/20 89/13 95/3 95/20 96/2 96/10 96/12 96/13 96/25 97/9 98/4 98/5 98/13 99/10 103/22 105/17 106/5 106/23 109/13 109/15 116/22 121/4
**computer's** [2] 67/19 98/15
**computers** [19] 46/22 64/12 67/16 76/21 77/11 79/5 79/10 79/23 79/24 80/8 80/10 105/22 106/24 106/25 113/4 113/19 116/17 118/25 119/1
**computing** [3] 20/13 118/23 118/25
**concealed** [2] 91/13 91/16
**Concealing** [1] 69/3
**concealment** [19] 43/2 43/10 43/11 43/13 43/13 52/7 52/10 85/15 90/24 90/25 91/8 91/11 91/19 91/25 92/1 92/9 92/14 92/17 93/4
**concede** [1] 18/10
**concept** [14] 20/18 30/11 41/5 41/10 41/19 76/11 77/12 82/4 86/24 86/25 87/1 106/21 107/25 132/5
**concepts** [1] 60/17
**concern** [1] 102/19
**concerned** [2] 28/11 63/10
**concerning** [1] 93/13
**conclude** [1] 36/20
**conclusion** [4] 43/16 49/21 58/7 76/8
**conclusions** [1] 112/22
**concrete** [3] 5/21 10/18 12/20
**conditioner** [2] 29/17 29/20
**conditions** [1] 41/6
**conduct** [4] 77/7 126/5 126/20 127/25
**conferences** [5] 35/16 37/6 65/12 88/23 93/18
**confidence** [1] 57/1
**confidential** [20] 69/6 100/13 100/16 100/20 101/12 101/15 102/11 102/17 103/4 103/8 103/13 103/14 103/15 103/17 104/9 104/16 104/23 118/25 126/10 128/7
**confirm** [1] 23/16
**conflated** [2] 120/2 125/4
**conformed** [1] 138/8
**confusing** [1] 84/2
**connecting** [1] 85/6
**connection** [1] 16/12
**connects** [1] 114/12
**Connolly** [1] 2/10
**cons** [1] 35/15
**consequences** [1] 101/14
**consider** [5] 24/8 26/6 56/12 114/17 127/18
**considerations** [1] 29/25
**considered** [4] 8/11 8/12 125/5 125/7
**considering** [1] 120/1
**consistent** [6] 10/23 30/15 128/21 129/5 129/9 129/10
**consistently** [1] 9/12
**consolidated** [2] 3/25 39/20
**constructive** [7] 50/19 54/13 54/18 56/19 57/2 59/21 100/11
**consultation** [1] 123/11
**consumer** [75] 9/2 9/22 14/22 15/6 15/8 15/14 15/22 18/4 19/4 19/10 28/2 28/13 29/6 29/13 30/7 32/11 35/9 36/23 37/11 37/13

**consumer... [55]** 38/11 45/9 45/24 46/6 46/13 48/13 56/21 60/23 63/9 75/7 80/12 80/13 81/14 82/16 82/18 83/1 83/5 83/6 83/7 83/11 83/13 83/15 83/16 83/22 83/24 84/16 84/17 85/10 88/25 89/21 90/2 90/4 90/5 90/19 94/25 95/2 99/10 100/9 101/13 108/1 108/2 108/6 109/2 109/22 114/7 114/18 115/3 115/14 116/3 116/5 125/25 126/12 128/23 131/5 135/3
**consumer's [1]** 115/1
**consumers [41]** 8/15 8/18 18/2 19/10 20/25 37/2 42/16 47/13 48/2 48/7 63/5 64/25 73/11 74/1 79/17 81/9 81/12 81/12 82/5 85/11 89/8 99/8 99/16 100/6 101/1 101/8 101/9 101/10 102/12 103/21 106/11 110/23 113/7 113/15 113/17 113/19 119/2 126/11 132/12 132/12 132/15
**consumers' [1]** 119/3
**consuming [7]** 63/6 66/16 81/22 87/24 88/17 89/3 89/11
**contained [1]** 128/18
**containing [1]** 74/2
**contains [1]** 113/23
**Conte [1]** 76/25
**contend [3]** 64/1 64/15 112/25
**contended [1]** 20/10
**content [1]** 47/16
**contention [3]** 11/4 23/6 74/1
**context [6]** 9/13 28/2 29/17 32/17 52/18 83/12
**continuation [1]** 10/19
**continue [3]** 66/25 99/5 136/10
**continued [4]** 20/21 46/16 48/25 115/9
**continuous [1]** 42/25
**continuum [4]** 10/14 11/6 28/7 41/14
**contours [1]** 72/7
**contract [20]** 7/1 7/5 7/6 17/4 17/9 18/17 51/5 51/10 52/24 53/1 53/5 53/14 54/3 104/22 112/25 113/5 113/23 113/24 114/4 126/24
**contractor [1]** 16/7
**contractual [3]** 16/11 17/18 17/20
**control [2]** 75/13 75/15
**controlled [3]** 6/8 56/15 57/10
**controlling [2]** 7/11 8/3
**conversation [1]** 81/5
**convert [1]** 10/8
**copies [3]** 72/1 72/20 82/23
**core [15]** 60/23 63/16 74/9 77/19 77/20 77/23 78/20 88/8 88/10 88/12 92/6 97/22 101/25 103/22 105/24
**corner [2]** 50/17 66/17
**CORP [2]** 1/3 3/5
**corporation [2]** 3/16 17/19
**correct [8]** 65/2 65/5 73/2 99/1 120/10 124/6 131/24 138/6
**corrected [3]** 4/3 64/25 66/18
**correcting [1]** 64/9
**corrections [1]** 118/8
**corrective [1]** 45/8
**correctly [1]** 118/7
**corrupted [1]** 30/8
**corruption [1]** 32/21
**corrupts [2]** 29/6 29/9
**Costco [1]** 37/19
**could [67]** 3/7 10/1 16/8 29/16 31/3 40/19 41/7 41/18 41/19 41/21 44/5 44/10 44/19 45/3 46/10 46/18 53/19 63/20 66/9 67/7 67/19 71/9 71/25 72/18 73/4 73/8 73/10 73/10 74/10 74/23 74/25 76/3 82/22 84/19 86/1 87/1 87/17 87/23 88/4 93/1 94/10 95/14 95/20 96/23 97/11 98/2 99/2 107/17 107/18 107/18 108/20 108/22 109/16 110/19 111/4 111/6 114/6 121/5 127/22 129/21 132/15 132/21 133/22 134/1 134/8 135/3 137/10
**couldn't [1]** 24/12
**counsel [13]** 3/7 4/6 13/25 20/23 28/9 46/24 79/15 112/13 115/12 120/3 131/8 131/19 132/20
**counter [2]** 30/23 42/22
**counter-factual [2]** 30/23 42/22
**country [1]** 23/22
**couple [2]** 16/25 98/7
**coupled [1]** 132/17
**course [17]** 5/20 6/3 6/16 7/10 10/20 23/9 24/5 24/12 26/1

**court [75]** 1/1 1/17 2/22 3/3 3/7 6/10 9/14 9/20 10/1 10/19 11/9 11/19 13/10 13/12 13/22 14/3 14/17 14/19 14/21 14/25 15/1 15/2 16/5 16/9 17/15 18/12 18/15 19/1 21/16 23/12 23/13 23/20 24/8 24/12 25/16 25/20 25/21 25/22 25/24 26/1 26/2 26/6 28/11 28/18 32/9 34/22 36/4 39/2 47/18 48/12 49/25 49/25 52/20 52/22 56/16 59/4 69/17 74/24 75/13 75/24 76/6 76/7 98/2 103/7 105/13 112/21 112/23 114/25 117/22 125/21 127/25 136/5 137/15 137/18 138/11
**Court's [3]** 4/23 51/15 69/16
**courthouse [2]** 2/22 95/18
**courts [12]** 10/6 15/24 16/4 18/24 24/23 32/3 34/19 37/14 48/3 89/10 115/22 125/23
**Courts' [1]** 50/5
**covenant [1]** 52/23
**cover [2]** 91/23 92/1
**covered [2]** 79/11 135/13
**CPU [14]** 1/3 3/5 60/14 60/15 66/22 98/13 98/16 103/24 108/3 109/1 109/23 119/16 126/10 126/16
**CPUs [22]** 60/21 60/22 61/10 61/12 62/13 62/21 69/5 69/7 71/21 74/9 83/9 91/13 101/6 107/3 110/1 119/6 126/8 128/6 128/10 128/13 128/16 128/19
**CPUs' [1]** 72/8
**crack [2]** 24/3 110/5
**crashes [1]** 95/3
**crazy [1]** 106/10
**create [9]** 18/13 101/2 101/11 102/17 113/22 113/24 116/8 116/9 119/13
**created [7]** 17/11 19/21 71/20 71/24 72/17 100/17 101/23
**creates [1]** 82/21
**creating [2]** 56/25 65/6
**creativity [2]** 136/15 136/23
**criminal [1]** 4/12
**critical [5]** 6/15 20/6 61/2 61/17 72/7
**critically [1]** 6/2
**cross [1]** 102/15
**CRR [1]** 138/11
**crushed [1]** 9/18
**CSR [1]** 2/22
**current [1]** 90/16
**curve [1]** 82/15
**customers [1]** 130/17
**customers' [1]** 119/9

**D**

**D.C [1]** 2/11
**DaimlerChrysler [3]** 18/21 19/8 32/5
**damages [6]** 9/23 51/22 52/11 100/13 125/5 132/23
**Dan [1]** 3/16
**Daniel [6]** 2/9 25/3 25/8 43/20 44/21 44/22
**dark [2]** 29/7 29/10
**data [12]** 21/11 21/25 22/5 30/8 32/21 70/7 72/7 91/14 114/23 119/9 126/12 128/17
**database [2]** 6/23 10/22
**DATE [1]** 138/11
**Daugherty [4]** 27/9 27/20 28/12 30/1
**Dave [1]** 3/10
**David [1]** 2/3
**Davila [4]** 11/10 13/15 46/4 48/6
**Davila's [1]** 49/6
**day [2]** 75/23 93/23
**days [2]** 48/22 96/24
**de [4]** 125/8 125/11 125/13 125/15
**de minimis [2]** 125/8 125/11
**deal [5]** 35/17 67/3 95/21 116/4 136/23
**dealer [3]** 15/5 15/22 19/11
**dealership [2]** 44/24 44/24
**dealing [4]** 7/13 12/10 26/17 52/24
**dealt [3]** 8/21 27/24 46/3
**death [1]** 13/2
**debate [1]** 34/11
**debated [1]** 36/21
**debating [1]** 35/15

**decades [1]** 123/20
**deceive [1]** 90/4
**deceived [1]** 90/5
**deception [2]** 130/22 133/18
**decide [5]** 16/10 56/4 87/2 87/21 130/18
**decided [1]** 63/15
**deciding [1]** 48/4
**decision [43]** 7/9 11/6 13/12 16/20 24/17 25/7 25/9 25/25 28/6 31/14 32/1 32/10 32/23 32/25 33/8 34/22 39/1 39/9 43/10 46/6 46/7 46/13 49/1 49/5 49/6 50/25 51/15 52/20 55/20 56/16 130/2 130/4 130/23 131/20 132/3 132/4 133/1 133/2 133/2 133/3 133/7 136/2 136/7
**decision-makers [1]** 130/4
**decisions [7]** 31/13 46/5 49/15 50/5 50/10 74/12 130/2
**decline [3]** 5/23 6/12 11/13
**deemed [5]** 35/20 36/8 36/14 38/19 53/21
**defeat [1]** 122/22
**defect [110]** 6/15 7/13 7/14 10/5 10/10 13/9 19/19 20/8 20/10 20/17 22/22 22/23 23/23 24/11 24/15 26/5 26/13 26/14 26/16 26/18 26/22 27/17 28/4 29/4 29/12 29/14 29/23 30/2 30/5 30/11 31/2 31/3 31/10 31/25 33/13 33/20 34/2 34/3 34/5 40/3 41/11 41/20 41/21 41/25 42/15 42/24 45/25 54/9 56/17 69/19 69/22 70/1 70/17 70/18 70/22 71/8 71/12 72/25 73/18 73/21 74/9 75/1 77/19 77/21 77/23 77/24 78/14 78/20 79/19 90/15 91/12 91/15 91/23 92/19 94/14 94/20 95/23 97/19 97/21 99/3 99/21 99/24 105/24 106/16 106/18 107/1 107/3 108/9 108/13 108/25 109/18 115/6 120/2 120/2 120/3 120/4 120/12 120/16 120/19 120/25 121/11 122/24 123/6 123/7 123/10 124/7 125/4 125/7 125/11 129/7
**defective [9]** 6/6 7/17 53/24 55/18 71/21 79/10 81/8 121/20 127/22
**defects [27]** 61/9 62/2 63/1 63/13 64/18 64/25 67/25 69/21 74/10 81/11 81/23 83/8 87/10 87/13 87/23 89/18 93/10 93/12 97/10 97/10 97/12 108/4 108/5 120/5 120/6 126/9 128/14
**defendant [15]** 2/9 4/2 7/23 26/8 35/2 35/20 38/19 103/13 104/1 122/1 127/6 127/9 127/10 127/19 134/3
**defendant's [2]** 90/3 120/22
**defendants [1]** 116/25
**defense [5]** 89/9 89/10 112/13 115/12 120/3
**defensive [1]** 23/20
**deferred [1]** 93/13
**defies [1]** 20/24
**define [3]** 30/12 97/19 120/20 126/6
**defined [4]** 7/15 20/10 100/8 108/10
**definitely [2]** 36/17 56/13
**degradation [3]** 48/9 118/8 125/12
**degradations [1]** 118/10
**degree [5]** 19/16 20/12 20/16 21/3 39/18
**deliver [2]** 62/13 119/13
**delivered [1]** 123/18
**delivering [1]** 61/13
**Dell [3]** 37/4 44/7 89/18
**Dells [1]** 88/22
**delta [1]** 78/19
**demonstrate [2]** 23/2 34/14
**demonstrated [3]** 6/8 20/18 46/9
**demonstrates [1]** 46/23
**demonstrations [1]** 62/18
**denied [1]** 62/13
**Dennis [4]** 2/22 58/12 138/10 138/11
**deny [1]** 50/7
**denying [1]** 50/12
**depend [2]** 104/18 127/9 134/16
**depending [3]** 4/22 5/8 58/20
**depends [2]** 101/21 101/22
**depreciation [1]** 13/2
**derivative [4]** 44/5 44/9 44/16 45/5
**describe [2]** 67/22 70/19
**described [5]** 51/8 55/24 68/3 130/22 130/23
**description [1]** 92/4
**descriptions [1]** 33/24

**design [28]** 3/18 4/13 11/13 11/19 22/14 24/21 26/8 30/16 31/17 31/17 31/21 32/1 32/6 32/9 33/8 34/13 40/21 41/1 41/12 41/13 41/17 46/6 47/3 63/20 66/5 66/21 74/11 93/13
**designed [9]** 9/4 12/14 60/23 61/10 61/24 63/3 101/1 126/8 128/6
**designer [1]** 30/17
**designing [2]** 69/5 128/16
**designs [1]** 63/22
**despite [2]** 33/2 61/3
**detail [1]** 23/5
**details [6]** 36/21 63/24 102/24 103/2 122/19 123/8
**detect [1]** 134/12
**determine [3]** 125/7 125/21 125/24
**determined [2]** 73/6 125/15
**determines [2]** 78/7 84/22
**determining [1]** 26/8
**developed [9]** 30/10 30/25 31/4 31/9 31/14 31/22 42/7 103/15 126/8
**development [1]** 130/3
**develops [1]** 30/21
**device [9]** 11/14 14/1 36/7 36/8 46/24 48/5 60/23 107/19 112/5
**device/Intel [1]** 60/23
**devices [6]** 5/23 5/24 42/12 74/2 107/17 114/19
**dialogue [2]** 112/3 134/7
**did [20]** 14/24 18/22 32/2 39/3 41/19 59/6 68/5 79/9 84/2 84/18 85/5 89/19 92/3 111/8 112/23 122/7 122/8 122/12 127/19 131/3
**didn't [43]** 8/19 14/6 14/10 14/11 16/10 16/15 16/20 19/3 28/21 30/9 31/3 33/6 33/9 37/16 40/15 41/11 41/13 41/20 44/7 48/19 49/23 54/7 56/15 64/10 65/2 69/17 69/19 78/11 81/12 81/17 85/1 85/2 106/20 106/20 107/22 109/17 110/2 111/18 111/18 115/9 122/15 122/18 133/24
**dies [1]** 95/4
**diesel [3]** 107/14 107/24 111/21
**differ [1]** 120/18
**difference [8]** 15/9 15/11 15/19 32/13 52/12 80/14 82/25 104/3
**differences [1]** 62/10
**different [18]** 10/13 11/5 26/11 37/12 42/9 52/19 65/16 68/9 68/12 69/12 84/3 101/16 120/17 120/17 129/3 129/19 133/17 133/21
**differentiate [1]** 131/16
**differently [6]** 9/5 43/24 44/8 73/8 84/23 85/25
**difficult [3]** 83/11 92/18 92/21
**difficulty [2]** 8/17 22/22
**digitally [1]** 138/8
**diminished [1]** 7/3
**diminutions [1]** 109/14
**direct [4]** 16/11 17/14 17/15 56/23
**directing [1]** 71/3
**direction [2]** 14/12 91/22
**directly [9]** 13/11 18/2 19/4 29/8 37/3 89/3 89/7 89/11 101/1
**disable [2]** 88/8 88/11
**disabled [1]** 88/13
**disagree [1]** 82/4
**discern [1]** 114/14
**discharged [1]** 52/25
**disclaimer [1]** 43/9
**disclose [36]** 23/3 23/8 23/10 26/8 27/15 27/18 27/21 28/3 28/6 33/11 33/17 34/15 38/25 43/17 45/14 47/25 51/8 51/9 54/5 54/6 58/4 69/4 69/9 72/25 87/21 88/17 88/18 88/20 88/21 88/24 90/14 94/10 94/14 108/14 132/24 134/23
**disclosed [39]** 39/16 39/21 40/6 42/3 45/7 47/6 47/11 47/22 64/2 64/15 65/5 67/6 67/8 68/11 69/10 72/15 72/21 73/1 81/11 84/13 84/14 84/15 85/4 85/18 86/8 87/3 123/6 123/8 123/10 124/3 124/4 124/12 132/16 134/8 134/18 134/24 134/25 135/2 135/5
**discloses [1]** 47/7
**disclosing [3]** 45/8 46/6 58/3
**disclosure [19]** 12/3 38/16 41/10 42/8 64/9 67/11 87/4 101/6 132/18 133/4 133/8 133/10 133/11 133/22 134/5 134/6 134/7 134/19 135/3
**disconnect [1]** 123/2
**discontinue [1]** 6/14
**discontinued [1]** 5/23

**discontinuing [1]** 11/14
**discount [1]** 129/8
**discover [2]** 40/1 42/17
**discovered [9]** 34/7 39/15 39/17 39/24 40/7 42/13 46/2 72/10 117/8
**discovery [10]** 63/14 63/24 65/24 87/7 88/2 93/2 97/14 118/14 126/3 137/9
**discuss [1]** 73/24
**discussed [8]** 21/21 30/1 40/22 45/12 62/4 74/14 74/18 93/11
**discusses [4]** 27/19 27/20 27/20 70/5
**discussing [4]** 28/19 29/23 29/24 86/15
**discussion [13]** 33/19 38/16 61/7 63/12 74/16 80/2 80/3 89/16 96/1 103/4 112/12 130/5 131/8
**discussions [2]** 136/13 136/15
**disguise [1]** 91/23
**dismiss [11]** 4/3 17/16 21/7 21/9 21/14 28/20 48/4 59/6 100/18 135/25 136/11
**dismissal [4]** 5/17 11/18 54/17 54/21
**dismissed [6]** 8/16 17/8 52/10 53/22 54/14 58/1
**dismissing [1]** 136/5
**dispositive [1]** 48/25
**dispute [6]** 27/6 34/18 117/1 118/1 118/18 136/25
**disputed [1]** 125/9
**distinct [2]** 126/20 133/25
**distinction [3]** 21/19 79/21 88/18
**distinctions [1]** 119/24
**distinguish [3]** 61/14 61/20 86/21
**distinguishable [1]** 13/8
**DISTRICT [25]** 1/1 1/2 1/17 2/22 9/15 10/6 13/12 14/17 14/20 16/3 17/7 17/12 18/12 18/15 21/14 24/23 25/15 25/20 32/18 34/19 36/3 48/18 50/4 52/10 111/20
**District Court [2]** 13/12 18/12
**division [1]** 53/14
**DK [1]** 11/24
**DK Systems [1]** 11/24
**do [103]** 4/19 5/11 11/9 16/24 17/25 17/25 18/1 23/14 24/10 35/4 35/12 35/17 36/10 41/16 41/16 43/12 47/16 48/3 49/9 49/12 50/23 53/2 58/12 58/14 58/18 59/5 59/25 60/3 60/5 61/16 61/19 64/1 64/10 68/13 73/8 76/14 78/20 79/4 79/17 79/19 80/14 80/15 81/16 81/19 82/21 84/3 84/23 84/25 85/24 86/12 87/21 88/6 90/13 91/20 92/3 94/12 94/17 94/23 94/24 95/6 95/6 95/12 95/14 96/13 96/14 97/8 97/20 98/5 98/9 99/4 99/4 99/9 102/20 102/25 103/3 103/18 105/7 105/23 106/15 106/21 107/10 107/12 107/15 110/16 111/4 113/12 114/1 114/10 115/2 116/4 119/2 120/16 120/17 126/11 128/13 131/13 131/20 132/21 134/22 135/22 136/20 137/4 137/6
**Docket [3]** 4/3 4/4 50/13
**doctor [2]** 89/8 89/9
**doctrine [10]** 36/18 50/24 51/11 52/18 53/4 53/6 54/8 54/22 56/4 56/17
**Document [1]** 1/6
**Dodge [1]** 74/5
**does [37]** 9/8 11/24 29/14 35/8 46/4 51/1 57/8 61/15 66/6 77/4 80/13 83/2 86/21 87/2 87/20 91/15 93/25 95/22 97/18 98/5 105/23 105/25 106/15 108/25 110/20 110/21 111/23 112/25 113/7 113/24 114/4 114/7 115/6 117/10 126/21 127/24 131/22
**doesn't [30]** 20/2 22/11 26/19 31/2 31/8 33/13 36/24 38/2 62/16 67/22 71/6 77/23 78/21 78/24 78/25 79/1 85/20 87/25 89/1 96/2 99/11 101/10 106/17 111/22 112/3 117/17 122/22 124/24 125/16 127/9
**doing [11]** 47/8 60/8 80/16 84/25 85/23 105/19 106/9 106/12 117/22 132/9 132/9
**dollars [1]** 78/17
**domain [6]** 12/5 37/16 38/1 38/7 38/17 45/14
**don't [130]** 4/17 4/18 4/25 6/21 8/21 9/23 10/5 10/12 11/4 12/4 14/15 15/11 15/18 17/11 17/24 18/10 18/18 20/9 22/2 23/19 23/21 24/23 27/5 28/20 30/14 31/2 31/15 35/19 38/7 43/3 43/6 44/2 44/19 45/17 45/19 45/22 46/9 46/16 52/4 53/8 53/25 54/11 55/12 55/24 56/21 57/22 58/10 58/18 61/16 63/17 65/14 65/17 65/22 66/17 66/18 66/19 67/11 67/18 68/5 69/19 70/3 70/15 70/19 74/3 75/5 75/6 75/24 76/7 76/16 78/2 78/9 78/12 79/18

**7** 79/25 80/10 80/10 80/13 85/2 85/15 87/6 87/18 91/9 94/4 94/5 95/9 96/17 98/9 100/15 102/8 103/2 103/7 103/18 104/12 105/20 105/25 107/4 108/5 109/1 109/10 109/24 111/4 114/1 115/19 116/6 116/19 116/24 116/25 117/17 117/22 118/12 120/19 121/17 121/22 123/4 129/5 129/8 129/10 129/20 129/23 130/3 131/24 134/4 134/4 134/11 135/15 136/20 136/20
**done [11]** 44/8 58/15 58/23 70/24 72/17 84/7 86/25 87/1 92/21 111/6 115/3
**door [3]** 9/17 98/7 104/7
**door-shutting [1]** 9/17
**doors [1]** 9/19
**dot [1]** 102/15
**doubt [2]** 69/20 82/17
**down [14]** 21/16 59/18 59/23 67/5 67/8 71/1 72/14 75/1 80/5 81/5 81/15 106/22 113/12 115/15
**download [7]** 66/16 73/19 77/8 80/9 88/7 106/3 117/6
**downloaded [2]** 80/19 106/5
**downloading [3]** 66/25 106/12 107/9
**dozens [2]** 47/7 47/7
**dramatically [1]** 128/12
**drastically [5]** 19/25 21/22 31/19 32/15 32/21
**draw [1]** 112/22
**drill [1]** 115/15
**drive [4]** 29/7 29/9 107/18 115/25
**driving [2]** 75/19 75/24
**dropped [1]** 48/13
**dry [2]** 22/18 22/18
**dryer [1]** 22/17
**due [3]** 119/25 125/4 128/9
**dummy [1]** 99/12
**dumped [1]** 10/17
**dunk [1]** 16/20
**durability [1]** 28/25
**durable [2]** 28/16 32/8
**during [4]** 71/24 72/18 82/21 112/12
**duty [28]** 23/3 23/8 23/10 26/8 27/15 27/21 28/3 33/10 33/17 34/15 38/25 43/16 51/4 51/7 51/9 51/10 52/23 54/5 54/6 54/15 57/15 58/3 88/17 88/18 90/14 94/10 94/14 108/13
**Dynamic [1]** 71/20

**E**

**each [5]** 24/23 44/13 60/17 66/16 137/14
**ear [1]** 75/9
**earlier [4]** 63/12 74/16 84/18 120/4
**early [1]** 64/9
**ears [1]** 75/8
**easier [4]** 23/24 59/8 123/23 136/18
**Eastern [1]** 52/10
**Eastern District [1]** 52/10
**easy [1]** 62/7
**eBay [2]** 48/16 48/18
**eBay's [1]** 48/20
**Ecodiesel [3]** 74/5 107/13 107/23
**economic [27]** 13/10 50/18 50/24 51/3 51/11 51/14 51/18 51/24 52/3 52/12 52/15 52/17 53/4 53/13 53/20 53/23 54/8 54/21 55/1 55/6 55/8 55/9 55/15 55/23 56/4 56/7 56/12
**effect [2]** 8/2 8/14
**effectively [1]** 24/8
**effects [1]** 70/11
**efficient [2]** 36/19 80/24
**effort [1]** 9/21
**Eighth [4]** 6/21 6/24 7/9 9/1
**Eighth Circuit [1]** 6/24
**either [25]** 5/5 23/25 25/25 32/15 41/19 45/8 45/20 56/9 57/17 64/9 64/25 68/6 68/12 79/1 91/25 92/2 96/24 98/21 105/15 108/7 108/13 127/19 129/6 136/5 136/21
**electric [1]** 75/15
**Electrolux [5]** 22/16 52/9 53/17 54/1 56/15
**electronic [2]** 75/13 117/20
**element [5]** 43/20 44/3 44/22 45/1 105/23 109/11
**elements [4]** 25/10 90/10 127/3 127/13
**eliminate [2]** 130/13 131/13
**eliminating [1]** 131/21

**else [15]** 45/5 45/6 46/11 63/11 85/22 92/1 94/7 96/20 101/3 102/5 103/12 106/2 130/11 130/15 131/15
**elsewhere [1]** 7/20
**eMachines [1]** 25/1
**emanates [1]** 16/3
**emits [1]** 22/9
**emitting [1]** 29/18
**emphasize [1]** 21/18
**employ [2]** 125/23 125/24
**employed [1]** 121/10
**employee [1]** 52/25
**employees [1]** 98/22
**employing [1]** 126/1
**en [1]** 26/1
**encourage [2]** 137/9 137/14
**encouragement [1]** 137/16
**end [9]** 18/6 42/15 70/16 75/22 88/19 88/19 89/16 95/14 136/4
**end-users [1]** 18/6
**ended [2]** 84/15 113/1
**enforcing [2]** 60/14 126/13
**engine [3]** 97/23 97/24 98/1
**engineer [1]** 94/1
**engineers [1]** 60/15
**English [5]** 72/5 85/8 121/4 121/12 122/11
**enough [5]** 7/24 53/10 56/3 113/14 116/11
**enrichment [24]** 7/6 7/22 54/4 54/9 54/12 57/4 57/5 57/11 57/12 57/13 57/17 57/21 60/5 60/10 126/23 126/24 127/5 127/24 128/2 130/24 133/17 133/23 134/2 134/21
**ensuring [1]** 119/9
**entered [1]** 104/23
**entering [2]** 104/9 104/16
**entire [2]** 6/2 6/17
**entirely [1]** 33/19
**entities [2]** 76/3 80/13
**entitled [2]** 84/10 138/7
**environment [2]** 6/9 83/12
**equipment [1]** 130/10
**equities [1]** 127/15
**err [1]** 131/20
**ESG [2]** 57/19 127/8
**ESG Capital [1]** 127/8
**especially [6]** 24/1 28/3 54/20 116/5 129/17 130/25
**espousing [1]** 43/19
**essence [3]** 10/18 99/9 115/16
**essential [2]** 60/21 99/23
**essentially [4]** 6/22 22/1 27/23 29/5
**estimate [1]** 136/1
**evaluate [1]** 35/12
**even [66]** 5/16 9/17 10/9 11/17 11/25 12/20 17/1 18/5 18/12 18/15 19/16 20/12 20/15 20/16 20/17 21/2 21/6 22/4 24/23 29/19 30/2 30/10 30/11 32/6 35/18 36/22 40/7 40/16 40/16 43/3 43/20 45/19 46/9 46/25 48/14 53/4 53/18 55/4 56/12 61/17 62/15 62/19 63/21 75/8 75/9 75/15 76/22 78/20 79/6 80/13 82/11 86/3 86/23 86/23 87/14 93/1 93/19 113/21 115/24 115/25 116/20 118/3 119/6 132/24 136/23
**event [2]** 99/18 100/5
**ever [6]** 41/18 81/3 86/25 130/12 136/16 137/11
**every [8]** 22/21 28/6 48/22 60/14 75/14 83/19 96/24 119/13
**everybody [8]** 58/19 58/25 75/9 77/7 83/20 85/22 88/7 107/9
**everyone [3]** 5/11 46/11 106/2
**everything [9]** 5/1 95/12 95/14 98/13 101/11 110/20 130/11 132/24 135/13
**evidence [8]** 9/9 30/14 41/21 89/18 93/16 119/18 119/19 126/2
**eviscerate [1]** 27/21
**exact [1]** 70/3
**exactly [8]** 22/22 63/1 79/19 109/5 114/5 122/20 134/17 134/17
**examined [1]** 114/3
**example [13]** 12/12 12/21 22/13 22/13 29/16 38/10 71/22 72/9 88/9 107/15 110/17 115/12 131/1 131/1
**examples [1]** 29/8
**excellent [1]** 136/10

**exception [17]** 14/19 14/22 16/1 16/4 17/1 17/3 18/16 19/5 45/4 51/11 51/14 51/19 52/4 53/3 53/6 55/10 72/9
**exceptions [8]** 15/25 18/23 19/2 45/3 50/23 51/2 52/22 55/23
**exchange [1]** 103/12
**exclusive [31]** 34/10 34/14 34/16 34/20 34/23 34/25 35/2 35/5 35/6 35/13 35/21 36/5 36/15 36/20 37/15 38/19 39/3 39/7 39/14 39/16 40/16 44/6 93/10 93/13 93/17 93/20 94/1 122/1 122/23 124/20 128/10
**exclusivity [1]** 35/18
**excuse [1]** 121/17
**execute [2]** 62/6 70/10
**execution [16]** 20/19 46/12 62/6 62/15 64/6 67/17 67/17 71/20 71/23 71/24 72/16 72/16 82/20 82/20 94/4 126/13
**exhaust [4]** 28/14 28/22 28/25 32/7
**Exhibit [1]** 47/9
**exist [2]** 30/5 48/2
**existed [4]** 10/11 20/8 42/25 122/19
**existence [5]** 31/1 38/14 47/20 122/21 123/7
**exists [2]** 57/2 100/20
**expand [1]** 55/21
**expect [6]** 77/21 104/13 115/3 115/14 119/5 136/1
**expectation [1]** 115/1
**expectations [1]** 119/3
**expected [1]** 6/25
**expecting [1]** 108/1
**expense [3]** 74/12 127/7 128/5
**expensive [3]** 22/1 28/16 56/24
**experience [3]** 35/10 134/12 134/14
**experienced [1]** 137/3
**experiencing [1]** 11/15
**experts [5]** 35/14 69/11 72/24 123/12 131/10
**explain [5]** 23/20 37/23 55/21 55/22 121/3
**explained [3]** 71/19 76/25 122/4
**explaining [1]** 122/24
**explication [1]** 56/17
**explicitly [1]** 24/7
**exploit [6]** 20/19 30/19 30/21 117/9 122/18 130/10
**exploited [11]** 31/3 41/7 41/18 41/20 41/22 46/10 87/16 87/18 87/24 117/11 130/12
**exploits [10]** 66/24 76/16 83/8 96/21 122/11 122/15 123/13 124/2 124/8 128/9
**exploring [1]** 130/6
**expose [4]** 51/17 53/19 55/14 73/5
**exposed [3]** 45/7 52/15 124/7
**exposes [1]** 84/20
**exposure [10]** 43/22 44/3 44/4 44/12 44/12 44/22 44/25 45/4 45/21 65/7
**express [2]** 27/2 104/22
**expressed [1]** 105/18
**expressly [1]** 11/18
**extend [1]** 92/7
**extended [2]** 9/3 22/10
**extending [1]** 61/1
**extent [11]** 4/9 4/11 11/2 29/12 51/9 54/6 60/7 66/7 87/4 108/12 109/8
**extra [2]** 54/16 54/16
**extreme [3]** 10/10 11/25 13/2
**extremely [1]** 82/16

---

**F**

**F.3d [1]** 7/8
**fabric [1]** 119/16
**fabricated [1]** 13/9
**face [3]** 34/2 110/6 125/21
**fact [39]** 11/12 13/11 23/19 31/1 31/8 33/2 45/25 47/12 47/19 47/21 48/1 49/16 50/6 60/24 65/25 74/7 74/18 90/6 95/6 97/20 99/4 100/16 100/25 101/11 103/4 103/5 103/17 103/20 107/3 117/10 118/20 118/21 119/4 123/18 124/2 125/20 129/13 129/18 129/23
**factor [9]** 35/18 36/25 37/23 38/13 43/2 78/6 121/25 122/22 129/21
**factors [12]** 33/15 33/18 38/8 38/14 54/16 56/10 90/21 90/24

**factors...** [4]  93/6 127/17 127/18 129/3
**facts** [14]  12/2 12/19 35/2 38/22 49/7 54/23 59/15 69/4 73/16 100/19 122/1 122/23 135/2 135/4
**factual** [5]  30/23 42/22 118/18 125/8 125/10
**factually** [1]  6/4
**fail** [2]  31/19 32/8
**failed** [7]  7/1 21/23 32/15 69/5 91/14 126/16 128/17
**failing** [1]  69/3
**fails** [3]  34/4 57/12 57/13
**failure** [6]  21/24 69/9 69/12 72/24 87/20 134/23
**fair** [4]  52/24 53/10 56/3 125/24
**faith** [1]  52/23
**FAL** [2]  90/1 90/7
**fall** [1]  126/21
**familiar** [5]  6/22 13/6 15/21 45/10 107/14
**famous** [1]  77/9
**far** [4]  17/22 17/23 93/23 123/25
**fare** [1]  6/20
**fashion** [3]  15/1 29/15 84/9
**fast** [1]  46/11
**faster** [2]  85/22 97/11
**fastest** [4]  64/13 80/23 89/14 101/2
**fatal** [2]  12/15 129/24
**FCRR** [1]  138/11
**FDA** [4]  36/6 37/13 37/14 38/5
**fear** [1]  11/1
**feature** [15]  8/5 8/10 8/16 8/19 9/10 9/17 9/25 30/16 48/25 88/10 88/12 97/23 98/12 108/25 111/3
**featured** [2]  21/24 32/17
**features** [1]  78/18
**February** [2]  1/5 3/1
**federal** [3]  14/16 58/5 95/12
**feel** [6]  16/22 59/10 89/16 96/17 101/19 106/3
**Ferris** [2]  121/20 121/22
**few** [8]  23/15 26/5 50/25 67/2 79/6 83/13 112/13 119/24
**field** [1]  73/13
**fight** [2]  93/8 111/14
**figure** [7]  37/22 94/16 97/8 122/8 133/6 136/16 137/11
**figured** [7]  85/21 122/11 122/15 122/15 122/17 123/5 124/15
**filed** [4]  13/24 49/23 120/8 133/22
**filing** [1]  79/6
**filings** [4]  63/8 63/23 65/22 93/19
**Finally** [1]  45/18
**Financial** [1]  16/5
**find** [11]  14/24 19/5 47/21 50/24 63/23 81/4 92/22 98/4 108/20 110/15 119/3
**fine** [10]  4/25 59/1 59/9 59/24 83/19 96/12 96/16 117/10 137/12 137/12
**finely** [1]  28/7
**fines** [1]  12/21
**fingerprint** [3]  76/15 77/1 88/3
**fingers** [1]  9/18
**finish** [1]  125/2
**fire** [1]  53/18
**fires** [1]  22/17
**first** [31]  5/19 7/10 13/8 14/5 24/6 24/16 24/22 26/6 31/10 33/16 39/16 41/23 51/13 55/13 55/24 58/12 68/14 70/5 71/3 71/12 71/17 72/3 72/24 72/25 79/9 82/15 93/22 95/24 107/2 115/5 126/13
**fishing** [1]  37/20
**fit** [8]  22/11 23/1 40/15 57/8 86/20 114/15 118/23 134/3
**fitness** [4]  19/17 20/12 20/16 21/3
**fits** [3]  57/9 92/3 92/5
**five** [7]  12/3 12/20 13/23 20/22 25/3 46/20 48/17
**fix** [11]  66/18 66/22 72/14 73/20 97/1 107/5 107/6 108/5 109/3 110/3 128/14
**fixed** [3]  107/4 107/4 107/5
**fixing** [1]  45/9
**FLA** [1]  59/20
**flaw** [48]  61/11 61/16 61/25 62/4 62/4 63/13 63/15 63/17 65/18 66/1 66/5 67/6 67/6 67/7 67/9 67/9 67/22 67/23 67/24 67/24

**factors...** [4]  93/6 127/17 127/18 129/3
**factor** [13]  63/2 73/2 74/4 74/8 74/8 75/11 76/11 85/6 85/6 86/21 94/2 94/2 94/5 94/20 95/10 95/22 99/11 99/23 105/21 116/5 123/18 123/24 129/7 130/7 131/18
**Flaw 1** [2]  61/11 67/7
**flaws** [9]  72/14 79/5 79/13 87/15 99/23 109/14 120/6 128/10 131/22
**flies** [1]  34/2
**Floor** [1]  2/4
**fly** [1]  84/25
**focus** [1]  64/9
**focused** [3]  61/8 65/22 94/3
**focusing** [1]  119/11
**folks** [1]  124/5
**follow** [3]  25/17 27/9 133/20
**following** [3]  8/18 35/4 98/17
**fool** [1]  33/4
**forced** [2]  6/14 21/12
**Ford** [5]  25/3 25/8 43/20 44/21 44/22
**foregoing** [1]  138/5
**foreseeable** [1]  31/18
**Foreshadow** [16]  33/21 34/4 61/15 61/19 66/8 66/13 72/3 72/11 82/7 96/3 120/24 124/4 124/13 124/23 128/9 130/8
**forget** [1]  80/6
**forgot** [1]  80/6
**form** [2]  22/6 42/25
**formulate** [1]  134/17
**forward** [5]  4/6 5/2 5/11 32/24 44/14
**found** [5]  54/24 57/21 96/18 103/8 117/22
**foundation** [1]  57/11
**four** [2]  55/23 136/8
**fours** [5]  6/4 13/16 28/23 49/2 53/25
**fourth** [1]  55/25
**framework** [2]  49/10 116/13
**Francisco** [1]  2/7
**frankly** [4]  4/22 49/5 50/20 95/21
**fraud** [44]  9/22 28/2 28/14 32/11 36/18 50/19 50/20 51/2 51/2 52/18 53/6 53/16 54/4 54/7 54/13 54/18 54/20 55/9 56/5 56/19 56/20 57/3 57/3 57/12 57/15 57/25 59/20 59/21 59/21 60/3 83/12 89/22 89/24 90/11 100/11 104/23 126/22 127/10 127/10 128/2 133/18 134/5
**fraudulent** [12]  52/10 53/2 54/20 55/25 56/1 56/13 60/9 90/1 90/10 126/5 126/20 127/25
**fraudulently** [1]  53/1
**free** [2]  59/10 83/18
**frequently** [2]  21/8 58/4
**friend** [1]  70/20
**front** [5]  60/19 70/4 70/13 84/2 95/15
**froze** [1]  21/10
**Frye** [3]  56/22 102/21 103/2
**full** [3]  79/1 101/5 108/10
**fully** [1]  132/12
**function** [15]  29/20 60/14 60/21 75/2 75/25 90/20 98/2 98/3 107/25 108/22 109/4 109/22 110/4 111/23 112/7
**functional** [32]  23/22 24/11 24/15 26/5 26/13 26/18 26/18 26/22 27/16 29/4 29/23 30/2 31/25 33/13 45/20 56/8 94/14 95/23 97/19 97/21 98/19 99/3 99/21 99/23 105/24 106/16 106/18 107/1 108/9 108/13 109/18 111/3
**functionality** [4]  19/24 109/11 119/19 128/13
**functions** [3]  88/8 112/7 112/8
**fundamental** [7]  52/25 77/19 77/20 77/24 78/20 86/21 96/5
**further** [4]  13/13 20/16 45/8 135/10
**future** [2]  67/1 82/2

---

**G**

**gain** [3]  74/12 128/5 132/11
**gave** [9]  38/23 83/14 83/23 91/12 91/13 97/25 103/13 115/12 127/20
**Gearshift** [1]  12/24
**geek** [1]  95/1
**geeks** [1]  80/21
**general** [6]  16/7 25/15 59/14 131/8 131/19 132/20
**generally** [8]  39/21 40/16 69/11 72/23 100/8 123/2 124/17 125/20

**genuine [2]** 116/8 116/9
**get [57]** 9/8 14/11 16/4 23/3 27/16 30/22 37/11 45/19 53/2 56/6 56/11 58/10 62/11 64/7 64/7 69/2 69/25 73/23 78/11 79/3 79/23 81/3 82/2 82/10 93/1 96/3 96/23 97/7 98/16 99/8 99/21 104/19 106/14 107/11 107/22 108/11 108/11 108/14 109/8 109/17 110/2 112/17 112/21 113/12 114/9 114/23 115/23 116/2 116/2 116/21 118/13 124/6 128/24 134/10 136/1 136/19 137/11
**gets [1]** 136/21
**getting [11]** 7/18 18/4 35/23 53/22 92/12 108/3 109/7 109/9 110/3 129/8 132/7
**Gilbert [1]** 16/4
**gist [1]** 125/16
**give [15]** 23/18 58/23 59/14 60/23 85/7 89/4 98/19 103/11 103/15 130/5 131/23 132/11 136/1 137/4 137/12
**given [6]** 22/14 50/1 67/9 85/12 88/24 135/23
**gives [1]** 102/18
**giving [5]** 108/15 121/2 131/1 132/18 133/3
**glad [1]** 137/2
**glass [2]** 48/11 48/13
**Glazer's [1]** 51/1
**go [43]** 4/10 4/12 4/23 12/25 20/16 22/11 23/5 32/24 34/18 37/6 38/21 42/19 54/5 58/21 60/7 61/21 62/17 62/18 62/24 63/9 63/15 67/2 71/17 73/15 83/20 86/14 86/15 88/15 91/25 94/10 94/12 96/1 102/20 108/25 112/9 112/12 113/17 114/13 128/3 130/19 131/17 132/19 136/11
**goes [18]** 7/4 22/24 23/23 29/7 29/10 34/13 34/21 37/13 40/21 52/4 57/22 64/6 73/17 97/22 105/1 115/14 115/17 134/16
**going [85]** 14/12 17/15 20/25 22/13 23/3 24/10 26/21 27/15 28/9 29/14 29/18 30/22 31/6 31/19 31/22 31/23 38/9 46/1 46/10 46/22 46/24 48/22 50/13 51/7 56/3 59/14 59/19 59/22 60/5 61/20 62/17 64/6 64/7 64/11 65/4 68/15 70/25 71/9 72/14 73/3 73/15 73/22 77/5 78/21 78/23 79/19 79/22 80/1 80/15 80/17 81/1 81/4 83/4 83/10 84/8 84/24 88/3 88/4 92/1 94/17 96/3 98/9 98/10 98/21 99/6 102/24 105/4 110/14 110/25 112/11 112/17 115/24 116/1 118/24 120/16 128/24 129/16 130/18 132/21 132/22 134/6 135/20 136/7 136/13 136/16
**gone [5]** 50/15 63/8 94/18 118/14 135/25
**good [28]** 3/9 3/12 3/14 3/17 3/18 3/20 3/21 3/23 23/7 23/12 23/17 23/18 24/1 27/8 37/1 48/20 48/23 52/23 60/11 68/13 68/14 98/20 105/5 110/17 110/18 116/11 117/10 136/1
**Goodman [3]** 34/21 38/21 39/9
**goods [1]** 74/6
**Google [12]** 39/15 39/17 41/4 41/19 46/2 86/9 122/8 122/10 122/14 124/1 124/5 132/6
**Google Project [1]** 132/6
**Google's [1]** 40/7
**goose [1]** 91/22
**got [14]** 11/10 13/15 29/8 44/23 70/21 74/4 81/13 82/15 97/6 104/20 106/13 110/23 111/17 121/19
**gotten [3]** 7/21 44/25 108/10
**governed [1]** 90/2
**government [1]** 55/18
**grant [1]** 99/7
**granted [5]** 21/8 21/8 21/9 21/14 28/20
**granularity [1]** 39/19
**great [2]** 89/1 136/23
**greater [1]** 125/25
**greatest [1]** 89/15
**greatly [1]** 80/10
**green [2]** 107/21 111/8
**ground [1]** 54/17
**grounds [1]** 17/16
**guess [10]** 51/4 55/12 58/23 69/8 78/24 79/12 82/3 84/19 116/14 136/25
**guest [1]** 98/24
**gun [1]** 118/13
**guts [1]** 27/6
**guys [2]** 97/7 116/21

**H**

**hack [6]** 5/23 6/8 11/1 20/14 30/10 31/23

**hacked [9]** 5/18 34/8 75/11 76/2 83/25 85/20 95/19 95/20 96/25
**hacking [7]** 6/7 75/16 75/19 75/23 76/2 82/10 117/19
**hackings [1]** 88/4
**had [47]** 6/13 8/4 9/18 14/12 22/22 30/10 33/20 33/25 34/14 36/10 38/25 44/7 44/25 45/7 48/21 56/8 56/8 56/22 64/4 64/12 65/3 75/12 75/23 76/17 76/22 76/25 78/17 82/11 83/15 84/14 87/24 88/16 93/12 93/17 93/20 97/24 98/21 98/22 100/6 103/17 107/17 111/2 121/20 121/20 124/16 128/16 129/6
**Hadley [1]** 58/1
**hadn't [3]** 20/17 48/22 86/23
**half [6]** 35/10 70/5 70/8 80/11 92/11 92/17
**half-truth [2]** 92/11 92/17
**hallway [1]** 102/25
**hand [1]** 105/4
**handful [1]** 79/17
**handle [1]** 4/17
**handled [1]** 39/5
**happen [2]** 62/16 123/14
**happened [5]** 41/9 42/2 66/22 76/9 134/11
**happening [1]** 82/6
**happens [3]** 42/3 42/9 134/13
**happy [1]** 50/16
**hard [5]** 15/2 29/6 29/9 60/15 99/16
**hardness [1]** 48/11
**hardware [11]** 48/8 61/2 61/8 61/9 63/20 66/20 92/8 93/13 104/7 107/5 117/4
**harm [13]** 9/11 9/22 10/7 10/18 12/7 13/18 52/13 52/16 53/23 55/1 55/6 55/8 125/25
**harm/loss [1]** 53/23
**has [77]** 6/17 7/6 10/10 10/18 14/4 14/21 18/3 19/16 20/8 20/14 26/8 27/10 27/17 29/25 30/2 30/24 31/1 31/4 31/8 33/11 33/11 35/2 37/25 38/3 38/10 42/25 46/9 48/14 49/23 51/16 52/7 52/14 53/6 54/22 55/9 55/13 55/14 58/3 65/25 66/2 66/7 66/11 66/20 66/22 67/16 70/21 75/14 77/7 79/8 86/25 87/3 88/1 90/18 90/20 93/22 93/23 94/7 96/12 96/16 96/25 99/14 99/15 100/17 101/23 102/9 106/2 107/25 108/9 108/12 109/13 113/4 116/12 119/10 119/11 121/13 128/12 133/10
**hasn't [2]** 66/22 117/20
**Hauck [16]** 14/6 16/15 19/18 21/20 29/22 34/5 49/5 49/12 50/5 51/24 68/3 68/9 68/12 69/13 69/16 120/12
**have [324]**
**haven't [19]** 10/5 10/14 18/12 18/12 19/13 38/11 44/3 56/7 56/8 56/9 70/24 86/2 100/14 104/23 106/23 114/3 114/4 117/21 118/13
**having [7]** 8/17 13/25 67/1 118/8 122/1 128/22 130/5
**hazard [11]** 23/11 25/4 25/12 25/21 26/3 27/9 27/24 33/12 45/20 53/18 56/8
**hazards [1]** 27/12
**he [3]** 7/6 11/11 61/4
**head [1]** 111/17
**Health [1]** 17/17
**hear [5]** 39/13 43/4 43/12 117/22 119/22
**heard [6]** 61/3 90/22 98/23 100/12 123/20 131/8
**hearing [1]** 1/14 8/9 9/4 74/23 84/12 87/13
**held [12]** 6/10 8/7 15/23 16/8 17/19 21/16 25/17 28/18 36/4 39/2 48/12 102/1
**Helicopter [7]** 50/19 51/16 52/5 52/19 53/4 55/16 55/22
**help [2]** 110/25 123/15
**helpful [1]** 111/24
**helps [1]** 131/16
**her [2]** 16/17 52/2
**here [92]** 3/24 6/3 6/7 6/19 7/12 7/14 7/16 10/9 11/13 11/25 12/7 12/18 12/23 14/8 15/6 15/12 17/22 17/23 20/4 20/8 22/2 22/20 22/23 23/2 26/3 26/17 26/22 27/2 28/24 29/1 29/2 30/4 30/12 32/2 32/3 33/7 35/6 36/16 36/17 40/20 42/23 43/25 44/13 45/19 50/2 51/6 51/20 53/9 53/12 54/12 54/24 54/25 55/3 57/9 59/24 61/22 61/25 62/1 62/9 68/10 71/19 73/14 75/7 76/11 76/13 77/12 77/14 77/16 82/15 88/3 89/2 91/18 91/23 92/3 95/11 95/19 95/20 96/1 100/12 100/22 103/1 103/18 108/19 108/21 113/15 115/23 116/19 126/4 127/4 129/7 135/5 135/18 137/13
**Herron [1]** 36/9

**hesitation [1]** 95/5
**Hewlett [5]** 21/7 21/9 23/5 23/6 23/9
**Hewlett-Packard [5]** 21/7 21/9 23/5 23/6 23/9
**hid [1]** 63/6
**hide [1]** 47/7
**high [10]** 9/3 21/5 27/15 29/25 30/3 33/12 38/15 47/11 47/22 82/16
**high-severity [1]** 47/11
**higher [2]** 24/18 24/21
**highest [1]** 119/12
**highlight [1]** 13/22
**highly [1]** 117/14
**Highway [1]** 12/21
**him [1]** 102/25
**himself [1]** 39/5
**Hinojas [1]** 13/5
**Hinojos [2]** 74/4 78/5
**his [5]** 6/25 7/3 7/5 38/23 46/5
**history [1]** 119/11
**Hodsdon [14]** 23/15 24/1 24/6 24/22 26/6 26/10 26/15 27/14 28/18 29/8 32/5 58/2 90/9 90/18
**holding [1]** 102/13
**home [3]** 95/20 95/20 96/10
**homeowner [1]** 16/12
**Honda [1]** 27/10
**honed [1]** 112/13
**honest [2]** 95/8 102/22
**Honor [114]** 3/4 3/9 3/12 3/18 3/21 4/22 5/14 5/19 7/10 8/1 10/9 11/21 12/1 12/8 13/4 13/13 14/15 14/24 15/12 15/21 16/17 18/25 19/19 20/6 23/3 23/19 24/6 24/16 25/14 25/24 27/7 28/5 30/5 33/10 33/24 37/2 37/6 38/5 38/15 38/21 41/23 42/9 45/10 46/18 47/18 47/21 48/1 50/15 50/16 56/6 60/13 61/2 63/11 65/14 66/9 68/5 69/15 71/9 73/2 73/14 73/23 73/25 76/17 81/6 81/15 82/3 82/14 83/6 84/1 87/23 88/9 89/21 90/6 90/16 91/2 92/20 94/11 95/7 95/24 96/17 99/7 99/18 100/11 101/25 103/20 105/4 106/1 106/4 108/19 109/20 111/12 111/13 111/16 112/2 112/19 113/8 113/21 114/1 116/15 116/23 118/12 118/19 119/21 120/14 122/3 123/1 123/15 127/9 127/16 129/13 133/20 133/23 135/7 135/13
**Honor's [2]** 43/10 50/22
**HONORABLE [1]** 1/16
**hope [3]** 85/19 104/8 104/8
**hopefully [3]** 42/18 56/7 123/22
**hoping [3]** 108/11 108/16 108/17
**host [1]** 129/22
**hotel [7]** 98/7 98/10 98/17 98/19 98/21 98/25 99/3
**hour [2]** 4/10 58/22
**how [70]** 4/19 6/20 20/9 20/15 25/10 26/11 33/25 35/4 35/12 35/17 37/22 38/12 39/22 40/22 43/7 44/11 44/25 46/9 57/8 57/18 62/18 63/1 76/11 77/3 77/4 78/22 83/1 86/21 87/2 87/18 87/21 94/17 95/22 96/6 97/18 100/7 105/7 108/14 109/10 109/18 114/10 115/22 116/4 116/12 116/20 116/25 117/7 117/10 117/15 120/17 120/19 120/25 122/8 122/18 123/8 124/20 128/21 128/25 129/5 129/8 130/1 130/21 133/13 133/15 133/16 133/17 134/16 135/2 136/16 136/18
**However [3]** 14/19 35/8 134/12
**HP [3]** 15/13 37/5 44/7
**HPs [1]** 88/22
**human [3]** 24/13 37/17 37/20
**hundred [1]** 22/6
**hurt [4]** 75/10 108/7 108/8 108/9
**hurting [1]** 75/8
**hybrid [1]** 39/7
**Hyperthreading [1]** 88/9
**hypothesis [1]** 36/19
**hypothetical [6]** 8/8 30/14 30/22 31/7 89/19 130/1
**Hypothetically [1]** 40/13

**I**

**I'd [1]** 27/8
**I'll [18]** 4/16 13/14 16/24 23/20 59/25 60/8 61/6 65/14 67/2

**I'm [83]** 4/24 8/17 13/6 14/10 17/24 23/25 27/15 28/9 32/12 37/22 38/16 45/10 50/5 50/13 50/16 50/20 55/19 56/3 59/7 59/14 59/19 62/17 67/10 68/19 68/23 70/2 70/25 71/9 73/15 73/22 75/17 78/9 78/21 79/7 79/14 79/15 81/4 82/24 84/6 84/7 84/12 84/25 85/9 85/20 87/12 87/13 92/1 94/17 95/7 95/9 95/24 96/4 98/6 102/21 104/9 104/15 105/4 107/13 109/15 110/4 110/7 110/11 111/13 111/14 111/14 112/11 112/17 116/14 116/18 118/20 119/7 128/22 128/24 129/11 132/8 133/1 133/6 133/12 133/19 133/20 133/21 135/20 136/12
**I's [1]** 102/15
**I've [7]** 23/15 55/24 57/14 60/17 85/14 94/18 115/17
**i5 [2]** 131/2 131/3
**i7 [3]** 131/2 131/3 131/5
**ID [1]** 80/6
**idea [4]** 81/2 130/1 132/9 133/17
**identified [6]** 71/11 73/20 122/16 123/25 124/1 126/6
**identify [1]** 3/8
**identifying [1]** 6/25
**iDevices [1]** 11/13
**ignore [1]** 95/21
**ii [1]** 72/6
**iii [2]** 7/6 74/3
**imagination [1]** 77/13
**imagine [1]** 15/2
**immediately [3]** 42/6 65/1 65/3
**imminent [1]** 5/22
**impact [20]** 5/24 11/16 11/20 11/23 12/2 13/17 13/18 13/19 20/5 66/17 67/1 77/8 80/19 81/3 88/13 106/9 117/24 118/1 123/12 125/6
**impacted [10]** 6/15 6/18 11/3 39/1 46/13 79/25 80/1 80/10 109/4 110/23
**impacting [2]** 118/3 118/4
**impacts [1]** 81/1
**impairs [1]** 29/12
**impervious [1]** 104/21
**implement [1]** 80/8
**implementation [1]** 71/20
**implemented [2]** 63/23 131/12
**implementing [3]** 71/23 72/16 82/20
**implicate [1]** 90/13
**implicated [1]** 51/19
**implication [1]** 18/8
**implications [2]** 101/7 101/13
**implied [19]** 7/6 13/14 14/5 16/19 17/7 20/8 21/5 29/17 29/24 32/16 54/3 60/8 104/21 105/10 108/14 114/10 115/10 125/2 133/25
**importance [1]** 6/15
**important [26]** 10/24 14/3 15/20 19/18 27/14 34/18 48/16 49/15 51/21 63/25 66/10 71/14 75/18 78/6 82/14 86/6 88/9 89/3 90/19 98/12 100/7 100/9 107/22 109/25 115/7 130/16
**importantly [2]** 8/10 94/2
**imposed [1]** 27/22
**imposing [1]** 27/25
**impressed [1]** 102/23
**In re [1]** 14/20
**In re Apple [1]** 11/11
**incapable [4]** 29/5 29/13 29/19 30/7
**incidental [4]** 113/13 113/14 113/15 113/21
**include [2]** 113/4 113/10
**including [5]** 11/8 13/17 20/23 32/21 69/4
**incomplete [4]** 62/5 66/5 70/9 74/13
**inconsistency [2]** 77/17 78/1
**inconsistent [3]** 24/18 129/11 133/16
**increase [1]** 126/14
**increasing [1]** 48/7
**incurring [1]** 118/9
**independent [10]** 51/4 51/5 51/10 51/18 52/15 55/15 57/7 127/5 128/2 133/5
**independently [1]** 133/7
**indicate [1]** 14/18
**indicates [3]** 94/7 117/25 119/15
**indication [1]** 117/2

**I**

**indisputable [1]** 6/17
**individual [2]** 33/24 88/25
**induced [1]** 53/1
**inducement [5]** 53/3 54/20 55/25 56/2 56/13
**industry [21]** 37/20 42/4 46/11 49/17 66/3 66/6 88/23 94/21 94/24 114/20 114/21 117/5 117/16 117/19 117/22 121/8 121/14 121/15 122/14 122/17 124/15
**industry-wide [4]** 49/17 66/3 114/20 114/21
**infer [5]** 113/3 113/5 113/8 113/9 113/20
**inferences [1]** 112/22
**inferior [1]** 28/16
**infirmities [1]** 39/1
**infirmity [2]** 32/16 33/8
**inform [2]** 87/24 132/12
**information [58]** 6/25 12/5 13/20 34/17 35/20 35/24 36/24 37/15 38/6 39/15 39/18 43/24 44/15 44/23 45/7 45/13 46/21 48/18 62/14 63/6 63/20 64/21 64/23 69/6 69/10 72/2 72/7 72/8 72/20 73/5 75/20 75/21 75/24 81/25 82/24 85/12 86/6 91/17 93/24 96/18 97/7 98/15 100/6 100/8 101/22 103/11 103/13 103/16 104/5 104/5 105/2 115/4 119/1 121/5 123/24 126/10 128/7 134/11
**informing [1]** 132/14
**inherent [1]** 49/22
**inherently [1]** 133/14
**initio [1]** 32/20
**injunction [1]** 81/25
**injunctive [5]** 81/17 81/21 82/2 83/3 99/7
**injure [1]** 28/1
**injured [1]** 10/2
**injuries [2]** 10/3 13/2
**injury [15]** 5/21 6/10 7/3 10/15 10/21 11/12 12/11 12/20 13/10 32/11 52/23 74/7 75/9 85/10 89/9
**inoperable [4]** 19/24 31/5 31/6 31/9
**inquiry [2]** 44/12 44/12
**inside [7]** 18/3 18/5 60/24 89/13 109/6 109/16 113/5
**insisted [1]** 129/8
**installed [2]** 22/3 28/14
**instance [4]** 80/18 97/6 108/22 108/23
**instead [2]** 28/15 119/18
**instruction [3]** 62/12 72/4 126/13
**instructions [17]** 61/12 61/13 62/6 62/19 62/19 62/22 65/19 66/1 70/6 70/10 70/11 73/6 84/21 91/13 99/13 122/6 123/19
**instructive [1]** 110/16
**insufficient [1]** 34/6
**insurance [1]** 52/24
**INTEL [139]**
**Intel's [18]** 4/2 4/4 11/5 23/1 44/1 50/12 58/21 61/10 61/12 67/16 71/19 74/1 74/11 77/7 77/15 122/12 128/19 131/7
**intellectually [1]** 40/8
**intended [2]** 113/13 113/19
**intentionally [1]** 106/7
**interesting [3]** 40/8 50/25 78/4
**interestingly [1]** 16/9
**interfere [1]** 77/10
**intermediate [1]** 44/17
**internal [1]** 35/24
**internally [1]** 65/21
**interpret [1]** 34/16
**interpreted [3]** 10/23 26/10 54/22
**intervening [3]** 24/18 24/21 25/13
**introduced [1]** 31/5
**involved [9]** 7/16 13/9 16/6 33/1 38/22 48/20 75/12 82/15 137/6
**involves [2]** 74/22 111/20
**invulnerable [1]** 45/25
**iPads [2]** 21/15 61/19
**iPhone [4]** 48/12 48/13 106/14 112/5
**iPhones [2]** 42/20 61/18
**iPod [4]** 8/5 74/22 75/1 75/2
**iPods [1]** 75/10
**IQ [5]** 17/6 18/17 22/3 114/18 115/8
**iron [1]** 28/15

**ish [1]** 58/23
**Isip [1]** 22/8
**isn't [18]** 7/25 10/25 11/2 14/12 25/13 29/20 41/11 44/9 56/13 88/24 98/24 115/20 118/24 119/5 121/13 125/24 129/17 132/17
**isolate [1]** 133/1
**issue [47]** 11/9 16/10 23/4 27/23 38/13 38/20 38/23 41/17 41/24 43/17 49/17 53/3 61/16 61/16 61/19 61/20 62/16 66/6 68/11 69/13 73/9 73/17 77/14 77/16 79/15 81/7 83/2 87/11 100/12 100/13 100/16 101/11 103/14 103/17 114/2 114/10 114/20 114/21 116/8 116/9 117/12 120/23 122/5 125/9 125/10 132/25 136/9
**issued [2]** 111/17 117/4
**issues [10]** 8/21 9/13 45/21 54/15 56/11 74/17 74/18 74/18 97/24 129/20
**issuing [1]** 118/2
**it [524]**
**it's [37]** 6/4 7/15 8/25 11/3 16/13 22/11 22/25 24/18 34/11 35/10 35/13 39/8 40/10 41/12 41/24 50/21 57/17 63/24 64/21 75/20 75/20 75/21 75/21 77/9 85/11 85/16 98/9 108/15 108/23 112/5 119/6 119/16 120/23 127/21 131/12 132/10 134/10
**item [1]** 48/22
**its [27]** 47/23 60/25 62/21 63/19 63/21 64/12 64/12 69/5 69/7 71/21 71/22 78/18 86/20 88/8 91/13 101/6 113/16 114/16 115/16 115/19 122/5 125/17 128/6 130/2 130/3 134/3 137/13
**itself [8]** 24/22 26/6 35/1 66/20 85/21 118/22 132/17 133/2
**Ivory [1]** 37/18
**Ivory Coast [1]** 37/18

**J**

**January [1]** 12/6
**January 2nd [1]** 12/6
**jargon [1]** 121/3
**Jeep [3]** 74/5 107/13 107/23
**Jersey [1]** 111/20
**jewels [1]** 104/12
**jingle [1]** 18/1
**judge [36]** 1/17 11/10 13/15 14/6 16/15 19/20 20/1 20/7 21/8 21/20 22/21 29/22 31/12 32/23 38/13 40/4 46/4 48/6 48/17 49/5 49/6 49/14 50/24 51/23 51/23 52/17 54/24 55/2 59/5 59/11 75/18 95/12 105/6 111/19 120/1 125/3
**Judge Chen [1]** 32/23
**Judge Koh [2]** 19/20 51/23
**judgment [4]** 74/17 99/22 116/9 136/11
**judicial [11]** 4/4 47/9 47/15 47/16 47/19 49/4 49/8 49/10 50/8 50/13 135/24
**June [2]** 66/12 66/13
**jury [5]** 99/23 116/10 116/10 136/6 136/21
**just [101]** 9/1 10/19 11/12 16/17 16/18 16/20 16/25 18/18 21/8 21/21 22/10 27/5 29/1 29/16 30/1 31/3 34/3 37/6 37/22 47/12 47/12 47/19 47/21 47/23 47/23 48/1 49/16 50/3 50/8 50/10 50/15 50/24 52/3 54/16 54/23 54/24 57/5 59/11 61/3 61/23 62/9 66/9 68/2 69/15 70/13 70/16 71/7 71/14 73/3 74/14 74/25 75/24 76/4 76/21 80/16 81/7 83/6 84/6 87/7 88/8 89/6 89/18 89/19 95/9 95/21 96/12 96/15 100/23 102/21 104/13 106/4 106/4 106/14 111/17 112/2 112/9 112/21 113/1 114/6 115/1 115/14 115/20 116/19 117/16 117/17 118/24 119/5 121/11 121/18 122/21 125/2 129/1 129/20 130/8 130/23 131/1 133/11 133/14 133/25 134/15 137/15

**K**

**Katz [13]** 2/9 3/16 4/21 5/9 5/13 61/4 74/16 75/5 79/8 79/16 81/17 90/22 94/7
**Katz's [1]** 102/23
**keep [4]** 14/3 50/3 50/8 137/5
**keeping [2]** 11/21 133/11
**Kelley [2]** 6/12 12/15
**Kellogg [1]** 58/1
**Kennedy [3]** 34/21 38/21 39/9
**Kent [2]** 21/7 21/9
**kept [1]** 75/10
**key [7]** 6/3 29/2 30/18 30/21 30/24 31/4 31/5
**kicked [1]** 107/19

**kids** [1] 96/9
**kind** [20] 20/18 25/13 31/20 39/7 42/14 74/24 75/4 75/4 75/6
77/12 80/21 82/9 86/2 92/8 93/25 96/15 97/25 107/25 114/12
119/24
**kinds** [3] 48/10 67/20 97/8
**knew** [27] 32/7 32/8 39/20 40/6 40/14 64/4 81/10 86/8 86/17
86/22 87/6 87/6 87/9 87/10 88/16 93/12 94/2 94/7 98/20 99/17
106/19 121/21 122/4 122/6 124/15 132/5 134/17
**know** [83] 6/21 14/6 14/9 15/21 18/1 18/4 28/8 31/6 31/22 34/25
35/19 37/17 41/21 42/16 42/16 44/7 45/25 46/9 47/13 48/2 48/7
49/23 59/11 63/17 63/17 66/17 66/19 67/13 70/13 70/16 70/19
76/4 76/16 76/16 76/22 76/22 78/12 79/18 80/1 80/14 81/12
81/17 86/5 86/25 87/18 88/1 88/5 88/6 93/23 95/14 95/25 96/6
97/23 98/10 100/3 102/8 105/21 106/9 106/20 106/20 110/13
111/4 114/5 115/24 116/25 120/19 121/15 121/18 122/7 122/19
123/2 123/4 124/1 129/15 130/3 130/7 132/8 132/21 134/11
134/15 134/16 134/22 137/1
**knowing** [8] 20/25 21/1 48/17 69/7 79/5 96/2 97/12 98/15
**knowingly** [3] 98/14 126/8 128/6
**knowledge** [33] 33/17 34/9 34/10 34/14 34/16 34/20 34/20
34/24 35/2 35/5 35/21 36/5 36/15 37/19 38/11 38/20 39/3 39/7
39/8 39/14 40/4 40/16 44/6 63/21 65/17 93/10 93/13 93/17
93/20 94/1 122/1 122/23 124/20
**knowledge/superior** [1] 39/7
**known** [27] 33/21 33/25 34/6 35/2 35/7 35/13 36/21 40/11 40/16
44/8 46/21 48/21 65/10 65/15 69/10 72/23 78/18 87/10 100/6
121/7 121/13 122/2 123/20 124/16 124/19 128/16 129/6
**knows** [4] 36/23 48/13 83/20 121/16
**Koh** [15] 14/6 16/15 19/20 20/1 21/8 21/20 22/21 40/4 50/24
51/23 51/23 54/24 55/2 120/1 125/3
**Koh's** [4] 20/7 29/22 49/5 52/17
**Kohl's** [1] 13/5
**Korsinsky** [1] 2/6
**Kuhns** [5] 6/21 6/22 6/24 7/2 7/8
**Kuhns'** [1] 7/5

**L**

**lab** [3] 20/18 30/11 46/9
**label** [3] 18/3 89/9 113/4
**labeled** [1] 33/2
**laboratory** [3] 41/6 86/23 86/24
**lack** [5] 8/5 9/20 19/16 20/15 49/1
**lacked** [1] 20/11
**lacks** [1] 21/2
**land** [1] 31/25
**landfill** [1] 10/17
**landscape** [1] 116/12
**language** [7] 29/22 29/24 75/17 75/19 78/4 84/20 108/21
**laptop** [5] 21/9 29/7 29/10 36/10 36/12
**laptops** [1] 36/11
**Lassen** [6] 7/15 8/1 8/14 8/23 9/16 11/8
**last** [5] 28/17 48/15 110/13 111/18 137/15
**lastly** [1] 21/18
**later** [10] 9/10 24/8 25/10 30/20 31/8 34/8 39/13 52/20 124/13
130/7
**latest** [1] 82/6
**Laughter** [2] 118/17 135/17
**law** [38] 8/8 13/14 14/12 23/7 23/12 23/17 23/18 24/1 25/22
26/3 27/22 27/22 27/25 28/14 43/21 50/19 53/5 54/13 54/17
59/21 60/6 60/7 87/2 87/5 87/20 89/5 90/8 90/11 90/16 92/12
97/18 108/10 112/3 112/6 114/8 126/25 127/11 129/16
**law's** [1] 46/16
**lawsuit** [1] 79/6
**lawyers** [2] 50/2 94/22
**lay** [1] 18/23
**layer** [2] 61/2 61/8
**layperson** [1] 39/9
**lays** [1] 70/8
**lead** [1] 95/15
**leaders** [1] 73/12
**leading** [1] 10/20

**leads** [1] 63/20
**leak** [1] 63/20
**leaky** [1] 64/5
**leaky cache** [1] 64/5
**learn** [1] 92/18
**learned** [2] 39/14 66/13
**learning** [2] 66/24 82/15
**least** [15] 9/12 11/7 13/1 14/12 14/14 17/4 18/16 30/14 37/9
50/4 72/23 84/12 102/4 103/17 106/23
**leave** [4] 62/20 67/9 89/22 121/5
**led** [4] 12/15 13/1 111/5 123/4
**left** [5] 18/21 76/15 77/1 105/14 105/16
**legal** [4] 101/14 102/18 105/19 112/21
**Legally** [1] 6/4
**legion** [1] 35/25
**legislative** [2] 49/7 50/6
**lends** [1] 118/22
**length** [1] 101/16
**lengths** [1] 12/19
**Lenovo** [2] 37/5 44/7
**Lenovos** [1] 88/22
**less** [12] 9/7 12/4 14/2 28/16 28/16 32/22 33/23 34/1 81/13
100/9 128/19 129/1
**let** [17] 4/7 4/20 30/13 32/23 50/24 51/13 58/12 69/2 69/25
74/19 85/15 88/15 94/16 94/22 96/5 98/22 129/25
**let's** [11] 17/1 29/17 30/16 34/2 34/10 34/25 58/19 59/2 76/18
79/3 114/9
**letter** [2] 36/6 38/5
**letters** [2] 67/11 75/21
**letting** [1] 111/14
**level** [6] 23/8 27/25 33/12 65/21 80/7 136/5
**Levi** [1] 2/6
**liability** [20] 1/4 3/6 9/11 9/22 10/7 21/23 27/22 27/25 27/25
32/11 51/18 52/15 53/20 55/15 55/17 64/15 67/12 72/13 84/7
85/18
**liability/no** [1] 32/11
**Library** [1] 56/22
**life** [8] 28/17 32/9 36/10 36/14 45/25 47/12 95/12 95/16
**light** [2] 87/11 93/17
**like** [70] 4/10 6/7 6/12 6/19 6/22 9/1 10/12 11/4 11/13 17/12
18/6 18/16 21/8 21/23 22/2 22/12 22/19 23/4 23/11 23/8 29/1
29/6 29/16 29/20 29/23 32/2 33/15 35/23 35/25 36/18 37/4
37/16 38/6 39/7 40/20 40/25 41/23 45/21 46/2 54/16 57/1 57/19
66/6 67/16 70/16 74/17 74/25 84/19 84/24 85/20 86/3 89/16
97/25 98/1 98/6 99/6 106/2 106/4 106/14 106/19 107/18 107/18
114/23 117/8 121/18 125/18 126/23 128/3 133/25 137/11
**likelihood** [1] 88/25
**likely** [3] 32/8 87/18 90/5
**LiMandri** [15] 33/15 33/18 35/1 35/18 36/25 37/23 38/8 38/14
43/2 54/15 56/9 90/21 93/6 121/25 122/22
**limitations** [1] 27/21
**limited** [4] 28/3 37/7 43/24 69/4
**limiting** [2] 28/4 38/12
**Linares** [1] 111/19
**linchpin** [1] 119/13
**line** [8] 28/12 45/2 45/4 45/11 109/7 113/12 130/11 131/12
**link** [2] 17/21 119/8
**lint** [1] 22/16
**listing** [1] 48/21
**literally** [2] 9/18 40/22
**LITIGATION** [1] 1/5 3/6 48/6 111/19 112/20
**little** [19] 18/1 23/5 59/22 61/20 66/10 77/13 79/7 79/8 83/21
84/3 85/24 90/23 92/12 92/16 96/6 96/11 97/3 107/12 112/2
**live** [3] 95/12 95/21 106/13
**LLP** [3] 2/3 2/6 2/10
**locate** [1] 18/25
**location** [1] 72/7
**lock** [2] 98/7 104/7
**locked** [1] 21/10
**log** [1] 97/1
**logos** [1] 96/12
**long** [6] 4/17 119/11 121/14 124/16 132/16 137/12
**longer** [3] 59/23 105/22 109/15

**L**

**look [29]** 4/6 5/2 5/11 9/2 12/18 18/6 29/14 29/21 37/2 38/12 63/9 65/16 66/6 75/13 75/16 81/7 84/19 86/4 87/5 91/25 94/3 97/14 97/19 109/20 109/21 114/7 117/19 127/15 137/11
**looked [3]** 74/24 114/25 115/22
**looking [9]** 35/1 37/14 55/19 68/19 85/7 91/21 103/20 114/15 115/18
**looks [2]** 90/3 99/6
**lose [5]** 89/10 95/4 96/13 116/8 116/10
**loss [28]** 6/2 8/7 8/9 9/4 50/18 50/24 51/3 51/11 51/14 51/18 51/24 52/4 52/12 52/18 53/4 53/13 53/20 53/23 54/8 54/22 55/9 55/15 55/23 56/4 56/7 56/12 58/7 134/13
**lost [2]** 21/11 21/25
**lot [14]** 19/8 29/23 62/24 66/10 74/18 78/7 80/20 82/9 86/2 89/23 101/14 130/9 135/24 136/15
**loud [1]** 75/10
**Lourdeaux [1]** 52/21
**low [1]** 38/15
**lower [5]** 6/12 12/15 39/6 77/23 78/10
**lunch [4]** 4/10 4/11 4/24 58/22
**Luong [1]** 17/12
**lurches [1]** 22/9
**Lusson [1]** 25/19

**M**

**M's [1]** 37/16
**MacBook [1]** 96/10
**MacBooks [1]** 96/7
**made [25]** 11/5 13/3 17/14 28/14 28/24 31/13 32/22 46/7 48/11 53/18 64/24 67/19 68/6 77/9 79/8 82/25 84/14 86/1 103/6 110/19 123/23 130/2 130/23 132/3 132/4
**maintain [2]** 16/8 53/13
**make [29]** 4/16 16/25 23/25 24/2 27/23 28/6 31/5 31/9 32/10 35/8 41/24 59/15 60/17 63/11 66/9 71/25 72/19 82/22 85/22 89/24 92/21 94/7 97/11 99/17 101/5 101/19 124/13 130/1 132/15
**makers [1]** 130/4
**makes [9]** 15/18 22/15 30/21 30/23 68/9 85/17 98/18 124/23 130/1
**making [11]** 31/16 31/17 32/1 62/7 64/21 83/11 92/18 112/21 133/3 133/10 133/10
**malfunction [2]** 22/12 31/19
**malfunctioned [4]** 12/11 21/22 32/15 32/21
**malfunctioning [2]** 31/24 36/7
**malicious [7]** 6/7 62/11 64/22 67/20 76/17 76/20 121/6
**maliciously [1]** 20/19
**manifest [1]** 10/3
**manuals [2]** 86/14 86/14
**manufactured [1]** 126/8
**manufacturer [30]** 14/23 15/5 15/7 15/7 15/16 15/23 19/4 19/8 19/12 28/1 31/16 32/1 38/10 44/25 64/24 65/25 81/8 89/13 97/10 99/11 101/8 101/10 101/13 101/24 103/23 104/8 104/10 104/12 104/16 104/19
**manufacturer's [1]** 74/6
**manufacturers [7]** 14/9 44/7 45/12 85/25 88/22 114/22 124/25
**manufacturing [1]** 44/18
**many [11]** 13/2 15/12 40/23 74/22 80/16 80/21 80/24 96/22 110/13 116/25 118/17
**March [1]** 138/10
**market [16]** 5/23 6/11 6/16 6/17 13/17 13/18 13/19 18/13 36/19 36/19 84/9 84/10 89/3 108/4 130/21 132/10
**market-wide [1]** 13/17
**marketing [12]** 1/4 3/5 17/10 18/2 18/7 18/9 18/18 19/4 67/10 74/5 100/25 102/12
**marketplace [2]** 36/23 88/21
**markets [1]** 101/8
**Mary [2]** 4/14 50/12
**massive [3]** 45/13 117/24 117/25
**match [1]** 71/6
**material [16]** 35/2 46/23 47/4 69/4 83/1 90/18 100/4 105/2 122/1 122/23 126/9 129/23 129/23 134/13 135/2 135/4
**materiality [12]** 43/22 45/18 45/21 45/23 46/19 48/5 48/16 49/1

**matter [6]** 4/13 22/22 78/22 128/25 131/22 137/17
**mattress [1]** 128/24
**may [26]** 7/19 14/18 16/16 30/15 30/15 38/11 40/8 40/15 42/17 73/9 73/23 78/14 79/22 83/7 87/15 87/15 90/7 106/5 108/8 108/10 118/13 118/15 129/22 129/23 132/19 133/14
**maybe [32]** 8/20 8/20 22/17 31/14 43/4 55/21 65/20 65/21 68/15 80/16 86/15 87/14 92/15 92/16 93/1 94/2 95/9 95/9 95/11 107/8 111/1 111/4 116/6 118/20 127/19 127/20 127/20 129/7 129/18 130/5 136/20 136/20
**McCoy [1]** 37/18
**md [1]** 1/3
**MDL [1]** 3/5
**me [69]** 3/10 4/7 4/7 4/20 8/19 23/17 23/18 23/24 30/13 39/12 40/1 43/5 47/16 49/8 50/17 50/24 51/2 51/13 58/7 58/9 58/12 59/7 60/1 67/7 68/8 69/2 69/9 69/25 70/21 71/3 71/7 72/22 74/19 77/20 82/15 83/14 83/23 84/2 84/4 84/15 85/7 85/17 88/15 91/7 94/12 94/16 94/22 96/5 96/13 96/24 97/2 97/18 98/1 99/20 99/24 100/19 101/14 101/19 102/18 103/15 103/19 105/18 116/7 129/1 129/25 132/1 132/15 135/23 136/5
**mean [26]** 22/11 26/11 26/23 28/5 28/12 31/2 31/2 31/9 38/2 43/8 54/9 54/12 64/3 68/13 70/19 75/5 77/16 80/20 86/2 88/12 93/5 104/18 109/24 129/11 134/7 134/14
**meaning [2]** 90/18 108/15
**meaningful [1]** 51/3
**means [8]** 9/11 21/6 34/16 43/14 63/21 82/13 126/14 131/3
**meant [1]** 83/16
**measure [1]** 35/18
**measures [9]** 69/5 95/18 128/17
**meat [1]** 50/16
**mechanics [1]** 12/21
**mechanism [1]** 136/24
**media [1]** 95/13
**medical [2]** 36/6 36/8
**meeting [3]** 21/6 131/7 131/15
**Meltdown [20]** 33/21 34/3 34/12 41/12 47/10 49/20 61/15 61/19 66/7 66/12 72/3 72/11 82/7 96/2 120/24 124/4 124/12 124/23 128/9 130/8
**Meltdown/Foreshadow [1]** 128/9
**members [2]** 117/5 122/14
**memo [1]** 102/6
**memory [11]** 60/16 61/11 61/25 67/19 72/1 72/19 82/23 93/14 98/15 121/5 126/14
**mention [3]** 49/11 76/5 81/17
**mentioned [1]** 118/15
**Mercedes [3]** 22/8 111/19 111/21
**Mercedes-Benz [1]** 22/8
**merchantability [9]** 14/7 16/19 19/15 21/5 21/19 60/9 115/11 125/3 134/1
**merely [1]** 118/11
**merging [1]** 53/5
**merits [4]** 7/4 7/18 8/12 8/20
**met [6]** 20/9 30/3 33/14 44/3 44/23 45/1
**MICHAEL [1]** 1/16
**microarchitecture [9]** 88/8 121/9 121/14 122/12 122/16 123/3 123/9 123/13 124/21
**Microsoft [2]** 42/10 96/25
**mid [1]** 34/8
**mid-2017 [1]** 34/8
**middle [1]** 42/20
**might [19]** 22/18 26/23 29/19 41/4 41/17 51/9 54/23 63/16 65/15 88/19 92/10 93/2 96/20 101/11 104/21 109/16 109/16 124/19 137/10
**mile [1]** 23/22
**million [1]** 12/22
**mind [2]** 14/4 91/9
**minimis [4]** 125/8 125/11 125/13 125/15
**minimum [3]** 21/6 102/4 115/19
**minute [7]** 4/12 16/24 27/16 58/19 59/2 88/16 105/9
**minutes [2]** 5/8 105/8
**mis [1]** 91/15
**mis-speculation [1]** 91/15
**misled [1]** 81/9

**misrepresent [1]** 133/15
**misrepresentation [8]** 29/2 33/2 33/5 55/14 85/14 92/11 102/7 119/18
**misrepresentations [7]** 5/16 60/6 74/7 90/8 102/14 102/16 102/17
**missed [3]** 68/16 91/1 91/2
**misstating [1]** 36/14
**mistake [2]** 127/20 127/21
**mistaken [1]** 72/9
**misuse [1]** 75/7
**mitigate [1]** 42/19
**mitigated [1]** 107/7
**mitigation [3]** 42/7 120/3 120/4
**mitigations [3]** 67/3 73/16 73/17
**MMO7 [1]** 36/13
**mobile [1]** 114/19
**modern [1]** 47/20
**modest [1]** 4/10
**modified [1]** 110/22
**modify [2]** 63/21 110/22
**mold [3]** 22/14 22/15 29/18
**moldy [6]** 115/13 115/13 115/14 115/15 116/20 128/24
**moment [5]** 26/24 34/3 69/2 69/25 91/18
**moments [1]** 83/13
**money [1]** 131/3
**Montgomery [1]** 2/6
**months [3]** 25/4 36/12 50/25
**moot [1]** 45/22
**more [41]** 5/16 8/10 10/10 11/17 11/25 14/13 15/3 16/25 23/5 39/21 51/3 53/25 54/4 67/7 73/14 79/25 80/1 81/13 81/25 82/1 83/21 84/23 85/7 92/5 92/18 92/21 94/1 94/3 101/19 105/18 108/22 113/15 113/21 117/12 118/10 122/13 131/2 131/5 134/14 135/8 137/6
**morning [9]** 3/9 3/12 3/14 3/17 3/18 3/20 3/21 3/23 135/14
**most [15]** 19/16 20/12 20/15 21/2 52/5 61/4 73/11 75/18 80/24 89/8 89/10 98/14 102/8 104/4 130/16
**mostly [1]** 64/11
**mother [1]** 46/16
**mother-in-law's [1]** 46/16
**motion [17]** 1/14 4/3 4/3 4/4 21/7 21/8 21/14 28/20 48/4 50/8 50/12 100/18 135/24 135/25 136/11 136/21 137/8
**motions [3]** 3/24 4/2 59/6
**motivated [1]** 83/22
**Motor [5]** 25/3 25/8 43/20 44/21 44/22
**Motors [1]** 25/15
**movant [1]** 4/20
**move [4]** 13/14 89/21 93/3 126/23
**moving [2]** 13/1 19/15
**Mr [7]** 2/2 2/2 2/3 2/9 2/9 59/17 81/17
**Mr. [21]** 4/21 5/9 5/9 5/13 61/4 74/16 75/5 79/8 79/16 90/22 94/7 102/23 111/25 112/6 114/13 116/17 118/15 119/23 122/4 122/24 128/22
**Mr. Katz [10]** 4/21 5/9 5/13 61/4 74/16 75/5 79/8 79/16 90/22 94/7
**Mr. Katz's [1]** 102/23
**Mr. Seeger [9]** 5/4 111/25 112/6 114/13 118/15 119/23 122/4 122/24 128/22
**Mr. Seeger's [1]** 116/17
**Ms [3]** 2/5 2/10 60/2
**Ms. [6]** 5/4 60/4 105/11 111/11 112/1 135/9
**Ms. Rivas [6]** 5/4 60/4 105/11 111/11 112/1 135/9
**much [10]** 4/8 17/24 56/4 79/8 94/23 94/24 96/3 98/23 105/7 136/13
**multi [1]** 63/16
**multi-core [1]** 63/16
**multiple [7]** 7/13 21/4 37/8 73/16 88/12 112/7 112/7
**multiple-function [1]** 112/7
**multitask [1]** 137/5
**must [9]** 29/5 38/15 43/23 66/4 73/19 91/1 127/5 127/12 134/23
**my [43]** 35/9 37/23 40/2 42/23 46/15 48/15 51/13 58/23 59/25 82/14 91/19 91/24 95/3 95/12 95/20 96/9 96/10 96/25 98/4 98/5 98/5 99/15 99/19 102/24 105/15 105/17 106/10 109/15 111/17 112/9 115/17 116/4 116/22 121/3 121/12 122/10 126/4 129/16 135/14 135/18 136/25
**myself [3]** 94/17 109/24 118/21

---

**N**

**named [4]** 13/24 20/20 33/25 44/13
**narrow [1]** 54/12
**National [1]** 12/21
**nationwide [1]** 58/8
**nearly [1]** 6/16
**necessarily [5]** 37/16 38/2 54/21 110/25 122/18
**need [16]** 4/25 5/8 5/10 16/10 58/10 59/17 70/15 89/15 90/21 93/2 93/6 97/1 105/6 117/6 134/4 134/4
**needed [1]** 73/17
**needs [2]** 4/9 4/12
**nefarious [1]** 76/2
**negate [2]** 12/2 13/19
**negating [1]** 12/7
**negligence [6]** 51/25 52/18 53/15 55/2 55/3 55/5
**Nestle [1]** 37/18
**network [2]** 22/5 22/5
**never [6]** 30/17 56/6 63/23 84/8 118/13 124/7
**new [12]** 46/1 59/25 66/21 66/23 66/24 79/11 95/5 96/15 108/18 111/20 116/17 120/12
**New Yorker [1]** 59/25
**newer [1]** 79/25
**news [2]** 95/13 95/15
**Newsweek [2]** 36/11 38/4
**next [3]** 66/19 102/20 120/15
**Nexus [1]** 21/23
**night [2]** 42/20 98/20
**nine [1]** 36/11
**Ninth [29]** 6/4 6/14 8/3 8/7 8/8 9/8 9/12 10/4 10/6 13/6 13/15 15/24 23/7 23/16 24/16 24/17 24/24 25/2 25/11 26/1 27/14 28/10 29/11 32/3 43/21 48/3 90/17 100/4 111/23
**Ninth Circuit [29]** 6/4 6/14 8/3 8/7 8/8 9/8 9/12 10/4 10/6 13/6 13/15 15/24 23/7 23/16 24/16 24/17 24/24 25/2 25/11 26/1 27/14 28/10 29/11 32/3 43/21 48/3 90/17 100/4 111/23
**Nissan [2]** 7/15 8/1
**NJ [1]** 2/4
**no [108]** 1/3 4/5 6/11 6/13 7/14 8/14 9/9 9/11 9/16 9/22 9/24 10/7 10/18 11/12 11/12 11/13 13/18 14/7 14/21 14/25 16/18 19/22 20/14 21/11 21/11 22/12 22/15 22/21 23/9 24/7 26/22 27/2 27/17 28/4 28/24 28/24 30/7 30/8 30/8 30/17 31/15 32/11 32/11 33/17 34/8 36/4 39/19 40/3 42/9 42/15 43/6 43/25 44/1 45/23 46/9 48/5 48/19 51/7 52/12 52/13 52/14 55/8 56/1 56/10 57/13 57/15 57/15 58/3 63/14 65/25 67/12 67/24 68/23 68/25 75/1 76/15 76/25 77/12 78/21 81/2 83/18 83/21 83/24 84/16 84/17 84/24 85/13 88/3 89/18 91/5 91/6 95/5 102/13 104/11 105/21 107/23 109/15 121/10 121/24 123/1 124/5 128/24 130/1 131/19 131/22 133/12 135/1 137/13
**no one [3]** 10/18 22/15 46/9
**no-harm [3]** 9/11 9/22 10/7
**nobody [7]** 41/17 93/22 93/23 99/14 106/22 109/13 123/17
**noise [1]** 22/9
**Noll [2]** 48/16 48/18
**non [2]** 77/5 111/3
**non-pollution [1]** 111/3
**non-speculative [1]** 77/5
**nondisclosure [1]** 134/19
**none [3]** 12/18 12/23 114/5
**nonspeculative [1]** 12/11
**nonviable [1]** 57/25
**Norcia [1]** 32/25
**normal [1]** 83/22
**normally [2]** 98/18 101/16
**Northern [9]** 9/15 14/20 17/7 17/12 21/14 25/15 32/18 48/18
**Northern District [1]** 17/7
**Norton [1]** 32/19
**not [221]**
**not plausible/too [1]** 53/21
**note [1]** 20/6

**N**

**Notebook [1]** 112/20
**noted [3]** 6/15 24/22 26/10
**notes [1]** 103/20
**nothing [9]** 11/15 11/22 17/8 18/20 57/1 58/2 82/13 96/14 135/18
**notice [27]** 4/4 17/25 37/19 47/10 47/15 47/16 47/19 48/1 49/4 49/8 49/10 49/11 50/8 50/13 80/13 80/15 80/19 81/21 81/24 82/4 83/3 83/4 84/19 84/19 99/8 106/10 135/24
**noting [1]** 25/17
**notion [1]** 43/18
**notwithstanding [1]** 95/18
**now [83]** 4/24 5/15 7/18 10/1 26/21 30/23 30/24 31/3 31/4 31/9 31/11 33/15 34/10 39/20 49/15 51/7 58/19 61/14 62/17 63/18 64/15 65/10 65/20 66/3 66/13 68/13 68/14 68/19 70/9 70/13 70/15 71/6 75/13 76/19 78/9 78/19 79/3 81/4 81/24 81/25 82/17 83/10 83/14 83/17 83/24 84/3 86/12 86/24 87/16 88/2 94/18 94/19 94/25 95/3 95/11 95/15 99/4 103/24 105/21 106/4 106/21 107/8 107/12 108/5 109/4 110/3 112/5 112/9 116/6 116/12 116/18 119/23 120/12 125/18 126/23 129/14 130/21 131/25 131/25 132/4 132/14 132/25
**nullification [1]** 15/3
**number [9]** 4/1 42/10 46/5 65/11 74/4 79/4 80/21 96/19 131/11
**NW [1]** 2/11

**O**

**o'clock [1]** 58/23
**o'clock-ish [1]** 58/23
**objecting [1]** 49/24
**objection [1]** 50/7
**objective [1]** 90/4
**objectively [1]** 92/13
**obligation [3]** 27/17 41/10 87/24
**obtain [1]** 126/2
**obtained [1]** 7/21
**obviously [9]** 15/22 22/19 54/2 70/24 74/3 112/11 126/25 129/13 134/16
**occasion [1]** 24/7
**occasionally [2]** 136/14 137/5
**occur [2]** 42/11 66/23
**occurred [1]** 63/13
**occurrence [1]** 42/21
**OEM [1]** 113/23
**OEMs [2]** 113/4 113/16
**Oestreicher [1]** 57/10
**off [9]** 42/14 59/8 59/10 95/24 97/25 105/4 105/14 105/16 115/4
**offer [1]** 130/16
**offered [1]** 119/17
**Official [1]** 138/11
**Oh [3]** 84/8 89/17 113/1
**okay [38]** 4/16 24/4 42/5 50/11 59/2 59/12 59/22 64/17 71/2 71/12 71/13 83/19 84/13 89/22 91/10 92/15 92/17 92/20 92/24 93/3 93/9 94/9 94/18 96/9 99/2 102/20 105/3 106/8 111/10 112/18 114/9 125/1 125/14 128/24 130/18 133/20 135/6 135/16
**older [2]** 79/23 79/24
**omission [20]** 23/10 27/19 29/3 33/3 34/4 53/16 53/24 67/13 68/2 68/3 68/8 68/10 72/13 85/3 89/25 90/10 92/19 100/4 100/12 134/20
**omission-based [1]** 134/20
**omissions [8]** 59/20 60/3 64/16 74/7 85/16 85/18 90/8 90/13
**omitted [5]** 44/15 47/3 67/13 67/14 67/16
**once [6]** 13/19 42/3 65/24 67/7 88/13 104/13
**one [89]** 5/22 6/5 8/3 10/18 11/23 13/2 14/9 14/24 16/2 18/24 19/2 21/24 22/15 26/11 26/12 28/8 28/23 29/19 32/10 33/3 36/11 43/1 43/18 43/19 44/5 44/17 46/9 50/1 51/3 55/25 58/3 58/23 66/9 68/6 69/2 69/25 71/17 74/22 79/24 80/16 80/25 83/16 86/21 88/8 88/10 89/5 89/6 90/9 90/21 90/23 91/18 91/25 92/2 92/6 93/6 93/8 94/13 95/5 96/11 96/15 96/20 97/6 98/18 100/16 108/21 108/22 108/23 110/13 110/18 111/1 111/14 112/13 114/17 115/2 118/13 119/12 119/25 120/21 122/13 124/6 129/21 129/23 130/15 132/19 136/7 136/22 136/22 136/23 137/6

**only [29]** 6/8 11/23 13/22 26/13 26/16 28/2 32/19 33/16 36/11 39/14 41/3 43/19 46/8 47/25 50/18 52/12 52/22 54/17 57/16 58/6 76/10 77/12 78/18 93/5 94/2 107/5 122/4 122/6 137/2
**oOo [1]** 138/3
**open [11]** 3/3 14/13 41/2 41/4 41/7 59/4 76/19 80/16 104/13 105/13 108/4
**opened [2]** 40/2 42/23
**opening [1]** 58/16
**openly [1]** 40/22
**opens [1]** 76/18
**operate [1]** 77/25
**operated [1]** 123/21
**operating [3]** 12/14 22/6 61/1
**opinion [8]** 6/21 16/17 70/17 75/17 91/20 107/23 110/15 111/17
**opportunity [1]** 43/14
**opposition [7]** 10/12 11/19 25/16 25/20 33/20 43/19 102/6
**oral [3]** 3/4 4/6 135/22
**order [7]** 67/17 70/17 71/23 72/13 72/16 82/20 137/15
**ordinarily [1]** 42/3
**ordinary [12]** 19/17 20/3 20/12 21/3 36/23 37/13 39/9 56/21 86/20 114/15 125/17 134/4
**OREGON [2]** 1/2 1/6
**original [1]** 138/7
**other [41]** 6/1 21/4 21/21 24/24 26/5 38/7 38/14 39/10 42/10 43/1 45/21 46/25 47/21 50/6 52/8 52/13 53/20 57/6 57/6 57/16 65/25 70/23 74/11 75/11 81/1 81/7 82/13 84/23 84/25 85/25 88/21 94/8 94/20 96/23 110/9 118/7 122/14 124/24 127/11 132/25 137/14
**others [4]** 34/8 67/16 103/23 134/9
**otherwise [6]** 25/23 26/2 38/5 38/13 66/23 109/2
**our [47]** 19/22 42/20 43/8 48/22 56/17 57/2 59/6 62/1 68/17 68/24 69/24 73/5 73/8 73/25 74/14 76/23 78/13 78/19 79/9 79/9 80/22 81/20 83/2 84/20 85/22 88/2 89/17 91/3 91/16 92/7 92/8 94/6 95/18 97/13 100/6 100/12 118/22 119/8 119/9 119/10 119/12 123/22 126/4 130/17 131/14 134/13 136/4
**ourselves [1]** 131/16
**out [79]** 8/13 13/20 15/25 18/18 18/23 28/14 30/1 31/10 35/24 37/15 37/22 38/14 39/10 40/2 41/2 41/4 41/6 42/7 46/22 46/24 55/2 57/18 57/23 60/25 62/11 62/12 62/20 63/24 64/23 66/15 66/21 67/17 70/8 71/10 71/23 72/16 77/4 79/11 79/17 79/24 81/24 81/25 82/4 82/20 85/21 89/8 94/16 94/21 95/12 96/1 96/12 96/16 96/18 97/3 97/7 97/8 97/17 99/8 99/13 108/21 111/14 111/15 116/18 117/5 122/9 122/11 122/15 122/15 122/17 123/6 124/15 127/21 128/12 130/7 133/6 134/3 136/13 136/16 137/11
**out-of-order [4]** 67/17 71/23 72/16 82/20
**outline [1]** 62/1
**outset [2]** 132/3 134/18
**outside [8]** 21/15 61/1 65/11 65/18 65/23 69/11 102/25 123/17
**outsiders [1]** 98/2
**outstanding [1]** 135/22
**oven [1]** 52/11
**ovens [1]** 53/19
**over [15]** 9/9 19/9 22/9 34/19 38/18 61/23 76/3 88/4 122/3 126/12 128/3 128/6 130/19 132/11 134/9
**overall [1]** 29/15
**overheated [1]** 21/15
**overpaid [5]** 12/6 13/21 14/2 74/2 78/12
**overpaying [1]** 74/6
**overpayment [8]** 6/1 6/5 7/16 77/18 78/16 78/19 79/1 131/4
**overruled [1]** 24/9
**oversimplify [1]** 85/20
**overstate [1]** 33/4
**overturn [1]** 24/17
**overview [2]** 59/14 60/3
**own [3]** 65/3 76/24 79/11

**P**

**p.m [1]** 4/13
**pace [1]** 59/22
**Packard [5]** 21/7 21/9 23/5 23/6 23/9
**page [5]** 11/19 25/20 33/20 91/11 95/15

**paid [17]** 9/7 12/4 14/1 33/23 34/1 78/11 78/17 78/18 78/21 81/13 100/9 107/22 109/9 109/17 128/19 129/1 131/2
**painstakingly [2]** 15/25 18/23
**palpable [1]** 10/21
**panel [2]** 24/16 24/17
**papers [9]** 35/7 37/7 37/8 65/12 86/13 93/19 94/3 94/6 94/6
**paperweight [1]** 22/2
**paragraph [24]** 10/11 34/12 38/18 38/18 38/18 68/18 68/19 68/22 69/24 70/5 70/8 70/13 71/10 71/16 82/25 83/14 84/17 119/8 121/3 126/7 126/15 126/18 128/11 128/20
**paragraphs [5]** 20/4 62/2 126/6 128/8 128/14
**paraphrased [1]** 70/13
**paraphrasing [2]** 70/3 71/5
**park [4]** 2/4 12/25 121/19 121/23
**part [19]** 8/5 8/10 9/5 9/20 16/7 18/14 72/6 89/3 89/12 91/19 92/14 102/8 107/2 108/13 111/7 119/15 119/19 134/5 134/5
**particular [13]** 4/5 9/10 11/2 28/21 38/2 69/12 86/16 97/1 98/21 121/22 122/5 125/19 126/6
**particularized [1]** 5/21
**particularly [3]** 15/19 29/22 89/1
**parties [2]** 22/6 114/24
**Partners [1]** 127/8
**party [21]** 14/11 14/13 14/18 14/22 15/9 15/15 16/1 17/3 18/16 18/24 38/24 44/18 112/14 112/23 113/1 113/11 113/13 113/24 114/2 114/6 115/4
**password [1]** 96/19
**passwords [1]** 104/5
**past [4]** 4/10 4/24 99/22 114/9
**patch [6]** 20/22 42/7 42/10 42/19 116/18 134/12
**patched [5]** 21/1 109/12 126/10 129/14 129/17
**patches [30]** 11/20 33/22 34/1 66/15 66/16 66/18 66/25 67/3 73/19 77/8 77/8 79/25 80/9 80/18 106/3 106/6 106/13 106/22 107/8 107/10 109/3 110/3 110/4 117/4 117/5 117/6 118/3 118/7 128/12
**patching [2]** 20/2 45/25
**patent [5]** 37/8 63/7 63/23 65/21 93/19
**patents [1]** 86/11
**patents' [1]** 77/15
**patience [1]** 111/11
**pattern [1]** 103/20
**Pause [2]** 42/4 124/11
**pay [4]** 80/22 112/5 129/6 132/22
**paying [1]** 131/5
**payment [1]** 131/5
**PCID [3]** 80/1 80/9 80/10
**peculiar [1]** 123/25
**pejorative [1]** 80/20
**pending [1]** 137/8
**people [45]** 10/16 13/20 13/23 13/23 28/1 31/23 33/25 36/7 42/8 45/15 46/2 46/2 48/21 65/20 66/25 75/7 75/8 75/22 75/25 80/16 80/20 80/21 82/9 94/21 94/23 98/10 98/23 99/4 103/12 103/23 106/2 107/20 111/8 111/9 115/9 116/16 117/6 118/25 119/1 121/15 121/18 129/14 129/15 131/8 137/2
**people's [2]** 97/7 104/4
**per [1]** 16/11
**percent [6]** 6/16 20/1 20/5 22/6 88/14 125/5
**perfect [1]** 91/5
**performance [34]** 5/24 11/3 11/16 11/20 11/23 33/5 33/22 48/6 65/4 66/17 67/1 74/12 80/9 80/14 80/23 84/10 88/14 96/4 106/8 109/15 110/23 117/24 118/1 118/9 118/10 120/2 125/6 125/11 126/15 128/13 129/3 133/13 134/13 134/14
**performance-related [1]** 65/4
**performing [1]** 126/13
**period [4]** 22/10 26/14 26/17 26/25
**periods [1]** 9/3
**permit [2]** 61/10 61/24
**permitted [2]** 52/22 93/14
**permitting [1]** 126/12
**perpetual [1]** 27/23
**person [3]** 22/13 55/15 67/10
**personal [3]** 6/25 85/10 89/9

**perspective [4]** 12/1 71/7 73/25 74/21
**persuade [3]** 99/22 101/9 116/10
**persuasive [1]** 7/19
**pharmaceutical [1]** 89/7
**phone [5]** 22/1 22/3 70/20 114/21 115/1
**phones [4]** 21/25 33/4 114/22 115/8
**photos [2]** 62/14 75/21
**phrase [3]** 37/23 108/9 108/15
**phrases [1]** 35/1
**physical [2]** 10/3 52/23
**physically [1]** 10/2
**pick [3]** 58/20 62/8 105/10
**Picking [2]** 105/14 105/15
**picture [2]** 66/13 89/8
**pinpoint [3]** 122/12 122/16 123/12
**place [5]** 10/13 67/9 88/4 98/20 130/11
**placed [1]** 63/4
**plain [4]** 85/8 121/4 121/12 122/11
**plaintiff [32]** 3/8 11/3 11/14 11/15 24/12 35/3 35/9 35/11 35/17 36/12 36/23 37/24 38/2 38/3 39/13 43/19 43/23 43/25 44/9 44/13 51/17 52/14 53/20 108/12 112/25 118/9 122/2 125/6 127/5 128/16 128/18 134/23
**plaintiff's [2]** 56/25 127/7
**plaintiffs [64]** 2/2 3/10 3/13 5/15 5/20 6/5 6/13 8/4 8/9 9/18 10/10 10/25 11/18 11/22 12/1 12/3 12/19 13/24 15/12 17/2 17/13 20/20 20/23 23/1 25/9 25/19 27/1 27/24 29/1 33/16 33/18 33/21 33/25 34/7 38/17 41/11 43/4 44/13 44/23 46/20 47/24 48/17 49/24 51/21 53/11 53/22 54/2 56/21 68/16 74/23 76/6 78/13 79/4 79/9 101/4 105/19 105/21 106/23 111/2 119/4 119/5 120/8 123/11 135/10
**plaintiffs' [13]** 5/7 12/8 21/21 24/11 25/14 28/9 39/11 58/20 71/7 72/12 74/9 84/7 90/1
**planted [1]** 97/10
**plausibility [2]** 8/21 116/13
**plausible [6]** 10/5 52/16 53/21 89/1 93/16 116/7
**plausibly [1]** 100/20
**play [1]** 9/2
**plays [2]** 18/11 57/18
**plead [6]** 5/21 12/2 12/20 14/10 17/4 44/19
**pleading [2]** 43/22 53/12
**pleadings [2]** 3/25 118/19
**pleads [1]** 5/22
**please [1]** 3/8
**pleasure [1]** 50/22
**pled [14]** 10/1 10/2 10/5 12/18 14/14 45/6 53/15 53/16 56/8 56/9 100/14 112/15 116/7 116/11
**plenty [1]** 90/8
**plus [2]** 20/22 91/20
**point [37]** 8/24 8/25 18/17 22/11 22/11 37/11 47/5 48/15 48/15 49/3 52/8 58/2 58/23 64/4 64/8 64/18 65/15 66/10 71/10 73/11 73/15 78/13 78/14 78/24 79/24 81/9 81/15 89/5 91/3 99/19 106/10 109/22 109/25 110/9 118/13 118/18 126/4
**point-in-time [1]** 109/25
**pointed [1]** 85/5
**pointing [1]** 86/11
**points [4]** 16/25 65/16 68/16 94/13
**policy [5]** 27/8 27/11 29/25 48/21 53/1
**polluted [1]** 107/19
**polluting [1]** 110/20
**pollution [1]** 111/3
**Portland [2]** 1/6 2/23
**pose [1]** 63/7
**posit [2]** 32/12 38/9
**positing [2]** 31/20 31/21
**position [4]** 77/18 77/19 81/20 118/22
**possibility [3]** 95/19 130/6 130/13
**possible [4]** 131/21 134/10 136/12 136/24
**possibly [4]** 20/9 30/3 130/10 137/10
**post [2]** 24/25 55/20
**post-Robinson [1]** 55/20
**post-Rutledge [1]** 24/25
**postdated [1]** 25/18

**posted [1]** 36/6
**potential [5]** 6/8 53/18 65/6 87/10 131/9
**potentially [1]** 55/17
**powerful [1]** 101/25
**PowerPoint [3]** 59/7 60/19 91/12
**practice [8]** 125/20 125/24 125/25 126/1 126/4 126/15 127/20 136/21
**practices [7]** 1/4 3/6 90/3 125/19 126/7 126/19 126/21
**prawns [1]** 37/21
**pre [1]** 97/14
**pre-discovery [1]** 97/14
**precedent [1]** 10/20
**precise [2]** 69/23 82/1
**precisely [3]** 67/8 84/13 113/17
**predated [1]** 13/7
**predecessor [1]** 17/20
**prediction [1]** 46/12
**preempt [1]** 102/9
**Premera [2]** 43/10 91/19
**premise [1]** 60/13
**prepared [2]** 4/24 112/11
**preposition [1]** 113/2
**present [4]** 20/21 26/24 41/15 120/6
**presentation [4]** 42/23 50/16 58/16 135/14
**presented [2]** 35/8 63/5
**presents [1]** 5/16
**presumed [1]** 100/5
**pretty [5]** 90/17 96/3 98/12 101/25 103/3
**prevent [3]** 63/22 117/10 117/11
**previous [1]** 24/17
**previously [1]** 45/12
**price [10]** 12/2 13/9 77/23 78/6 78/10 78/13 78/14 79/1 129/2 129/3
**prides [1]** 85/21
**primarily [1]** 53/5
**principally [2]** 12/9 13/4
**principle [7]** 28/5 38/6 38/12 42/8 115/5 115/6 115/17
**principles [3]** 48/4 114/14 114/17
**priorities [2]** 119/10 119/12
**prioritized [1]** 134/9
**private [2]** 98/14 104/5
**privately [1]** 115/3
**privilege [1]** 93/14
**privileged [4]** 63/20 72/2 72/20 82/24
**privileges [1]** 60/14
**privity [17]** 14/7 14/13 15/23 15/25 16/10 16/14 16/21 16/25 17/9 17/11 17/16 18/11 18/14 18/19 19/6 19/11 114/10
**privy [1]** 45/13
**probably [17]** 5/8 16/13 30/13 30/22 65/3 80/11 92/22 93/1 94/19 94/24 96/15 96/24 108/20 115/17 116/2 132/22 136/25
**probative [3]** 117/7 117/11 117/14
**problem [34]** 6/23 30/18 34/9 45/9 64/9 65/25 66/4 66/18 66/21 69/16 73/9 73/10 73/20 74/21 76/13 82/17 85/23 86/12 86/16 96/3 97/8 99/11 99/15 102/13 106/19 106/20 107/7 107/8 107/9 107/17 110/4 111/21 113/22 133/14
**problematic [1]** 97/12
**problems [2]** 74/22 74/23
**procedure [1]** 44/2
**proceed [5]** 4/6 4/20 4/24 24/10 52/6
**proceeding [2]** 29/3 51/21
**proceedings [5]** 1/15 59/4 105/13 124/11 138/6
**process [2]** 48/24 108/16
**processes [1]** 121/4
**processing [17]** 77/10 85/21 88/10 97/11 107/10 108/6 109/1 109/4 109/23 110/2 130/14 130/15 130/19 131/14 131/15 131/17 131/22
**processor [16]** 11/11 14/1 22/25 30/24 46/10 49/6 50/5 68/10 68/12 69/14 71/25 72/19 82/22 96/7 108/3 109/12
**processors [26]** 18/6 19/24 20/3 20/11 20/13 23/1 23/23 30/6 41/15 49/18 60/25 62/5 63/16 64/12 70/6 70/10 71/22 77/10 82/19 85/22 92/15 99/5 105/17 105/22 109/7 137/5

**product [64]** 3/6 6/12 7/13 7/17 9/5 9/11 9/22 10/7 10/13 11/5 12/14 13/8 14/23 15/4 19/16 21/2 21/22 26/24 27/22 27/24 29/5 29/12 29/15 30/24 31/5 31/5 31/9 31/13 31/18 31/24 32/11 32/15 32/20 32/22 33/6 53/24 77/21 77/22 77/22 78/7 78/15 81/8 84/9 84/10 85/12 88/13 92/6 95/23 97/23 101/24 105/2 108/2 109/21 114/15 115/7 119/10 119/13 125/17 127/21 129/18 129/21 129/22 130/2 134/3
**products [9]** 1/4 12/10 20/25 21/23 33/23 37/3 45/24 112/7 128/18
**professional [1]** 88/23
**Professor [1]** 76/25
**Professor Conte [1]** 76/25
**profits [1]** 126/12
**program [8]** 62/22 70/6 73/6 73/6 84/21 84/21 91/13 122/6
**programmed [1]** 33/3
**programmers [1]** 86/15
**programs [7]** 61/11 61/25 80/17 80/25 82/11 88/12 134/10
**progress [1]** 84/14
**project [12]** 16/7 39/15 39/17 40/8 41/4 46/3 86/9 122/8 122/10 124/1 124/5 132/6
**Project Zero [2]** 40/8 46/3
**promised [3]** 7/2 66/21 103/11
**prong [4]** 28/19 57/24 58/6 90/2
**prongs [1]** 60/10
**proof [12]** 20/18 30/11 41/5 41/10 41/19 76/10 77/12 86/23 86/24 87/1 106/21 132/5
**proper [1]** 49/10
**properly [5]** 12/25 20/13 30/9 33/9 38/25
**property [1]** 52/14
**proposition [1]** 26/15
**proprietary [1]** 123/8
**pros [1]** 35/15
**pros and cons [1]** 35/15
**protect [5]** 42/7 69/5 78/25 103/16 104/4
**protected [7]** 61/11 61/25 62/22 70/7 91/14 102/5 121/5
**Protecting [1]** 119/9
**protection [5]** 6/25 61/1 80/7 83/11 85/10
**protections [2]** 88/7 92/7
**prove [4]** 77/5 77/6 108/12 111/2
**provide [4]** 7/1 115/20 115/21 118/23
**provided [4]** 55/18 83/4 83/4 123/13
**providing [1]** 81/21
**proving [1]** 23/22
**provision [1]** 113/24
**public [20]** 12/5 34/17 35/24 37/15 38/1 38/7 38/17 45/14 47/24 53/1 63/6 66/16 81/22 87/25 88/17 89/4 89/11 102/2 122/7 124/18
**publications [1]** 82/7
**publicly [1]** 40/7
**published [5]** 25/6 25/7 25/9 36/5 37/13
**publishing [2]** 37/7 37/8
**puffed [1]** 92/16
**puffery [2]** 92/12 102/3
**puffing [1]** 102/2
**pull [1]** 71/10
**purchase [4]** 39/2 82/19 120/4 120/5
**purchased [6]** 7/21 36/12 78/15 79/2 79/4 100/10
**purchaser [2]** 56/24 86/4
**purchasers [1]** 103/6
**purchasing [4]** 15/22 19/11 76/1 81/14
**pure [4]** 23/10 27/19 29/3 52/15
**purely [3]** 11/4 75/3 130/1
**purpose [15]** 20/3 32/19 86/20 93/5 98/19 114/15 115/15 115/19 115/20 115/21 118/24 118/24 119/15 125/17 134/4
**purposes [2]** 50/6 86/19
**pursue [1]** 43/13
**pushes [1]** 66/15
**put [18]** 18/3 18/18 30/16 61/6 64/23 68/17 84/8 84/10 94/5 97/10 98/8 98/14 101/3 104/12 114/6 126/12 129/7 134/3
**puts [1]** 48/7
**putting [4]** 80/12 114/22 127/21 130/21

**quasi [1]** 126/24
**quasi-contract [1]** 126/24
**question [23]** 8/12 8/12 14/10 16/13 36/1 47/15 68/14 75/2 79/12 85/1 90/5 92/20 92/23 96/6 100/23 102/10 103/5 109/25 116/15 120/16 125/20 129/25 132/20
**questioning [3]** 4/23 90/22 96/4
**questions [6]** 13/13 28/8 59/8 73/15 135/8 135/15
**quick [4]** 16/25 24/3 45/18 62/9
**quickly [2]** 67/3 73/15
**quite [4]** 13/15 43/18 44/11 121/14
**quoting [1]** 82/24

**R**

**rampant [1]** 98/21
**range [1]** 77/4
**rather [1]** 50/6
**rationale [1]** 56/15
**RDR [2]** 2/22 138/11
**re [13]** 1/3 3/25 11/11 12/12 12/24 14/20 15/2 17/6 18/17 21/23 22/3 74/5 112/19
**re-read [1]** 3/25
**reach [2]** 14/6 49/21
**reaction [1]** 105/16
**read [26]** 3/24 3/25 4/1 5/1 23/15 26/15 26/19 38/3 39/22 49/4 49/6 50/4 53/11 55/12 55/12 56/16 60/18 62/24 63/8 70/4 70/16 83/6 84/18 102/6 119/7 127/23
**readable [1]** 22/5
**reading [5]** 16/17 74/24 84/20 89/9 127/23
**reads [2]** 69/3 71/16
**reaffirmed [2]** 25/2 25/12
**real [17]** 9/4 61/13 61/13 62/2 62/11 62/14 64/7 64/7 65/18 66/1 76/9 99/12 99/14 108/15 123/18 129/6 129/12
**real-world [1]** 129/12
**realistic [1]** 105/18
**really [60]** 4/3 8/23 10/21 17/23 18/10 18/20 22/18 27/6 27/8 30/22 33/19 37/14 40/3 41/3 43/18 46/11 47/25 49/16 49/24 50/21 51/5 51/6 53/15 53/22 56/5 57/16 59/15 61/4 61/8 74/24 75/6 75/25 76/9 77/11 77/20 78/19 79/15 80/22 82/17 83/17 92/16 95/10 96/1 96/5 96/13 97/22 98/13 99/9 99/17 100/17 101/21 102/9 102/15 102/23 107/5 109/24 114/7 130/17 131/16 137/2
**realm [1]** 39/8
**realtime [1]** 22/4
**reason [13]** 16/16 26/18 28/3 57/24 87/9 87/25 106/1 111/7 111/9 117/17 123/12 125/22 129/19
**reasonable [23]** 4/11 7/2 22/13 31/16 31/17 32/23 42/16 45/24 46/13 47/12 48/2 48/6 48/12 90/2 90/4 90/5 112/22 114/18 114/25 116/3 116/14 119/3 128/23
**reasonably [11]** 4/9 35/3 35/8 35/10 35/13 35/16 36/22 37/24 38/1 101/5 122/2
**reasoned [1]** 38/6
**reasoning [2]** 49/7 52/3
**reasons [13]** 13/17 24/22 27/9 27/11 50/1 51/8 54/14 57/14 57/16 65/3 96/14 111/1 129/22
**rebut [1]** 43/14
**Rebuttal [1]** 135/12
**recall [1]** 6/13
**recalls [3]** 12/15 12/21 13/2
**recast [2]** 9/21 32/10
**receive [1]** 126/11
**received [3]** 44/15 127/6 127/12
**receiving [1]** 127/13
**recess [5]** 58/19 59/2 59/3 105/10 105/12
**recognize [2]** 10/24 111/18
**recognized [3]** 18/23 53/3 126/25
**recommend [1]** 131/17
**recommendations [1]** 88/11
**recommended [2]** 67/4 96/9
**record [2]** 3/8 138/6
**recount [1]** 38/18
**recover [1]** 28/13

**redesign [2]** 117/18 132/1
**redesigning [4]** 117/3 118/2 118/21 131/25
**reduce [4]** 33/22 115/19 128/12 130/13
**reduced [1]** 19/25
**refer [2]** 64/4 130/7
**referenced [2]** 62/23 86/14
**references [3]** 60/17 61/21 100/23
**referencing [1]** 76/23
**referred [4]** 62/4 65/12 72/2 72/10
**referring [5]** 14/18 66/4 68/18 110/14 110/24
**refers [1]** 76/6
**refined [1]** 135/4
**reflecting [1]** 74/11
**refund [1]** 132/22
**refutable [1]** 92/13
**regard [4]** 56/19 90/23 112/23 121/22
**regarding [2]** 14/5 101/6
**registration [3]** 38/24 38/25 39/4
**reinforced [1]** 48/14
**relate [6]** 71/11 83/2 87/25 90/20 91/15 108/1
**related [6]** 7/5 16/7 23/7 65/4 73/20 75/2
**relatedly [1]** 4/4
**relates [5]** 1/6 22/24 59/20 74/10 98/1
**relating [3]** 9/17 42/24 53/24
**relationship [18]** 17/21 56/23 57/1 100/14 100/16 100/20 101/12 101/15 101/23 102/11 102/17 103/5 103/8 103/14 103/18 104/9 104/16 104/24
**reliable [1]** 115/21
**reliance [12]** 25/10 43/17 43/20 43/21 44/9 44/16 45/5 48/19 100/3 100/4 100/13 129/20
**relied [3]** 27/11 27/13 101/5
**relief [5]** 81/17 81/21 82/2 83/3 99/7
**reluctance [1]** 23/15
**rely [11]** 12/9 13/4 17/9 33/1 34/16 43/8 50/10 56/22 74/20 75/11 129/21
**relying [5]** 17/3 27/1 29/1 33/16 45/17
**remain [2]** 62/7 72/8
**remains [2]** 99/24 136/19
**remedies [1]** 57/5
**remedy [1]** 127/1
**remember [13]** 10/9 64/20 76/7 80/2 80/3 80/4 84/20 96/11 99/12 102/23 103/2 103/3 106/1
**remind [1]** 69/15
**reminding [1]** 103/19
**remotely [1]** 45/19
**removed [1]** 15/13
**render [3]** 20/2 115/7 125/17
**rendered [2]** 19/24 115/8
**rendering [1]** 71/21
**repeat [3]** 5/1 70/25 109/24
**repeated [1]** 58/4
**repeatedly [1]** 60/20
**repeating [1]** 118/21
**rephrase [1]** 94/22
**replacing [1]** 79/23
**replies [1]** 120/22
**reply [2]** 49/11 58/21
**reported [2]** 12/20 20/14
**REPORTER [2]** 2/22 138/11
**reprehensible [1]** 24/14
**representation [1]** 51/17
**representations [4]** 28/25 48/11 92/8 103/6
**represented [2]** 33/6 60/22
**request [2]** 47/9 49/14
**require [3]** 18/16 90/14 112/3
**required [2]** 34/6 87/4
**requirement [7]** 16/1 16/14 16/21 18/19 45/4 112/14 129/16
**requirements [3]** 19/6 39/4 74/8
**requires [6]** 5/20 43/21 91/25 105/24 112/6 126/1
**requiring [1]** 88/7
**research [1]** 37/5
**researchers [1]** 123/2

**resolve [1]** 136/4
**resolved [3]** 118/19 136/7 136/21
**respect [18]** 12/8 20/17 24/22 27/16 29/4 30/11 35/5 42/10 42/11 45/23 46/19 53/18 78/12 99/2 104/3 119/25 125/4 136/12
**respects [1]** 110/14
**respond [5]** 14/16 43/15 44/2 81/19 102/10
**response [4]** 44/1 58/20 59/6 116/17
**responses [1]** 14/10
**responsible [3]** 42/8 64/24 102/14
**responsibly [1]** 136/2
**restatement [1]** 62/25
**Restaurant [1]** 51/1
**restitution [1]** 126/25
**restrict [1]** 60/15
**restrictions [1]** 60/15
**result [3]** 55/9 126/9 134/9
**resumed [2]** 59/4 105/13
**retailers [1]** 113/16
**retained [2]** 127/6 127/13
**retaining [1]** 127/14
**returning [3]** 65/18 72/4 99/12
**returns [1]** 99/12
**revealed [2]** 73/11 132/6
**reverse [1]** 94/1
**reverse-engineer this [1]** 94/1
**review [1]** 23/11
**revisit [1]** 31/14
**revisiting [1]** 56/17
**rich [1]** 77/9
**Ridgefield [1]** 2/4
**right [62]** 3/24 4/14 5/10 7/19 11/10 13/16 14/7 14/15 15/18 16/14 16/20 27/3 27/5 27/7 31/15 39/23 39/23 39/25 40/19 40/19 41/8 41/9 41/9 42/2 44/16 45/16 45/20 51/12 52/1 52/8 55/19 56/1 61/14 68/4 69/3 69/15 70/1 70/15 81/4 81/24 82/17 86/24 87/17 88/2 89/12 89/20 94/15 99/17 104/2 105/9 106/3 107/4 107/8 116/2 116/12 119/22 120/9 127/4 130/4 135/11 135/20 136/10
**rise [1]** 126/21
**risk [19]** 9/4 63/5 75/3 75/16 75/23 76/7 76/9 76/12 77/4 77/5 77/12 116/21 117/21 117/23 118/11 120/7 121/22 130/20 131/13
**risks [2]** 121/21 126/9
**rival [1]** 128/6
**Rivas [9]** 2/5 3/12 5/4 60/2 60/4 105/11 111/11 112/1 135/9
**RMR [2]** 2/22 138/11
**road [3]** 2/4 75/14 81/5
**Roberts [1]** 22/16
**Robinson [9]** 50/19 51/16 52/5 52/19 53/4 55/13 55/16 55/20 55/22
**Robinson Helicopter [2]** 51/16 53/4
**roll [1]** 117/5
**rolled [2]** 42/7 128/12
**roof [1]** 16/8
**roofing [1]** 16/6
**room [3]** 2/23 98/18 98/19
**rooms [1]** 98/23
**Rosemary [6]** 2/5 3/12 59/11 89/23 102/9 111/16
**routine [1]** 47/20
**routinely [3]** 21/10 47/6 48/3
**rule [12]** 50/18 51/3 51/14 51/19 51/19 51/24 52/4 55/7 55/9 55/23 56/12 136/6
**Rule 56 [1]** 136/6
**ruling [1]** 110/11
**run [3]** 15/16 80/24 88/11
**running [2]** 42/14 76/20
**runs [1]** 115/24
**Rupp [2]** 52/21 55/20
**Rutledge [14]** 24/20 24/25 25/4 25/13 25/17 25/18 26/7 26/10 26/18 27/6 29/8
**Rychlak [1]** 2/10

**S.W [1]** 2/23
**sacrificed [1]** 85/23
**sacrifices [1]** 71/18
**safe [14]** 98/8 98/8 98/9 103/23 104/11 104/11 104/12 104/19 104/19 106/3 115/21 118/23 137/17
**safeguards [1]** 7/2
**safely [1]** 119/1
**safes [1]** 104/20
**safest [2]** 92/7 92/15
**safety [22]** 8/5 8/10 8/15 8/19 9/25 10/14 12/22 19/23 23/11 25/4 25/12 25/21 26/3 27/9 27/12 27/23 33/12 45/20 56/8 90/15 92/7 126/12
**said [70]** 5/2 6/24 7/20 9/1 9/8 9/16 9/20 10/1 13/10 13/17 14/21 15/2 15/24 16/9 17/15 18/13 18/25 19/10 19/18 20/2 20/15 24/7 24/10 25/4 25/20 26/6 28/13 32/9 33/11 33/20 35/23 37/18 38/3 44/23 48/6 48/21 51/24 56/7 56/20 68/22 69/18 70/23 71/6 73/5 75/18 76/7 76/24 78/11 84/3 84/20 85/6 88/1 88/15 92/10 93/18 94/7 96/10 103/15 104/19 110/8 110/9 110/10 112/7 112/21 115/1 115/18 116/25 120/3 125/16 133/16
**sale [6]** 6/1 17/21 34/5 81/9 109/21 109/22
**sales [3]** 1/4 3/6 99/6
**salient [1]** 52/5
**same [22]** 7/16 8/2 8/14 11/9 16/22 19/22 20/4 32/16 37/6 39/12 41/14 53/15 68/3 79/13 80/18 90/11 96/15 103/25 110/9 120/16 128/21 137/7
**Samsung [2]** 32/25 33/3
**San [1]** 2/7
**satisfied [1]** 56/9
**satisfies [2]** 74/7 109/10
**satisfy [2]** 36/24 121/25
**saw [1]** 105/20
**say [88]** 5/5 7/4 7/12 7/14 10/10 10/12 11/1 11/11 11/22 14/2 15/12 16/4 17/10 17/11 18/15 18/20 20/16 20/22 24/12 27/8 29/17 29/21 31/6 34/5 34/7 34/12 37/2 38/15 41/11 43/4 43/7 43/9 43/12 44/14 45/11 46/4 51/7 54/24 60/22 63/12 70/4 72/15 73/8 76/18 78/6 84/4 84/12 84/24 86/5 87/13 87/20 92/14 92/22 94/18 95/7 96/16 97/20 100/15 101/4 101/19 102/2 102/9 106/1 107/4 107/7 108/15 109/17 110/15 112/10 114/5 114/5 116/5 117/2 117/24 118/20 120/15 121/17 122/13 125/3 127/23 129/5 129/15 130/18 130/25 131/10 135/16 136/3 137/2
**saying [30]** 10/25 13/20 13/25 17/2 30/6 39/24 40/20 42/14 65/4 72/15 75/17 78/9 79/14 83/17 85/11 86/7 89/13 91/4 98/2 102/4 102/16 109/8 116/24 121/7 123/6 123/7 123/9 124/19 133/9 133/12
**says [17]** 5/9 9/2 19/1 35/19 40/14 51/16 53/5 57/10 58/2 66/3 75/14 89/24 100/14 119/9 130/8 130/15 131/15
**scheduled [1]** 4/13
**science [1]** 76/23
**scientists [3]** 35/7 35/14 37/7
**scope [1]** 135/17
**Scottrade [3]** 6/22 7/1 7/8
**screen [5]** 29/7 29/10 48/12 100/21 100/22
**scroll [1]** 108/20
**se [1]** 16/11
**Seagate [3]** 14/20 15/2 15/4
**searched [2]** 14/24 38/15
**second [12]** 7/11 13/9 24/25 24/25 36/24 55/14 70/8 71/12 71/17 72/6 93/8 115/6
**secret [2]** 62/14 134/10
**secrets [17]** 61/11 61/13 61/25 62/20 62/22 63/4 64/7 65/8 65/9 67/18 72/4 73/10 75/20 83/7 86/1 102/4 103/24
**secure [13]** 22/25 32/23 60/22 92/6 101/3 101/24 103/22 104/8 107/3 119/6 119/16 126/16 128/17
**secured [1]** 110/2
**securely [2]** 84/24 119/2
**security [58]** 10/14 19/20 28/7 31/24 32/2 32/20 33/9 42/11 42/13 46/1 46/8 47/13 47/19 60/14 60/20 63/5 63/7 71/20 71/22 74/12 78/25 84/11 85/23 91/5 93/15 95/18 96/19 96/25 98/12 98/13 99/2 101/6 108/4 108/23 108/25 109/1 109/23 110/3 117/9 119/10 119/11 119/11 119/13 119/14 119/19 120/7 120/7 126/9 128/5 128/10 129/2 129/2 129/6 130/19 131/7 131/17 131/21

**security... [2]** 133/13 134/9
**see [22]** 20/9 29/16 43/3 43/7 54/7 63/9 63/22 70/5 78/2 82/8 91/24 95/10 98/2 99/9 109/10 109/16 116/20 127/8 129/5 129/8 136/18 136/24
**Seeger [14]** 2/2 2/3 3/9 3/11 5/4 59/17 111/25 112/6 114/13 118/15 119/23 122/4 122/24 128/22
**Seeger's [1]** 116/17
**seeing [1]** 96/11
**seek [2]** 9/23 81/17
**seem [5]** 50/23 51/1 77/23 80/8 89/1
**seemed [1]** 77/20
**seems [6]** 8/19 23/15 55/21 90/14 105/18 129/1
**seen [11]** 18/12 18/12 19/13 35/6 38/12 45/6 62/18 85/14 86/2 99/14 136/20
**select [1]** 18/2
**self [2]** 52/11 53/19
**self-cleaning [2]** 52/11 53/19
**sell [1]** 113/16
**seller [3]** 17/14 17/15 101/17
**sellers [1]** 103/6
**selling [7]** 15/7 15/13 15/13 15/14 18/6 113/16 113/18
**sells [2]** 15/8 81/8
**seminal [2]** 8/3 27/10
**send [2]** 76/20 91/21 111/18 115/4
**sends [1]** 62/11
**sense [7]** 20/24 22/15 38/1 46/5 47/25 75/5 98/18
**sensitive [3]** 72/2 72/20 82/23
**sensor [1]** 9/20
**sentence [2]** 71/17 113/2
**separate [4]** 54/11 97/3 128/1 133/18
**serious [2]** 19/20 31/2
**seriously [1]** 20/10
**serve [1]** 134/1
**servers [1]** 118/4
**session [1]** 136/4
**set [6]** 3/4 15/25 21/5 30/1 33/11 40/2
**setting [1]** 28/12
**settle [3]** 136/16 136/17 137/10
**settled [3]** 107/24 111/2 136/18
**settlement [5]** 110/24 111/5 136/7 136/12 137/10
**settling [1]** 136/25
**several [2]** 5/2 49/5
**severe [2]** 22/12 63/7
**severity [2]** 47/11 47/23
**sharp [1]** 21/19
**she [13]** 16/16 16/20 22/22 43/23 51/24 60/5 120/1 120/2 125/4 125/5 125/6 125/15 125/16
**ship [1]** 66/21
**shoes [1]** 16/6
**short [1]** 32/25
**should [42]** 9/4 10/13 11/5 11/9 26/6 34/6 40/11 49/11 54/14 64/1 64/14 65/5 67/6 67/8 67/14 67/15 68/11 72/15 72/21 83/4 83/12 83/18 83/21 84/6 84/8 84/12 84/13 84/15 85/3 85/17 85/24 87/5 87/9 87/11 123/6 123/8 123/9 132/3 134/18 134/24 134/24 135/5
**shouldn't [1]** 118/19
**show [12]** 21/4 43/23 44/5 88/3 95/22 96/6 100/20 121/24 127/6 129/20 131/9 135/1
**showed [1]** 41/20
**showing [3]** 41/19 100/22 127/10
**shown [2]** 41/5 62/1
**shows [2]** 68/11 87/17
**shut [2]** 21/16 72/14
**shutting [1]** 9/17
**SI [2]** 1/3 3/5
**side [19]** 5/7 33/5 40/24 40/24 47/1 62/8 64/20 64/21 64/22 65/6 67/21 67/25 68/1 116/22 123/19 123/23 124/17 126/17 131/21
**side-channel [11]** 40/24 40/24 62/8 64/20 65/6 67/21 67/25 68/1 123/19 124/17 126/17
**sides [6]** 4/1 110/7 110/8 110/10 136/19 137/3
**sides' [1]** 94/19

**signature [3]** 138/8 138/8 138/8
**signed [3]** 48/23 121/20 138/8
**significant [1]** 118/8
**signing [2]** 103/12 138/5
**silly [5]** 74/25 75/4 75/5 75/5 75/6
**similar [4]** 5/17 57/24 96/4 103/21
**SIMON [1]** 1/16
**simple [2]** 31/23 50/3
**simplify [1]** 59/6
**simply [5]** 18/13 18/18 57/25 84/8 88/20
**since [16]** 10/11 11/4 13/19 17/25 20/8 20/11 30/6 30/6 31/1 42/25 47/9 50/4 58/15 66/11 66/13 76/10
**single [1]** 5/22
**sitting [1]** 96/19
**situation [9]** 9/1 17/18 19/3 22/23 84/16 89/12 99/17 101/16 103/21
**six [1]** 24/23
**Sixth [1]** 2/4
**skeptical [1]** 110/10
**skepticism [2]** 116/4 116/6
**skip [2]** 73/22 91/9
**slam [1]** 16/20
**slam-dunk [1]** 16/20
**sleep [5]** 22/14 22/15 98/20 115/13 116/1
**sleeping [1]** 116/1
**slide [5]** 61/5 61/24 62/9 66/19 81/15
**slides [2]** 67/2 112/11
**slightest [1]** 95/4
**slightly [1]** 82/4
**Sloan [1]** 25/15
**slow [2]** 59/17 59/23
**slowdown [2]** 20/2 126/10
**slowdowns [1]** 109/14
**slowed [1]** 106/22
**slower [2]** 108/16 108/16
**slowly [1]** 5/11
**smart [1]** 137/3
**smelled [1]** 97/24
**smells [1]** 22/9
**smelly [1]** 116/21
**smoking [1]** 118/12
**snow [1]** 137/13
**so [164]**
**Social [1]** 96/19
**software [7]** 22/3 32/19 48/7 61/4 82/9 82/11 114/22
**sold [6]** 15/6 26/24 48/23 81/11 107/20 126/8
**solely [2]** 35/24 133/23
**some [48]** 12/11 14/16 17/25 22/22 30/15 33/24 36/5 39/7 42/14 44/6 45/9 50/1 50/23 52/15 57/20 58/23 60/18 60/18 73/23 74/4 74/16 74/19 75/8 75/10 76/2 76/17 78/14 80/13 85/7 85/23 85/25 87/16 90/14 93/1 95/25 103/13 105/18 108/20 112/11 114/13 127/11 128/3 129/15 131/8 136/9 136/18 137/4 137/12
**somebody [12]** 45/5 70/21 85/15 88/1 94/7 96/20 98/15 104/13 127/20 130/8 130/15 131/15
**someday [2]** 40/14 42/17
**somehow [4]** 21/2 35/22 43/9 69/12
**someone [12]** 30/20 42/17 45/6 77/22 91/21 92/18 101/15 113/12 121/19 129/5 129/24 131/1
**something [30]** 27/24 28/10 31/10 40/6 44/8 58/3 58/4 63/9 63/11 77/20 78/17 80/6 84/3 84/18 84/24 86/3 88/15 90/19 91/21 95/4 97/25 108/23 110/25 121/13 122/6 122/7 127/14 127/19 127/21 134/15
**something-ID [1]** 80/6
**Sometimes [2]** 57/5 110/8
**somewhat [1]** 26/7
**somewhere [2]** 80/5 92/1
**Sony [1]** 112/19
**soon [1]** 7/24
**sophisticated [1]** 37/4
**sophistication [1]** 130/9
**sorry [3]** 68/23 111/13 111/16
**sort [10]** 12/16 39/14 39/17 44/9 50/4 50/17 60/16 105/16

**sort... [2]** 130/21 130/22
**sorts [1]** 118/4
**sound [1]** 85/20
**sounded [2]** 54/4 74/17
**sounds [7]** 54/3 54/7 54/19 59/1 97/25 97/25 98/1
**source [2]** 34/18 47/24
**sources [1]** 47/21
**Southern [2]** 36/3 51/1
**speak [6]** 5/11 58/8 74/19 125/23 127/24 137/14
**speakers [1]** 102/13
**special [2]** 56/20 57/3
**specialists [2]** 36/22 83/25
**specialized [1]** 95/1
**species [2]** 56/20 57/3
**specific [10]** 5/24 12/13 17/18 18/17 44/12 70/18 85/3 121/17 122/7 124/21
**specifically [12]** 11/16 16/2 17/2 20/1 67/5 67/13 67/15 69/19 69/20 69/22 71/19 120/11
**specificity [1]** 39/19
**Spectre [19]** 19/22 33/21 34/3 34/7 34/12 41/12 47/10 49/19 49/19 50/1 61/16 66/4 66/6 66/11 66/12 72/11 82/7 120/23 124/13
**Spectre/Meltdown [2]** 34/12 47/10
**speculation [5]** 40/24 70/11 91/15 94/4 99/13
**speculation-based [1]** 40/24
**speculative [20]** 6/11 13/10 13/18 20/19 46/12 62/6 62/15 64/6 67/17 71/23 72/16 75/3 75/23 76/7 76/11 77/4 77/5 82/20 117/21 118/11
**speculatively [2]** 62/5 70/10
**speed [23]** 28/7 32/2 33/9 46/8 77/9 77/11 85/21 107/10 107/19 108/6 109/5 109/23 110/2 130/14 130/15 130/19 131/14 131/16 131/17 131/22 132/1 132/2 134/9
**spent [1]** 66/10
**spinning [1]** 111/17
**spoken [1]** 74/4
**Spokeo [1]** 10/20
**stab [1]** 73/4
**stage [5]** 48/4 87/2 87/20 136/6 136/6
**stake [1]** 68/3
**stand [2]** 10/4 60/25
**standard [22]** 19/15 20/9 21/6 23/8 25/2 25/5 26/2 26/13 27/9 27/12 29/5 33/12 33/13 34/11 34/20 34/20 34/24 39/6 40/12 43/22 90/3 90/14
**Standards [1]** 25/12
**standing [38]** 5/19 5/20 5/25 6/23 7/7 7/25 8/2 8/4 8/12 8/16 8/22 9/9 9/13 9/16 9/24 10/2 10/5 11/9 12/1 12/9 12/17 13/3 13/14 23/4 26/15 59/19 60/3 73/22 74/3 74/20 77/18 81/7 81/16 82/2 86/19 111/22 136/9 136/11
**stands [1]** 80/7
**start [6]** 4/20 5/19 51/13 59/9 60/13 89/16
**started [1]** 66/11
**starting [1]** 12/6
**starts [2]** 76/20 102/11
**state [15]** 11/18 19/1 24/8 24/12 45/22 55/16 58/8 60/6 60/7 109/7 114/10 128/1 134/18 134/20 134/22
**state-of-the-art/top-of-the-line [1]** 109/7
**stated [2]** 43/22 51/15 90/17
**statement [4]** 60/17 91/4 101/25 102/3
**statements [3]** 92/13 119/7 119/17
**states [5]** 1/1 1/17 2/22 25/22 52/22
**status [1]** 78/7
**statutes [2]** 90/11 90/12
**stay [1]** 136/13
**staying [2]** 98/6 111/15
**stays [1]** 99/14
**stealing [1]** 98/24
**steel [4]** 28/15 28/15 28/21 32/7
**steering [1]** 50/2
**step [3]** 15/14 15/19 132/19
**stepped [1]** 16/6
**steps [3]** 15/13 45/8 126/16

**still [36]** 4/14 13/20 14/2 14/2 22/14 22/17 23/12 23/17 23/18 24/1 25/5 26/3 30/2 46/22 55/5 64/6 64/7 79/10 80/9 98/5 102/18 104/4 104/15 104/23 105/17 108/17 108/18 109/11 109/12 109/19 110/10 110/19 110/20 115/13 122/21 129/14
**stock [3]** 38/23 38/24 39/3
**stood [1]** 49/24
**stop [5]** 21/12 29/18 112/4 112/4 129/17
**stopping [2]** 106/22 106/24
**store [1]** 118/25
**stored [1]** 128/17
**storm [1]** 137/13
**straight [1]** 58/21
**strain [1]** 48/8
**Stratos [1]** 127/8
**stream [1]** 80/25
**Street [2]** 2/6 2/11
**stretches [1]** 77/13
**strict [1]** 27/25
**strikes [1]** 23/24
**structure [1]** 136/24
**struggling [5]** 87/12 110/7 110/11 110/17 129/13
**studies [1]** 36/5
**study [1]** 65/20
**stuff [6]** 13/3 35/22 65/20 98/11 98/24 104/6
**sub [1]** 25/10
**sub-elements [1]** 25/10
**Subaru [3]** 17/12 17/13 17/14
**subclass [1]** 83/25
**subcontractor [2]** 16/6 16/9 16/12
**subject [6]** 49/19 49/19 49/25 51/23 54/21 63/14
**subjects [1]** 9/3
**submit [7]** 10/22 11/17 20/24 34/23 45/23 56/13 127/25
**substance [2]** 5/6 44/2
**substantial [2]** 63/5 88/13
**succeed [1]** 126/22
**succeeded [1]** 17/19
**success [2]** 124/2 124/8
**successful [2]** 67/25 124/24
**successor [1]** 17/18
**such [10]** 7/15 16/4 16/11 16/19 22/12 31/24 63/22 91/5 103/16 111/7
**Sud [1]** 37/19
**sudden [1]** 42/13
**sue [1]** 104/21
**sued [1]** 132/22
**suffer [1]** 74/9
**suffered [6]** 7/2 8/9 10/14 10/18 75/9 81/14
**sufficient [10]** 7/25 8/22 36/8 36/14 36/15 37/18 50/9 74/2 88/24 101/11
**suggest [1]** 77/15
**suggests [1]** 78/7
**suing [2]** 10/16 42/14
**suit [1]** 13/24
**Suite [1]** 2/6
**summarize [1]** 81/8
**summary [4]** 74/17 99/22 116/9 136/11
**sunlight [1]** 21/15
**superior [2]** 34/19 39/7
**supplied [1]** 15/5
**supply [2]** 24/14 37/17
**support [6]** 6/11 74/15 114/8 115/25 128/4 130/24
**supported [1]** 46/15
**supports [1]** 65/24
**suppose [1]** 136/8
**supposed [7]** 22/25 49/9 49/12 61/5 76/23 107/21 107/21
**Supreme [10]** 10/19 15/1 25/22 26/1 26/2 34/22 39/2 51/15 52/20 56/16
**Supreme Court [1]** 10/19
**sure [14]** 4/16 13/6 18/6 32/12 37/22 41/3 50/20 59/15 63/17 88/11 110/6 123/16 124/13 132/8
**surprise [1]** 105/18
**surprised [2]** 95/7 95/25

surrebuttal [2] 135/16 135/18
survey [1] 119/2
Susanna [2] 2/10 3/21
susceptible [1] 83/8
swooped [1] 42/6
Symantec [2] 32/17 32/19
system [9] 6/6 28/14 28/22 28/25 32/7 61/1 76/19 76/21 97/11
systems [2] 11/24 117/20

**T**
T's [1] 102/15
take [46] 4/4 4/10 4/17 5/10 8/25 10/7 24/3 28/1 41/24 47/16 47/18 48/1 49/8 49/11 50/8 50/13 58/19 58/21 58/24 59/2 59/7 59/10 59/22 64/23 69/5 71/1 71/15 73/3 76/3 77/4 83/8 89/8 89/10 98/11 100/25 105/9 117/17 123/24 126/16 128/13 128/17 130/5 130/9 135/20 136/15 136/23
taken [3] 45/7 89/23 135/25
takes [2] 25/24 135/17
taking [3] 25/14 83/11 110/5
talented [1] 137/3
talk [14] 7/23 9/10 33/17 33/25 34/10 35/25 43/17 50/18 61/20 68/15 82/5 82/16 85/15 131/9
talked [8] 40/4 54/14 57/14 75/3 97/24 106/5 116/16 136/3
talking [33] 12/13 19/7 22/19 24/21 29/13 32/19 33/7 33/7 33/18 35/16 36/9 36/13 37/8 39/13 39/18 40/2 40/20 42/22 46/7 47/2 52/2 60/4 61/4 61/6 66/11 66/12 74/11 75/19 79/16 81/22 86/12 86/13 114/13
talks [3] 25/9 29/11 71/17
tangible [1] 10/15
teaching [2] 8/23 53/16
team [1] 132/6
tech [3] 14/20 45/24 61/6
technical [4] 40/17 94/21 94/23 121/2
Technically [1] 121/2
technological [2] 36/20 42/12
technologies [1] 119/14
technology [9] 30/20 37/4 38/10 42/18 83/25 95/1 130/10 131/10 136/4
television [1] 17/24
tell [21] 4/7 23/17 39/12 40/15 43/5 65/15 66/15 71/7 82/13 89/17 89/18 91/7 94/16 97/18 100/19 101/10 102/22 110/5 131/19 132/21 132/23
telling [13] 4/7 69/9 72/22 73/18 77/7 96/24 99/20 99/24 103/21 105/16 116/7 117/6 132/15
ten [2] 105/8 105/9
ten-minute [1] 105/9
terminology [1] 88/19
terms [7] 4/8 9/11 11/3 51/5 51/10 94/1 97/18
test [9] 24/11 30/3 36/13 36/20 105/19 111/23 125/23 125/23 126/1
testing [2] 36/6 36/8
tests [3] 26/7 37/12 74/11
texting [1] 115/2
texts [1] 114/23
Thai [1] 37/20
than [35] 5/17 11/25 15/3 23/25 37/12 42/9 54/1 59/23 70/19 70/23 73/8 79/25 81/7 81/13 82/14 85/22 85/25 94/8 94/20 94/20 94/23 94/24 94/25 108/16 108/16 108/22 113/15 113/21 117/12 118/10 125/25 131/3 131/5 133/21 137/6
than my [1] 82/14
thank [7] 5/14 60/11 103/19 111/10 111/11 111/25 135/9
that [1150]
that is [1] 36/16
that's [187]
theft [1] 98/21
their [85] 5/15 5/23 5/24 6/6 6/14 7/22 8/6 9/18 10/11 10/17 10/25 11/1 11/4 11/19 11/20 17/2 17/9 20/3 21/24 25/20 32/16 32/17 33/20 38/18 39/1 41/14 47/8 48/24 49/17 50/19 54/3 54/4 55/5 64/15 65/3 65/21 66/15 74/21 75/8 75/10 77/7 77/9 77/11 79/11 79/23 80/17 81/18 81/22 86/11 88/10 88/12 89/3 89/4 89/10 92/6 92/15 93/23 98/14 99/6 101/2 103/24 104/5 105/22

their most [1] 98/14
them [46] 7/7 16/2 18/24 20/22 22/18 22/18 39/12 42/7 48/2 50/21 64/25 65/2 65/5 71/21 74/10 75/15 77/9 78/12 80/17 82/8 89/4 90/9 93/12 98/24 100/7 102/24 103/24 104/21 104/24 110/22 112/12 113/18 113/18 113/19 113/20 115/9 124/12 124/24 127/21 128/19 129/14 129/15 131/19 131/23 132/21 132/23
themselves [6] 5/21 8/9 68/1 75/10 86/5 133/11
then [80] 4/16 7/4 15/6 15/8 18/19 18/20 25/11 25/14 30/20 31/25 37/19 38/7 38/13 40/3 40/11 40/15 41/2 42/13 42/18 43/1 43/7 43/14 43/16 45/12 46/3 46/14 46/19 48/24 51/9 54/7 55/9 56/3 57/12 57/22 58/19 58/21 59/19 60/2 60/10 61/7 62/19 70/25 71/5 71/12 72/14 73/3 76/20 77/23 79/1 79/3 82/18 83/20 84/12 84/14 84/15 89/22 90/13 90/21 91/7 92/11 93/3 97/19 100/11 102/2 102/16 105/10 109/3 120/15 122/8 125/7 125/16 129/1 129/2 130/11 131/13 132/3 132/19 135/16 137/11
theoretical [21] 46/8 75/16 84/11 86/22 87/3 87/15 95/10 95/19 116/21 116/24 117/1 117/3 117/8 117/8 117/13 117/18 118/11 130/6 130/9 130/19 131/21
theoretically [2] 44/5 136/8
theory [20] 7/16 9/6 29/3 42/24 51/22 52/6 53/12 53/24 54/20 55/6 56/2 57/5 72/13 78/16 84/7 90/13 102/7 113/23 130/24 133/17
there [232]
there's [19] 11/11 16/18 18/15 23/9 26/22 28/4 30/7 32/13 33/17 37/19 39/19 40/3 52/12 91/22 102/3 108/24 110/21 123/1 129/2
therefore [5] 8/16 17/20 25/12 36/24 113/11
these [55] 9/12 12/19 17/25 21/1 34/1 41/6 45/21 47/5 47/13 48/2 48/4 53/19 60/16 60/22 61/9 62/2 62/17 62/17 63/1 63/6 64/25 72/14 73/19 74/14 74/18 75/14 76/18 78/10 79/5 79/5 80/18 82/19 87/14 87/14 87/23 88/3 90/11 96/20 97/16 99/23 106/2 108/4 109/13 109/14 109/14 112/7 117/4 117/5 117/6 118/2 118/3 118/22 119/7 124/8 129/24
they [362]
they're [26] 10/25 17/4 21/7 21/16 28/7 29/2 29/13 37/5 39/23 40/2 45/17 45/22 54/25 79/22 96/24 103/24 104/21 106/24 107/16 108/24 109/11 117/3 117/6 118/1 129/3 130/5
they've [8] 7/21 40/17 49/24 72/17 109/4 117/5 117/8 130/23
thing [11] 41/3 43/18 64/19 77/8 77/25 79/24 80/16 83/16 91/5 124/6 128/22
things [22] 26/5 26/11 26/12 41/6 50/3 50/8 64/23 67/18 78/8 81/1 85/24 93/18 98/5 101/9 106/22 112/13 115/2 118/7 119/25 130/16 131/11 134/8
think [227]
thinking [3] 17/24 85/9 137/9
thinks [3] 108/3 109/2 113/8
third [26] 2/23 14/11 14/13 14/18 14/22 15/9 15/15 16/1 17/3 18/16 18/24 22/6 38/24 111/22 112/14 112/23 113/1 113/11 113/13 113/24 114/2 114/23 115/4 115/17 121/25 122/22
third-party [19] 14/11 14/13 14/18 14/22 15/9 15/15 16/1 17/3 18/16 18/24 38/24 112/14 112/23 113/1 113/11 113/13 113/24 114/2 115/4
this [228]
Thomas [2] 2/9 3/19
Thomas Chapman [1] 3/19
thorough [1] 15/3
those [59] 10/4 14/17 21/20 21/25 29/8 44/17 45/12 47/17 49/6 50/20 54/15 54/16 56/11 57/15 57/19 60/12 60/18 61/21 63/24 64/23 66/16 67/18 68/6 68/15 68/16 70/11 77/8 80/8 81/4 82/8 87/18 90/12 91/25 92/8 94/6 96/11 97/12 102/16 102/24 106/7 106/14 107/9 107/20 110/4 111/8 111/8 113/10 118/10 119/17 123/4 123/23 126/19 128/14 129/9 129/20 136/8 136/13 136/14 136/22
though [13] 9/17 18/5 29/19 32/6 35/23 43/20 49/4 75/6 75/15 77/3 106/11 118/3 136/3
thought [25] 15/5 45/2 45/3 54/2 54/4 54/19 59/8 59/23 77/11 77/15 78/16 84/14 84/18 103/13 108/6 109/5 110/13 119/25 120/2 124/3 124/5 134/15 136/23 137/4 137/12
thoughts [1] 4/5

**T**

threat [1] 63/7
three [4] 26/11 55/24 96/24 134/14
threshold [3] 23/8 45/22 94/13
threw [1] 55/2
through [25] 18/19 21/20 44/14 50/15 56/11 58/22 67/2 68/20
71/10 73/15 75/13 94/12 94/18 96/20 98/16 108/20 112/12
114/13 116/22 118/14 119/8 119/24 126/2 127/20 136/11
throw [1] 112/3
thrown [1] 8/13
thus [3] 51/11 93/15 103/16
Tidenberg [1] 56/20
ties [1] 47/12
Till [2] 48/20 48/23
time [51] 3/4 4/8 6/1 9/3 20/13 20/14 20/21 22/7 22/10 24/25
28/6 31/13 31/22 34/5 41/14 42/12 64/8 64/18 65/16 65/17
66/11 68/13 68/14 71/15 71/24 72/18 73/11 80/18 80/25 81/11
82/5 82/19 82/21 89/22 89/23 97/12 99/16 105/7 109/21 109/21
109/25 117/12 120/4 120/5 120/6 121/14 122/13 124/16 137/7
137/14 137/15
times [8] 5/2 23/15 49/5 57/6 110/9 116/25 118/17 134/14
timing [1] 4/8 47/1 58/12 58/20 124/14
timing/side-channel [1] 47/1
to tell [1] 43/5
today [5] 46/25 57/14 66/2 76/23 108/21
together [2] 5/8 64/24
told [12] 49/25 82/19 83/13 83/15 83/18 83/20 83/21 84/15
106/3 106/12 107/10 109/6
too [6] 53/21 60/12 75/10 79/7 79/8 96/23
took [2] 43/18 89/4
top [4] 32/22 109/7 110/23 119/10
tort [2] 53/14 57/20
Toshiba [2] 36/10 36/12
total [2] 21/24 47/22
totally [5] 82/5 82/8 89/5 104/15 130/13
touted [2] 64/10 64/12
Toyota [3] 12/12 12/21 75/12
track [2] 59/8 59/10
Trackpad [1] 112/20
trade [1] 82/6
tradeoff [1] 129/2
trafficking [3] 24/13 37/17 37/20
transaction [2] 39/4 137/7
transactions [1] 56/21
transcript [3] 1/15 138/6 138/7
transient [8] 61/13 62/1 62/12 65/19 66/1 72/4 99/13 123/19
transition [1] 62/19
transmitted [2] 22/4 114/23
transportation [3] 12/22 115/20 115/22
travel [1] 43/1
travels [1] 137/17
treat [1] 11/8
trial [3] 116/10 136/5 136/12
tries [1] 101/9
trigger [1] 95/25
triggering [1] 34/15
trouble [1] 128/22
true [6] 12/23 49/22 78/18 92/16 98/4 99/9
trumpeting [1] 40/22
trust [1] 57/1
trusted [1] 104/4
trusting [1] 103/23
truth [2] 92/11 92/17
truthful [1] 43/9
try [4] 10/8 73/3 93/25 136/24
trying [18] 32/12 37/22 43/1 43/8 47/6 59/5 84/6 85/20 95/25
97/7 102/10 102/21 117/11 129/11 133/1 133/6 133/19 133/20
tubular [3] 28/15 28/15 32/6
Tuesday [1] 42/10
tune [2] 12/22 18/1
turn [9] 26/4 26/21 33/15 44/24 48/8 74/25 104/13 125/18 136/2
turned [1] 131/2

turns [1] 94/19
tutorial [1] 94/19
twice [1] 25/2
two [21] 3/24 13/23 15/12 15/14 20/23 24/20 24/21 25/1 25/10
25/14 33/16 46/23 49/15 64/23 73/12 90/22 91/25 96/24 107/2
120/6 129/22
two-part [1] 107/2
Tyco [2] 17/18 17/19
type [6] 28/21 30/10 54/20 74/17 101/23 136/9
types [1] 124/18
typical [5] 35/11 37/11 38/11 94/25 95/1

**U**

U.S [1] 26/2
ubiquitous [1] 47/14
UCL [8] 28/19 57/24 59/20 60/9 90/2 90/7 125/16 125/19
UCLR [1] 59/20
ultimate [1] 101/24
ultimately [3] 62/12 62/13 110/21
unabashedly [1] 23/16
unattended [1] 13/1
unauthorized [23] 60/16 61/10 61/24 62/21 63/4 69/6 70/7
71/25 72/1 72/9 72/18 72/19 73/5 74/13 82/22 82/23 84/21
91/13 93/14 122/5 128/7 131/10 134/10
uncertainty [1] 111/4
under [27] 6/20 8/7 9/6 26/9 28/13 41/5 42/8 43/1 43/21 51/21
52/6 54/21 57/25 72/13 84/7 87/17 90/1 90/10 90/12 113/22
116/13 126/25 127/2 133/24 135/20 135/25 137/17
underlying [2] 17/8 57/20
undermined [1] 71/22
understand [39] 8/18 8/22 39/11 39/12 44/11 49/3 54/5 64/14
73/25 79/19 81/6 82/8 83/5 83/7 83/22 83/24 84/6 85/12 85/24
87/13 88/20 91/18 92/10 94/19 94/23 94/24 94/25 95/3 95/10
97/15 100/2 101/18 109/10 110/24 116/17 116/19 118/6 119/22
133/19
understanding [10] 37/23 39/8 51/14 79/9 79/20 82/12 88/25
91/24 116/14 122/10
understands [3] 82/17 83/6 99/10
understood [7] 37/25 64/5 64/17 64/19 84/16 84/17 123/17
undo [6] 62/5 66/5 70/9 74/13 91/14 94/4
undone [1] 94/4
unencrypted [1] 22/6
unfair [15] 16/13 28/19 57/24 58/2 125/19 125/20 125/22 126/4
126/7 126/19 126/21 127/19 132/7 132/10 132/10
unfit [3] 20/3 21/16 125/17
unfixed [1] 108/24
unintended [2] 12/12 12/13
unit [1] 75/13
UNITED [3] 1/1 1/17 2/22
units [1] 75/15
unjust [33] 7/6 7/22 54/4 54/9 54/12 57/4 57/5 57/11 57/12
57/13 57/16 57/21 60/5 60/10 126/23 126/24 127/4 127/22
127/24 128/2 130/23 130/24 130/25 131/20 132/17 133/2 133/7
133/14 133/17 133/23 134/2 134/2 134/20
unjustly [3] 127/6 127/13 127/14
unknown [1] 70/12
unlawful [2] 58/6 60/10
unless [9] 13/13 23/10 24/18 38/5 43/5 73/14 125/21 135/7
135/14
unlike [1] 134/9
unlikely [4] 28/16 130/12 131/11 131/12
unmerchantable [2] 6/19 49/18
unmitigated [1] 108/24
unnecessary [3] 72/1 72/19 82/22
unpack [1] 35/4
unpublished [1] 25/6
unreasonable [1] 23/11
unrepaired [1] 108/24
unsafe [3] 30/23 115/24 116/20
until [8] 25/21 31/3 34/7 41/4 41/18 41/21 66/18 86/23
up [41] 10/20 20/4 20/20 21/10 22/19 47/2 48/23 48/25 58/20
59/12 60/17 62/8 66/19 70/16 71/6 71/10 75/10 76/18 76/19
80/17 82/6 84/15 88/14 89/23 91/12 91/23 92/1 95/14 98/17

**U**

**up... [12]** 99/6 103/11 103/12 104/14 105/10 105/14 105/15 107/19 125/2 129/11 130/11 131/12
**updates [2]** 42/20 106/14
**uploading [1]** 103/24
**upon [7]** 7/20 35/7 35/9 65/11 75/11 101/5 109/13
**upset [1]** 109/16
**urge [1]** 5/11
**us [11]** 4/2 9/4 25/8 43/18 47/10 47/22 77/4 92/25 102/5 103/11 131/16
**US-CERT [2]** 47/10 47/22
**use [27]** 5/24 19/17 20/12 20/21 21/3 21/16 22/13 23/1 29/6 29/13 29/19 30/7 30/23 30/24 76/24 98/24 106/24 109/12 113/18 113/20 114/16 115/9 118/4 118/25 119/1 125/17 137/14
**used [5]** 28/21 29/22 29/24 63/20 72/18
**useful [2]** 28/17 32/9
**useless [2]** 115/7 115/9
**user [5]** 71/25 72/18 73/5 74/12 82/22
**users [8]** 18/6 63/5 69/6 73/19 75/10 84/21 88/19 88/19
**using [21]** 6/14 11/14 21/12 22/5 22/5 46/12 67/20 76/24 86/1 105/17 105/22 106/4 106/22 106/24 108/17 109/15 109/19 112/4 112/4 129/14 129/17
**usually [1]** 110/9
**utility [1]** 126/1
**utter [1]** 81/4

**V**

**vague [1]** 26/7
**vaguely [1]** 11/24
**Vaio [1]** 112/19
**value [9]** 5/23 6/12 7/3 11/13 62/11 62/14 99/12 99/14 108/10
**values [11]** 6/12 12/16 61/13 62/7 62/18 64/7 65/18 66/1 94/4 99/12 123/18
**values/real [1]** 61/13
**variants [2]** 66/14 66/23
**various [5]** 63/7 80/17 83/8 123/21 134/8
**vehicles [2]** 6/6 6/14
**verifiable [1]** 92/13
**versus [3]** 46/8 88/20 133/13
**vertical [5]** 14/7 14/13 18/11 19/5 114/10
**very [48]** 5/5 7/19 9/3 10/6 10/17 14/3 14/3 17/17 21/5 26/4 27/10 27/15 28/11 28/11 29/2 29/25 30/3 30/22 30/23 31/22 32/3 32/25 33/11 42/21 43/17 50/25 54/12 60/11 60/15 62/7 63/11 63/24 67/2 77/8 78/6 86/17 89/11 95/15 101/16 103/21 105/5 107/14 110/18 111/24 122/7 130/12 131/12 133/16
**viable [3]** 56/5 57/17 57/21
**video [1]** 80/25
**view [4]** 57/4 91/16 92/9 102/3
**viewed [1]** 57/7
**viewing [1]** 43/25
**vigilant [1]** 10/7
**violated [1]** 127/11
**violation [1]** 52/25
**Volkswagen [3]** 107/14 107/24 110/18
**volume [2]** 9/3 75/1
**vulnerabilities [23]** 19/21 19/21 21/1 40/25 42/11 47/6 47/8 47/11 47/13 47/19 47/22 61/3 61/5 63/7 69/18 71/21 82/10 121/16 121/18 123/3 123/4 124/4 124/18
**vulnerability [25]** 12/3 20/17 42/13 42/18 46/1 65/6 83/19 84/11 86/22 87/3 91/22 95/11 116/19 121/17 122/18 122/19 122/22 122/25 124/9 124/10 124/16 124/17 124/22 131/9 132/2
**vulnerable [6]** 6/7 40/23 47/1 69/7 95/17 101/5

**W**

**wait [2]** 43/4 43/12
**walk [1]** 71/10
**wall [1]** 90/23
**want [51]** 4/9 4/17 5/19 16/25 18/2 23/19 24/3 43/5 43/12 43/17 45/18 46/16 47/16 47/18 49/8 58/9 58/13 59/7 60/7 63/11 67/5 67/13 71/7 73/24 80/23 80/23 80/24 80/25 81/16 81/19 84/3 84/5 84/5 85/16 85/17 86/5 94/12 98/5 102/9 102/20 105/7 107/15 111/8 114/13 115/25 116/1 116/3 116/6 117/9 124/13

**wanted [2]** 92/25 112/9
**wants [2]** 22/15 50/17
**war [1]** 64/11
**warning [2]** 40/23 73/4
**warranties [1]** 27/23
**warranty [27]** 13/14 14/5 16/19 17/7 20/9 21/5 26/14 26/16 26/17 26/25 27/2 27/22 28/24 29/17 29/24 32/17 54/3 54/3 60/9 104/22 104/22 105/10 108/14 114/11 115/10 125/2 134/1
**was [210]**
**Washington [1]** 2/11
**wasn't [20]** 8/10 16/2 17/21 31/10 34/7 38/4 38/4 39/16 40/16 41/18 46/23 65/10 75/9 76/2 81/11 85/6 103/10 118/10 120/5 123/25
**watch [2]** 17/24 98/8
**watching [1]** 95/13
**way [50]** 4/5 4/19 7/15 10/23 14/9 14/16 16/22 26/19 30/18 32/3 34/15 38/13 39/10 39/12 41/15 45/9 46/8 46/11 51/19 55/12 57/9 58/22 64/20 66/9 71/24 72/17 73/17 77/6 79/3 80/20 82/21 83/5 85/22 89/6 89/17 92/23 95/13 96/17 103/25 107/12 108/7 110/5 111/23 117/9 117/11 117/20 124/24 133/3 136/24 137/13
**ways [4]** 96/23 97/8 123/21 136/8
**we [306]**
**we'll [1]** 105/9
**we're [6]** 17/15 26/21 39/13 42/22 59/15 83/10
**we've [20]** 56/7 62/23 64/18 66/10 66/13 70/2 70/9 78/9 78/11 78/12 88/14 90/22 91/12 93/11 93/11 100/5 104/25 116/7 122/3 134/15
**website [7]** 36/6 37/13 37/14 38/5 47/8 47/24 97/1
**websites [1]** 47/17
**week [5]** 35/10 47/10 47/23 59/24 111/18
**weighing [1]** 126/2
**Weiss [2]** 2/3 3/11
**welcome [4]** 23/14 24/2 70/20 111/11
**well [52]** 5/10 7/10 7/19 19/7 34/4 35/9 35/13 36/21 41/16 44/19 45/14 50/3 52/17 53/6 61/5 64/3 76/10 77/2 78/23 79/14 83/2 83/17 84/12 85/9 86/19 87/10 93/22 94/13 96/16 100/15 100/21 104/18 104/25 106/19 108/8 108/15 112/17 113/8 114/4 116/7 116/16 116/18 117/25 121/7 121/18 123/5 123/11 127/15 129/1 129/10 130/8 132/7
**well-known [2]** 35/13 36/21
**went [13]** 12/19 14/6 16/20 21/20 24/12 44/24 61/23 79/11 79/17 119/24 121/19 125/7 127/23
**were [68]** 5/17 6/11 10/2 26/23 26/23 29/8 31/13 35/8 36/5 36/7 36/9 36/21 37/3 40/5 41/6 48/11 49/24 50/7 52/12 53/22 55/18 60/22 62/17 63/3 63/3 63/23 64/18 65/22 66/12 68/16 69/7 71/3 71/5 73/12 75/8 75/25 76/4 81/13 83/20 85/7 86/13 87/14 87/15 90/23 92/8 93/18 96/13 96/14 97/12 101/2 101/4 107/10 107/20 107/20 108/11 108/16 108/17 110/1 110/2 110/22 114/22 119/2 120/6 122/24 123/12 124/18 130/13 131/7
**weren't [3]** 115/8 118/23 135/2
**what [226]**
**what's [16]** 18/8 47/16 57/4 66/17 70/1 70/4 70/17 71/6 71/8 79/19 82/6 87/3 91/7 115/18 121/3 125/10
**whatever [7]** 7/4 26/23 84/5 84/5 106/7 112/6 117/17
**whatnot [1]** 118/5
**whatsoever [1]** 11/23 18/21 31/24 44/1
**wheel [2]** 121/20 121/22
**when [68]** 7/1 10/7 12/18 14/14 17/24 22/4 29/11 31/10 31/17 31/22 32/6 33/7 35/1 44/23 46/20 47/2 47/2 48/13 53/2 53/12 62/6 62/11 62/15 62/19 63/13 63/15 64/6 66/3 70/10 75/13 81/8 82/14 82/16 83/23 84/14 85/5 87/6 87/11 87/13 87/23 88/16 89/7 89/10 89/16 90/12 94/3 98/8 98/23 99/13 101/8 104/7 105/16 106/14 107/11 107/19 108/1 109/23 109/25 114/14 115/18 120/1 121/4 121/16 122/23 124/3 131/1 134/24 136/1
**where [67]** 9/1 10/18 12/10 12/16 12/25 15/5 16/3 16/3 17/13 17/18 19/1 21/14 21/22 27/6 28/6 29/7 29/16 30/21 32/14 32/19 33/3 34/10 38/16 38/19 41/5 41/17 42/12 43/3 43/5 48/6 48/10 48/19 48/21 51/4 52/6 52/21 52/22 54/5 55/23 56/22 56/23 57/20 57/22 61/17 62/5 66/22 74/22 76/4 78/6 78/13 84/16 85/11 90/25 92/14 92/17 92/17 97/6 97/24 99/14 102/20 103/10 105/14 105/15 107/1 112/15 114/19 133/14
**where's [1]** 93/16

**W**

**whereas [1]** 15/6
**whether [42]** 11/2 18/4 19/20 19/21 24/8 24/13 26/8 33/12 34/19 36/17 38/6 49/22 53/15 56/4 56/12 76/8 81/2 82/16 86/20 88/1 90/3 90/4 99/21 99/22 100/16 101/12 103/17 113/12 114/7 115/10 117/1 125/5 125/10 125/11 125/13 125/20 126/22 127/9 127/18 130/2 134/11 136/19
**which [55]** 8/2 9/15 13/3 13/6 15/21 16/5 19/22 24/20 24/25 25/3 26/24 27/13 29/2 33/8 33/11 34/22 36/2 37/10 37/18 42/3 44/14 47/24 47/25 52/9 53/4 53/13 57/21 58/2 63/3 66/4 66/10 67/2 67/3 68/18 70/6 71/11 71/25 72/18 76/20 78/5 80/11 81/9 82/21 84/18 89/17 89/18 90/3 90/14 90/18 90/21 96/23 103/7 109/1 109/5 112/25
**while [11]** 22/5 51/23 63/5 66/11 67/18 69/7 70/4 80/25 108/23 116/1 127/18
**White [2]** 86/13 93/19
**who [27]** 10/16 13/23 13/23 13/24 15/6 15/8 37/2 45/6 48/17 65/20 76/17 77/7 79/4 79/17 89/15 96/20 97/10 98/10 99/10 106/2 107/9 108/2 109/5 109/6 113/16 116/5 124/4
**whoever [1]** 103/25
**whole [2]** 99/15 129/22
**wholesaler [1]** 56/23
**why [39]** 7/25 8/22 16/15 16/16 23/12 23/17 23/20 27/14 30/3 31/7 40/1 42/19 46/16 47/5 49/23 50/20 55/7 58/18 63/23 77/10 78/3 78/19 79/4 82/1 88/9 88/24 89/2 93/8 98/14 106/18 109/16 109/16 111/1 111/8 113/20 113/20 122/19 133/6 133/7
**wide [5]** 13/17 49/17 66/3 114/20 114/21
**widely [1]** 35/7
**widespread [1]** 38/17
**WiFi [1]** 22/5
**wild [1]** 91/22
**will [72]** 7/23 9/10 18/4 22/10 22/17 22/18 23/19 27/21 33/16 39/13 42/18 43/4 43/7 43/12 46/3 58/18 58/20 58/21 58/22 58/22 58/25 59/9 59/10 59/24 60/2 60/3 60/18 62/12 62/13 63/23 66/23 66/24 66/25 66/25 68/14 70/4 71/10 73/23 74/11 81/2 81/2 88/13 89/18 89/21 89/22 91/21 97/1 97/16 99/8 99/9 102/25 103/16 104/8 104/8 105/10 108/5 108/14 110/11 113/19 116/8 116/10 118/20 130/9 130/12 134/13 136/2 136/3 136/4 136/15 136/23 137/2 137/4
**Williams [3]** 2/10 25/11 25/18
**Williamson [1]** 48/10
**willing [4]** 109/12 131/25 132/1 136/19
**Wilson [21]** 23/5 23/6 23/9 23/12 23/16 23/17 23/21 24/1 24/1 24/9 25/2 25/12 25/17 25/21 25/25 26/2 27/11 27/19 30/1 34/5 90/13
**Wilson's [1]** 25/4
**window [1]** 82/21
**windows [2]** 71/24 72/17
**wine [7]** 51/1 56/22 56/23 56/24 103/6 103/6 103/25
**wiped [3]** 62/12 62/20 99/13
**wireless [1]** 114/21
**wish [1]** 5/5
**withheld [1]** 101/22
**withholding [1]** 105/2
**within [13]** 23/21 26/14 26/16 26/24 32/8 39/8 40/15 40/17 49/10 71/21 92/3 124/20 135/17
**without [4]** 65/24 85/12 126/13 138/7
**witness [1]** 94/17
**WL [1]** 112/20
**won't [5]** 60/18 62/24 89/17 91/24 103/11
**wonder [2]** 19/4 96/1
**word [2]** 71/1 71/1
**words [4]** 6/1 81/4 82/8 88/21
**work [13]** 33/6 58/18 58/22 58/25 60/15 78/21 78/24 79/1 96/11 104/8 137/6 137/8 137/8
**worked [6]** 96/12 96/16 117/5 119/13 123/9 124/21
**working [3]** 89/19 109/12 117/20
**world [3]** 42/12 92/15 129/12
**worried [1]** 101/7
**worries [1]** 101/14
**worry [1]** 56/4
**would [173]**

**would [173]** 3/6 12/19 15/6 17/25 19/25 20/22 20/4 68/23 76/22 77/21 78/20 78/24 82/8 83/15 88/4 98/24 99/17 115/4 115/14 121/24 121/25 128/23
**wrap [1]** 47/2
**write [4]** 50/13 67/5 67/8 67/11
**writing [1]** 35/15
**written [3]** 38/14 110/15 135/22
**wrong [9]** 45/3 55/11 62/6 62/15 64/6 70/11 91/21 95/9 120/1
**wrongfully [1]** 52/25
**wrote [2]** 50/24 80/5

**Y**

**Yamaha [2]** 25/11 25/18
**yeah [15]** 27/7 37/1 43/11 44/4 45/10 53/8 68/17 80/15 81/1 85/9 87/17 90/25 97/15 101/21 116/18
**year [1]** 52/20
**year-later [1]** 52/20
**years [9]** 19/20 22/24 30/20 31/4 31/8 31/11 69/18 119/12 123/20
**yes [18]** 4/15 41/6 50/9 51/1 54/10 58/17 59/9 66/5 71/4 81/20 84/1 86/16 86/22 93/21 96/8 97/5 118/12 119/21
**yet [4]** 30/15 46/24 66/22 80/14
**Yorker [1]** 59/25
**you [368]**
**you'd [1]** 127/15
**you'll [6]** 23/18 31/14 43/14 56/6 134/12 136/10
**you're [23]** 19/7 23/14 31/6 31/20 31/21 31/23 33/12 38/9 40/20 42/2 65/4 67/12 70/20 72/14 95/25 96/3 103/22 114/3 116/2 121/7 123/6 123/9 132/15
**you've [13]** 51/8 56/11 62/18 68/2 69/9 99/24 100/12 102/7 106/5 114/12 121/11 123/20 130/22
**your [173]**
**Your Honor [99]** 3/4 4/22 5/19 7/10 8/1 10/9 11/21 12/1 12/8 13/4 13/13 14/15 14/24 15/12 15/21 16/17 18/25 19/19 20/6 23/3 23/19 24/6 24/16 25/14 25/24 28/5 30/5 33/10 33/24 37/2 37/6 38/5 38/15 38/21 41/23 42/9 45/10 46/18 47/18 47/21 48/1 50/15 50/16 56/6 60/13 61/2 63/11 65/14 66/9 68/5 69/15 71/9 73/2 73/14 73/23 73/25 76/17 81/6 81/15 82/3 82/14 83/6 84/1 87/23 88/9 89/21 90/6 90/16 92/20 94/11 95/7 95/24 99/7 100/11 101/25 105/4 106/1 108/19 109/20 111/12 111/13 112/2 112/19 113/8 113/21 114/1 116/15 116/23 118/19 122/3 123/15 123/15 127/9 127/16 129/13 133/20 133/23 135/7 135/13
**Your Honor's [2]** 43/10 50/22
**yourself [1]** 3/8

**Z**

**Zero [10]** 39/15 39/17 40/8 41/4 46/3 86/9 122/8 124/1 124/5 132/6