**Steve D. Larson,** OSB No. 863540
Email: slarson@stollberne.com
**Jennifer S. Wagner,** OSB No. 024470
Email: jwagner@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 SW Oak Street, Suite 500
Portland, Oregon 97204
Telephone: (503) 227-1600

*Attorneys for Plaintiffs*

[Additional Counsel Listed on Signature Page.]

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| IN RE: INTEL CORP. CPU MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 3:18-md-02828-SI |
| | **SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT** |
| This Document Relates to ALL ACTIONS | **DEMAND FOR JURY TRIAL** |

SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

JURISDICTION AND VENUE ................................................................................14

PARTIES ...................................................................................................................14

NAMED PLAINTIFFS .............................................................................................14

DEFENDANT ........................................................................................................150

CHOICE OF LAW .................................................................................................150

SUBSTANTIVE ALLEGATIONS ........................................................................152

    A.    General Background ..............................................................152

        1.    Intel's 8086 and x86 Instruction Set ...............................152

        2.    Intel's 80286 and the Introduction of Protected Mode ...........153

        3.    Intel's 80486 and the Introduction of Pipelines and On-Die Caches.......157

        4.    Intel's P5 Microarchitecture ...........................................163

        5.    Intel's P6 and the Introduction of Dynamic Execution ...........165

        6.    The Netburst Microarchitecture Disaster .................................170

        7.    Intel's Core Microarchitecture ................................................173

        8.    "Tick/Tock" and the Nehalem Architecture ...........................177

        9.    Intel's Claimed Focus on Security with Core Tick/Tocks......181

        10.    Intel Continued Advertising its Defective CPUs' Superior Performance and Security and Charging a Substantial Premium Despite its Knowledge of Meltdown and Spectre and the Need for Performance-killing Mitigations.............................................190

    B.    Intel's Processors Are Defective.........................................................199

1.    Security Vulnerabilities Created by Intel's Use of Speculative Execution and an Unsecured Cache Subsystem Lead to Confidentiality Security Breaches ...................................199

2.    Intel Knew That Its Architecture Was Susceptible to Side-Channel Exploits ........................................................................202

3.    Intel Knew That Permitting Unprotected Memory Access During Speculative Execution Could Be Exploited ...............................212

4.    "Meltdown" ...............................................................................216

5.    "Foreshadow" or "L1 Terminal Fault" ...................................220

6.    SwapGS ....................................................................................225

7.    MDS Exploits ...........................................................................226

8.    "Spectre" ..................................................................................239

C.    Intel Was Aware of Numerous Methods That Would Have Mitigated Side-Channel Exploits .........................................................................242

D.    The Intel CPU Exploits Are Both Weaponized And Untraceable ......................245

E.    The Intel CPU Exploits Are an Intel Problem, Not an Industry-Wide Problem ............................................................................................247

F.    Intel's Interim Patches Have Impacted the Performance of the CPUs And Still Leave the CPUs Vulnerable to Exploit .........................................250

G.    Intel's Failed Mitigation Attempts Have Resulted in Significant Negative Consequences .................................................................................254

H.    Intel's Interim Patches Have Come at a Significant Cost to the CPUs' Processing Speed and Performance ...................................................255

I.    Performance Matters ..................................................................................263

J.    Plaintiffs' Performance Testing of Intel's CPUs .................................................267

1.    Responsiveness on Windows ...................................................271

2.    Linux:  Individual Workloads ..................................................274

3.    Intel Server Processors:  Typical Server Workloads ...............279

PAGE ii –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT

      4.      Analysis on MacOS ...................................................................282

      5.      Mitigations Transform Higher-End CPUs Into Lower-End CPUs ..........284

      6.      Intel CPUs Are Slower Than Cheaper AMD CPUs After Mitigation .....285

    K.      Intel's Performance Degradation in Context .........................................286

    L.      The Only True "Fix" for the Security Vulnerabilities Inherent in Intel's
Defective CPUs Is a New CPU .............................................................288

    **M.      Intel's CPU Defects Have Imposed Enormous Costs on Enterprise
Plaintiffs, Which Have Legal Duties to Protect Third-party Data on
Their Networks ....................................................................................290**

CLASS ACTION ALLEGATIONS .................................................................308

TOLLING OF APPLICABLE LIMITATIONS PERIODS ...............................313

CLAIMS ALLEGED .....................................................................................314

NATIONWIDE COUNT I  VIOLATIONS OF THE CALIFORNIA UNFAIR
    COMPETITION LAW Cal. Bus. & Prof. Code § 17200 *et seq.* ...................314

NATIONWIDE COUNT II ..............................................................................320

QUASI CONTRACT OR UNJUST ENRICHMENT Common Law Claim .............320

CLAIMS ALLEGED ON BEHALF OF THE SUBCLASSES...................................324

ALABAMA SUBCLASS, COUNT III  ALABAMA DECEPTIVE TRADE PRACTICES
    ACT Ala. Code § 8-19-1 *et seq.* .................................................................324

ALASKA SUBCLASS, COUNT IV  ALASKA CONSUMER PROTECTION ACT
    Alaska Stat. § 45.50.471 *et seq.*...................................................................327

ARIZONA SUBCLASS, COUNT V   ARIZONA CONSUMER FRAUD ACT A.R.S. §
    44-1521 *et seq.* .........................................................................................329

ARKANSAS SUBCLASS, COUNT VI  ARKANSAS DECEPTIVE TRADE
    PRACTICES ACT, A.C.A. § 4-88-101, *et seq.*.............................................331

COLORADO SUBCLASS, COUNT vii  COLORADO CONSUMER PROTECTION
    ACT, Colo. Rev. Stat. § 6-1-101 *et seq.* .......................................................335

PAGE iii –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

CONNECTICUT SUBCLASS, COUNT viii  CONNECTICUT TRADE PRACTICES
ACT C.G.S.A. § 42-110g *et seq.* .....................................................................337

DELAWARE SUBCLASS, COUNT iX  DELAWARE CONSUMER FRAUD ACT 6
Del. Code § 2511 *et seq.* ..............................................................................340

DISTRICT OF COLUMBIA SUBCLASS, COUNT X  DISTRICT OF COLUMBIA
CONSUMER PROTECTION PROCEDURES ACT D.C. Code § 28-3904 *et seq.* .......343

FLORIDA SUBCLASS, COUNT XI  FLORIDA DECEPTIVE AND UNFAIR TRADE
PRACTICES ACT Fla. Stat. § 501.201 *et seq.* ................................................345

GEORGIA SUBCLASS, COUNT XII  GEORGIA UNIFORM DECEPTIVE TRADE
PRACTICES ACT O.C.G.A. § 10-1-390 *et seq.* ...............................................348

HAWAII SUBCLASS, COUNT XIII  HAWAII UNFAIR PRACTICES AND UNFAIR
COMPETITION ACT Haw. Rev. Stat. § 480-1 *et seq.* ......................................351

HAWAII SUBCLASS, COUNT XIV  HAWAII UNIFORM DECEPTIVE TRADE
PRACTICE ACT Haw. Rev. Stat. § 481a-3 *et seq.* ...........................................353

IDAHO SUBCLASS, COUNT XV  IDAHO CONSUMER PROTECTION ACT Idaho
Code § 48-601 *et seq.* ...................................................................................354

ILLINOIS SUBCLASS, COUNT XVI  ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT 815 ILCS § 505 *et seq.* ..........................356

ILLINOIS SUBCLASS, COUNT XVII  ILLINOIS UNIFORM DECEPTIVE TRADE
PRACTICES ACT 815 ILCS § 510/2 *et seq.* ...................................................358

INDIANA SUBCLASS, COUNT XVIII  INDIANA DECEPTIVE CONSUMER SALES
ACT Ind. Code § 24-5-0.5-1 *et seq.*................................................................359

IOWA SUBCLASS, COUNT XIX  IOWA PRIVATE RIGHT OF ACTION FOR
CONSUMER FRAUDS ACT Iowa Code § 714H .........................................................364

KANSAS SUBCLASS, COUNT XX.........................................................................367

KANSAS CONSUMER PROTECTION ACT K.S.A. § 50-623 *et seq.* ......................367

LOUISIANA SUBCLASS, COUNT XXI  LOUISIANA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION LAW La. Rev. Stat. Ann. § 51:1401 *et seq.*..........372

MAINE SUBCLASS, COUNT XXII  MAINE UNFAIR TRADE PRACTICES ACT 5
Me. Rev. Stat. §§ 205, 213, *et seq.* .................................................................375

PAGE iv –     SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

MAINE SUBCLASS, COUNT XXIII  MAINE UNIFORM DECEPTIVE TRADE
PRACTICES ACT 10 Me. Rev. Stat. § 1212 *et seq.*......................................................377

MARYLAND SUBCLASS, COUNT XXIV  MARYLAND CONSUMER PROTECTION
ACT Md. Comm. Code § 13-301 *et seq.* ..........................................................379

MICHIGAN SUBCLASS, COUNT XXV  MICHIGAN CONSUMER PROTECTION
ACT Mich. Comp. Laws Ann. § 445.903 *et seq.*.............................................382

MINNESOTA SUBCLASS, COUNT XXVI  MINNESOTA CONSUMER FRAUD ACT
Minn. Stat. § 325f.68, e*t seq.* and Minn. Stat. § 8.31 *et seq.* ............................386

MINNESOTA SUBCLASS, COUNT XXVII  MINNESOTA UNIFORM DECEPTIVE
TRADE PRACTICES ACT Minn. Stat. § 325D.43 *et seq.*..............................388

MISSISSIPPI SUBCLASS, COUNT XXVIII  MISSISSIPPI CONSUMER PROTECTION
ACT Miss. Code § 75-24-1 *et seq.* ...................................................................390

MISSOURI SUBCLASS, COUNT XXIX  MISSOURI MERCHANDISE PRACTICES
ACT Mo. Rev. Stat. § 407.010 *et seq.* ...............................................................393

MONTANA SUBCLASS, COUNT XXX  MONTANA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION ACT M.C.A. § 30-14-101 *et seq.*..........................396

NEBRASKA SUBCLASS, COUNT XXXI .................................................................398

NEBRASKA CONSUMER PROTECTION ACT Neb. Rev. Stat. § 59-1601 *et seq.* ...............398

NEBRASKA SUBCLASS, COUNT XXXII  NEBRASKA UNIFORM DECEPTIVE
TRADE PRACTICES ACT Neb. Rev. Stat. § 87-301 *et seq.*........................400

NEVADA SUBCLASS, COUNT XXXIII  NEVADA DECEPTIVE TRADE PRACTICES
ACT Nev. Rev. Stat. Ann. § 598.0903 *et seq.* ................................................403

NEW HAMPSHIRE SUBCLASS, COUNT XXXIV  NEW HAMPSHIRE CONSUMER
PROTECTION ACT N.H.R.S.A. § 358-A *et seq.*..........................................405

NEW JERSEY SUBCLASS, COUNT XXXV  NEW JERSEY CONSUMER FRAUD
ACT, N.J. Stat. Ann. § 56:8-1 *et seq.* ............................................................407

NEW MEXICO SUBCLASS, COUNT XXXVI  NEW MEXICO UNFAIR PRACTICES
ACT N.M. Stat. Ann. § 57-12-2 *et seq.* .........................................................410

NEW YORK SUBCLASS, COUNT XXXVII  NEW YORK GENERAL BUSINESS
LAW N.Y. Gen. Bus. Law § 349 *et seq.* .......................................................413

PAGE v –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

NORTH CAROLINA SUBCLASS, COUNT XXXVIII  NORTH CAROLINA UNFAIR
    TRADE PRACTICES ACT N.C. Gen. Stat. Ann. § 75-1.1 *et seq.*................................415

NORTH DAKOTA SUBCLASS, COUNT XXXIX  NORTH DAKOTA UNLAWFUL
    SALES OR ADVERTISING ACT N.D. Cent. Code § 51-15-01 *et seq.* ........................417

OHIO SUBCLASS, COUNT XL  OHIO CONSUMER SALES PRACTICES ACT Ohio
    Rev. Code § 1345.01 *et seq.* ..........................................................................420

OHIO SUBCLASS, COUNT XLI  OHIO DECEPTIVE TRADE PRACTICES ACT Ohio
    Rev. Code § 4165.01 *et seq.* ..........................................................................424

OKLAHOMA, SUBCLASS COUNT XLII  OKLAHOMA CONSUMER PROTECTION
    ACT Okla. Stat. Tit. 15, § 751 *et seq.*..............................................................426

OREGON SUBCLASS, COUNT XLIII  OREGON UNLAWFUL TRADE PRACTICES
    ACT Or. Rev. Stat. § 646.608 *et seq.* ..............................................................429

PENNSYLVANIA SUBCLASS, COUNT XLIV  PENNSYLVANIA UNFAIR TRADE
    PRACTICES AND  CONSUMER PROTECTION LAW 73 Pa. Cons. Stat. §§ 201-
    2 & 201-3, *et seq.*..........................................................................................433

RHODE ISLAND SUBCLASS, COUNT XLV  RHODE ISLAND DECEPTIVE TRADE
    PRACTICES ACT R.I. Gen. Laws § 6-13.1 *et seq.* ............................................435

SOUTH CAROLINA SUBCLASS, COUNT XLVI  SOUTH CAROLINA UNFAIR
    TRADE PRACTICES ACT S.C. Code Ann. § 39-5-10 *et seq.* ......................................438

SOUTH DAKOTA SUBCLASS, COUNT XLVII  SOUTH DAKOTA DECEPTIVE
    TRADE PRACTICES AND  CONSUMER PROTECTION ACT S.D. Codified
    Laws § 37-24-1 *et seq.* ....................................................................................441

TENNESSEE SUBCLASS, COUNT XLVIII  TENNESSEE CONSUMER PROTECTION
    ACT Tenn. Code Ann. § 47-18-101 *et seq.* ....................................................444

TEXAS SUBCLASS, COUNT XLIX  TEXAS DECEPTIVE TRADE PRACTICES–
    CONSUMER PROTECTION ACT Texas Bus. & Com. Code § 17.41 *et seq.* .............448

UTAH SUBCLASS, COUNT L  UTAH CONSUMER SALES PRACTICES ACT Utah
    Code § 13-11-1 *et seq.* ....................................................................................453

VERMONT SUBCLASS, COUNT LI  VERMONT CONSUMER FRAUD ACT Vt. Stat.
    Ann. Tit. 9, § 2451 *et seq.*...............................................................................458

VIRGINIA SUBCLASS, COUNT LII  VIRGINIA CONSUMER PROTECTION ACT Va.
    Code Ann. § 59.1-196 *et seq.*...........................................................................461

PAGE vi –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

WASHINGTON SUBCLASS, COUNT LIII  WASHINGTON CONSUMER
    PROTECTION ACT Wash. Rev. Code Ann. § 19.86.020 *et seq.*...................................464

WEST VIRGINIA SUBCLASS, COUNT LIV  WEST VIRGINIA CONSUMER CREDIT
    AND PROTECTION ACT W. Va. Code § 46A-6-101 *et seq.* ......................................467

WISCONSIN SUBCLASS, COUNT LV  WISCONSIN DECEPTIVE TRADE
    PRACTICES ACT Wis. Stat. § 100.18 *et seq.* ...............................................................472

WYOMING SUBCLASS, COUNT LVI  WYOMING CONSUMER PROTECTION ACT
    Wyo. Stat. Ann. § 40-12-101 *et seq.* ...............................................................................474

REQUEST FOR RELIEF .................................................................................................477

JURY DEMAND .............................................................................................................478

Plaintiffs, individually and on behalf of the members of the Class defined below, allege the following against Defendant Intel Corporation ("Intel" or "the Company"), based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, the investigation of counsel and review of public documents as to all other matters.[1]

## INTRODUCTION

1.      Despite Intel's intentional concealment of specific design choices that it long knew rendered its central processing units ("CPUs" or "processors") unsecure and defective, it was only in January 2018 that it was first revealed to the public that Intel's CPUs have significant security vulnerabilities that give unauthorized program instructions access to protected data.

2.      A CPU is the "brain" in every computer and mobile device and processes all of the essential applications, including the handling of confidential information such as passwords and encryption keys.  Maintaining the security of confidential information is a fundamental function of all CPUs that Plaintiffs and members of the Class relied upon Intel to provide.  "Processor-level security is foundational and can prevent the exploitation that software-based products can be prone to."[2]  Indeed, the CPU "plays a fundamental role in security because of performance, hardware-rooted trust, and the ability to provide security functionality, such as encryption, while exposing minimal attack surface area."[3]

---

[1] Plaintiffs do not re-plead in this Second Amended Consolidated Class Action Complaint those claims that the Court dismissed with prejudice in its March 27, 2020 and March 29, 2021 decisions (ECF Nos. 178, 204).  In accordance with Ninth Circuit precedent, re-pleading is unnecessary to preserve those claims for appeal.  *See Lacy v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012).

[2] *See* John Abbott, *Trusting in the CPU: Getting to the Roots of Security*, June 2017 at p. 4.

[3] *Id*. at p. 9

PAGE 1 –     SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

3.      Although Plaintiffs and members of the Class relied upon Intel to design its CPUs to ensure that private data remains secure from access by unauthorized parties, increased sales, and thus increased profits, drove Intel to implement certain techniques, such as speculative execution and out-of-order execution, in a defective manner that left users' confidential information exposed and vulnerable to unauthorized access.

4.      In a nutshell, speculative execution allows a CPU to run instructions from software programs or applications before knowing whether an instruction is required or whether access to information is authorized.  Intel's defective implementation of "speculative execution" maintains accessed user information, including confidential information, within the CPU (a fast memory known as Cache, and several internal buffers including the Line Fill Buffers, Store Buffers, and Writeback buffers associated with the Cache) in a vulnerable manner, and thus exposes user data to a substantial security risk of exposure and theft by unauthorized third parties.

5.      The exploits publicly disclosed in 2018, generally dubbed "Meltdown," "Spectre," and "Foreshadow" (and related variants), are part of a class of exploits that allow unauthorized third parties to exploit Intel's processor vulnerabilities to gain access to confidential information.  The exploits take advantage of design defects in Intel's CPUs related to memory access protection and speculative execution of computer program instructions, which made information that should otherwise remain secure accessible to unauthorized use.  Unbeknown to Plaintiffs and members of the Class, when Intel's processors engage in speculative execution, the processors make information, which should remain secure and inaccessible to unauthorized use, accessible in the processors' unsecured subsystems.  These undisclosed design defects, which Plaintiffs define herein

PAGE 2 –      SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

as "Unauthorized Access" and "Incomplete Undo" (the "Defects"), are exploited by an ever-increasing number of exploits as hackers gain additional insight into the Defects.

6.      As designed, Intel CPUs suffer from Unauthorized Access which allows program instructions unauthorized access to protected data (e.g., secrets).   When Intel processors speculatively execute instructions, Incomplete Undo allows protected data to remain in Intel's CPU's unsecure subsystems (e.g., those instructions are not completely undone) when speculation is wrong.   Intel was aware that its processor design, which allowed secrets to be placed into the CPU's unsecure subsystems by unauthorized users, presented a substantial security risk to consumers and could be exploited.

7.      More troubling, Intel's flawed processor design affects almost every x86-64 Core processor CPU that Intel designed, manufactured, marketed, sold, and distributed in the last 20 years ("Intel's CPU(s)").

8.      Because Intel has failed and refused to address the underlying Defects in Intel's CPUs, additional exploits, dubbed "Fallout," "RIDL," and "ZombieLoad" (and related variants) by the researchers (and referred to collectively by Intel as Microarchitectural Data Sampling ("MDS")) as well as SwapGS and LazyFP were disclosed in 2019.   Even more exploits, dubbed "Vector Register Sampling," "CacheOut," and "Snoop-assisted L1 Data Sampling" were disclosed in 2020. All of these exploits take advantage of the same undisclosed Defects in Intel's CPU design and have been discovered on an ongoing basis for over two years, with the most recent one reported in March 2020.   Undoubtedly, more exploits exploiting the Defects are expected and will continue to be disclosed.   Fallout, RIDL, ZombieLoad, SwapGS, LazyFP, Vector Register Sampling, CacheOut,

PAGE 3 –      SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

Snoop-assisted L1 Data Sampling, and the yet-to-be-disclosed exploits are referred to collectively with Meltdown, Spectre, and Foreshadow as the "Intel CPU Exploits."

9.      The Defects that allow the Intel CPU Exploits are the direct result of Intel's knowing decision to sacrifice security in favor of speed to gain an edge in its ongoing competition with rivals such as Advanced Micro Devices, Inc. ("AMD").  As with the Meltdown and Foreshadow exploits, Fallout, RIDL, ZombieLoad, SwapGS, LazyFP, Vector Register Sampling, and CacheOut exploit Intel-processor Defects.  AMD has reported that its processors are not subject to Meltdown, Foreshadow, Fallout, RIDL, ZombieLoad, SwapGS, LazyFP, Vector Register Sampling, and CacheOut.  Despite Intel's efforts to mischaracterize the Defects and the Intel CPU Exploits as industry-wide risks of chip manufacturers, the truth is that only Intel designed its CPUs in this flawed manner and, because of its design choices, the Intel CPU Exploits are largely an Intel-only problem.

10.      Moreover, Intel's decision to forego security for the sake of speed was contrary to the public statements it made about the security of its processors.  Although Intel publicly touted its processors' security, Intel kept its hardware design strictly confidential, within its exclusive knowledge, and actively protected it as a trade secret.  Plaintiffs and members of the Class had no way of knowing before their purchases that Intel disregarded a fundamental CPU function – data security – and knowingly designed its CPUs to permit unprotected memory access during speculative execution.

11.      To be sure, Intel concealed the Unauthorized Access Defect, never disclosing it publicly.  This was non-public information that was unavailable to Plaintiffs or anyone else outside Intel.  Even after the disclosure of Meltdown and the other Intel CPU Exploits, Intel failed to disclose

PAGE 4 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

the Unauthorized Access Defect, *i.e.*, the root cause of the exploits.  This defect – an intentional design decision by Intel to remove well-accepted security that had ensured memory isolation – was not written about or known to industry experts, academics, or the public at large.  Plaintiffs are aware of no technical articles or white papers that discuss the Unauthorized Access Defect.  As alleged herein, the Unauthorized Access Defect was concealed by Intel at all times.

12.     Intel inaccurately claims that there has been no successful use of the Intel CPU Exploits by any hacker.  It is impossible to draw such a conclusion because executing the Intel CPU Exploits leaves no fingerprints or forensic trace and are thus exceptionally hard to detect.  "But [it is] suspect[ed] that for intelligence agencies and commercial hacking groups, Meltdown and Spectre [as well as the other Intel CPU Exploits] are already parts of their toolkits; they're probably paired with fileless malware as an entry point.  With fileless malware, nothing is written to disk, and with Meltdown [and the other Intel CPU Exploits], there's reportedly no need for privilege escalation. The result is a super-stealthy exploit that is less likely to trigger any alarms."[4]  Even Intel acknowledged that the Intel CPU Exploits could "be maliciously exploited in the wild by highly sophisticated cyber-criminals."[5]

13.     Although programs without the requisite permission should not be allowed to read data associated with other programs, an unauthorized user can exploit the Defects to get hold of secrets stored in the memory of other running programs.  This might include confidential or personal

---

[4]  Mike Fong, *Five Mobile Security Predictions For 2020*, Forbes (Jan. 16, 2020), https://www.forbes.com/sites/forbestechcouncil/2020/01/16/five-mobile-security-predictions-for-2020/#56a5fb822cb6

[5] Maxwell Cooter, *We've secured our CPU silicon, and ready to secure your business, says post-Meltdown Intel*, The Register (Sept. 12, 2019), https://www.theregister.co.uk/2019/09/12/securing_the_silicon/

PAGE 5 –     SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

information such as passwords stored in a password manager or web browser, personal photos, emails, instant messages and even business-critical documents. For example, by exploiting the Defects, a web page in one browser tab could read a user's online banking password from another browser tab. Or, on cloud servers, one virtual machine could snoop on the data in other virtual machines on the same system. This is not supposed to be possible.

14.    Although it has yet to come forth with a full and candid description of all facts known only to it concerning the unprecedented security Defects, what Intel has already admitted is damning. According to Intel, "[t]hese side-channel leaks are particularly dangerous in environments running large numbers of virtualized servers on shared host servers in the cloud. It is problematic because it is possible for an unauthorized virtual machine to eavesdrop on a victim's VM."[6] Acknowledging that its customers are "security conscious," Intel has advised its customers to "deploy only machines with the latest generations of processors inside" – which Intel claims include the necessary security defenses "built in."[7]

15.    Because of the significant security threat these Intel CPU Exploits pose, Intel and other industry participants and experts advise all users to immediately patch all devices capable of patching and, for those devices for which Intel did not release patches, Intel advises users to immediately retire them and replace them with new devices. The reason that Plaintiffs and Class members are still using devices with defective Intel CPUs is because they have downloaded the

---

[6] Maxwell Cooter, *We've secured our CPU silicon, and ready to secure your business, says post-Meltdown Intel*, The Register (Sept. 12, 2019), https://www.theregister.co.uk/2019/09/12/securing_the_silicon/

[7] Maxwell Cooter, *We've secured our CPU silicon, and ready to secure your business, says post-Meltdown Intel*, The Register (Sept. 12, 2019), https://www.theregister.co.uk/2019/09/12/securing_the_silicon/

PAGE 6 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

patches they have been told safeguard the devices from the disclosed Intel CPU Exploits. As alleged herein, however, Intel continues to deceive Plaintiffs, Class members, and the public because the mitigations do not address the Defects. In order to truly secure the CPUs, the Defects must be fixed at the CPU *hardware* level.

16.     Unbeknownst to Plaintiffs and members of the Class, Intel has known for years that its proprietary CPU design (which permitted unauthorized memory access during speculative execution) could be exploited by side-channel exploits. Furthermore, Intel has been aware of various methods that would secure its CPUs; yet has failed to implement them. Indeed, research shows that Intel purposely implemented the Defects (and concealed them), which undermined the security of Intel CPUs simply to achieve a performance advantage over AMD and other competitors.

17.     As the leader in the global CPU industry, Intel knows the critical importance of both performance and protecting consumers' sensitive data from unauthorized access. Intel also knows the multitude of harms that foreseeably flow to individual consumers when sensitive data is stolen by criminals, including, among other things, identify theft, fraud, credit and reputational harm, erroneous tax claims, and extortion. Indeed, Intel's success is largely based on the advertised speed and security of its CPUs.

18.     While some mitigations with microcode updates, operating system-level fixes, and patches to applications like web browsers have become available to ostensibly eliminate the threat of the publicly disclosed Intel CPU Exploits, the mitigations materially affect the performance of Intel's CPUs for all users and also have been shown to be inadequate in curing the Defects. Each mitigation associated with a new exploit creates an additional layer of performance impact.

PAGE 7 –     SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

19.     Notably, Intel has misreported and understated the significant performance impacts the mitigations cause and even suggested "there has been no meaningful performance impact observed as a result of mitigations applied."[8]  In response to third-party testing showing that the performance degradation caused by the mitigations was far greater than Intel reported, Intel attempted to add new restrictions to its software license agreement to prevent users from publishing software benchmark or comparison test results.   Despite Intel's efforts to hide declining performance, testing using accepted testing equipment, protocols, and a wide variety of benchmarks conducted by engineering experts in performance evaluation, confirm that each security mitigation *individually* leads to significant performance degradations in Intel processors (on average as high as 17.6% for Meltdown-related mitigations, 8.8% for those related to Spectre, 4.2% for those related to Foreshadow, and 20.6% for those related to MDS).  Moreover, combining the individual security mitigations in the default mitigations leads to a *cumulative* effect.  As a result, overall performance degradations are even greater and as high as 31.4% for Linux operating systems, 7.5% for Mac operating systems, and 16.6% for Windows operating systems on account of the default mitigations on average.  For certain workloads, Intel's CPU mitigations degraded performance by 46.6% on average and up to 54.5%.

20.     Each Plaintiff and member of the Class suffered injury from Intel's security mitigations, one way or the other, *irrespective* of the following:

- Level of security mitigation:  individual or cumulative;

- Processor type:  desktop, mobile or server processor;

---

[8]  *Resources   and   Response   to   Side   Channel   L1   Terminal   Fault*,   Intel, https://www.intel.com/content/www/us/en/architecture-and-technology/l1tf.html

PAGE 8 –     SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                COMPLAINT

- Operating system:  Linux, Mac OS, or Windows;

- Software:  system software, networking, application software, Web browsing;

- Price:  expensive versus cheaper processor;

- Time of purchase (release date):  new versus old processor; and

- CPU Model:  i9, i7, i5 or i3.

21.     Even worse, to minimize the risk of exploit, it is recommended that users disable key Intel CPU performance functionality altogether, such as Hyper-Threading (which allows a single physical CPU to appear as two logical CPUs to an operating system with the ability to share physical execution resources).[9]    That is why Google disabled Hyper-Threading on its Intel-based Chromebooks.

22.     In other words, every Plaintiff's CPU now suffers reduced functionality and performance as a direct result of downloading Intel's mitigations to address the undisclosed Defects in Intel's CPU design.   As a consequence of the material post-mitigation performance and functionality degradation, Plaintiffs' processors' performance is essentially downgraded into the performance of slower lower cost processors.

23.     The only true fix is to exchange each defective CPU for a device containing a processor not subject to the Defects.  The fact that Intel has left variants of MDS unpatched for more than 18 months is a byproduct of Intel's piecemeal and incomplete response to the Intel CPU Exploits.  Rather than prevent further exploits by correcting the root cause of the exploits (i.e., the Defects), Intel merely provides a superficial patch for each specific exploit as researchers

---

[9] Stephen Röttger, *Escaping the Chrome Sandbox with RIDL*, Google Project Zero (Feb. 15, 2020), https://googleprojectzero.blogspot.com/2020/02/escaping-chrome-sandbox-with-ridl.html.

PAGE 9 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

demonstrate yet another variant of the Intel CPU Exploits.  As long as Intel continues to only respond with symptomatic fixes, additional exploits like the Intel CPU Exploits will keep happening.  As industry experts stress, "[r]esearchers find these things without even trying very hard.  And it probably means that other adversaries will find them, too."[10]

24.    To be sure, given that Intel has dozens of CVEs[11] reflecting the status "RESERVED," it appears that numerous yet-to-be-disclosed Intel CPU Exploits are known to Intel and have been embargoed for 6 months or more (characteristic of Intel's practice of significantly delayed disclosure of Intel CPU Exploits).

25.    Intel's mitigations are mere band-aids.  The security Defects need to be fixed at the CPU *hardware* level.  As even Intel has acknowledged, "industry experts have long realised that software only solutions simply will not cut the mustard, since they can ultimately be compromised or bypassed in some way.  Instead, security needs to be rooted in hardware capabilities that cannot be altered or disabled by malicious code."[12]

26.    Even after Intel learned that the Intel CPU Exploits were taking advantage of its design Defects, Intel unreasonably delayed disclosing the side-channel exploits for months, thereby increasing exposure, risk, and injury to Plaintiffs and the other Class members.  Incredibly, during this time, not only did Intel continue to market and sell its defective CPUs at a substantial premium, touting the defective CPUs' superior speed and security, but Intel also launched new defective

---

[10] Andy Greenberg, *Intel is Patching the Patch for the Patch for Its 'ZombieLoad' Flaw*, Wired (Jan. 27, 2020), https://www.wired.com/story/intel-ZombieLoad-third-patch-speculative-execution/.

[11] "CVE" refers to Common Vulnerabilities and Exposures, a standardized, industry-endorsed list of security vulnerabilities.

[12] Dan Robinson, *Hardware-drive security in the hybrid cloud*, The Register (Nov. 16, 2017), https://www.theregister.co.uk/2017/11/16/hardwaredriven_security_in_the_hybrid_cloud/

PAGE 10 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

products to the market knowing they were vulnerable to Meltdown and Spectre.  Because Intel processors' higher prices are linked directly to their touted performance and security claims, Intel deliberately concealed the known exploits that target undisclosed Defects in Intel CPUs and the performance killing mitigations that would transform Intel's purported high-end CPUs into lower-end CPUs – all to take advantage of Plaintiffs, Class members, and the consuming public for Intel's profit.

27.    Google Project Zero teams confidentially shared their findings on Meltdown and Spectre to Intel in mid-2017; well before Intel launched its 8th generation "Coffee Lake" processors. The exploits were kept under embargo, and Intel did its best to make sure the public did not find out.  Meltdown and Spectre were made public only on January 3, 2018.

28.    By the time Intel launched the "Coffee Lake" processor family (September 25, 2017, with October 5 availability),[13] Intel was fully aware that the product it was releasing was vulnerable to Meltdown and Spectre.[14]  Intel's engineers had sufficient time to understand the severity of the vulnerability because "Coffee Lake" is essentially the same micro-architecture as "Kaby Lake" and "Skylake."

29.    Worse still, Intel knew or should have known that the mitigations for Meltdown and Spectre would materially impact the CPUs' performance and function and yet concealed this

---

[13]    Wikipedia, 2017 *Coffee Lake*, last modified April 30, 2021, https://en.wikipedia.org/wiki/Coffee_Lake

[14] Btarunr, *Intel Released 'Coffee Lake' Knowing it Was Vulnerable to Spectre and Meltdown*, Tech Power Up (January 5, 2018), https://www.techpowerup.com/240283/intel-released-coffee-lake-knowing-it-was-vulnerable-to-spectre-and-meltdown#:~:text=By%20the%20time%20Intel%20launched,more%20publicized%20of%20which%2C%20are%20%22

PAGE 11 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

information from Plaintiffs and class members. Intel could have (and, indeed, should have) very easily put out a notice stating that pending security patches could impact performance and provide approximate ranges that the patches will slow down systems. Revealing this information would not put security of the larger community at risk. In other words, there was no reasonable basis to withhold this information from the public, while simultaneously pushing defective products to the Plaintiffs and Class members at a substantial premium that Intel knew the products did not genuinely deserve. But Intel put its short-term profit ahead of the interests of its customers.

30.     During this delay and before any of the Intel CPU Exploits were made public (and patches made available), and while Intel continued to advertise, market, and sell its known defective CPUs at a significant premium, former Intel CEO Brian Krzanich exercised and sold off nearly 900,000 company shares and stock options (while investors and the SEC were unaware of the vulnerabilities) – raking in about $24 million. This was months after being informed of the significant security exploits taking advantage of its flagship CPUs but before Intel publicly disclosed the problem. The stock sale left Krzanich with just 250,000 shares of Intel stock – the minimum that he is required to own under his Intel employment agreement. By withholding the facts concerning the defective CPUs, Intel put its own interests ahead of the very consumers who placed their trust and confidence in Intel and benefitted itself to the detriment of Plaintiffs and Class members.

31.     During this period since mid-2017, when Intel indisputably knew not only that the Defects plagued its CPUs but also that Meltdown and Spectre exploited those Defects, and also knew that it would be releasing necessary mitigations to safeguard its CPUs, which would cause a significant impact on performance, Intel continued to sell and distribute its processors at a

PAGE 12 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

substantial premium.  It did so without repairing or disclosing either the Defects or the need to download software patches that would materially impact performance.   In other words, Intel intentionally duped every purchaser of an Intel CPU since mid-2017, including a number of Plaintiffs and Class members.

32.     Indeed, despite knowing that its defective CPUs were vulnerable to Meltdown and Spectre and that the mitigations would materially impact the performance and functionality of the CPUs, Intel continued advertising the superior speed and security of its CPUs and selling and distributing them at a substantial premium.

33.     The processors that Intel sold and distributed were not of the quality represented and were not capable of the security and performance that it represented, and Intel knew it.

34.     Since the 1990's, every computer or device sold with an Intel chip has displayed a sticker with the slogan "Intel Inside," to make consumers believe that they were buying a product with the best, fastest and most powerful processor.  And with its marketing and advertising, Intel led consumers to believe that each new generation of processors it introduced was faster and higher performing that the previous one.  In fact, at the point of sale, whether online or in a brick-and-mortar store, consumers are presented with the specific processer speed for the Intel CPU that is inside.  Plaintiffs and Class members had no reason to suspect and could not have reasonably discovered that Intel had sacrificed security for speed, that the CPUs suffered from the Defects or that their computers and devices would suffer significant performance degradation as a result of implementing mitigations necessary to address the Defects to protect against the Intel CPU Exploits.

35.     Had Plaintiffs known about the Defects in Intel's CPUs or that Intel's mitigations needed to address the Defects and protect against the Intel CPU Exploits would materially impact

PAGE 13 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

the CPUs' security, functionality, and performance, they would have paid less for them based only on the CPUs' post-mitigation performance (not the promised pre-mitigation performance). Alternatively, because of the influx of new disclosures and uncertainty surrounding future mitigations and burdens of additional performance regressions, Plaintiffs would not have purchased the devices with Intel processors altogether and, instead, would have purchased a device with a processor manufactured by AMD or another competitor. Reportedly, competitors' processors are largely immune to the Intel CPU Exploits.

## JURISDICTION AND VENUE

36.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and Intel is a citizen of a State different from that of at least one Class member.

37.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Intel transacts business and may be found in this District.

## PARTIES

## NAMED PLAINTIFFS

38.     Each and every Plaintiff and each Class member has suffered a concrete and particularized injury, including, but not limited to, loss of the benefit of the bargain and diminished value of their processors, as a result of Intel's concealment of known Defects in its processors and the material performance regression associated with downloading mitigations in order to ameliorate – but not cure – Intel's deficient security and protect their sensitive information. The deterioration in performance suggests an average reduction in value of 15-20% or more.

PAGE 14 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

## JIMAYA GOMEZ – ARIZONA

39.     Plaintiff Jimaya Gomez is a resident and citizen of the State of Arizona.  On or about March 22, 2016, Plaintiff bought a new Mac OS laptop which featured an Intel Core i7-4980HQ as the computer's CPU.  Plaintiff bought the laptop from Apple online.  Plaintiff reviewed and relied on the information about the laptop and Intel processor that was displayed online.  Plaintiff purchased and still owns this device containing an Intel processor.  Plaintiff has heard and/or read that Intel processors were the world's fastest.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

40.     Plaintiff has used, and continues to use, the Intel device for multitasking – with various applications open at the same time – between video editing, photo editing, streaming videos and music, email, and general web browser use.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

41.     Unknown to Plaintiff, at the time of purchase, the laptop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against the Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Plaintiff has also experienced difficulty in multitasking, with the laptop slowing significantly when using multiple applications.  Plaintiff avoids using her laptop for certain tasks, such as

PAGE 15 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

streaming videos. In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on her Intel device.

42.     Plaintiff paid for security and processor performance that she did not receive. Plaintiff's device is comparable to test machine Apple 2011 MacBook Pro with Intel Core i7. Responsiveness testing, detailed in Section J.4., infra, on the test machine confirms that Intel's mitigations degraded performance by 4% on average under the Default Mitigations and up to 9%.

43.     Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain. After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs. Plaintiff's Intel CPU is worth less than what she paid for it.

44.     Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life. Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online, Plaintiff would have seen them, and no doubt have taken them into account in making her purchasing decision. In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects

PAGE 16 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

would materially impact the CPUs' functionality and performance, she would not have bought the laptop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

### RYAN CLARKE – ARIZONAb

45.    Plaintiff Ryan Clarke is a resident and citizen of the State of Arizona.  On or about August 16, 2017, Plaintiff bought a new Mac OS which featured an Intel Core i7-7820HQ as the computer's CPU.  Plaintiff bought the laptop from the Apple Store online.  Plaintiff reviewed and relied on the information about the laptop and Intel processor that was displayed online.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has read that Intel processors were the world's fastest processors and had advanced performance.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

46.    Plaintiff has used, and continues to use, the Intel device for personal use while multitasking in various applications, including web browsers, email services, video and music streaming services, and graphic design applications.  Plaintiff often has multiple applications open at the same time.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

PAGE 17 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

47.     Unknown to Plaintiff, at the time of its purchase, the laptop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against the Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.   Specifically, Plaintiff has experienced freezing while using programs, which has caused him to avoid video-editing on the device.  He often has resorted to using his phone for certain tasks to avoid having too many programs open at once on his laptop.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device.

48.     Plaintiff paid for security and processor performance that he did not receive.  Plaintiff's device is comparable to test machine Apple 2011 MacBook Pro with Intel Core i7.  Responsiveness testing, detailed in Section J.4., infra, on the test machine confirms that Intel's mitigations degraded performance by 4% on average under the Default Mitigations and up to 9%.

49.     Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

PAGE 18 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

50.     Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the laptop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

## LOUISA FERRER – CALIFORNIA

51.     Plaintiff Louisa Ferrer is a resident and citizen of the State of California.  On or about May 8, 2016, Plaintiff bought a new Windows laptop which featured an Intel Core i7-6500U as the computer's CPU.  Plaintiff bought the laptop from Amazon online.  Plaintiff reviewed and relied on the information about the laptop and Intel processor that was displayed online.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard and/or read that Intel processors were the world's fastest processors.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any

PAGE 19 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

52.     Plaintiff has used, and continues to use, the Intel device for streaming videos, video editing, web-browsing, and streaming movies and music.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

53.     Unknown to Plaintiff, at the time of its purchase, the laptop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced slowed video editing and freezing when using programs.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on her Intel device.

54.     Plaintiff paid for security and processor performance that she did not receive. Plaintiff's device is comparable to test machine Intel Core i9-7900X Skylake – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 21% on average under the Default Mitigations and up to 29%.

55.     Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's

PAGE 20 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                   COMPLAINT

CPUs would be negatively impacted – across the board – as a result of the necessary patches to secure data from the Defects due to the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what she paid for it.

56.    Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making her purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, she would not have bought the laptop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

**PAMELA GREEN – CALIFORNIA**

57.    Plaintiff Pamela Green is a resident and citizen of the State of California.  On or about February 4, 2015, Plaintiff bought a new Windows laptop which featured an Intel Core i5-4200U as the computer's CPU.  Plaintiff bought the laptop from Fry's Electronics store.  Plaintiff reviewed and relied on the information about the laptop and Intel processor that was displayed in store.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard and/or read that Intel processors were the world's fastest.  Plaintiff expected the processor to

PAGE 21 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

function as Intel advertised and represented. Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise. Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

58.    Plaintiff has used, and continues to use, the Intel device for multitasking – with various applications open at the same time – between word processing, email, and general web browser use. Plaintiff's computer receives periodic updates that include the CPU patches released to date.

59.    Unknown to Plaintiff, at the time of its purchase, the laptop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties. While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed. Plaintiff has also experienced difficulty in multitasking, with the laptop slowing significantly and taking several minutes to start up. In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on her Intel device.

60.    Plaintiff paid for security and processor performance that she did not receive. Plaintiff's device is comparable to test machine Intel Core i5-4670 Haswell – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 11% on average under the Default Mitigations and up to 21%.

PAGE 22 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

61.     Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what she paid for it.

62.     Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed in store, Plaintiff would have seen them, and no doubt have taken them into account in making her purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, she would not have bought the laptop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

PAGE 23 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

## CARLO GARCIA – CALIFORNIA

63.     Plaintiff Carlo Garcia is a resident and citizen of the State of California.  On or about November 25, 2017, Plaintiff bought a new Windows desktop which featured an Intel Core i7-8700 as the computer's CPU.  Plaintiff bought the desktop from Dell online.  Plaintiff reviewed and relied on the information about the desktop and Intel processor that was displayed online.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard that Intel processors were the industry performance leader and had advanced performance.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

64.     Plaintiff has used the Intel device for multitasking between various personal uses including gaming, video editing, streaming music, email, and streaming video.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

65.     Unknown to Plaintiff, at the time of its purchase, the desktop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against the Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Opening and loading the Internet and web pages slowed and applications froze.  Plaintiff also experience sluggishness while switching between applications and browser pages when multitasking.  Plaintiff's computer also crashed.  In addition, as a result of the Defects in Intel's

CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device purchasing antivirus software to guard against threats. Plaintiff also had to rely on his phone and then purchase an iPad, as the desktop is no longer sufficiently functional.

66.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i7-8700K Coffee Lake – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 14% on average under the Default Mitigations and up to 30%.

67.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain. After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the patches necessary to mitigate the threat of unauthorized access to private information from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs. Plaintiff's Intel CPU is worth less than what he paid for it.

68.    Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life. Had disclosures of the Defects in the CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision. In

PAGE 25 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
           COMPLAINT

particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the desktop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a desktop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

### EUGENE CODERRE – CONNECTICUT

69.    Plaintiff Eugene Coderre is a resident and citizen of the State of Connecticut.  In or about December 2013, Plaintiff bought a new Windows desktop which featured an Intel Core i5-3450 as the computer's CPU.  Plaintiff bought the desktop from Hewlett Packard online.  Plaintiff reviewed and relied on the information about the desktop and Intel processor that was displayed online.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard and read that Intel processors were the world's fastest processors and had amazing performance consumers could see and feel.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

70.    Plaintiff has used the Intel device for multitasking between various activities, including web-browsing, playing videogames, streaming music, and word processing.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

PAGE 26 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
           COMPLAINT

71.     Unknown to Plaintiff, at the time of its purchase, the desktop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced significant slowdowns in processing speed, and the system frequently crashed and froze while using programs and as a result, Plaintiff has discontinued use of the system.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device.

72.     Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i5-4670 Haswell – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 11% on average under the Default Mitigations and up to 21%.

73.     Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

PAGE 27 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

74.     Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the desktop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a desktop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

### BRUCE BODOFSKY – DELAWARE

75.     Plaintiff Bruce Bodofsky is a resident and citizen of the State of Delaware.  In or about December 2016, Plaintiff bought a new Windows desktop which featured an Intel Core i5-6400 as the computer's CPU.  Plaintiff bought the desktop from a Staples store.  Plaintiff reviewed and relied on the information about the desktop and Intel processor that was displayed in ads and at the store.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard and read that Intel processors were the world's fastest processors, had amazing performance consumers could see and feel, were the industry performance leader and had advanced performance.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data

PAGE 28 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

would not potentially be exposed to compromise. Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

76.     Plaintiff has used, and continues to use, the Intel device for multitasking various business and personal activities, such as managing inventory for his business, word processing, email, web browsing, scanning photographs, and storing photographs. Plaintiff's computer receives periodic updates that include the CPU patches released to date.

77.     Unknown to Plaintiff, at the time of its purchase, the desktop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties. While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed. Specifically, Plaintiff has experienced extreme slowdown which has increased time required to load and/or run programs, sluggish response, increased time in switching between programs and tabs within a web browser, additional time to complete tasks/workloads, and more time waiting for websites to load or respond. In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device spending approximately four to six hours researching articles on how to deal with the issues.

78.     Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i5-6500 Skylake – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 14% on average under the Default Mitigations and up to 27%.

PAGE 29 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

79.     Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

80.     Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the desktop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a desktop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

PAGE 30 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

## LINDA PHILLIPS – DISTRICT OF COLUMBIA

81.    Plaintiff Linda Phillips is a resident and citizen of the District of Columbia.  On or about March 30, 2017, Plaintiff bought a new Windows laptop which featured an Intel Core i3-5005U as the computer's CPU.  Plaintiff bought the laptop from a Staples store.  Plaintiff reviewed and relied on the information about the laptop and Intel processor that was displayed in the store. Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard that Intel processors were the world's fastest processors, had amazing performance consumers could see and were the industry performance leader and had advanced performance.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

82.    Plaintiff has used, and continues to use, the Intel device for web browsing, email, scanning documents, and word processing.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

83.    Unknown to Plaintiff, at the time of its purchase, the laptop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced significant deterioration in functionality and has had problems with scanning and saving documents and other files to the computer.  In addition, as a

PAGE 31 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on her Intel device as well as conferring with Hewlett Packard tech support attempting to address the problems she has experienced.

84.    Plaintiff paid for security and processor performance that she did not receive. Plaintiff's device is comparable to test machine Intel Core i3-4130 Haswell – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 22% on average under the Default Mitigations and up to 37%.

85.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what she paid for it.

86.    Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making her purchasing decision.  In

PAGE 32 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, she would not have bought the laptop containing the Intel processor or would have paid less for it. Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

### SCHWARTZ EYE ASSOCIATES, PA – FLORIDA

87.     Plaintiff Schwartz Eye Associates, PA ("Schwartz Eye") is a full-service eye care provider that is organized under the laws of the state of Florida and primarily does business in Florida.

88.     Schwartz Eye maintains private, sensitive, and confidential information, including electronic health records ("EHR"), protected health information ("PHI"), electronic PHI ("ePHI"), and other confidential or protected information, which Schwartz Eye is obligated under the Health Insurance Portability and Accountability Act ("HIPAA") and the American Recovery and Reinvestment Act ("ARRA"), among other statutes and regulations, to protect from unauthorized access.

89.      In making purchases and deciding to deploy devices containing Intel CPUs, Schwartz Eye relied on Intel's representations (both direct and indirect) that its CPUs would provide superior security, performance, and speed, and were fit for use in its servers, PCs, and other devices that store, process or access sensitive, confidential, and personal information and data. Intel represented that its processors would deliver such performance securely, so that private and personal

data would not potentially be exposed to compromise. Schwartz Eye paid for security and processor performance it did not receive.

90.    Schwartz Eye's employees used (and are still using) Affected Devices to perform their duties and tasks, which requires them to work with or switch between multiple programs, use multiple tabs on web browsers, and use and access intensive applications and databases.

91.    Based on these direct and indirect representations, Schwartz Eye has purchased, and continues to use, a large number of products containing defective Intel processors, including desktop computers and a retinal imaging system.

92.    Schwartz Eye expected the processors to function as Intel advertised and represented. Implicit in Intel's representations was that its processors would deliver such performance securely, so that that data would not potentially be exposed to compromise. Any reasonable purchaser would expect that the computing device being purchased would be secure and free from potential exploits.

93.    Unknown to Schwartz Eye, at the time that it purchased the Affected Devices, those Devices were equipped with Intel processors that contained the undisclosed Defects described in this Amended Complaint.

94.    Schwartz Eye purchased the Affected Devices on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life. Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed in Intel's advertisements, brochures, bulletins, and on its webpage, Schwartz Eye would have seen them and no doubt have taken them into account in making its purchasing decisions. In particular, had Schwartz Eye known about the Defects in Intel's

PAGE 34 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality, security, and performance, it would not have bought the Affected Devices containing Intel processors or it would have paid less for them.

95.     As a result of the Defects in Intel's CPUs and the mitigations needed to address the Defects and in order to comply with its duty to protect confidential information and documents, Schwartz Eye spent many hours researching the Intel CPU Exploits, implementing available mitigations, and installing patches for its computers and servers to address the security vulnerabilities.  Additionally, Schwartz Eye has incurred and will continue to incur time and costs because it has been and will continue to be required to, among other things:  implement mitigation and remedial measures, such as patching to address the security vulnerabilities; monitor and test new patches and firmware updates; remove from service products with affected processors that cannot be patched; purchase on an accelerated schedule compared to normal business practices more powerful processors to compensate for decreased performance resulting from required software remediation patching; transfer data to secure systems from Affected Devices that cannot be patched; reconfigure its networks to provide increased security from internet accessibility for those systems containing the most sensitive data; increase monitoring of the Affected Devices, servers, and firewalls for security threats, attacks and breaches; and supplement its network and computing security program(s) with additional security monitoring

96.     During the Class Period (i.e., January 1, 2006 to the present), Schwartz Eye purchased at least two desktop computers that featured an Intel processor.  By way of example, Schwartz Eye purchased a Windows desktop that featured an Intel Core i3-7100U as the desktop's CPU.  Schwartz Eye's desktop is comparable to test machine Intel Core i3 8100 Coffee Lake -

Windows 10.  Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 16% on average under Default Mitigations and up to 28%.

97.    During the Class Period, Schwartz Eye purchased at least one retinal imaging system that featured an Intel Core i5-4590 as the system's CPU.  Schwartz Eye's imaging system is comparable to test machine Intel Core i3 4130 Haswell - Windows 10.  Responsiveness testing, detailed in Section J.1, infra, on the test machine confirms that Intel's mitigations degraded performance by 22% on average under Default Mitigations and up to 37%.

98.    Because the Intel CPU Defects can be mitigated, but not completely fixed, on existing hardware, Schwartz Eye will continue to be injured by incurring these additional monitoring costs as long as the Affected Devices are deployed as part of its IT infrastructure.  Further, because the only true fix is a defect-free CPU, Intel must redesign its CPUs without the Defects.  When those CPUs are released, Schwartz Eye will be compelled to accelerate its purchases of this new equipment, prematurely and outside normal replacement cycles, to eliminate the security risk created by Intel's design decisions.  Consequently, Schwartz Eye will sustain additional damages by expending the costs necessary to upgrade to non-defective computers and servers.

99.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Schwartz Eye's Intel processors, and Schwartz Eye did not receive the benefit of its bargain. As detailed in this Amended Complaint, Schwartz Eye's Affected Devices are worth less than what it paid for them, and the Defects in the CPUs have increased the threat of security breaches requiring Schwartz Eye to incur increased costs for its IT operations.

PAGE 36 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

## JUBAL MALAY – GEORGIA

100.    Plaintiff Jubal Malay is a resident and citizen of the State of Georgia.  In or about the summer of 2010, Plaintiff bought a new Windows laptop which featured an Intel Core i3-350M as the computer's CPU.  Plaintiff bought the laptop from Sony online.  Plaintiff reviewed and relied on the information about the laptop and Intel processor that was displayed online.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard and/or read that Intel processors were the world's fastest processors.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

101.    Plaintiff has used, and continues to use, the Intel device for web browsing, playing videogames, streaming movies, streaming music, and email, and has used it for word processing, scanning tasks, all frequently while multitasking, with multiple applications open at the same time.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

102.    Unknown to Plaintiff, at the time of its purchase, the laptop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced computer applications unexpectedly being non-responsive and terminating.  In addition, as a result of the Defects in Intel's CPUs and Intel's

PAGE 37 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
        COMPLAINT

mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device.

103.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i3-530 Clarkdale – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 11% on average under the Default Mitigations and up to 22%.

104.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

105.    Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the

PAGE 38 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

laptop containing the Intel processor or would have paid less for it. Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

## JOSEPH PHILLIPS – GEORGIA

106.    Plaintiff Joseph Phillips is a resident and citizen of the State of Georgia. On or about December 29, 2017, Plaintiff bought a new Intel Core i7-8700k as the CPU for a custom-built desktop. Plaintiff bought the processor from Fry's Electronics in store. Plaintiff reviewed and relied on the information about the Intel processor that was displayed online and in the store. Plaintiff still owns this desktop containing the Intel processor. Plaintiff has read that Intel processors were the world's fastest processors and were the industry performance leader. Plaintiff expected the processor to function as Intel advertised and represented. Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise. Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

107.    Plaintiff has used, and continues to use, the Intel device for personal and business use, frequently performing multiple tasks at the same time, including playing online multiplayer videogames, word processing, computer aided design plans for construction projects, streaming music, and email. Plaintiff will often switch back and forth between applications while using his device. Plaintiff's computer receives periodic updates that include the CPU patches released to date.

108.    Unknown to Plaintiff, at the time of its purchase, the Intel processor contained undisclosed design Defects that made information, which should have remained secure and

PAGE 39 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

inaccessible, accessible to unauthorized parties. While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed. Specifically, Plaintiff experienced a significant reduction in frames per second while playing online games and unexpected freezes. In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device.

109.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i7-8700K Coffee Lake – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 14% on average under the Default Mitigations and up to 30%.

110.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor, and Plaintiff did not receive the benefit of the bargain. After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs. Plaintiff's Intel CPU is worth less than what he paid for it.

111.    Plaintiff purchased the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life. Had disclosures of the Defects in the Intel

PAGE 40 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision. In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the Intel processor or would have paid less for it. Plaintiff would have purchased an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

### TITI RICAFORT – HAWAII

112.    Plaintiff Titi Ricafort is a resident and citizen of the State of Hawaii. On or about July 16, 2015, Plaintiff bought a new Windows laptop which featured an Intel Core i3-5010U as the computer's CPU. Plaintiff bought the laptop from Best Buy online. Plaintiff reviewed and relied on the information about the laptop and Intel processor that was displayed online. Plaintiff purchased, and still owns, this device containing an Intel processor. Plaintiff has heard that Intel processors were industry leaders in both performance and security. Plaintiff expected the processor to function as Intel advertised and represented. Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise. Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

113.    Plaintiff has used, and continues to use, the Intel device for multitasking between various personal and business tasks, including web browsing, streaming media, storing photographs,

PAGE 41 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

and using a virtual private network application.  Plaintiff often will have multiple applications open at the same time.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

114.    Unknown to Plaintiff, at the time of its purchase, the laptop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced frequent freezing while using programs.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on her Intel device.

115.    Plaintiff paid for security and processor performance that she did not receive. Plaintiff's device is comparable to test machine Intel Core i3 4130 Haswell – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 22% on average under the Default Mitigations and up to 37%.

116.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the

PAGE 42 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what she paid for it.

117.   Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making her purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, she would not have bought the laptop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

**KENNETH WOOLSEY – IDAHO**

118.   Plaintiff Kenneth Woolsey is a resident and citizen of the State of Idaho.  On or about November 2017, Plaintiff bought a new Windows desktop which featured an Intel Core i7-8700 as the computer's CPU.  Plaintiff bought the desktop from a Costco store.  Plaintiff reviewed and relied on the information about the desktop and Intel processor that was displayed in the store.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard and read that that Intel processors were the world's fastest processors.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor

would deliver such performance securely, so that that data would not potentially be exposed to compromise. Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

119.    Plaintiff has used the Intel device for multitasking between various activities, including web browsing, graphic architectural design, and playing videogames. Plaintiff's computer receives periodic updates that include the CPU patches released to date.

120.    Unknown to Plaintiff, at the time of its purchase, the desktop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties. While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed. Specifically, Plaintiff has experienced computer freezes and has lost information following crashes. Plaintiff discontinued use of his desktop because of the Defect. In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device.

121.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i7-8700K Coffee Lake – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 14% on average under the Default Mitigations and up to 30%.

122.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of

PAGE 44 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

123.    Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the desktop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a desktop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

## CLAUDE VOGEL – ILLINOIS

124.    Plaintiff Claude Vogel is a resident and citizen of the State of Illinois.  On or about August 26, 2014, Plaintiff bought a new Mac OS laptop which featured an Intel Core i5-4260U as the computer's CPU.  Plaintiff bought the laptop from Best Buy online.  On or about May 21, 2015,

Plaintiff bought a new Mac OS desktop which featured an Intel Core i5-4260U as the computer's CPU.  Plaintiff bought the desktop from B&H Photo online.  Plaintiff reviewed and relied on the information about the devices and Intel processors that were displayed online.  Plaintiff purchased, and still owns, the devices containing Intel processors.  Plaintiff has heard and read that Intel processors had advanced performance.  Plaintiff expected the processors to function as Intel advertised and represented.  Implicit in Intel's representations was that its processors would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

125.    Plaintiff has used both Intel devices, and continues to use, the laptop for web browsing and playing video card games.  Plaintiff's laptop receives periodic updates that include the CPU patches released to date.

126.    Unknown to Plaintiff, at the time of purchase, the devices were equipped with Intel processors that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced freezing while using programs and unexpected shutdowns.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations.

PAGE 46 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

127.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's devices are comparable to test machine Apple 2013 MacBook Pro with Intel Core i5. Responsiveness testing, detailed in Section J.4., infra, on the test machine confirms that Intel's mitigations degraded performance by 5% on average under the Default Mitigations and up to 11%.

128.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processors and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

129.    Plaintiff purchased devices containing the Intel processors on the reasonable, but mistaken, belief that the processors would provide the performance promised, would do so securely, and would retain all of their operating characteristics throughout their useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making purchasing decision. In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the devices containing the Intel processor or would have paid less for them.  Plaintiff would have purchased devices containing an AMD or other competing processor (which are largely

PAGE 47 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

### JUSTIN WHIPPO -- ILLINOIS

130.    Plaintiff Justin Whippo was a resident and citizen of the State of Illinois, who is currently residing in New South Wales.  While a resident of Illinois, in or about July 2014, Plaintiff bought a Windows laptop which featured a new Intel Pentium 2117U as the computer's CPU. Plaintiff bought the laptop from Newegg online.  Plaintiff reviewed and relied on the information about the laptop and Intel processor that was displayed online.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard and/or read that Intel processors were the world's fastest processors and were an industry performance leader.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

131.    Plaintiff has used the Intel device for various personal and business activities, almost always performing multiple tasks at the same time, such as data submission, web browsing/evaluation, word processing, online gaming, email, and social networking, and now continues to use it for general use.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

132.    Unknown to Plaintiff, at the time of its purchase, the laptop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were

implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced slowness while performing multiple tasks, sluggish start up and shut down cycles and frequent unexpected shutdowns.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device.

133.   Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i3 4130 Haswell – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 22% on average and up to 37%.

134.   Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of his bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

135.   Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the

PAGE 49 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision. In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the laptop containing the Intel processor or would have paid less for it. Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

## DAVID COPELAND – IOWA

136.    Plaintiff David Copeland is a resident and citizen of the State of Iowa. In or about November 2016, Plaintiff bought a new Windows laptop which featured an Intel Core i7-6500U as the computer's CPU. Plaintiff bought the laptop from Best Buy in the store. Plaintiff reviewed and relied on the information about the laptop and Intel processor that was displayed in the store. Plaintiff purchased, and still owns, this device containing an Intel processor. Plaintiff has heard and read that Intel processors were the industry performance leader and had advanced performance. Plaintiff expected the processor to function as Intel advertised and represented. Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise. Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

137.    Plaintiff has used, and continues to use, the Intel device for graphic design, editing, word processing, social networking, and 3D modeling.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

138.    Unknown to Plaintiff, at the time of its purchase, the laptop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.   Specifically, Plaintiff has experienced slow performance that has progressively worsened over time.  Applications such as Adobe Photoshop and Adobe Illustrator operated slowly.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device as well as purchasing a new hard drive.

139.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i9-7900X Skylake – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 21% on average under the Default Mitigations and up to 29%.

140.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches

PAGE 51 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

141.    Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the laptop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

## KOTTEMANN ORTHODONTICS, PLLC – MINNESOTA

142.    Plaintiff Kottemann Orthodontics, PLLC ("Kottemann Orthodontics") is a private orthodontics practice organized under the laws of the State of Minnesota and primarily doing business in Minnesota.

143.    Kottemann Orthodontics maintains private, sensitive, and confidential information, including EHR, PHI, ePHI, and other confidential or protected information, which Kottemann

Orthodontics is obligated under HIPAA and ARRA, among other statutes and regulations, to protect from unauthorized access.

144.    In making purchases and deciding to deploy devices containing Intel CPUs, Kottemann Orthodontics relied on Intel's representations (both direct and indirect) that its CPUs would provide superior security, performance, and speed, and were fit for use in its servers, PCs, and other devices that store, process or access sensitive, confidential and personal information, and data.  Intel represented that its processors would deliver such performance securely so that private and personal data would not potentially be exposed to compromise. Kottemann Orthodontics paid for processor security and performance it did not receive.

145.    Kottemann Orthodontics researched the devices before purchasing them, and that research included reviewing the Intel website or marketing material description of the security and capabilities of the CPUs contained in the devices that Kottemann Orthodontics purchased.

146.    Kottemann Orthodontics' employees used and are still using Affected Devices to perform their duties and tasks, which requires them to multitask and work with or switch between multiple programs at same time, use multiple tabs on web browser, and use and access intensive applications and databases.

147.    Based on these direct and indirect representations, Kottemann Orthodontics has purchased, and continues to use, a large number of products containing defective Intel processors, including servers and desktop computers.

148.    Kottemann Orthodontics' orthodontists, nurses, and staff use the Affected Devices in their ordinary course of business to deliver orthodontic services to their patients and otherwise support the delivery of those services.

PAGE 53 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

149.    Kottemann Orthodontics also uses servers that are Affected Devices to store vast amounts of medical records which Kottemann Orthodontics is legally required to maintain confidentially. This confidential data includes a patient's name, address, phone number, Social Security Number, medical insurance information, next of kin, employer, prescribed medications, prior medical history, diagnoses, and medical treatments provided by Kottemann Orthodontics.

150.    As a result of the Defects in Intel's CPUs and the mitigations needed to address the Defects and in order to comply with its duty to protect confidential information and documents, Kottemann Orthodontics spent significant time and effort researching the Intel CPU Exploits and implementing available mitigations.   Additionally, Kottemann Orthodontics has been injured because it incurred and will continue to incur costs to monitor protected information, including ePHI and EHR, for data breaches and other malicious activity.   These monitoring costs are above and beyond the costs that would be incurred as part of Kottemann Orthodontics' ordinary risk management processes and include:

- Time spent by Kottemann Orthodontics' employees analyzing and selecting "patches" designed to mitigate risks of the Intel CPU Exploits as those patches are released;

- Time spent by employees installing such "patches" as are suitable individually on each appropriate device utilizing an Intel CPU;

- Increased time spent monitoring the Affected Devices and servers for security threats, attacks, and breaches;

PAGE 54 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

- Increased time spent by employees monitoring data outflows because the Defects increase the risk of EHR, PHI, and ePHI being subject to hacking or other unauthorized access; and

- Increased time spent auditing and interacting with third-party cloud-based service providers to determine the third party's efforts to address the Defects having increased the risk of EHR, PHI, and ePHI being subject to hacking or other authorized use.

151.    Because the Intel CPU Defects can be mitigated, but not completely fixed, on existing hardware, Kottemann Orthodontics will continue to be injured by incurring these additional monitoring costs as long as the Affected Devices are deployed as part of its IT infrastructure. Further, because the only true fix is a defect-free CPU, Intel must redesign its CPUs without the Defects.  When those CPUs are released, Kottemann Orthodontics will be compelled to accelerate its purchases of this new equipment, prematurely and outside normal replacement cycles, to eliminate the security risk created by Intel's design decisions. Consequently, Kottemann Orthodontics will sustain additional damages by expending the costs necessary to upgrade to non-defective computers and servers.

152.    Kottemann Orthodontics has suffered further injury by having to spend money to hire outside consultants to perform tasks that normally would be performed by its salaried Director of Information Technologies because that Director devoted additional time to addressing risks posed by variants of the Intel CPU Exploits.

153.    Although security patches were implemented to protect against the Intel CPU Exploits, after January 2018 when the patches were installed, Kottemann Orthodontics' computing

PAGE 55 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

systems experienced material performance degradation, including unacceptable losses of functionality in certain devices, requiring capital expenditures that Kottemann Orthodontics would not have incurred otherwise.  Kottemann Orthodontics owns approximately 80 Affected Devices, primarily PCs and laptops that ran a Microsoft Windows 7 operating system.  The Affected Devices experienced freezing or unacceptable slowdowns from the patches.   To date, Kottemann Orthodontics has upgraded more than 20 of those machines at a per machine cost of roughly $500.00 for RAM, SSD, and licensing costs.  Additionally, Kottemann Orthodontics incurred additional employee time, ranging from approximately two hours to eight hours, to perform necessary upgrades on one or more machines.  Kottemann Orthodontics would not have experienced these injuries and would not have incurred these out-of-pocket costs or costs of employee time but for its need to address the Defects.

154.    During the Class Period, Kottemann Orthodontics purchased at least 17 servers that featured an Intel processor. By way of example, Kottemann Orthodontics purchased several Windows servers that featured an Intel Xeon Silver 4114 as the server's CPU.  Kottemann Orthodontics' server is comparable to test machine Xeon Gold 6138 Skylake - Linux VM. Testing on server workloads, detailed in Section J.3., infra, on the test machine confirms that Intel's mitigations resulted in 12% average degradation (up to 19%) under the Default Mitigations, and 18% average degradation (up to 29%) under the Maximum Mitigations.

155.    During the Class Period, Kottemann Orthodontics purchased at least 64 Windows desktop computers that featured an Intel processor.  By way of example, Kottemann Orthodontics purchased a Windows desktop that featured an Intel Core i7-4790 as the desktop's CPU.  Kottemann Orthodontics' desktop is comparable to test machine Intel Core i7 4558U Haswell - Windows 10.

PAGE 56 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 27% on average and up to 49%.

156.    During the Class Period, Kottemann Orthodontics also purchased a macOS desktop that featured an Intel Core i5-4250U as the desktop's CPU.  Kottemann Orthodontics' desktop is comparable to test machine Intel Core i3 4130 Haswell - Windows 10.  Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 22% on average under Default Mitigations and up to 37%.

157.    Intel has announced that it is designing and will release CPUs that are not subject to the Intel CPU Exploits.  When those CPUs are released, Kottemann Orthodontics will be compelled to accelerate its purchases of this new equipment, prematurely and outside normal replacement cycles, in order to eliminate the security risk created by Intel's design decisions.  Consequently, Kottemann Orthodontics will sustain additional damages by expending the costs necessary to upgrade to non-defective computers and servers.

158.    Kottemann Orthodontics expected the processors to function as Intel advertised and represented.   Implicit in Intel's representations was that its processors would deliver such performance securely, so that that data would not potentially be exposed to compromise. Any reasonable purchaser would expect that the computing device being purchased would be secure and free from potential exploits.

159.    Unknown to Kottemann Orthodontics, at the time that it purchased the Affected Devices, those Devices were equipped with Intel processors that contained the undisclosed Defects described in this Amended Complaint.

PAGE 57 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

160.    Kottemann Orthodontics purchased the Affected Devices on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed in Intel's advertisements, brochures, bulletins, and on its webpage, Kottemann Orthodontics would have seen them and no doubt have taken them into account in making its purchasing decisions. In particular, had Kottemann Orthodontics known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality, security, and performance, it would not have bought the Affected Devices containing Intel processors or it would have paid less for them.

161.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Kottemann Orthodontics' Intel processors, and Kottemann Orthodontics did not receive the benefit of its bargain.  As detailed in this Amended Complaint, Kottemann Orthodontics' Affected Devices are worth less than what it paid for them, and the Defects in the CPUs have increased the threat of security breaches requiring Kottemann Orthodontics to incur increased costs for its IT operations.

### ALLIANCE HEALTHCARE SYSTEM, INC. – MISSISSIPPI

162.    Plaintiff Alliance Healthcare System, Inc. ("Alliance") is a for-profit healthcare provider organized under the laws of the State of Delaware that primarily does business in Holly Springs and Potts Camp, Mississippi.  Alliance operates a hospital and two clinics.

163.     Alliance maintains private, sensitive, and confidential information, including EHR, PHI, ePHI, and other confidential or protected information, which Alliance is obligated under HIPAA and ARRA, among other statutes and regulations, to protect from unauthorized access.

164.     In purchasing a large number of devices containing Intel CPUs, Alliance relied on Intel's representations (both direct and indirect) that its CPUs would provide superior security, performance, and speed, and were fit for use in its servers, PCs, and other devices that store, process or access sensitive, confidential, and personal information and data.   Intel represented that its processors would deliver such performance securely, so that private and personal data would not potentially be exposed to compromise.   Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.   Alliance paid for processor security and performance it did not receive.

165.     Alliance's employees used (and are still using) Affected Devices to perform their duties and tasks, which requires them to work with or switch between multiple programs, use multiple tabs on web browsers, and use and access intensive applications and databases.

166.     Alliance requires secure and fast data transmissions facilities through inter-connected servers, PCs and other devices with the defective Intel CPUs.  Alliance spends substantial sums annually on IT capital and operations.

167.     Alliance researched the devices before purchasing them, and that research included reviewing the Intel website or marketing material description of the security and capabilities of the CPUs in the devices that Alliance purchased.

168.     Unknown to Alliance, at the time of its purchase, the devices equipped with Intel processors that contained undisclosed design Defects that made information, which should have

remained secure and inaccessible, accessible to unauthorized parties.  As a result of the Defects, and in order to comply with its statutory and regulatory privacy obligations, Alliance has been and will be required to (a) undertake measures to mitigate the security risks posed by the Defects defined and detailed in this Amended Complaint and any other risk arising from the defective Intel CPUs, including installing the CPU patches released to date; (b) incur additional costs monitoring its computing resources for security breaches; and (c) replace its computing resources on an accelerated schedule and at significant expense with CPUs that, when available, are not susceptible to these security risks.

169.    Alliance has been required to regularly patch all of its Affected Devices.  Alliance investigates and approves all patches before they are applied.  Alliance reviews all firewall activity at least once per day.  Alliance increased its scrutiny of all firewall activity since being notified of the Intel CPU vulnerabilities in January 2018, which requires approximately ten hours of additional staff time per week.

170.    While security patches were implemented to protect against the Intel CPU Exploits, after January 2018 when the patches were downloaded, Alliance experienced material performance degradation, including reduced processing speed.

171.    During the Class Period, Alliance purchased multiple servers that featured an Intel processor.  By way of example, Alliance purchased a Windows server that featured an Intel Xeon E5620 as the server's CPU.  Alliance's server is comparable to test machine Xeon E3 1680 v3 Haswell – Linux.  Testing on server workloads, detailed in Section J.3., infra, on the test machine confirms that Intel's mitigations resulted in 14% average degradation (up to 22%) under the Default Mitigations, and 23% average degradation (up to 46%) under the Maximum Mitigations.

PAGE 60 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

172.     During the Class Period, Alliance purchased multiple laptop computers that featured an Intel processor.  By way of example, Alliance purchased a Windows laptop that featured an Intel Pentium N3540 as the laptop's CPU.  Alliance's laptop is comparable to test machine Intel Core i3 2120 Sandy Bridge - Windows 7.  Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 9% on average and up to 16%.

173.     During the Class Period, Alliance purchased at least 22 desktop computers that featured an Intel processor.  By way of example, Alliance purchased a Windows desktop that featured an Intel Core Duo E7500 as the desktop's CPU.  Alliance's desktop is comparable to test machine Intel Core i5 2520M Sandy Bridge - Windows 10.  Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 25% on average and up to 53%.

174.     Alliance's IT personnel spend additional time monitoring the performance of all Alliance devices and monitoring the firewall.  The IT personnel also spend more time investigating possible solutions to the processing speed degradation as a result of the necessary patching to mitigate unauthorized access to private data.

175.     Alliance maintains one server at each clinic and two servers at the hospital. All of the information at one facility is backed up on the cloud or on a server at one of the other facilities.

176.     Alliance normally replaces its devices every three to five years. In the normal course of business, Alliance's IT personnel review advertisements and manufacturer websites to investigate devices to be purchased for Alliance.  They specifically investigated information relating to the Intel CPUs for desired security, speed, and value.  They reviewed Intel's website to obtain information

PAGE 61 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

about the Intel CPUs and eventually purchased.  Alliance purchased devices with the Intel CPUs because of, among other things, their advertised security.

177.    Alliance purchased the Affected Devices on the reasonable, but mistaken, belief that the Intel CPUs would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed in Intel's advertisements, brochures, bulletins, and on its webpage, Alliance would have seen them and no doubt have taken them into account in making its purchasing decisions.  In particular, had Alliance known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality, security, and performance, it would not have bought the Affected Devices containing Intel processors if a secure alternative was available, or, if not, it would have paid less for them.

178.    As a result of the Defects in Intel's CPUs and the mitigations needed to address the Defects and in order to comply with its duty to protect confidential information and documents, Alliance spent many days and effort researching the Intel CPU Exploits and implementing available mitigations on the Affected Devices.  Additionally, Alliance has incurred and will continue to incur time and costs because it has been and will continue to be required to, among other things:  increased monitoring of the Affected Devices and servers for security threats, attacks, and breaches; implement mitigation and remedial measures, such as patching to address the security vulnerabilities; monitor and test new patches and firmware updates; remove from service products with affected processors that cannot be patched; purchase on an accelerated schedule compared to normal business practices more powerful processors to compensate for decreased performance

PAGE 62 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

resulting from required software remediation patching; transfer data to secure systems from Affected Devices that cannot be patched; reconfigure its networks to provide increased security from internet accessibility for those systems containing the most sensitive data; increase monitoring of the Affected Devices, servers, and firewalls for security threats, attacks and breaches; and supplement its network and computing security program(s) with additional security monitoring.

179.    Because the Intel CPU Defects can be mitigated, but not completely fixed, on existing hardware, Alliance will continue to be injured by incurring these additional mitigation and monitoring costs as long as the Affected Devices are deployed as part of its IT infrastructure. Further, because the only true fix is a defect-free CPU, Intel must redesign its CPUs without the Defects.  When those CPUs are released, Alliance will be compelled to accelerate its purchases of this new equipment, prematurely and outside normal replacement cycles, to eliminate the security risk created by Intel's design decisions. Consequently, Alliance will sustain additional damages by expending the costs necessary to upgrade to non-defective computers and servers

180.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Alliance's Intel processors, and Alliance did not receive the benefit of its bargain.  As detailed in this Amended Complaint, Alliance's Affected Devices are worth less than what it paid for them, and the Defects in the CPUs have increased the threat of security breaches requiring Alliance to incur increased costs for its IT operations.

### KEVIN CRAWFORD – MONTANA

181.    Plaintiff Kevin Crawford is a resident and citizen of the State of Montana.  In or about November 2014, Plaintiff bought a new Windows laptop which featured an Intel Core i3-

PAGE 63 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
          COMPLAINT

4030U as the computer's CPU.  Plaintiff bought the laptop from a retailer online.  Plaintiff reviewed and relied on the information about the laptop and Intel processor that was displayed online. Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard and/or read that Intel processors were the industry performance leader.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

182.    Plaintiff has used, and continues to use, the Intel device for various personal and business activities, including web browsing, email, playing online videogames, and word processing.  Plaintiff frequently has multiple applications open at the same time.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

183.    Unknown to Plaintiff, at the time of its purchase, the laptop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against the Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, he regularly experiences sluggishness and slowness.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device.

184.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i3-4130 Haswell – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 22% on average under the Default Mitigations and up to 37%.

185.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

186.    Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online, Plaintiff would have seen them, and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the laptop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely immune from the Intel

PAGE 65 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

## ARTESIA GENERAL HOSPITAL ("AGH") – NEW MEXICO

187.    Plaintiff Artesia General Hospital ("AGH") is a non-profit healthcare provider organized under the laws of the State of New Mexico that primarily does business in Artesia, New Mexico.

188.    AGH maintains private, sensitive, and confidential information, including EHR, PHI, ePHI, and other confidential or protected information, which AGH is obligated under HIPAA and ARRA, among other statutes and regulations, to protect from unauthorized access.

189.    To facilitate its ability to provide medical services to patients and to comply with various legal obligations to make personal medical records data available to its patients, AGH purchases or leases hundreds of Affected Devices, including:

- Purchasing, and sometimes leasing, desktop computers, laptop computers, and servers that are used in AGH's everyday operations;

- Leasing specialized medical devices, including CAT scans, an MRI machine, and telemetry devices that are maintained by the entity leasing the device to AGH; and

- Contracting with various cloud-based services to lease space on their servers and receive certain services which enable AGH to make patient medical records (including EHR, PHI and ePHI) available to patients, to store employment records, and to pay employees and keep payroll records.

PAGE 66 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

190.     To that end, AGH spends substantial sums annually on IT capital and operations. AGH staggers its IT capital expenses so that it replaces laptops every three years, PCs every four years, and servers every five years.

191.     In purchasing or leasing devices with CPUs, AGH considers five critical factors – functionality, compatibility, reliability, and price.  Security is the utmost concern.  Introducing insecure devices to AGH's IT infrastructure would compromise the overall security of its systems beyond simply the insecure device.  Therefore, security is an important consideration in any purchases AGH makes of computing devices.

192.     AGH researched the devices before purchasing them, and that research included reviewing the Intel website or marketing material description of the security and capabilities of the CPUs contained in the devices that AGH purchased.

193.     In purchasing a large number of devices containing Intel CPUs, AGH relied on Intel's representations (both direct and indirect) that its CPUs would provide superior performance, speed, and security and were fit for use in its servers, PCs, and other devices that store, process or access sensitive, confidential, and personal information and data.  Intel represented that its processors would deliver such performance securely, so that private and personal data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from Defects that exposed protected data.  AGH paid for processor performance it did not receive.

194.     AGH's employees used (and are still using) Affected Devices to perform their duties and tasks, which requires them to work with or switch between multiple programs at same time, use multiple tabs on web browsers, and use and access intensive applications and databases.

PAGE 67 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

195.    Based on these direct and indirect representations, AGH has purchased, and continues to use, a large number of products containing defective Intel processors, including servers, desktop computers, and laptop computers.

196.    AGH expected the processors to function as Intel advertised and represented.

197.    Unknown to AGH, at the time that it purchased the Affected Devices, those Devices were equipped with Intel processors that contained the undisclosed Defects described in this Amended Complaint.

198.    AGH purchased the Affected Devices on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed in Intel's advertisements, brochures, bulletins, and on its webpage, AGH would have seen them and no doubt have taken them into account in making its purchasing decisions.  In particular, had AGH known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality, security, and performance, it would not have bought the Affected Devices containing Intel processors or it would have paid less for them.

199.    AGH's doctors, nurses, medical technicians, and other personnel use Affected Devices to assist in the delivery of medical services to the Hospital's patients and otherwise support the delivery of those services.

200.    AGH also uses servers that are Affected Devices to store vast amounts of medical records which the Hospital is legally required to maintain confidentially.  This confidential data

PAGE 68 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

includes a patient's name, address, phone number, Social Security Number, medical insurance information, next of kin, employer, prescribed medications, prior medical history, diagnoses, and medical treatments provided by the Hospital.

201.    AGH also contracts with third parties to utilize the third party's servers, which are also Affected Devices, to make each patient's confidential records available to that patient via a web portal.

202.    As a result of the Defects in Intel's CPUs and the mitigations needed to address the Defects and in order to comply with its duty to protect confidential information and documents, AGH spent many days and effort researching the Intel CPU Exploits and implementing available mitigations.  Since the announcements in January 2018 of threats to computer security posed by the Intel CPU Exploits, AGH has incurred and continues to incur costs to monitor protected information, including ePHI and EHR, for data breaches and other malicious activity.  These monitoring costs are above and beyond the costs that would be incurred as part of AGH's ordinary risk management processes and include:

- Time spent by AGH employees analyzing and selecting "patches" designed to mitigate risks of the Intel CPU Exploits as those patches are released;

- Time spent by employees installing such "patches" as are suitable individually on each appropriate device utilizing an Intel CPU;

- Increased time spent monitoring the Affected Devices and servers for security threats, attacks, and breaches;

PAGE 69 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

- Increased time spent by employees monitoring data outflows because the Defects increase the risk of EHR, PHI, and ePHI being subject to hacking or other unauthorized access; and

- Increased time spent auditing and interacting with third-party cloud-based service providers to determine the third party's efforts to address the Defects having increased the risk of EHR, PHI, and ePHI being subject to hacking or other authorized use.

203.    Because the Intel CPU Defects can be mitigated, but not completely fixed, on existing hardware, AGH will continue to be injured by incurring these additional monitoring costs as long as the Affected Devices are deployed as part of AGH's IT infrastructure.

204.    AGH has suffered further injury by having to spend money to hire outside consultants to perform tasks that normally would be performed by AGH's salaried Director of Information Technologies because that Director had to devote additional time to addressing risks posed by variants of the Intel CPU Exploits.

205.    While security patches were implemented to protect against the Intel CPU Exploits, after January 2018 when the patches were installed, AGH's computing systems experienced material performance degradation, including unacceptable losses of functionality in certain devices requiring capital expenditures that AGH would not have incurred otherwise.  For example, after the PCs in AGH's Emergency Room admissions desks were patched, those PCs "froze" or experienced significant delays in interacting with AGH's internal servers, resulting in patient complaints. AGH owns approximately 150 Affected Devices, which experienced freezing or unacceptable slowdowns from the patches which were primarily PCs and laptops that ran a Microsoft Windows 7 operating

PAGE 70 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

system. After some experimentation, AGH's IT personnel determined that the performance problems created by patches addressing the Defects could be addressed, in each such Affected Device, by increasing the random-access memory ("RAM") to eight gigabytes, installing solid state drive ("SSD"), and upgrading to a Windows 10 operating system. To date, AGH has upgraded more than 100 of those machines at a per machine cost of roughly $500.00 for RAM, SSD and licensing costs. Additionally, AGH incurred additional employee time, ranging from approximately two to eight hours, to perform necessary upgrades on one or more machines.

206.    During the Class Period, AGH purchased over 300 servers that featured an Intel processor. By way of example, AGH purchased several Windows servers that featured an Intel Xeon E5-2650 as the server's CPU. AGH's server is comparable to test machine Xeon Gold 6138 Skylake - Linux VM. Testing on server workloads, detailed in Section J.3., infra, on the test machine confirms that Intel's mitigations resulted in 12% average degradation (up to 19%) under the Default Mitigations, and 18% average degradation (up to 29%) under the Maximum Mitigations.

207.    During the Class Period, AGH purchased over 135 laptop computers that featured an Intel processor. By way of example, AGH purchased several Windows laptops that featured an Intel Core i5-5200U as the laptop's CPU. AGH's laptop is comparable to test machine Intel Core i5 5300U Broadwell - Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 30% on average and up to 51%.

208.    During the Class Period, AGH purchased over 325 desktop computers that featured an Intel processor, including 17 PCs in late July 2017. By way of example, AGH purchased several Windows desktops that featured an Intel Core i7-8700 as the desktop's CPU. AGH's desktop is comparable to test machine Intel Core i7 8700K Coffee Lake - Windows 10. Responsiveness

PAGE 71 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 14% on average and up to 30%.

209.    Intel has announced that it is designing and will release CPUs that are not subject to the Intel CPU Exploits.  When those CPUs are released, AGH will be compelled to accelerate its purchases of this new equipment, prematurely and outside normal replacement cycles, in order to eliminate the security risk created by Intel's design decisions. Consequently, AGH will sustain additional damages by expending the costs necessary to upgrade to non-defective computers and servers.

210.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of AGH's Intel processors, and AGH did not receive the benefit of its bargain.  As detailed in this Amended Complaint, AGH's Affected Devices are worth less than what it paid for them, and the Defects in the CPUs have increased the threat of security breaches requiring AGH to incur increased costs for its IT operations.

## EMILIO RODRIGUEZ – NEW JERSEY

211.    Plaintiff Emilio Rodriguez is a resident and citizen of the State of New Jersey.  On or about April 7, 2015, Plaintiff bought a new Intel Core i5-4690K as the CPU for a self-built computer.  Plaintiff bought the device from Newegg online.  Plaintiff reviewed and relied on the information about the Intel processor that was displayed online.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff read that Intel processors had advanced performance capabilities and were faster.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver

such performance securely, so that that data would not potentially be exposed or compromised. Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

212.    Plaintiff has used the Intel device for various personal uses, including playing videogames with high video and sound processing requirements, using social media gaming applications, web browsing, email, and banking. Plaintiff's computer receives periodic updates that include the CPU patches released to date.

213.    Unknown to Plaintiff, at the time of its purchase, the desktop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties. While security patches were implemented to protect against the Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed. Specifically, Plaintiff has experienced a significant slowdown in his device which includes bottleneck. Plaintiff has also noticed significant loss of frames since purchase and definite performance degradation following installation of the patch. In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device. Plaintiff spent at least three hours dealing with these performance issues.

214.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i5 4670 Haswell – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 11% on average under the Default Mitigations and up to 21%.

PAGE 73 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

215.   Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

216.   Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the Intel processor or would have paid less for it.  Plaintiff would have purchased an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

PAGE 74 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

**AMY STOREY – NEW MEXICO**

217.    Plaintiff Amy Storey is a resident and citizen of the State of New Mexico.  In or about 2014, Plaintiff bought a new Mac OS desktop which featured an Intel Core i7-4578U as the computer's CPU.  Plaintiff bought the desktop from Apple online.  Plaintiff reviewed and relied on the information about the desktop and Intel processor that was displayed online.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard and/or read that Intel processors were the world's fastest processors, had excellent performance and are of superior quality.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

218.    Plaintiff has used, and continues to use, the Intel device for both personal and business use.  Specifically, Plaintiff frequently multitasks while using social media, word processing, drafting press releases, organizing fundraisers via email and messaging applications, streaming music, playing games, and storing photographs.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

219.    Unknown to Plaintiff, at the time of its purchase, the desktop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced such significant reduction in processing speed that

she frequently has to use her phone or tablet to accomplish tasks.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on her Intel device.

220.    Plaintiff paid for security and processor performance that she did not receive. Plaintiff's device is comparable to test machine Apple 2011 MacBook Pro with Intel Core i7. Responsiveness testing, detailed in Section J.4., infra, on the test machine confirms that Intel's mitigations degraded performance by 4% on average under the Default Mitigations and up to 9%.

221.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what she paid for it.

222.    Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online, Plaintiff would have seen them, and no doubt have taken them into account in making her purchasing decision.  In particular, had

PAGE 76 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, she would not have bought the desktop containing the Intel processor or would have paid less for it. Plaintiff would have purchased a desktop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

### GEORGE APPLE – NEW YORK

223.    Plaintiff George Apple is a resident and citizen of the State of North Carolina. In or about March 2014, when he resided in New York, Plaintiff bought a new Windows desktop which featured an Intel Core i7-4770S as the computer's CPU. Plaintiff bought the desktop from Best Buy in the store. Plaintiff reviewed and relied on the information about the desktop and Intel processor that was displayed in the store. Plaintiff purchased, and still owns, this device containing an Intel processor. Plaintiff has heard and/or read that Intel processors were the world's fastest processors and were the best on the market/performance leaders. Plaintiff expected the processor to function as Intel advertised and represented. Implicit in Intel's representations was that its processors would deliver such performance securely, so that that data would not potentially be exposed to compromise. Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

224.    Plaintiff has used, and continues to use, the Intel device with the core i7 4770S, for personal use and professional use in business. Plaintiff multitasks on the computer, frequently running multiple applications for web browsing, email, tracking expenses, and other accounting

tasks at once. Plaintiff's computer has received periodic updates that include the CPU patches released to date.

225.    Unknown to Plaintiff, at the time of its purchase, the desktop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced reduced speed in performing multiple tasks such as using the web and trying to open the documents folder, slowness when loading or attempting to open games, and has to reset the computer because it is too slow to start and/or freezes upon start up.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device.

226.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i7-4558U Haswell – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 27% on average under the Default Mitigations and up to 49%.

227.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches

PAGE 78 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs. Plaintiff's Intel CPU is worth less than what he paid for it.

228. Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life. Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed in the store, Plaintiff would have seen them, and no doubt have taken them into account in making his purchasing decision. In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the desktop containing the Intel processor or would have paid less for it. Plaintiff would have purchased a desktop containing AMD or other competing processors (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

## KORY JENO – NORTH CAROLINA

229. Plaintiff Kory Jeno is a resident and citizen of the State of North Carolina. On or about June 22, 2017, Plaintiff bought a new HP Envy laptop which featured an Intel Core i7-7500U as the computer's CPU. Plaintiff bought the laptop from Best Buy in Asheville, North Carolina. Plaintiff reviewed and relied on the information about the laptop and Intel processor that was displayed at Best Buy. Plaintiff purchased, and still owns, this device containing an Intel processor. Plaintiff has heard and/or read that Intel is the industry performance leader. Plaintiff expected the

PAGE 79 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

processor to function as Intel advertised and represented. Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise. Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

230.    Plaintiff has used, and continues to use, the Intel device for graphics programs and web-browsing. Plaintiff's computer receives periodic updates that include the CPU patches released to date.

231.    Unknown to Plaintiff, at the time of its purchase, the laptop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties. While security patches were implemented to protect against the Defects, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed. Specifically, Plaintiff has experienced slowed performance and freezing when using programs as well as complete shut-downs. In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device.

232.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core Intel Core i7-7700K Kaby Lake – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 18% on average under the Default Mitigations and up to 33%.

233.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the patches necessary to mitigate the threat of unauthorized access to private information from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

234.    Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the laptop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

PAGE 81 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                COMPLAINT

**ZACHARY RICHARD – PENNSYLVANIA**

235.    Plaintiff Zachary Richard is a resident and citizen of the State of Pennsylvania.  On or about November 11, 2015, Plaintiff bought a new Windows desktop which featured an Intel Core i7-6700 as the computer's CPU.  Plaintiff bought the desktop from Best Buy in the store.  Plaintiff reviewed and relied on the information about the desktop and Intel processor that was displayed in the store.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard that the computer with his Intel processor was a very high-speed computer, just about top of the line.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

236.    Plaintiff has used, and continues to use, the Intel device for personal use, including playing videogames, streaming video, and web browsing.  Plaintiff frequently has multiple applications open at the same time and multitasks.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

237.    Unknown to Plaintiff, at the time of its purchase, the desktop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced sluggishness and non-responsiveness when working on programs.   In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed

PAGE 82 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device. Plaintiff also purchased a cleanup and performance program to attempt to optimize performance, and spent time changing his settings to avoid further issues. Despite these attempts, Plaintiff has used his device less frequently, as he has not been able to remediate the reduced processing speed.

238. Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i9 7900X Skylake – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 21% on average under the Default Mitigations and up to 29%.

239. Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain. After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs. Plaintiff's Intel CPU is worth less than what he paid for it.

240. Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life. Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online, Plaintiff would have seen them,

PAGE 83 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

and no doubt have taken them into account in making his purchasing decision. In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the laptop containing the Intel processor or would have paid less for it. Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

### CITY OF NEW CASTLE – PENNSYLVANIA

241.    Plaintiff, City of New Castle ("New Castle"), is a Pennsylvania Third Class City and is the County Seat of Lawrence County, Pennsylvania. It is home to approximately 20,000 residents.

242.    New Castle maintains a significant amount of private, sensitive, and confidential information that it has a duty to protect from unauthorized access or disclosure, including, but not limited to: (1) financial records; (2) tax records, information and databases: (3) criminal records, information, and databases; (4) Personal Identifiable Information ("PPI") such as Social Security Number ("SSN"), taxpayer ID number, credit card information; (5) police and fire department records, files, and data; (6) and confidential or sensitive files, records, and data of other city agencies. It processes and stores such information and records on its computer servers.

243.    To meet its needs and run the daily business of a city and comply with its various legal obligations and duty to protect and safeguard third-party data and information, during the Class Period New Castle purchased and uses Affected Devices, including PCs (desktops and laptops), tablets, servers, and other devices.

PAGE 84 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

244.     New Castle's employees, staff and elected officials used (and are still using) Affected Devices to perform their duties and tasks, which requires them to work with or switch between multiple programs, use multiple tabs on web browsers, and use and access intensive applications and databases.

245.     In making purchases and deciding to deploy devices containing Intel CPUs, New Castle relied on Intel's representations (both direct and indirect) that its CPUs would provide superior security, performance, and speed, and were fit for use in its servers, PCs, and other devices that store, process or access sensitive, confidential, and personal information and data.  Intel represented that its processors would deliver such performance securely, so that private and personal data would not potentially be exposed to compromise.  New Castle paid for processor security and performance it did not receive.

246.     New Castle researched the devices before purchasing them, and that research included reviewing the Intel website or marketing material description of the security and capabilities of the CPUs contained in the devices that New Castle purchased.

247.     Based on these direct and indirect representations, New Castle has purchased, and continues to use, a large number of products containing defective Intel processors, including servers, desktop computers, and laptop computers.

248.     For New Castle to carry out and deliver cost effective and efficient services to its citizens and businesses doing business with and in New Castle, employees, staff and elected officials require secure and fast data transmissions through inter-connected servers, PCs, and other devices with Intel CPUs.  Those devices are characterized by the Defects described throughout this Amended Complaint. To that end, New Castle spends substantial sums annually on IT capital and

PAGE 85 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

operations, and even more now due to the increased costs for monitoring and remediating the security vulnerabilities from the Intel CPUs in the devices and servers.

249.    New Castle does not have an internal IT department. Rather, it contracts with a third-party IT vendor who provides all of the IT services to the New Castle including, among other things, "specing" out computers and servers for purchases that meet New Castle's IT needs, among which are the ability to efficiently and cost-effectively perform the necessary tasks and operations of a city, and compliance with various legal obligations and duty to protect and safeguard third-party data and information.

250.    When making its decisions to purchase devices and servers, New Castle and its IT vendor considered, among other things, performance, speed, security, compatibility, functionality, reliability and price.  Of utmost importance, however, were speed, performance, and security.

251.    When it purchased the Affected Devices, New Castle was unaware of the Intel CPUs' Defects, including "speculative execution," instead believing that the Intel CPUs were the fastest and most secure processors and thus immune to third-party attacks on its data and information stored in its devices and servers.  New Castle and its IT vendor researched the devices before purchasing them, and that research included reviewing information contained in Intel's advertisements, bulletins, brochures, and website describing performance, speed, capabilities and security of its CPUs. New Castle purchased devices with Intel CPUs because of, among other things, their advertised speed, performance, and security.

252.    As a result of the Defects in Intel's CPUs and the mitigations needed to address the Defects, and in order to comply with its duty to protect confidential information and documents as well as efficiently and effectively operate the city, New Castle spent many days and effort

PAGE 86 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

researching the Intel CPU Exploits and implementing available mitigations. Additionally, New Castle incurred and will continue to incur time, costs and expenses to:

- Monitor the devices and servers containing Intel CPUs for security threats, attacks and breaches, including installing remote monitoring agents.

- Monitor the available remedial measures, such as software patching, BIOS firm updates, and other remedial measures.

- Undertake remedial measures to mitigate the security risks posed by the CPU vulnerabilities, including applying the applicable software patches through operating system updates and BIOS firmware updates.

- Remove devices and servers from service for which software patching and the applicable BIOS firmware updates cannot be applied.

- Transfer data, information, and records from devices and servers that cannot be patched with software patching and/or BIOS firmware to another device or server which has been patched and updated.

- Replace or upgrade its devices, servers and computing resources on an accelerated schedule.

- Replace or supplement its network and computing security program with additional security monitoring.

- Engage in continual monitoring to protect the private, sensitive, and confidential records and information of its employees, elected officials, residents, and those who do business with or in New Castle.

PAGE 87 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

253.    For example, after becoming aware in January 2018 of the Intel CPU Exploits and the need for their mitigation, New Castle's employees and staff spent to date approximately 336 hours researching, investigating, monitoring and then, in conjunction with its IT vendor, implementing available mitigations to protect against the exploits.  In addition, New Castle hired and paid its IT vendor to apply software patches and BIOS firm updates to all of its devices and servers which can be patched and updated 20 computers (desktops and laptops) that could not be patched and updated were removed from service.  Also, the IT vendor transferred all of the data from one server that could not be patched to a protected server.  Once the data was transferred, the server was taken out of service.  To date, because of the security vulnerabilities that require monitoring and remediation, New Castle has paid the IT vendor approximately $40,000 for 375 hours of monitoring and remediation of New Castle's and its police department's IT infrastructure, including its computers and servers, to ensure that they are protected against the security vulnerabilities.

254.    New Castle has had no real choice in undertaking these measures in response to Intel CPU flaws, given that it is obligated under the law to protect third-party information, data, and records entrusted to it.

255.    Through investigation and monitoring, New Castle and its IT vendor determined that, after the security patches were implemented to protect against the Intel Security Exploits, New Castle's computing systems experienced material performance degradation, consistent with the diminished CPU performance detailed in this Amended Complaint.  That performance degradation included reduced processing speed and the freezing of computers, which required rebooting.

PAGE 88 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

256.    During the Class Period, New Castle purchased at least four servers that featured an Intel processor for use by the City and its Police Department.  By way of example, New Castle purchased for City use a Windows server that featured an Intel Xeon E5-2620 as the server's CPU. New Castle's server is comparable to test machine Xeon E3 1680 v3 Haswell - Linux. Testing on server workloads, detailed in Section J.3., infra, on the test machine confirms that Intel's mitigations resulted in 14% average degradation (up to 22%) under the Default Mitigations, and 23% average degradation (up to 46%) under the Maximum Mitigations. New Castle also purchased for Police Department use a Windows server that featured an Intel Xeon E5-2620 as the server's CPU.

257.    During the Class Period, New Castle purchased at least 20 laptop computers that featured an Intel processor for use by the City and its Police Department, including two laptops on September 19, 2017 and November 3, 2017.  By way of example, New Castle purchased a Windows laptop that featured an Intel Core i7-7600U as the laptop's CPU.  New Castle's laptop is comparable to test machine Intel Core i7 7700K Kaby Lake - Windows 10.  Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 18% on average under Default Mitigations and up to 33%.

258.    During the Class Period, New Castle purchased at least 55 desktop computers that featured an Intel processor for use by the City and its Police Department.  By way of example, New Castle purchased a Windows desktop that featured an Intel Core i7-4790 as the desktop's CPU. New Castle's desktop is comparable to test machine Intel Core i7 4558U Haswell - Windows 10. Responsiveness testing, detailed in Section J.1, infra, on the test machine confirms that Intel's mitigations degraded performance by 27% on average under Default Mitigations and up to 49%.

PAGE 89 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

259.    New Castle expected the processors to function as Intel advertised and represented. Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise. Any reasonable purchaser would expect that the computing device being purchased would be secure and free from potential exploits.

260.    Unknown to New Castle, at the time that it purchased the Affected Devices, those Devices were equipped with Intel processors that contained undisclosed design Defects that made information, which should have remained secure and inaccessible to unauthorized parties.

261.    New Castle purchased the Affected Devices on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed in Intel's advertisements, brochures, bulletins, and on its webpage, New Castle would have seen them and no doubt have taken them into account in making its purchasing decisions.  In particular, had New Castle known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality, security, and performance, it would not have bought the Affected Devices containing Intel processors or it would have paid less for them.

262.    As a result of the security vulnerabilities and flaws, New Castle has incurred and will continue to incur time and costs because it has been and will continue to be required to, among other things:  implement mitigation and remedial measures, such as patching to address the security vulnerabilities; monitor and test new patches and firmware updates; remove from service products with affected processors that cannot be patched; purchase on an accelerated schedule compared to

PAGE 90 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

normal business practices more powerful processors to compensate for decreased performance resulting from required software remediation patching; transfer data to secure systems from Affected Devices that cannot be patched; reconfigure its networks to provide increased security from internet accessibility for those systems containing the most sensitive data; increase monitoring of the Affected Devices, servers, and firewalls for security threats, attacks and breaches; and supplement its network and computing security program(s) with additional security monitoring.

263.    Because the Intel CPU Defects can be mitigated, but not completely fixed, on existing hardware, New Castle will continue to be injured by incurring these additional monitoring costs as long as the Affected Devices are deployed as part of its IT infrastructure.  Further, because the only true fix is a defect-free CPU, Intel must redesign its CPUs without the Defects.  When those CPUs are released, New Castle will be compelled to accelerate its purchases of this new equipment, prematurely and outside normal replacement cycles, to eliminate the security risk created by Intel's design decisions. Consequently, New Castle will sustain additional damages by expending the costs necessary to upgrade to non-defective computers and servers.

264.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of New Castle's Intel processors, and New Castle did not receive the benefit of its bargain.  As detailed in this Amended Complaint, New Castle's Affected Devices are worth less than what it paid for them, and the Defects in the CPUs have increased the threat of security breaches requiring New Castle to incur increased costs for its IT operations.

## ZOG, INC. – PENNSYLVANIA

265.    Plaintiff Zog, Inc. ("Zog") is organized under the laws of the state of Pennsylvania and primarily does business there. Zog provides information technology support services, including secure cloud services to its clients.

266.    Zog maintains private, sensitive, and confidential information, including EHR, PHI, ePHI, and other confidential or protected information. With respect to its health care enterprise clients, Zog is required and has agreed to be bound by the same privacy obligations that apply to its clients, including federal and state laws and regulations, such as HIPAA and ARRA.

267.    In making purchases and deciding to deploy devices containing Intel CPUs, Zog relied on Intel's representations (both direct and indirect) that its CPUs would provide superior security, performance, and speed, and were fit for use in its servers, PCs, and other devices that store, process or access sensitive, confidential, and personal information and data.  Intel represented that its processors would deliver such performance securely, so that private and personal data would not potentially be exposed to compromise. Zog paid for processor security and performance it did not receive.

268.    Zog researched the devices before purchasing them, and that research included reviewing the Intel website or marketing material description of the security and capabilities of the CPUs contained in the devices that Zog purchased.

269.    Zog's employees used (and are still using) Affected Devices to perform their duties and tasks, which requires them to work with or switch between multiple programs, use multiple tabs on web browsers, and use and access intensive applications and databases.

PAGE 92 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

270.    Based on these direct and indirect representations, Zog has purchased, and continues to use, a large number of products containing defective Intel processors, including servers, desktop computers, and laptop computers.

271.    Zog expected the processors to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable purchaser would expect that the computing device being purchased would be secure and free from potential exploits.

272.    Unknown to Zog, at the time that it purchased the Affected Devices, those Devices were equipped with Intel processors that contained undisclosed Defects that made information, which should have remained secure and inaccessible to unauthorized parties.

273.    Zog purchased the Affected Devices on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed in Intel's advertisements, brochures, bulletins, and on its webpage, Zog would have seen them and no doubt have taken them into account in making its purchasing decisions.  In particular, had Zog known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality, security, and performance, it would not have bought the Affected Devices containing Intel processors or it would have paid less for them.

274.    As a result of the Defects in Intel's CPUs and the mitigations needed to address the Defects and in order to comply with its duty to protect confidential information and documents, Zog

PAGE 93 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

spent many hours researching the Intel CPU Exploits and implementing available mitigations. Additionally, Zog has incurred and will continue to incur costs to monitor protected information, for data breaches and other malicious activity.  These monitoring costs are above and beyond the costs that would be incurred as part of Zog's ordinary risk management processes and include time spent:

275.    Among other things, Zog:

- Performed increased monitoring of the Affected Devices for security threats, attacks, and breaches in order to safeguard protected information.

- Installed patches for computers and servers to address the security vulnerabilities posed by the Defects, and monitored and tested its computer systems in order to ensure that the patches were installed properly and did not adversely impact the operation of its computer systems.

- As part of the patching process, set anti-virus registry keys so that they would allow remediation patches to be installed.

- Engaged in multiple rounds of scanning for patches and installing the patches because not all computers would immediately detect the patches, and there were many released patches that broke network adapter configurations and resulted in blue screen loops.

- Patched hypervisors' firmware, which required scheduled downtime for its hosted servers and cluster and multiple rounds of firmware and BIOS updates.

276.    Zog employees spent over 60 hours completing the tasks described above.

PAGE 94 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

277.    Because the Intel CPU Defects can be mitigated, but not completely fixed, on existing hardware, Zog will continue to be injured by incurring these additional monitoring costs as long as the Affected Devices are deployed as part of its IT infrastructure.  Further, because the only true fix is a defect-free CPU, Intel must redesign its CPUs without the Defects.  When those CPUs are released, Zog will be compelled to accelerate its purchases of this new equipment, prematurely and outside normal replacement cycles, to eliminate the security risk created by Intel's design decisions. Consequently, Zog will sustain additional damages by expending the costs necessary to upgrade to non-defective computers and servers.

278.    During the Class Period, Zog purchased at least one server that featured an Intel Xeon E5-2640 as the server's CPU.  Zog's server is comparable to test machine Xeon E3 1680 v3 Haswell - Linux.  Testing on server workloads, detailed in Section J.3., infra, on the test machine confirms that Intel's mitigations resulted in 14% average degradation (up to 22%) under the Default Mitigations, and 23% average degradation (up to 46%) under the Maximum Mitigations.

279.    During the Class Period, Zog purchased multiple laptop computers that featured an Intel Core i3-7100U as the laptop's CPU.  Zog's laptop is comparable to test machine Intel Core i3 8100 Coffee Lake - Windows 10.  Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 16% on average under Default Mitigations and up to 28%.

280.    During the Class Period, Zog purchased multiple desktop computers that featured an Intel Core i5-6500 as the desktop's CPU.  Zog's desktop is comparable to test machine Intel Core i5 6500 Skylake - Windows 10.  Responsiveness testing, detailed in Section J.1., infra, on the test

PAGE 95 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

machine confirms that Intel's mitigations degraded performance by 14% on average under Default Mitigations and up to 27%.

281.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Zog's Intel processors, and Zog did not receive the benefit of its bargain.  As detailed in this Amended Complaint, Zog's Affected Devices are worth less than what it paid for them, and the Defects in the CPUs have increased the threat of security breaches requiring Zog to incur increased costs for its IT operations.

## ANDREW EAST – SOUTH CAROLINA

282.    Plaintiff Andrew East is a resident and citizen of the South Carolina.  On or about July 6, 2014, Plaintiff bought a new Windows laptop which featured an Intel Core i7-4700HQ as the computer's CPU.  Plaintiff bought the device from Micro Center online.  Plaintiff reviewed and relied on the information about the devices and Intel processors that was displayed online.  Plaintiff purchased, and still owns, the device containing Intel processor.  Plaintiff has heard and/or read that Intel processors were the world's fastest processors and that they had advanced performance for gaming. Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

283.    Plaintiff has used, and continues to use, his device containing the Intel CPU, for multitasking during various activities, specifically web browsing, playing online multi-player videogames, which require high-end video and sound processing capabilities, and using online

PAGE 96 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

social media gaming applications.  Plaintiff frequently runs more than one application at the same time.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

284.    Unknown to Plaintiff, at the time of its purchase, the device was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced general slowness and a reduction in the frames-per-second of his videogames, impacting his play of these games.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device.

285.    Plaintiff paid for security and processor performance that he did not receive.  Plaintiff's device is comparable to test machine Intel Core i7-4558U Haswell – Windows 10.  Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 27% on average under the Default Mitigations and up to 49%.

286.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the

Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

287.    Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the device containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a device containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

## MARGARITE SAMPSON – LOUISIANA

288.    Plaintiff Margarite Sampson is a resident and citizen of the State of Louisiana.  On or about early 2015, Plaintiff bought a Windows desktop which featured an Intel Pentium 3825U as the computer's CPU.  Plaintiff bought the desktop online from HSN.com.  Plaintiff reviewed and relied on the information about the desktop and Intel processor that was displayed HSN.com.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff read and heard that Intel was an industry leader whose processors were the world's fastest and consistently outperformed competitors. Plaintiff was made aware of these claims via commercials she had seen

PAGE 98 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

on TV and online advertisements on websites she frequented on her mobile device. Plaintiff expected the processor to function as Intel advertised and represented. Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise. Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

289.    Plaintiff has used, and continues to use, the Intel device to shop online, pay bills, schedule medication delivery, and make Skype video calls. She has also used the device to listen to gospel music, both online and on CD. Plaintiff has also used the desktop's disc drive to watch video DVDs. Plaintiff would and will frequently multitask while using the computer. Oftentimes, she would and will listen to gospel music while performing other tasks on the device. Moreover, Plaintiff rarely uses the device's web browser on only one task. Instead, multiple tabs remain open, one for online shopping and another for tracking bill payments, as plaintiff alternates between the two. Plaintiff's computer receives periodic updates that include the CPU patches released to date.

290.    Unknown to Plaintiff, at the time of its purchase, the desktop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties. While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed. Specifically, Plaintiff has experienced unexpected freezes and difficulty starting. In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on her Intel device, and purchased antivirus software to protect against malicious actors.

PAGE 99 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

Plaintiff currently experiences such significantly reduced processing speed that she usually uses her phone for tasks, when possible.

291.    Plaintiff paid for security and processor performance that she did not receive. Plaintiff's device is comparable to test machine Intel Core i3-4130 Haswell – Windows 8. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 22% on average under the Default Mitigations and up to 37%.

292.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what she paid for it.

293.    Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making her purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, she would

PAGE 100 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

not have bought the desktop containing the Intel processor or would have paid less for it. Plaintiff would have purchased a desktop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

## CASSANDRA PAYNE – MICHIGAN

294.    Plaintiff Cassandra Payne is a resident and citizen of the State of Michigan. In or about March 2014, Plaintiff bought a new Windows desktop which featured an Intel Core i3-4010U as the computer's CPU. Plaintiff bought the desktop from Dell online. Plaintiff reviewed and relied on the information about the desktop and Intel processor that was displayed online. Plaintiff purchased, and still owns, this device containing an Intel processor. Plaintiff has heard and read that Intel processors were the industry performance leader. Plaintiff expected the processor to function as Intel advertised and represented. Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise. Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

295.    Plaintiff has used, and continues to use, the Intel device for web browsing, social media, viewing documents, and playing videogames. Plaintiff's computer receives periodic updates that include the CPU patches released to date.

296.    Unknown to Plaintiff, at the time of its purchase, the desktop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties. While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were

PAGE 101 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

downloaded, Plaintiff experienced material performance degradation, including reduced processing speed. Specifically, Plaintiff has experienced significantly slower functionality when working on programs and regular rebooting. In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on her Intel device, specifically spending significant time speaking with representatives of Dell, and sending her device to Dell for repairs.

297. Plaintiff paid for security and processor performance that she did not receive. Plaintiff's device is comparable to test machine Intel Core i3 4130 Haswell - Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 22% on average under the Default Mitigations and up to 37%.

298. Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain. After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs. Plaintiff's Intel CPU is worth less than what she paid for it.

299. Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life. Had disclosures of the Defects in the CPUs, or that mitigations needed to address the Defects would materially impact the

PAGE 102 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

CPU's functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making her purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, she would not have bought the desktop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a desktop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

### ALMA JENNINGS – MISSOURI

300.    Plaintiff Alma Jennings is a resident and citizen of the State of Missouri.  In or about 2011, Plaintiff bought a new Windows desktop which featured an Intel Core i5-2500K as the computer's CPU.  Plaintiff bought the desktop from Micro Center in the store.  In or about 2013, Plaintiff bought a new Windows laptop which featured an Intel Core i5-3210M as the computer's CPU.  Plaintiff bought the laptop from Costco in the store.  Plaintiff reviewed and relied on the information about the devices and Intel processors that were displayed in the store.  Plaintiff purchased, and still owns, these devices containing an Intel processor.  Plaintiff has heard and read that Intel processors were the world's fastest processors and had amazing performance consumers could see and feel.   Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

PAGE 103 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

301.    Plaintiff has used both Intel devices, and continues to use, the laptop with the Intel CPU for multitasking between various personal and business tasks, including email, drafting spreadsheets, and word processing.  Plaintiff often switches between various applications while using her Intel device.  Plaintiff's computers each receive periodic updates that include the CPU patches released to date.

302.    Unknown to Plaintiff, at the time of purchase, the devices were equipped with Intel processors that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed with both devices.  Plaintiff's laptop device has displayed sluggishness and functionality when using programs.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on her Intel device.

303.    Plaintiff paid for security and processor performance that she did not receive. Plaintiff's Windows desktop is comparable to test machine Intel Core i5-2520M Sandy Bridge – Windows 10.  Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 25% on average under the Default Mitigations and up to 43%.  Plaintiff's Windows laptop is comparable to test machine Intel Core i5-4670 Haswell – Windows 10.  Responsiveness testing on the test machine confirms that Intel's mitigations degraded performance by 11% on average under the Default Mitigations and up to 21%.

PAGE 104 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

304.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPUs are worth less than what she paid for them.

305.    Plaintiff purchased devices containing Intel processors on the reasonable, but mistaken, belief that the processors would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout their useful life.  Had disclosures of the Defects in the CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making her purchasing decisions.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, she would not have bought the devices containing the Intel processors or would have paid less for them. Plaintiff would have purchased devices containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

## JAMES BRADSHAW – NEBRASKA

306.    Plaintiff James Bradshaw is a resident and citizen of the State of Nebraska.  On or about November 14, 2017, Plaintiff bought a new Intel Core i7-7700K CPU for a self-built computer.  Plaintiff bought the Intel processor from Newegg.com online.  Plaintiff reviewed and relied on the information about the Intel processor that was displayed online.  Plaintiff still owns this device containing an Intel processor.  Plaintiff has heard and read that Intel processors were the world's fastest processors, had amazing performance consumers could see and feel, were the industry performance leaders.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

307.    Plaintiff has used, and continues to use, the Intel device for both personal and business purposes.  Plaintiff uses IO intensive applications, including databases.  Plaintiff uses the device for word processing, Microsoft office, Axure user experience software, and Figma user experience software.  Axure and Figma programs are usually open at the same time, and Plaintiff bounces between each frequently.  Plaintiff also uses Visual Studio, which is a database software.  Plaintiff usually multitasks on his device, switching between multiple programs at the same time.  Plaintiff also uses his device for gaming and voice chat.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

308.    Unknown to Plaintiff, at the time of its purchase, the Intel processor contained undisclosed design Defects that made information, which should have remained secure and

PAGE 106 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced performance impacts such as increased time required to load and/or run programs, sluggish response, increased time in switching between programs and tabs within a web browser, additional time to complete tasks and workloads, and more time waiting for websites to load or respond.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device which includes overclocking his CPU in order to increase the speed of the Intel CPU.  Plaintiff has spent time dealing with these issues and implementing additional mitigations.

309.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i7-7700K Kaby Lake – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 18% on average under the Default Mitigations and up to 33%.

310.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the

Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

311.    Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the Intel processor or would have paid less for it.  Plaintiff would have purchased an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

**MICHAEL STRAUB – NEVADA**

312.    Plaintiff, Michael Straub, is a resident and citizen of the State of Nevada. On or about September 2015, Plaintiff bought two Intel Core i7-2700K chips to serve as the CPUs for two self-built personal computers. Plaintiff bought the Intel CPUs from Tiger Direct. Plaintiff had reviewed and relied upon the information about the Intel processors that were displayed at Tiger Direct. Plaintiff still owns the devices each containing the Intel processors.  Plaintiff has heard and read Intel processors were the world's fastest processors, had amazing performance consumers could see and feel, were the industry performance leader, and had advanced performance.  Plaintiff expected

PAGE 108 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

the processors to function as Intel advertised and represented. Implicit in Intel's representations was that its processors would deliver such performance securely, so that his data would not potentially be exposed to compromise. Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

313.    Plaintiff has used, and continues to use, the Intel devices for personal activities, specifically word processing, web browsing, and playing video games. However, his usage has significantly decreased, because of the extreme performance issues he continues to experience.

314.    Unknown to Plaintiff, at the time of purchase, the Intel processors contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties. While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced significant, material performance degradation, including reduced processing speed. Specifically, Plaintiff's web browser became so slow, that he was unable to use it, and he was unable to play certain video games that he had purchased for use on the devices. In addition, as a result of the defects in Intel's CPUs, and Intel's attempts at mitigation needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits, and implementing available mitigation on his computers. Plaintiff purchased a new motherboard and SSD drive for the Intel devices as well as Malwarebytes Premium antivirus protection. Plaintiff has experienced such significant problems with processing speed that he built another computer, containing a chip that does not contain the design Defects. Plaintiff spent a minimum of 120 hours dealing with these issues and implementing additional mitigation, as well as spending in excess of $1,000, which would include the cost of the new motherboard, SSD drive, additional RAM, and additional antivirus protection.

PAGE 109 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

315.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's devices are comparable to test machine Intel Core i7-3960X Sandy Bridge E – Windows 10.  Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 16% on average under the Default Mitigations and up to 37%.

316.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processors, and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPUs are worth considerably less than what he paid for them.

317.    Plaintiff purchased devices containing the Intel processor on the reasonable, but mistaken, belief that the processors would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the CPUs, or that mitigation needed to address the Defects would materially impact the CPU's functionality and performance, been displayed online or in the store, Plaintiff would have seen them, and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the Intel processors.  Plaintiff would have purchased AMD or other competing

processors (which are largely immune from the Intel CPU Exploits) or paid only for CPUs delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

## ANGELO PANDAZIS – NEW JERSEY

318.    Plaintiff Angelo Pandazis is a resident and citizen of the State of New Jersey.  On or about February 7, 2017, Plaintiff bought a new Windows laptop which featured an Intel Core i7-7500U as the computer's CPU.  Plaintiff bought the desktop from Dell online.  Plaintiff reviewed and relied on the information about the laptop and Intel processor that was displayed online. Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard and/or read that Intel processors were the world's fastest processors.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

319.    Plaintiff has used, and continues to use, the Intel device for personal and business using various applications and programs, including word processers, internet browsers, email, and video streaming.  Plaintiff frequently will stream video while performing other tasks.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

320.    Unknown to Plaintiff, at the time of its purchase, the laptop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing

PAGE 111 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

speed.  Specifically, Plaintiff has experienced system freezing while using programs and particularly when streaming videos.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device.

321.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i7-7700K Kaby Lake – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 18% on average under the Default Mitigations and up to 33%.

322.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

323.    Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed online, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff

PAGE 112 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the laptop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

## JORDAN ROBBINS – NEW JERSEY

324.    Plaintiff Jordan Robbins is a resident and citizen of the State of New Jersey.  On or about January 22, 2017, Plaintiff bought a new Windows desktop which featured an Intel Core i7-6700 as the computer's CPU.  Plaintiff bought the desktop from Purchasing Power online.  Plaintiff reviewed and relied on the information about the desktop and Intel processor that was displayed online.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard that Intel processors were the industry performance leader and had advanced performance.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

325.    Plaintiff has used, and continues to use, the Intel device for multitasking between various personal and as a DJ, including making and performing music, playing videogames, streaming music, email, and streaming video.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

PAGE 113 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

326.    Unknown to Plaintiff, at the time of its purchase, the desktop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced unexpected freezes, requiring him to restart the computer.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device purchasing antivirus software to guard against threats.  Plaintiff also had to rely on his phone and then purchase an iPad, as the desktop is no longer sufficiently functional.

327.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i9-7900X Skylake – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 21% on average under the Default Mitigations and up to 29%.

328.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the

PAGE 114 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

329.     Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the desktop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a desktop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

## ANDREW MONTOYA – NEW MEXICO

330.     Plaintiff Andrew Montoya is a resident and citizen of the State of New Mexico.  On or about December 1, 2017, Plaintiff bought a new Mac OS desktop which featured an Intel Core i5-4278U as the computer's CPU.  Plaintiff bought the desktop from the Apple Store online.  Plaintiff reviewed and relied on the information about the desktop and Intel processor that was displayed online.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard and/or read that Intel processors were the world's fastest processors and were the industry performance leader.  Plaintiff expected the processor to function as Intel advertised and

PAGE 115 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

represented.   Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.   Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

331.    Plaintiff has used, and continues to use, the Intel device for multitasking between various personal tasks, such as email, web browsing, shopping online, word processing, and storing photographs.  Plaintiff also uses the Excel, Word, and PowerPoint for non-profit management tasks. Plaintiff frequently is using more than one application at the same time.   Plaintiff's computer receives periodic updates that include the CPU patches released to date.

332.    Unknown to Plaintiff, at the time of its purchase, the desktop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.   While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.   Specifically, Plaintiff has experienced slower times in loading emails, applications, and various webpages.   In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device, as well as spending at least 40 hours with various technical assistance specialists to address the problems he was experiencing.   Plaintiff at times has had to rely on his phone, Kindle Fire, iPad, and work computer to perform certain tasks, as his desktop is no longer sufficiently functional for all of his personal and non-profit needs.

PAGE 116 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

333.   Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine 2013 MacBook Pro with Intel Core i5. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 5% on average under the Default Mitigations and up to 11%.

334.   Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

335.   Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed online, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the desktop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a desktop containing an AMD or other competing processor (which are largely immune from the

PAGE 117 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

### VICTORIA BELLE DUNN – OHIO

336.    Plaintiff Victoria Belle Dunn is a resident and citizen of the State of Ohio.  On or about July 17, 2017, Plaintiff bought a new Dell Inspiron laptop which featured an Intel Core i5-6200U as the computer's CPU.  Plaintiff bought the laptop from Staples in Findlay, Ohio.  Plaintiff reviewed and relied on the information about the laptop and Intel processor that was displayed in-store at Staples.  Plaintiff purchased, and still owns, this device containing an Intel processor. Plaintiff has heard and/or read that Intel processors were the world's fastest processors.  Plaintiff expected the processor to function as Intel advertised and represented.   Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

337.    Plaintiff has used, and continues to use, the Intel device for streaming music, word processing, email, and web-browsing.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

338.    Unknown to Plaintiff, at the time of its purchase, the laptop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against the Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced slowed performance when doing word processing and

PAGE 118 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

multi-tasking and can only perform one task at a time due to slowed and delayed processing speed. The device has also experienced overheating since patching.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on her Intel device.

339.    Plaintiff paid for security and processor performance that she did not receive. Plaintiff's device is comparable to test machine Intel Core Intel Core i5-6500 Skylake – Windows 10.  Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 14% on average under the Default Mitigations and up to 27%.

340.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the patches necessary to mitigate the threat of unauthorized access to private information from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what she paid for it.

341.    Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making her purchasing decision.  In

PAGE 119 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                       COMPLAINT

particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, she would not have bought the laptop containing the Intel processor or would have paid less for it. Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

**ROBERT KEY – OREGON**

342.    Plaintiff Robert Key is a resident and citizen of the State of Oregon. On or about May 19, 2017, Plaintiff bought a new Windows device which featured an Intel Core i5-6300U as the computer's CPU. Plaintiff bought the device from Bukoos online. Plaintiff reviewed and relied on the information about the device and Intel processor that was displayed online. Plaintiff purchased, and still owns, this device containing an Intel processor. Plaintiff has read that Intel processors had amazing performance consumers could see and feel, that they were the industry performance leader and had advanced performance. Plaintiff expected the processor to function as Intel advertised and represented. Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise. Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

343.    Plaintiff has used (and infrequently continues to use) the Intel device for his property management business. Plaintiff has used the device for multitasking while word processing, sending and receiving emails and engaging in other organizational tasks for his business, including scanning

and printing.  Plaintiff frequently used more than one application at the same time.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

344.    Unknown to Plaintiff, at the time of its purchase, the device was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed and function such that he now rarely uses the device.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device.

345.    Plaintiff paid for security and processor performance that he did not receive.  Plaintiff's device is comparable to test machine Intel Core i5-6500 Skylake – Windows 10.  Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 14% on average under the Default Mitigations and up to 27%.

346.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

PAGE 121 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

347.    Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the device containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a device containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

### JAMAL ELAKRAH – SOUTH CAROLINA

348.    Plaintiff Jamal Elakrah is a resident and citizen of the State of South Carolina.  On or about April 22, 2014, Plaintiff bought a new Intel Core i7-4770K to serve as the CPU for a self-built computer.  Plaintiff bought the CPU from Newegg online.  Plaintiff reviewed and relied on the information about the Intel processor that was displayed online.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has grown up with computers and technology and had a wealth of knowledge related to computers and was aware that Intel processors were the industry leaders.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely,

so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

349.    Plaintiff has used, and continues to use, the Intel device for personal and business purposes, including playing video games, creating music, making phone calls over the internet, and social networking.  Plaintiff frequently uses multiple applications and programs at the same time. Plaintiff's computer receives periodic updates that include the CPU patches released to date.

350.    Unknown to Plaintiff, at the time of purchase, the device was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced crashes and a lag on the frame rate for videogames. In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device.  Plaintiff also purchased a high-end graphics card to address the problems with frame rates, but the card did not remediate the issue.

351.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i7-4558U Haswell – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 27% on average under the Default Mitigations and up to 49%.

352.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of

PAGE 123 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain. After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs. Plaintiff's Intel CPU is worth less than what he paid for it.

353.    Plaintiff purchased an Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life. Had disclosures of the Defects in the CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision. In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the Intel processor or would have paid less for it. Plaintiff would have purchased an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

### KATHLEEN GREER – SOUTH CAROLINA

354.    Plaintiff Kathleen Greer is a resident and citizen of the State of South Carolina. On or about September 14, 2017, Plaintiff bought a new Windows laptop which featured an Intel Pentium 4405U as the computer's CPU. Plaintiff bought the laptop from Staples in the store.

PAGE 124 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

Plaintiff reviewed and relied on the information about the laptop and Intel processor that was displayed in the store.  Plaintiff purchased, and still owns, this device containing an Intel processor. Plaintiff has heard and/or read that Intel processors were the world's fastest processors and that they had advanced performance.  Plaintiff expected the processor to function as Intel advertised and represented.   Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

355.     Plaintiff has used, and continues to use, the Intel device for multitasking between various personal and business tasks, such as accounting, web browsing, compiling tax information, merchandizing, word processing, self-publishing software and email.  Plaintiff frequently uses more than one of these applications at the same time.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

356.     Unknown to Plaintiff, at the time of its purchase, the laptop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced freezing while using programs and unexpected shutdowns.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on her Intel device.

PAGE 125 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                     COMPLAINT

357. Plaintiff paid for security and processor performance that she did not receive. Plaintiff's device is comparable to test machine Intel Core i5-6500 Skylake – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 14% on average under the Default Mitigations and up to 27%.

358. Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what she paid for it.

359. Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making her purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, she would not have bought the laptop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely

PAGE 126 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished

post-mitigation performance (not the promised pre-mitigation performance).

## HIBBITS INSURANCE – SOUTH CAROLINA

360.    Plaintiff Hibbits Insurance, Inc. ("Hibbits Insurance") provides insurance brokerage

services, is organized under the laws of the state of South Carolina, and primarily does business

there.

361.    In connection with its provision of health, dental, vision, disability income, and long-

term care insurance services and consulting, Hibbits Insurance maintains private, sensitive, and

confidential information that it is obligated under the Gramm-Leach-Bliley Act ("GLB Act"),

among other statutes and regulations, to protect from unauthorized access.

362.    Hibbits Insurance also provides property and casualty insurance services and

consulting, which requires safeguarding confidential information of customers.  Hibbits Insurance

is required by the GLB Act, among other things, to evaluate potential security threats, like those

posed by the Defects, and protect against the unauthorized use or disclosure of non-public personal

financial data.

363.    In making purchases and deciding to deploy devices containing Intel CPUs, Hibbits

Insurance relied on Intel's representations (both direct and indirect) that its CPUs would provide

superior security, performance, and speed, and were fit for use in its servers, PCs, and other devices

that store, process or access sensitive, confidential, and personal information and data.   Intel

represented that its processors would deliver such performance securely, so that private and personal

data would not potentially be exposed to compromise.  Hibbits Insurance paid for processor

performance it did not receive.

PAGE 127 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

364.    Hibbits Insurance researched the devices before purchasing them, and that research included reviewing the Intel website or marketing material description of the security and capabilities of the CPUs contained in the devices that Hibbits Insurance purchased.

365.    Based on these direct and indirect representations, Hibbits Insurance has purchased, and continues to use, a large number of products containing defective Intel processors, including servers, desktop computers, and laptop computers.

366.    Hibbits Insurance relied upon Intel's representations that its CPUs were secure and fit for use in its servers, PCs, and other devices that store or access sensitive records and information.

367.    Hibbits Insurance expected the processors to function as Intel advertised and represented. Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise. Any reasonable Enterprise Entity would expect that the computing device being purchased would be secure and free from potential exploits.

368.    Unknown to Hibbits Insurance, at the time that it purchased the Affected Devices, those devices were equipped with Intel CPUs that contained the undisclosed Defects described in this Amended Complaint.

369.    Hibbits Insurance purchased the Affected Devices on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life. Had disclosures of the Defects in the CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed in Intel's advertisements, brochures, bulletins, and on its webpage, Hibbits Insurance would have seen them and no doubt have taken them into account

PAGE 128 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                   COMPLAINT

in making its purchasing decisions.  In particular, had Hibbits Insurance known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality, security, and performance, it would not have bought the Affected Devices containing Intel processors or it would have paid less for them.

370.    As a result of the Defects in Intel's CPUs and the mitigations needed to address the Defects and in order to comply with its duty to protect confidential information and documents, Hibbits Insurance spent many hours researching the Intel CPU Exploits and implementing available mitigations. Among other things, Hibbits Insurance increased its monitoring of the Affected Devices for security threats, attacks and breaches in order to safeguard protected information.  Additionally, Hibbits Insurance has incurred and will continue to incur time and costs because it has been and will continue to be required to, among other things:  increase monitoring of the Affected Devices and servers for security threats, attacks, and breaches; implement mitigation and remedial measures, such as patching to address the security vulnerabilities; monitor and test new patches and firmware updates; remove from service products with affected processors that cannot be patched; purchase on an accelerated schedule compared to normal business practices more powerful processors to compensate for decreased performance resulting from required software remediation patching; transfer data to secure systems from Affected Devices that cannot be patched; reconfigure its networks to provide increased security from internet accessibility for those systems containing the most sensitive data; increase monitoring of the Affected Devices, servers, and firewalls for security threats, attacks and breaches; and supplement its network and computing security program(s) with additional security monitoring Hibbits Insurance also installed patches for its computers and servers to address the security vulnerabilities and monitored and tested its computer systems to ensure that

PAGE 129 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

the patches were installed properly and did not adversely impact the operation of its computer systems.

371.    Because the Intel CPU Defects can be mitigated, but not completely fixed, on existing hardware, Hibbits Insurance will continue to be injured by incurring these additional monitoring costs as long as the Affected Devices are deployed as part of its IT infrastructure. Further, because the only true fix is a defect-free CPU, Intel must redesign its CPUs without the Defects.  When those CPUs are released, Hibbits Insurance will be compelled to accelerate its purchases of this new equipment, prematurely and outside normal replacement cycles, to eliminate the security risk created by Intel's design decisions. Consequently, Hibbits Insurance will sustain additional damages by expending the costs necessary to upgrade to non-defective computers and servers.

372.    Moreover, Hibbits Insurance installed patches that were designed to address the Defects.  When the patches were installed, Hibbits Insurance's computing systems experienced material performance degradation, including reduced processing speed, consistent with the degraded performance detailed in this Amended Complaint.

373.    During the Class Period, Hibbits Insurance purchased several desktop computers that featured an Intel processor.  By way of example, Hibbits Insurance purchased a Windows desktop that featured an Intel Core i5-4700 as the desktop's CPU.  Hibbits Insurance's desktop is comparable to test machine Intel Core i3 4130 Haswell - Windows 10.  Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 22% on average under Default Mitigations and up to 37%.

PAGE 130 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

374.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Hibbits Insurance's Intel processors, and Hibbits Insurance did not receive the benefit of its bargain. After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs. As detailed in this Amended Complaint, Hibbits Insurance's Affected Devices are worth less than what it paid for them.  Moreover, the Defects in the CPUs have increased the threat of security breaches requiring Hibbits Insurance to incur increased costs for its IT operations.

### JERRY PEACOCK – SOUTH DAKOTA

375.    Plaintiff Jerry Peacock is a resident and citizen of the State of South Dakota.  In or about November 2016, Plaintiff bought a new Windows laptop which featured an Intel Core i5-6200U as the computer's CPU.  Plaintiff bought the laptop from a Walmart store.  Plaintiff reviewed and relied on the information about the laptop and Intel processor that was displayed online and the store.  Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard and read that Intel processors were the world's fastest processors, had amazing performance consumers could see and feel, were the industry performance leader and had advanced performance. Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

PAGE 131 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

376.    Plaintiff has used, and continues to use, the Intel device for educational and personal tasks, such as creating presentations, video editing, word processing, photo processing, web browsing, and drafting spreadsheets.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

377.    Unknown to Plaintiff, at the time of its purchase, the laptop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced unexpected freezes of the device while using programs.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device.

378.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i5-6500 Skylake – Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 14% on average under the Default Mitigations and up to 27%.

379.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches

PAGE 132 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                     COMPLAINT

necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs. Plaintiff's Intel CPU is worth less than what he paid for it.

380.   Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life. Had disclosures of the Defects in the CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision. In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the laptop containing the Intel processor or would have paid less for it. Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

**JACK MEZZELL - TEXAS**

381.   Plaintiff Jack Mezzell is a resident and citizen of the State of Texas. In or about December 2016, Plaintiff bought a new Windows laptop which featured an Intel Core i3-5015U as the computer's CPU. Plaintiff bought the laptop from Best Buy in the store. Plaintiff reviewed and relied on the information about the laptop and Intel processor that was displayed in the store. Plaintiff purchased, and still owns, this device containing an Intel processor. Plaintiff has heard and read that Intel processors were the world's fastest processors, had amazing performance consumers

PAGE 133 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

could see and feel, were the industry performance leader and had advanced performance.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

382.    Plaintiff has used, and continues to use, the Intel device for various personal activities, often performing numerous tasks at the same time, including web browsing, email, banking, video editing, banking, and storing pictures.  Plaintiff's computer receives periodic updates that include the CPU patches released to date.

383.    Unknown to Plaintiff, at the time of its purchase, the laptop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced frequent freezes while using programs and unexpected shutdowns.  In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device.

384.    Plaintiff paid for security and processor performance that he did not receive.  Plaintiff's device is comparable to test machine Intel Core i3-4130 Haswell – Windows 9.  Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 22% on average under the Default Mitigations and up to 37%.

PAGE 134 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

385.   Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

386.   Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the laptop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a laptop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

PAGE 135 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

**CAROL MARZIALE – UTAH**

387.    Plaintiff Carol Marziale is a resident and citizen of the State of Utah.  In or about May 2014, Plaintiff bought a new Lenovo desktop which featured an Intel fourth generation Pentium G3220 as the computer's CPU.  Plaintiff bought the desktop at Staples online.  Plaintiff reviewed and relied on the information about the desktop and Intel processor that was displayed online. Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has read that Intel processors were the world's fastest processors, had amazing performance consumers could see and feel, were the industry performance leader and had advanced performance.  Plaintiff expected the processor to function as Intel advertised and represented.  Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

388.    Plaintiff has used the Intel device for various personal activities, including web browsing, email, online shopping, and storing pictures.

389.    Unknown to Plaintiff, at the time of its purchase, the desktop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed.  Specifically, Plaintiff has experienced such slow processing time while using programs and has lost data in certain instances.  Eventually, the computer's functionality decreased to the point that Plaintiff could no longer even start the computer.  In addition, as a result of the Defects in Intel's

PAGE 136 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on her Intel device.

390.    Plaintiff paid for security and processor performance that she did not receive. Plaintiff's device is comparable to test machine Intel Core i3 4130 Haswell - Windows 10. Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 22% on average under the Default Mitigations and up to 37%.

391.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what she paid for it.

392.    Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed online or in the store, Plaintiff would have seen them and no doubt have taken them into account in making her purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, she would

PAGE 137 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

not have bought the desktop containing the Intel processor or would have paid less for it. Plaintiff would have purchased a desktop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

## BLUE PEAKS HOSTING, LLC - UTAH

393.    Plaintiff Blue Peaks Hosting, LLC ("Blue Peaks") is organized under the laws of the state of Utah and primarily does business there. Blue Peaks provides website hosting and virtual private server hosting to its clients.

394.    Blue Peaks maintains private, sensitive, and confidential information.

395.     In making purchases and deciding to deploy devices containing Intel CPUs, Blue Peaks relied on Intel's representations (both direct and indirect) that its CPUs would provide superior security, performance, and speed, and were fit for use in its servers, PCs, and other devices that store, process or access sensitive, confidential, and personal information and data. Intel represented that its processors would deliver such performance securely, so that private and personal data would not potentially be exposed to compromise. Blue Peaks paid for processor security and performance it did not receive.

396.    Blue Peaks researched the devices before purchasing them, and that research included reviewing the Intel website or marketing material description of the security and capabilities of the CPUs contained in the devices that Blue Peaks purchased.

397.    Blue Peaks expected the processors to function as Intel advertised and represented. Implicit in Intel's representations was that its processor would deliver such performance securely,

so that that data would not potentially be exposed to compromise. Any reasonable purchaser would expect that the computing device being purchased would be secure and free from potential exploits.

398.    Unknown to Blue Peaks, at the time that it purchased the Affected Devices, those Devices were equipped with Intel processors that contained undisclosed Defects that made information, which should have remained secure and inaccessible to unauthorized parties.

399.    Blue Peaks purchased the Affected Devices on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life. Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed in Intel's advertisements, brochures, bulletins, and on its webpage, Blue Peaks would have seen them and no doubt have taken them into account in making its purchasing decisions. In particular, had Blue Peaks known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality, security, and performance, it would not have bought the Affected Devices containing Intel processors or it would have paid less for them.

400.    As a result of the Defects in Intel's CPUs and the mitigations needed to address the Defects and in order to comply with its duty to protect confidential information and documents, Blue Peaks spent significant time and effort researching the Intel CPU Exploits and implementing available mitigations. Additionally, Blue Peaks has been injured because it incurred and will continue to incur time and costs because it has been and will continue to be required to, among other things: increase monitoring of the Affected Devices and servers for security threats, attacks, and breaches; purchase on an accelerated schedule compared to normal business practices more

PAGE 139 – SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
         COMPLAINT

powerful processors to compensate for decreased performance resulting from disabling Hyper-Threading; reconfigure its networks to provide increased security from internet accessibility for those systems containing the most sensitive data; increase monitoring of the Affected Devices, servers, and firewalls for security threats, attacks and breaches; and supplement its network and computing security program(s) with additional security monitoring.

401.    As a result of its research regarding the Intel CPU Exploits, Blue Peaks understood that to address the security vulnerabilities it must either install patches for its computers and servers and disable Hyper-Threading on its computers and servers.  Blue Peaks' research revealed that installing patches would result in reduced processing speed.  Accordingly, Blue Peaks elected to disable Hyper-Threading on its computers and servers.  After disabling Hyper-Threading on its computers and servers, however, Blue Peaks experienced noticeable decreases in processing speed.

402.    Blue Peaks' employees spent over 50 hours completing the tasks described above.

403.    Based on these direct and indirect representations, Blue Peaks has purchased, and continues to use, a large number of products containing defective Intel processors, including servers and desktop computers.

404.    During the Class Period, Blue Peaks purchased at least two servers that featured an Intel processor. By way of example Blue Peaks purchased a Linux server that featured an Intel Xeon E5670 as the server's CPU.  Blue Peaks' server is comparable to test machine Xeon E3 1680 v3 Haswell - Linux. Testing on server workloads, detailed in Section J.3., infra, on the test machine confirms that Intel's mitigations resulted in 14% average degradation (up to 22%) under the Default Mitigations, and 23% average degradation (up to 46%) under the Maximum Mitigations.

PAGE 140 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

405.    Because the Intel CPU Defects can be mitigated, but not completely fixed, on existing hardware, Blue Peaks will continue to be injured by incurring these additional monitoring costs as long as the Affected Devices are deployed as part of its IT infrastructure.  Further, because the only true fix is a defect-free CPU, Intel must redesign its CPUs without the Defects.  When those CPUs are released, Blue Peaks will be compelled to accelerate its purchases of this new equipment, prematurely and outside normal replacement cycles, to eliminate the security risk created by Intel's design decisions. Consequently, Blue Peaks will sustain additional damages by expending the costs necessary to upgrade to non-defective computers and servers.

406.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Blue Peaks' Intel processors, and Blue Peaks did not receive the benefit of its bargain. As detailed in this Amended Complaint, Blue Peaks' Affected Devices are worth less than what it paid for them. Moreover, the Defects in the CPUs have increased the threat of security breaches requiring Blue Peaks to incur increased costs for its IT operations.

## MICHAEL NELSON – WASHINGTON

407.    Plaintiff Michael Nelson is a resident and citizen of the State of Washington.  On or about September 1, 2010, Plaintiff bought a new Windows desktop which featured an Intel Core i5-650 as the computer's CPU.  Plaintiff bought the desktop from Best Buy in the store.  Plaintiff reviewed and relied on the information about the desktop and Intel processor that was displayed. Plaintiff purchased, and still owns, this device containing an Intel processor.  Plaintiff has heard and/or read that Intel processors were the world's fastest processors, had advanced performance, and were the industry performance leader.  Plaintiff expected the processor to function as Intel

PAGE 141 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

advertised and represented. Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise. Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

408.    Plaintiff has used, and continues to use, the Intel device for personal use and for his work as a college professor. Plaintiff multitasks on the computer, frequently running multiple applications at the same time. These include browsing the internet, using iTunes, editing photographs, word processing, creating spreadsheets, communicating with people through Skype and Zoom, and creating PowerPoint presentations. Plaintiff's computer receives periodic updates that include the CPU patches released to date.

409.    Unknown to Plaintiff, at the time of its purchase, the desktop was equipped with an Intel processor that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties. While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing speed. Specifically, Plaintiff has experienced sluggish performance, and freezing of his computer while browsing the internet, requiring restarting. In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel device.

410.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's device is comparable to test machine Intel Core i5 2520M Sandy Bridge-Windows 10.

PAGE 142 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 25% on average under the Default Mitigations and up to 43%.

411.   Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processor and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPU is worth less than what he paid for it.

412.   Plaintiff purchased a device containing the Intel processor on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed in the store, Plaintiff would have seen them and no doubt have taken them into account in making his purchasing decision.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the desktop containing the Intel processor or would have paid less for it.  Plaintiff would have purchased a desktop containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for a device with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

PAGE 143 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                       COMPLAINT

**BARRY WAYNE BROWNING – WEST VIRGINIA**

413.    Plaintiff Barry Wayne Browning is a resident and citizen of the State of West Virginia. In or about 2010, Plaintiff bought a new Windows laptop which featured an Intel Pentium T3200 as the computer's CPU.  Plaintiff bought the laptop from Best Buy in the store.   In or about 2012, Plaintiff bought a new Windows laptop which featured an Intel Core i5-3210 as the computer's CPU.  Plaintiff bought the laptop from Sam's Club in the store.  Plaintiff reviewed and relied on the information about the laptops and Intel processors that were displayed in the stores. Plaintiff purchased, and still owns, the devices containing the Intel processors.  Plaintiff has heard and/ or read that Intel processors were the world's fastest processors and had the fastest performance. Plaintiff expected the processors to function as Intel advertised and represented. Implicit in Intel's representations was that its processors would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable consumer would expect that the computing device being purchased would be secure and free from potential exploits.

414.    Plaintiff has used, and continues to use, the Intel devices for both personal and business use, often performing multiple tasks at one time, including monitoring security systems for his business, web browsing, storing photographs, and email.  Plaintiff's computers receive periodic updates that include the CPU patches released to date.

415.    Unknown to Plaintiff, at the time of their purchases, the devices were equipped with Intel processors that contained undisclosed design Defects that made information, which should have remained secure and inaccessible, accessible to unauthorized parties.  While security patches were implemented to protect against Intel CPU Exploits, after January 2018 when the patches were downloaded, Plaintiff experienced material performance degradation, including reduced processing

PAGE 144 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

speed.  Specifically, Plaintiff has experienced unexpected freezing and non-responsiveness when working with applications. In addition, as a result of the Defects in Intel's CPUs and Intel's mitigations needed to address the Defects, Plaintiff spent time and effort researching the Intel CPU Exploits and implementing available mitigations on his Intel devices.  In addition, plaintiff has purchased an iPad to use when possible, or will use his iPhone to mitigate the problems caused by the performance issues.

416.    Plaintiff paid for security and processor performance that he did not receive. Plaintiff's Intel Pentium device is comparable to test machine Intel Core i5 2520M Sandy Bridge – Windows 7.  Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 10% on average under the Default Mitigations and up to 16%.  Plaintiff's Intel Core i5 device is comparable to test machine Intel Core i5 4670 Haswell – Windows 10.  Responsiveness testing, detailed in Section J.1., infra, on the test machine confirms that Intel's mitigations degraded performance by 11% on average under the Default Mitigations and up to 21%.

417.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of Plaintiff's Intel processors and Plaintiff did not receive the benefit of the bargain.  After disclosure of the Intel CPU Exploits, it became well known in the market that processor performance of Intel's CPUs would be negatively impacted – across the board – as a result of the necessary patches necessary to mitigate the threat of unauthorized access to private information secure data from the Intel CPU Exploits stemming from the undisclosed Defects in the CPUs.  Plaintiff's Intel CPUs are worth less than what he paid for them.

PAGE 145 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

418.    Plaintiff purchased devices containing the Intel processors on the reasonable, but mistaken, belief that the processors would provide the performance promised, would do so securely, and would retain all of their operating characteristics throughout their useful life.  Had disclosures of the Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, been displayed in the stores, Plaintiff would have seen them, and no doubt have taken them into account in making his purchasing decisions.  In particular, had Plaintiff known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance, he would not have bought the devices containing the Intel processors or would have paid less for them. Plaintiff would have purchased devices containing an AMD or other competing processor (which are largely immune from the Intel CPU Exploits) or paid only for devices with a CPU delivering the diminished post-mitigation performance (not the promised pre-mitigation performance).

### DK SYSTEMS, LLC - WISCONSIN

419.    Plaintiff DK Systems, LLC ("DK Systems") is organized under the laws of the state of Wisconsin and primarily does business there. DK Systems provides information technology support services, including secure cloud services, to its clients.

420.    DK Systems maintains private, sensitive, and confidential information, including EHR, PHI, ePHI, and other confidential or protected information. With respect to its health care enterprise clients, DK Systems is required and has agreed to be bound by the same privacy obligations that apply to its clients, including federal and state laws and regulations, such as HIPAA and ARRA.

PAGE 146 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

421.    In making purchases and deciding to deploy devices containing Intel CPUs, DK Systems relied on Intel's representations (both direct and indirect) that its CPUs would provide superior security, performance, and speed, and were fit for use in its servers, PCs, and other devices that store, process or access sensitive, confidential, and personal information and data.  Intel represented that its processors would deliver such performance securely, so that private and personal data would not potentially be exposed to compromise.  DK Systems paid for processor security and performance it did not receive.

422.    DK Systems researched the devices before purchasing them, and that research included reviewing the Intel website or marketing material description of the security and capabilities of the CPUs contained in the devices that DK Systems purchased.

423.    DK Systems expected the processors to function as Intel advertised and represented. Implicit in Intel's representations was that its processor would deliver such performance securely, so that that data would not potentially be exposed to compromise.  Any reasonable purchaser would expect that the computing device being purchased would be secure and free from potential exploits.

424.    Unknown to DK Systems, at the time that it purchased the Affected Devices, those Devices were equipped with Intel processors that contained undisclosed Defects that made information, which should have remained secure and inaccessible to unauthorized parties.

425.    DK Systems purchased the Affected Devices on the reasonable, but mistaken, belief that the processor would provide the performance promised, would do so securely, and would retain all of its operating characteristics throughout its useful life.  Had disclosures of the Defects in the CPUs, or that mitigations needed to address the Defects would materially impact the CPU's functionality and performance, been displayed in Intel's advertisements, brochures, bulletins, and

PAGE 147 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

on its webpage, DK Systems would have seen them and no doubt have taken them into account in making its purchasing decisions.  In particular, had DK Systems known about the Defects in Intel's CPUs or that mitigations needed to address the Defects would materially impact the CPUs' functionality, security, and performance, it would not have bought the Affected Devices containing Intel processors or it would have paid less for them.

426.    As a result of the Defects in Intel's CPUs and the mitigations needed to address the Defects and in order to comply with its duty to protect confidential information and documents, DK Systems spent significant time and effort researching the Intel CPU Exploits and implementing available mitigations.  Additionally, DK Systems has been injured because it incurred and will continue to incur time and costs because it has been and will continue to be required to, among other things:  increase monitoring of the Affected Devices and servers for security threats, attacks, and breaches; implement mitigation and remedial measures, such as patching to address the security vulnerabilities; monitor and test new patches and firmware updates; remove from service products with affected processors that cannot be patched; purchase on an accelerated schedule compared to normal business practices more powerful processors to compensate for decreased performance resulting from required software remediation patching; transfer data to secure systems from Affected Devices that cannot be patched; reconfigure its networks to provide increased security from internet accessibility for those systems containing the most sensitive data; increase monitoring of the Affected Devices, servers, and firewalls for security threats, attacks and breaches; and supplement its network and computing security program(s) with additional security monitoring.

427.    DK Systems also installed patches for its computers and servers to address the security vulnerabilities and monitored and tested its computer systems to ensure that the patches

PAGE 148 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

were installed properly and did not adversely impact the operation of its computer systems. As part of the patching process, DK Systems had to spend time to set anti-virus registry keys so that they would allow remediation patches to be installed. DK Systems also had to engage in multiple rounds of scanning for patches and installing the patches because not all computers would immediately detect the patches.  DK Systems also patched hypervisors' firmware, which required scheduled downtime for its hosted servers and cluster and multiple rounds of firmware and BIOS updates.

428.    DK Systems' employees spent over 20 hours completing the tasks described above.

429.    Based on these direct and indirect representations, DK Systems has purchased, and continues to use, a large number of products containing defective Intel processors, including servers.

430.    During the Class Period, DK Systems purchased at least five servers that featured an Intel processor. By way of example, DK Systems purchased a Windows server that featured an Intel Xeon E5-2430 as the server's CPU.  DK Systems' server is comparable to test machine Xeon E3 1680 v3 Haswell - Linux.  Testing on server workloads, detailed in Section J.3., infra, on the test machine confirms that Intel's mitigations resulted in 14% average degradation (up to 22%) under the Default Mitigations, and 23% average degradation (up to 46%) under the Maximum Mitigations.

431.    Because the Intel CPU Defects can be mitigated, but not completely fixed, on existing hardware, DK Systems will continue to be injured by incurring these additional monitoring costs as long as the Affected Devices are deployed as part of its IT infrastructure.  Further, because the only true fix is a defect-free CPU, Intel must redesign its CPUs without the Defects.  When those CPUs are released, DK Systems will be compelled to accelerate its purchases of this new equipment, prematurely and outside normal replacement cycles, to eliminate the security risk created by Intel's

PAGE 149 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

design decisions. Consequently, DK Systems will sustain additional damages by expending the costs necessary to upgrade to non-defective computers and servers.

432.    Intel's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling its processors with the undisclosed Defects has diminished the value of DK Systems' Intel processors, and DK Systems did not receive the benefit of its bargain. As detailed in this Amended Complaint, DK Systems' Affected Devices are worth less than what it paid for them. Moreover, the Defects in the CPUs have increased the threat of security breaches requiring DK Systems to incur increased costs for its IT operations.

## **DEFENDANT**

433.    Defendant Intel Corporation is a Delaware corporation with its principal place of business located at 2200 Mission College Blvd., Santa Clara, California.  At all relevant times, Intel designed, manufactured, distributed, marketed, and sold the defective CPUs throughout the United States.

## **CHOICE OF LAW**

434.    The application of California law to this litigation is appropriate given Intel's connection to the State of California since the 1970s.  As Intel itself states:

> We purchased our first piece of property–a 26-acre pear orchard on the corner of Coffin Road and Central Expressway in Santa Clara, California in 1970.  Today, we have 15,000 employees across the state at three major sites in Santa Clara, San Jose, and Folsom, and at research and development sites in Irvine and San Diego. Santa Clara is home to Intel's corporate headquarters and the flagship Intel Museum, which showcases five decades of Intel® innovations.[15]

---

[15] Intel in California, https://www.intel.com/content/www/us/en/corporate-responsibility/intel-in-california.html (as published August 21, 2018).

PAGE 150 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                     COMPLAINT

435.    Intel boasts that it has "invested in California for five decades, since our founding in Mountain View in 1968."[16]

436.    But Intel's connection to California does not end in Santa Clara.  It has divisions throughout the State of California, including in Folsom.

437.    Intel states that its "Folsom site is a center of excellence for graphics, chipsets and solid state drives, delivering innovative technology and support for a wide range of devices and client platforms.  With close to 6,000 employees, Intel is Folsom's largest private sector employer, and one of the Sacramento region's top 5 private employers."[17]

438.    Intel's Santa Clara site, however, is where the fraudulent conduct as described herein originated.  As Intel states, "The Santa Clara site is involved in engineering, design, research and development, and software engineering, and houses several corporate organizations, including sales and marketing, legal, supply chain, and human resources.  With more than 6,500 employees, Intel is one of the largest employers in Santa Clara."[18]

439.    Intel's own website even shows that nearly all of its available marketing jobs in the United States – the very arm of the Company that would have been responsible for the consumer-facing advertisements, representations, and even omissions – are located in the State of California.[19]

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] Intel Job Openings for "Marketing" Positions, https://jobs.intel.com/ListJobs/All/Search/jobtitle/marketing/ (as published August 21, 2018).

PAGE 151 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

440.    The State of California has a substantial interest in ensuring that corporations do not misrepresent their products, omit security risks concerning those products, and otherwise engage in business decisions that would harm consumers.

441.    The application of California law to Intel – a California company that took substantial actions in the State of California impacting Plaintiffs and the Class members in the State of California – would be neither unfair nor unlawful; nor would it violate the Due Process Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution.

## SUBSTANTIVE ALLEGATIONS

A.    **General Background**

1.    **Intel's 8086 and x86 Instruction Set**

442.    Intel, a portmanteau of the words "integrated" and "electronics," was founded by Robert Noyce and Gordon Moore in 1968 for the purpose of designing and manufacturing memory devices for computers utilizing silicon, a semiconducting material and one of the common elements found on Earth.  In 1971, the Company went public, and its shares have been traded on the NASDAQ continuously ever since.   That same year, Intel launched the first commercially available microprocessor, the Intel 4004.

443.    A microprocessor is an integrated electronic circuit that contains all the functions of a CPU of a computer.  The CPU is the "brains" of the computing device, performing all necessary computations for each application (e.g., Microsoft Word) and each peripheral (e.g., a printer).  Each program communicates with the processor through instructions, with each instruction representing a calculation or operation that the CPU must execute on behalf of the requesting application.  For each calculation, the CPU "fetches" the instruction from the computer's memory, "decodes" it,

"executes" it, and, finally, "writes-back" the result.  The time it takes a CPU to process instructions is measured in "clock cycles."  Each step in the process – fetch, decode, execute, and write-back – takes at least one clock cycle.  The number of clock cycles a CPU completes per second is known as the "clock rate."  "Clock speed" or "frequency" is a way to measure a CPU's processing speed and is usually expressed in megahertz ("MHz") or gigahertz ("GHz").

444.    In 1978, Intel debuted the 8086 microprocessor.  The 8086 was a 5 MHz, 16-bit processor, capable of handling up to 1 megabyte ("MB") of data.[20]  For the 8086, Intel designed an "instruction set," known as x86, and a "microarchitecture," known as 8086.  The instruction set serves as an interface between a computer's software and hardware.  The microarchitecture governs the various parts of the processor and how they work together to implement the instruction set.

445.    In July 1981, IBM launched its first personal computer ("PC"), powered by Intel's 8088 microprocessor, a more economical version of the 8086 microprocessor, also based on the x86 instruction set.  Because IBM allowed Original Equipment Manufacturers ("OEMs"; that is computer manufacturers) to clone its PC design, IBM PCs and clones thereof soon dominated the market.  Each of these computers was powered by a processor that implemented Intel's x86 instruction set.  Today, the majority of all PCs, laptops, workstations, and servers are powered by processors based on Intel's x86 instruction set.

### 2.    Intel's 80286 and the Introduction of Protected Mode

446.    In 1982, Intel released its second-generation processor based on the x86 instruction set, the 80286.  Before the 80286, processors had one operation mode known as "real mode."  When

---

[20] A "bit" is the smallest unit of storage.  A "byte" is equal to 8 bits.

the computer operated in real mode, applications had unlimited and direct access to all of a computer's memory, including information stored in the "kernel."

447.    The kernel is the central part of the computer's operating system ("OS").  Notable OSs include Microsoft Windows, Linux, and Apple's MacOS.  As demonstrated in the graphic below, the kernel acts as the intermediary between the CPU, memory, and any applications or peripherals:



448.    When a computer is operating in real mode, it is possible for a malfunctioning or malignant application to access the kernel and overwrite the OS, leading to catastrophic failure of the computer.  Today, such a failure could lead to "kernel panic" or, on a computer running Windows, the feared "Blue Screen of Death," which is displayed if the OS experiences a fatal system error.

449.    In order to minimize OS failures, Intel's 80286 introduced the concepts of "protected mode" and "virtual memory."  Protected mode allows the OS to remain in control of the computer through the kernel.  "Virtual memory" allows the computer to segment its physical memory into separate spaces, including "kernel space," where the computer runs and stores the critical kernel

code, and "user space," where the computer runs and stores all of the other code needed to run the applications and peripherals.

450.    The relevant importance of the code is determined by utilizing the concept of "protection rings."  As demonstrated in the graphic below, "Ring 0" includes the most privileged information, which resides in the kernel, while "Ring 3," includes the least privileged information, which is accessible to virtually all applications:



451.    Access to these spaces is controlled by a program's "privilege level."  To protect the computer's most privileged information (Ring 0), engineers rely on the "principle of least privilege," meaning that every program only has access to the least amount of privileged information it needs to perform its intended function.  Typically, before a CPU fetches instructions or data requested by an application, the computer must first determine whether that program has the requisite privilege level to access that information.  If the application does not have permission to access the requested instructions or data, an exception occurs within the CPU and the request fails.

452.    The privilege levels defined in the x86 instruction set are meant to ensure that programs other than the kernel do not have direct access to a computer's most privileged information

and that, if access is required, it is controlled by and is initiated through the kernel.  This ensures that no application can access a computer's Ring 0 information or make changes to the OS without involving the kernel.

453.    With the launch of the 80386 processor in October 1985, the functionality of protected mode and virtual memory was improved, and to this day all modern processors utilize these functionalities to protect a computer's most privileged information.[21]

454.    With virtual memory, each user process has its own virtual address space, which creates the illusion that each user has a memory space much larger than the physical, hardware-backed memory actually available on the machine.  In fact, user processes are sharing the limited physical memory, and portions of each program's instructions or data may actually be located in secondary storage (e.g., on disk).



---

[21] Michael S. Malone, *The Intel Trinity: How Robert Noyce, Gordon Moore, and Andy Grove Built the World's Most Important Company* (2014).

455.    The virtual address space allows each program to believe it is the only one (aside from the kernel (OS)) that is running on the machine.  This serves as a security function by isolating processes from each other, and also helps prevent applications from.  User applications should not be able to access each other's memory, or read or write to kernel memory, without permission.  This allows multiple applications to run simultaneously on personal devices and multiple users to execute processes on the same machine in the cloud.

456.    When a processor seeks to access data or instructions from memory, a virtual address has to be translated into a physical address to determine where the information is located.  Page tables are used to map the virtual to physical addresses, translating the virtual addresses seen by an application into physical addresses used by the hardware.

### 3.    Intel's 80486 and the Introduction of Pipelines and On-Die Caches

457.    Intel introduced the next generation of the x86-based processor, the 80486, in 1989. The 80846 boasted twice the performance of the 80386, due in part to two key improvements to the microarchitecture:  pipelines and on-die caches.[22]

458.    **Instruction Pipelining.**  Earlier iterations of Intel's x86-based processors utilized "sequential" processing, working through each step of the first instruction (e.g., fetch, decode, execute, and write-back) before starting the next instruction.  The following diagram reflects the 80386's sequential processing.   In this example, it takes eight clock cycles to complete two instructions:

---

[22] Michael S. Malone, *The Intel Trinity: How Robert Noyce, Gordon Moore, and Andy Grove Built the World's Most Important Company* (2014).

PAGE 157 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

## Sequential Processing (386)



459.    The 80486 was a "pipelined" processor, meaning that the CPU began processing the next instruction before it had completed processing the prior instruction.  As reflected in the diagram below, on Clock Cycle 2, the 80486 was able both to decode the instruction fetched during Clock Cycle 1, and to concurrently fetch the next instruction.  With pipelining, the 80486 could complete six instructions in nine clock cycles, nearly tripling the work completed in the same amount of time:

## Pipelined Processing (486)



460.    **Memory Hierarchy and On-Die Caches.**  A computer's memory system, which holds instructions and data for the CPU, is a hierarchy of storage devices with different capacities and access times.  When the CPU needs instructions or data to complete a task, it must fetch it from memory.  The following pyramid helps depict the basic memory hierarchy:

PAGE 158 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                COMPLAINT



461.    Data in the CPU registers can be operated on immediately during execution by the CPU.

462.    A computer's physical memory space – known as "main memory" – is separated from the CPU on the computer's main circuit board or motherboard. Fetching instructions or data from main memory is highly inefficient because main memory runs at a slower speed than the CPU (the "performance gap") and because of the time it takes for information and data to travel between main memory and the CPU on the motherboard ("latency").

463.    In order to lessen the performance gap and the issue of latency, modern microarchitecture designs rely on caches. A "cache" is a location between main memory and the CPU that can be used to temporarily store information and data for the use of the CPU. Caches

typically operate at the same or similar speed as the CPU, shrinking the performance gap.  Caches also are located in closer proximity to the CPU, addressing the latency problem.  As a result, when a processor needs to fetch instructions or data, it can first check to see if the necessary information has been stored in the cache.  If the information is in the cache (a "cache hit"), the CPU avoids the delay and associated performance penalty associated with fetching the information from main memory.  If the information is not in the cache (a "cache miss"), the CPU fetches it from main memory.[23]

464.    Because caches help minimize delays associated with fetching information from main memory, a processor with at least one cache typically is faster than a processor without any caches. While prior generations of Intel's x86-based processors included a first level or "L1" cache between main memory (referred to as "DRAM" in the diagram below) and the CPU on the motherboard, the 80486 brought the L1 cache onto the same "die" (or piece of silicon) as the CPU and added a separate second level or "L2" cache to the motherboard:

---

[23] Worse yet, if not present in main memory, the data or instructions must be fetched from storage, e.g., disk, which is even slower.



465.    By placing the L1 cache directly on the CPU die, the 80486 further decreased the time needed to fetch instructions and data, improving latency.  By adding a second cache (L2), the increased overall cache capacity made it more likely the CPU would find the information it needed in one of the caches, without having to resort to fetching it from main memory.

466.    Despite the 80486's clear performance advantage, however, Intel struggled to convince OEMs to launch PCs powered by the 80486 or to convince end-users that they needed one.

467.    To make matters worse, at the end of 1990, Intel's largest competitor, AMD launched a clone of Intel's 80386 microprocessor, the AM386, which was faster and cheaper than Intel's 80386.  Notably, this was not the first time that AMD had launched a faster clone of an Intel processor.  With the 80286, IBM required Intel to use AMD as a second supply source, effectively forcing Intel to give to its competitor a license to the 80286 code.  This was not a good development for Intel:  AMD's 80286 clone, the AM286, could run as fast as 25 MHz, while Intel's 80286

PAGE 161 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

processors clocked between 6 MHz and 12 MHz.[24]   As a result, when Intel subsequently launched the 80386, the Company refused to grant AMD a license.

468.   In response to the success (and speed) of the AM386, Intel sued AMD and launched a $250 million multi-media "Intel Inside"-based campaign to push the end-users to demand from the OEMs PCs powered by Intel's new 80486 microprocessor.   Intel had started its "Intel Inside" campaign in 1989 by asking PC makers, including IBM, to place "Intel Inside" stickers on the computers themselves to generate brand-loyalty among the end-users.[25]   The goal of the campaign was to cultivate in consumers the belief as to the reliability and superior performance of Intel-branded processors and to ensure that they could differentiate between an Intel processor and a clone made by one of its competitors.   As Intel's former CEO, Andrew Grove described it, "Intel Inside" drove home the point "that the identity and class of the computer were determined more than anything else by the microprocessor within."[26]

469.   The campaign worked.   Not only did customer pressure lead to OEMs announcing new PCs powered by Intel's 80486, but many of the manufacturers agreed to use the "Intel Inside" branding in their own marketing efforts.   By 1997, 1,500 OEMs were incorporating the "Intel

---

[24] Michael S. Malone, *The Intel Trinity: How Robert Noyce, Gordon Moore, and Andy Grove Built the World's Most Important Company* (2014).

[25] *Intel Launches a Huge Advertising Campaign: *Technology: The $250-million blitz is aimed at cutting down the competition and selling its next-generation 486 microprocessors*, Los Angeles Times (November 2, 1991), http://articles.latimes.com/1991-11-02/business/fi-797_1_advertising-campaign.

[26] Andrew S. Grove, *Only the Paranoid Survive: How to Exploit the Crisis Points That Challenge Every Company* (1988).

PAGE 162 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

Inside" theme into their marketing efforts.[27]  By 2000, Intel was the second-best-known industrial brand (after Coca-Cola) in the world.[28]

### 4.    **Intel's P5 Microarchitecture**

470.    In 1993, Intel introduced its fifth-generation microarchitecture based on the x86 instruction set, known as P5.  Intel launched the "Pentium"-branded processors based on P5.

471.    The P5-based processors were significantly faster due to their superscalar design. Whereas pipelining allowed a CPU to process different aspects of multiple instructions at the same time, a superscalar design allowed the CPU to fetch two instructions at the same time, decode two instructions at the same time, and so forth.  A pipelined superscalar design, such as the P5-based Pentium processor, allowed the processor to decode Instructions 1 and 2, while fetching Instructions 3 and 4:

## Superscalar Issue (Pentium)

| Cycle | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| Instr$_1$ | Fetch | Decode | Execute | | | Write | | | |
| Instr$_2$ | Fetch | Decode | Wait | | | Execute | Write | | |
| Instr$_3$ | | Fetch | Decode | Execute | Write | | | | |
| Instr$_4$ | | Fetch | Decode | Wait | | | Execute | Write | |
| Instr$_5$ | | | Fetch | Decode | Execute | Write | | | |
| Instr$_6$ | | | Fetch | Decode | Execute | Write | | | |
| Instr$_7$ | | | | Fetch | Decode | Execute | Write | | |
| Instr$_8$ | | | | Fetch | Decode | Execute | Write | | |

---

[27]  *Intel Corp.*, AdAge Encyclopedia (September 15, 2013), http://adage.com/article/adage-encyclopedia/intel-corp/98721/.

[28]  Michael S. Malone, *The Intel Trinity: How Robert Noyce, Gordon Moore, and Andy Grove Built the World's Most Important Company* (2014).

PAGE 163 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

472.    As compared to a sequential processor (e.g., the 80386 at two instructions in eight clock cycles), and a pipelined processor (e.g., the 80486 at six instructions in nine clock cycles), a superscalar pipelined processor could complete eight instructions in eight clock cycles.

473.    Intel used its "Intel Inside" campaign to make "Pentium" a household name.  The success of the campaign, however, became a curse once Intel discovered, in the summer of 1994, that Pentium had a design flaw.  Intel initially decided not to publicly disclose the defect because it believed very few customers would be impacted.  The flaw, though, was later uncovered by a North Carolina professor in October 1994, ultimately leading to intense media scrutiny.  The *Wall Street Journal*'s principal technology columnist, Walter Mossberg, described the scandal as worse than Watergate.  IBM, in turn, suspended shipment of all Pentium-powered PCs on December 12, 1994, because its independent research confirmed the flaw was more serious than Intel had represented.[29]

474.    At first, Intel resisted public pressure to conduct a full recall, continuing to sell the flawed Pentium and agreeing only to issue replacements if consumers could demonstrate that they were likely to encounter the flaw.  On December 19, 1994, however, just one week after IBM suspended shipments of Pentium-powered PCs, Intel finally agreed to a full recall.  On January 17, 1995, Intel announced that it would spend $475 million to replace the flawed processors and that, going forward, that it would immediately disclose any and all defects in its future microprocessors.[30]

---

[29] *Id.*

[30] *Id.*

PAGE 164 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

5. **Intel's P6 and the Introduction of Dynamic Execution**

475. Intel introduced its P6 architecture in November 1995. Makers of large computers, servers, and workstations quickly embraced the P6-based Pentium Pro processors.[31] In 1997, Intel also successfully launched the Pentium II processor, a more consumer-oriented processor based on the P6 architecture.

476. In a number of ways, the P6 microarchitecture represented a break from Intel's prior x86-based designs. As explained by Intel on its launch, the P6 "microarchitecture was tuned to what was proven performance," "[o]ptimizing CPI [clock per instruction] and [f]requency" to achieve a "50% frequency gain," and, ultimately, a "37% performance gain." In designing the P6 microarchitecture, Intel determined that "Dynamic Execution," which included the concepts of "out-of-order execution," "speculative execution," and "branch prediction" was "required for higher performance."[32]

477. **Out-of-Order Execution.** Every application or program has a set of instructions that it wants the CPU to execute in order ("program order"). These instructions require the CPU to, for example, engage in arithmetic or logical functions.

478. Instructions can be "data dependent," meaning that the instruction needs the data produced by a preceding instruction in order to execute. For example, suppose the CPU needs to add four numbers together: 1, 32, 75, and 89. Instruction 1 can add the first two numbers (1+32=33) and Instruction 2 can add the second two numbers (75+89=164). Instruction 3, however, is a data

---

[31] *Id.*

[32] David Papworth, *Optimizing the P6 Pipeline*, Presentation at 1995 Hot Chips Conference, https://www.hotchips.org/wp-content/uploads/hc_archives/hc07/2_Mon/HC7.S2/HC7.2.1.pdf.

PAGE 165 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

dependent instruction because the CPU needs the results of Instruction 1 (33) and Instruction 2 (164) to execute it.

479.    Instructions also can be "conditional" expressed as, "if X, then Y."  For instance, Microsoft Word has an autocorrect feature that determines whether a word is spelled correctly after it is typed.  If the word is spelled incorrectly, the program fixes it.  In that scenario, the conditional instruction is, "If a word is misspelled (X), then fix it (Y)."  With Word's autocorrect feature, there are two possibilities or "branches – there is a misspelling that needs to be fixed, or there is no misspelling, and the CPU can move on to another instruction.  A conditional instruction has to be resolved before the CPU can determine the next step or branch to take.  For this reason, such conditional instructions are sometimes called "branch instructions."

480.    Data dependent and conditional instructions (among others) can take a number of clock cycles to execute, leading the CPU to "stall" while it waits for the necessary data or branch it should follow to execute the next instruction.  The diagram below shows "in-order" execution in an 80486 pipelined processor where the CPU is stalled with respect to Instructions 2-6.  When Instruction 1 takes six clock cycles, only three instructions are complete at the end of eight clock cycles, as compared to five instructions after eight clock cycles where there is no CPU stall.

PAGE 166 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

## In-Order Pipeline (486)

| Cycle | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|-------|---|---|---|---|---|---|---|---|---|
| Instr$_1$ | Fetch | Decode | Execute | | | Write | | | |
| Instr$_2$ | | Fetch | Decode | Wait | | Execute | Write | | |
| Instr$_3$ | | | Fetch | Decode | Wait | | Execute | Write | |
| Instr$_4$ | | | | Fetch | Decode | Wait | | Execute | Write |
| Instr$_5$ | | | | | Fetch | Decode | Wait | | Execute |
| Instr$_6$ | | | | | | Fetch | Decode | Wait | |

481.    Out-of-order execution ("OoOE") addresses this problem.  Instead of executing each instruction in "program order," the CPU executes instructions based on "dataflow order," or, in other words, the CPU executes instructions based on an order determined by what data is available to it at any given time.  Dataflow order is akin to what students are taught to do with standardized tests – complete questions for which the answer is known first, before going back to those questions for which the answer is not immediately clear.

482.    The following diagram shows OoOE in the P6 microarchitecture.  In Steps 1 and 2, the instructions are fetched, decoded, and moved to the Reservation Station.  In Step 3, the Reservation Station sends instructions in dataflow order to the Execution Units.  During Step 4, the Execution Units execute the instructions and send the results to the Reorder Buffer.  Information necessary to execute these instructions is held in the processor's cache.  The Reorder Buffer puts the instructions back into "program order" (Step 5) and sends them to be retired in order (Step 6).



483.   With OoOE, P6-based processors can overcome the CPU stall generated by Instruction 1 in the image below and execute five instructions in eight clock cycles, eliminating the performance penalty and speeding up the processor.

## Out-of-Order Execution (Pentium II)

| Cycle | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| Instr$_1$ | Fetch | Decode | Execute | | | Write | | | |
| Instr$_2$ | | Fetch | Decode | Wait | | Execute | Write | | |
| Instr$_3$ | | | Fetch | Decode | Execute | Write | | | |
| Instr$_4$ | | | | Fetch | Decode | Wait | Execute | Write | |
| Instr$_5$ | | | | | Fetch | Decode | Execute | Write | |
| Instr$_6$ | | | | | | Fetch | Decode | Execute | Write |

484.   Ultimately, Intel concluded that OoOE was helpful because it "allowed higher clock frequency without CPI [average clock cycles per instruction] degradation" and "provid[ed] more performance per square mil of datapath."[33]

---

[33] David Papworth, *Optimizing the P6 Pipeline*, Presentation at 1995 Hot Chips Conference, https://www.hotchips.org/wp-content/uploads/hc_archives/hc07/2_Mon/HC7.S2/HC7.2.1.pdf.

PAGE 168 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                 COMPLAINT

485.    **Branch Prediction and Speculative Execution.**    While OoOE improves the performance of a processor by mitigating CPU stalls generated by data dependent instructions, only branch prediction and speculative execution ameliorate the performance impact of conditional instructions on the CPU.  When the CPU fetches and decodes a conditional instruction, the processor predicts the "branch" based on prior results and then speculatively executes instructions down that branch until the conditional instruction is executed and the branch is resolved.

486.    The following diagram demonstrates branch prediction and speculative execution in the P6 microarchitecture.  If a conditional instruction is fetched and decoded (Steps 1 and 2), then the Branch Prediction Unit (Step 3) is queried, with the resulting guess going to the Instruction Fetch Unit in Step 4.  From there, the processor decodes and speculatively executes the instructions down the predicted branch (Steps 5-7).  Meanwhile, the information for these speculatively executed instructions is stored in the processor's caches.



487.    When the CPU eventually executes the conditional instruction, the processor checks whether its prediction was correct.  If the Branch Prediction Unit has guessed correctly, the processor has performed useful work and the results are written to memory (Step 9, above).  If the CPU has guessed incorrectly – a "mispredicted branch" – the processor "flushes" its pipeline of the

PAGE 169 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                     COMPLAINT

impact of the speculatively executed instructions and proceeds to execute the instructions from the correct path. Critically, and as further explained in Section B, according to Intel's microarchitecture design, the CPU does not flush its cache after a mispredicted branch and so the information associated with the speculative execution down the incorrect branch remains in the processor.

488.   Research shows that Intel's P6 architecture did not permit unauthorized access by programs to protected memory. In other words, the P6 did not implement the Unauthorized Access Defect to allow instructions to access the read value (and instead returned a random number similar to AMD's CPUs).[34]

### 6.   The Netburst Microarchitecture Disaster

489.   The speed at which a CPU performs is a material attribute for consumers purchasing a desktop, laptop, workstation, or server powered by an Intel processor. Without sufficient processing speed, a CPU will be unable to effectively and efficiently run the device's OS and applications, or to utilize connected hardware and peripherals. As a result of Intel's various direct-to-consumer marketing campaigns, including "Intel Inside," consumers look to and rely upon the processor's advertised clock speed to measure a CPU's performance. Intel's focus on clock speed in its marketing led to the "Megahertz Wars," followed by the "Gigahertz Wars," during which Intel and its main competitor, AMD, battled to see which company could achieve the fastest clock speed.

490.   After successfully cloning the 80286, 80386, and 80486, AMD launched its own x86-based microarchitecture design, K5, in 1995. Like Intel's P6, AMD's microarchitecture designs relied upon OoOE, speculative execution, and branch prediction to achieve performance increases

---

[34] *See* H. Wong, *The Microarchitecture Behind Meltdown,* StuffedCow.net (May 18, 2018), http://blog.stuffedcow.net/2018/05/MELTDOWN-MICROARCHITECTURE/

PAGE 170 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

over earlier generations of processors.  In July 1999, AMD took the "speed crown" from Intel with the launch of its K7-based Athlon-branded processors.[35]  Thereafter, the title of the fastest processor changed hands several times.

491.    Then in March 2000, AMD successfully launched the first processor that could reach 1 GHz. Desperate to also reach the coveted goal of 1 GHz, Intel resorted to introducing the 1 GHz P6-based Pentium III processor just two days later, well before the Company was ready to ship these processors, as well as the previously announced 850, 866, and 933 MHz P6-based Pentium III processors to consumers.  Intel quickly followed this much-derided "paper launch" by announcing a 1.13 GHz Pentium III processor in July 2000.[36]

492.    Problems, however, with the 1.13 GHz Pentium III on the test bench led tech reviewers to publicly conclude that Intel had serious production issues with its 1.13 GHz CPU.  After a third outlet, *AnandTech*, came forward, confirming these reports, Intel recalled the 1.13 GHz Pentium III in August 2000, approximately one week after the first shipments of these processors had reached customers.

493.    Hoping to outrun the negative press that it had generated over the last year, Intel announced its newest microarchitecture, Netburst and Netburst-based Pentium 4 processors in November 2000.  According to Intel, Netburst-based CPUs "feature[d] significantly higher clock rates and world-class performance."

---

[35] Anand L. Shimpi, *Intel's 1.13GHz CPU Recalled_Is Intel resorting to desperate measures?*, AnandTech (August 29, 2000), https://www.anandtech.com/show/613/2

[36] *Id.*

PAGE 171 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

494.    Although the original Pentium 4 processors clocked at just over 1 GHz, Intel designed the Netburst microarchitecture with room to allow successive processors to reach clock speeds of up to 10 GHz.  To reach these speeds, Netburst included an improved cache subsystem, featuring larger, faster caches, a deeply pipelined design (doubling the number of pipeline stages), and "Hyper-Threading" technology, to ensure that the CPU was effectively and efficiently taking advantage of all available resources to achieve increased frequency and performance benchmarks.

495.    Intel designed the first Netburst-based processors, Pentium 4s code-named "Willamette," to reach clock speeds of 1.5 GHz.  The Willamette processors, though, could not outscore the P6-based Pentium IIIs or AMD's Athlon processors in commercially available benchmark testing.  In a lawsuit filed in 2002 in California state court, styled *Skold v. Intel Corp.*, No. 1-05-CV-039231 ("*Skold*"), consumers who ultimately purchased computers powered by the Willamette processors alleged that the "Pentium 4's scores were so bad that Intel [internally] deemed it 'not competitive' with AMD's Athlon processor or . . . [the] Pentium III processor, noting that most benchmark tests showed a 'negative or zero performance gain.'"

496.    According to the plaintiffs in *Skold*, the Willamette processors performed poorly due to "design flaws" in the Netburst architecture, which "Intel admitted . . . were so serious and so pervasive that they would significantly impair any computer's performance by dramatically slowing its ability to process the computer's instructions."  These flaws were the result of "a 'complete failure' of the design process," requiring "a dramatic change in [Intel's] engineering" process and a redesign that would prevent Intel from releasing a new processor for another two years.

497.    With AMD already taking market share, Intel could not wait until 2002 to launch a competitive processor.  Through its "Intel Inside" campaign, the Company had conditioned

PAGE 172 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                       COMPLAINT

consumers to look to computers containing Intel processors for superior performance, security, and reliability.  By focusing on processing speed and commercial benchmarking, Intel likewise had conditioned the market to focus on clock speed to measure a processor's performance and determine which computer to purchase.  Moreover, critically, Intel priced its processors based on the market's perception of their performance.  In fact, Intel was able to garner a premium for its processors throughout the 1990s.

498.    If, however, Intel released the Willamette processors, the public would soon learn what the Company already had discovered internally:  the Pentium 4 was an overpriced dud.  As reported in *Skold*, "Intel solved its problem by making it *appear* as if the [Willamette processor] outscored the Pentium III and AMD Athlon processors" (emphasis in original) by inflating its performance scores after it publicly launched the processor.  This strategy included surreptitiously developing a new, purportedly independent benchmark and altering another purportedly independent benchmark to fool consumers into thinking that Intel's Willamette processor outperformed the Pentium III and AMD processors.  Intel also disabled features on the Pentium III, hobbling its performance so that the Willamette processors would appear faster by comparison.  OEMs like HP were incentivized to help Intel with its deception in order to sell more computers.

499.    Ultimately, Intel settled the *Skold* lawsuit in 2014, agreeing to pay a 49-state class of consumers who had purchased a computer powered by a Willamette processor $15 per device.

### 7.    Intel's Core Microarchitecture

500.    After the Willamette debacle, Intel tried several times (without success) to release a number of processors based on the Netburst microarchitecture in response to AMD's successful products, including dual-core Athlon and Opteron processors.  In a last-ditch attempt to make

Netburst work, Intel designed, tested, and launched (in just nine months) "Smithfield," a dual-core, high-end Netburst-based processor.  By August 2005, as reported by PCWorld, Intel publicly admitted that it's "first dual-core [processor] was a hastily concocted design that was rushed out the door in hopes of beating rival … [AMD] to the punch."[37]

501.    The failed Smithfield launch made it clear that Intel had hit a wall.  Where Intel was once able to announce materially increased clock speeds with each new processor, now it was lucky if it could eke out a single-digit percentage increase.  Intel's designs could not handle the heat generated by higher clock speeds (the "thermal wall") or support the power necessary to materially increase clock speeds with each new processor (the "power wall").  The last Netburst-based processor, Prescott, never clocked higher than 3.8 GHz.  As a result, Intel scrapped Netburst and designed its next microarchitecture, known as "Core," to achieve higher performance through more efficient design.

502.    Released in 2006, Core rejected Netburst's reliance on a deeply pipelined, single-core processor, in favor of dual- or multi-core processors with cache subsystems.  Work on Core started in 2001, after Intel had lost the speed crown to AMD and the initial failure of Netburst in the Willamette Pentium 4 processors.[38]  Intel went back to its P6 microarchitecture design, and enlisted a team of engineers, who had designed the first microarchitecture for mobile computers (e.g., laptops), Pentium M, based on P6.[39]

---

[37] Tom Krazit, *First Dual-Core Pentium 4 a Rush Job, Intel Says*, PC World (August 17, 2005), https://www.pcworld.com/article/122236/article.html.

[38] Glenn Hinton, *Key Nehalem Choices*, Intel Fellow Nehalem Lead Architect Presentation (February 17, 2010), https://www.slideshare.net/parallellabs/10intelnehalemdesignslides.

[39] Fedy Abi-Chahla, *Intel Core i7 (Nehalem): Architecture by AMD?*, Tom's Hardware, (October 14, 2008), https://www.tomshardware.com/reviews/Intel-i7-nehalem-cpu,2041.html.

PAGE 174 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

503.    Core-based processors relied on techniques, including OoOE, speculative execution, and branch prediction, to address stalls, misses, mispredictions, and other taxes on a processor's overall performance.  On its release, Intel heralded Core as "a new foundation for Intel architecture-based desktop, mobile, and mainstream server multi-core processors," explaining that it had been "[d]esigned for efficiency and optimized performance across a range of market segments and power envelopes."

504.    With Core, Intel expanded its use of Dynamic Execution (OoOE, speculative execution, and branch prediction) to enable delivery of more instructions per clock cycle.  Intel designed each "core" or independent processing unit within the processor, often called a "processing element" or a "core," such that it could fetch, dispatch, execute, and retire up to four full instructions simultaneously.  Intel increased the instruction buffers (similar to the Reservation Station in the P6 design) for greater execution flexibility.

505.    Intel also attempted to enhance the Branch Prediction Unit.  According to Intel, "branch prediction" is among the processors' functions that have "the greatest leverage for improving overall performance" because of the penalty associated with recovering from an incorrectly predicted branch.  As Intel explained, "more efficient branch prediction gives better efficiency *with no other changes to the machine.*"[40]  In other words, memory isolation purportedly remained intact and the security of data was purportedly not put at greater risk.

---

[40] *The Next Generation of Intel Core Microarchitecture*, Intel Technology Journal, Volume 14, Issue 3  (2010)  https://www.intel.com/content/dam/www/public/us/en/documents/research/2010-vol14-iss-3-intel-technology-journal.pdf (emphasis in original).  All quotes unless otherwise specified are from this source.

PAGE 175 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

506.    Additionally, Core featured a redesigned memory and cache subsystems.  With "Smart Memory Access," Intel purported to improve the processor's performance by more effectively utilizing the current system of buffers and cores to hide latencies created by accessing main memory.  Intel also imbued each execution core with the ability to speculatively load data for instructions prior to execution.  With "Advanced Smart Cache," Intel created a large shared L2 cache accessible by both cores on a chip.

507.    Intel's renewed reliance on Dynamic Execution, including branch prediction, and efficient memory and cache access led to reports of increased performance in processors based on the Core architecture.  Core-based desktop and server processors boasted 40% and 80% increased performance, respectively, over similar processors based on Netburst.[41]  Furthermore, these performance increases came at decreased clock speeds – the 2.66 GHz Core Duo 2 achieved 40% greater performance over a 3.6 GHz Netburst-based Pentium D processor.[42]  With Core, Intel stabilized its market share[43] and won back the performance crown[44].

508.    Unbeknown to Plaintiffs and members of the Class, however, research revealed that, unlike Intel's P6 architecture, Intel's Core architecture permitted unauthorized access by programs to protected memory.   In other words, the Core architecture purposely implemented the Unauthorized Access Defect to allow instructions to access the read value (instead of returning a

---

[41] 2006 Intel Annual Meeting Slides.

[42]  Jack Dowek, *Inside Intel Core Microarchitecture*, Intel, https://www.hotchips.org/wp-content/uploads/hc_archives/hc18/3_Tues/HC18.S9/HC18.S9T4.pdf (last visited May 5, 2020).

[43] 2006 Intel Annual Meeting Slides.

[44] [44] Fedy Abi-Chahla, *Intel Core i7 (Nehalem): Architecture by AMD?,* Tom's Hardware (October 14, 2008), https://www.tomshardware.com/reviews/Intel-i7-nehalem-cpu,2041.html.

PAGE 176 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

random number similar to Intel's P6 and AMD's CPUs).[45]  Intel accomplished this in secret in order achieve superior performance over AMD's processors.  Indeed, the Defects were consciously designed and implemented by Intel as undisclosed performance features.

## 8.    **"Tick/Tock" and the Nehalem Architecture**

509.    Beginning with Core, Intel made "[p]erformance . . . an integral part of production definition and success."  To that end, "Intel set[] very aggressive performance targets to deliver products with compelling performance to the end user."[46]  Intel also "employ[ed] significant time and effort to ensure that the processor performance me[t] expectations at every stage of the product development cycle from concept to silicon arrival to product launch.  All design decisions [we]re weighed against performance impact."

510.    With the introduction of Core in 2006, Intel announced "an ambitious plan to return to evolving its processor architectures at a rapid pace, as [it] had done in the mid-1990s" known as "Tick-Tock."[47]  Each "Tick" represented Intel's effort to optimize the current microarchitecture design for a new manufacturing process or, in other words, shrinking the processor to fit on a smaller piece of silicon.  The first "Tick" after Core was the Penryn microarchitecture, which optimized Core for the 45-nanometer (nm) manufacturing process.  Each "Tock" represented Intel's effort to

---

[45] *See* H. Wong, *The Microarchitecture Behind Meltdown*, Stuffedcow.net (May 18, 2018), http://blog.stuffedcow.net/2018/05/MELTDOWN-MICROARCHITECTURE/.

[46] *The Original 45-nm Intel Core 2 Processor Performance*, Intel Technology Journal, Volume 12, Issue 3 (October 2008), https://www.intel.com/content/dam/www/public/us/en/documents/research/2008-vol12-iss-3-intel-technology-journal.pdf.

[47] Fedy Abi-Chahla, *Intel Core i7 (Nehalem): Architecture by AMD?,* Tom's Hardware (October 14, 2008), https://www.tomshardware.com/reviews/Intel-i7-nehalem-cpu,2041.html.

PAGE 177 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

redesign its microarchitecture.  Under this product cycle, Intel utilized parallel design teams and committed to releasing either a Tick or a Tock each year.

511.    The "starting point" for the first Tock following Core – known as Nehalem – was the previous Tick, the Penryn microarchitecture.[48]  As Intel reported, with Penryn-based processors, "Intel delivered a product with record-breaking performance on a wide range of client and server applications" by implementing "[f]requency improvements," "a larger L2 cache," and other "microarchitectural enhancements."[49]  With the Nehalem microarchitecture design Intel sought "a greater utilization of the possible peak performance" of the processor.

512.    Work had begun on Nehalem in 2003.  While most of the microarchitecture decisions were made in 2004, the major engineering work was done between 2005-07.[50]  Because Intel was forced to get Core out the door quickly to stop the fallout from the Netburst fiasco, Core was not fully optimized for all types of processor use cases.[51]  Whereas Core supported up to two cores, Nehalem was designed to effectively and efficiently support multiple cores and for use in laptops,

---

[48] "The Next Generation of Intel Core Microarchitecture," Intel Technology Journal, Volume 14, Issue 3 (2010).  All quotes unless otherwise specified are from this source.

[49] *The Original 45-nm Intel Core 2 Processor Performance*," Intel Technology Journal, Volume 12, Issue 3 (October 2008), https://www.intel.com/content/dam/www/public/us/en/documents/research/2008-vol12-iss-3-intel-technology-journal.pdf.  All quotes in this section unless otherwise specified are from this source.

[50] Glenn Hinton, *Key Nehalem Choices*, Intel Fellow Nehalem Lead Architect Presentation (February 17, 2010), https://www.slideshare.net/parallellabs/10intelnehalemdesignslides.

[51] Fedy Abi-Chahla, *Intel Core i7 (Nehalem): Architecture by AMD?*, Tom's Hardware (October 14, 2008), https://www.tomshardware.com/reviews/Intel-i7-nehalem-cpu,2041.html.

PAGE 178 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

desktops, and servers alike.[52]  Or, as Intel told shareholders at its 2006 Annual Meeting, "One Micro-Architecture for all High Volume Segments."

513.    To accomplish this, and eliminate a perceived "performance bottleneck," Intel implemented branch prediction in Nehalem's OoOE engine that sought to feed the engine "code and data at an unprecedented rate."  As *Ars Technica* explained, "to imagine that the [Penryn-based processor's] thirsty execution engine has been separated from the pools of code and data that lay in main memory by relatively thin pipes (the frontside-bus and cache hierarchy)" by "replacing the plumbing with very wide pipes and beefing up the pump in order to take full advantage of all this new capacity," Nehalem's design allows the processor to "get much closer to reaching its full potential."[53]  Intel also enlarged the "out-of-order" window (e.g., where instructions are executed in dataflow order) by 33% and increased the size of the load, store, and reorder buffers in order to make room for more instructions form predicted branches.

514.    Intel also attempted to "deliver a per core performance increase" in Nehalem-based processors.  To that end, Intel added a Level 3 or L3 cache that was shared between all of the processors' cores.  In prior iterations of Intel's architecture, customers had "to choose between high-performance when all cores [were] active or high performance when only some cores [were] being used."  "Having such a shared cache allow[ed] the entire cache to be used by any subset of the cores, in line with [Intel's] goal of not penalizing applications that cannot take advantage of all cores."

---

[52] Glenn Hinton, *Key Nehalem Choices*, Glenn Hinton Intel Fellow Nehalem Lead Architect Presentation (Feb. 17, 2010), https://www.slideshare.net/parallellabs/10intelnehalemdesignslides.

[53] Jon Stokes, *What you need to know about Intel's Nehalem CPU*, *ArsTechnica* (April 9, 2008), https://arstechnica.com/gadgets/2008/04/what-you-need-to-know-about-nehalem/2/.

PAGE 179 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

515.    In addition to addressing per-core performance, Intel designed Nehalem to address the Company's shortcomings in the server space.  For instance, Intel re-introduced "Hyper-Threading" technology in processors.  A form of simultaneous multithreading technology, Intel's Hyper-Threading Technology (or HT) allows a CPU to duplicate certain of its resources virtually in order to increase the number of independent instructions in its pipeline.  In the server space, HT allows a number of virtual machines to operate seamlessly (and separately) on the same physical server.  Accordingly, Intel designed the Nehalem architecture to "further increase the utilization of the [architecture] design" and "to improve the throughput of the core for multi-threaded software environments."

516.    Following the major advances of Core and the Nehalem architectures, Intel continued releasing either a Tick or Tock every 12-18 months until 2016 as follows:



517.    With each Tock, Intel sought to enhance its Dynamic Execution (OoOE, speculative execution, and branch prediction) and cache subsystem in pursuit of increased performance of each

PAGE 180 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

successive processor.  With each Tick, Intel implemented a new manufacturing process known as a process or die shrink.  During a process shrink (e.g., moving from 45 nm to 32 nm), the CPU, and in particular, its transistors, are scaled down to fit on a smaller piece of silicon.

518.    A process shrink can make a CPU both more powerful and efficient.  Smaller transistors mean that more transistors can be packed onto the die, increasing the available power.  Less space between the transistors means that information can flow more efficiently, increasing the performance.  At the same time, however, the higher number and concentration of transistors also generates more heat.  As a result, when it optimized its "Tick" microarchitecture for a new manufacturing process, Intel relied upon shared resources (e.g., shared L3 caches) in an attempt to balance power, efficiency, and thermal output in its processors, including, in particular, its multi-core processors.

519.    In 2016, Intel retired "Tick/Tock" in favor of a new product cycle known as Process-Architecture-Optimization.  Under the new product cycle, Sky Lake (formerly a Tock) is now an "Architecture" improvement, with the follow-on microarchitectures, Kaby Lake (2017) and Coffee Lake (2018), considered "Optimizations" of Sky Lake.

### 9.    Intel's Claimed Focus on Security with Core Tick/Tocks

520.    Intel understood and appreciated that "protecting the confidentiality of secret or sensitive information is a major concern for users of computer systems."[54]  In addition to computing the correct result, CPUs are to be designed to ensure that privileged data is not accessible to another program unless expressly authorized to share the data.

---

[54] Z. Wang & R. Lee, *New Cache Designs for Thwarting Software Cache-based side channel attacks*, ISCA (2007) at p.1, https://dl.acm.org/doi/pdf/10.1145/1250662.1250723.

PAGE 181 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

521.    Computer processors are supposed to carry out program instructions in a way that is secure – preventing access to confidential information as they run through the system.  Data security is supposed to protect against access to and misuse of personal information, customer's information, business intel and much more.

522.    Plaintiffs and absent Class members expected Intel to take adequate security measures and relied on Intel processors to protect and safeguard sensitive and confidential information.  Indeed, public and private entities entrusted with sensitive third-party data have legal obligations and duties to protect that data from unauthorized access.  Such entities as those named as Plaintiffs herein have been and continue to be required to engage in costly mitigation techniques to secure their IT infrastructures because of their statutory and non-statutory duties.

523.    In particular, healthcare-oriented organizations are subject to obligations under the Health Insurance Portability and Accountability Act ("HIPAA"), the American Recovery and Reinvestment Act ("ARRA"), and attendant regulations and other bodies of law.    HIPAA establishes a national standard that requires health care providers and their business associates to develop and follow procedures ensuring the confidentiality and security of protected health information ("PHI"), including electronic PHI ("ePHI"), when it is stored, transferred, received, handled, or shared.  Healthcare providers are subject to substantial fines by the Office of Civil Rights ("OCR") of the United States Department of Health and Human Services ("HHS") for violations of HIPAA.[55]    ARRA requires healthcare providers to make "meaningful use" of electronic health

---

[55] *See, e.g., Technical Report on Widespread Processor Vulnerabilities HHS Severity Level 2: Medium*, HCCIC (January 12, 2018), https://content.govdelivery.com/attachments/USDHSCIKR/2018/01/17/file_attachments/944452/HCCIC-2018-001a-SpectreMeltdown.pdf (last visited May 29, 2020).

PAGE 182 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

records to engage patients and family and to maintain privacy and security of patient health information.

524.    Public and private entities also have various other statutory and non-statutory legal obligations and duties to protect and safeguard third party data and information.  For example, the Gramm-Leach-Bliley Act ("GLB Act") requires financial institutions – including companies that offer consumers financial products or services (like loans, financial or investment advice, or insurance) – to protect a consumer's non-public personal information ("NPI").  Among other things, the GLB Act requires that financial institutions ensure the security and confidentiality of customer's NPI, protect against any anticipated threats or hazards to the security or integrity of customer's NPI, and protect against unauthorized access to or use of customer NPI that could result in substantial harm or inconvenience to any customer.

525.    Public and private entities routinely use Intel CPUs in their servers, PCs, and other devices that are deployed as part of their IT infrastructure to generate, analyze, and store electronic health records ("EHR"), PHI, ePHI and other confidential or protected information.  Healthcare providers also utilize medical devices manufactured by third parties that include Intel CPUs and that gather, analyze, store, and disseminate EHR, PHI, and ePHI.  Many healthcare providers also contract with third party cloud-based entities that maintain servers with Intel CPUs that store and disseminate patients' EHR, PHI, ePHI, and other confidential or protected information.

526.    Intel clearly understood the importance of security to entities that are subject to HIPAA and other patient privacy laws.  Intel's website, for instance, states: "Protection of personal health information is a critical priority.  Intel®-based technologies can support the need for compliance with local regulation of health care information such as the HIPAA privacy and security

PAGE 183 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

rule."  That same web page warned that "[t]he financial impact from security breaches in the United States averaged more than USD 5.2 million per event in 2011."

527.    Beginning with Westmere, the "Tick" following Nehalem, and continuing with each successive Tick/Tock, Intel touted the security of its processors through its vPro offering, often with the tagline, "Secure to the Core."

528.    Launched in 2007, vPro included Intel's Active Management Technology ("AMT") and a suite of security technologies for commercial uses of Intel processors including, among others, Intel Trusted Execution Technology ("TXT") and Intel Data Protection Technology (e.g., Intel Advanced Encryption Standards – New Instructions ("AES-NI")).  In particular, in *Service Security and Compliance in the Cloud*, Intel Technical Journal, Volume 16, Issue 4, 2012 ("ITJ"), Intel recognized that "[s]ecurity is a key barrier to the broader adoption of cloud computing" (*id.* at 35), and that a fundamental security challenge facing cloud computing is the ability of an unauthorized user to launch a side-channel exploit to extract information from VMs running on the same system.[56] Intel described TXT as embedded hardware technology in its vPro chips to secure against such risks.

529.    TXT is a "hardware-based" technology intended "to protect sensitive information from software-based attacks."  To that end, TXT purportedly provided "[h]ardware-assisted methods that remove residual data at an improper [measured launch environment] shutdown,

---

[56] In connection with its statements, Intel cited to "Ristenpart, T., Tromer, E., et al., *Hey, You, Get Off of My Cloud: Exploring Information Leakage in Third-Party Compute Clouds*" CCS'09, Chicago, Illinois, in which the authors warn of the risks of side channel attacks in a VM environment.  The authors further noted that these side channel attacks exploit time-shared caches "which appear to be particularly conducive to attacks."  *Id.*, ¶ 8.5.

PAGE 184 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

protecting data from memory-snooping software and reset attacks."[57]   According to Intel, TXT "addresse[d] the increasing and evolving security threats across physical and virtual infrastructures" and was one of the "building blocks" through which Intel was "setting an industry benchmark for secure processing in data centers."[58]

530.    Intel also intended TXT to allow for "[p]rotected execution," whereby an application can "run in [an] isolated environment so that no unauthorized software on the platform can observe or tamper with the operational information."[59]   Based on these features, Intel described TXT as a key ingredient for building trusted platforms that allow IT administrators the ability to control virtualized or cloud-based machines able to withstand attacks, including (according to Intel) firmware, rootkit, and side-channel exploits.

531.    AES-NI refers to new instructions that Intel developed to provide "hardware support" for the Advanced Encryption Standard.   Adopted by the U.S. Government in 2001, AES relies on cryptography to ensure the confidentiality of communications through an insecure or public/shared channel.   Cryptographic functions, though, are traditionally seen as too complex and "computationally costly" to execute efficiently.   As Intel explained in a 2010 white paper, "[i]t is expected that when encryption is turned on, performance will degrade."[60]   Intel touted AES-NI's

---

[57]         Intel         Trusted         Execution         Technology         White         Paper, https://www.intel.com/content/www/us/en/architecture-and-technology/trusted-execution-technology/trusted-execution-technology-security-paper.html.

[58] *Id.*

[59] *Service Security and Compliance in the Cloud*, Intel Technology Journal, Vol. 16, Issue 4 (2012), https://www.intel.com/content/dam/www/public/us/en/documents/research/2012-vol16-iss-2-intel-technology-journal.pdf.

[60] Leslie Xu, *Securing the Enterprise with Intel AES-NI*, Intel White Paper (September 2010) at p. 9, https://www.intel.com/content/dam/doc/white-paper/enterprise-security-aes-ni-white-paper.pdf

PAGE 185 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

ability "to protect data" stored on hardware resources (e.g., processors) shared by several virtual machines in a data center from unauthorized access, use, or alteration through encryption, while removing "the main objection to using encryption to protect data: the performance penalty."  In particular, Intel asserted that AES-NI "help[ed] prevent software side-channel attacks."[61]

532.    In launching "Haswell" in 2014, the fourth generation of the Core microarchitecture, Intel touted vPro's ability to "protect the OS kernel" from incursions.  Intel maintained that its CPUs contained "intelligent security [that] senses when threats are near…. [and] automatically guard[s] your company's data from viruses and malicious attacks with the hardware-assisted technology[.]"

533.    What Intel failed to disclose, however, was that the privileged information typically stored within the OS kernel (or other information sufficient to identify the privileged information) was not secure and could be leaked through side-channel exploits on the unsecured caches within Intel's processors.

534.    Intel represented to consumers that its CPUs were "secure to the core."  It fully appreciated and recognized that many information security standards and regulations require "the protection of sensitive data" and asserted that Intel's processors "stand out" by "extending protection outside the operating system and into the hardware layer."[62]  For example, Intel touted its hardware-based security to protect against malicious attacks:

---

[61] Leslie Xu, "Securing the Enterprise with Intel AES-NI" Intel White Paper (September 2010) at p.    5,    https://www.intel.com/content/dam/doc/white-paper/enterprise-security-aes-ni-white-paper.pdf.

[62] Intel Product Brief, *Building A Secure Digital Learning Environment*, Intel https://www.intel.com/content/dam/www/public/us/en/documents/brochures/authenticate-product-brief-english.pdf (last visited May 5, 2020).

PAGE 186 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT



535.    According to Intel, "[i]f you own a business, you're at risk….  Virus protection and other software solutions – though useful and necessary – only get you so far ….  So what can you do to stay safe?  Don't rely on software alone.  You need your hardware to do the heavy lifting."[63] Intel assured consumers that "Intel Core processors ha[d] hardware-enhanced security features that allow hardware and software to work together, protecting your business from malware and *securing the important, private data and content* you create and share:[64]

[63] *Could Your Old PCs Be Putting Your Business at Risk?*, Intel IT Peer Network (February 16, 2016),                https://itpeernetwork.intel.com/could-your-old-pcs-be-putting-your-business-at-risk/#gs.60gfpu.

[64] *Id.* (emphasis added).

PAGE 187 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT



536.    With the launch of "Skylake" in 2015, the sixth generation of the Core microarchitecture, Intel touted the CPUs' "cutting-edge security,"[65] claiming "[t]he Skylake architecture has been designed to enable better security"[66] not just for enterprise consumers through the vPro platform[67] but all consumers "at home."  Intel asserted consumers were "safe and secure at home" "knowing all of [their] pictures, videos, and personal files [were] securely stores at home." The "6th gen Intel Core processors with hardware-based security features help keep your system and data free from malware, hacking, viruses, and prying eyes."[68]

537.    Similarly, prior to January 2018, Intel represented that "[s]ecurity is a top priority [and that it] will restore confidence in data security with customer-first urgency, transparency, and timely communication."[69]  Intel recognized that cyber-attacks were "moving down the computing

---

[65] *Top Reasons to Modernize Your Agency with the 6th Gen Intel Core vPro Processor Family*, Intel, https://www.intel.com/content/dam/www/public/us/en/documents/sales-briefs/modernize-with-6th-gen-core-vpro-brief.pdf (last visited May 5, 2020).

[66] *Intel Sets New Standard for Computing with 6th Gen Intel Core Processor Family and Intel Xeon Processors for Mobile Workstations – Intel's Best Processors Ever*, Intel News Fact Sheet, http://download.intel.com/newsroom/kits/core/6thgen/pdfs/6th_Gen_Intel_Core-Intel_Xeon_Factsheet.pdf (last visited May 5, 2020).

[67] Intel News Fact Sheet, *Intel Sets New Standard for Computing with 6th Gen Intel Core Processor Family and Intel Xeon Processors for Mobile Workstations – Intel's Best Processors Ever*, Intel http://download.intel.com/newsroom/kits/core/6thgen/pdfs/6th_Gen_Intel_Core-Intel_Xeon_Factsheet.pdf (last visited May 15, 2020),

[68] *Safe and Sound at Home with Desktop PCs,* Intel https://www.intel.com/content/www/us/en/desktops/desktop-storylines-security-infographic.html (last visited Aug. 24, 2018) Note*: since the filing of Plaintiffs' Consolidated Class Action Allegation Complaint, Intel has removed this advertisement infographic from its website.  Archived versions are available at web.archive.org,* http://web.archive.org/web/20170423053311/http://www.intel.com/content/www/us/en/desktops/desktop-storylines-security-infographic.html.

[69]Q4'17 Earnings Presentation, Intel, https://d1io3yog0oux5.cloudfront.net/_9e8578e05cb2822a3c0c8800a0811dba/intel/db/887/7654/earnings_presentation/Q4-Earnings-Deck-Final-corrected.pdf

PAGE 189 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

stack, traversing from software to hardware, threatening devices in homes, cars, businesses, networks and cloud," making it such that "[t]he legacy model of software protecting software can't keep up with advancing threats against digital security, safety and privacy."  To address this known threat, Intel represented that it had designed "hardware-enabled security capabilities" directly into its processor, thereby allowing the CPU to protect the computing ecosystem "against evolving and modern threats."[70]  Ultimately, although Intel touted its "leading edge security," critical hardware to the central function of Intel's CPUs responsible for securing against unauthorized access to users' confidential information was intentionally discarded by Intel – rendering Intel's CPUs uniquely susceptible to the Intel Exploits.

538.    Intel's decision to sacrifice security in its implementation of speculative execution led Intel's CPUs to be uniquely exposed to several major categories of exploits – Meltdown, Foreshadow, Fallout, RIDL, ZombieLoad, SwapGS, LazyFP, Vector Register Sampling, CacheOut, L1D Snoop Sampling, and likely numerous yet-to-be-disclosed exploits.

**10.    Intel Continued Advertising its Defective CPUs' Superior Performance and Security and Charging a Substantial Premium Despite its Knowledge of Meltdown and Spectre and the Need for Performance-killing Mitigations.**

539.    Upon information and belief, Intel has manipulated the embargo process in order to maintain its market share and maximize profits – all at the expense of its customers.  As two researchers noted, "[t]here are tremendous incentives for [Intel] to delay [disclosure of] known vulnerabilities and downplay their risks once they are known.  We see this in the case of Meltdown

---

[70] Hardware – Enabled Security Powered by Intel Technology, *Strengthening Security Protection*, WaybackMachine          (April          7,          2017), https://web.archive.org/web/20170407073442/https://www.intel.com/content/www/us/en/security/hardware/hardware-security-overview.html (last visited May 25, 2021).

PAGE 190 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                  COMPLAINT

and particularly in the later but related MDS attacks. In both cases, the vulnerability was known to CPU vendors (in this case, Intel) for a very long time – over a year in the case of the MDS attacks – before the vulnerability was publicly disclosed. This is very different from software security, where the process from vulnerability discovery to patch is typically 90 days or less. This tremendous delay between vulnerability discovery and vulnerability defense hugely exacerbates the information asymmetry between [Intel] and [its customers], as [Intel] is selling a known insecure product to the [customers] without the [customers'] knowledge, potentially for many months if not longer."[71]

540.    By mid-2017, Intel indisputably knew that its CPUs were uniquely vulnerable to exploits by both Meltdown and Spectre attacks. As explained herein, despite Intel's false narrative that the exploits are an industry-wide problem, Meltdown is largely an Intel-only problem that targets the Unauthorized Access Defect that Intel implemented when it removed well-accepted hardware security and violated well-settled CPU design principles.

541.    Intel likewise knew that the mitigations that purchasers would be required to download would cause Plaintiffs and Class members to suffer significant – indeed, extreme – performance degradation.

542.    Yet, despite this knowledge, Intel continued to advertise, market, and sell its defective CPUs at higher prices based upon the perception of superior performance and security. The inflated prices were passed on to end-consumers by computer manufacturers, or OEMs, which incorporated Intel CPUs' inflated price into Intel CPU-equipped devices.

---

[71] Adam Hastings and Simha Sethumadhavan, *WaC: A New Doctrine for Hardware Security*, ASHES '20 (November 13, 2020), https://dl.acm.org/doi/10.1145/3411504.3421217.

PAGE 191 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

543.    Indeed, since mid-2017, Intel deliberately claimed its CPUs had superior performance and security – all while concealing its knowledge of the Defects, the Intel CPU Exploits, and the performance-killing mitigations necessary to safeguard against the exploits.

544.    For example, Intel touted the "blazing fast capabilities" of the 8th Generation Intel Core Processor family:



545.    Incredibly, Intel specifically stated that 8th generation Core "Coffee Lake" processor family had "strong security" and was 40% faster than the previous generation – all while concealing that such performance gains would soon be lost due to the looming need for users to install patches[72]:

---

[72] WorldWideTechScience, *Intel Core 8th Gen Processors Ad*, YouTube (November 7, 2017), https://www.youtube.com/watch?v=yiNhotmMMM8.

Intel Newsroom, *8th Gen Intel Core Processor-Powered PCs, Amazing in All Shapes and Sizes*, Intel (August 31, 2017), https://newsroom.intel.com/editorials/8th-gen-intel-core-processor-powered-pcs-amazing-shapes-sizes/#gs.zsn5iy.

*see also* Intel Press Release, *Intel Unveils the 8th Gen Intel Core Processor Family for Desktop, Featuring Intel's Best Gaming Processor Ever*, Intel Newsroom (September 24, 2017),

PAGE 192 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                     COMPLAINT



INTEL CORE 8TH GEN PROCESSORS AD.

2,867 views • Nov 7, 2017

546.    With the release of the new 8th generation, Intel targeted consumers who were using older computers and were looking to upgrade, claiming that there are "at least 450 million computers still in service that are five or more years old."[73]

547.    Despite knowing its defective CPUs were vulnerable to the yet-to-be disclosed exploits and would require mitigations that would materially impact performance and functionality,

https://newsroom.intel.com/news-releases/intel-unveils-8th-gen-intel-core-processor-family-desktop/#gs.08km7d.

[73]Dan Ackerman, *Intel bets on a big speed boost for 8th-gen Core chips*, CNET.com (August 21, 2017), https://www.cnet.com/news/intel-bets-on-a-big-speed-boost-for-8th-gen-core-chips/.

PAGE 193 – SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

Intel claimed that its 8th Gen Intel Core processors were "designed for what's next" and had "amazing performance & responsiveness"[74]:



548.    Knowing the mitigations would effectively the high-end CPUs into slower (and cheaper) CPUs post-mitigation, Intel's marketing claimed that the 8th generation CPUs "deliver premium performance, with a Boost in Frame Rate of up to 25% Gen over Gen" and "[p]erformance boosts that deliver frame rate improvements of up to 25 percent compared with 7th Gen Intel core for smooth gaming experiences and up to 65 percent faster editing in content creation compared with a 3-year-old machine."[75]

---

[74] Intel Newsroom, *Introducing 8th Gen Intel Core Processors*, YouTube (August 21, 2017), https://www.youtube.com/watch?v=JrOb84MetfQ&t=9s.

*see also* Product Brief, *8th Generation Intel Core Processors*, Intel Newsroom (August 11, 2017), https://newsroom.intel.com/wp-content/uploads/sites/11/2017/08/8th-gen-intel-core-product-brief.pdf

[75] Intel Press Release, *Intel Unveils the 8th Gen Intel Core Processor Family for Desktop, Featuring Intel's Best Gaming Processor Ever*, Intel Newsroom, September 24, 2017,

PAGE 194 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

549.     According to Intel, 8th Generation CPUs provided "exceptional platform performance" delivering "an impressive portfolio of standard and unlocked systems from a broad range of usages and performance levels."  These CPUs also included "Intel Hyper-Threading technology, which allows each processor core to work on two tasks at the same time, improving multitasking, speeding up workflows, and accomplishing more in less time."[76]  As described herein, however, in order to mitigate the threat posed by the Intel CPU Exploits, experts recommend turning Hyper-Threading off.

550.     With the disclosure of the exploits and performance killing mitigations looming, Intel made sure to take advantage of holiday sales to maximize profits – placing its financial interest above its customers' best interests[77]:

https://newsroom.intel.com/news-releases/intel-unveils-8th-gen-intel-core-processor-family-desktop/#gs.08km7d.

[76] Intel Newsroom, *8th Generation Intel Core Desktop Processors*, Intel (September 9, 2017, https://newsroom.intel.com/newsroom/wp-content/uploads/sites/11/2017/09/8th-gen-intel-core-product-brief.pdf.

[77] *Intel's 2017 Holiday Buyers Guide*, Intel (November 11, 2017), https://newsroom.intel.com/wp-content/uploads/sites/11/2017/11/intel-2017-holiday-buyers-guide.pdf.



551.   Intel's 2017 Holiday Buyers Guide[78] advertised numerous devices powered by defective Intel CPUs:

- Lenovo Yoga 920: "Powered by the 8th Generation Intel Core processor with high performance and exceptional connectivity; perfect for content creation."

- Asus Vivobook Flip 15: "Powerful and efficient 8th Generation Intel Core i7 processor."

- Dell XPS 13: "8th Generation Intel Core processor boosts performance by more than 40% over prior generation."

---

[78] Intel Newsroom, *Intel's 2017 Holiday Buyers Guide*, Intel (November 11, 2017), https://newsroom.intel.com/wp-content/uploads/sites/11/2017/11/intel-2017-holiday-buyers-guide.pdf.

PAGE 196 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

- Dell Inspiron 15 7000 2-In-1: "The latest Intel processors (up to 8th Generation Quad Core i7) enable fast, responsive performance, keeping your music and videos running smoothly without interruption."

- HP Spectre 13: "Build for productivity with exception and responsive performance with the latest 8th Generation Intel Core processors."

- HP Spectre X360 13: "Creators and multitaskers will be delighted by the optimized thermals, exceptional performance brought by the latest 8th Generation Intel Core processors."

- HP Envy 13: "Impressive stamina.  Incredible speed.  Overpower the most demanding tasks with up to 14 hours of mixed usage battery life, and the latest 8th Generation Intel Core processors."

- Microsoft Surface Laptop: "Intel Core i5 or i7 options power everything you need to do."

- Microsoft Surface Pro: "Surface pro delivers even more speed and performance thanks to a powerful Intel Core processor."

- Acer Swift 5:  Style meets substance with 8th Generation Intel Core processor providing exceptional performance."

- Acer Switch 7 Black Edition: "Ideal companion for intensive tasks, creative production and content streaming thanks to the 8th Generation Intel Core processor."

- Google Pixelbook and Pixelbook Pen: "Powered by the 7th Generation Intel Core i5 and i7 processors to keep up with all of your needs."

PAGE 197 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

- Dell XPS Tower Special Edition: "Never slow down with our most powerful XPS ever. Powered by 8th Generation Intel Core processors."

552. Intel's intensive marketing efforts resulted in record profits. "Q4 marked an all-time record quarter in an all-time record year. [Intel m]et or exceeded all 2017 corporate and business unit revenue, spending, and profitability goals." Intel recorded revenue of $62.8 billion in 2017 and $17.1 billion in the 4Q alone.[79]

553. The processors that Intel sold and distributed, however, were not of the quality represented. Intel knew that the failure to maintain memory isolation in the design and implementation of speculative execution could be exploited through side-channel attacks. It also knew the patches would significantly impact the level of CPU performance that Plaintiffs and Class members bargained and paid money for.

554. Incredibly, Intel made a habit of launching new products that were vulnerable to Intel CPU Exploits and keeping those vulnerabilities secret from Plaintiffs, Class members, and the consuming public. For example, after researchers informed Intel in May 2019 of the MDS exploits, Intel kept the MDS under embargo for over 18 months. During this time, Intel launched certain 10th generation "Ice Lake" processors that were vulnerable to the MDS exploits and required microcode patches to mitigate against the exploit.[80]   As detailed herein, like the patches for Meltdown and Spectre, the MDS mitigations cause substantial performance degradation.

---

[79] Q4'17 Earnings Presentation, Intel, https://d1io3yog0oux5.cloudfront.net/_9e8578e05cb2822a3c0c8800a0811dba/intel/db/887/7654/earnings_presentation/Q4-Earnings-Deck-Final-corrected.pdf (last visited May 18, 2021).

[80] Daniel Moghimi, *Data Sampling on MDS-resistant 10th Generation Intel Core (Ice Lake)* (2020), https://moghimi.org/papers/techreport2020-IceLakeMDS.pdf.

PAGE 198 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

555.     There was no reasonable basis, however, for Intel to withhold critical information from the public, while simultaneously marketing and selling its defective products to the Plaintiffs and Class members at a substantial premium that Intel knew the products did not deserve.  Intel should have disclosed that there were pending security mitigations that could impact security and performance and provided approximate ranges that the mitigations could impact devices with Intel CPUs.  Revealing this information would have protected the computer security of the larger community and would have removed the information asymmetry that Intel was exploiting to sell defective CPUs.

**B.**      **Intel's Processors Are Defective**

    **1.**      **Security Vulnerabilities Created by Intel's Use of Speculative Execution and an Unsecured Cache Subsystem Lead to Confidentiality Security Breaches**

556.     Ensuring the "confidentiality" of secret, sensitive, or private information by preventing its disclosure to an unauthorized entity is one of the most basic security properties, and an obligation Intel and its competitors in the industry acknowledged and accepted when designing new CPUs to release in the market.

557.     Hardware plays a central role in security. "Fundamental to almost any security question is the idea of a secret.  Whether a secret is cryptographic key, or merely a hidden certificate, a secure processor must be able to generate, protect, and share that secret with the outside world."[81]

558.     All CPUs found in laptops, desktops, and data center servers require security to be useful for normal, ordinary use.  This security protects the confidentiality of sensitive information

---

[81] G. Edward Suh, et al., *Design & Implementation of the AEGIS Single-Chip Secure Processor Using Physical Random Functions* (2005), p. 1, http://csg.csail.mit.edu/pubs/memos/Memo-483/Memo-483.pdf.

by controlling access to the information such that only authorized users can read or modify it.[82] Since 1985, Intel's microarchitecture designs, like its competitors, have relied upon protected mode and virtual memory to ensure that sensitive information is protected from unauthorized access.

559.    As Patterson and Hennessy explain in their undergraduate textbook *Computer Organization and Design*, processors are designed "to compile each program into its own *address space* – a separate range of memory locations accessible only to this program.  Virtual memory implements the translation of a program's address space to physical addresses.  This translation process enforces protection of a program's address space from other virtual machines."[83] Indeed, these most basic design mechanisms – which Intel secretly discarded – "ensur[e] that multiple processes sharing the processor, memory, or I/O devices cannot interfere, intentionally or unintentionally, with one another by reading or writing each other's data.  These mechanisms also isolate the operating system from a user process."[84]

560.    To be able to share computing resources, processors must guarantee that different users would be "isolated" from each other, i.e., one user's actions or tasks would not ordinarily be visible to another user.  All programs likewise expect and rely on this memory isolation.

561.    A "security attack" or exploit is a specific action that can cause a "security breach" or an event that violates a basic security property.  It is characterized by a detailed description of the

---

[82] Ruby B. Lee, *Security Basics for Computer Architects* (2013).

[83] *Computer Organization and Design, RISV-V Edition*, by D. A. Patterson and J. L. Hennessy (2018), pg. 420,
http://staff.ustc.edu.cn/~llxx/cod/reference_books/Computer%20Organization%20and%20Design%20RISC-V%20edition.pdf.

[84] *Id*.

PAGE 200 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                 COMPLAINT

vulnerability exploited, the path of attack, and the subject of the exploit.  Critically, exploits that breach confidentiality are hard to recover from because once the information is disclosed, it is already too late.[85]  A "security vulnerability" is a weakness in the system that can be exploited in a security attack.[86]

562.    Unbeknown to Plaintiffs and members of the Class, Intel intentionally sacrificed security, defied well-settled architecture design principles, and permitted unauthorized program instructions to access protected memory – all to achieve increased speed.  Specifically, and as explained herein, Intel's implementation of Dynamic Execution created security vulnerabilities within its CPUs, rendering them defective.  For example, Intel undermined the security of its processors by implementing OoOE and speculative execution in a way that (i) created windows of time during which an unauthorized user could have the processor make unnecessary or unauthorized memory accesses to copies of sensitive or privileged information (i.e., Unauthorized Access) and (ii) allowed that information (or critical data about the location or contours of that information) to remain in the CPUs' caches after the mistaken or unauthorized access (e.g., an exception) was discovered (i.e., Incomplete Undo).

563.    Intel likewise undermined the security of its processors by implementing a shared cache design that did not (i) include any mechanism to ensure that sensitive or privileged information (or data concerning that information) was flushed once the processor determined it had unnecessarily or improperly accessed memory, or (ii) provide any protection against side channel

---

[85] *Id.*

[86] *Id.*

exploits that use the cache to siphon out data that remains in the cache after a processor completes its tasks.

564.    As explained below, Intel knew that its processors, and in particular, the CPUs' cache subsystems, were vulnerable to side-channel exploits, and that side-channel exploits could be used to "leak" confidential information that was exposed as a result of Intel's implementation of OoOE and speculative execution in its CPUs.

### 2.    <u>Intel Knew That Its Architecture Was Susceptible to Side-Channel Exploits</u>

565.    Leaking information through covert or side-channels is one type of security exploit that can lead to a confidentiality security breach.  In a side-channel exploit, an unauthorized actor exploits a security vulnerability to access or monitor information about the implementation of a computer system for the purpose of learning about or accessing otherwise privileged information. In this way, private information is deduced from observing the side-effects of operations.  Such exploits need not depend on software bugs.  Instead, as described here, they can exploit hardware vulnerabilities.

566.    In a "timing" side-channel exploit, an unauthorized actor exploits a security vulnerability with the express purpose of obtaining information about how long it takes the computer to complete a task, in order to infer something about otherwise privileged information.  If someone can determine how long it takes a CPU to fetch instructions or data it needs to complete its operations, he can infer where the information is located within the system, and, ultimately, the substance of the information.

567.    In particular, it takes less time to access data that resides in a processor's cache subsystem than data that must be retrieved from main memory.  By measuring the amount of time

PAGE 202 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

it takes for a processor to fetch instructions or data, an unauthorized user can learn whether the requested information is in the cache or in main memory. If certain data is stored within the cache subsystem or "cached," an unauthorized user then knows that it has been accessed recently. Once an unauthorized user has access to these measurable differences in the amount of time it takes to access different kinds of information, he can discern the underlying information.

568.    Consider the following analogy. An individual (e.g., the unauthorized user) goes to a library (e.g., the computer) to read a book (e.g., data) from a special collection the individual does not have permission to access (e.g., kernel memory). The individual asks the librarian to retrieve "Special Book #1 and the Sue Grafton novel that corresponds to the first letter of page 1 of Special Book #1," (e.g., a program instruction). The librarian retrieves (e.g., fetches) Special Book #1 from the special collection and determines (e.g., decodes) that the first letter on page 1 of that book is "C," requiring the librarian to also retrieve "C is for Corpse," by Sue Grafton. The librarian returns to the front desk with Special Book #1 and "C is for Corpse" by Sue Grafton. Before the librarian shows the individual the requested books, she checks his library card. If the librarian determines that the individual does not have permission to access books in the special collection, she will put the books on a cart to be re-shelved (e.g., the cache) without showing them to the individual.

569.    Knowing that the Sue Grafton book with the title corresponding to the first letter on the first page of Special Book #1 – the book the individual wants to read but does not have permission to access – is now on the cart, the individual begins methodically requesting Sue Grafton books, starting with "A is for Alibi." If the librarian responds to this request with "please wait while I go and retrieve that book," the individual knows that book is not on the re-shelving cart and the first letter on the first page of Special Book #1 is not A.

PAGE 203 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

570.    When the individual requests "C is for Corpse," however, the fact that the librarian is able to quickly retrieve it from the re-shelving cart reveals to the individual that the first letter on page 1 of the Special Book #1 is "C."  If it takes nanoseconds to complete these tasks (as it would within a CPU), the individual could determine fairly quickly the contents of Special Book #1 without ever actually seeing the book itself.  In the same way, a timing side-channel exploit on a CPU cache allows an unauthorized actor to gather enough data about where sensitive or privileged information is located within the computer to deduce the precise contours of that sensitive or privileged information.

571.    Although unknown to the consuming public, the susceptibility of Intel's cache design to side-channel exploits was described by researchers and academics in highly technical research papers concerning early iterations of its processors.  In fact, discussions of the fundamental problems that underlie the vulnerabilities appear in computer science literature from the early- to mid-1990s. For example, Olin Sibert *et al.*, *The Intel 80x86 Processor Architecture: Pitfalls for Secure Systems* (1995), identified exploitable weaknesses in Intel's microarchitecture and explained that caches may be used as covert timing channels to leak sensitive information.  *Id.*, § 3.10 (citing Wray, *An Analysis of Covert Timing Channels* (1991)).  The authors of the article emphasized that the imbalance in scrutiny of hardware security had already become "untenable" and "increasingly difficult to justify." *Id.*, §§ 1, 2.[87]  Intel's design response and associated micro-architectural changes to address these and other expressed security concerns have been largely confidential.

---

[87] *See also* Paul C. Kocher, *Timing attacks on implementations of Diffie-Hellman, RSA, DSS, and other systems*.  Advances in Cryptology—CRYPTO, Vol. 1109 Lecture Notes in Computer Science, 104-113 (1996) (a seminal work on timing attacks, which noted the potential to exploit timing measurements from vulnerable systems to find entire secret keys, and specifically referenced RAM

572.    In a 2010 white paper entitled, *Securing the Enterprise with Intel AES-NI* (Sept. 2010), Intel described an on-going problem with AES cryptographic keys, noting that "in multiple processing environments . . . a piece of malicious code running on the platform could seed the cache, run cryptographic operations, then time specially crafted memory accesses to identify changes in the cache.  From these changes, the unauthorized user could determine portions of the cryptographic key value"[88] which can then be used to defeat AES encryption.  To solve this problem, Intel launched AES-NI, *see supra* at paragraphs 528 and 531, which protected AES cryptographic keys from side-channel exploits by ensuring that this information was never stored in the CPU's caches. Despite knowing that the root cause of the side-channel exploit against AES was an unauthorized user's ability to "seed the cache" and "identify changes in the cache," Intel did not secure the cache subsystem from side-channel exploits.  Though Intel implemented AES-NI to help avert cache timing side-channel exploits against AES by eliminating the use of cache for AES calculations, it did nothing to address Intel's fundamental defective design choices.

573.    The vulnerability created by Intel's decision to leave the cache subsystem unsecured is exacerbated when the cache is shared among the CPU's threads and cores.  For over a decade, Intel knew, or reasonably should have known, that unauthorized users could exploit a CPU resource (such as a cache or buffer) that is shared by two processes running simultaneously on the CPU.  In

---

cache   hits   as   a   source   of   such   exploitable   timing   differentials), https://www.paulkocher.com/doc/TimingAttacks.pdf.

[88] Leslie Xu, *Securing the Enterprise with Intel AES-NI*, Intel White Paper (September 2010), at p. 5-6,          https://www.intel.com/content/dam/doc/white-paper/enterprise-security-aes-ni-white-paper.pdf.

effect, one process may "spy" on the other by examining changes made to that shared resource by the other process.

574.    Computer security researcher Colin Percival demonstrated one exploit of this kind in late 2004.  Percival showed that on Intel CPUs with a "Hyper-Threading" design, where multiple threads (i.e., processes) are scheduled to run simultaneously on the same processor, the use of shared memory caches allowed an unauthorized process to make deductions about the other program's behavior and steal information, in this case, cryptographic keys.  Percival described having caches shared between threads as a vastly dangerous avenue of attack.  He notified Intel of this problem in early 2005, prior to presenting his paper describing the exploit, *Cache Missing for Fun and Profit* (2005).[89]  At approximately the same time, another group of researchers published a work that similarly showed exploitation of the shared cache through two techniques.[90]

575.    The exploit Percival detailed is one variation of the same basic theme – an unauthorized actor exploiting the changes a process causes to the micro-architectural state of a CPU (in particular, a shared memory cache) in order to acquire another's information.  In fact, any time a resource is shared, there is a possibility information can leak.  For example, if one CPU core asks

---

[89] *See* Colin Percival Daemonic Dispatches Blog, *Some thoughts on Spectre and Meltdown*, Daemonlogy.net,  http://www.daemonology.net/blog/2018-01-17-some-thoughts-on-spectre-and-meltdown.html (last visited May 5, 2020); *see also* Colin Percival, *Hyper-Threading Considered Harmful*, Daemonlogy.net, http://www.daemonology.net/hyperthreading-considered-harmful/ (last visited May 5, 2020).

[90] In Osvik, *et al.*, *Cache Attacks and Countermeasures: the Case of AES* (2005), the group explained that unauthorized users could mount a powerful attack by determining which cache sets had been accessed by a victim program.  First, in an attack known as Evict + Time, and unauthorized user measures how execution time is influenced by evicting a chosen cache set to see whether a particular cache set was used by a victim.  Second, in a Prime + Probe attack, the unauthorized user can get better accuracy by measuring cache access times directly rather than indirectly through execution time. https://www.cs.tau.ac.il/~tromer/papers/cache.pdf.

PAGE 206 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

whether certain data is present in the L3 cache, the answer, a binary yes or no, provides some useful information about the current work the CPU is engaged in.  If an unauthorized actor can access that information and analyze it, it could lead the actor directly to secret or privileged information thought to be protected in other parts of the computer.

576.    In a 2006 paper, *Covert and Side Channels Due to Processor Architecture*, Dr. Ruby Lee and Zhenghong Wang, examining a different Intel processor family, presciently highlighted a new "speculation-based covert channel," arising from the fact that when Intel allows a load instruction to execute speculatively in the IA-64, although a bit is set in the register if the speculative load instruction would cause an exception, the exception is not handled right away.  Instead, "[c]ontrol speculation allows deferral of the exception," including exceptions such as access violations, thereby opening the door for unauthorized users to leak information via a side-channel exploit. *Id.*, § 3.4.

577.    Dr. Lee has emphasized that software-based solutions still left the "crown jewels of primary key material" susceptible to attack and that "[a]ll current processors with caches are vulnerable – from embedded devices to cloud servers."[91]  In a paper published in 2007, in which Lee and Wang discuss thwarting side-channel exploits at the root, the authors cautioned that "[c]ache-based side channel attacks can be very dangerous" and "very effective."[92]

---

[91]  R. Lee, *University Research in Hardware Security*, Hotchips.org (August 10, 2014), http://web.archive.org/web/20160423203134/https://www.hotchips.org/wp-content/uploads/hc_archives/hc26/HC26.10-tutorial-epub/HC26.10-tutorial1-HW-Security-epub/HC26.10.155-6_Lee_UniversityResearch_go.pdf.

[92]  Wang *et al.*, *New cache Designs for Thwarting Software Cache-based Side Channel Attacks* § 7 (2007).

PAGE 207 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

578.    At approximately the same time that Dr. Lee's paper was published, an analogous side-channel exploit that exploited speculative execution and a shared CPU resource called the Branch Target Buffer (or "BTB"), used in branch prediction, was described. *See* Acıçmez *et al.*, *Predicting Secret Keys via Branch Prediction* (2006).  Using the described exploit, an unauthorized actor could determine private cryptographic keys used in the target user's computer.

579.    Later, in 2013, Yuval Yoram demonstrated a cache-based side-channel exploit that showed that the unauthorized user and victim process need not share the execution core. *See* Yoram *et al.*, *Flush+Reload: A High Resolution, Low Noise, L3 Cache Side-Channel Attack* (2013).  In this cross-core attack, as long as the processes had shared use of the cache, the unauthorized user could identify the target's access to specific memory.[93]  The crux of the exploit is a weakness in Intel's X86 architecture; specifically, the lack of permission checks before permitting use of an instruction that allows an unauthorized user to evict specific memory lines from cache.  As the researchers observed, "Not restricting the use of the instruction is a security weakness of the Intel implementation of the X86 architecture," which "requires a hardware fix."[94]  The authors cautioned that "[g]iven the strength of the attack, . . . the memory saved by sharing pages in a virtualized environment does not justify the breach in the isolation between guests."

---

[93] This could be accomplished through a "Flush + Reload" technique in which (1) the unauthorized user flushes a memory line from the cache, then (2) waits to give the victim an opportunity to access the memory line, and then (3) the unauthorized user reloads the memory line, which will be quick if the victim did in fact access the line (since it is now back in cache) or will be significantly longer if the victim did not access the line, which then needs to be brought in from main memory. https://eprint.iacr.org/2013/448.pdf.

[94] The authors note that ARM architecture also includes an instruction to evict cache lines but that it can be used only when the processor is in an elevated privilege mode. https://eprint.iacr.org/2013/448.pdf.

PAGE 208 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

580.    That same year, researchers described a side-channel exploit for deducing information about privileged address space layout which can be used to defeat a common memory management security technique called kernel address-space-layout randomization ("KASLR").[95] Those exploits against Intel x86-based processors (specifically, Intel i7-870, Intel i7-950, and Intel i7-2600) are enabled because "hardware (such as caches and physical memory) are *shared* between privileged and non-privileged code" and "the nature of the cache facilities still enables an unauthorized user to indirectly measure certain side-effects." Hund at 195 (emphasis in original).

581.    By 2015, Intel knew, or reasonably should have known, that an unauthorized user could mount a cache side-channel without the need to install code on a victim's machine. In Oren, *et al.*, *The Spy in the Sandbox:  Practical cache Attacks in JavaScript and their Implication* (2015), the authors described a cache side-channel exploit that ran entirely in a web browser. Thus, "the victim needs only to browse to an untrusted webpage that contains attacker-controlled content" to facilitate an attack. *Id*. at Abstract.[96]

582.    Thus, research papers describe cache side-channel exploits that exploit Intel's decision to lessen the security of its CPUs – while seeking additional performance to further marketing claims – and thus gain access to kernel memory and other privileged information.

583.    The types of highly technical/academic research papers that reported on side-channel exploits, however, are not commonly viewed by the general public buying Intel's CPUs and

---

[95] *See* Hund *et al.*, *Practical Timing Side Channel Attacks Against Kernel Space ASLR* (2013) ("Hund"), https://www.ieee-security.org/TC/SP2013/papers/4977a191.pdf.

[96] Using their Javascript-based cache side channel attack, the authors were able to map more that 50% of a victim's cache in as little as one minute and gain access to the victim's mouse movements and network activity (i.e., websites visited).

PAGE 209 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

products containing them, given the sophisticated and specialized nature of the papers.  Rather, these types of research papers are often aimed at industry insiders, such as Intel, and academics.

584.    Moreover, while Intel hid from Plaintiffs and members of the Class that these vulnerabilities pose a severe security threat, in various patent filings Intel acknowledged the security risks caused by cache side-channel timing exploits.  Intel was aware that its hardware design could be used to leak privileged information, and even claimed knowledge and awareness of means to modify its chip designs to prevent such exploits.  *See Mitigating Branch Prediction and Other Timing Based Side Channel Attacks*, U.S. Patent No. 8,869,294 B2 (filed Dec. 5, 2007) (the "'294 patent") ("New mitigations to side channel attacks are needed to deter attempts to subvert the security of a computer system.") col. 1, lines 45-46; *Protecting Private Data From Cache Attacks*, U.S. Patent No. 8,516,201 (Dec. 5, 2007) (the "'201 patent") ("Cache-based side channel attacks have recently become a concern for applications that perform cryptographic operations . . . .  Side channel attacks are also possible when two applications share the same cache.") col. 1, line 63-col. 2, line 5; *Protected Cache Architecture and Secure Programming Paradigm to Protect Applications*, U.S. Patent No. 8,341,356 B2 (filed May 3, 2011)[97] (the "'356 patent") (proposed invention "to prevent a so-called side channel attack in which an attacker program and a victim program . . . both use the same physical cache.") col. 2, lines 5-8; *Obscuring Memory Access Patterns in Conjunction with Deadlock Detection or Avoidance*, U.S. Patent No. 8,407,425 B2 (filed Dec. 28, 2007) (the "'425 Patent") ("side-channel attacks exploit aspects of multi-threading environments where two

---

[97] The provisional application No. 60/873,051 was filed Dec. 5, 2006.

PAGE 210 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

concurrent threads share computing resources" and "[o]ther exploits that use this type of information leakage may be readily envisioned") col. 1, lines 18-26.

585.    As such, Intel knew of the substantial risks of allowing unauthorized access to protected information.  And yet, Intel never disclosed (indeed, it actively concealed) that, when its processors engaged in speculative execution, the processors rendered information that should have remained secure and inaccessible to unauthorized use, accessible in the processors' unsecured cache subsystem.  In so doing, Intel's processors created a vast security vulnerability that could be accessed through a number of different exploits.

586.    Incredibly, despite its knowledge of the risk of side channel attack and its flawed processor design, Intel concealed that it had implemented the Unauthorized Access Defect and failed to redesign to make its CPUs safer or revert to the security it had implemented in the P6 architecture but subsequently removed to achieve increased performance.  As ordinary consumers, Plaintiffs and members of the Class did not know (and had no way of learning) that Intel had permitted unauthorized access to protected data – which was directly contrary to the message about the security of its hardware security that Intel touted.

587.    To be sure, the articles, white papers, and patent filings do not disclose or even discuss the Unauthorized Access Defect that is the root cause of the Intel CPU Exploits.  Rather, as explained *infra*, these technical and academic materials simply address the ability of unauthorized actors to retrieve information from the CPU subsystems and that Intel knew how to prevent it.  These materials further demonstrate why Intel knew (or certainly should have known) well prior to the disclosure of the Intel CPU Exploits that its defective design of its CPUs was dangerous and rendered its CPUs unsafe and insecure.  But, again, it was not known outside of Intel that it had

PAGE 211 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

removed fundamental CPU security and implemented the Unauthorized Access Defect.   Ordinary consumers and Enterprises had no reason to research these articles, white papers, or patent filings, especially in light of Intel's advertisements and marketing representing the performance of its processors and their security.   Importantly, Intel kept its CPU design strictly confidential.   Indeed, had Intel disclosed the Unauthorized Access Defect, "[t]here's no reason someone couldn't have found [Meltdown] years ago instead of [in mid-2017]."[98]

### 3.  Intel Knew That Permitting Unprotected Memory Access During Speculative Execution Could Be Exploited

588.    Intel's implementation of speculative execution in its processors created a window of time during which an unauthorized user could make unnecessary or unauthorized requests to access memory for information.   As alleged and explained above, when a processor engages in speculative execution it fetches information it needs to execute instructions out of program order, allowing the CPU to avoid performance penalties when it encounters data dependent or conditional instructions.   These requests could be legitimate, e.g., the application requests access to information that is not itself privileged, but unnecessary (i.e., the information ultimately will not be utilized by the processor).   These requests also could be illegitimate – e.g., the application requesting access to privileged information is not authorized to do so.   Irrespective of the necessity or legitimacy of the request to access memory, the information fetched from memory was stored in the CPU's caches and buffers (a type of cache that assists the processor in transporting information from one process to another) until it was needed.

---

[98] Andy Greenberg, *Meltdown:  How So Many Researchers Found a 20-Year-Old Chip at the Same Time*, WIRED (January 7, 2018), https://www.wired.com/story/meltdown-spectre-bug-collision-intel-chip-flaw-discovery/

PAGE 212 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

589.    Intel designed its processors to avoid taking any action to address unauthorized (e.g., exceptions) or unnecessary (e.g., mistakes) memory requests until such time as the processor was ready to retire the instructions in program order.  This allowed the CPU to defer action on any mistakes or exceptions encountered during out-of-order or speculative execution until the end of the process to enhance the processor's performance.  Intel's decision to defer these actions, however, allowed, without permission, sensitive or privileged information (or data about that information) to be transferred to and maintained in the CPU's caches or buffers.

590.    Intel's implementation of out-of-order or speculative execution created a window that remained open until the instruction necessitating out-of-order or speculative execution in the first instance was complete – e.g., in the case of a conditional instruction (if X, then Y), when the CPU determines the correct branch direction and target.  It was only after the window closed that Intel's processors addressed any mistakes (e.g., a mis-predicted branch where the memory access was legitimate but unnecessary) or exceptions (e.g., an application accessing data with insufficient privileges) that occurred while the CPU was engaged in out-of-order or speculative execution, and then flushed its pipelines of any impact from the related instructions.

591.    The information fetched for instructions executed out-of-order or speculatively, however, remained behind in the CPU's caches and buffers.  In other words, while its processors should have rolled back any impacts of executing unnecessary or improper instructions on the computer, Intel allowed the raw materials the CPU fetched to execute these instructions to remain in the processors' caches or buffers, and thus vulnerable to unauthorized access.

592.    Intel relied on speculative execution to increase the performance of its processors even though it knew that, as Dr. Lee and her co-author, Wang, explicitly warned as early as 2006,

PAGE 213 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                       COMPLAINT

the deferral of exceptions "can be exploited to facilitate information leakage."[99]  Six years later, Wang again warned of the risks of speculation-based side-channel attacks in his doctoral thesis, *Information Leakage Due to Cache and Processor Architectures* (Nov. 2012), on which Dr. Lee was the advisor, stating, "[w]e wish to emphasize the severity of this channel before real damage is done."  *Id.* at 81.

593.    Intel likewise knew through at least two other instances that the Company's decision to permit unchecked memory accesses in its processors presented a serious security vulnerability, exploitable by unauthorized users siphoning information out of the processor cache through a side-channel attack – the "Prefetch Side Channel Attack" and the "TSX Side Channel Attack."

594.    **Prefetch Side-Channel Attack.**  Intel's processors include a function known as "prefetch," with which a software program can direct the CPU to fetch data before it is needed. According to Intel, the prefetch instruction "can hide the latency of data access in performance-critical sections of application code by allowing data to be fetched in advance of actual usage." Because prefetch "merely provides a hint to the hardware," its usage "*generally does not generate exceptions or faults*" in the CPU.  As explained in *Prefetch Side-Channel Attacks: Bypassing SMAP and Kernel ASLR* (2016), though, "[p]refetch instructions on Intel CPUs *ignore* privilege levels and access permissions" making it possible for any unauthorized user to use prefetch to access "inaccessible kernel memory" and then execute a cache-based timing side-channel exploit to access the data put in the cache by the prefetch function.  *Id.* § 3.2.  The authors of *Prefetch Side-Channel Attacks* noted that Intel reference manuals from 2014 (and, indeed, by as early as 2012) reflect that

---

[99] Zhenghong Wang and Ruby B. Lee, *Covert and Side Channels due to Processor Architecture* (2006), http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.190.1003&rep=rep1&type=pdf.

PAGE 214 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                  COMPLAINT

the "prefetch" command could be used to access illegal or unprivileged memory space without generating any exceptions.

595.   **TSX Side-Channel Attack.**   In 2016, researchers revealed a timing side-channel exploit that exploited an Intel hardware feature called Transactional Synchronization Extension (TSX).  As researchers explained:

> One surprising behavior of TSX, which is essentially the root cause of this security loophole, is that it aborts a transaction without notifying the underlying kernel even when the transaction fails due to a critical error, such as a page fault or an access violation, which traditionally requires kernel intervention.

Jang *et al.*, *Breaking Kernel Address Space Layout Randomization with Intel TSX* (Oct. 2016) ("Jang") at 380.

596.   In other words, with TSX, the processor allowed a thread to perform a sequence of operations inside a transaction and if an exception due to unprivileged access occurs, the OS will not be notified.  Instead, the exception will be suppressed, meaning, as stated in Intel's September 2016 manual, transactional execution would abort and it will be as though the exception or fault had never occurred. *See* https://www.intel.com/content/dam/www/public/us/en/documents/manuals/64-ia-32-architectures-software-developers-manual.pdf.   The   authors   noted   that   because   TSX suppresses exceptions, such as an access violation that is caused by accessing kernel space from a user process, TSX "exposes a clear, stable timing channel."  Jang at 382.  Jang went on to describe a side-channel attack exploiting the suppression of exceptions by TSX that can "extract the executable and non-executable bit of every kernel page and defeats KASLR ("Kernel Address Space Layout Randomization").  *Id.*  Thus, the TSX side-channel exploit, like the Prefetch Side-Channel Attack, is another instance in which Intel's suppression of exceptions was exploited by a timing side-channel exploit to gain access to kernel information.

PAGE 215 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

597.    Intel knew, or should have known, that just as its suppression of exceptions under Prefetch and TSX could be exploited by a timing side-channel exploit, the decision to defer taking action on memory access violations under speculative execution could also be exploited by side-channel exploits.  This is precisely what occurred in Meltdown, Foreshadow, and Spectre.

### 4.    **"Meltdown"**

598.    In July 2017, researchers identified "Meltdown" or "Rogue data cache load" (CVE-2017-5754), also known as "Variant 3," and informed Intel of this particular type of side-channel exploit.  The exploit was nicknamed "Meltdown" by researchers due to its ability to effectively dissolve the informational barrier that protects privileged data, allowing an unauthorized user to read sensitive information like passwords, login keys, and encryption keys. [100]

599.    Meltdown takes advantage of both the Unauthorized Access and Incomplete Undo Defects inherent in Intel's CPUs.

600.    Specifically, speculative execution fetches data *before* enforcing a privilege check to confirm that the user is authorized to read such data.  Intel designed its CPUs to forgo this critical privilege check so that its chips could run faster.  If it turns out that the user attempting to access the data possesses the appropriate privilege level, allowing access to the data "speculatively" (*i.e.*, without first checking and enforcing access permissions) saves time.  On the other hand, if the user lacks the appropriate privilege level, an error or "exception" occurs and the user should be denied

---

[100] *See Alert (TA18-004A) Meltdown and Spectre Side-Channel Vulnerability Guidance*, DHS (January 4, 2018, last revised May 1, 2018), https://www.us-cert.gov/ncas/alerts/TA18-004A; *June 2018 OCR Cybersecurity Newsletter – Guidance on Software Vulnerabilities and Patching*, HHS (June 2018), https://www.hhs.gov/sites/default/files/cybersecurity-newsletter-june-2018-software-patches.pdf.

PAGE 216 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

access to the privileged data. Intel's defective CPUs, however, defer enforcement of the exception thereby creating a window of time where an unauthorized actor can gain unauthorized access to privileged information (or secrets) present in the operating system's "kernel" memory, which is the most protected memory on a computer.

601.    By engineering a system that permits access to privileged information/secrets in a manner that allows a user to win a "race condition" between the instruction execution and the delayed enforcement of a privilege check, the unauthorized user gains a window of time to deploy a side-channel exploit to infer the privileged information/secrets from data contained in the cache. This is Meltdown in a nutshell.



*https://www.computerhope.com/jargon/m/meltdown-and-spectre.htm.*

PAGE 217 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

602.    The first step in a Meltdown exploit is to run instructions that attempt to load the cache with an address that the unauthorized user has rights to and that depends on secret data, which ordinarily triggers an exception:

```
1  ; rcx = kernel address
2  ; rbx = probe array
3  retry:
4  mov al, byte [rcx]
5  shl rax, 0xc
6  jz retry
7  mov rbx, qword [rbx + rax]
```

*https://meltdownattack.com/meltdown.pdf.*

603.    Because of speculative execution, the subsequent instructions to move the inaccessible address are executed speculatively and out of order, before the exception is handled, thereby loading the secret value into the cache without enforcing the privilege check on the user:



*https://meltdownattack.com/meltdown.pdf.*

604.    In order to ensure that all of the necessary instructions to complete the exploit are speculatively executed before the exception is triggered, a Meltdown exploit may exploit "exception handling" or "exception suppression" techniques that prevent the OS from terminating the program as soon as the exception is triggered.  Once the exception is handled, the program is terminated, but the secret data remains in the cache and is not flushed.

PAGE 218 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                  COMPLAINT

605.    Finally, a Meltdown exploit uses a side-channel exploit, such as "Flush+Reload," to repeatedly probe the contents of the cache by flushing and reloading its contents while monitoring small differences in the time it takes to access the loaded cache block.  Through this process, an unauthorized user can determine where in the cache the privileged memory was stored and deduce the contents of that memory.  For example, assuming the secret data is the value "15," the unauthorized user will probe cache blocks 1-15.  If the timing differences in flushing and reloading the cache indicate that block 15 is present, the unauthorized user can infer that the secret data is 15.

606.    By repeating these steps, an unauthorized user can read not only "kernel" memory, but because all major operating systems also typically map the entire physical memory into the kernel address space, an unauthorized user can also read the entire physical memory of the target machine.[101]   The result is that a bad actor can entirely bypass the privilege-mode isolation on a machine to access its most sensitive and confidential information, like secret passwords, without detection.

607.    Meltdown is extremely similar to the Prefetch Side-Channel Attack.  For instance, both the Meltdown and Prefetch Side-Channel Attack "melt down" the boundary between user space and kernel space and exploit Intel's failure to enforce privilege checks and access permissions prior to granting access to kernel memory.  Additionally, the team that discovered Meltdown used the

---

[101] Kernel memory addresses are mapped in the user process's virtual address space and corresponding page table (along with the user's own virtual memory addresses).  This is done so that when a switch into kernel mode is required, e.g., because of either a system call (i.e., asking OS to do something) or an interrupt happens, the switch to kernel mode can be done quickly since the kernel addresses are already mapped in the page table for the user's address space.  Kernel memory address ranges are marked as non-accessible so that the user program itself cannot read or write to those spaces of kernel memory.  Unfortunately, as Meltdown demonstrates, Intel CPUs speculate past those protections, making that data obtainable by unauthorized actors.

PAGE 219 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

exception suppression "feature" of TSX to carry out their Meltdown exploit.  *See* Lipp *et al.*, *Meltdown: Reading Kernel Memory from User Space*, at p. 6.

608.    Significantly, because of differences in AMD's (and other competitors') architecture and implementation of speculative execution, their CPUs are not vulnerable to Meltdown side-channel exploits.  This is an issue exclusive to Intel's CPUs and stems from Intel's misplaced design decisions.

609.    In order to mitigate Meltdown, Intel recommended that operating system developers implement *Kernel Page Table Isolation* ("KPTI"), which separates kernel and process page tables into two.  As Intel knows, this separation has the effect of increasing the time it takes for instructions to be processed because the Translation Lookaside Buffer ("TLB") is flushed each time the OS kernel is involved and when control is transferred back to the user process.  Thus, whereas a process may take eight CPU cycles to complete prior to Intel's recommended KPTI mitigation for Meltdown, that same process would take *26 times* that amount of time to complete the same process with Intel's KPTI mitigation.

### 5.    "Foreshadow" or "L1 Terminal Fault"

610.    In January 2018, a group of researchers discovered another exploit that takes advantage of both the Unauthorized Access and Incomplete Undo Defects inherent in Intel's CPUs as a result of Intel's flawed Intel's implementation of speculative execution.  After the first variant (which targeted Intel's SGX technology) was identified, Intel's subsequent investigation uncovered two closely related exploit variants.  The first variant has been dubbed "Foreshadow," and the latter two variants have been dubbed "Foreshadow-NG" (for "Next Generation") by researchers; Intel refers to the exploits collectively as L1 Terminal Fault (or "L1TF").  Like Meltdown, the

PAGE 220 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

Foreshadow exploits are based on the fact that Intel CPUs execute speculatively and defer permission checks thereby creating a window of time during which an unauthorized process can steal sensitive information.

611.    **Relevant Computer Architecture Background.**  The L1 (level 1) data cache is a memory resource shared between all software running on the same core.  Therefore, the ability to speculatively access data left in the L1 cache can have serious security consequences.  Even worse, modern Intel processors with Hyper-Threading also share the L1 cache between sibling cores.  As alleged more fully below, disabling Hyper-Threading is one necessary mitigation for government and commercial enterprise servers and cloud services using Intel CPUs.

612.    Generally, and as discussed previously, to achieve a secure computer system, each process has its own separate virtual address space.  When a process accesses a memory location in its virtual address space, the hardware translates the address into the corresponding physical address.  One process should not be able to access another process's physical address space (unless the two processes are explicitly sharing data, e.g., to communicate with one another).  The operating system keeps track of data access permissions by mapping virtual to physical addresses through page tables.  The page tables are used to translate each process's virtual addresses to the physical addresses corresponding to its memory locations.

613.    During a page table check or "walk," the CPU will perform the translation and will also check whether the page is actually "present" in main memory.  Non-present entries can exist when a virtual page that has not been used recently is "swapped" or moved out to disk and the corresponding page table entry is then marked to show that process's page is not present.  When access to that absent memory location is requested, a page fault (a type of exception) will occur,

PAGE 221 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                   COMPLAINT

which will cause the address translation process to terminate, and the missing data must be located on disk and pulled back into physical memory.

614.    But to speed performance, Intel CPUs continue to speculate forward and allow instructions to execute despite the page fault.  Specifically, Intel CPUs are designed so that if the address translation process is prematurely terminated through a page fault, the L1 cache lookup is still performed based on the physical address pointed to in the page table (which is no longer the physical memory of the requesting process). This enables speculative instructions, that do not otherwise have the requisite permissions, to gain unauthorized access to data stored in the cache. The Foreshadow exploits are also referred to as "L1 terminal fault" because they cause the translation process to prematurely terminate through a page fault, while, dangerously, data is still being passed from the L1 cache to subsequent instructions.

615.    Finally, as with Meltdown, unauthorized users can use the "Flush+Reload" technique to establish the secret information.

616.    **Foreshadow-OS (CVE-2018-3620).**    This variant allows an unprivileged application to access kernel memory.  An unauthorized application can simply wait for the OS to clear the "present" bit in a page table entry (which happens when a memory page that has not been used recently is swapped out of memory to disk).  The unauthorized actor then inputs a virtual address, which must be translated through the page table.  Since the bit is marked not present in the page table, the translation process is terminated.  Because of Intel's implementation of speculative execution, the unauthorized actor can then use speculative instructions to read any cached contents pointed to by the physical address from the page table entry.

PAGE 222 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

617.  **Foreshadow-VMM (CVE-2018-3646).**  In a "virtualized" environment, where multiple guest operating systems run on the same machine, (e.g. cloud computing), the mapping and translation process is slightly modified.  The Foreshadow-VMM variant allows an unauthorized guest virtual machine to access memory belonging to other guest virtual machines and the hypervisor (which is the software that manages the virtualized environment).

618.  In a virtualized environment, two translations may occur by using "extended" page tables.  First, the guest machine's virtual address is translated to a guest "physical" address through its guest page table.  Second, the guest "physical" address is translated to the underlying machine's host-physical address using the host page table.

619.  An unauthorized guest has control over the guest page table and therefore can directly clear the "present" bit in that page table.  That triggers the page fault, which terminates the translation process, eliminating the host address translation step.  Due to Intel's flawed implementation of speculative execution, it is the guest "physical" address that is passed to the L1 data cache.  Notably, because in this variant the guest has control over the guest page table and thus controls the "physical" address, the unauthorized guest can speculatively read any cached memory, including secret data belonging to other virtual machines or the hypervisor itself.[102]

620.  **Foreshadow-SGX (CVE-2018-3615).**  Intel's Software Guard eXtensions ("SGX"), introduced in 2013, allow users to allocate private regions of memory called "enclaves," which are intended to allow secure execution on an adversary-controlled machine.  With SGX, an additional

---

[102] Whereas the Meltdown attack described above was limited to reading privileged supervisor data mapped within an unauthorized user's virtual address space, the Foreshadow-type attacks directly expose cached physical memory contents to unauthorized actors from locations that are not mapped in the unauthorized user's physical address space.

PAGE 223 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

level of checks is supposed to be performed after the address translation process is completed in order to enforce strict access control for enclaves.  In the SGX variant, unauthorized users can exploit the L1TF behavior described above to terminate the address translation process so that any cached enclave secrets are passed to speculative instructions before SGX protections are enforced. Additionally, as with Meltdown, unauthorized users can leverage the TSX exception suppression "feature" to carry out the exploit.

621.    Ironically, although Intel stated that SGX was "designed to increase the security of application code and data," *see* https://software.intel.com/en-us/sgx, SGX is itself vulnerable to the Foreshadow side-channel exploits.  *See* https://arxiv.org/pdf/1709.09917.pdf.

622.    As with Meltdown, AMD's and other competitors' CPUs are not vulnerable to Foreshadow side-channel exploits.  Foreshadow is exclusively an Intel CPU problem and the result of Intel's flawed implementation of speculative execution.

623.    In order to prevent Foreshadow exploits on Intel's defective CPUs, Intel must redesign its CPU hardware to eliminate the Defects.  Short of that, mitigating Foreshadow requires: (a) OS modification of page table entry of not present pages to refer to invalid addresses, and (b) Intel's removal of microcode from the L1 data cache during privilege transitions.  These mitigations increase L1 data cache misses, slowing the processor down.

624.    In addition, for commercial and government enterprise servers and cloud services (e.g., Amazon Web Services, also known as "AWS") using Intel's processors, Foreshadow mitigations require the complete disabling of Hyper-Threading.  Without Hyper-Threading, CPU cores are no longer shared between processes which results in a substantial degradation of performance.

PAGE 224 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

6.    **SwapGS**

625.    In 2018, researchers revealed SwapGS (CVE-2019-1125).  Researchers first alerted Intel to this exploit on August 7, 2018.  Intel initially responded that it was already aware of the SwapGS exploit but did not intend to do anything to address it in affected CPUs.  The researchers who had discovered SwapGS continued to insist that the SwapGS exploit was problematic and, on March 29, 2019, provided an additional concern – a SwapGS exploit could be used to leak kernel memory.  The existence of the SwapGS exploit was not disclosed publicly until August 6, 2019 – nearly a year from the date Intel was first made aware of its existence.

626.    **Relevant Computer Architecture Background**.  Intel processors have special instructions to allow a program fast access to data structures that support concurrent execution within the CPU and switching between tasks executing on the CPU.  One of these instructions, SwapGS, from which the exploit derives its name, facilitates the fast switching between kernel mode and user mode.  Depending on the particular special instruction utilized by the unauthorized user, a SwapGS exploit can leak data from the FS or GS registers.  A "register" is a quickly accessible memory location within a CPU, consisting of a small amount of fast storage.

627.    Utilizing the SwapGS exploit, an unauthorized user can take advantage of the Intel-designed speculative execution process to allow an unauthorized process to leak stale data from another process maintained in the FS or GS registers.  Specifically, the unauthorized user starts by launching a "speculative segment write," by writing data to either the FS or GS register in the wrong format. The incorrect format will cause the unauthorized user program to be aborted triggering a fault.  Due to Intel's defective design (Unauthorized Access), however, this will create a window in time during which the unauthorized user may read data maintained the FS or GS registers to which

PAGE 225 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

the unauthorized user otherwise would not have permission to access.  These unauthorized accesses can be exploited in a manner similar to the Meltdown and Foreshadow exploits.  Because, however, the patches for Meltdown and Foreshadow do not fix the root cause for generating the fault or assist (Unauthorized Access), the patches for Meltdown and Foreshadow do not affect an unauthorized user's ability to launch this kind of SwapGS exploit.

628.    Because the SwapGS exploit leaks data stored in general use registers, the data stored there could be virtually anything stored in the CPU or memory, including kernel memory.  This data can then be leaked from the CPU (Incomplete Undo) through a flush+reload attack.

629.    There also is a version of the SwapGS exploit that involves the use of branch prediction to leak information from the kernel space.  This form of the SwapGS exploit is similar to certain Spectre variants that exploit intentional branch (mis) prediction to trick the kernel into leaking data.  Despite these similarities, however, the patches for Spectre do not stop an unauthorized user from launching this kind of SwapGS exploit.

630.    It is reported that only Intel-designed CPUs are susceptible to a SwapGS exploit.

**7.    MDS Exploits**

631.    In 2018, researchers revealed a new series of exploits, dubbed by Intel as microarchitectural data sampling or MDS exploits.  MDS exploits "leak arbitrary data across address spaces and privilege boundaries (e.g., process, kernel, SGX, and even CPU-internal operations)," each of which exploits Intel's proprietary implementation of speculative execution.[103]  These exploits are "powerful."  Researchers alerted Intel to key aspects of what became known as

---

[103] Stephan van Schaik *et al.*, *RIDL: Rogue In-Flight Data Load*, at 1 (2019, updated January 27, 2020), https://mdsattacks.com/files/ridl.pdf.

PAGE 226 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

Microarchitectural Data Sampling Uncacheable Memory ("MDSUM") (CVE-2019-11091), as early as March 28, 2018.[104]

632.    Subsequent discoveries both within Intel and by independent researchers led to the identification of multiple MDS exploits, including Microarchitectural Fill Buffer Data Sampling ("MFBDS") (CVE-2018-12130), Microarchitectural Load Port Data Sampling ("MLPDS') (CVE-2018-12127), and Microarchitectural Store Buffer Data Sampling ("MSBDS") (CVE-2018-12126) in June 2018,[105] Transactional Synchronization Extensions Asynchronous Abort ("TAA") (CVE-2019-11135) in September 2018,[106] L1D Eviction Sampling ("L1DES") (CVE-2020-0549) in April 2019,[107] and Vector Register Sampling ("VRS") (CVE-2020-0548) in October 2019.[108]

633.    Researchers consider the implications of MDS exploits "worrisome" because, among other things, these exploits "bypass[] all existing 'spot' mitigations [i.e., patches] in software . . . and hardware . . . and cannot easily be mitigated even by more heavyweight defenses."[109]  Indeed, MDS exploits likely ensure that "spot" mitigations, such as those employed by Intel and software

---

[104] Michael Schwarz *et al.*, *ZombieLoad: Cross-Privilege-Boundary Data Sampling* (2019), https://ZombieLoadattack.com/ZombieLoad.pdf.

[105] Intel registered each of these exploits with the CVE database on June 11, 2018. However, this date "[t]his date does not indicate when the vulnerability was discovered, shared with the affected vendor, publicly disclosed, or updated in CVE."  *See* https://cve.mitre.org/about/faqs.html#date_entry_created_in_cve_entry (last visited May 18, 2021).

[106] Researchers reported the TAA exploit to Intel on September 29, 2018.

[107] Researchers reported L1DES exploit to Intel on April 24, 2019.

[108] Researchers reported VRS exploit to Intel on October 1, 2019.

[109] Stephan van Schaik, et al., *RIDL: Rogue In-Flight Data Load*, at 1, https://mdsattacks.com/files/ridl.pdf  (last visited May 18, 2021).

PAGE 227 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

companies, are not "sustainab[le]" as new forms are revealed, and that more "fundamental mitigations are needed to contain ever-emerging speculative execution attacks."[110]

634.     As in the case of the discovery of Meltdown, Foreshadow, and Spectre, though, Intel again embargoed information, which prevented disclosure about these attacks for significant periods of time.  Consequently, the MDS exploits were disclosed on May 15, 2019 (MDSUM, MFBDS, MLPDS, and MSBDS), November 12, 2019 (TAA), and January 27, 2020 (L1DES and VRS). Researchers were not allowed to disclose TAA until November 12, 2019, despite Intel having been provided proof of TAA in September 2018.

635.     The MDS exploits have a variety of nicknames generated by the researchers who have publicly reported them:  RIDL (Rogue Inflight Data Load), ZombieLoad, Fallout, and CacheOut.  The team that publicly reported and named RIDL reports that all of the MDS exploits, including ZombieLoad, Fallout, and CacheOut, are variants of RIDL.  These researchers named these exploits "RIDL" because the source of the leakage of in-flight data was, at first, a mystery or riddle, and to acknowledge that the RIDL exploits follow Meltdown, which Intel formally named RCDL or rogue data cached load.

636.     The team that discovered ZombieLoad attaches that moniker to the following MDS exploits (each of which also are claimed variants of RIDL): MFBDS (CVE-2018-12130), TAA (CVE-2019-11135), and LIDES (CVE-2020-0549).  ZombieLoad refers to the speculatively executed loads that are a hallmark of these exploits, which resurrect decarded in-flight data, and the fact that the exploit is difficult to "kill."

---

[110] *Id.* at 1.

PAGE 228 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                 COMPLAINT

637.    The researchers that identified MSBDS (CVE-2018-12126) dubbed it "Fallout" because this exploit is the direct consequence of the Meltdown exploit and fallouts are typically the results of meltdowns.  Moreover, like the Meltdown exploit, Fallout requires "software fixes with potentially significant performance overheads are still necessary to ensure proper isolation between the kernel and user space."[111]

638.    The researchers that identified LIDES (CVE-2020-0549) dubbed it "CacheOut" because "cache" is a homophone for "cash" and the exploit allows the unauthorized user to force data out of the caches into a buffer and subsequently leak it.

639.    **Relevant Computer Architecture Background**.  While the Meltdown, Foreshadow, and Spectre exploits leak data stored in the CPU's caches, MDS exploits leak in-flight data.  CPUs perform instructions as a series of steps.  An instruction is said to have "committed" once all steps have been completed.  While a CPU is processing an instruction, the data utilized by that instruction is "in-flight."  Because CPU caches can perform only a few of the steps necessary to complete instructions each clock cycle, the CPU relies on a variety of "buffers" and "ports" within the CPU, including "line fill buffers," "load ports," and "store buffers" to temporarily hold in-flight data until the instruction that requires it has either been completed or cancelled.

640.    The MDS exploits described below read unsecured "in-flight" data, as opposed to data stored in memory locations, and thus differ from Meltdown, Spectre, and Foreshadow.  Further, because Intel has failed to fix the underlying undisclosed Defects (the root cause of the Intel CPU Exploits), none of the mitigations to combat the Meltdown, Spectre, and Foreshadow exploits

---

[111] Claudio Canella *et al.*, *Fallout: Leaking Data on Meltdown-resistant CPUs*, at 1, https://mdsattacks.com/files/fallout.pdf (last visited May 18, 2021).

PAGE 229 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

prevent MDS exploits.  In contrast, processors designed by Intel's competitors, including those designed by AMD, are immune to an MDS exploit, further confirming Intel's defective design choices.

641.    **MFBDS (CVE-2018-12130)**. Intel's CPU design allows an unauthorized user to deploy the MFBDS exploit to leak data stored within the line fill buffers by inducing speculative execution. Specifically, Intel's design allows the line fill buffers to hold on to in-flight data even after they have been copied to their destination (e.g., the Level 1 cache).  The stale in-flight data in the line fill buffers can be read by speculatively executed loads under conditions generated by an unauthorized user. Intel's CPU design also allows data retrieved by one program to be read by another program from the line fill buffers without authorization.

642.    In an MFBDS exploit, an unauthorized user first triggers a condition that causes repeated speculative execution within the CPU by generating exceptional events, including "faults" and assists."  Because Intel's CPU design does not require any checks to determine whether a program has permission to access data in the event of a fault or an assist (Unauthorized Access), in-flight data temporarily stored within the line fill buffer can be "read" by the unauthorized user. Normally, programs need to have authorization to access data that is not theirs.   By exploiting this vulnerability in Intel processors, unauthorized users can gain access to *any* data that is present in the line fill buffers, including data used by programs that they normally would not have access to.  This data can include critical information such as passwords, cryptographic keys used for disk encryption or logins, browser history, browser authentication cookies, or other information that can aid or enhance other attack methods.

PAGE 230 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

643.    Once the in-flight data temporarily stored within the line fill buffer has been read by the unauthorized user, it can be leaked from the CPU utilizing a covert communication channel using the CPU's unsecured cache (Incomplete Undo) to leak the in-flight data, the most popular of which is the flush+reload method.

644.    Because leaking in-flight data can quickly result in the extraction of voluminous data/information, the MFBDS exploit also employs a filtering technique to intelligently sample the in-flight data. This filtering technique allows the unauthorized user to look for a particular data sequence of interest, e.g., a user password that is stored in a file and leak that data.

645.    According to AMD, the MFBDS exploit is not successful against its CPUs because AMD designed its processors to ensure that the translation lookaside buffer (or TLB) always checks the permissions of speculatively executed loads to determine whether these loads should be given access to data in the fill buffer.  Intel, however, sacrificed security and proper microarchitecture design by failing to enforce permission checks prior to speculative execution, and by failing to clear the line fill buffer once the data temporarily held within has been written to the data cache.

646.    **MSBDS (CVE-2018-12126)**.  Intel's CPU design allows an unauthorized user to deploy the MSBDS exploit to leak data stored within the "store buffers" by inducing speculative execution. Store buffers temporarily hold values before they are written to memory.  A function of a store buffer is to "forward" data to memory locations when appropriate, i.e., when the requesting application has authorization to read the data maintained in the store buffer.  Intel's CPU design allows the store buffers to forward data held therein without fully checking if the requesting application has the authorization to read that data (Unauthorized Access).  This issue is compounded when the CPU is operated in hyperthreaded mode.  In that instance, stale data from one thread

PAGE 231 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

maintained in the store buffers can be accessed by another thread that does not have permission to read that data.

647.    The MSBDS exploit can be used against Intel-designed store buffers as described in ¶¶586-87 above.   Effectively, the unauthorized user forces the CPU to engage in speculative execution leading to store-to-loading leakage.  Because the Intel-designed CPU does not check the permissions of an application to access data within the store buffer once an assist or fault is generated (Unauthorized Access), an unauthorized user can access this data and then utilize a flush+reload exploit to leak out that information through the CPU's L1 cache (Incomplete Undo).  With the MSBDS exploit, an unauthorized user can gain any information that is left over in the store buffers. Given that all data that is used for the "write" processing step goes through the store buffers of a CPU, this essentially means that an unauthorized user can access *any* value written by a victim thread, including keys, secrets, passwords, and cookies.

648.    The fact that an unauthorized user can access stale – but highly private and valuable – data left in the store buffers with MSBDS "has profound consequences for defenses, as merely draining outside stores by serializing the instruction stream . . . does not suffice to fully mitigate store buffer leakage."[112]

649.    The MSBDS exploit does not work on AMD processors because AMD designed its processors to prevent an unauthorized application from reading data maintained in the store buffers when there is an assist or fault.  In search of speed and marketing claims, Intel, however, deferred privilege checks when faced with an assist or fault, and further failed to clear out the store buffers

---

[112]  Claudio Canella *et al.*, *Fallout: Leaking Data on Meltdown-resistant CPUs*, at 1, https://mdsattacks.com/files/fallout.pdf  (last visited May 18, 2021).

of stale information.   Implementing such steps – important elements of sound and secure microarchitecture design – would have jeopardized the performance claims that Intel chose to prioritize over security.

650.    **MLPDS (CVE-2018-12127)**. Intel's CPU design allows an unauthorized user to deploy the MLPDS exploit to leak data stored within the buffers in the "load ports" by inducing speculative execution.   Load ports are a set of wires that carry information across different blocks of the CPU. In a CPU, a load port holds results of "reads" from the data cache and the buffers in the load ports hold cache lines that are spilled from the L1 data cache.

651.    Intel's load ports design allows the data maintained in these ports to be forwarded to speculatively executed instruction when there is a fault or an assist without first checking whether that instruction has permission to access the data within the load port (Unauthorized Access). Specifically, the MLPDS exploit can be used against Intel-designed load ports as described in ¶¶586-87 above.   Effectively, the unauthorized user forces the CPU to engage in speculative execution leading to faults or assists. Because the Intel-designed CPU does not check the permissions of an application to access data within the load port once the fault or assist is generated (Unauthorized Access), an unauthorized user can access this data and then utilize a flush+reload attack to leak out that information through the CPU's L1 cache (Incomplete Undo). With the MLPDS exploit, an unauthorized user can gain any information that is left over in the load ports. Notably, the MLPDS exploit does not work on AMD processors.

652.    Through the use of sound and secure microarchitecture design, Intel could have prevented MLPDS exploits – i.e., by clearing the buffers in the load ports after they have been used

or tagging the information held within the load buffers with ownership information that prevents data in the load port from being speculatively accessed across programs.

653.    **MDSUM (CVE-2019-11091)**. Intel's CPU design allows an unauthorized user to deploy the MDSUM exploit to leak data, specifically, uncacheable data, stored within the "write buffers" by inducing speculative execution. Uncacheable data is any data that a programmer determines can be stored only in main memory, requiring it to bypass all caches when utilized by a CPU.  Typically, data that is not frequently used by the program is deemed uncacheable and is not stored in cache to ensure that there is more space in the CPU's caches for data that is frequently utilized.  Uncacheable data is maintained in temporary buffers until it can be written to memory.

654.    The MDSUM exploit can be used against Intel-designed temporary buffers as described in in ¶¶586-87 above to access uncacheable data stored therein. Specifically, because the Intel-designed CPU does not check the permissions of an application to access uncacheable data within the temporary buffers once the fault or assist is generated (Unauthorized Access), an unauthorized user can access this data and then utilize a flush+reload attack to leak out that information through the CPU's L1 cache (Incomplete Undo).  Notably, the MDSUM exploit does not work on AMD processors.

655.    **TAA (CVE-2019-11135)**. The TAA exploit takes advantage of one of Intel's proprietary TSX hardware feature to efficiently mount an MDS exploit even on allegedly non-vulnerable Intel CPUs (e.g., CPUs with hardware mitigations meant to address MDS exploits).

According to Intel, "[t]he [TAA] vulnerability affects the same microarchitectural structures as [the] MDS [exploits] but uses a different mechanism for the exploit."[113]

656.    TSX refers to an Intel-specific set of instructions for its CPUs which, when implemented, are meant to improve the performance of parallel programs on the same CPU. Specifically, TSX are transactional memory instructions that allow a programmer to group together a set of instructions to execute in an all or nothing manner when programming an application.  If there is an interruption while this set of instructions is executing, the transaction (i.e., the set of instructions set to execute together), is aborted and retried at a later time.  This abort-and-retry mechanism is automatically performed by the hardware due to TSX and is unique to Intel CPUs.

657.    Intel's TSX allows an unauthorized user to exploit both the Unauthorized Access and Incomplete Undo Defects to read secret "in-flight" data by using an "abort and retry" mechanism to create a window of time during which data can be read from many intermediate CPU buffers, including the line fill buffer.  Specifically, an unauthorized person creates a transaction, which is then intentionally aborted by flushing the cache to a particular memory address (i.e., a Flush + Reload side-channel attack).  The flushed instruction from the cache then allocates space in the line fill buffer, allowing the transaction to speculatively access the data in the fill buffer.  Put simply, the TAA exploit allows old (yet still private) data from the line fill buffer containing sensitive information to be read by the unauthorized transaction.

658.    As with other MDS exploits, the TAA exploit allows an unauthorized user to exploit Intel's CPU defective design choices to gain access to virtually ***any*** data present in the line fill

---

[113] *Side Channel Vulnerabilities: Microarchitectural Data Sampling and Transactional Asynchronous Abort*, Intel, https://www.intel.com/content/www/us/en/architecture-and-technology/mds.html (last visited May 18, 2021).

PAGE 235 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

buffers of the CPU, including data used by programs the unauthorized person would ordinarily have no access to and, most critically, data such as passwords, cryptographic keys used for disk encryption and logins, browser history, and browser authentication cookies.  To be sure, one researcher took just 30 seconds to use TAA to trick a target machine into revealing a hash of an administrator's password.[114]

659.    Indeed, in order to protect Intel's CPUs from the TAA exploit, it is recommended that two of the important components and marketing features of Intel's CPUs – Hyper-Threading (SMT) and TSX – be completely disabled, which are used to, among other things, speed up execution of multi-threaded software and make parallel programming easier.  Critically, the TAA exploit does not impact AMD processors because AMD processors do not have TSX instructions implemented in them.

660.    **VRS (CVE-2020-0548)**.  Intel's CPU design allows an unauthorized user to deploy the VRS exploit to leak in-flight data stored within the CPU's vector registers after certain operations are completed.  Like buffers and ports, registers are data holding locations within the CPU that maintain in-flight data, specifically operands used for operations or results of the operations.  Vector instructions, i.e., program instructions that require the CPU to employ the vector registers to complete an operation, are used to speed up rendering graphics, to efficiently process strings of text, or to efficiently perform complicated cryptographic operations.

661.    The VRS exploit allows an unauthorized user to gain access to sensitive information in a CPU's registers by executing speculative code that moves data in the vector register into the

---

[114]Andy Greenberg, *Intel Failed to Fix a Hackable Chip Flaw Despite a Year of Warnings*, WIRED (November 12, 2019), https://www.wired.com/story/intel-mds-attack-taa/.

PAGE 236 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

CPU's memory. While "in-flight," from the vector register to the CPU's memory, the data is maintained in the store buffer. The VRS exploit then removes the data from the store buffer using TSX instructions. This exploit can then be used against Intel designed store buffers as described in ¶¶586-87. Notably, the VRS exploit has been reported in Intel CPUs with microcode patches to address the Fallout exploit, demonstrating that those mitigations were insufficient to address the undisclosed Defects in Intel's CPU design.

662.    **L1DES (CVE-2020-0549)**. Intel's CPU design allows unauthorized users to utilize the L1DES exploit to push data within the L1 data cache into one of the CPU buffers and leak that data through the use of speculative execution. Specifically, the L1DES exploit takes advantage of TSX instructions – proprietary Intel instructions – to position cached data into a buffer and leak it through an MDS exploit, as described above in paragraphs 642-43.

663.    The L1DES exploit demonstrated that Intel's mitigation plan for other MDS exploits was incomplete because, even with those mitigations, researchers were able to force a victim's sensitive data out of the L1 data cache into the microarchitectural buffers after the operating system clears them, which could then be leaked to obtain the victim's data utilizing the L1DES exploit. In order to mitigate the L1DES exploit, it is necessary both to overwrite the buffers and to flush the L1 data cache in the CPU before switching across security domains (or in many cases, between the operating system and a virtual machine), which materially degrades CPU performance. Because L1DES exploits Intel's defective CPU design, as well as its proprietary TSX instruction set, L1DES does not impact AMD CPUs. Notably, this exploit has been reported in Intel processors with microcode patches meant to fix the original RIDL and ZombieLoad variants, demonstrating that those mitigations were insufficient to address Intel's defective CPU design.

PAGE 237 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

664.    **Snoop Assisted L1D Sampling (CVE-2020-0550)**.  Intel's CPU design allows an unauthorized user to deploy the Snoop Assisted L1D Sampling to push data from Intel's L1 data cache into a buffer via a TSX instruction which, as designed by Intel, is vulnerable to an MDS exploit.

665.    Bus "snooping" or "monitoring" refers to a "cache-coherence mechanism" used by the CPU to ensure the "coherence" of information stored in a variety of caches, particularly when a CPU is used for multi-threaded, parallel applications.  Having multiple copies of shared information within the CPUs caches improves the overall performance of the processor; this information, however, must be the same in each cache.  To ensure this "coherence," caches are accessed via a microarchitectural element that is shared among the systems – a "bus connection" – which is then monitored by cache controllers to ensure that the consistency of the copied data across the CPU's caches.  For instance, if a transaction modifies the memory location used by one of these copies, the bus will share that information with each cache so that the copied data is updated, and coherence is maintained.

666.    With a Snoop-assisted L1D sampling exploit, an unauthorized user utilizes a version of the TAA exploit to push data from the L1 data cache into the CPU buffers where it is then vulnerable to an MDS exploit as described in ¶¶586-87 above.  Importantly, Intel has advised OS developers that "Snoop-assisted L1D sampling could be mitigated by flushing the L1D cache before executing potentially unauthorized applications, which would require changes to the OS scheduler

PAGE 238 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

when Hyper-Threading is enabled and could impact the performance of system transitions."[115]
AMD processors are not impacted by Snoop-assisted L1D.

667.    **Load Value Injection (CVE-2020-0551)**.  The LVI exploit utilizes in-flight data
obtained during an MDS exploit to trick an Intel-designed CPU to turn on itself and leak its
privileged data during a fault or assist generated by speculatively executed instructions
(Unauthorized Access and Incomplete Undo)

668.    There are at least two variants of the Load Value Injection exploit:  LVI Stale Data
and LVI Zero Data.  LVI Stale Data takes advantage of stale in-flight data within the buffers and
LVI Zero Data takes advantage of the mitigation for Meltdown and Foreshadow that inserts a 0
value when there is a fault or assist during speculative execution.  In other words, a mitigation for
certain aspects of the Unauthorized Access Defect has exposed Intel-designed CPUs to LVI exploits,
demonstrating that these mitigations were insufficient to fix the undisclosed Defects in Intel's CPU
design.

### 8.    "Spectre"

669.    Beginning in April 2017, researchers discovered the first in a series of related
security exploits or exploits known as Spectre.  Spectre gets its name from "speculative execution."
Intel was aware of the first two Spectre variants by June 1, 2017, but the public did not become
aware of Spectre or the security vulnerability that it exploited until January 3, 2018.

670.    Generally speaking, a Spectre exploit takes advantage of the security vulnerabilities
created by Intel's reliance upon speculative execution and, in particular, the branch prediction unit,

---

[115] *Snoop-assisted L1 Data Sampling / CVE-2020-0550 / INTEL-SA-00330*
https://software.intel.com/content/www/us/en/develop/articles/software-security-
guidance/advisory-guidance/snoop-assisted-l1-data-sampling.html (last visited May 18, 2021).

PAGE 239 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

and an unsecured cache subsystem to achieve increased performance.  Spectre allows unauthorized users to gain access to memory locations but only within the same process (e.g., another tab in a web browser).  But unlike Meltdown and Foreshadow, the Spectre exploit uses Intel CPUs' branch predictor to enable the unauthorized access.

671.    Spectre trains the branch predictor to make a wrong prediction.  Critically, it is difficult to detect the execution of a Spectre exploit, in part because the CPU does not recognize that its "mis-speculation" was, in fact, coerced, and cache-timing side-channel exploits generally leave no readily discernible trail to indicate that the caches have been improperly accessed.  Thus, the unauthorized user can compromise Intel's CPU and obtain sensitive information without leaving any "fingerprints" behind.

672.    Each Spectre exploit involves several steps.  First, the unauthorized user uses a "leak gadget" to coerce the CPU to speculatively execute instructions that are not a normal part of the processor's operation.  Second, unaware that it is under attack, Intel's CPU fetches and stores within its caches the data needed to execute the coerced instructions.  Third, still unaware that it is under attack, Intel's CPU determines that it has "mis-speculated," or speculatively executed incorrect instructions, and proceeds to flush its pipelines – *but not its caches* – of the effects of the incorrect instructions.  Finally, the unauthorized user uses a "transmit gadget" to execute an exploit on Intel CPU's caches and surreptitiously transmit the information that remains after the processor's mis-speculation.  By July 10, 2018, researchers had identified six Spectre variant exploits as follows:

PAGE 240 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

| **Name of Variant** | **Date 1st Identified** | **Date 1st Reported** | **Key Attributes of Variant** |
|---|---|---|---|
| **Variant 1**, Bounds Check Bypass (CVE-2017-5753) | June 2017 | 1/3/2018 | Exploits the speculative operations that occur when CPUs execute certain conditional branch instruction – e.g., whether an input is "in bounds" – to engage in otherwise unauthorized or unnecessary memory accesses. |
| **Variant 1.1**, Bounds Check Bypass on Loads (CVE-2018-3693) | | 7/10/2018 | Exploits speculative stores and how the CPU addresses speculative buffer overflows to bypass mitigations implemented for earlier Spectre variants. This variant uses a form of "stack smashing," a common method of capitalizing on a buffer overflow. |
| **Variant 1.2**, Read-only Protection Bypass | | 7/10/2018 | Exploits speculative stores and how the CPU addresses speculative buffer overflows where the processor doesn't enforce read/write protections to bypass mitigations implemented for earlier Spectre variants. |
| **Variant 2**, Branch Target Injection (CVE-2017-5715) | June 2017 | 1/3/2018 | Exploits the part of the CPU that directs what operations need to be speculatively executed (the "indirect branch predictor") to allow unauthorized code to be speculatively executed. |
| **Variant 3a**, Rogue System Register Read (CVE-2018-3640) | | 5/23/2018 | Exploits the "read system register" function to allow an unauthorized user to improperly access information about the state of the CPU's system register (similar to a cache). |
| **Variant 4**, Speculative Store Bypass (CVE-2018-3639) | | 5/23/2018 | Exploits the CPU's ability to speculatively load data into its caches. |

673.    On July 23, 2018, a team of security experts from the University of California, Riverside disclosed a new Spectre exploit, SpectreRSB.[116]    In a SpectreRSB exploit, an

---

[116] Esmaiel Mohammadian Koruyeh, *et al.¸ Spectre Returns! Speculation Attacks using the Return Stack Buffer* https://arxiv.org/pdf/1807.07940.pdf (last visited May 18, 2021).

unauthorized user exploits a different component of Intel's CPU microarchitecture utilized in speculative execution – the return stack buffer or RSB.  The purpose of an RSB in a processor employing speculative execution is to predict where Intel's CPU should go to, or the "return address," once its current operation is complete.  Like the other variants of Spectre, SpectreRSB involves utilizing a "leak gadget" to "poison" the RSB, which has the effect of either mis-training or "polluting" the branch prediction unit so as to force it to speculatively execute certain instructions.

## C.    Intel Was Aware of Numerous Methods That Would Have Mitigated Side-Channel Exploits

674.    Intel at all times treated (and continues to treat) its CPU design files as highly confidential trade secrets and does not disclose such information to consumers.  Plaintiffs and members of the Class did not have access to Intel's proprietary chip and microarchitecture designs, and thus could not reasonably discover the Defects on their own.

675.    At all relevant times, Intel has had exclusive knowledge concerning its defective hardware design that deferred privilege checks and permitted unauthorized memory access, thus compromising security.

676.    But, as many of its patent filings show, Intel was fully aware of the vulnerability of its architecture to side-channel exploits and the steps it could have taken to plug the security holes in its leaky microarchitecture and architecture design.  In addition, Intel was aware of many research papers that proposed various solutions to issues with speculative execution generally, but it did nothing.

677.    As alleged herein, Intel had previously implemented safeguards in its P6 architecture that would have largely protected against the Intel CPU Exploits.  That is why AMD's CPUs are reported to be immune from all of the aforementioned exploits, except for Spectre.  Unlike Intel,

PAGE 242 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

AMD did not remove well-accepted security.  Thus, to fix the Unauthorized Access Defect, Intel would need to disable hardware that allows transient instructions to receive unauthorized data (e.g., return a dummy value such as 0 or a random number) – which is what AMD CPUs do and what Intel's earlier P6 architecture did.

678.    Intel knew that its CPUs left data insecure and thus vulnerable to exploit.  It failed to disclose that, in designing its CPUs, it had sacrificed security for speed and specifically chose to allow unauthorized access to users' privileged data – all in an effort to secure a performance advantage over AMD and other competitors.

679.    As previously discussed, side-channel exploits, such as the Intel CPU Exploits, require fine-grain time measurements to time cache accesses to leak information.  Intel includes in the x86 Instruction Set a Read Time-Stamp Counter instruction (or RDTSC), which provides high resolution CPU timing information.  RDTSC is the instruction used to collect timing information in virtually all cache side-channel exploits.

680.    In the '294 patent, Intel recognized the role that RDTSC played in cache side-channel exploits.  In particular, Intel acknowledged that "[d]isabling counters almost guarantees that timing-based attacks cannot be executed by Ring 3 [user privilege level] spies." *Id.* at col. 3, l. 14-15.  Intel then proposed limiting access to the RDTSC instruction based on privilege, "leaving it to the OS [operating system] to determine which applications have the privilege to read timestamp and performance counters." *Id.* at col. 4, l. 19-20.

681.    Furthermore, in 2012, Intel was presented with a solution that further restricted access to the fine-grain timekeeping needed to carry out timing side-channel exploits.  In Martin *et al.*, *Timewarp: Rethinking Timekeeping and Performance Monitoring Mechanisms to Mitigate Side-*

PAGE 243 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
          COMPLAINT

*Channel Attacks* (2012), the authors provided a comprehensive solution that would "limit the fidelity of fine grain timekeeping and performance counters, making it difficult for an unauthorized user to distinguish between different microarchitectural events, thus thwarting attacks." *Id*. at Abstract.

682.    Intel has proposed other protections to prevent cache side-channel exploits.  In the '356 patent, Intel described a scenario that again foreshadows the exploits at issue here and noted that to thwart such an exploit, one could prevent repeated evictions from the cache of the victim's data, which is a critical step used in cache side-channel exploits.[117]  Intel went on to propose a protected cache design in which a cache controller handles access to, and eviction of, given cache line data based on protection data stored in the cache that controls access to the corresponding cache line.

683.    Another mitigation that Intel was aware of from at least 2010[118] are the cache designs presented by Dr. Lee in Lee *et al.*, *New cache Designs for Thwarting Software Cache-based Side Channel Attacks* (2007).  Dr. Lee proposed a cache design that "can defend against cache-based side channel attacks . . . with very little performance degradation and hardware cost."  Her cache design incorporates a cache partition mechanism, called PLcache, that creates "a flexible 'private partition'" so that "cache lines cannot be evicted by other cache accesses not belonging to this

---

[117] In the described attack, two threads use the same cache such that "when the attacker program is swapped into the processor state in place of the victim program, the data of the victim program in the cache is evicted and vice-versa.  [W]hen the attacker program is being swapped in again, it can identify which parts of its own data was evicted by observing the latency of its read operations.  By repeating that process, the attacker can infer information about the access patterns of the victim and expose a private key associated with the victim program, thus enabling the attacker program to access the private data of the victim."  '356 patent at col.2, l.9-19.

[118] Intel participated in the Hot Chips 26 conference where Dr. Lee presented her cache design.  *See Hot Chips: A Symposium on High Performance Chips* (August 10-12, 2014) http://web.archive.org/web/20141006045415/https://www.hotchips.org/archives/2010s/hc26/.

private partition." *Id.* at 4.1.  Dr. Lee also a described a cache design, called RPcache, which employs dynamic random mapping to deny an unauthorized user information about where potential victim code exists in the cache.  *Id.* at 4.2. [119]

684.     In sum, Intel was fully aware that its leaky cache design posed a substantial security risk from increasingly effective side-channel exploits.  Though Intel was aware of techniques or designs that could mitigate or thwart variants of such exploits.  Intel failed to do so.

685.     It was only after Meltdown and Spectre were disclosed, and it had a proverbial "gun to its head," that Intel acquiesced to prospectively change its hardware design to deal with vulnerabilities inherent to its defective design.

686.     Even then, however, Intel failed to fix the underlying Defects in its CPU design that allowed the authorized memory access, and as a result numerous additional exploits were disclosed on an ongoing basis for over two years since, with the most recent one found in March 2020.

**D.     The Intel CPU Exploits Are Both Weaponized And Untraceable**

687.     The Intel CPU Exploits are not merely theoretical threats.  They are real-world threats that are weaponized "in the wild."

688.     As of January 30, 2018, Fortinet, a prominent manufacturer of enterprise network hardware, reported that it had found dozens of malware samples that have started taking advantage of the proof-of-concept codes for Meltdown and Spectre.  In the span of two weeks after the vulnerabilities were disclosed, security research teams found 119 malware samples associated with

---

[119] Dr. Lee has received a patent, *Cache Memory Having Enhanced Performance and Security Features*, U.S. 8,549,208, issued October 1, 2013 and published July 15, 2010, that describes her secure cache design.  She also filed a patent application, *Systems and Methods for Random Fill Caching and Prefetching for Secure Cache Memories*, Pub. No. U.S. 2016/0170889 A1 (filed December 14, 2015), that proposes additional security enhancements.

PAGE 245 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

Meltdown and Spectre.  After analyzing the samples, Fortinet discovered they were all based on the previously released proof of concept.[120]

689.    As of February 1, 2018, the number had grown to 139 malware samples.[121]

690.    Alex Ionescu, a security architect and consultant expert in kernel development, security training, and reverse engineering at CrowdStrike, Inc., confirmed in a tweet that he had "weaponized" Meltdown.[122]

691.    Even Intel admitted that the Intel CPU Exploits can "be maliciously exploited in the wild by highly sophisticated cyber-criminals."[123]

692.    The Intel CPU Exploits "leave[] no trace that would make in-the-wild attacks detectable."[124]  The well-known cybersecurity company McAfee advised that the Intel CPU Exploits

---

[120]    *See    Meltdown/Spectre    Update*,    Fortinet    (January    30,    2018), https://www.fortinet.com/blog/threat-research/the-exponential-growth-of-detected-malware-targeted-at-meltdown-and-spectre.html; *see also* Lucian Armasu, *Hundreds of Meltdown, Spectre Malware    Samples    Found    in    the    Wild*,    Toms    Hardware    (February    1,    2018) https://www.tomshardware.com/news/meltdown-spectre-malware-found-fortinet,36439.html.

[121] *See* Andy Patrizio, *Researchers find malware samples that exploit Meltdown and Spectre*, NetworkWorld.com    (February    8,    2018), https://www.networkworld.com/article/3253898/researchers-find-malware-samples-that-exploit-meltdown-and-spectre.html.

[122]    *See    *    @aionescu,    Twitter    (January    10,    2018,    8:59    PM), https://twitter.com/aionescu/status/951272403853717504 (last visited May 18, 2021).

[123] Maxwell Cooter, *We've secured our CPU silicon, and ready to secure your business, says post-Meltdown    Intel*",    The    Register    (September    12,    2019), https://www.theregister.co.uk/2019/09/12/securing_the_silicon/.

[124] Andy Greenberg, *Intel is Patching the Patch for the Patch for Its 'ZombieLoad' Flaw*, *Wired* (January    27,    2020),    https://www.wired.com/story/intel-ZombieLoad-third-patch-speculative-execution/.

PAGE 246 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

"are exceptionally hard to detect as they do not leave forensic trace or halt program execution. This makes post-infection investigations and attack attribution much more complex."[125]

## E.    The Intel CPU Exploits Are an Intel Problem, Not an Industry-Wide Problem

693.    The major falsehood pushed by Intel and its marketing team in order to maximize profits is that the Intel CPU Exploits are an industry-wide problem. Only Intel, however, implemented the flawed CPU architecture and microarchitecture, including both Defects (Unauthorized Access and Incomplete Undo).

694.    AMD does not appear to be vulnerable to the vast majority of Intel CPU Exploits. As noted, the Intel CPUs at issue are subject to numerous Intel CPU Exploits and related variants (see chart at Paragraph 691 below); whereas the CPUs manufactured by Intel's principal competitor, AMD, are at risk of only Spectre.

695.    In the face of this reality, and in a desperate attempt to avoid a loss of market share, Intel has continued to mischaracterize the exploits as an industry-wide problem. For example, in response to a story by *Computer Business Review*, which reported that the Intel CPU Exploit SWAPGS bypasses all known mitigation mechanisms implemented in the wake of the disclosure of Meltdown and Spectre, "Intel's US PR agency told Computer Business Review in an email that this is 'not an Intel-specific issue. We would appreciate if you could update your article to note that this is an industry-wide issue that affects both Intel and AMD.'"

696.    In response to Intel's email, *Computer Business Review* contacted AMD. "AMD reject[ed] that claim, saying 'based on external and internal analysis, AMD believes it is not

---

[125] *See Decyphering the Noise Around 'Meltdown' and 'Spectre'*, McAfee Advanced Threat Research (January 4, 2018), https://securingtomorrow.mcafee.com/other-blogs/mcafee-labs/decyphering-the-noise-around-meltdown-and-spectre/.

vulnerable to the SWAPGS variant exploits because AMD products are designed not to speculate on the new GS value following a speculative SWAPGS.  For the exploit that is not a SWAPGS variant, the mitigation is to implement our existing recommendations for Spectre variant 1.' (i.e., no new mitigations have been required.)."

697.    In short, in side-by-side safety analyses between Intel and AMD processors, industry experts have concluded that AMD's CPUs are safer and more secure than Intel's CPUs.  It is reported that, consistent with sound CPU microarchitecture and architecture design principles, AMD – unlike Intel – designed its CPUs with security in mind.[126]

698.    As a result, AMD has been "outselling Intel in the desktop category with its third-generation Ryzen processors.  Intel is stumbling, rushing out new processors, slashing prices by as much as half, and struggling to work out how to compete against AMD[.]"[127]

699.    Indeed, it has been reported that numerous OEM and cloud providers have transitioned from systems employing Intel processors to those powered by AMD processors. Following Google's Project Zero security team's disclosures concerning the Meltdown and Spectre CPU exploits, Google has reportedly grown increasingly dissatisfied with Intel's processors.[128]

---

[126] Lucian Armasu, *Intel vs AMD Processor Security: Who Makes the Safest CPUs?*, Tom's Hardware (November 4, 2019),  https://www.tomshardware.com/features/intel-amd-most-secure-processors.

[127] Rich Edmonds and Richard Devine, *Intel spent much of this decade all alone churning out mino CPU upgrades, but we take a look at how AMD managed to claw its way back onto the field*, Windows Central (December 23, 2019), https://www.windowscentral.com/decade-in-review-amd-ryzen-intel-2010s; *see also* Rob Thubron, *report: Intel will cut desktop CPU prices by 10-15% as Ryzen 3000 draws* near, TechSpot (June 21, 2019), https://www.techspot.com/news/80614-report-intel-cut-desktop-cpu-prices-10-15.html.

[128] Lucian Armasu, *AMD's Epyc Potential Win: Google May Ditch Intel*, Tom's Hardware (July 30, 2019),https://www.tomshardware.com/news/google-switch-intel-server-cpus-amd-epyc,40045.html.

PAGE 248 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

Google confirmed the rumors and announced it was moving to systems powered by AMD processors for internal workloads as well as for Google Cloud customers.[129]

700.    At the same time, Twitter confirmed it was moving to AMD-powered computing systems for its data centers as well.[130]

701.    Backblaze has also stated it may move to AMD-powered systems.[131]  This news comes after Backblaze openly said that Meltdown and Spectre were causing them to consider alternatives to Intel-powered systems.[132]

702.    The switch to AMD CPUs is not limited to cloud services.  Among others, Microsoft announced plans to use AMD processors instead of Intel processors for its upcoming Surface laptop line.[133]

703.    In addition to placing its financial interests ahead of the best interests of its customers, Intel placed its interests ahead of national security.  Notably, although it notified a group

---

[129] Bart Sano and Brad Calder, *AMD EPYC processors come to Google- and to Google Cloud* Google Cloud (August 7, 2019),  https://cloud.google.com/blog/products/compute/amd-epyc-processors-come-to-google-and-to-google-cloud.

[130] Ari Levy, *AMD shares surge 16% after Google and Twitter say they're using the chipmaker's new processor*, CNBC (August 8, 2019),  https://www.cnbc.com/2019/08/08/amd-shares-surge-14percent-after-google-and-twitter-sign-on-with-epyc-chips.html; Tom Warren, *Inside Microsoft's New Custom Surface Processors with AMD and Qualcomm*, The Verge (October 2, 2019), https://www.theverge.com/2019/10/2/20888999/microsoft-surface-pro-x-laptop-3-custom-processor-qualcomm-amd.

[131] Andy Klein, *Petabytes on a Budget: 10 Years and Counting*, Backblaze (September 24, 2019), https://www.backblaze.com/blog/petabytes-on-a-budget-10-years-and-counting/.

[132] *Cloud companies consider Intel rivals after the discovery of microchip security flaws*, CNBC (January 10, 2018),  https://www.cnbc.com/2018/01/10/cloud-companies-consider-intel-rivals-after-security-flaws-found.html.

[133] Matt Hanson, *Microsoft could ditch Intel for AMD with its Surface Laptop 3*, TechRadar (September 16, 2019), https://www.techradar.com/news/microsoft-could-ditch-intel-for-amd-with-its-surface-laptop-3.

PAGE 249 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

of international private technology firms – including some in China – Intel did not disclose the Meltdown and Spectre exploits to customers in the U.S. government, such as the National Security Agency or the Department of Homeland Security.  Both of these agencies learned of the Meltdown and Spectre exploits the same way that the consuming public did – through news reports on or after January 3, 2018.  As a result, the federal government could not assess the national security implications of the hardware exploits or take steps to defend federal computer systems against them during the months that researchers and private companies grappled with the crisis behind the scenes.

704.    By not informing the U.S. government about the hardware exploits, Intel gave international interests an unimpeded advantage at improperly accessing U.S. systems.  "It's really troubling and concerning that many if not all computers used by the government contain a processor vulnerability that could allow hostile nations to steal key data sets and information," New Hampshire Senator Maggie Hassan said during congressional hearings.  It is even more troubling that Intel knew about these exploits for nearly a year without notifying the federal government.

**F.    Intel's Interim Patches Have Impacted the Performance of the CPUs And Still Leave the CPUs Vulnerable to Exploit**

705.    Plaintiffs and absent Class members have been harmed, injured, and damaged by, *inter alia,* Intel's acts, omissions, and practices in connection with its inherently and materially defective CPUs, which allow unauthorized users to steal confidential, valuable, and sensitive data.  Furthermore, Intel's mitigation efforts to date have slashed the promised CPU performance and also failed to eliminate the ongoing security vulnerabilities of its CPUs.  Having disregarded security considerations for years in connection with its design and development of Intel's CPUs (as described above), Intel has so fully integrated the Defects into its CPU-design that the only way to eliminate the security vulnerabilities is for Intel to redesign the defective portions of its CPUs.

PAGE 250 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

706.    Despite its knowledge of the Defects, Intel has been unable or unwilling to repair the Defects without substantial performance degradation, or to offer Plaintiffs and Class members a non-defective Intel CPU or reimbursement for the cost of such defective CPUs and the consequential damages arising from the purchase and use of the defective CPUs.

707.    Instead, Intel rushed initial fixes out, which resulted in many adverse consequences. Operating system patches were released, but these caused unacceptable data corruption and loss, and were quickly withdrawn.  CPU microcode updates were released, but this resulted in disabled servers (causing many customers to steer clear of these risky updates).  Intel, meanwhile, promised that future CPUs without the Defects would be "available soon" – which, of course, did nothing to address the many millions of vulnerable devices already in the market and in use.

708.    Worse still, the available patches not only dramatically degrade the CPUs' performance, but they do not even fix the Defects.

709.    Indeed, the existing mitigations leave the door wide open for further exploits that take advantage of the same core Defects involving Intel's speculative execution, processor-caching and memory usage.  Because the mitigations fail to address the underlying Defects and are limited only to the specifics of a particular exploit, further exploit variations that exploit the Defects will continue to emerge.  In fact, since the Meltdown and Spectre exploits were publicly disclosed in January 2018, almost two-dozen *new* exploit variations have been identified, including the following:

PAGE 251 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

| **INTEL CPU EXPLOIT** | **CVE** | **ALIASES** |
|---|---|---|
| Foreshadow | 2018-3615 | L1 Terminal Fault-SGX |
| Foreshadow-NG | 2018-3620 | L1 Terminal Fault-OS/ SMM |
| Foreshadow-NG | 2018-3646 | L1 Terminal Fault-VMM |
| Fallout | 2018-2126 | Store Buffer Data Sampling<br><br>Microarchitectural Data Sampling |
| RIDL/ZombieLoad | 2018-2127 | Load Port Data Sampling<br><br>Microarchitectural Data Sampling |
| RIDL/ZombieLoad | 2018-2130 | Fill Buffer Data Sampling<br><br>Microarchitectural Data Sampling |
| SwapGS | 2019-1125 | |
| RIDL/ZombieLoad | 2019-1091 | Data Sampling Uncacheable Memory<br><br>Microarchitectural Data Sampling |
| RIDL/ZombieLoad | 2019-1135 | Transactional Synchronization Extensions Asynchronous Abort<br><br>Microarchitectural Data Sampling |

PAGE 252 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

| **INTEL CPU EXPLOIT** | **CVE** | **ALIASES** |
|---|---|---|
| Vector Register Sampling | 2020-0548 | |
| CacheOut | 2020-0549 | L1D Eviction Sampling |
| Snoop-assisted      L1D Sampling | 2020-0550 | |
| Load Value Injection | 2020-0551 | |

710.    Despite the continuous discovery of security vulnerabilities and the impact that corresponding mitigations have on performance, Intel continues to advertise and tout its processors' performance without regard to how future patches could affect processor performance and, thus, the central functionality of its CPUs.

711.    The only way for Intel to put an end to this vicious security attack/mitigation patch cycle is for it to redesign its CPU microarchitecture and eliminate the Defects, and otherwise safeguard processor-caching and memory usage from side-channel attacks.  Until then, Plaintiffs and absent Class members are left with the unappealing choice of spending money on a whole new computer that uses a rival CPU that does not contain the Defects, or continuing to use their Intel CPU-based computer which exposes them to substantial security risk and/or significant performance degradation (by as much as 40 percent) if the necessary mitigation patches are applied.

PAGE 253 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                   COMPLAINT

G.    **Intel's Failed Mitigation Attempts Have Resulted in Significant Negative Consequences**

712.    Even after the date that Intel claims it first learned of Meltdown and Spectre, it intentionally delayed disclosing the vulnerability for months, thereby increasing the exposure, risks, and injury to Plaintiffs and Class members.  Yet, even with such substantial lead-time, Intel was very slow to provide patches.  The mitigations came nearly two months after the CPU vulnerabilities were first exposed publicly and nearly nine months after they were first reported to Intel.

713.    Then, when it finally did deploy patches, albeit months too late, Intel's patches caused systems to reboot unexpectedly and led to data loss and corruption.  Intel even advised consumers not to download its patches until better versions were deployed.  Intel EVP Neil Shenoy stated that "[w]e recommend that OEMs, cloud service providers, system manufacturers, software vendors, and end users stop deployment of current versions on specific platforms as they may introduce higher than expected reboots and other unpredictable system behavior."[134]  Intel then buried a warning in its latest financial results that its buggy firmware updates could lead to "data loss or corruption."[135]

714.    Moreover, while it attempted to patch the exploits caused by its Defects in *certain* CPUs, Intel chose to ignore numerous systems affected by the Defects and leave them vulnerable to exploit.   CPU families that Intel will *not* patch include Bloomfield, Clarksfield, Gulftown,

---

[134] Joe Osborne, *Don't download Intel's latest Spectre and Meltdown patch, Intel Warns*, TechRadar (January 22, 2018), https://www.techradar.com/news/dont-download-intels-latest-spectre-and-meltdown-patch-intel-warns.

[135] Tom Warren, *Microsoft issues emergency Windows update to disable Intel's buggy Spectre fixes*, The Verge (January 29, 2018), https://www.theverge.com/2018/1/29/16944326/microsoft-spectre-processor-bug-emergency-windows-update-reboot-fix.

PAGE 254 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

Harpertown Xeon C0, Harpertown Xeon E0, Jasper Forest, Penryn/QC, SoFIA 3GR, Wolfdale C0 and M0, Wolfdale E0 and R0, Wolfdale Xeon X0, Wolfdale Xeon E0, Yorkfield, and Yorkfield Xeon.[136]

**H.     Intel's Interim Patches Have Come at a Significant Cost to the CPUs' Processing Speed and Performance**

715.     The Intel CPU Exploits, including the Meltdown, Foreshadow, RIDL, ZombieLoad, Fallout, L1 Data Eviction Sampling, Vector Register Sampling, L1D Snoop Sampling, Transactional Asynchronous Abort, Load Value Injection, and Spectre, which exploit the Defects in Intel's CPUs, are not just extraordinary issues of security, but also performance. Intel's mitigations cause substantial performance degradation, with some researchers, including those at Apple, claiming in excess of 40% loss in performance.[137]

716.     The purported fixes carry performance costs, in part because the cache side-channel techniques exploit Intel's implementation of speculative execution, which as described above is a physical feature built into the Intel CPUs to speed up operations.  Thus, safeguarding against attacks compromises marketed features and diminishes the speed and performance on which Intel distinguished its CPUs.

717.     For example, to mitigate the Meltdown exploit, Intel recommends disabling key performance functionality through changes to operating system kernel code, including increased isolation of kernel memory from user-mode processes.  This mitigation is often referred to as kernel

---

[136] Liam Tung, *Intel: We now won't ever patch Spectre variant 2 flaw in these chips*, ZDNet.com (April 4, 2018), https://www.zdnet.com/article/intel-we-now-wont-ever-patch-spectre-variant-2-flaw-in-these-chips/.

[137] *How to enable full mitigation for Microarchitectural Data Sampling (MDS) vulnerabilities*, Apple Support (June 7, 2019), https://support.apple.com/en-gb/HT210108.

PAGE 255 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                       COMPLAINT

page-table isolation ("KPTI," which is also referred to as KAISER). The protection is based on complete separation of kernel and user page tables. As a result, kernel and user programs exist in separate address spaces, effectively mitigating Meltdown, but not the other side-channel exploits. KPTI effectively mitigates Meltdown because user applications no longer can perform speculative memory accesses to kernel address space because the kernel is completely unmapped, as depicted below:



718.    KPTI protection, though, comes at a substantial performance cost. The performance impact (often referred to as "overhead") of the KPTI patches alone was measured by Dave Hansen, a Linux kernel developer who works at Intel, to be anywhere from 5% to 30%, even with the PCID optimization[138]; for database engine PostgreSQL the impact on read-only tests on an Intel Skylake

---

[138] Communication from Dave Hansen, *Patch 00/30 v.3 KAISER: unmap most of the kernel from userspace page tables*, LWN.net  (November 10, 2017), https://lwn.net/Articles/738997/.

processor was 7% to 17% (or 16% to 23% without PCID),[139] while a full benchmark lost 13% to 19% (Coffee Lake vs. Broadwell-E).[140]

719.    KPTI patches, however, do not protect from any variation of the Foreshadow and Spectre exploits or when Meltdown is performed within the same address space, for example in the case of software modules protected with software fault isolation techniques.

720.    To mitigate the Foreshadow exploits, Intel recommends implementing microcode and operating system updates and hypervisor changes (for cloud guests).  Foreshadow mitigations enable a new feature called the ESXi Side-Channel-Aware Scheduler, also referred to as the ESXi SCA Scheduler.  This scheduler will schedule the hypervisor and VMs on only one logical processor of an Intel Hyper-Threading-enabled core.  This means the ESXi Side-Channel-Aware Scheduler will not make use of all the Hyper-Threading cores presented.

721.    Like the KPTI patches, the Foreshadow mitigation techniques have a significant adverse impact on performance.  For example, the performance impact observed in test environments for enterprise class workloads after implementing Foreshadow patches and enabling the ESXi Side-Channel-Aware Scheduler was as high as 32%.[141]

---

[139] Communication from Andrews Freund, *headsup: Fix for intel hardware bug will lead to performance regressions*, PostgreSQL (January 1, 2018), https://www.postgresql.org/message-id/20180102222354.qikjmf7dvnjgbkxe%40alap3.anarazel.de.

[140] Michael Larabel, *Initial Benchmarks of The Performance Impact Resulting from Linux's x86 Security Changes*, Phoronix (January 2, 2018), https://www.phoronix.com/scan.php?page=article&item=linux-415-x86pti&num=2.

[141] *VMware Performance Impact Statement for 'L1 Terminal Fault-VNM' (L1tf-VMM) mitigations: CVE-2018-3646 (55767)*, VMWare Knowledge Base (last updated April 18, 2020), https://kb.vmware.com/s/article/55767#q=performance.

PAGE 257 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

| Application Workload / Guest OS | Performance Degradation After Enabling Foreshadow Mitigations |
|---|---|
| Database OLTP / Windows | 32% |
| Database OLTP / Linux (with vSAN) | 32% |
| Mixed Workload / Linux | 25% |
| Java / Linux | 22% |
| VDI / Windows | 30% |

722.    Incredibly, aware that the performance impacts of mitigating this severe vulnerability created by its own flawed microarchitecture design decisions would be substantial for many consumers, Intel attempted to impose a licensing restriction in order to prevent owners of its CPUs from using benchmark software to assess the extent of the performance overhead associated with patching their CPUs to prevent a Foreshadow exploit.[142]

723.    To mitigate the MDS exploits (including MDSUM, MFBDS, MLPDS, MSBDS, TAA, L1DES and VRS exploits), Intel recommends fixes to operating systems, virtualization mechanisms, web browsers, and microcode patches that flush intermediate processor buffers when switching to a lower privileged level.

724.    Intel has also recommended that users disable Hyper-Threading or employ a group scheduler. Intel describes Hyper-Threading as a technique for improving processor efficiency: "Simultaneous multithreading (SMT) is a technique for improving the overall efficiency of superscalar CPUs with hardware multithreading. SMT permits multiple independent threads of execution to better utilize the resources provided by modern processor architectures. Intel® Hyper-

---

[142]    *Software License for Intel Memory Latency Checker (Intel MCL)*, Intel http://web.archive.org/web/20191124030318/https://software.intel.com/en-us/protected-download/739797/493768.

PAGE 258 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

Threading technology (Intel® HT) is Intel's implementation of SMT." Intel has claimed that Hyper-Threading results in performance improvements of close to 30%.[143]

725.    To mitigate TAA exploits, Intel recommends disabling transactional memory extensions, or applying all the mitigations used to mitigate RIDL, ZombieLoad, Fallout, and Vector Register Sampling exploits.  Disabling transactional memory exploits, though, can result in significant performance degradation for workloads that use transactional memory, especially when Hyper-Threading is disabled.  It is well known that transactional memory makes it simpler for programmers to write high performance parallel code.  A paper published by Intel researchers indicated that "on a set of real-world, high performance computing workloads, Intel TSX provides 1.41x average speedup over lock- and atomics-based implementations… [and] 1.31x bandwidth improvement on a set of network intensive applications."[144]

726.    The mitigations to protect against the MDS exploits result in an adverse impact of 8% to 10% in performance without disabling Hyper-Threading.[145]  Apple, though, has warned that its own tests have shown as much as a 40% reduction in performance when its Mac computers handle certain computing-intensive workloads.[146]

---

[143] Shawn D. Casey, *How to Determine the Effectiveness of Hyper-Threading Technology with an Application*, Intel (April 28, 2011), https://software.intel.com/content/www/us/en/develop/articles/how-to-determine-the-effectiveness-of-hyper-threading-technology-with-an-application.html

[144] R. M. Yoo, et al. *Performance Evaluation of Intel Transactional Synchronization Extensions for High-Performance Computing*, (2013), http://pages.cs.wisc.edu/~rajwar/papers/SC13_TSX.pdf.

[145] Michael Larabel, *Benchmarking AMD FX vs. Intel Sandy/Ivy Bridge CPUs Following Spectre, Meltdown, L1TF, ZombieLoad*, Phoronix (May 24, 2019), https://www.phoronix.com/scan.php?page=article&item=sandy-fx-ZombieLoad&num=1.

[146] *Intel ZombieLoad bug fix to slow data centre computers*, BBCNews (May 15, 2019), https://www.bbc.com/news/technology-48278400.

PAGE 259 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                       COMPLAINT

727.    Despite Intel's mitigations (and their resulting impact on CPU performance), L1D Eviction Sampling/CacheOut was reported in processors that had Intel's microcode patches to protect against RIDL/ZombieLoad exploits.  According to RedHat (IBM), Intel's fix did not properly clear the fill buffers during its mitigation (leaving out some "corner cases"), and the CacheOut exploit exposed this issue.  This is another instance of how Intel's piecemeal approach to mitigation and failure to fix the underlying Defects leaves the door open to more exploits.[147]

728.    Similarly, Vector Register Sampling was reported in processors that had Intel's microcode patches to protect against the Fallout exploit.  According to RedHat (IBM), Intel's fix did not take into account the fact that program instructions can complete after Intel's patches cleared out the buffers.  Moreover, Intel has yet to release a microcode patch or other mitigation to protect against Vector Register Sampling.

729.    To mitigate a class of vulnerabilities known as Snoop Assisted L1 Sampling, Intel recommends flushing the L1 Data cache before executing potentially unauthorized applications.

730.    Mitigations against the Load Value Injection exploit are particularly catastrophic for Intel SGX.  Essentially, any instruction that involves memory while in SGX mode will need to be executed non-speculatively.  Depending on the execution properties of the Intel SGX enclave workload (for example, CPU-bound vs. I/O-bound, cache locality, etc.), the performance impact of mitigation will vary depending on workload but can be significant.

731.    Notably, one of the features that enables SGX exploits using Load Value Injection is Intel's fix against the Meltdown exploit in hardware (in processors after the Whiskey Lake

---

[147] *CVE-2020-0549*, Red Hat (January 27, 2020), https://access.redhat.com/security/cve/cve-2020-0549.

generation).  These processors produce a value 0x00 for a load that "faults" (instead of returning the value in the cache as is the case in processors without the hardware mitigations).  The value 0x00 can be considered a valid memory address in SGX mode, and an unauthorized user can map arbitrary pages at this address to leak information through loads that depend on the faulting load.

732.    The Load Value Injection mitigation techniques have a significant adverse impact on performance.  For example, the performance impact observed in test environments on Intel's Kaby Lake processors resulting in adverse performance impact of 22%.[148]  Mitigations proposed by a Google engineer to protect against the Load Value Injection exploit and other side-channel exploits saw just 7% the original performance in one of her tests.[149]

733.    To mitigate the Spectre exploits, Intel also recommends implementing separate microcode updates and retpoline compiler changes.

734.    In total, there are at least seven layers of performance overhead related to Intel's mitigations for the Defects.  They include:

- Guest kernel KPTI patches

- Intel microcode updates

- Cloud provider hypervisor changes (for cloud guests)

- Retpoline compiler changes

---

[148] Michael Larabel, *The Brutal Performance Impact for Mitigating the LVI Vulnerability*, Phoronix (March 12, 2020), https://www.phoronix.com/scan.php?page=article&item=lvi-attack-perf&num=1.

[149] *[x86][seses] Introduce SESES pass for LVI,* Phabricator, https://reviews.llvm.org/D75939 (as published March 10, 2020) (last visited May 28, 2020); se*e also* Michael Larabel, *Google Engineer Shows 'SESES' for Mitigating LVI + Side-Channel Attacks – Cod Runs ~ 7% Original Speed*, Phoronix (March 21, 2020), https://www.phoronix.com/scan.php?page=news_item&px=LLVM-SESES-Mitigating-LVI-More.

PAGE 261 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                COMPLAINT

- Software to flush the L1 data cache

- Compiler de-optimization for SGX code

- Disabling Hyper-Threading

735.    Intel's mitigations affect real-world application benchmarks and cause a massive drain on CPU performance.[150]    Exactly how much the system is impacted depends on the characteristics of the application being tested.  As Brendan Gregg, a senior performance architect at Netflix, explained, applications with higher system call (or syscall) rates, such as proxies and databases that do lots of I/O (input/output), will suffer the largest losses.  The impact also rises with higher context switch and page fault rates.[151]    The severity of the impact will also depend on the CPU overcommit ratio on a given host and the host utilization.[152]

736.    Nevertheless, performance testing has confirmed that all Plaintiffs and members of the Class suffer material performance regressions as a direct consequence of installing Intel's mitigations – all while not curing the underlying hardware Defects giving rise to the exploits.

737.    Based on side-by-side comparisons between systems built from different generations of Intel CPUs, the patches issued to mitigate the Defects inherent in Intel's defective CPUs (which,

---

[150] Brendan Gregg, *KPTI/KAISER Meltdown Initial Performance Regressions*, Brendan Gregg's Blog (February 9, 2018),  http://www.brendangregg.com/blog/2018-02-09/kpti-kaiser-meltdown-performance.html.

[151] Brendan Gregg, *KPTI/KAISER Meltdown Initial Performance Regressions*, Brendan Gregg's Blog (February 9, 2018),  http://www.brendangregg.com/blog/2018-02-09/kpti-kaiser-meltdown-performance.html.

[152] *VMware Performance Impact Statement for 'L1 Terminal Fault-VNM' (L1tf-VMM) mitigations: CVE-2018-3646 (55767)*, VMware Knowledge Base (last updated April 18, 2020),  https://kb.vmware.com/s/article/55767#q=performance.

PAGE 262 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

for many, disable marketed functionality and features of the CPUs) reduce the performance of a given Intel CPU model to that of a CPU model of several generations prior.

## I.   **Performance Matters**

738.    Computer processing performance is fundamental to basic computer functionality.

739.    Performance significantly impacts user experience.  Users *really* care about speed in interactive environments.  Responsiveness is a key feature that consumers expect from their computer system.  That is because responsiveness is a basic user interface design rule that's dictated by human needs, not by individual technologies.

740.    Responsiveness matters for two reasons:

- Human limitations, especially in the areas of memory and attention.  Users simply do not perform as well if they have to wait and suffer the inevitable decay of information stored in short-term memory.

- Human aspirations.  Users like to feel in control of their destiny rather than subjugated to a computer's whims.[153]

741.    A faster user experience is a paramount objective (but not at the expense of removing fundamental security),  for the simple reason that people engage more when they can move freely and focus on the content instead of on their endless wait.

742.    Users who run more than one application at a time (i.e., multitasking) depend on tasks being managed in such a way as to create an illusion that each task has a dedicated CPU all to

---

[153]   Jakob Nielson, *Website Response Times*, Nielsen Norman Group (June 20, 2010), https://www.nngroup.com/articles/website-response-times/.

PAGE 263 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

itself, which allows users to have several applications open and working at the same time without interruption:



743.    When talking about responsiveness to performance requests, milliseconds matter. Even delays of a fraction of a second are perceived by users, and disconnect users from their experience, and their action and reaction.[154]

744.    Studies show that responsiveness affects users' stress level and their own performance.   Responsiveness has been shown to be one of the strongest stressors in human interactions with computers.[155]

745.    Recognizing the role that responsiveness plays in user experience, Intel has nurtured a computer culture focused on processing power and performance.  It advertises the responsiveness advantages of the products it brings to the market.  Notably, responsiveness has been one of the key

---

[154] M. Kearny, A. Osmani, K. Basques, J. Miller, *Measure Performance with the RAIL Model*, Google     Web     Fundamentals     (June     10,     2020), https://developers.google.com/web/fundamentals/performance/rail (last visited May 25, 2021).

[155] Noah Stupak, *Time delays and system response times in human-computer interaction*, Rochester Institute     of     Technology     RIT     Scholar     Works     (September     10,     2009), https://scholarworks.rit.edu/cgi/viewcontent.cgi?article=2374&context=theses.

PAGE 264 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                 COMPLAINT

features that Intel has emphasized over the years in presentations and marketing materials, as can

be seen from the following promotional example:



https://www.intel.com/content/www/us/en/architecture-and-technology/responsiveness-technologies.html.



https://www.intel.com/content/www/us/en/products/docs/devices-systems/laptops/laptop-innovation-program.html?utm_source=facebook&utm_medium=social&CID=iosm|&linkId=100000010719482.

PAGE 265 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                          COMPLAINT

746. Indeed, Intel invested many millions of dollars in research, development, manufacturing, and marketing of its Speed Shift technology, which Intel touted as delivering dramatically quicker responsiveness with single-threaded, transient (short duration) workloads, such as web browsing, by allowing the processor to more quickly select its best operating frequency and voltage for optimal performance and power efficiency. Previously, it took about 20-30 milliseconds for a processor to inform the operating system that something has happened (the workload has gone up, the system is getting too hot, etc.) and for the operating system to then respond (increase the frequency to handle the workload, reduce the frequency to reduce power draw). Intel's Speed Shift technology reduced the time that a CPU typically takes to 1ms (i.e., a 19ms gain)[156]:



https://wccftech.com/intel-introduces-speed-shift-technology/.

747. Like Intel, computer makers feature processing power as the heart of their advertising. Hewlett Packard's website affirms that "[c]omputer processor speed [] is one of the most important elements to consider when comparing computers." [157] On May 21, 2019, Apple

---

[156] Usman Pirzada, *Intel Introduces Speed Shift Technology for Skylake 6th Generation Processors – Will Be Landing This Month Via A Windows 10 Update*, WCCFTech (November 10, 2015), https://wccftech.com/intel-introduces-speed-shift-technology/.

[157] *See* Sophie Sirois, *What is Processor Speed and Why Does It Matter*, HP Tech Takes (December 18, 2018), https://store.hp.com/us/en/tech-takes/what-is-processor-speed.

PAGE 266 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

introduced what was deemed "the fastest Mac notebook ever" due to its new "faster 8th- and 9th-generation Intel Core processors."[158]  Dell also points to the functional importance of a processor where it assists potential customers in understanding processors by stating, "The processor is the engine behind your computer processing critical information and instructions.  The speed at which your system runs programs, loads pages and downloads files depends … on the processor."[159]

748.    All of Intel's marketed performance gains (and then some), though, are lost by installing Intel's mitigations for the Defects.  Because the mitigations essentially downgrade the processor back to performance levels of a prior CPU generation, a consumer is left with a computer that has substantially different CPU specifications than originally purchased.

## J.    Plaintiffs' Performance Testing of Intel's CPUs

749.    In Plaintiffs' performance testing of the Intel CPUs, the mitigations offered to reduce the security risks created by the Defects materially degrade the performance of the CPUs.

750.    Soon after new Intel CPU Exploits were disclosed, operating system vendors and/or Intel released updates with mitigations.  There has been a history of faulty updates and material performance regressions after update.  Over the years, a whole series of regressions has been added.

751.    The below devices were evaluated over the course of testing.  Twenty Intel Desktop machines, 7 Intel Mobile machines, 5 Intel server machines, 3 AMD machines, and 5 Apple MacOS machines were considered.  The set of machines provide a good view of the available computer

---

[158] *Apple introduces first 8-core MacBook Pro, the fastest Mac notebook ever*, Apple (May 21, 2019), https://www.apple.com/newsroom/2019/05/apple-introduces-first-8-core-macbook-pro-the-fastest-mac-notebook-ever/.

[159] *Help Me Choose:  Intel Processor*, Dell, https://www.dell.com/en-us/shop/help-me-choose/cp/hmc-intel-processor-consumer (last visited May 18, 2021).

PAGE 267 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

landscape, with a wide spread per category in terms of release date, raw performance, and price category.  The processors identified below are (roughly) arranged by release date and recommended price at introduction[160]:

|  | Processor | Release date | Hard drive | Price at introduction |
|---|---|---|---|---|
| **Desktop** | *Intel Core i9 7980XE Skylake* | 2017 | SSD | $1,980 |
|  | *Intel Core i9 7900X Skylake X* | 2017 | SSD | $989 |
|  | *Intel Core i7 8700K Coffee Lake* | 2017 | SSD | $360 |
|  | *Intel Core i5 8400 Coffee Lake* | 2017 | SSD | $180 |
|  | *Intel Core i3 8100 Coffee Lake* | 2017 | SSD | $117 |
|  | *Intel Core i7 7700K Kaby Lake* | 2017 | SSD | $340 |
|  | *Intel Core i5 7600K Kaby Lake* | 2017 | SSD | $242 |
|  | *Intel Core i5 6500 Skylake* | 2015 | SSD | $192 |
|  | *Intel Core i7 5775C Broadwell* | 2015 | SSD | $366 |
|  | *Intel Core i7 5960X Haswell E* | 2014 | SSD | $999 |
|  | *Intel Core i7 4960X Ivy Bridge E* | 2013 | SSD | $1,059 |
|  | *Intel Core i3 4130 Haswell* | 2013 | SSD | $117 |
|  | *Intel Core i7 4770K Haswell* | 2013 | SSD | $339 |
|  | *Intel Core i5 4670 Haswell* | 2013 | SSD | $224 |
|  | *Intel Core i7 3770K Ivy Bridge* | 2012 | SSD | $342 |
|  | *Intel Core i7 3960X Sandy Bridge E* | 2011 | SSD | $1,059 |
|  | *Intel Core i5 2700K Sandy Bridge* | 2011 | SSD | $332 |
|  | *Intel Core i7 990X Gulftown* | 2011 | SSD | $1,059 |
|  | *Intel Core i3 2120 Sandy Bridge* | 2011 | SSD | $120 |
|  | *Intel Core i3 530 Clarkdale* | 2010 | SSD | $117 |
|  |  |  |  |  |
| **Mobile** | *Intel Core i7 8550U Kaby Lake R* | 2017 | SSD | $409 |
|  | *Intel Core i5 8250U Kaby Lake R* | 2017 | SSD | $297 |
|  | *Intel Core i7 5600U Broadwell* | 2015 | SSD | $393 |
|  | *Intel Core i5 5300U Broadwell* | 2015 | SSD | $281 |
|  | *Intel Core i7 4558U Haswell* | 2013 | SSD | $454 |
|  | *Intel Core i5 2520M Sandy Bridge* | 2011 | SSD | $225 |

---

[160] The price at introduction for the Intel processors is obtained from ark.intel.com.  The release price for the AMD processors is obtained from wikichip.org.

PAGE 268 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

|  |  |  |  |  |
|---|---|---|---|---|
|  | *Intel Core i7 720QM Clarksfield* | 2009 | HDD | $364 |
|  |  |  |  |  |
| **Server** | *Intel Xeon Gold 6138 Skylake* | 2017 | SSD | $2,612 |
|  | *Intel Xeon E3-1275 v6 Kaby Lake* | 2017 | SSD | $339 |
|  | *Intel Xeon E3 1280 v5 Skylake* | 2015 | SSD | $612 |
|  | *Intel Xeon E5 2687W v3 Haswell* | 2014 | SSD | $2,141 |
|  | *Intel Xeon E5 1680 v3 Haswell* | 2014 | SSD | $1,723 |
|  |  |  |  |  |
| **AMD** | *AMD Ryzen Threadripper 2990WX* | 2018 | SSD | $1,799 |
|  | *AMD Ryzen 7 2700X Zen* | 2018 | SSD | $329 |
|  | *AMD Ryzen 5 2600 Zen* | 2018 | SSD | $199 |
|  |  |  |  |  |
| **MacOS** | *Apple 2011 MacBook Pro: Intel Core i7 @ 2.2 GHz* | ~2011 | SSD | N/A |
|  | *Apple 2013 MacBook Pro: Intel Core i5 @ 2.6 GHz* | ~2013 | SSD | N/A |
|  | *Apple 2014 Mac Mini: Intel Core i5 @ 2.6 GHz* | ~2014 | SSD | N/A |
|  | *Apple 2015 MacBook: Intel Core M @ 1.2 GHz* | ~2015 | SSD | N/A |
|  | *Apple 2016 MacBook Pro: Intel Core i7 @ 2.6 GHz* | ~2016 | SSD | N/A |

752.    Plaintiffs used a wide variety of benchmarks and made a distinction between benchmarks used on Linux, Windows, MacOS operating systems, and desktop/mobile processors versus server processors.

753.    Plaintiffs considered three operating systems, Linux, Windows, and MacOS. There are two key reasons for considering more than one operating system:

- Different users use different operating systems.

- Linux enables fine-grain performance analysis by allowing to enable and disable specific security mitigations. In addition, benchmarking on Linux is easier than on Windows or MacOS because there are more benchmarks and more tools available.

PAGE 269 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

754.   Plaintiffs considered the following security mitigations:

- No Mitigations:  Default operating system with mitigations disabled.

- Default Mitigations:  Default operating system with all standard Meltdown, L1TF, MDS, and Spectre mitigations enabled.  Default Mitigations equals Spectre Mitigations on AMD.

- Maximum Mitigations: Default operating system with all standard Meltdown, L1TF, MDS, and Spectre mitigations enabled, plus related options to further increase the security around the various vulnerabilities.  In particular, Maximum Mitigations disables Intel's Hyper-Threading (Simultaneous Multi-Threading).

755.   Because Linux is an opensource operating system that permits testing of the individual mitigations for each of the Meltdown, L1TF, MDS, and Spectre mitigations, Plaintiffs also considered the following on Linux systems:

- Meltdown Mitigations:  Default operating system with Meltdown mitigations enabled on Intel processors but Spectre, L1TF and MDS disabled.  AMD processors are not affected.

- L1TF (Foreshadow) Mitigations:  Default operating system with L1TF mitigations enabled on Intel processors but Meltdown, Spectre and MDS mitigations disabled. AMD processors are not affected.

- MDS Mitigations:  Default operating system with MDS mitigations enabled on Intel processors but Meltdown, Spectre and L1TF mitigations disabled.  AMD processors are not affected.

PAGE 270 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                     COMPLAINT

- Spectre Mitigations:  Default operating system with Spectre mitigations enabled but Meltdown, L1TF, and MDS mitigations disabled.  Both Intel and AMD processors are subject to Spectre.

756.    Plaintiffs' testing confirmed that every single Plaintiff and member of the Class was hurt by downloading the mitigations for the undisclosed Defects in Intel's CPUs.

757.    Significantly, Plaintiffs' testing does not reflect the additional performance impact attendant to the mitigations for the more recently disclosed Intel CPU Exploits, including SwapGS, Lazy FP, Vector Register Sampling, CacheOut, L1D Snoop Sampling (and of course the numerous yet-to-be-disclosed Intel CPU Exploits).  Each of these mitigations adds an additional layer of performance regression because the mitigations have a *compound* performance impact.  Indeed, until Intel fixes the underlying Defects in its processors, Plaintiffs and absent members of the Class will continue to incur additional performance degradation on top of the regressions already incurred to date by reason of applied mitigations.

## 1.    <u>Responsiveness on Windows</u>

758.    Customers expect high-performing and responsive systems.  This encompasses a broad scope of scenarios ranging from boot time to fluid user interactions with applications.

759.    When performing interactive tasks such as launching a program, saving a document, opening a photo, or searching handwritten text, it is critical for the user to receive timely responses such that the system does not appear to be "hung."

760.    Plaintiffs analyzed system responsiveness on Windows systems.  Plaintiffs considered a diverse set of workloads that measure system responsiveness in different ways:

PAGE 271 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

| Benchmark |
|-----------|
| *OSBench – launch programs* |
| *OSBench – create threads* |
| *OSBench – memory allocation* |
| *OSBench – create files* |
| *Tesseract OCR – optical character recognition* |
| *t-test – memory allocation* |

761.    The benchmarks provide a representative picture of a system's responsiveness with respect to launching computer programs, creating threads, allocating memory, accessing files, and response-time-sensitive application software.

762.    Plaintiffs observed significant and severe performance degradations across Intel platforms (desktop, mobile and server) for the benchmarks.  In other words, Intel processor responsiveness degrades significantly under the mitigations.  The average performance degradation across this set of benchmarks amounts to 16.6% under the Default Mitigations, and up to 51%.

763.    The performance degradations are significantly higher on the Intel processors compared to the AMD processors (average degradation of 0.6% under the Default Mitigations).

764.    ***OSBench – launch programs***:    OSBench is a collection of benchmarks for measuring operating system primitives, including the time to program launch, i.e., how long it takes to launch a new application.

765.    On average across the Intel platforms, the Intel CPUs' performance degrades by 13.0% on average under the Default Mitigations.  In contrast, for AMD processors, performance degrades by only 1.6% on average under the Default Mitigations (for Spectre[161]).  The Intel

---

[161] As noted above, this is the only exploit to which AMD's processors are susceptible.

PAGE 272 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                COMPLAINT

processors suffer significantly:  program launch is 13% slower on average and up to 37% under the Default Mitigations.

766.    ***OSBench – create threads***:  OSBench is a collection of benchmarks for measuring operating system primitives, including the time to create threads.

767.    On average across the Intel platforms, performance degrades by 30.8% on average under the Default Mitigations.  In contrast, for AMD platforms, performance degrades by 3.4% on average under the Default Mitigations (for Spectre).  The Intel processors suffer significantly: creating threads is 30% slower on average and up to 51% under the Default Mitigations.

768.    ***OSBench – memory allocation***:  OSBench is a collection of benchmarks for measuring operating system primitives, including the time to allocate memory.

769.    On average across the Intel platforms, performance degrades by 9.8% on average under the Default Mitigations.  For AMD platforms, by contrast, performance degrades by, at most, 1% under the Default Mitigations (for Spectre).  The Intel processors suffer significantly: allocating memory is almost 10% slower on average and up to 22% under the Default Mitigations.

770.    ***OSBench – create files***:  OSBench is a collection of benchmarks for measuring operating system primitives, including the time to create files.

771.    On average across the Intel platforms, performance degrades by 4.2% on average under the Default Mitigations.  For AMD platforms, by contrast, performance does not degrade at all under the Default Mitigations (for Spectre).  The Intel processors suffer significantly:  creating files is more than 4% slower on average and up to 29% under the Default Mitigations.

772.    ***Recognition***:  Tesseract OCR is included as an example application software that is sensitive to the response time.  This benchmark measures the time it takes to process 7 images.

PAGE 273 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                   COMPLAINT

773.    On average across the Intel platforms, performance degrades by 25.8% on average under the Default Mitigations.  For AMD platforms, by contrast, performance degrades by only 0.4% on average under the Default Mitigations (for Spectre).  This recognition application software significantly suffers under the Default Mitigations on Intel processors.

774.    ***Memory Allocation – t-test***:  t-test is a basic memory allocation benchmark.

775.    On average across the Intel platforms, performance degrades by 15.9% under the Default Mitigations.  For AMD platforms, by contrast, performance degrades by, at most, 3% under the Default Mitigations (for Spectre).  The Intel processors suffer significantly:  allocating memory is slowed down by 15.9% on average and up to 44% under the Default Mitigations.

## 2.    Linux:  Individual Workloads

776.    Plaintiffs also evaluated how the individual mitigations affect performance for a diverse set of individual workloads, which represent different user interactions with a computer system, i.e., every computer user has experienced some of the performance impacts because the workloads are prevalently used.

777.    More specifically, every computer user reads files from disk; every computer user sends and receives files over the network; every user has run a computer system that is overloaded; and every user is browsing the Web.

778.    The benchmarks were chosen such that different basic computer functionality is evaluated:

| Category | Benchmark |
|---|---|
| Disk performance | *CompileBench – read compiled tree* |
| Network throughput | *SockPerf – throughput* |
| Network latency | *Ethr – latency w/ 16 threads* |
| Operating system | *Hackbench w/ 16 threads* |

PAGE 274 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
           COMPLAINT

| Context switching | *Ctx* |
|---|---|
| Web browsing | *Google Chrome Selenium ARES-6* |

779.   ***Disk performance (CompileBench)***:  CompileBench benchmarks a filesystem and measures disk performance by creating, compiling, patching, stating, and reading kernel trees.

780.   Each of the individual security mitigations lead to significant performance degradations of the Intel CPUs:

- Spectre mitigation:  3.2% performance degradation on average, and up to 22.6%

- Meltdown mitigation:  7.2% performance degradation on average, and up to 23.3%

- L1TF mitigation:  performance degradation up to 14.0%

- MDS mitigation:  8.0% performance degradation on average, and up to 37.7%

781.   The compound effect of the individual security mitigations leads to even higher overall performance degradation.  On average across the Intel platforms, performance degrades by 14.2% under the Default Mitigations and by 15.9% under the Maximum Mitigations.  For AMD platforms by contrast, performance degrades by only 2.5% under the Default Mitigations (for Spectre).  Disk performance degrades significantly under the Default Mitigations on Intel processors, by 14.2% and up to 47.3%.

782.   ***Network throughput (SockPerf)***:  SockPerf measures network throughput in MB/s.

783.   Each of the individual security mitigations lead to non-negligible performance degradations on the Intel processors:

- Spectre mitigation:  12.5% performance degradation on average, and up to 19.4%

- Meltdown mitigation:  6.9% performance degradation on average, and up to 13.1%

- L1TF mitigation:  performance degradation up to 11.2%

PAGE 275 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

- MDS mitigation:  7.7% performance degradation on average, and up to 12.3%

784.    The compound effect of the individual security mitigations leads to even higher performance degradation.  On average across the Intel platforms, performance degrades by 22.1% under the Default Mitigations.  For AMD platforms by contrast, performance degrades by 8.7% on average under the Default Mitigations (for Spectre).  Network throughput decreases by 22.1% on average under the Default Mitigations on Intel processors, and up to 34.6%.

785.    ***Network latency (Ethr)*:**  Ethr is a network benchmark developed by Microsoft and measures network latency with parallel connections.

786.    Each of the individual security mitigations lead to non-negligible performance degradations on the Intel processors:

- Spectre mitigation:  9.9% performance degradation on average, and up to 19.0%

- Meltdown mitigation:  5.1% performance degradation on average, and up to 12.7%

- L1TF mitigation:  performance degradation up to 9.5%

- MDS mitigation:  7.9% performance degradation on average, and up to 18.4%

787.    The compound effect of the individual security mitigations leads to even higher performance degradation.  On average across the Intel platforms, performance degrades by 17.4% under the Default Mitigations.  For AMD platforms by contrast, performance degrades by 6.2% under the Default Mitigations (for Spectre).  Network latency increases under the Default Mitigations by 17.4% on average, and up to 26.9%.

788.    ***Operating system (HackBench)*:**  HackBench is benchmark and stress test for the Linux kernel scheduler.  The scheduler gets involved when multiple concurrent applications need to execute and get access to the processor in the computer system.

PAGE 276 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

789.    Each of the individual security mitigations lead to material performance degradations od the Intel processors:

- Spectre mitigation:  8.5% performance degradation on average, and up to 12.8%

- Meltdown mitigation:  16.0% performance degradation on average, and up to 24.4%

- L1TF mitigation:  20.9% performance degradation on average, and up to 53.0%

- MDS mitigation: 25.3% performance degradation on average, and up to 33.7%

790.    The compound effect of the individual security mitigations leads to even higher performance degradation.  On average across the Intel platforms, performance degrades by 35.0% under the Default Mitigations and by 52.5% under Maximum Mitigations.  For AMD platforms, by contrast, performance degrades by only 3.3% on average under the Default Mitigations (for Spectre).  Operating system kernel scheduler performance degrades severely under the Default Mitigations (35.0% average performance degradation, and up to 47.6%) and the Maximum Mitigations (52.5% average performance degradation, and up to 69.2%), in contrast to AMD processors (3.3% average performance degradation).

791.    ***Context switching (ctx)***:  ctx measures the context switch time in clock cycles. Context switching happens under multi-tasking – i.e., when co-executing different applications at the same time, e.g., Web browsing, email client, text editing, etc.  The heavier the load on the system, the more context switches happen.

792.    Each of the individual security mitigations lead to non-negligible performance degradations on the Intel processors:

- Spectre mitigation:  1.1% performance degradation on average, and up to 10.1%;

PAGE 277 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

- Meltdown mitigation:  69.0% performance degradation on average, and up to 74.3%;

- L1TF mitigation:  9.7% performance degradation on average, and up to 85.7%; and

- MDS mitigation:  73.0% performance degradation on average, and up to 77.2%.

793.   The compound effect of the individual security mitigations leads to even higher performance degradation.  On average across the Intel platforms, performance degrades by 80.6% under the Default Mitigations and by 80.8% under Maximum Mitigations.  For AMD platforms, by contrast, performance is unaffected under the Default Mitigations (for Spectre).  Context switching suffers severely under the Default Mitigations (80.6% performance degradation on average, and up to 86.7%) and the Maximum Mitigations (80.8% on average, and up to 90.5%) on the Intel processors, in contrast to AMD processors (0.0% performance degradation).

794.   **Web browsing:**  Selenium's ARES-6 benchmark on Google Chrome measures the execution time of JavaScript's features, and rewards CPUs that start up quickly and run smoothly.[162]

795.   Each of the individual security mitigations lead to non-negligible performance degradations on the Intel processors.  In particular, the performance degradation is as follows:

- Spectre: 17.6% performance degradation on average, and up to 31.7%

- Meltdown: performance degradation up to 3.2%

- L1TF: 2.1% performance degradation on average, and up to 7.2%

- MDS: 1.7% performance degradation on average, and up to 6.5%

796.   The compound effect of the individual security mitigations leads to even higher performance degradation.  On average across the Intel platforms, performance degrades by 19.4%

---

[162] This web browsing benchmark was not executed on the Intel server processors.

PAGE 278 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

under the Default Mitigations and up to 35.3%.  For AMD, performance degrades by 6.3% on average under the Default Mitigations (Spectre).  Web browsing on Intel processors suffer significantly more compared to the AMD processors (6.3% performance degradation).

**3.    Intel Server Processors:  Typical Server Workloads**

797.    Plaintiffs' examination of Intel server CPUs focused on a set of typical server workloads:

| Category | Benchmark |
|---|---|
| Key-value store | *Memcached – get* |
| PHP | *PHPBench* |
| Database | *PostgreSQL* |
| Java | *SPECjbb2015* |
| Web server | *NGINX* |
| Web server | *Apache* |
| Mail server | *PostMark* |

798.    This set of benchmarks complements those considered above.  These further analyses for server processors examine a broader set of performance-critical applications common to server use.

- ***Key-value store***:  Memcached is a widely used distributed in-memory key-value store.  It is a central piece of software infrastructure to allow online services to scale to a large number of servers.

- ***PHP***:  PHP is a popular general-purpose scripting language that is widely suited to web development.  PHPBench performs a large number of tests against the PHP interpreter.

- ***Database***:  PostgreSQL is a widely used open-source relational database.

- ***Java***:  SPECjbb2015 is SPEC's Java server benchmark.

PAGE 279 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                   COMPLAINT

- **Web serving:** Two benchmarks are included for static Web serving: one is run against the NGINX Web server, the other one is run against Apache. NGINX carries out 2,000,000 requests with 500 concurrent requests. Apache carries out 1,000,000 requests with 100 concurrent requests.

- **Mail server:** PostMark evaluates small-file accesses similar to the tasks endured by web and mail servers. The benchmark performs 25,000 transactions, with 500 simultaneous files having sizes ranging between 5KB and 512KB.

799.   Plaintiffs observed significant and severe performance degradations on all Intel server processors for the benchmarks and mitigation levels.

- Memcached:  26.2% average degradation (up to 36.4%) under the Default Mitigations, and 30.6% average degradation (up to 50.2%) under the Maximum Mitigations.

- PHPBench: no degradation under the Default Mitigations, and 14.6% average degradation (up to 18.5%) under the Maximum Mitigations.

- PostgreSQL: 8.7% average degradation (up to 11.7%) under the Default Mitigations, and 46.8% (up to 54.5%) average degradation under the Maximum Mitigations.

- SPECjbb: 2.3% average degradation (up to 3.8%) under the Default Mitigations, and 27.7% average degradation (up to 31.9%) under the Maximum Mitigations.

- NGINX:  23.7% average degradation (up to 27.1%) under the Default Mitigations, and 25.2% average degradation (up to 28.2%) under the Maximum Mitigations.

- Apache:  22.7% average degradation (up to 29.4%) under the Default Mitigations, and 6.1% average degradation (up to 20.6%) under the Maximum Mitigations.

PAGE 280 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

- PostMark:  19.7% average degradation (up to 22.2%) under the Default Mitigations and 21.6% average degradation (up to 24.7%) under the Maximum Mitigations.

800.    ***Database performance***:   Server processors are widely used to run database workloads and to serve as web servers in enterprises.   Popular open-source databases include Apache Cassandra (NoSQL database), Facebook RocksDB (key-value database), and PostgreSQL (relational database); Apache Siege is a popular http web server load tester.

801.    The performance degradations of the individual mitigations are as follows: for Spectre (2.5% on average, up to 4.7%), for Meltdown (3.3% on average, up to 5.9%), and for MDS (7.3% on average, up to 11.9%).   The Default Mitigations lead to an average performance degradation of 9.5% and up to 13.4%.   The biggest performance impact is observed when disabling Hyper-Threading.   The MDS mitigation plus disabling Hyper-Threading degrades performance by 38.3% on average and up to 43.9%.   The Maximum Mitigations degrade performance by 46.6% on average and up to 54.5%.

802.    ***Virtualization***:   Virtualization is frequently used in server machines to isolate processes and applications from different users sharing the same physical machine.   Plaintiffs evaluated the performance impact of the security mitigations under virtualization on two server processors, namely Intel Xeon Gold 6138 Skylake and Intel Xeon E3 1280 v5 Skylake; and ran the set of benchmarks under KVM (Kernel-based Virtual Machine), which is a full virtualization solution for Linux on x86 hardware.

803.    The security mitigations cause a significant performance impact under virtualization. For these two server processors, a performance degradation of 8.9% and 10.1% was observed under

PAGE 281 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
        COMPLAINT

the Default Mitigations, and a performance degradation of 14.1% to 19.0% under the Maximum Mitigations.

806.    The performance impact is more severe for bare-metal execution.  A performance degradation of 10.2% and 11.1% was reported for the Default Mitigations, and 20.5% and 24.2% for the Maximum Mitigations, respectively, for bare-metal execution.

805.    Users who run virtual machines on their own machine, as well as users who run software in the cloud, suffer from significant performance degradation due to the security mitigations to address the Defects in Intel's CPUs.

### 4.    Analysis on MacOS

806.    Although MacOS and Linux are built on similar foundation, unlike Linux, MacOS (like Windows) is closed source and does not provide transparency and controls in connection with performance testing.  Apple's Mac devices also run Windows and Linux operating systems (sometimes referred to as "triple boot" machines), in addition to MacOS.  Thus, in addition to the Linux and Windows testing described above, a set of MacOS-focused benchmarks were also examined, as follows:

| Benchmark |
| --- |
| *SQLite* |
| *DaCapo jython* |
| *Stress-NG* |

807.    The benchmarks are selected to provide a representative picture of a system's responsiveness with respect to launching computer programs, creating threads, allocating memory, accessing files, and response-time-sensitive application software.

PAGE 282 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

808.    Plaintiffs observed significant and severe performance degradations across MacOS systems for the benchmarks.  In other words, Intel processor responsiveness materially degrades under the mitigations.  The average performance degradation across this set of benchmarks amounts to 7.5% under the Default Mitigations, and up to 21.7%.

809.    *SQLite:* This benchmark measures the time it takes to perform a pre-defined number of insertions in an indexed database.

810.    On average across the Intel platforms, performance degrades by 13.8% on average (up to 21.7%) under the Default Mitigations, and by 31.8% under the Maximum Mitigations. The Intel processors suffer significantly: inserting data elements in an indexed database is substantially slower.

811.    *DaCapo jython:* This benchmark is a Python interpreter written in Java.  Python is a widely used general-purpose scripting language.

812.    On average across the Intel platforms, performance degrades by 4.1% on average (up to 14.6%) under the Default Mitigations, and by 2.2% under the Maximum Mitigations.  The Intel processors suffer significantly: interpreting Python scripts is substantially slower.

813.    *Stress-NG:* This benchmark stress-tests a computer system in various ways including memory mapping, memory allocation, forking processes, context switching, data sorting, matrix multiplication, socket activity, etc.

814.    On average across the Intel platforms, performance degrades by 4.8% on average (up to 9.1%) under the Default Mitigations, and by 34.9% under the Maximum Mitigations.  The Intel processors suffer significantly: basic computer functionality including memory mapping, memory allocation, forking processes, context switching, data sorting, etc. is substantially slower.

PAGE 283 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

5. **Mitigations Transform Higher-End CPUs Into Lower-End CPUs**

815.    Because of the Defects, and the material performance impact associated with the mitigations required to address the Defects, Plaintiffs and absent members of the Class now have Intel processors that perform comparable to significantly cheaper pre-mitigated Intel processors (making the purchased devices not worth the price paid).  Plaintiffs and absent members of the Class did not get the performance they bargained for in obtaining computers with Intel CPUs installed and have thus suffered a financial loss.

816.    Performance testing reflects that the mitigations effectively reduced the performance of a higher end processor model (e.g., Core i7) to that of a lower-end processor (e.g., Core i5) without the mitigations.    Consider, for example, two 7th generation, Intel Kaby Lake microprocessors:  the Intel Core i7 7700K and the Intel Core i5 7600K.  Both processors were introduced in 2017; at introduction, the i7 7700K had a price tag of $340 whereas the cheaper i5 7600K sold for $242.  This price difference was justified by the superior performance of the i7, which outperformed the i5 by 5.0% on the responsiveness benchmarks before the mitigations.  Once the Default Mitigations were installed on the i7, all of this performance that the consumers paid for disappeared, wherein the post-mitigation performance of the i7 became 12.6% *lower* than that of the pre-mitigation i5.

817.    Also, compare two 8th generation, Intel Coffee Lake microprocessors:  the Intel Core i5 8400 and the Intel Core i3 8100.  Both processors were introduced in 2017; at introduction, the i5 8400 had a price tag of $180 whereas the cheaper i3 8100 sold for $117.  This price difference was justified by the superior performance of the i5, which outperformed the i3 by 19.0% on the responsiveness benchmarks before the mitigations.  Once the Default Mitigations were installed on

PAGE 284 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

the i5, all of this performance that the consumers paid for disappeared, wherein the post-mitigation performance of the i5 became 1.3% *lower* than that of the pre-mitigation i3.

818.    Simply put, consumers lost an amount of performance that they had valued at the extra $98 and $63, respectively, at the time they made their purchasing decisions.

### 6.    Intel CPUs Are Slower Than Cheaper AMD CPUs After Mitigation

819.    Following the application of the various Intel CPU Exploit mitigations, AMD's cheaper processors outperform Intel's processors.  Plaintiffs and absent members of the Class did not get the performance they bargained for in obtaining computers with Intel CPUs installed and have thus suffered a financial loss.

820.    For example, compare the performance of two systems based on high-end Intel and AMD processors:  the Intel Core i9 7900x and the AMD Ryzen 7 2700x Zen.  The Intel Core i9 was released in 2017, at an initial price of $989, whereas the AMD Ryzen was introduced in 2018 with a $329 price tag.  Prior to the mitigations, the more expensive Intel Core i9 outperformed the AMD Ryzen on the responsiveness benchmarks, at an average of 4.4% (up to 39.4%).  After the mitigations, however, the AMD Ryzen outperforms the Intel Core i9 by 21.6% on average, erasing the performance advantages of the far more expensive Intel Core i9.

821.    These results illustrate that a consumer who had paid the extra $660 to buy the Intel Core i9 instead of the AMD Ryzen would have lost all of the performance differential that justified that price difference.

PAGE 285 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

K.    **Intel's Performance Degradation in Context**

822.    Every 12 to 18 months, Intel releases a new processor generation, and within each generation Intel's core processors are divided into tiers (e.g., Core i3 [entry-level], Core i5 [mainstream], Core i7 [high-end], and Core i9 [highest-end]), with several models in each tier.

823.    Intel has touted and relied upon single-digit performance gains to market, advertise, and sell its new generation of processors as well as differentiate its processors within tiers. Thus, these performance advancements are material to Intel and consumers because Intel has used them to justify its premium price for newly released CPUs and between processors within the same generation tiers, as well as the millions of dollars invested in their research, development, manufacturing, and marketing.

824.    Each new CPU generation is generally more expensive than the CPUs it has replaced. For example, Intel sold its 6th generation Core processors, christened Skylake, at a higher price than it sold the previous generation Core processors, which it had christened Broadwell.

825.    In general, the higher the tier within each generation the more expensive the CPU. For example, Intel Core i7 processors are sold at a higher price than its Core i5 processors, which, in turn, are sold at a higher price than Intel Core i3 processors.

826.    For example, Intel promised that Haswell processors, its 4th generation Core processors, would achieve 5% to 15% performance gains over Ivy Bridge, which was its 3rd generation Core processors. Performance testing comparing Haswell processors to Ivy Bridge processors revealed performance gains of 1% to 19%, with an average improvement of 8.3%.

PAGE 286 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

Compared to Sandy Bridge, Intel's 2nd generation Core processors, Haswell processor yielded a performance improvement of 7% to 26%, with an average performance advantage of 17%.[163]

827.    Performance testing comparing Intel's 5th generation Core processors, Broadwell processors, to its prior 4th generation Core processors, Haswell processors, shows the two generations' performance to be "very close."  Broadwell processors performed better than Haswell processors by approximately 5% to 10% on a given task when the CPU models were exactly the same.[164]

828.    Indeed, Intel's own marketing material touted performance benefits of 5% to 11% when upgrading from one generation of CPU to the next – considerably less than the performance decline resulting from the Defects' mitigations.  In the below figure, adjacent bars represent the relative performance of successive generations of Intel processors:

---

[163]Anand Lal Shimpi, *The Haswell Review: Intel Core i7-4770K & i5-4670K Tested*, AnandTech (June  1,  2013),  https://www.anandtech.com/show/7003/the-haswell-review-intel-core-i74770k-i54560k-tested/6.

[164] Gordon Mah Ung, *The truth about Intel's Broadwell vs. Haswell CPU*, PCWorld (July 6, 2015), https://www.pcworld.com/article/2940489/the-truth-about-intels-broadwell-vs-haswell-cpu.html.

PAGE 287 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                       COMPLAINT



829.    In view of the foregoing – by standards that Intel itself has acknowledged are material to purchasers and that it uses to price its CPUs – the performance impacts caused by installation of its mitigations to address the Defects in its CPUs are material to users.

## L.    The Only True "Fix" for the Security Vulnerabilities Inherent in Intel's Defective CPUs Is a New CPU

830.    Researchers have confirmed that the Intel CPU Exploits (but for Spectre) are unique to Intel CPUs, and that a proper implementation of speculative execution would have prevented these exploits.

831.    Intel's mitigations to date attempt to address only the specifics of each exploit (as opposed to correcting the underlying CPU Defects) so its CPUs remain vulnerable to new exploit variations.  Moreover, although Intel has deployed patches to mitigate the Defects, the mitigations

are only band-aids.  In fact, the real fix, according to researchers and even Intel, is remedying its defective CPU design.[165]

832.    Thus, Intel's only *true* fix is a CPU microarchitecture that safeguards processor-caching and memory usage from side-channel exploit.

833.    Intel's former CEO Brian Krzanich announced that Intel expected to ship a CPU with hardware fixes to protect against Meltdown, Foreshadow, and Spectre by the end of 2018.[166]

834.    Intel released Cascade Lake in 2018.  Intel's Cascade Lake purported to fix for Meltdown, Foreshadow, and Spectre, as follows:

## Cascade Lake Mitigations for Side-Channel Methods

Cascade Lake implements hardware mitigations against targeted side-channel methods

| Variant | Side-Channel Method | Mitigation on Cascade Lake |
|---------|--------------------|-----------------------------|
| Variant 1 | Bounds Check Bypass | OS/VMM |
| Variant 2 | Branch Target Injection | Hardware + OS/VMM |
| Variant 3 | Rogue Data Cache Load | Hardware |
| Variant 3a | Rogue System Register Read | Firmware |
| Variant 4 | Speculative Store Bypass | Firmware + OS/VMM or runtime |
| Variant 5 | L1 Terminal Fault | Hardware |

Cascade Lake SP expected to provide higher performance over software mitigations available for existing products

For additional information related to security updates and side channel methods on Intel® products, please visit
https://www.intel.com/content/www/us/en/architecture-and-technology/facts-about-side-channel-analysis-and-intel-products.html

Future Intel® Xeon® Scalable Processor – Hot Chips 2018      

---

[165] *VMware Performance Impact Statement for 'L1 Terminal Fault-VNM' (L1tf-VMM) mitigations: CVE-2018-3646 (55767)*, VMWare Knowledge Base (last updated April 18, 2020), https://kb.vmware.com/s/article/55767#q=performance.

[166] Ian Cutress, *Intel at Hot Chips 2018: Showing the Ankle of Cascade Lake*, AnandTech (August 19, 2018), https://www.anandtech.com/show/13239/intel-at-hot-chips-2018-showing-the-ankle-of-cascade-lake.

835.    As originally planned, the Cooper Lake line was going to be dropped near the end of 2019 before being replaced by a 2020 Ice Lake line.  As alleged herein, it has been reported that Intel's Ice Lake processors are vulnerable to Intel CPU Exploits, including MDS. So long as Intel refuses to fix its defective design, Intel's CPU will continue to be uniquely plagued by newly disclosed Intel CPU Exploits.

**M.    Intel's CPU Defects Have Imposed Enormous Costs on Enterprise Plaintiffs, Which Have Legal Duties to Protect Third-party Data on Their Networks**

836.    The information technology ("IT") industry generally recognizes two distinct categories of users: (1) Enterprises and (2) end-user consumers. Enterprises, as that term is commonly used, covers small, medium and large organizations and includes businesses, governments and educational institutions. This important segment of the market historically has represented roughly 60% of the sales of computer systems, including PCs and servers. Several of the governmental and private entity plaintiffs that have brought claims against Intel, including for instance Alliance, AGH, City of New Castle, Hibbits, and Kottemann, are Enterprise users (collectively, the "Enterprise Plaintiffs").

837.    Enterprises acquire and operate complex IT *systems* (directly or through outsourcing firms) to support their operations. Those systems include, but by no means are limited to, PCs and servers with Intel CPUs. Enterprise customers, including companies that provide cloud and web services, account for the vast majority of servers purchased, and their IT environments will have more PCs, applications, networking devices and connections than a consumer user.

838.    In today's world, Enterprise users in the public and private sectors store their own data, as well as third-party data – including financial and health records, among other sensitive information – on their IT systems. As described below, these entities are subject to federal, state, or

PAGE 290 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

territorial laws or regulations that impose standards of care or duties with respect to the protection of third-party information and data in their custody.

839.    Thus, being able to maintain the security of that data is a paramount consideration for Enterprises in purchasing the computing equipment they will deploy on their networks. This includes PCs and servers, for which maintaining the security of the data stored on their IT systems is an essential quality and characteristic of the Intel CPUs used. Intel understood and appreciated that for its Enterprise customers protecting the confidentiality of secret or sensitive information was a major concern.

840.    Since the first public disclosures in January 2018 and thereafter that these Intel CPUs contained the Defects and were vulnerable to the Intel CPU Exploits, these entities have incurred and will continue to incur enormous costs in mitigating and responding to the Defects and Exploits described herein and any that may be discovered in the future. This includes devoting increased manpower to the heightened monitoring of their Intel-based PCs and servers *and the IT systems on which they are deployed* for security breaches; procuring and installing software "patches" designed to mitigate Intel's CPU Defects; and purchasing additional devices or upgrading their hardware to compensate for the reduced performance of mitigated but still insecure Intel CPUs.

### 1.    Enterprises are Required by Law to Protect Third-party Data on Their IT Systems

841.    Each of the Enterprise Plaintiffs – like Enterprise users generally – maintain sensitive third-party data on their IT systems as part of their organizational operations.   In the case of governmental entities like the City of New Castle, third-party information processed and stored on their IT systems include, *inter alia*, (1) financial records; (2) tax records, information and databases: (3) criminal records, information, and databases; (4) Personal Identifiable Information ("PPI") such

PAGE 291 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

as SSNs, taxpayer ID numbers, and credit card information; (5) police and fire department records, files, and data; (6) and confidential or sensitive files, records, and data of employees and other agencies. Health care providers like Alliance, AGH and Kottemann maintain PHI, including ePHI, on their systems. This sensitive data includes individually identifiable information regarding subjects like diagnoses, treatment information, medical test results, and prescription information. It also includes information regarding payment for health care services.

842.    Federal, state, and territorial laws and regulations impose standards of care or duties on Enterprises concerning the treatment and protection of sensitive third-party data on their IT systems.

843.    In addition to any duties arising under the common law, many states have imposed statutory obligations on businesses that maintain PII. Examples include:

- California: Cal.Civ.Code § 1798.81.5 ("A business that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure.").

- Colorado: C.R.S.A. § 6-1-713.5 ("To protect personal identifying information, as defined in section 6-1-713(2), from unauthorized access, use, modification, disclosure, or destruction, a covered entity that maintains, owns, or licenses personal identifying information of an individual residing in the state shall implement and maintain reasonable security procedures and practices that are

PAGE 292 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

appropriate to the nature of the personal identifying information and the nature and size of the business and its operations.").

- Florida: F.S.A.  § 501.171(2) ("Each covered entity, governmental entity, or third-party agent shall take reasonable measures to protect and secure data in electronic form containing personal information.").

- New Mexico: N. M. S. A. 1978, § 57-12C-4 ("A person that owns or licenses personal identifying information of a New Mexico resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal identifying information from unauthorized access, destruction, use, modification or disclosure.").

- New York: Gen. Bus. Law § 899-bb ("Any person or business that owns or licenses computerized data which includes private information of a resident of New York shall develop, implement and maintain reasonable safeguards to protect the security, confidentiality and integrity of the private information including, but not limited to, disposal of data.").

- Texas: Tex. Bus. & Com. Code § 521.052 ("A business shall implement and maintain reasonable procedures, including taking any appropriate corrective action, to protect from unlawful use or disclosure any sensitive personal information collected or maintained by the business in the regular course of business.").

844.    Enterprises are also subject to sector-specific rules regarding the protection of third-part data on their IT systems.  Health care providers like Alliance, AGH and Kottemann, for

PAGE 293 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

instance, are subject to obligations under HIPAA, the ARRA, and attendant regulations and other bodies of law.  HIPAA establishes a national standard that requires health care providers and their business associates to develop and follow procedures ensuring the confidentiality and security of PHI, including ePHI, when it is stored, transferred, received, handled, or shared.  Health care providers are subject to substantial fines by the Office of Civil Rights of the United States Department of Health and Human Services for violations of HIPAA.  OCR may impose annual fines up to $1.5 million on a health care provider for violations of HIPAA.

845.    The GLB Act requires financial institutions, including companies that offer consumers financial products or services like loans, financial or investment advice, or insurance, to protect a consumer's NPI.  Among other things, the GLB Act requires that financial institutions like Plaintiff Hibbits Insurance, Inc. ensure the security and confidentiality of customer's NPI, protect against any anticipated threats or hazards to the security or integrity of customer's NPI, and protect against unauthorized access to or use of customer NPI that could result in substantial harm or inconvenience to any customer.

846.    Governmental Enterprises like the City of New Castle are required by various statues, laws, regulations to maintain and safeguard a significant amount of private, sensitive, and confidential information on behalf of their employees, citizens, and business from unauthorized access or disclosure.

## 2.    Enterprises Place Critical Emphasis on the Security of their IT Infrastructure

847.    The "IT infrastructure" of an Enterprise consists of all the various components that are required to run an IT system.  These include software such as operating systems, applications, and middleware, etc.; composite hardware such as servers, desktop and laptop PCs, smartphones,

PAGE 294 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

tablets, etc.; network services such as local area networks, Wi-Fi networks, routers bridges, switches, firewalls, Virtual Private Networks, etc. Servers, typically using Intel XEON processors, generally have been at the core of an Enterprise's IT infrastructure during the Class Period.

848.    Given the sensitive nature of information, including third-party information, stored on a typical Enterprise IT system, Enterprises consider the security of the entire infrastructure – including the secure nature of any servers, PCs and other devices deployed on that network – to be of paramount importance. *The presence on a network of a device with a vulnerability, such as a PC or server, can compromise the security of the entire network and put at risk sensitive data stored anywhere on that network, not just on the device itself.*

849.    That is a concept Intel understands well. In writing about data security, Intel has noted that it "is not just about protecting company and customer data from threats. Your network is made up of multiple layers that have unique attack surfaces. Compromise at one layer can propagate through the operating system and applications." Data Security: What It Is, Why It's Important, and How to Get Started (https://www.intel.com/content/www/us/en/analytics/data-security.html).

850.    Enterprises must undertake intense risk management efforts to prevent unauthorized access of data stored on their IT systems. Those efforts begin with the selection of platforms (e.g., Intel x86, Microsoft Windows, Google Docs, Chrome web browser, etc.) and the specific products within those platforms that can be acquired and deployed as part of their IT system. Any products must fit and work within the Enterprise's IT infrastructure, meaning they must be compatible and interoperable with the existing equipment. Furthermore, those products must not compromise the security and integrity of the IT system.

PAGE 295 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

851.    The IT industry has spent considerable energy, starting in the mid-1980s, on "computer system lifecycle management," sometimes referred to under the rubric of "asset management."  As the number of computers in Enterprises increased, so too did the need to manage them collectively, effectively, efficiently and securely.  With the rise of viruses and malware, the need arose to implement security policies across the entire Enterprise, which often include policies regarding limitations as to the devices that can be deployed on the system.  As a result, today, virtually every Enterprise has a policy that covers how it purchases, deploys, and operates IT equipment.

852.    Security specialists use the term "attack surface" to describe the collection of different points a bad actor can *try* to use to gain unauthorized control of, copy data from or enter data into an IT infrastructure.

853.    Previously, Enterprise users could rely on the security afforded their physical possessions to safeguard the data on their PCs. A bad actor had to gain access to the site and steal the disk(s) containing the data, the computer(s) including the disks or, time permitting, make copies of the contents of these disks.

854.    Once a PC or server is connected to a network, especially to a wide-area network ("WAN") or the Internet, the notion of premises security, while still essential, no longer covers the likely means by which bad actors can attempt to gain unauthorized access.  Of course, users can password protect access to their computer.  They can encrypt the contents of their disk(s).  These steps, when adopted, make it more difficult for bad actors to gain access to data and to seize control of the system.

PAGE 296 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

855.    In Enterprise computing environments, in addition to their end users' PCs, a large amount of confidential and sensitive data is located on the central, divisional, geographic, line-of-business, web, email, departmental and other *server* computers.

856.    These server computers are the most important part of the Enterprise's attack surface. As the notorious but quotable bank robber, Willie Sutton (responsible for the eponymously named "Sutton's Law") observed when asked why he robbed banks: "Because that's where the money is …".  The same is true in Enterprise IT, where the servers are the targets for hackers because that is where the data is.

857.    Accordingly, Enterprises focus security efforts on *protecting their entire IT systems from the edge to the core* (the edge being the point at which users and equipment contact, authenticate and connect to the Enterprise network and obtain their credentials which will govern their access and usage privileges while connected to the network).

858.    Enterprises and the IT industry itself expend a large amount of time, money and energy trying to ensure that bad actors cannot disguise themselves and access the network.  In modern Enterprise systems, however, many users access the network from locations that are not "secure" and with equipment that is not "secure".  These systems are also built to allow non-employee access to portions of the Enterprise system including using some applications and viewing some data.  These users, who may include customers, partners, interested parties, may be placing orders, reading publications, updating shipment data.

859.    Once a PC or server in an Enterprise IT system has been compromised, *the entire network in the IT infrastructure is vulnerable*.  In today's threat environment, with a falsely obtained

PAGE 297 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

credential giving a bad actor access to some parts of the IT infrastructure, that person can use other exploits to obtain additional privileges and access to critical, sensitive information.

860.    The danger to an Enterprise's IT system is particularly insidious in the case of the Defects here.  As described above, the injection or insertion of malware that can exploit the Defects can operate without detection, meaning that searches for malware may not be able to detect altered software because the Enterprise software was not modified.  Indeed, the severity of these types of exploits is discernible in the reactions of vendors such as Intel, Google and Microsoft.  As noted elsewhere, these companies determined that to mitigate the exposure from these exploits they had to distribute temporary mitigations (no permanent fix is possible) that materially impacted the performance and functionality of users' computer systems.  And they urged their users to adopt these "fixes" quickly in order to protect not simply the vulnerable PCs or servers, but the data on the Enterprises' systems.

861.    Thus, given the need to secure sensitive information on their IT systems, and the implications to the security of the entire IT system from introducing a vulnerable device, Enterprises require (and have required) PCs and servers with CPUs that can perform not just basic computing tasks, but that can do so securely. Secure computing, in other words, is necessarily a basic function of any CPU being marketed and sold to Enterprise users.

**3.    Intel Marketed Security as a Central Feature of its Processors for Enterprise Users**

862.    Because of the enormous size of the Enterprise market and the needs of Enterprise customers, the IT industry tailors products, product complements, support offerings, promotional materials, product cycles (including announcement dates) to that group of users. Computer manufacturers, for instance, make different products for Enterprise customers that often have

PAGE 298 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                       COMPLAINT

different feature sets, prices points and qualities than PCs marketed to consumers. They sell these products to Enterprises through different sales channels – distributors or OEMS – and provide support through different mechanisms.

863.    As alleged herein, Intel is not simply a passive supplier of PC or server components; instead, it designed, developed, and actively engaged in aggressive marketing of its CPUs and devices that included those processors. Well before Intel initiated its "Intel Inside" program, Intel marketed directly to customers the alleged benefits of purchasing systems that used Intel CPUs. With barrages of TV advertisements that made the Intel chime instantly recognizable, in-store display marketing material branding Intel CPUs in computer systems sold at that retail outlet, and "Intel Inside" labels prominently displayed on the outside of the computer system's packaging material and on the front of the computer itself, Intel has been making the importance of its product's security of paramount importance in the minds of computer users. The "Intel Inside" campaign was also important as a means by which Intel sought to reinforce the virtues and benefits of its products – its CPUs and their chipsets (sometimes referred to as glue chips) and later, their networking chips.

864.    Among these features and benefits were security and upward compatibility. Upward compatibility was basically an undertaking from Intel wherein Intel would ensure that future products would work seamlessly with a customer's existing products that included these Intel CPUs and other parts. This "future-proofing" was an important element in Intel's efforts to persuade CIOs and other decision-makers that choosing Intel CPUs was a "safe" choice or in the coinage of business: "no one ever got fired for buying Intel".

865.    Intel segmented the market for its products along several different axes. It recognized separate market segments for consumers versus Enterprises. Another line of

PAGE 299 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                   COMPLAINT

segmentation has been by industry, for example, healthcare, local government, military, financial services, manufacturing, etc.

866.    Using these segments Intel focused its marketing efforts into identifying key concerns in that division and demonstrating the ways in which the Intel products were responsive to these needs.  Of paramount concern to many of these "industry segments" was security.  Intel worked to demonstrate how Intel CPUs addressed these concerns and, accordingly, why it was a good and a "safe" decision to specify Intel CPUs when buying computer systems.

867.    Consistent with this, Intel has actively marketed security as a foundational feature (right alongside performance) of its processors and platform for those users over the years.  Intel's web site currently states, for instance: "A high-performance business demands business-class PCs. When you have performance, security features, manageability, and stability, you can turn your PC fleet into a competitive advantage."

## What Does Performance Look Like for Your Business PCs?

PC performance has a major impact on employee productivity. In fact, employees can lose up to one full workday each year waiting for their three-plus-year-old computer to boot up.[2]

Choosing a PC with a business CPU means getting fast, responsive performance for multitasking and data analysis, the latest connectivity standards, and a long battery life. All this keeps employees in the flow so they can be more productive.

Read about performance for business PCs →

## Why Your Business PCs Need Hardware-Based Security?

While software-based security plays a key role in protecting your devices, it's not enough to keep up with modern threats. Hackers are coming up with new ways to inject malware into the code beneath your operating system.

Security technologies built into your PC hardware provide an important layer of protection for your devices, applications, and data. Hardware-based security features can help minimize the risk of firmware attacks and support mobile security and identity management.

Learn about hardware-based security →

(https://www.intel.com/content/www/us/en/business/enterprise-computers/overview.html)

868.    Even before the Intel CPU Exploits were made public, Intel understood that CPU and hardware-level security was central to the needs of Enterprise users and marketed its processors accordingly. For example, Intel's marketing included "ENHANCED SECURITY" headline and

PAGE 300 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

specifically referenced "security" and "user productivity" for its 6th Generation Intel Core vPro processors as reasons to upgrade workforce devices:



(May 25, 2016) (available at https://web.archive.org/web/20160525020431/http://www.intel.com/content/www/us/en/enterprise-security/pcs-for-business.html).

869.    Intel also described its products as "HARDWARE ENHANCED SECURITY" in marketing materials:



(May 31, 2016) (available at https://web.archive.org/web/20160531054024/http:/www.intel.com/content/www/us/en/processors/vpro/core-processors-with-vpro-technology.html).

     870.    Intel also asserted that the average cost of a security breach $5.9 Million as support for purchasing Intel products:

(June 7, 2016) (https://web.archive.org/web/20160607042629/http:/www.intel.com/content/www/us/en/enterprise-security/workplace-transformation.html).

PAGE 302 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                  COMPLAINT

871.    Beyond just marketing security as a core function of its CPUs for Enterprises generally, Intel promoted its processors for use by Enterprises in specific regulated markets, such as health care provides.  For instance, regarding Enterprises subject to HIPAA and other patient privacy laws, Intel has stated on its web site: "Protection of personal health information is a critical priority. Intel®-based technologies can support the need for compliance with local regulation of health care information such as the HIPAA privacy and security rule."



(Nov. 22, 2016) (available at https://web.archive.org/web/20161122160605/http://www.intel.com/content/www/us/en/healthcare-it/health-it.html). Intel has also warned on its website that "[t]he financial impact from security breaches in the United States averaged more than USD 5.2 million per event in 2011."

872.    Nonetheless, Intel never disclosed to the Enterprise Plaintiffs or, on information and belief, to Enterprises generally that its CPUs suffered from the Defects. The Enterprise Plaintiffs had no reason to doubt Intel's assurances that its CPUs were "secure to the core," as Intel repeatedly stated over the years.

**4.      <u>Enterprises Could Not Allow Unpatched PCs or Servers with Intel CPUs to Remain on Their IT Systems</u>**

PAGE 303 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

873.   As soon as the Defects and the Meltdown and Spectre Exploits were disclosed publicly, Enterprises began receiving warnings of the potential consequences to the security of their IT systems and the protected data on those systems from PCs and servers with affected Intel CPUs.

874.   OCR sent an email update shortly after the public disclosure advising HIPAA-covered Enterprises that they must mitigate the vulnerabilities resulting from the CPU Defects and these specific Exploits as part of their risk management processes. Given the nature of the Defects, failure to mitigate risks the confidentiality, integrity, and availability of EHR, PHI, and ePHI. Stated differently, OCR advised HIPAA-covered Enterprises that they must take all necessary steps to prevent unauthorized access of EHR, PHI, ePHI, and other private data.

875.   On January 12, 2018, HHS's Health Care Cybersecurity and Communications Integration Center ("HCCIC") issued a technical report on the Meltdown and Spectre Exploits, which instructed health care entities to "employ risk management processes to address these vulnerabilities and ensure the security of medical records and PHI."[167] The report noted "[m]ajor concerns" for the health care sector, including, but not limited to:

- Challenges identifying vulnerable medical devices and accessory medical equipment and ensuring patches are validated to prevent impacts to the intended use.

- Cloud Computing: Potential PHI or Personally Identifiable Information (PII) data leakage in shared computing environments.

- Web browsers: Possible PHI/PII data leakage.

- Patches: Potential for service degradation and/or interruption from patches.

---

[167] *See, e.g., Technical Report on Widespread Processor Vulnerabilities HHS Severity Level 2: Medium*, HCCIC (January 12, 2018), https://content.govdelivery.com/attachments/USDHSCIKR/2018/01/17/file_attachments/944452/HCCIC-2018-001a-SpectreMeltdown.pdf (last visited May 6, 2021).

PAGE 304 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

876.     Allowing data to leak between applications meant that these entities could not guarantee that the protections they have in place properly safeguard PHI, PII, accounts, credentials, cookies, or payment information.  This is true for both on-premises applications, whether purchased or built in-house, and any cloud applications they may use.  These Enterprises also must constantly monitor web applications as data leakage could occur within web browsers.

877.     In June 2018, OCR published its Cybersecurity Newsletter, which warned of "widespread" Exploits known as Spectre and Meltdown.[168]  OCR warned that "HIIPA covered entities (CEs) and business associates (BAs) are required to conduct a risk analysis – an accurate and thorough assessment of the potential risks and vulnerabilities to the confidentiality, integrity, and availability of electronic protected health information (ePHI) they hold" and "must implement measures that reduce these risks and vulnerabilities to a reasonable and appropriate level."  OCR recognized that "[d]ue to the complexity of some systems, installing a patch or collection of patches can be a major undertaking."

**5.    Intel's CPU Defects Have Forces Enterprises to Internalize Costs of Mitigating the Security Vulnerabilities**

878.     In early January 2018, vendors such as Microsoft and Google worked quickly to roll out patches for various operating systems (including Microsoft's Windows, Apple's macOS, and Linux) and BIOS firmware updates to mitigate against Meltdown, Spectre, Foreshadow, Zombieland, and their variants.  As new Intel CPU Exploits have been discovered, additional patches have been developed, tested, and installed.

---

[168]  *Guidance on Software Vulnerabilities and* Patching, OCR (June 2018), https://www.hhs.gov/sites/default/files/cybersecurity-newsletter-june-2018-software-patches.pdf (last visited May 6, 2021)

PAGE 305 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

879.    Enterprises approach the issue of maintenance of their IT system with great care. An IT system for an Enterprise is a critical utility.  They cannot afford to undertake maintenance that risks causing users, PCs, data servers and applications to become unavailable.  When an IT system is unavailable, key business functions are not available to employees, partners, and customers. Patching an Enterprise's network and devices connected through that network therefore requires a great deal of research, care, time and out-of-pocket costs.

880.    Because the security and efficacy of these IT systems is of paramount importance, "automatic updates" are not utilized for the installation of the patches. Rather, to ensure the security, reliability, speed, and productivity of their IT infrastructure, Enterprises test software patches before installation on devices in their network.  This generally involves creating a test environment and then testing each patch for efficacy and compatibility with its applications before pushing the patches to the devices.  The creation of test environments and patch testing, installation, and monitoring takes substantial time and incurs costs for additional equipment that otherwise would have not been needed.

881.    Although the security risks resulting from the Defects and additional Intel CPU Exploits may be mitigated through patching, they are not eliminated. Only a full redesign of Intel's CPUs, which is not yet available, can remedy these Defects which impact not only the devices that include them but the IT systems on which those devices are deployed.

882.    Because the patching does not eliminate the security risks posed by Intel's CPUs, after patches are successfully installed and tested for network safety, compatibility, and reliability, IT departments or managers must spend *additional time beyond that which was previously necessary to monitor the entity's systems for attacks by hackers or others*. This requires, for instance,

PAGE 306 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                         COMPLAINT

additional efforts to ensure the system's firewall is properly constructed and also further monitoring of the data flow through the firewall, whether incoming or outgoing, for any indication that defective Intel CPUs deployed on the network have allowed a side channel or similar attack. These efforts are above and beyond what was required before knowledge of the Defects was made public.

883.    Because some patches caused computers to no longer start or run properly, the patches could not be applied until the patch creators confirmed that their solution was compatible (and not harmful) to Enterprises' existing network systems.

884.    When an Enterprise was required to purchase newer, faster devices in order to run updated, patched software, those devices also had defective Intel CPUs, but the entity had little choice because roughly 90% of the approximately 1.5 billion PCs and servers in use today are powered by Intel CPUs and compatibility within networks often compelled the purchase of Intel processors despite the Defects and vulnerability to the Intel CPU Exploits.  The Enterprises are in a Catch 22.

885.    In some instances, software running on Intel CPUs and microcode running within Intel CPUs can be modified to reduce, but not eliminate, the risk from the Defects.   But even, when available, these techniques reduce the performance of the CPUs, particularly for CPU operations involving numerous input/output operations.  Because the Enterprise Plaintiffs deal with substantial amounts of data, the performance degradation caused by the mitigations to the Intel CPU Defects imposes a substantial and material negative impact on their networks. Even a small percentage degradation in performance is material to Enterprise operations. As alleged herein, a 30% performance degradation is common. This causes a substantial and material adverse impact to Enterprises.

PAGE 307 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                          COMPLAINT

## CLASS ACTION ALLEGATIONS

886.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs seek certification of a Class ("the Class") defined as follows:

All persons or entities that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in the United States and its territories since January 1, 2006 to the present.

887.    In addition to this nationwide Class, and pursuant to Federal Rule of Civil Procedure Rule 23(c)(5) and/or the respective state statute(s), Plaintiffs seek to represent all members of the following Subclass of the Class, as well as any subclasses or issue classes as Plaintiffs may propose and/or this Court may designate at the time of class certification, including but not limited to claims under the consumer protection and unfair and deceptive trade practices statutes of each of the jurisdictions below in each of those jurisdictions:

All persons or entities that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in the United States and its territories since January 1, 2006 to the present within Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin.

PAGE 308 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
          COMPLAINT

888.     Plaintiffs reserve their rights to modify or redefine the Class, or, pursuant to Rule 23(c)(5), to propose subclasses, if necessary or alternatively, including but not limited to statewide subclasses (e.g., the Alabama Subclass, the Washington Subclass, etc.) and/or entity subclasses.

889.     Collectively, unless otherwise so stated, the above-defined Class and Subclass are referred to herein as the "Class."

890.     Excluded from the Class are: (1) Intel, its subsidiaries, affiliates, officers, directors, employees, agents, and contractors; (2) persons or entities that have settled with and validly released Intel from separate, non-class legal actions based on the conduct alleged herein; and (3) the Court and its personnel and relatives.

891.     **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  Plaintiffs are informed and believe – based upon the publicly-available information discussed herein – that there are millions of Class members throughout the country, making joinder plainly impracticable.

892.     **Commonality and Predominance:  Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).**  There are numerous questions of law and fact common to Plaintiffs and Class members that predominate over any question affecting only individual Class members.  The answers to these common questions will drive the resolution of the litigation as to all Class members.  Moreover, the questions of law and fact common to the Class that predominate over the questions that may affect individual Class members.  The common questions include the following:

     a.   Whether Intel engaged in the conduct alleged herein;

     b.   Whether Intel designed, manufactured, distributed, and sold CPUs that it knew

PAGE 309 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

were defective;

c.  Whether Intel advertised and marketed CPUs it knew were defective and withheld material information regarding the defective nature from purchasers or purposely misrepresented the CPUs to purchasers;

d.  Whether Intel designed or manufactured the CPUs in such a way that made them susceptible to security exploits, allowing for side-channel exploits;

e.  Whether Intel induced Plaintiffs and the other Class members to purchase devices containing its CPUs that were advertised as secure yet fast and, if so, to what extent it profited from its inducements;

f.  Whether Plaintiffs and absent Class members received the benefit of their bargain in purchasing the Intel CPUs;

g.  Whether Plaintiffs and absent Class members overpaid for the Intel CPUs in light of the diminished processor performance resulting from installation of the various mitigations for the Defects;

h.  Whether Intel was under a duty to disclose the true nature of the Intel CPUs to purchasers;

i.  Whether the true nature of the Intel CPUs constitute material facts that reasonable purchasers would have considered in deciding whether to purchase the Intel CPUs or computers containing them;

j.  Whether Intel concealed material facts from Plaintiffs and absent Class members;

k.  Whether Intel's conduct violated the consumer protection statutes, false advertising laws, and common laws asserted herein;

PAGE 310 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

l.    Whether Plaintiffs and absent Class members are entitled to equitable relief, including, but not limited to, restitution, non-restitutionary disgorgement, declaratory and injunctive relief;

f.    Whether Intel has been unjustly enriched as a result of its improper conduct, such that it would be inequitable for Intel to retain the benefits conferred upon it by Plaintiffs and the other Class members;

g.    The aggregate compensatory or consequential damages that should be awarded to Plaintiffs and absent Class members; and

h.    Whether Intel's conduct in actively suppressing knowledge of the Defects rises to a level of egregiousness that warrants an award of punitive damages.

893.    **Typicality:  Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of absent Class members' claims because all Plaintiffs and Class members purchased an Intel CPU or a device containing an Intel CPU during the Class Period and were subjected to the same allegedly unlawful conduct and injured in the same way.  Plaintiffs' claims are based on the same legal theories as the claims of all other members of each of their respective class.  Moreover, Plaintiffs seek the same forms of relief for themselves as they do on behalf of absent Class members.

894.    **Adequacy of Representation:   Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate class representatives because they assert claims that are typical of those of absent Class members, giving them every incentive to vigorously pursue those claims and protect absent members' interests.  Plaintiffs' interests do not conflict with the interests of the other Class members who they seek to represent, they are represented by counsel seasoned in consumer class action litigation (whom the Court has already appointed on an interim basis pursuant to Rule 23(g)

to lead the litigation), and Plaintiffs intend to prosecute this action vigorously.  Absent Class members' interests will be adequately protected by Plaintiffs and their counsel.

895.    **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2).** Intel has acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.  Injunctive relief is particularly necessary in this case because (1) Plaintiffs and absent Class members desire to purchase products with the same qualities and attributes as Intel advertised the Intel CPUs to have; (2) if Intel actually manufactured Intel CPUs with the performance and security advertised, Plaintiffs would purchase those Intel CPUs; (3) Plaintiffs do not, however, have the ability to determine whether Intel's representations concerning the Intel CPUs will be truthful if they purchase Intel CPUs or computers containing Intel CPUs in the future.  Indeed, Plaintiffs, and absent Class members may in the future want to purchase Intel CPUs or computers containing Intel CPUs, but they expect that Intel will continue to misrepresent or conceal defects in those processors.  Moreover, to the extent that Plaintiffs have no adequate remedy at law for their monetary losses or their remedies at law are insufficient, equitable relief is appropriate.

896.    **Superiority:  Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Intel, so it would be impracticable for Class members to individually seek redress for Intel's wrongful conduct.  Even if Class members could afford to pursue individual litigation, the court

PAGE 312 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                     COMPLAINT

system could not handle a deluge of individual suits.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  The benefits of proceeding on a class-wide basis, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue on an individual basis substantially outweigh any potential difficulties in managing this litigation on a class basis.

## TOLLING OF APPLICABLE LIMITATIONS PERIODS

897.    **Discovery Rule Tolling.**  Neither Plaintiffs nor absent Class members could have discovered, through the exercise of reasonable diligence, that their Intel CPUs had serious security Defects within the time period of any applicable statutes of limitation.  As described herein, substantial technical expertise is required to uncover and comprehend the existence of the Defects alleged herein, and the ordinary reasonable consumer could not – with reasonable diligence – discover that their CPUs were affected by the Defects and were consequently vulnerable to side-channel exploits until experts started publicly voicing their research and concerns.

898.    **Fraudulent Concealment Tolling.**  Throughout the time period relevant to this action, Intel concealed from and failed to disclose to Plaintiffs and absent Class members vital information concerning the Intel CPUs.  Indeed, Intel kept Plaintiffs and absent Class members ignorant of vital information essential to the pursuit of their claims.  As a result, neither Plaintiffs nor absent Class members could have discovered the Defects and security flaws, even upon reasonable exercise of diligence.

PAGE 313 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

899.     Despite its knowledge of the above, Intel failed to disclose and concealed, and continues to conceal, critical information from Plaintiffs and absent Class members, even though, at any point in time, it could have communicated material information through individual correspondence, media releases, or other means.  Although Intel has finally acknowledged the security Defects in its chips, it waited years to do so, and has continued to conceal the true risks that one faces in using its CPUs.

900.     Plaintiffs and absent Class members relied on Intel to disclose any defects in their CPUs, because those defects were hidden and not discoverable through reasonable efforts by Plaintiffs and absent Class members.

901.     Thus, the running of all applicable statutes of limitation has been suspended with respect to any claims that Plaintiffs and absent Class members have sustained as a result of the Defects, by virtue of the fraudulent concealment doctrine.

902.     **Estoppel.**  Intel was under a continuous duty to disclose to Plaintiffs and the other Class members the true nature, quality, and character of its CPUs.  Intel, however, concealed the true nature, quality, and character of the CPUs, as described herein.  Based upon the foregoing, Intel is estopped from relying on any statutes of limitations in defense of this action.

## CLAIMS ALLEGED

## NATIONWIDE COUNT I

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200 *et seq*.

903.     Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

PAGE 314 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
          COMPLAINT

904.    Plaintiffs bring this cause of action for themselves and on behalf of the Class and/or on behalf of the California Subclass.

905.    In accordance with the liberal application and construction of California's Unfair Competition Law ("UCL"), application of the UCL to all Class members is appropriate, given that Intel's headquarters is in Santa Clara, California; Intel's conduct as described herein originated from California; Intel's branding and marketing campaigns were devised in California; and the decisions regarding the design of the defective CPUs emanated from California.

906.    Intel is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

907.    Intel violated Cal. Bus. & Prof. Code § 17200 *et seq.* by engaging in unfair business acts and practices.

908.    For years and continuing to today, Intel has branded itself as a chip manufacturer offering security and performance, in recognition that both security and performance are necessary and material to Plaintiffs and absent Class members.  Unbeknownst to Plaintiffs and absent Class members, however, Intel's CPUs contained the undisclosed material Defects described herein that were contrary to its security messaging.

909.    Intel concealed at all times relevant and never disclosed that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

910.    In 2017, Google Project Zero's discovery of Meltdown and Spectre meant that the Defects in Intel's CPUs would ultimately be exposed and revealed to Plaintiffs, absent Class members, and the public at large, including that Intel's CPUs were uniquely vulnerable to exploit

PAGE 315 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

and that the mitigations to address such exploits would materially impact the CPUs' performance and functionality. Intel appreciated that the truth would hurt its substantial market share and ultimately the Company's profits. Thereafter, Intel took a series of deliberate steps that were motivated by its goals of keeping its market share in the chip market and maintaining its inflated pricing based on the perception of superior security and performance.

911.    Intel kept the Intel CPU Exploits secret for as long as possible and continued to sell and distribute CPUs at a premium price through the time of public disclosure although it knew that its CPUs had the Defects that would continue to be plagued by future exploits and performance impacts resulting from necessary mitigations. Intel even launched new product to the market that it knew not only had the Defects but were also vulnerable to known Intel CPU Exploits – all while concealing the Defects, the Intel CPU Exploits, and the required mitigations that would substantially degrade performance and functionality.

912.    Intel launched a broad public relations campaign and issued statements falsely claiming that the Intel CPU Exploits were an industry-wide problem and not unique to Intel, in an effort to avoid decreased sales, despite its knowledge that only Intel implemented the Unauthorized Access Defect and removed fundamental CPU security.

913.    When Meltdown and Spectre were disclosed to the public in January 2018, Intel pledged to put "security" first and issued statements promising that future chips would be redesigned at the silicon (or hardware) level to protect against the exploits and their variants, although even its new chip releases have been plagued by the Intel CPU Exploits and performance impacts because Intel has failed and refused to fix the root cause (i.e., the Defects) at the hardware level. Intel merely provides superficial patches for a specific exploit as researchers meanwhile demonstrate yet another

PAGE 316 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

variant of the Intel CPU Exploits.  Intel knows that as long as it continues to respond only with symptomatic fixes, additional exploits like the Intel CPU Exploits will keep happening.  The only true fix is to exchange each defective CPU for processor not subject to the security and performance Defects.

914.    When the Intel CPU Exploits were finally disclosed to the public, Intel misreported and understated the significant performance impacts the mitigations cause.  Intel then attempted to ban users who downloaded its security patches from publishing or providing benchmark testing results showing the true performance impacts.

915.    Intel even manipulated the process for disclosing security exploits.  Although disclosures of security vulnerabilities are generally embargoed, the typical period is 90 days.  Intel has manipulated the disclosure process and has refused to disclose security vulnerabilities for much longer periods despite knowing about them.  For example, Intel took 21 months to disclose the MDS exploits and kept the exploits secret from Plaintiffs, Class members, and the public – all while it continued to  sell and distribute its defective products (and even launch new defective CPUs to market) at a substantial premium based on the false perception of Intel CPUs' superior security and performance.  Intel could have very easily put out a notice about pending security patches that could impact performance and provide approximate ranges that the patches will slow down systems.  Revealing this information would not put security of the larger community at risk.  But Intel put its short-term profit ahead of the interests of its customers.

916.    Intel's defective CPUs and its unfair conduct have, among other things, caused the Plaintiffs and Class members to unfairly incur substantial time and/or costs to mitigate, replace if

necessary, and monitor the devices with Intel CPUs to minimize the security risks to their private data.

917.    Intel's practices, alleged herein, constitute unfair business practices in violation of the UCL for at least the following reasons:

    a.    The gravity of the harm to Plaintiffs and the proposed Class members resulting from Intel's acts and practices outweigh any legitimate utility of that conduct;

    b.    Intel's conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and proposed Class members; and

    c.    Intel's conduct undermines or violates the stated public policies underlying various statutes requiring the protection of confidential, financial and health information of consumers, including HIPAA and the GLB Act, among others.

918.    As a result of Intel's unfair acts or business practices, Plaintiffs and absent Class members have suffered injury in fact and lost money or property.

919.    Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law, including restitution stemming from Intel's unfair business practices; declaratory relief; injunctive relief requiring Intel to cease (1) representing that the Intel CPU Exploits are industry-wide problems, and (2) selling, distributing, and shipping CPUs that contain the Defects; and other appropriate equitable relief.

920.    To the extent that California law applies to all Plaintiffs' and Class members' claims, this claim for monetary equitable relief is appropriate because Plaintiffs have no adequate remedy at law for their monetary losses.  *See* the Court's Orders of March 27, 2020 and March 29, 2021.

PAGE 318 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

921.    To the extent that California law does not apply to all Plaintiffs' and Class members' claims, this claim for monetary equitable relief is brought in the alternative to any other state law claims for damages that Plaintiffs and Class members may otherwise have.  This claim for monetary equitable relief is appropriate in the alternative because Plaintiffs have not yet retained an expert to determine whether an award of damages can or will adequately remedy for their monetary losses caused by Intel.  Particularly, because legal damages focus on remedying the loss to the plaintiff whereas equitable restitution focuses distinctly on restoring monies wrongly acquired by Intel, legal damages may be inadequate to remedy Plaintiffs' losses. Plaintiffs do not know at this juncture, and are certainly not required to set forth evidence, whether a model for legal damages (as opposed to equitable restitution) will be viable or will adequately compensate Plaintiffs' losses.

922.    This claim for monetary equitable relief is also appropriate because the injuries to Plaintiffs and Class members are also continuing and ongoing, rendering damages imprecise or uncertain at this time.  Since Meltdown and Spectre were publicly disclosed in January 2018, almost two dozen new variations of the Intel CPU Exploits have been identified, necessitating further mitigations and resulting in further adverse performance impact.

923.    This claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

PAGE 319 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
        COMPLAINT

## NATIONWIDE COUNT II

### QUASI CONTRACT OR UNJUST ENRICHMENT
### Common Law Claim

924.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

925.    Plaintiffs bring this cause of action for themselves and on behalf of the Class and/or on behalf of each state subclass under the law of each state in which Class or subclass members purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU.

926.    For years and continuing to today, Intel has branded itself as a CPU manufacturer offering security and performance, in recognition that both security and performance are critical and central to the computing needs of Plaintiffs and absent Class members.  Unbeknownst to Plaintiffs and absent Class members, however, Intel's CPUs contained the undisclosed material Defects described herein that were contrary to its security messaging.

927.    Plaintiffs and absent Class members purchased Intel CPUs or devices containing Intel CPUs that had the Defects that made information, which should remain secure and inaccessible to unauthorized use, accessible in the processors' unsecured subsystems.  To gain a market advantage over its competitors, and unbeknownst to Plaintiffs and absent Class members, Intel knowingly sacrificed security for speed and implemented speculative execution in a defective manner.  Intel knew that the manner in which it implemented speculative execution violated fundamental CPU design principles by removing well-accepted security to ensure memory isolation and leaving confidential information accessible to unauthorized access.  Intel had knowledge of methods for designing its CPUs to safeguard against unauthorized access and eliminate the threat of the Intel CPU Exploits, but it did not use such methods.

PAGE 320 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

928.    Intel had within its exclusive knowledge at all times relevant and never disclosed that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

929.    Rather than prevent further exploits by correcting the root cause of the exploits (i.e., the Defects) at the hardware level, Intel merely provides superficial patches for the specific exploit as researchers demonstrate yet another variant of the Intel CPU Exploits.  Intel knows that, as long as it continues to respond only with symptomatic fixes, additional exploits like the Intel CPU Exploits will keep occurring.  The only true fix is to exchange each defective CPU for a device containing a processor not subject to the security and performance Defects.

930.     Intel also knew that Plaintiffs and absent Class members expected security against known risks and that certain Plaintiffs and absent Class members were required to adhere to state and federal standards for the protection of confidential personally identifying, financial, and health information.

931.    Plaintiffs and absent Class members did not expect that Intel would knowingly sell and distribute defective CPUs, or at a substantial premium, including during embargo periods when Intel deliberately kept Intel CPU Exploits secret from Plaintiffs and absent Class members.  Likewise, Plaintiffs and absent Class members did not expect that Intel would launch new products that it knew not only had the Defects but were also vulnerable to known Intel CPU Exploits – all while concealing the Defects, the Intel CPU Exploits, and the required mitigations that would substantially degrade performance and functionality.

PAGE 321 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                       COMPLAINT

932.    When the Intel CPU Exploits were finally disclosed to the public, Intel misreported and understated the significant performance impacts the mitigations cause and even suggested "there has been no meaningful performance impact observed as a result of mitigations applied."  Aware that the performance impacts of mitigating the Intel CPU Exploits created by its own flawed microarchitecture design decisions would be substantial for Plaintiffs and absent Class members, Intel attempted to add new restrictions to its software license agreement to prevent users from publishing software benchmark or comparison test results.

933.    Despite Intel's efforts to hide declining performance, testing confirmed that the mitigations transform higher-end CPUs into lower-end CPUs.  All of Intel's marketed performance gains (and then some), though, are lost by installing Intel's mitigations for the Defects.  Because the mitigations essentially downgrade the processor to performance levels of a prior CPU generation or a lower-tier processor (e.g., an Intel i7 processor performs at the level of an i5) or a lower-caliber processor within the same tier, a consumer is left with a computer that has substantially lower CPU performance than originally purchased.

934.    Incredibly, Intel also falsely and publicly claimed that the Intel CPU Exploits were an industry wide problem, despite knowing that its CPUs were uniquely vulnerable and launched a massive public relations campaign to deceive Plaintiffs, absent Class members, and the public at large.

935.    By withholding the facts concerning the defective CPUs, Intel put its own interests ahead of the very purchasers who placed their trust and confidence in Intel and benefitted itself to the detriment of Plaintiffs and absent Class members.

PAGE 322 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

936.    As a result of its conduct as alleged herein, Intel sold more CPUs than it otherwise would have and was able to charge Plaintiffs and Class members more than it otherwise could have. Intel was unjustly enriched by overcharging for those CPUs to the detriment of Plaintiffs and absent Class members.

937.    It would be inequitable, unfair, and unjust for Intel to retain these wrongfully obtained benefits.  Intel's retention of wrongfully obtained monies would violate fundamental principles of justice, equity, and good conscience.

938.    Intel's defective CPUs and its unfair conduct have, among other things, caused Plaintiffs and Class members to unfairly incur substantial time and/or costs to mitigate, replace if necessary, and monitor the devices with Intel CPUs to minimize the security risks to their private data.

939.    Each Plaintiff and member of the proposed Classes is entitled to restitution and non-restitutionary disgorgement in the amount by which Intel was unjustly enriched, to be determined at trial.

940.    To the extent that California law applies to Plaintiffs' and Class members' claims, this claim for monetary equitable relief is appropriate because Plaintiffs have no adequate remedy at law for past damages.  *See* the Court's Orders of March 27, 2020 and March 29, 2021.

941.    To the extent that California law does not apply to Plaintiffs' and Class members' claims, this claim for monetary equitable relief is brought in the alternative to any other state law claims for damages that Plaintiffs and Class members may otherwise have.

942.    This claim for monetary equitable relief is appropriate in the alternative because Plaintiffs have not yet retained an expert to determine whether an award of damages can or will

PAGE 323 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

adequately remedy for their monetary losses caused by Intel. Particularly, because legal damages focus on remedying the loss to the plaintiff and equitable restitution focuses distinctly on restoring monies wrongly acquired by the defendant, legal damages may be inadequate to remedy Plaintiffs' losses. Plaintiffs do not know at this juncture, and are certainly not required to set forth evidence, whether a model for legal damages (as opposed to equitable restitution) will be viable or will adequately compensate Plaintiffs' losses.

943. This claim for monetary equitable relief is also appropriate because the injuries to Plaintiffs and Class members are continuing and ongoing, rendering damages imprecise and/or uncertain at this time. Since Meltdown and Spectre were publicly disclosed in January 2018, almost two dozen new variations of the Intel CPU Exploits have been identified, necessitating further mitigations and resulting in further performance impact.

## CLAIMS ALLEGED ON BEHALF OF THE SUBCLASSES

## ALABAMA SUBCLASS, COUNT III

### ALABAMA DECEPTIVE TRADE PRACTICES ACT
### Ala. Code § 8-19-1 *et seq.*

944. Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

945. Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Alabama, and/or on behalf of the Alabama Subclass.

946. Intel is a "person" as defined by Ala. Code § 8-19-3(5).

PAGE 324 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                COMPLAINT

947.    Plaintiffs and Alabama Subclass members[169] are "consumers" as defined by Ala. Code § 8-19-3(2).

948.    Intel received notice pursuant to Ala. Code § 8-19-10(e) concerning its wrongful conduct as alleged herein by Plaintiffs and Alabama Subclass members.  Sending pre-suit notice pursuant to Ala. Code § 8-19-10(e), however, would have been an exercise in futility for Plaintiffs, because Intel has already been informed of the allegedly unfair and unlawful conduct as described herein as of the date of the first-filed lawsuit, and has yet to offer Alabama Subclass members a remedy in accordance with similar consumer protection statutes.

949.    Intel advertised, offered, or sold goods or services in Alabama, and engaged in trade or commerce directly or indirectly affecting the people of Alabama.

950.    Intel engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-5, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

951.    Intel's misrepresentations and omissions were material because they were likely to deceive ordinary, reasonable consumers.

---

[169] Unless otherwise noted, references throughout this Second Amended Complaint to a state subclass or to the members of a particular state subclass (e.g., "Alabama Subclass members" or "the Florida Subclass") alternatively refer to the members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in that state.

PAGE 325 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

952.    Intel intended to mislead Plaintiffs and Alabama Subclass members and induce them to rely on its misrepresentations and omissions.

953.    Had Intel disclosed to Plaintiffs and Alabama Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information, (iii) mitigations to address the Defects would result in significant CPU performance degradation, and (iv) that in designing its CPUs, Intel failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Alabama Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

954.    Intel acted intentionally, knowingly, and maliciously to violate the Alabama Deceptive Trade Practices Act, and recklessly disregarded Plaintiffs' and Alabama Subclass members' rights.  Intel's knowledge of the CPUs' Defects put it on notice that the CPUs were not as it advertised.

955.    As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and Alabama Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and safety issues.

PAGE 326 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

956.    Intel's deceptive acts and practices caused substantial injury to Plaintiffs and Alabama Subclass members, which they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

957.    Plaintiffs and the Alabama Subclass seek all monetary and non-monetary relief allowed by law, including the greater of (a) actual damages, or (b) statutory damages of $100 each; treble damages; injunctive relief; attorneys' fees; costs; and any other relief that is just and proper.

958.    The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## ALASKA SUBCLASS, COUNT IV

### ALASKA CONSUMER PROTECTION ACT
### Alaska Stat. § 45.50.471 *et seq.*

959.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

960.    Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Alaska, and/or on behalf of the Alaska Subclass.

961.    Subclass, repeats and re-alleges all previously alleged paragraphs, as if fully alleged herein.

962.    Intel advertised, offered, or sold goods or services in Alaska and engaged in trade or commerce directly or indirectly affecting the people of Alaska.

PAGE 327 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

963.   Alaska Subclass members are "consumers" as defined by Alaska Stat. § 45.50.561(4).

964.   Intel received notice pursuant to Alaska Stat. § 45.50.535 concerning its wrongful conduct as alleged herein by Plaintiffs and Alaska Subclass members.  Sending pre-suit notice pursuant to Alaska Stat. § 45.50.535, however, is an exercise in futility for Plaintiffs, because Intel has already been informed of the allegedly unfair and unlawful conduct as described herein as of the date of the first-filed lawsuit and has yet to offer Alaska Subclass members remedy in accordance with similar consumer protection statutes.

965.   Intel engaged in unfair or deceptive acts and practices in the conduct of trade or commerce, in violation Alaska Stat. § 45.50.471, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

966.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

967.   Intel intended to mislead Plaintiffs and Alaska Subclass members and induce them to rely on its misrepresentations and omissions.

968.   Intel acted intentionally, knowingly, and maliciously to violate Alaska's Consumer Protection Act, and recklessly disregarded Plaintiffs' and Alaska Subclass members' rights.  Intel's knowledge of the CPU's security and performance issues put it on notice that the CPUs were not as it advertised.

PAGE 328 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

969.    As a direct and proximate result of Intel's unfair and deceptive acts and practices, Plaintiffs and Alaska Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain, and increased time and expense in dealing with CPU performance and security issues.

970.    Plaintiffs and the Alaska Subclass seek all monetary and non-monetary relief allowed by law, including the greater of (a) three times their actual damages, or (b) statutory damages in the amount of $500; punitive damages; reasonable attorneys' fees and costs; injunctive relief; and any other relief that is necessary and proper.

971.    The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## ARIZONA SUBCLASS, COUNT V

### ARIZONA CONSUMER FRAUD ACT
### A.R.S. § 44-1521 *et seq.*

972.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

973.    Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Arizona, and/or on behalf of the Arizona Subclass.

974.    Intel is a "person" as defined by A.R.S. § 44-1521(6).

PAGE 329 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

975.    Intel advertised, offered, or sold goods or services in Arizona and engaged in trade or commerce directly or indirectly affecting the people of Arizona.

976.    Intel engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts affecting the people of Arizona in connection with the sale and advertisement of "merchandise" (as defined in Arizona Consumer Fraud Act, A.R.S. § 44-1521(5)) in violation of A.R.S. § 44-1522(A).

977.    Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

978.    Intel intended to mislead Plaintiffs and Arizona Subclass members and induce them to rely on its misrepresentations and omissions.

979.    Had Intel disclosed to Plaintiffs and Arizona Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Arizona Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

980.    Intel acted intentionally, knowingly, and maliciously to violate Arizona's Consumer Fraud Act, and recklessly disregarded Plaintiffs' and Arizona Subclass members' rights.  Intel's

knowledge of the CPUs' performance and security issues put it on notice that the CPUs were not as it advertised.

981.    As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and Arizona Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and safety issues.

982.    Plaintiffs and Arizona Subclass members seek all monetary and non-monetary relief allowed by law, including compensatory damages; disgorgement; punitive damages; injunctive relief; and reasonable attorneys' fees and costs.

983.    The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## ARKANSAS SUBCLASS, COUNT VI

### ARKANSAS DECEPTIVE TRADE PRACTICES ACT,
### A.C.A. § 4-88-101, *et seq*.

984.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

985.    Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Arkansas, and/or on behalf of the Arkansas Subclass.

986.    Intel is a "person" as defined by A.C.A. § 4-88-102(5).

PAGE 331 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

987.    Intel's products and services are "goods" and "services" as defined by A.C.A. §§ 4-88-102(4) and (7).

988.    Intel advertised, offered, or sold goods or services in Arkansas and engaged in trade or commerce directly or indirectly affecting the people of Arkansas.

989.    The Arkansas Deceptive Trade Practices Act ("ADTPA"), A.C.A. § 4-88-101 *et seq.*, prohibits unfair, deceptive, false, and unconscionable trade practices.

990.    Intel engaged in acts of deception and false pretense in connection with the sale and advertisement of services in violation of A.C.A. § 4-88-1-8(1) and concealment, suppression, and omission of material facts, with intent that others rely upon the concealment, suppression, or omission in violation of A.C.A. § 4-88-1-8(2), and engaged in the following deceptive and unconscionable trade practices defined in A.C.A. § 4-88-107, including

    a.    Concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

    b.    Continuing to sell and distribute chips at a premium price through the time of public disclosure although it knew that its CPUs had the Defects that would continue to be plagued by future exploits and performance impacts resulting from necessary mitigations.  Intel even launched new product to the market that it knew not only had the Defects but were also vulnerable to known Intel CPU Exploits-all while

PAGE 332 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

concealing the Defects, the Intel CPU Exploits, and the required mitigations that would substantially degrade performance and functionality.

c. Launching a broad public relations campaign and issuing statements falsely claiming that the Intel CPU Exploits were an industry-wide problem and not unique to Intel, in an effort to avoid decreased sales, despite its knowledge that only Intel implemented the Unauthorized Access Defect and removed fundamental CPU security.

d. Pledging to put "security" first and issuing statements promising that future chips would be redesigned at the silicon (or hardware) level to protect against the exploits and their variants, although even its new chip releases have been plagued by the Intel CPU Exploits and performance impacts because Intel has failed and refused to fix the root cause (i.e., the Defects) at the hardware level. Intel merely provides superficial patches for a specific exploit as researchers demonstrate yet another variant of the Intel CPU Exploits. Intel knows that, as long as it continues to only respond with symptomatic fixes, additional exploits like the Intel CPU Exploits will keep happening. The only true fix is to exchange each defective CPU for a device containing a processor not subject to the security and performance Defects.

e. Misrepresenting and understating the significant performance impacts the mitigations cause. Intel then attempted to ban users who downloaded its security patches from publishing or providing benchmark testing results showing the true performance impacts.

f. Manipulating the process for disclosing security exploits.

PAGE 333 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

991.    Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

992.    Intel intended to mislead Plaintiffs and Arkansas Subclass members and induce them to rely on its misrepresentations and omissions.

993.    Had Intel disclosed to Plaintiffs and Arkansas Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Arkansas Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

994.    Intel acted intentionally, knowingly, and maliciously to violate Arkansas's Deceptive Trade Practices Act, and recklessly disregarded Plaintiffs' and Arkansas Subclass members' rights. Intel's knowledge of the CPU's performance and safety issues put it on notice that the CPUs were not as it advertised.

995.    As a direct and proximate result of Intel's unconscionable, unfair, and deceptive acts or practices and Plaintiffs and Arkansas Subclass members' reliance thereon, Plaintiffs and Arkansas Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their

PAGE 334 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

bargain in purchasing the CPUs, and increased time and expense in dealing with performance and safety.

996.    Plaintiffs and the Arkansas Subclass members seek all monetary and non-monetary relief allowed by law, including actual financial losses; injunctive relief; and reasonable attorneys' fees and costs.

997.    The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## COLORADO SUBCLASS, COUNT VII

### COLORADO CONSUMER PROTECTION ACT,
### Colo. Rev. Stat. § 6-1-101 *et seq*.

998.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

999.    Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Colorado, and/or on behalf of the Colorado Subclass.

1000.    Intel is a "person" as defined by Colo. Rev. Stat. § 6-1-102(6).

1001.    Intel engaged in "sales" as defined by Colo. Rev. Stat. § 6-1-102(10).

1002.    Plaintiffs and Colorado Subclass members, as well as the general public, are actual or potential consumers of the products and services offered by Intel or successors in interest to actual consumers.

1003.   Intel engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1), including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1004.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1005.   Intel intended to mislead Plaintiffs and Colorado Subclass members and induce them to rely on its misrepresentations and omissions.

1006.   Had Intel disclosed to Plaintiffs and Colorado Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that, in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Colorado Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1007.  Intel acted intentionally, knowingly, and maliciously to violate Colorado's Consumer Protection Act, and recklessly disregarded Plaintiffs' and Colorado Subclass members'

PAGE 336 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                COMPLAINT

rights.  Intel's knowledge of the CPUs' performance and security issues put it on notice that the CPUs were not as it advertised.

1008.  As a direct and proximate result of Intel's deceptive trade practices, Colorado Subclass members suffered injuries to their legally protected interests.

1009.  Intel's deceptive trade practices significantly impact the public because Intel is one of the largest CPU manufacturers in the world, with hundreds of thousands of sales of those devices to Colorado consumers.

1010.  Plaintiffs and Colorado Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of (a) actual damages, (b) $500 each, or (c) three times actual damages (for Intel's bad faith conduct); injunctive relief; and reasonable attorneys' fees and costs.

1011.  The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## CONNECTICUT SUBCLASS, COUNT VIII

### CONNECTICUT TRADE PRACTICES ACT
### C.G.S.A. § 42-110g *et seq.*

1012.  Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1013.  Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Connecticut, and/or on behalf of the Connecticut Subclass.

1014.  Intel is a "person" as defined by C.G.S.A. § 42-110a (3).

PAGE 337 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
           COMPLAINT

1015.   Intel is engaged in "trade" or "commerce" as those terms are defined by C.G.S.A. § 42-110a(4).

1016.   At the time of filing the Complaint, Plaintiffs sent notice to the Attorney General and Commissioner of Consumer Protection pursuant to C.G.S.A. § 42-110g(c).  Plaintiffs will provide a file-stamped copy of the Complaint to the Attorney General and Commissioner of Consumer Protection.

1017.   Intel advertised, offered, or sold goods or services in Connecticut, and engaged in trade or commerce directly or indirectly affecting the people of Connecticut.

1018.   Intel engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the Connecticut Trade Practices Act, C.G.S.A. § 42-110b, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1019.   Intel intended to mislead Plaintiffs and Connecticut Subclass members and induce them to rely on its misrepresentations and omissions.

1020.   Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects, that the CPU Defects allowed unauthorized access to confidential information, that necessary mitigations to address the Defects would result in significant CPU performance degradation, and that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks. These material facts should have been disclosed because both

PAGE 338 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial representations as alleged herein. Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

1021.   Intel's representations and omissions were material because were likely to deceive reasonable consumers.

1022.   Had Intel disclosed to Plaintiffs and Connecticut Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that, in designing its CPUs, Intel  had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Connecticut Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1023.   Intel acted intentionally, knowingly, and maliciously to violate the Connecticut Unfair Trade Practices Act, and recklessly disregarded Plaintiffs' and Connecticut Subclass members' rights.  Intel's knowledge of the CPUs' performance and security issues put it on notice that the CPUs were not as it advertised.

1024.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and Connecticut Subclass members have suffered and will continue to suffer injury, ascertainable losses

PAGE 339 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with CPU performance and security issues.

1025. Intel's deceptive acts and practices caused substantial, ascertainable injury to Plaintiffs and Connecticut Subclass members, which they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

1026. Intel's violations of Connecticut law were done with reckless indifference to Plaintiffs and the Connecticut Subclass or was with an intentional or wanton violation of those rights.

1027. Plaintiffs request damages in the amount to be determined at trial, including statutory and common law damages, attorneys' fees, and punitive damages.

## DELAWARE SUBCLASS, COUNT IX

### DELAWARE CONSUMER FRAUD ACT
### 6 Del. Code § 2511 *et seq.*

1028. Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1029. Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Delaware, and/or on behalf of the Delaware Subclass.

1030. Intel is a "person" that is involved in the "sale" of "merchandise," as defined by 6 Del. Code § 2511(6)-(8).

1031. Intel advertised, offered, or sold goods or services in Delaware and engaged in trade or commerce directly or indirectly affecting the people of Delaware.

PAGE 340 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

1032.   The purpose of the Delaware Consumer Fraud Act, 6 Del. Code § 2511 *et seq.*, is "to protect consumers…from unfair or deceptive merchandising practices in the conduct of any trade or commerce."

1033.   Intel engaged in unfair and deceptive practices in the conduct of trade or commerce, in violation of 6 Del. Code § 2512, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1034.   Intel used and employed deception, fraud, false pretense, false promise, misrepresentation, and the concealment, suppression, and omission of material facts with intent that others rely upon such concealment, suppression and omission, in connection with the sale and advertisement of merchandise, in violation of 6 Del. Code § 2513(a).

1035.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1036.   Intel acted intentionally, knowingly, and maliciously to violate Delaware's Consumer Fraud Act, and recklessly disregarded Plaintiffs' and Delaware Subclass members' rights.  Intel's knowledge of the CPUs' performance and security issues put it on notice that the CPUs were not as it advertised.

1037.   Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects, that the CPU Defects allowed unauthorized access to confidential information, that necessary mitigations to address the Defects would result in significant

CPU performance degradation, and that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks. These material facts should have been disclosed because both security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial representations as alleged herein. Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

1038. Had Intel disclosed to Plaintiffs and Delaware Subclass members material facts, including but not limited to, that: (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that, in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold. Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market. Plaintiffs and absent Delaware Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1039. Intel's unlawful trade practices were gross, oppressive, and aggravated, and Intel breached the trust of Plaintiffs and Delaware Subclass members.

1040. As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Delaware Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving

the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1041.   Plaintiffs and Delaware Subclass members seek all monetary and non-monetary relief allowed by law, including damages under 6 Del. Code § 2525 for injury resulting from the direct and natural consequences of Intel's unlawful conduct; injunctive relief; and reasonable attorneys' fees and costs.

1042.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

### DISTRICT OF COLUMBIA SUBCLASS, COUNT X

### DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT
### D.C. Code § 28-3904 *et seq.*

1043.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1044.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in the District of Columbia, and/or on behalf of the District of Columbia Subclass.

1045.   Intel is a "person" as defined by D.C. Code § 28-3901(a)(1).

1046.   Intel is a "merchant" as defined by D.C. Code § 28-3901(a)(3).

1047.   Plaintiffs and District of Columbia Subclass members are "consumers" who purchased or received goods or services for personal, household, or family purposes, as defined by D.C. Code § 28-3901.

PAGE 343 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                     COMPLAINT

1048.   Intel advertised, offered, or sold goods or services in District of Columbia and engaged in trade or commerce directly or indirectly affecting the people of District of Columbia.

1049.   Intel engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the D.C. Code § 28-3904, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1050.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1051.   Intel intended to mislead Plaintiffs and District of Columbia Subclass members and induce them to rely on its misrepresentations and omissions.

1052.   The above unfair and deceptive practices and acts by Intel were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Plaintiffs and District of Columbia Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

1053.   Intel acted intentionally, knowingly, and maliciously to violate the District of Columbia's Consumer Protection Procedures Act, and recklessly disregarded Plaintiffs' and District of Columbia Subclass members' rights.  Intel's knowledge of the CPUs' performance and security issues put it on notice that the CPUs were not as it advertised.

1054.   As a direct and proximate result of Intel's unfair, unlawful, and deceptive trade practices, Plaintiffs and absent District of Columbia Subclass members have suffered and will

continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with CPU performance and security issues.

1055.   Plaintiffs and District of Columbia Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, restitution, injunctive relief, punitive damages, attorneys' fees and costs, the greater of treble damages or $1500 per violation, and any other relief that the Court deems proper.

1056.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## FLORIDA SUBCLASS, COUNT XI

### FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### Fla. Stat. § 501.201 *et seq.*

1057.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1058.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Florida, and/or on behalf of the Florida Subclass.

1059.   Plaintiffs and Florida Subclass members are "consumers" as defined by Fla. Stat. § 501.203.

1060.   Intel advertised, offered, or sold goods or services in Florida and engaged in trade or commerce directly or indirectly affecting the people of Florida.

PAGE 345 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

1061.    Intel engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, in violation of Fla. Stat. § 501.204(1), including:

   a.    Concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

   b.    Continuing to sell and distribute chips at a premium price through the time of public disclosure although it knew that its CPUs had the Defects that would continue to be plagued by future exploits and performance impacts resulting from necessary mitigations.  Intel even launched new product to the market that it knew not only had the Defects but were also vulnerable to known Intel CPU Exploits-all while concealing the Defects, the Intel CPU Exploits, and the required mitigations that would substantially degrade performance and functionality.

   c.    Launching a broad public relations campaign and issuing statements falsely claiming that the Intel CPU Exploits were an industry-wide problem and not unique to Intel, in an effort to avoid decreased sales, despite its knowledge that only Intel implemented the Unauthorized Access Defect and removed fundamental CPU security.

   d.    Pledging to put "security" first and issuing statements promising that future chips would be redesigned at the silicon (or hardware) level to protect against the exploits and their variants, although even its new chip releases have been plagued by the Intel

PAGE 346 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

CPU Exploits and performance impacts because Intel has failed and refused to fix the root cause (i.e., the Defects) at the hardware level.  Intel merely provides superficial patches for a specific exploit as researchers demonstrate yet another variant of the Intel CPU Exploits.  Intel knows that, as long as it continues to only respond with symptomatic fixes, additional exploits like the Intel CPU Exploits will keep happening.  The only true fix is to exchange each defective CPU for a device containing a processor not subject to the security and performance Defects.

e.    Misrepresenting and understating the significant performance impacts the mitigations cause.  Intel then attempted to ban users who downloaded its security patches from publishing or providing benchmark testing results showing the true performance impacts.

f.    Manipulating the process for disclosing security exploits.

1062.  Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1063.  Had Intel disclosed to Plaintiffs and Florida Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that, in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs

PAGE 347 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
        COMPLAINT

and absent Florida Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1064.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Florida Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1065.   Plaintiffs and Florida Subclass members seek all monetary and non-monetary relief allowed by law, including actual or nominal damages under Fla. Stat. § 501.21; declaratory and injunctive relief; reasonable attorneys' fees and costs, under Fla. Stat. § 501.2105(1); and any other relief that is just and proper.

1066.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## GEORGIA SUBCLASS, COUNT XII

### GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### O.C.G.A. § 10-1-390 et *seq.*

1067.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1068.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Georgia, and/or on behalf of the Georgia Subclass.

PAGE 348 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

1069.   Intel, Plaintiffs, and Georgia Subclass members are "persons" within the meaning of § 10-1-371(5) of the Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA").

1070.   Intel received notice pursuant to O.C.G.A. § 10-1-399 concerning its wrongful conduct as alleged herein by Plaintiffs and Georgia Subclass members.   Sending pre-suit notice pursuant to O.C.G.A. § 10-1-399, however, is an exercise in futility for Plaintiffs because Intel has already been informed of the allegedly unfair and unlawful conduct as described herein as of the date of the first-filed lawsuit and has yet to offer Georgia Subclass members remedy.

1071.   Intel engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of O.C.G.A. § 10-1-372(a), including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.   This information was not available to Plaintiffs, absent Class members, or the public at large.   To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1072.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1073.   Intel intended to mislead Plaintiffs and Georgia Subclass members and induce them to rely on its misrepresentations and omissions.

1074.   In the course of its business, Intel engaged in activities with a tendency or capacity to deceive.

1075.   Intel acted intentionally, knowingly, and maliciously to violate Georgia's Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiffs' and Georgia Subclass

PAGE 349 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

members' rights.  Intel's knowledge of the CPUs' performance and security issues put it on notice that the CPUs were not as it advertised.

1076.  Had Intel disclosed to Plaintiffs and Georgia Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that, in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Georgia Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1077.  As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Georgia Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1078.  Plaintiffs and Georgia Subclass members seek all relief allowed by law, including injunctive relief, and reasonable attorneys' fees and costs, under O.C.G.A. § 10-1-373.

1079.  The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as

plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## HAWAII SUBCLASS, COUNT XIII

### HAWAII UNFAIR PRACTICES AND UNFAIR COMPETITION ACT
### Haw. Rev. Stat. § 480-1 *et seq.*

1080.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1081.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Hawaii, and/or on behalf of the Hawaii Subclass.

1082.   Plaintiffs and Hawaii Subclass members are "consumers" as defined by Haw. Rev. Stat. § 480-1.

1083.   Plaintiffs, Hawaii Subclass members, and Intel are "persons" as defined by Haw. Rev. Stat. § 480-1.

1084.   Intel advertised, offered, or sold goods or services in Hawaii and engaged in trade or commerce directly or indirectly affecting the people of Hawaii.

1085.   Intel engaged in unfair or deceptive acts or practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the goods and services purchased by Hawaii Subclass members in violation of Haw. Rev. Stat. § 480-2(a), including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

PAGE 351 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

1086.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1087.   Intel intended to mislead Plaintiffs and Hawaii Subclass members and induce them to rely on its misrepresentations and omissions.

1088.   The foregoing unlawful and deceptive acts and practices were immoral, unethical, oppressive, and unscrupulous.

1089.   Intel acted intentionally, knowingly, and maliciously to violate Hawaii's Unfair Practices and Unfair Competition Act, and recklessly disregarded Plaintiffs' and Hawaii Subclass members' rights.  Intel's knowledge of the CPUs' performance and security issues put it on notice that the CPUs were not as it advertised.

1090.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Hawaii Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1091.   Plaintiffs and Hawaii Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, benefit of the bargain damages, treble damages, injunctive relief, and reasonable attorneys' fees and costs.

1092.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

PAGE 352 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                       COMPLAINT

## HAWAII SUBCLASS, COUNT XIV

### HAWAII UNIFORM DECEPTIVE TRADE PRACTICE ACT
### Haw. Rev. Stat. § 481a-3 *et seq.*

1093.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1094.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Hawaii, and/or on behalf of the Hawaii Subclass.

1095.   Plaintiffs and Hawaii Subclass members are "persons" as defined by Haw. Rev. Stat. § 481A-2.

1096.   Intel engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the Haw. Rev. Stat. § 481A-3, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1097.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1098.   The above unfair and deceptive practices and acts by Intel were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Plaintiffs and Hawaii Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

PAGE 353 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

1099.    As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Hawaii Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1100.    Plaintiffs and Hawaii Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, attorneys' fees and costs, and any other relief that the Court deems proper.

1101.    The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## IDAHO SUBCLASS, COUNT XV

### IDAHO CONSUMER PROTECTION ACT
### Idaho Code § 48-601 *et seq.*

1102.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1103.    Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Idaho, and/or on behalf of the Idaho Subclass.

1104.    Intel is a "person" as defined by Idaho Code § 48-602(1).

1105.    Intel's conduct as alleged herein pertained to "goods" and "services" as defined by Idaho Code § 48-602(6) and (7).

PAGE 354 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

1106.   Intel advertised, offered, or sold goods or services in Idaho and engaged in trade or commerce directly or indirectly affecting the people of Idaho.

1107.   Intel engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the Idaho Code §§ 48-603 and 48-603(C), including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1108.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1109.   Intel intended to mislead Plaintiffs and Idaho Subclass members and induce them to rely on its misrepresentations and omissions.  Intel knew its representations and omissions were false.

1110.   Intel acted intentionally, knowingly, and maliciously to violate Idaho's Consumer Protection Act, and recklessly disregarded Plaintiffs' and Idaho Subclass members' rights.  Intel's knowledge of the CPUs' performance and security issues put it on notice that the CPUs were not as it advertised.

1111.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Idaho Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

PAGE 355 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

1112.   Plaintiffs and Idaho Subclass members seek all monetary and non-monetary relief allowed by law, including damages, punitive damages, injunctive relief, costs, and attorneys' fees.

1113.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## ILLINOIS SUBCLASS, COUNT XVI

## ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
## 815 ILCS § 505 *et seq.*

1114.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1115.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Illinois, and/or on behalf of the Illinois Subclass.

1116.   Intel is a "person" as defined by 815 ILCS §§ 505/1(c).

1117.   Plaintiffs and Illinois Subclass members are "consumers" as defined by 815 ILCS §§ 505/1(e).

1118.   Intel's conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 ILCS § 505/1(f).  Intel's conduct is described in full detail above.

1119.   Intel's deceptive, unfair, and unlawful trade acts or practices, in violation of 815 ILCS § 505/2, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information

was not available to Plaintiffs, absent Class members, or the public at large. To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1120. Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1121. Intel intended to mislead Plaintiffs and Illinois Subclass members and induce them to rely on its misrepresentations and omissions.

1122. The above unfair and deceptive practices and acts by Intel were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any benefit to consumers or to competition.

1123. Intel acted intentionally, knowingly, and maliciously to violate Illinois's Consumer Fraud Act, and recklessly disregarded Plaintiffs' and Illinois Subclass members' rights. Intel's knowledge of the CPUs' performance and security issues put it on notice that the CPUs were not as it advertised.

1124. As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Illinois Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issue.

1125. Plaintiffs and Illinois Subclass members seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

1126.    The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## ILLINOIS SUBCLASS, COUNT XVII

### ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### 815 ILCS § 510/2 *et seq.*

1127.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1128.    Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Illinois, and/or on behalf of the Illinois Subclass.

1129.    Intel is a "person" as defined by 815 ILCS §§ 510/1(5).

1130.    Intel engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the 815 ILCS §§ 510/2(a), including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1131.    Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1132.    The above unfair and deceptive practices and acts by Intel were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Plaintiffs and Illinois Subclass

PAGE 358 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

1133.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Illinois Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1134.   Plaintiffs and Illinois Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorney's fees.

1135.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## INDIANA SUBCLASS, COUNT XVIII

### INDIANA DECEPTIVE CONSUMER SALES ACT
### Ind. Code § 24-5-0.5-1 *et seq.*

1136.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1137.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Indiana, and/or on behalf of the Indiana Subclass.

1138.   Intel is a "person" as defined by Ind. Code § 24-5-0.5-2(a)(2).

PAGE 359 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

1139.   Intel is a "supplier" as defined by § 24-5-0.5-2(a)(1), because it regularly engages in or solicits "consumer transactions" within the meaning of § 24-5-0.5-2(a)(3)(A).

1140.   Intel engaged in unfair, abusive, and deceptive acts, omissions, and practices in connection with consumer transactions, in violation of Ind. Code § 24-5-0.5-3(a), including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1141.   Intel's representations and omissions include both implicit and explicit representations and were carried out as a scheme or artifice to defraud.

1142.   Intel's acts and practices were "unfair" because they caused or were likely to cause substantial injury to consumers, which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

1143.   The injury to consumers from Intel's conduct was and is substantial because it was non-trivial and non-speculative; and involved a monetary injury.  The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

1144.   Consumers could not have reasonably avoided injury because Intel's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making.  By withholding important information from consumers about the performance and security of its CPUs, and Defects within those processors, Intel created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

PAGE 360 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

1145.   Intel's business practices, in concealing material information or misrepresenting the qualities, characteristics, and performance of its CPUs, had no countervailing benefit to consumers or to competition.

1146.   Intel's acts and practices were "abusive" for numerous reasons, including: (a) because they materially interfered with consumers' ability to understand a term or condition in a consumer transaction, interfering with consumers' decision-making; (b) because they took unreasonable advantage of consumers' lack of understanding about the material risks, costs, or conditions of a consumer transaction; consumers lacked an understanding of the material risks and costs of a variety of their transactions; (c) because they took unreasonable advantage of consumers' inability to protect their own interests; consumers could not protect their interests due to the asymmetry in information between them and Intel; (d) because Intel took unreasonable advantage of consumers' reasonable reliance that it was providing truthful and accurate information.

1147.   Intel also engaged in "deceptive" acts and practices in violation of Indiana Code § 24-5-0.5-3(a) and § 24-5-0.5-3(b), including: (a) misrepresenting that the subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have; (b) misrepresenting that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not; and (c) misrepresenting that the subject of a consumer transaction will be supplied to the public in greater quantity (here, greater speed) than the supplier intends or reasonably expects.

1148.   Intel intended to mislead Plaintiffs and Indiana Subclass members and induce them to rely on its misrepresentations and omissions.

PAGE 361 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

1149.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1150.   Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects, that the CPU Defects allowed unauthorized access to confidential information, that necessary mitigations to address the Defects would result in significant CPU performance degradation, and that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks. These material facts should have been disclosed because both security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial representations as alleged herein.  Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

1151.  Had Intel disclosed to Plaintiffs and Indiana Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information, (iii) mitigations to address the Defects would result in significant CPU performance degradation, and (iv) that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Indiana Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

PAGE 362 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

1152.   Intel acted intentionally, knowingly, and maliciously to violate Indiana's Deceptive Consumer Sales Act, and recklessly disregarded Plaintiffs' and Indiana Subclass members' rights. Intel's knowledge of the CPUs' performance and security issues put it on notice that the CPUs were not as it advertised.

1153.   Intel received notice pursuant to Ind. Code § 24-5-0.5-5 concerning its wrongful conduct as alleged herein by Plaintiffs and Indiana Subclass members.  Moreover, Intel has had constructive notice of Plaintiffs' demand for relief for the Indiana Subclass pursuant to Ind. Code § 24-5-0.5-5 since the filing of the first action among those that have now been centralized in this multidistrict litigation, which contained substantially similar allegations.  Therefore, sending pre-suit notice pursuant to Ind. Code § 24-5-0.5-5 is an exercise in futility for Plaintiffs because Intel has not cured its unfair, abusive, and deceptive acts and practices, or its violations of Indiana Deceptive Consumer Sales Act were incurable.

1154.   Intel's conduct includes incurable deceptive acts that Intel engaged in as part of a scheme, artifice, or device with intent to defraud or mislead, under Ind. Code § 24-5-0.5-2(a)(8).

1155.   As a direct and proximate result of Intel's uncured or incurable unfair, abusive, and deceptive acts or practices, Plaintiffs and absent Indiana Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with CPU performance and security issues.

1156.   Intel's violations present a continuing risk to Plaintiffs and absent Indiana Subclass members as well as to the general public.

PAGE 363 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

1157.   Plaintiffs and Indiana Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $500 for each non-willful violation; the greater of treble damages or $1,000 for each willful violation; restitution; reasonable attorneys' fees and costs; injunctive relief; and punitive damages.

1158.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## IOWA SUBCLASS, COUNT XIX

## IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT
### Iowa Code § 714H

1159.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1160.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Iowa, and/or on behalf of the Iowa Subclass.

1161.   Intel is a "person" as defined by Iowa Code § 714H.2(7).

1162.   Plaintiffs and Iowa Subclass members are "consumers" as defined by Iowa Code § 714H.2(3).

1163.   Intel's conduct described herein related to the "sale" or "advertisement" of "merchandise" as defined by Iowa Code §§ 714H.2(2), (6), & (8).

PAGE 364 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

1164.   Intel engaged in unfair, deceptive, and unconscionable trade practices, in violation of the Iowa Private Right of Action for Consumer Frauds Act, as described throughout and herein, including:

a.   Concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

b.   Continuing to sell and distribute chips at a premium price through the time of public disclosure although it knew that its CPUs had the Defects that would continue to be plagued by future exploits and performance impacts resulting from necessary mitigations.  Intel even launched new product to the market that it knew not only had the Defects but were also vulnerable to known Intel CPU Exploits-all while concealing the Defects, the Intel CPU Exploits, and the required mitigations that would substantially degrade performance and functionality.

c.   Launching a broad public relations campaign and issuing statements falsely claiming that the Intel CPU Exploits were an industry-wide problem and not unique to Intel, in an effort to avoid decreased sales, despite its knowledge that only Intel implemented the Unauthorized Access Defect and removed fundamental CPU security.

d.   Pledging to put "security" first and issuing statements promising that future chips would be redesigned at the silicon (or hardware) level to protect against the exploits

PAGE 365 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

and their variants, although even its new chip releases have been plagued by the Intel CPU Exploits and performance impacts because Intel has failed and refused to fix the root cause (i.e., the Defects) at the hardware level.  Intel merely provides superficial patches for a specific exploit as researchers demonstrate yet another variant of the Intel CPU Exploits.  Intel knows that, as long as it continues to only respond with symptomatic fixes, additional exploits like the Intel CPU Exploits will keep happening.  The only true fix is to exchange each defective CPU for a device containing a processor not subject to the security and performance Defects.

e.    Misrepresenting and understating the significant performance impacts the mitigations cause.  Intel then attempted to ban users who downloaded its security patches from publishing or providing benchmark testing results showing the true performance impacts.

f.    Manipulating the process for disclosing security exploits.

1165.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1166.   Intel intended to mislead Plaintiffs and Iowa Subclass members and induce them to rely on its misrepresentations and omissions.

1167.   Intel acted intentionally, knowingly, and maliciously to violate Iowa's Private Right of Action for Consumer Frauds Act, and recklessly disregarded Plaintiffs' and Iowa Subclass members' rights.  Intel's knowledge of the CPU performance and security issues put it on notice that the CPUs were not as it advertised.

PAGE 366 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

1168.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Iowa Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1169.   Plaintiffs has provided the requisite notice to the Iowa Attorney General, the office of which approved the filing of this class action lawsuit pursuant to Iowa Code § 714H.7.

1170.   Plaintiffs and Iowa Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, damages, punitive damages, and reasonable attorneys' fees and costs.

1171.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## **KANSAS SUBCLASS, COUNT XX**

### **KANSAS CONSUMER PROTECTION ACT**
### **K.S.A. § 50-623 *et seq.***

1172.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1173.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Kansas, and/or on behalf of the Kansas Subclass.

PAGE 367 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
          COMPLAINT

1174.   K.S.A. § 50-623 *et seq.* is to be liberally construed to protect consumers from suppliers who commit deceptive and unconscionable practices.

1175.   Plaintiffs and Kansas Subclass members are "consumers" as defined by K.S.A. § 50-624(b).

1176.   The acts and practices described herein are "consumer transactions," as defined by K.S.A. § 50-624(c).

1177.   Intel is a "supplier" as defined by K.S.A. § 50-624(l).

1178.   Intel advertised, offered, or sold goods or services in Kansas and engaged in trade or commerce directly or indirectly affecting the people of Kansas.

1179.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1180.   Intel intended to mislead Plaintiffs and Kansas Subclass members and induce them to rely on its misrepresentations and omissions.

1181.   Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects, that the CPU Defects allowed unauthorized access to confidential information, that necessary mitigations to address the Defects would result in significant CPU performance degradation, and that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks. These material facts should have been disclosed because both security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial

PAGE 368 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                   COMPLAINT

representations as alleged herein.  Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

1182.  Had Intel disclosed to Plaintiffs and Kansas Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that, in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Kansas Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1183.  Intel also engaged in unconscionable acts and practices in connection with a consumer transaction, in violation of K.S.A. § 50-627, including knowingly taking advantage of the inability of Plaintiffs and the Kansas Subclass to reasonably protect their interests, due to their lack of knowledge (*see* K.S.A. § 50-627(b)(1)); and requiring Plaintiffs and absent Kansas Subclass members to enter into a consumer transaction on terms that Intel knew were substantially one-sided in favor of Intel (*see* K.S.A. § 50-627(b)(5)).

1184.  Intel's unconscionable acts and practices also includes:

a.    Concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at

PAGE 369 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

b.    Continuing to sell and distribute chips at a premium price through the time of public disclosure although it knew that its CPUs had the Defects that would continue to be plagued by future exploits and performance impacts resulting from necessary mitigations.  Intel even launched new product to the market that it knew not only had the Defects but were also vulnerable to known Intel CPU Exploits-all while concealing the Defects, the Intel CPU Exploits, and the required mitigations that would substantially degrade performance and functionality.

c.    Launching a broad public relations campaign and issuing statements falsely claiming that the Intel CPU Exploits were an industry-wide problem and not unique to Intel, in an effort to avoid decreased sales, despite its knowledge that only Intel implemented the Unauthorized Access Defect and removed fundamental CPU security.

d.    Pledging to put "security" first and issuing statements promising that future chips would be redesigned at the silicon (or hardware) level to protect against the exploits and their variants, although even its new chip releases have been plagued by the Intel CPU Exploits and performance impacts because Intel has failed and refused to fix the root cause (i.e., the Defects) at the hardware level.  Intel merely provides superficial patches for a specific exploit as researchers demonstrate yet another variant of the Intel CPU Exploits.  Intel knows that, as long as it continues to only respond with symptomatic fixes, additional exploits like the Intel CPU Exploits will

PAGE 370 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

keep happening.  The only true fix is to exchange each defective CPU for a device containing a processor not subject to the security and performance Defects.

e.       Misrepresenting and understating the significant performance impacts the mitigations cause.  Intel then attempted to ban users who downloaded its security patches from publishing or providing benchmark testing results showing the true performance impacts.

f.       Manipulating the process for disclosing security exploits.

1185.   Plaintiffs and absent Kansas Subclass members had unequal bargaining power with respect to their purchase and/or use of Intel's CPUs because of Intel's omissions and misrepresentations.

1186.   The above unfair, deceptive, and unconscionable practices and acts by Intel were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Plaintiffs and absent Kansas Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

1187.   Intel acted intentionally, knowingly, and maliciously to violate Kansas's Consumer Protection Act, and recklessly disregarded Plaintiffs' and Kansas Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issue put it on notice that the CPUs were not as it advertised.

1188.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Kansas Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving

PAGE 371 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1189.   Plaintiffs and Kansas Subclass members seek all monetary and non-monetary relief allowed by law, including civil penalties or actual damages (whichever is greater), under K.S.A. §§ 50-634 and 50-636; injunctive relief; and reasonable attorneys' fees and costs.

1190.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## LOUISIANA SUBCLASS, COUNT XXI

### LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### La. Rev. Stat. Ann. § 51:1401 et seq.

1191.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1192.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Louisiana, and/or on behalf of the Louisiana Subclass.

1193.   Intel, Plaintiffs, and Louisiana Subclass members are "persons" within the meaning of the La. Rev. Stat. Ann. § 51:1402(8).

1194.   Plaintiffs and Louisiana Subclass members are "consumers" within the meaning of La. Rev. Stat. Ann. § 51:1402(1).

1195.   Intel engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. Ann. § 51:1402(10).

PAGE 372 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

1196.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce."  La. Rev. Stat. Ann. § 51:1405(A).  Unfair acts are those that offend established public policy, while deceptive acts are practices that amount to fraud, deceit, or misrepresentation.

1197.    Intel engaged in unfair and deceptive acts and practices in the conduct of trade or commerce, in violation of La. Rev. Stat. Ann. § 51:1405(A), including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1198.    Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1199.    Intel intended to mislead Plaintiffs and Louisiana Subclass members and induce them to rely on its misrepresentations and omissions.

1200.    Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects; that the CPU Defects allowed unauthorized access to confidential information; that necessary mitigations to address the Defects would result in significant CPU performance degradation; and that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks. These material facts should have been disclosed because both security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial

PAGE 373 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

representations as alleged herein.  Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

1201.   Intel's unfair and deceptive acts and practices were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Plaintiffs and absent Louisiana Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

1202.   Intel acted intentionally, knowingly, and maliciously to violate Louisiana's Unfair Trade Practices and Consumer Protection Law, and recklessly disregarded Plaintiffs' and Louisiana Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1203.   Had Intel disclosed to Plaintiffs and Louisiana Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Louisiana Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1204.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or

PAGE 374 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1205.   Plaintiffs and Louisiana Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages; treble damages for Intel's knowing violations of the Louisiana CPL; declaratory relief; attorneys' fees; and any other relief that is just and proper.

### MAINE SUBCLASS, COUNT XXII

### MAINE UNFAIR TRADE PRACTICES ACT
**5 Me. Rev. Stat. §§ 205, 213, *et seq.***

1206.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1207.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Maine, and/or on behalf of the and/or the Maine Subclass.

1208.   Intel is a "person" as defined by 5 Me. Rev. Stat. § 206(2).

1209.   Intel's conduct as alleged herein related was in the course of "trade and commerce" as defined by 5 Me. Rev. Stat. § 206(3).

1210.   Plaintiffs and Maine Subclass members purchased goods and/or services for personal, family, and/or household purposes.

1211.   A demand for relief in the form substantially similar to that required by 5 Me. Rev. Stat. § 213(1-A) was already sent at the commencement of this lawsuit but Intel has not made a written tender of settlement or offer of judgment.  Intel received supplemental notice pursuant to 5 Me. Rev. Stat. § 213(1-A) concerning its wrongful conduct as alleged herein by Plaintiffs and

PAGE 375 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

Maine Subclass members, but this and any subsequent demand was and would be an exercise in futility.

1212.   Intel engaged in unfair and deceptive trade acts and practices in the conduct of trade or commerce, in violation of 5 Me. Rev. Stat. §207, including concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1213.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1214.  Had Intel disclosed to Plaintiffs and Maine Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Maine Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1215.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Maine Subclass members have suffered and will continue to suffer injury, ascertainable losses

PAGE 376 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1216.   Plaintiffs and the Maine Subclass members seek all monetary and non-monetary relief allowed by law, including damages or restitution, injunctive and other equitable relief, and attorneys' fees and costs.

1217.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## MAINE SUBCLASS, COUNT XXIII

### MAINE UNIFORM DECEPTIVE TRADE PRACTICES ACT
### 10 Me. Rev. Stat. § 1212 *et seq.*

1218.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1219.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Maine, and/or on behalf of the and/or the Maine Subclass.

1220.   Intel is a "person" as defined by 10 Me. Rev. Stat. § 1211(5).

1221.   Intel advertised, offered, or sold goods or services in Maine and engaged in trade or commerce directly or indirectly affecting the people of Maine.

1222.   Intel engaged in deceptive trade practices in the conduct of its business, in violation of 10 Me. Rev. Stat. § 1212, including: representing that goods or services have characteristics that

PAGE 377 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

they do not have; representing that goods or services are of a particular standard, quality, or grade if they are of another; advertising goods or services with intent not to sell them as advertised; engaging in other conduct that creates a likelihood of confusion or misunderstanding; and concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1223.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1224.   Intel intended to mislead Plaintiffs and Maine Subclass members and induce them to rely on its misrepresentations and omissions.

1225.   Had Intel disclosed to Plaintiffs and Maine Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Maine Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

PAGE 378 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
          COMPLAINT

1226.    As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Maine Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1227.    Maine Subclass members are likely to be damaged by Intel's ongoing deceptive trade practices.

1228.    Plaintiffs and Maine Subclass members seek all monetary and non-monetary relief allowed by law, including damages or restitution, injunctive or other equitable relief, and attorneys' fees and costs.

1229.    The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## MARYLAND SUBCLASS, COUNT XXIV

### MARYLAND CONSUMER PROTECTION ACT
### Md. Comm. Code § 13-301 *et seq.*

1230.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1231.    Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Maryland, and/or on behalf of the Maryland Subclass.

1232.    Intel is a person as defined by Md. Comm. Code § 13-101(h).

PAGE 379 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

1233.   Intel's conduct as alleged herein related to "sales," "offers for sale," or "bailment" as defined by Md. Comm. Code §§ 13-101(i) and 13-303.

1234.   Maryland Subclass members are "consumers" as defined by Md. Comm. Code § 13-101(c).

1235.   Intel advertises, offers, or sell "consumer goods" or "consumer services" as defined by Md. Comm. Code § 13-101(d).

1236.   Intel advertised, offered, or sold goods or services in Maryland and engaged in trade or commerce directly or indirectly affecting the people of Maryland.

1237.   Intel engaged in unfair and deceptive trade practices, in violation of Md. Comm. Code § 13-301, including:  (a) false or misleading oral or written representations that have the capacity, tendency, or effect of deceiving or misleading consumers; (b) representing that consumer goods or services have a characteristic that they do not have; (c) representing that consumer goods or services are of a particular standard, quality, or grade that they are not; (d) failing to state a material fact where the failure deceives or tends to deceive; (e) advertising or offering consumer goods or services without intent to sell, lease, or rent them as advertised or offered; (f) deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion or sale of consumer goods or services or the subsequent performance with respect to an agreement, sale lease or rental; and concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

PAGE 380 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

1238.   Intel engaged in these unfair and deceptive trade practices in connection with offering for sale or selling consumer goods or services or with respect to the extension of consumer credit, in violation of Md. Comm. Code § 13-303.

1239.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1240.   Intel intended to mislead Plaintiffs and Maryland Subclass members and induce them to rely on its misrepresentations and omissions.

1241.   Had Intel disclosed to Plaintiffs and Maryland Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Maryland Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1242.   Intel acted intentionally, knowingly, and maliciously to violate Maryland's Consumer Protection Act, and recklessly disregarded Plaintiffs' and Maryland Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

PAGE 381 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

1243.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Maryland Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1244.   Plaintiffs and Maryland Subclass members seek all monetary and non-monetary relief allowed by law, including damages, disgorgement, injunctive relief, and attorneys' fees and costs.

1245.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## MICHIGAN SUBCLASS, COUNT XXV

### MICHIGAN CONSUMER PROTECTION ACT
### Mich. Comp. Laws Ann. § 445.903 *et seq.*

1246.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1247.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Michigan, and/or on behalf of the Michigan Subclass.

1248.   Intel, Plaintiffs, and absent Michigan Subclass members are "persons" as defined by Mich. Comp. Laws Ann. § 445.903(d).

PAGE 382 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

1249.   Intel advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.903(g).

1250.   Intel engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws Ann. § 445.903(1), including: (a) representing that its goods and services have characteristics, uses, and benefits that they do not have, in violation of Mich. Comp. Laws Ann. § 445.903(1)(c); (b) representing that its goods and services are of a particular standard or quality if they are of another, in violation of Mich. Comp. Laws Ann. § 445.903(1)(e); (c) making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of Mich. Comp. Laws Ann. § 445.903(1)(bb); and (d) failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter, in violation of Mich. Comp. Laws Ann. § 445.903(1)(cc).

1251.   Intel's unfair, unconscionable, and deceptive practices also includes:

a.      Concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

b.      Continuing to sell and distribute chips at a premium price through the time of public disclosure although it knew that its CPUs had the Defects that would continue to be plagued by future exploits and performance impacts resulting from necessary

PAGE 383 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

mitigations.  Intel even launched new product to the market that it knew not only had the Defects but were also vulnerable to known Intel CPU Exploits-all while concealing the Defects, the Intel CPU Exploits, and the required mitigations that would substantially degrade performance and functionality.

c.      Launching a broad public relations campaign and issuing statements falsely claiming that the Intel CPU Exploits were an industry-wide problem and not unique to Intel, in an effort to avoid decreased sales, despite its knowledge that only Intel implemented the Unauthorized Access Defect and removed fundamental CPU security.

d.      Pledging to put "security" first and issuing statements promising that future chips would be redesigned at the silicon (or hardware) level to protect against the exploits and their variants, although even its new chip releases have been plagued by the Intel CPU Exploits and performance impacts because Intel has failed and refused to fix the root cause (i.e., the Defects) at the hardware level.  Intel merely provides superficial patches for a specific exploit as researchers demonstrate yet another variant of the Intel CPU Exploits.  Intel knows that, as long as it continues to only respond with symptomatic fixes, additional exploits like the Intel CPU Exploits will keep happening.  The only true fix is to exchange each defective CPU for a device containing a processor not subject to the security and performance Defects.

e.      Misrepresenting and understating the significant performance impacts the mitigations cause.  Intel then attempted to ban users who downloaded its security

PAGE 384 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

patches from publishing or providing benchmark testing results showing the true performance impacts.

f.      Manipulating the process for disclosing security exploits.

1252.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1253.   Intel intended to mislead Plaintiffs and Michigan Subclass members and induce them to rely on its misrepresentations and omissions.

1254.   Intel acted intentionally, knowingly, and maliciously to violate Michigan's Consumer Protection Act, and recklessly disregarded Plaintiffs and Michigan Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1255.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Michigan Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1256.   Plaintiffs and Michigan Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250 each, injunctive relief, and any other relief that is just and proper.

1257.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as

PAGE 385 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## MINNESOTA SUBCLASS, COUNT XXVI

### MINNESOTA CONSUMER FRAUD ACT
### Minn. Stat. § 325f.68, e*t seq.* and Minn. Stat. § 8.31 *et seq.*

1258.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1259.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Minnesota, and/or on behalf of the Minnesota Subclass.

1260.   Intel, Plaintiffs, and the absent members of the Minnesota Subclass are a "person" as defined by Minn. Stat. § 325F.68(3).

1261.   Intel goods, services, commodities, and intangibles (specifically, Intel CPUs) are "merchandise" as defined by Minn. Stat. § 325F.68(2).

1262.   Intel engaged in "sales" as defined by Minn. Stat. § 325F.68(4).

1263.   Intel engaged in fraud, false pretense, false promise, misrepresentation, misleading statements, and deceptive practices in connection with the sale of merchandise, in violation of Minn. Stat. § 325F.69(1), including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential. This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1264.   Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects; that the CPU Defects allowed unauthorized access to

PAGE 386 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

confidential information, that necessary mitigations to address the Defects would result in significant CPU performance degradation; and that, in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks. These material facts should have been disclosed because both security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial representations as alleged herein. Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

1265. Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1266. Intel intended to mislead Plaintiffs and Minnesota Subclass members and induce them to rely on its misrepresentations and omissions.

1267. Intel's fraudulent, misleading, and deceptive practices affected the public interest, including millions of Minnesotans who purchased and/or used Intel CPUs.

1268. As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Minnesota Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1269. Plaintiffs and Minnesota Subclass members seek all monetary and non-monetary relief allowed by law, including damages, injunctive or other equitable relief, and attorneys' fees, disbursements, and costs.

PAGE 387 – SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT

1270.  The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## MINNESOTA SUBCLASS, COUNT XXVII

### MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### Minn. Stat. § 325D.43 *et seq.*

1271.  Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1272.  Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Minnesota, and/or on behalf of the Minnesota Subclass.

1273.  Intel engaged in deceptive trade practices in the course of its business, in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1274.  By engaging in deceptive trade practices in the course of its business and vocation, directly or indirectly affecting the people of Minnesota, Intel also violated the following provisions of Minn. Stat. § 325D.44: representing that its goods and services had characteristics, uses, and benefits that they did not have, in violation of Minn. Stat. § 325D.44(1)(5); representing that goods and services are of a particular standard or quality when they are of another, in violation of Minn.

PAGE 388 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                     COMPLAINT

Stat. § 325D.44(1)(7); advertising goods and services with intent not to sell them as advertised, in violation of Minn. Stat. § 325D.44(1)(9); and engaging in other conduct that similarly creates a likelihood of confusion or misunderstanding, in violation of Minn. Stat. § 325D.44(1)(13).

1275.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1276.   Intel intended to mislead Plaintiffs and Minnesota Subclass members and induce them to rely on its misrepresentations and omissions.

1277.   Had Intel disclosed to Plaintiffs and Minnesota Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that, in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Minnesota Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1278.   Intel acted intentionally, knowingly, and maliciously to violate Minnesota's Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiffs' and Minnesota Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

PAGE 389 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

1279.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Minnesota Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1280.   Plaintiffs and Minnesota Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief and attorneys' fees and costs.

1281.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## MISSISSIPPI SUBCLASS, COUNT XXVIII

### MISSISSIPPI CONSUMER PROTECTION ACT
### Miss. Code § 75-24-1 *et seq.*

1282.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1283.   The non-entity Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Mississippi, and/or on behalf of the Mississippi Subclass.

1284.   Intel is a "person," as defined by Miss. Code § 75-24-3.

1285.   Intel advertised, offered, or sold goods or services in Mississippi and engaged in trade or commerce directly or indirectly affecting the people of Mississippi, as defined by Miss. Code § 75-24-3.

PAGE 390 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

1286.   Prior to filing suit, Plaintiffs made reasonable attempts to resolve their claims via informal dispute resolution processes; however, such processes were unsuccessful.

1287.   The Mississippi Consumer Protection Act, Miss. Code § 75-24-1 *et seq.*, prohibits unfair or deceptive trade practices.

1288.   Intel engaged in unfair or deceptive trade practices in the conduct of trade or commerce, in violation Miss. Code § 75-24-5, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1289.   The above-described conduct also violated Miss. Code Ann. § 75-24-5(2), including: representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising goods or services with intent not to sell them as advertised.

1290.   Intel intended to mislead Plaintiffs and Mississippi Subclass members and induce them to rely on its misrepresentations and omissions.

1291.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1292.   Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects; that the CPU Defects allowed unauthorized access to confidential information; that necessary mitigations to address the Defects would result in significant

PAGE 391 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

CPU performance degradation; and that, in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks. These material facts should have been disclosed because both security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial representations as alleged herein. Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

1293. Had Intel disclosed to Plaintiffs and Mississippi Subclass members material facts, including but not limited to, that: (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that, in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold. Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market. Plaintiffs and absent Mississippi Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1294. Intel acted intentionally, knowingly, and maliciously to violate Mississippi's Consumer Protection Act, and recklessly disregarded Plaintiffs' and Mississippi Subclass members' rights. Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1295.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Mississippi Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1296.   Intel's violations present a continuing risk to Plaintiffs and Mississippi Subclass members as well as to the general public because, among other things, its omissions and misrepresentations have not been corrected.

1297.   Plaintiffs and Mississippi Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, restitution and other relief under Miss. Code § 75-24-11, injunctive relief, punitive damages, and reasonable attorneys' fees and costs.

1298.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## MISSOURI SUBCLASS, COUNT XXIX

### MISSOURI MERCHANDISE PRACTICES ACT
### Mo. Rev. Stat. § 407.010 *et seq.*

1299.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1300.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Missouri, and/or on behalf of the Missouri Subclass.

PAGE 393 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

1301.   Intel is a "person" as defined by Mo. Rev. Stat. § 407.010(5).

1302.   Intel advertised, offered, or sold goods or services in Missouri and engaged in trade or commerce directly or indirectly affecting the people of Missouri, as defined by Mo. Rev. Stat. § 407.010(4), (6) and (7).

1303.   Plaintiffs and Missouri Subclass members purchased or leased goods or services primarily for personal, family, or household purposes.

1304.   Intel engaged in unlawful, unfair, and deceptive acts and practices, in connection with the sale or advertisement of merchandise in trade or commerce, in violation of Mo. Rev. Stat. § 407.020(1), including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1305.   Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects; that the CPU Defects allowed unauthorized access to confidential information; that necessary mitigations to address the Defects would result in significant CPU performance degradation; and that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks. These material facts should have been disclosed because both security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial representations as alleged herein.  Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

PAGE 394 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

1306.   Intel representations and omissions were material because they were likely to deceive reasonable consumers.

1307.   Intel intended to mislead Plaintiffs and Missouri Subclass members and induce them to rely on its misrepresentations and omissions.

1308.   Intel acted intentionally, knowingly, and maliciously to violate Missouri's Merchandise Practices Act, and recklessly disregarded Plaintiffs' and Missouri Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1309.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Missouri Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1310.   Plaintiffs and Missouri Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, punitive damages, attorneys' fees and costs, injunctive relief, and any other appropriate relief.

1311.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

PAGE 395 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

## MONTANA SUBCLASS, COUNT XXX

### MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
### M.C.A. § 30-14-101 *et seq.*

1312.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1313.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Montana, and/or on behalf of the Montana Subclass.

1314.   Intel is a "person" as defined by MCA § 30-14-102(6).

1315.   Plaintiffs and Montana Subclass members are "consumers" as defined by M.C.A. § 30-14-102(1).

1316.   Intel advertised, offered, or sold goods or services in Montana and engaged in trade or commerce directly or indirectly affecting the people of Montana, as defined by M.C.A. § 30-14-102(8).

1317.   Intel engaged in unfair and deceptive acts and practices in the conduct of trade or commerce, in violation M.C.A. § 30-14-103, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1318.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

PAGE 396 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

1319.  Had Intel disclosed to Plaintiffs and Montana Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that, in designing its CPUs, Intel failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Montana Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1320.  Intel's acts described above are unfair and Plaintiffs and Montana Subclass members have lost money as a result of these practices.  Intel's acts are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.  Indeed, Intel lulled consumers into thinking its CPUs were secure and fast, but the flaws in the CPUs allowed for significant security issues, which Intel knew, should have known about, or was reckless in not knowing about when it sold the CPUs.  Intel knew, should have known, or was reckless in not knowing that it was exposing Plaintiffs and absent Montana Subclass members to significant security problems with their most sensitive data and yet failed to inform consumers about those significant security issues.  Thereafter, Intel put the onus on consumers to fix the defects by requiring the installation of patches which affected the core functionality of the CPUs.

1321.  Intel acted intentionally, knowingly, and maliciously to violate Montana's Unfair Trade Practices and Consumer Protection Act, and recklessly disregarded Plaintiffs' and Montana

PAGE 397 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
          COMPLAINT

Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1322.   As a direct and proximate result of Intel's unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade or commerce, Plaintiffs and absent Montana Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1323.   Plaintiffs and Montana Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of (a) actual damages or (b) statutory damages of $500 each, treble damages, restitution, attorneys' fees and costs, injunctive relief, and other relief that the Court deems appropriate.

1324.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## NEBRASKA SUBCLASS, COUNT XXXI

## NEBRASKA CONSUMER PROTECTION ACT
### Neb. Rev. Stat. § 59-1601 *et seq.*

1325.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

PAGE 398 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
        COMPLAINT

1326.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Nebraska, and/or on behalf of the Nebraska Subclass.

1327.   Intel and absent Nebraska Subclass members are each a "person" as defined by Neb. Rev. Stat. § 59-1601(1).

1328.   Intel advertised, offered, or sold goods or services in Nebraska and engaged in trade or commerce directly or indirectly affecting the people of Nebraska, as defined by Neb. Rev. Stat. § 59-1601.

1329.   Intel engaged in unfair and deceptive acts and practices in conducting trade and commerce, in violation of Neb. Rev. Stat. § 59-1602, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1330.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1331.   As a direct and proximate result of Intel's unfair and deceptive acts and practices, Plaintiffs and absent Nebraska Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

PAGE 399 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

1332.   Intel's unfair and deceptive acts and practices complained of herein affected the public interest, including the large percentage of Nebraskans who have purchased and/or used Intel CPUs.

1333.   Plaintiffs and Nebraska Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, the greater of either (1) actual damages or (2) $1,000 each, civil penalties, and reasonable attorneys' fees and costs.

1334.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## NEBRASKA SUBCLASS, COUNT XXXII

### NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### Neb. Rev. Stat. § 87-301 *et seq.*

1335.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1336.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Nebraska, and/or on behalf of the Nebraska Subclass.

1337.   Intel and Nebraska Subclass members are each a "person" as defined by Neb. Rev. Stat. § 87-301(19).

1338.   Intel advertised, offered, or sold goods or services in Nebraska and engaged in trade or commerce directly or indirectly affecting the people of Nebraska.

PAGE 400 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

1339.   Intel engaged in deceptive trade practices in the course of its business, in violation of Neb. Rev. Stat. §§ 87-302(a)(5), (8), and (10), including by:  representing that goods and services have characteristics, uses, benefits, or qualities that they do not have; representing that goods and services are of a particular standard, quality, or grade if they are of another; advertising its goods and services with intent not to sell them as advertised and in a manner calculated or tending to mislead or deceive; and concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1340.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1341.   Intel intended to mislead Plaintiffs and Nebraska Subclass members and induce them to rely on its misrepresentations and omissions.

1342.   Had Intel disclosed to Plaintiffs and Nebraska Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that, in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs

and absent Nebraska Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1343.   Intel acted intentionally, knowingly, and maliciously to violate Nebraska's Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiffs' and Nebraska Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1344.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and Nebraska Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1345.   Intel's deceptive trade practices complained of herein affected consumers at large, including the large percentage of Nebraskans who purchased and/or used Intel CPUs.

1346.   Plaintiffs and Nebraska Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, civil penalties, and attorneys' fees and costs.

1347.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

PAGE 402 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

## NEVADA SUBCLASS, COUNT XXXIII

### NEVADA DECEPTIVE TRADE PRACTICES ACT
### Nev. Rev. Stat. Ann. § 598.0903 *et seq.*

1348.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1349.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Nevada, and/or on behalf of the Nevada Subclass.

1350.   Intel advertised, offered, or sold goods or services in Nevada and engaged in trade or commerce directly or indirectly affecting the people of Nevada.

1351.   Intel engaged in deceptive trade practices in the course of its business or occupation, in violation of Nev. Rev. Stat. §§ 598.0915 and 598.0923, including: knowingly making a false representation as to the characteristics, uses, and benefits of goods or services for sale in violation of Nev. Rev. Stat. § 598.0915(5); representing that goods or services for sale are of a particular standard, quality, or grade when Intel knew or should have known that they are of another standard, quality, or grade, in violation of Nev. Rev. Stat. § 598.0915(7); advertising goods or services with intent not to sell them as advertised, in violation of Nev. Rev. Stat § 598.0915(9); failing to disclose a material fact in connection with the sale of goods or services ,in violation of Nev. Rev. Stat. § 598.0923(A)(2); violating state and federal statutes or regulations relating to the sale of goods or services, in violation of Nev. Rev. Stat. § 598.0923(A)(3);  and concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public

at large.   To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1352.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1353.   Had Intel disclosed to Plaintiffs and Nevada Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.   Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.   Plaintiffs and absent Nevada Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1354.   Intel acted intentionally, knowingly, and maliciously to violate Nevada's Deceptive Trade Practices Act, and recklessly disregarded Plaintiffs' and Nevada Subclass members' rights. Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1355.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Nevada Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving

the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1356.   Plaintiffs and Nevada Subclass members seek all monetary and non-monetary relief allowed by law, including damages, punitive damages, and attorneys' fees, and costs.

## NEW HAMPSHIRE SUBCLASS, COUNT XXXIV

## NEW HAMPSHIRE CONSUMER PROTECTION ACT
### N.H.R.S.A. § 358-A *et seq.*

1357.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1358.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in New Hampshire, and/or on behalf of the New Hampshire Subclass.

1359.   Intel is a "person" under N.H.R.S.A. §§ 358-A:1(I) and 358-A:2.

1360.   Intel advertised, offered, or sold goods or services in New Hampshire and engaged in trade or commerce directly or indirectly affecting the people of New Hampshire, as defined by N.H.R.S.A. § 358-A:1(II).

1361.   Intel engaged in unfair and deceptive acts or practices in the ordinary conduct of its trade or business, in violation of N.H.R.S.A. § 358-A:2, including:  representing that its goods or services have characteristics, uses, or benefits that they do not have, in violation of N.H.R.S.A. § 358-A:2(V); representing that its goods or services are of a particular standard or quality if they are of another, in violation of N.H.R.S.A. § 358-A:2(VII); advertising its goods or services with intent not to sell them as advertised, in violation of N.H.R.S.A. § 358-A:2(IX); and concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to

keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1362.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1363.   Intel acted intentionally, knowingly, and maliciously to violate New Hampshire's Consumer Protection Act, and recklessly disregarded Plaintiffs' and New Hampshire Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.  Intel's acts and practices went beyond the realm of strictly private transactions.

1364.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent New Hampshire Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1365.   Plaintiffs and New Hampshire Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, punitive damages, equitable relief (including injunctive relief), restitution, civil penalties, and attorneys' fees and costs.

1366.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

PAGE 406 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

**NEW JERSEY SUBCLASS, COUNT XXXV**

**NEW JERSEY CONSUMER FRAUD ACT,**
**N.J. Stat. Ann. § 56:8-1 *et seq.***

1367.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1368.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in New Jersey, and/or on behalf of the New Jersey Subclass.

1369.   Intel is a "person," as defined by N.J. Stat. Ann. § 56:8-1(d).

1370.   Intel sells "merchandise," as defined by N.J. Stat. Ann. § 56:8-1(c) & (e).

1371.   The New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1 *et seq.*, prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, as well as the knowing concealment, suppression, or omission of any material fact with the intent that others rely on the concealment, omission, or fact, in connection with the sale or advertisement of any merchandise.

1372.   Intel engaged in unconscionable commercial practices, in acts of deception and false pretense in connection with the sale and advertisement of services, and concealment, suppression and omission of material facts, with intent that others rely upon the concealment, suppression or omission in violation in violation of N.J. Stat. § 56:8-2, including:

a.      Concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at

large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

b.    Continuing to sell and distribute chips at a premium price through the time of public disclosure although it knew that its CPUs had the Defects that would continue to be plagued by future exploits and performance impacts resulting from necessary mitigations.  Intel even launched new product to the market that it knew not only had the Defects but were also vulnerable to known Intel CPU Exploits-all while concealing the Defects, the Intel CPU Exploits, and the required mitigations that would substantially degrade performance and functionality.

c.    Launching a broad public relations campaign and issuing statements falsely claiming that the Intel CPU Exploits were an industry-wide problem and not unique to Intel, in an effort to avoid decreased sales, despite its knowledge that only Intel implemented the Unauthorized Access Defect and removed fundamental CPU security.

d.    Pledging to put "security" first and issuing statements promising that future chips would be redesigned at the silicon (or hardware) level to protect against the exploits and their variants, although even its new chip releases have been plagued by the Intel CPU Exploits and performance impacts because Intel has failed and refused to fix the root cause (i.e., the Defects) at the hardware level.  Intel merely provides superficial patches for a specific exploit as researchers demonstrate yet another variant of the Intel CPU Exploits.  Intel knows that, as long as it continues to only respond with symptomatic fixes, additional exploits like the Intel CPU Exploits will

PAGE 408 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

keep happening.  The only true fix is to exchange each defective CPU for a device containing a processor not subject to the security and performance Defects.

e.    Misrepresenting and understating the significant performance impacts the mitigations cause.  Intel then attempted to ban users who downloaded its security patches from publishing or providing benchmark testing results showing the true performance impacts.

f.    Manipulating the process for disclosing security exploits.

1373.  Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1374.  Intel intended to mislead Plaintiffs and New Jersey Subclass members and induce them to rely on its misrepresentations and omissions.

1375.  Intel acted intentionally, knowingly, and maliciously to violate New Jersey's Consumer Fraud Act, and recklessly disregarded Plaintiffs' and New Jersey Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1376.  As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent New Jersey Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1377.   Plaintiffs and New Jersey Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, actual damages, treble damages, restitution, and attorneys' fees, filing fees, and costs.

1378.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

### NEW MEXICO SUBCLASS, COUNT XXXVI

**NEW MEXICO UNFAIR PRACTICES ACT**
**N.M. Stat. Ann. § 57-12-2 *et seq.***

1379.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1380.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in New Mexico, and/or on behalf of the New Mexico Subclass.

1381.   Intel is a "person" within the meaning of N.M. Stat. Ann. § 57-12-2.

1382.   Intel was engaged in "trade" and "commerce" within the meaning of N.M. Stat. Ann. § 57-12-2(C) when engaging in the conduct alleged.

1383.   The New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-2 *et seq.*, prohibits both unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce.

1384.   Intel engaged in unconscionable, unfair, and deceptive acts and practices in connection with the sale of goods or services in the regular course of its trade or commerce defined in N.M. Stat. Ann. §§ 57-12-2(D) and 57-12-2(E), including:

a.      Concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

b.      Continuing to sell and distribute chips at a premium price through the time of public disclosure although it knew that its CPUs had the Defects that would continue to be plagued by future exploits and performance impacts resulting from necessary mitigations.  Intel even launched new product to the market that it knew not only had the Defects but were also vulnerable to known Intel CPU Exploits-all while concealing the Defects, the Intel CPU Exploits, and the required mitigations that would substantially degrade performance and functionality.

c.      Launching a broad public relations campaign and issuing statements falsely claiming that the Intel CPU Exploits were an industry-wide problem and not unique to Intel, in an effort to avoid decreased sales, despite its knowledge that only Intel implemented the Unauthorized Access Defect and removed fundamental CPU security.

d.      Pledging to put "security" first and issuing statements promising that future chips would be redesigned at the silicon (or hardware) level to protect against the exploits

PAGE 411 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

and their variants, although even its new chip releases have been plagued by the Intel CPU Exploits and performance impacts because Intel has failed and refused to fix the root cause (i.e., the Defects) at the hardware level.  Intel merely provides superficial patches for a specific exploit as researchers demonstrate yet another variant of the Intel CPU Exploits.  Intel knows that, as long as it continues to only respond with symptomatic fixes, additional exploits like the Intel CPU Exploits will keep happening.  The only true fix is to exchange each defective CPU for a device containing a processor not subject to the security and performance Defects.

e.     Misrepresenting and understating the significant performance impacts the mitigations cause.  Intel then attempted to ban users who downloaded its security patches from publishing or providing benchmark testing results showing the true performance impacts.

f.     Manipulating the process for disclosing security exploits.

1385.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1386.   Intel intended to mislead Plaintiffs and New Mexico Subclass members and induce them to rely on its misrepresentations and omissions.

1387.   Intel acted intentionally, knowingly, and maliciously to violate New Mexico's Unfair Practices Act, and recklessly disregarded Plaintiffs' and New Mexico Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

PAGE 412 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

1388.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent New Mexico Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1389.   Plaintiffs and New Mexico Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, actual damages or statutory damages of $100 (whichever is greater), treble damages or statutory damages of $300 each (whichever is greater), and reasonable attorneys' fees and costs.

1390.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## NEW YORK SUBCLASS, COUNT XXXVII

### NEW YORK GENERAL BUSINESS LAW
### N.Y. Gen. Bus. Law § 349 *et seq.*

1391.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1392.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in New York, and/or on behalf of the New York Subclass.

1393.   Intel engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, including, concealing

PAGE 413 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential. This information was not available to Plaintiffs, absent Class members, or the public at large. To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1394. Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1395. Intel acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiffs' and New York Subclass members' rights. Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1396. As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent New York Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1397. Intel's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the millions of New Yorkers who purchased and/or used Intel CPUs.

1398. The above deceptive and unlawful practices and acts by Intel caused substantial injury to Plaintiffs and absent New York Subclass members that they could not reasonably avoid.

PAGE 414 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

1399.   Plaintiffs and New York Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 each (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

1400.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## NORTH CAROLINA SUBCLASS, COUNT XXXVIII

### NORTH CAROLINA UNFAIR TRADE PRACTICES ACT
### N.C. Gen. Stat. Ann. § 75-1.1 *et seq.*

1401.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1402.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in North Carolina, and/or on behalf of the North Carolina Subclass.

1403.   Intel advertised, offered, or sold goods or services in North Carolina and engaged in trade or commerce directly or indirectly affecting the people of North Carolina, as defined by N.C. Gen. Stat. Ann. § 75-1.1(b).

1404.   Intel engaged in unfair and deceptive acts and practices in or affecting commerce, in violation of N.C. Gen. Stat. Ann. § 75-1.1, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the

PAGE 415 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
           COMPLAINT

public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1405.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1406.   Intel intended to mislead Plaintiffs and North Carolina Subclass members and induce them to rely on its misrepresentations and omissions.

1407.   Had Intel disclosed to Plaintiffs and North Carolina Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that, in designing its CPUs, Intel failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent North Carolina members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1408.   Intel acted intentionally, knowingly, and maliciously to violate North Carolina's Unfair Trade Practices Act, and recklessly disregarded Plaintiffs' and North Carolina Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1409.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and North Carolina Subclass members have suffered and will continue to suffer injury, ascertainable

losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1410.   Intel's conduct as alleged herein was continuous, such that after the first violations of the provisions pled herein, each week that the violations continued constitute separate offenses pursuant to N.C. Gen. Stat. Ann. § 75-8.

1411.   Plaintiffs and North Carolina Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, and attorneys' fees and costs.

## <u>NORTH DAKOTA SUBCLASS, COUNT XXXIX</u>

### NORTH DAKOTA UNLAWFUL SALES OR ADVERTISING ACT
### N.D. Cent. Code § 51-15-01 *et seq.*

1412.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1413.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in North Dakota, and/or on behalf of the North Dakota Subclass.

1414.   Intel, Plaintiffs, and each member of the North Dakota Subclass is a "person," as defined by N.D. Cent. Code § 51-15-01(4).

1415.   Intel sells and advertises "merchandise," as defined by N.D. Cent. Code § 51-15-01(3) and (5).

1416.   Intel advertised, offered, or sold goods or services in North Dakota and engaged in trade or commerce directly or indirectly affecting the people of North Dakota.

PAGE 417 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
           COMPLAINT

1417.   The North Dakota Unlawful Sales or Advertising Act, N.D. Cent. Code § 51-15-01 *et seq*., prohibits unlawful, deceptive, false, and unconscionable practices.

1418.   Intel engaged in deceptive, false, fraudulent, misrepresentative, unconscionable, and substantially injurious acts and practices in connection with the sale and advertisement of merchandise, in violation of N.D. Cent. Code § 51-15-02, including:

a.   Concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

b.   Continuing to sell and distribute chips at a premium price through the time of public disclosure although it knew that its CPUs had the Defects that would continue to be plagued by future exploits and performance impacts resulting from necessary mitigations.  Intel even launched new product to the market that it knew not only had the Defects but were also vulnerable to known Intel CPU Exploits-all while concealing the Defects, the Intel CPU Exploits, and the required mitigations that would substantially degrade performance and functionality.

c.   Launching a broad public relations campaign and issuing statements falsely claiming that the Intel CPU Exploits were an industry-wide problem and not unique to Intel, in an effort to avoid decreased sales, despite its knowledge that only Intel implemented the Unauthorized Access Defect and removed fundamental CPU security.

PAGE 418 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

d.    Pledging to put "security" first and issuing statements promising that future chips would be redesigned at the silicon (or hardware) level to protect against the exploits and their variants, although even its new chip releases have been plagued by the Intel CPU Exploits and performance impacts because Intel has failed and refused to fix the root cause (i.e., the Defects) at the hardware level.    Intel merely provides superficial patches for a specific exploit as researchers demonstrate yet another variant of the Intel CPU Exploits.    Intel knows that, as long as it continues to only respond with symptomatic fixes, additional exploits like the Intel CPU Exploits will keep happening.    The only true fix is to exchange each defective CPU for a device containing a processor not subject to the security and performance Defects.

e.    Misrepresenting and understating the significant performance impacts the mitigations cause.    Intel then attempted to ban users who downloaded its security patches from publishing or providing benchmark testing results showing the true performance impacts.

f.    Manipulating the process for disclosing security exploits.

1419.    Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1420.    Intel's above-described acts and practices caused substantial injury to Plaintiffs and North Dakota Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

1421.    Intel intended to mislead Plaintiffs and North Dakota Subclass members and induce them to rely on its misrepresentations and omissions.

PAGE 419 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                COMPLAINT

1422.   Intel acted intentionally, knowingly, and maliciously to violate North Dakota's Unlawful Sales or Advertising Law, and recklessly disregarded Plaintiffs' and North Dakota Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1423.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent North Dakota Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1424.   Plaintiffs and North Dakota Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, damages, restitution, treble damages, civil penalties, and attorneys' fees, costs, and disbursements.

1425.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## OHIO SUBCLASS, COUNT XL

### OHIO CONSUMER SALES PRACTICES ACT
### Ohio Rev. Code § 1345.01 *et seq.*

1426.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

PAGE 420 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                COMPLAINT

1427.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Ohio, and/or on behalf of the Ohio Subclass.

1428.   Plaintiffs and absent Ohio Subclass members are "persons," as defined by Ohio Rev. Code § 1345.01(B).

1429.   Intel was a "supplier" engaged in "consumer transactions," as defined by Ohio Rev. Code §§ 1345.01(A) & (C).

1430.   Intel advertised, offered, or sold goods or services in Ohio and engaged in trade or commerce directly or indirectly affecting the people of Ohio.

1431.   Intel engaged in unfair and deceptive acts and practices in connection with a consumer transaction, in violation of Ohio Rev. Code §§ 1345.02, including:  representing that its goods, services, and intangibles had performance characteristics, uses, and benefits that it did not have, in violation of Ohio Rev. Code § 1345.02(B)(1); and representing that its goods, services, and intangibles were of a particular standard or quality when they were not, in violation of Ohio Rev. Code § 1345(B)(2).

1432.   Intel engaged in unconscionable acts and practices in connection with a consumer transaction, in violation of Ohio Rev. Code Ann. § 1345.03, including:  knowingly taking advantage of the inability of Plaintiffs and the absent members of the Ohio Subclass to reasonably protect their interest because of their ignorance of the issues discussed herein (Ohio Rev. Code Ann. § 1345.03(B)(1)); and requiring Plaintiffs and the absent members of the  Ohio Subclass to enter into a consumer transaction on terms that Intel knew were substantially one-sided in its favor (Ohio Rev. Code Ann. § 1345.03(B)(5)).

PAGE 421 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

1433.  Intel's deceptive and unconscionable acts and practices also includes:

a.       Concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

b.       Continuing to sell and distribute chips at a premium price through the time of public disclosure although it knew that its CPUs had the Defects that would continue to be plagued by future exploits and performance impacts resulting from necessary mitigations.  Intel even launched new product to the market that it knew not only had the Defects but were also vulnerable to known Intel CPU Exploits-all while concealing the Defects, the Intel CPU Exploits, and the required mitigations that would substantially degrade performance and functionality.

c.       Launching a broad public relations campaign and issuing statements falsely claiming that the Intel CPU Exploits were an industry-wide problem and not unique to Intel, in an effort to avoid decreased sales, despite its knowledge that only Intel implemented the Unauthorized Access Defect and removed fundamental CPU security.

d.       Pledging to put "security" first and issuing statements promising that future chips would be redesigned at the silicon (or hardware) level to protect against the exploits and their variants, although even its new chip releases have been plagued by the Intel CPU Exploits and performance impacts because Intel has failed and refused to fix

PAGE 422 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                     COMPLAINT

the root cause (i.e., the Defects) at the hardware level.   Intel merely provides superficial patches for a specific exploit as researchers demonstrate yet another variant of the Intel CPU Exploits.   Intel knows that, as long as it continues to only respond with symptomatic fixes, additional exploits like the Intel CPU Exploits will keep happening.   The only true fix is to exchange each defective CPU for a device containing a processor not subject to the security and performance Defects.

e.     Misrepresenting and understating the significant performance impacts the mitigations cause.   Intel then attempted to ban users who downloaded its security patches from publishing or providing benchmark testing results showing the true performance impacts.

f.     Manipulating the process for disclosing security exploits.

1434.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1435.   Intel intended to mislead Plaintiffs and Ohio Subclass members and induce them to rely on its misrepresentations and omissions.

1436.   Intel acted intentionally, knowingly, and maliciously to violate Ohio's Consumer Sales Practices Act, and recklessly disregarded Plaintiffs' and Ohio Subclass members' rights. Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1437.   Intel's unfair, deceptive, and unconscionable acts and practices complained of herein affected the public interest, including the millions of Ohioans who purchased and/or used Intel CPUs.

PAGE 423 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

1438.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Ohio Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1439.   Plaintiffs and the Ohio Subclass members seek all monetary and non-monetary relief allowed by law, including declaratory and injunctive relief, the greater of actual and treble damages or statutory damages, attorneys' fees and costs, and any other appropriate relief.

1440.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

### OHIO SUBCLASS, COUNT XLI

### OHIO DECEPTIVE TRADE PRACTICES ACT
### Ohio Rev. Code § 4165.01 *et seq.*

1441.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1442.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Ohio, and/or on behalf of the Ohio Subclass.

1443.   Intel, Plaintiffs, and absent Ohio Subclass members are each a "person," as defined by Ohio Rev. Code § 4165.01(D).

PAGE 424 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

1444.   Intel advertised, offered, or sold goods or services in Ohio and engaged in trade or commerce directly or indirectly affecting the people of Ohio.

1445.   Intel engaged in deceptive trade practices in the course of its business and vocation, in violation of Ohio Rev. Code § 4165.02, including:  representing that its goods and services have characteristics, uses, benefits, or qualities that they do not have, in violation of Ohio Rev. Code § 4165.02(A)(7); representing that its goods and services are of a particular standard or quality when they are of another, in violation of Ohio Rev. Code § 4165.02(A)(9); advertising its goods and services with intent not to sell them as advertise, in violation of Ohio Rev. Code § 4165.02(A)(11); and concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1446.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1447.   Intel intended to mislead Plaintiffs and Ohio Subclass members and induce them to rely on its misrepresentations and omissions.

1448.   Intel acted intentionally, knowingly, and maliciously to violate Ohio's Deceptive Trade Practices Act, and recklessly disregarded Plaintiffs' and Ohio Subclass members' rights. Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1449.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Ohio Subclass members have suffered and will continue to suffer injury, ascertainable losses

PAGE 425 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT

of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1450.   Plaintiffs and Ohio Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, actual damages, attorneys' fees, and any other relief that is just and proper.

1451.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## OKLAHOMA, SUBCLASS COUNT XLII

## OKLAHOMA CONSUMER PROTECTION ACT
### Okla. Stat. Tit. 15, § 751 e*t seq.*

1452.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1453.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Oklahoma, and/or on behalf of the Oklahoma Subclass.

1454.   Intel is a "person," as meant by Okla. Stat. tit. 15, § 752(1).

1455.   Intel's advertisements, offers of sales, sales, and distribution of goods, services, and other things of value constituted "consumer transactions" within the meaning of Okla. tit. 15, § 752(2).

PAGE 426 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

1456.   Intel engaged in deceptive and unfair acts and practices in the course of its business, in violation of Okla. Stat. tit. 15, § 753(20), including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1457.   Intel, in the course of its business, engaged in unlawful practices in violation of Okla. Stat. tit. 15, § 753, including the following:  making false representations, knowingly or with reason to know, as to the characteristics, uses, and benefits of the subjects of its consumer transactions, in violation of Okla. Stat. tit. 15, § 753(5); representing, knowingly or with reason to know, that the subjects of its consumer transactions were of a particular standard when they were of another, in violation of Okla. Stat. tit 15, § 753(7); advertising, knowingly or with reason to know, the subjects of its consumer transactions with intent not to sell as advertised, in violation of Okla. Stat. tit 15, § 753 (8); committing unfair trade practices that offend established public policy and were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, as defined by section 752(14), in violation of Okla. Stat. tit. 15, § 753(20); and committing deceptive trade practices that deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person as defined by section 752(13), in violation of Okla. Stat. tit. 15, § 753(20).

1458.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1459.   Intel intended to mislead Plaintiffs and Oklahoma Subclass members and induce them to rely on its misrepresentations and omissions.

PAGE 427 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

1460.   Intel acted unfairly in failing to disclose the Defects to Plaintiffs and Oklahoma Subclass members because it was in a superior position to provide that information to the Plaintiffs and Oklahoma Subclass members and ordinary, reasonable consumers would not be able to know that the CPUs contained defects or required patches to operate in a secure manner absent Intel's disclosure.

1461.   Had Intel disclosed to Plaintiffs and Oklahoma Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Oklahoma Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1462.   The above unlawful practices and acts by Intel were immoral, unethical, oppressive, unscrupulous, unfair, and substantially injurious.  These acts caused substantial injury to Plaintiffs and absent Oklahoma Subclass members.

1463.   Intel acted intentionally, knowingly, and maliciously to violate Oklahoma's Consumer Protection Act, and recklessly disregarded Plaintiffs' and Oklahoma Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

PAGE 428 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                     COMPLAINT

1464.   As a direct and proximate result of Intel's unfair and deceptive acts and practices, Plaintiffs and Oklahoma Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1465.   Like other Oklahoma Subclass members, Plaintiffs experienced actual losses in connection with the CPU defects and patching due to those defects.  Those losses include, but are not limited to, loss of time in patching computers as a result of the security flaws, loss or compromise of data due to security flaws, and/or mitigation costs – damages which can be proven at trial.

1466.   Plaintiffs and Oklahoma Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, civil penalties, and attorneys' fees and costs.

## OREGON SUBCLASS, COUNT XLIII

### OREGON UNLAWFUL TRADE PRACTICES ACT
### Or. Rev. Stat. § 646.608 *et seq.*

1467.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1468.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Oregon, and/or on behalf of the Oregon Subclass.

1469.   Intel is a "person," as defined by Or. Rev. Stat. § 646.605(4).

1470.   Intel engaged in the sale of "goods and services," as defined by Or. Rev. Stat. § 646.605(6)(a).

PAGE 429 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

1471.   Intel sold "goods or services," as defined by Or. Rev. Stat. § 646.605(6)(a).   The CPUs at issue may be sold individually or inside of a machine.   Intel CPUs are often a motivating factor for an individual's purchase of particular machine, and, at any rate, Intel routinely sells large quantities of CPUs individually.

1472.   Intel advertised, offered, or sold goods or services in Oregon and engaged in trade or commerce directly or indirectly affecting the people of Oregon.

1473.   Intel engaged in unlawful practices in the course of its business and occupation and engaged in unconscionable trade practices in violation of Or. Rev. Stat. §§ 646.607 and 646.608, including:

a.   Concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.   This information was not available to Plaintiffs, absent Class members, or the public at large.   To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

b.   Continuing to sell and distribute chips at a premium price through the time of public disclosure although it knew that its CPUs had the Defects that would continue to be plagued by future exploits and performance impacts resulting from necessary mitigations.   Intel even launched new product to the market that it knew not only had the Defects but were also vulnerable to known Intel CPU Exploits-all while concealing the Defects, the Intel CPU Exploits, and the required mitigations that would substantially degrade performance and functionality.

PAGE 430 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

c.      Launching a broad public relations campaign and issuing statements falsely claiming that the Intel CPU Exploits were an industry-wide problem and not unique to Intel, in an effort to avoid decreased sales, despite its knowledge that only Intel implemented the Unauthorized Access Defect and removed fundamental CPU security.

d.      Pledging to put "security" first and issuing statements promising that future chips would be redesigned at the silicon (or hardware) level to protect against the exploits and their variants, although even its new chip releases have been plagued by the Intel CPU Exploits and performance impacts because Intel has failed and refused to fix the root cause (i.e., the Defects) at the hardware level.   Intel merely provides superficial patches for a specific exploit as researchers demonstrate yet another variant of the Intel CPU Exploits.   Intel knows that, as long as it continues to only respond with symptomatic fixes, additional exploits like the Intel CPU Exploits will keep happening.   The only true fix is to exchange each defective CPU for a device containing a processor not subject to the security and performance Defects.

e.      Misrepresenting and understating the significant performance impacts the mitigations cause.   Intel then attempted to ban users who downloaded its security patches from publishing or providing benchmark testing results showing the true performance impacts.

f.      Manipulating the process for disclosing security exploits.

1474.  Intel's unlawful practices in the course of its business and occupation also violated the following provisions of Or. Rev. Stat. § 646.608, included the following:  representing that its

PAGE 431 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

goods and services have approval, characteristics, uses, benefits, and qualities that they do not have, in violation of Or. Rev. Stat. § 646.608(1)(e); representing that its goods and services are of a particular standard or quality if they are of another, in violation of Or. Rev. Stat. § 646.608(1)(g); advertising its goods or services with intent not to provide them as advertised, in violation of Or. Rev. Stat. § 646.608(1)(i); and concurrent with tender or delivery of its goods and services, failing to disclose any known material Defect, in violation of Or. Rev. Stat. § 646.608(1)(t).

1475.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1476.   Intel intended to mislead Plaintiffs and Oregon Subclass members and induce them to rely on its misrepresentations and omissions.

1477.   Had Intel disclosed to Plaintiffs and Oregon Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and Oregon Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1478.   Intel acted intentionally, knowingly, and maliciously to violate Oregon's Unlawful Trade Practices Act, and recklessly disregarded Plaintiffs' and Oregon Subclass members' rights.

PAGE 432 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1479.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Oregon Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs with installed Intel CPUs, and increased time and expense in dealing with performance and security issues.

1480.   Plaintiffs and Oregon Subclass members seek all monetary and non-monetary relief allowed by law, including equitable relief, actual damages or statutory damages of $200 per violation (whichever is greater), punitive damages, and reasonable attorneys' fees and costs.

## PENNSYLVANIA SUBCLASS, COUNT XLIV

### PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### 73 Pa. Cons. Stat. §§ 201-2 & 201-3, *et seq.*

1481.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1482.   The non-entity Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Pennsylvania, and/or on behalf of the Pennsylvania Subclass.

1483.   Intel is a "person," as meant by 73 Pa. Cons. Stat. § 201-2(2).

1484.   Plaintiffs and absent Pennsylvania Subclass members purchased goods and services in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

PAGE 433 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
           COMPLAINT

1485.   Intel engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. § 201-3, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1486.   Intel engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce in violation of 73 Pa. Cons. Stat. § 201-3, including the following:  representing that its goods and services have characteristics, uses, benefits, and qualities that they do not have (73 Pa. Cons. Stat. § 201-2(4)(v)); representing that its goods and services are of a particular standard or quality if they are another (73 Pa. Cons. Stat. § 201-2(4)(vii)); and advertising its goods and services with intent not to sell them as advertised (73 Pa. Cons. Stat. § 201-2(4)(ix)).

1487.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1488.   Intel intended to mislead Plaintiffs and Pennsylvania Subclass members and induce them to rely on its misrepresentations and omissions.

1489.   Had Intel disclosed to Plaintiffs and Pennsylvania Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel failed to take measures to protect confidential information from attacks by unauthorized users while knowing that

PAGE 434 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Pennsylvania Alabama Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1490.   Intel acted intentionally, knowingly, and maliciously to violate Pennsylvania Unfair Trade Practices and Consumer Protection Law, and recklessly disregarded Plaintiffs and absent Pennsylvania Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1491.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and Pennsylvania Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing their personal CPUs, and increased time and expense in dealing with performance and security issues.

1492.   Plaintiffs and Pennsylvania Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $100 (whichever is greater), treble damages, attorneys' fees and costs, and any additional relief the Court deems necessary or proper.

## RHODE ISLAND SUBCLASS, COUNT XLV

### RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT
### R.I. Gen. Laws § 6-13.1 *et seq.*

1493.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

PAGE 435 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

1494.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Rhode Island, and/or on behalf of the Rhode Island Subclass.

1495.   Plaintiffs and Rhode Island Subclass members are each a "person," as defined by R.I. Gen. Laws § 6-13.1-1(3).

1496.   Plaintiffs and Rhode Island Subclass members purchased goods and services for personal, family, or household purposes.

1497.   Intel advertised, offered, or sold goods or services in Rhode Island and engaged in trade or commerce directly or indirectly affecting the people of Rhode Island, as defined by R.I. Gen. Laws § 6-13.1-1(5).

1498.   Intel engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the R.I. Gen. Laws § 6-13.1-2, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1499.   Intel's unfair and deceptive acts and practices also violated R.I. Gen. Laws § 6-13.1-1(6), including:  representing that its goods and services have characteristics, uses, and benefits that they do not have (R.I. Gen. Laws § 6-13.1-1(6)(v)); representing that its goods and services are of a particular standard or quality when they are of another (R.I. Gen. Laws § 6-13.1-1(6)(vii)); advertising goods or services with intent not to sell them as advertised (R.I. Gen. Laws § 6-13.1-1(6)(ix)); engaging in any other conduct that similarly creates a likelihood of confusion or

misunderstanding (R.I. Gen. Laws § 6-13.1-1(6)(xii)); engaging in any act or practice that is unfair or deceptive to the consumer (R.I. Gen. Laws § 6-13.1-1 (6)(xiii)); and using other methods, acts, and practices that mislead or deceive members of the public in a material respect (R.I. Gen. Laws § 6-13.1-1 (6)(xiv)).

1500.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1501.   Intel intended to mislead Plaintiffs and Rhode Island Subclass members and induce them to rely on its misrepresentations and omissions.

1502.   Intel acted intentionally, knowingly, and maliciously to violate Rhode Island's Deceptive Trade Practices Act, and recklessly disregarded Plaintiffs' and absent Rhode Island Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1503.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Rhode Island Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1504.   Plaintiffs and Rhode Island Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $200 per Subclass Member (whichever is greater), punitive damages, injunctive relief, other equitable relief, and attorneys' fees and costs.

PAGE 437 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

1505.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

### SOUTH CAROLINA SUBCLASS, COUNT XLVI

### SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### S.C. Code Ann. § 39-5-10 *et seq.*

1506.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1507.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in South Carolina, and/or on behalf of the South Carolina Subclass.

1508.   Intel is a "person," as defined by S.C. Code Ann. § 39-5-10(a).

1509.   South Carolina's Unfair Trade Practices Act (SC UTPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  S.C. Code Ann. § 39-5-20.

1510.   Intel advertised, offered, or sold goods or services in South Carolina and engaged in trade or commerce directly or indirectly affecting the people of South Carolina, as defined by S.C. Code Ann. § 39-5-10(b).

1511.   Intel's acts and practices had, and continue to have, the tendency or capacity to deceive.

1512.   Intel engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the S.C. Code Ann. § 39-5-20, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision

PAGE 438 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1513.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1514.   Intel intended to mislead Plaintiffs and South Carolina Subclass members and induce them to rely on its misrepresentations and omissions.

1515.   Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects; that the CPU Defects allowed unauthorized access to confidential information; that necessary mitigations to address the Defects would result in significant CPU performance degradation; and that, in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks. These material facts should have been disclosed because both security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial representations as alleged herein.  Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

1516.   Had Intel disclosed to Plaintiffs and South Carolina Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel failed to take measures to protect confidential information from attacks by unauthorized users while knowing that

PAGE 439 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent South Carolina Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1517.  Intel's business acts and practices offend an established public policy, or are immoral, unethical, or oppressive.

1518.  Intel's unfair and deceptive acts or practices adversely affected the public interest because such acts or practices have the potential for repetition; Intel engages in such acts or practices as a general rule; and such acts or practices impact the public at large, including millions of South Carolina Subclass members that purchased and/or used an Intel CPU.

1519.  Intel unfair and deceptive acts or practices have the potential for repetition because the same kinds of actions occurred in the past, as described herein, thus making it likely that these acts or practices will continue to occur if left undeterred.  Additionally, Intel's policies and procedures create the potential for recurrence of the complained-of business acts and practices.

1520.  Intel violations present a continuing risk to Plaintiffs and absent South Carolina Subclass members as well as to the general public.

1521.  Intel intended to mislead Plaintiffs and South Carolina Subclass members and induce them to rely on its misrepresentations and omissions.

1522.  Intel acted intentionally, knowingly, and maliciously to violate South Carolina's Unfair Trade Practices Act, and recklessly disregarded Plaintiffs' and absent South Carolina Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice

that the CPUs were not as it advertised.  In light of this conduct, punitive damages would serve the interest of society in punishing and warning others not to engage in such conduct and would deter Intel and others from committing similar conduct in the future.

1523.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent South Carolina Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1524.   Plaintiffs and South Carolina Subclass members seek all monetary and non-monetary relief allowed by law, including damages for their economic losses, treble damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

1525.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## SOUTH DAKOTA SUBCLASS, COUNT XLVII

### SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT
### S.D. Codified Laws § 37-24-1 *et seq.*

1526.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

PAGE 441 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT

1527.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in South Dakota, and/or on behalf of the South Dakota Subclass.

1528.   Intel is a "person," as defined by S.D. Codified Laws § 37-24-1(8).

1529.   Intel advertises and sells "merchandise," as defined by S.D. Codified Laws § 37-24-1(6), (7), & (13).

1530.   Intel advertised, offered, or sold goods or services in South Dakota and engaged in trade or commerce directly or indirectly affecting the people of South Dakota, as defined by S.D. Codified Laws § 37-24-1(6), (7), & (13).

1531.   Intel knowingly engaged in deceptive acts or practices, misrepresentation, concealment, suppression, or omission of material facts in connection with the sale and advertisement of goods or services, in violation of S.D. Codified Laws § 37-24-6, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1532.   Intel intended to mislead Plaintiffs and South Dakota Subclass members and induce them to rely on its misrepresentations and omissions.

1533.   Intel representations and omissions were material because they were likely to deceive reasonable consumers.

1534.   Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects; that the CPU Defects allowed unauthorized access to

PAGE 442 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

confidential information; that necessary mitigations to address the Defects would result in significant CPU performance degradation; and that, in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks. These material facts should have been disclosed because both security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial representations as alleged herein.  Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

1535.   Had Intel disclosed to Plaintiffs and South Dakota Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.   Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent South Dakota Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1536.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent South Dakota Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving

the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1537.   Intel's violations present a continuing risk to Plaintiffs and absent South Dakota Subclass members as well as to the general public.

1538.   Plaintiffs and South Dakota Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, injunctive relief, and reasonable attorneys' fees and costs.

1539.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## TENNESSEE SUBCLASS, COUNT XLVIII

## TENNESSEE CONSUMER PROTECTION ACT
### Tenn. Code Ann. § 47-18-101 *et seq.*

1540.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1541.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Tennessee, and/or on behalf of the Tennessee Subclass.

1542.   Intel is a "person," as defined by Tenn. Code § 47-18-103(13).

1543.   Plaintiffs and absent Tennessee Subclass members are "consumers," within the meaning of Tenn. Code § 47-18-103(2).

PAGE 444 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

1544.   Intel advertised and sold "goods" or "services" in "consumer transaction[s]," as defined by Tenn. Code §§ 47-18-103(7), (18) & (19).

1545.   Intel advertised, offered, or sold goods or services in Tennessee and engaged in trade or commerce directly or indirectly affecting the people of Tennessee, as defined by Tenn. Code §§ 47-18-103(7), (18) & (19).  Furthermore, Intel's acts or practices affected the conduct of trade or commerce, within the meaning and scope of Tenn. Code § 47-18-104.

1546.   Intel intended to mislead Plaintiffs and Tennessee Subclass members and induce them to rely on its misrepresentations and omissions.

1547.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1548.   Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects; that the CPU Defects allowed unauthorized access to confidential information; that necessary mitigations to address the Defects would result in significant CPU performance degradation; and that, in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks.  These material facts should have been disclosed because both security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial representations as alleged herein.  Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

1549.  Had Intel disclosed to Plaintiffs and Tennessee Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed

unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Tennessee Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1550.   Intel's "unfair" acts and practices caused or were likely to cause substantial injury to consumers, which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

1551.   The injury to consumers was and is substantial because it was non-trivial and non-speculative and involved a monetary injury.  The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

1552.   Consumers could not have reasonably avoided injury because Intel's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making.  By withholding important information from consumers as described herein, Intel created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

1553.   Intel's business practices had no countervailing benefit to consumers or to competition.

PAGE 446 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                  COMPLAINT

1554.   Intel engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the Tenn. Code § 47-18-104, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1555.   By misrepresenting and omitting material facts, Intel violated the following provisions of Tenn. Code § 47-18-104(b):  representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; representing that goods or services are of a particular standard, quality or grade, if they are of another; advertising goods or services with intent not to sell them as advertised; and representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve.

1556.   Intel acted intentionally, knowingly, and maliciously to violate Tennessee's Consumer Protection Act, and recklessly disregarded Plaintiffs' and absent Tennessee Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1557.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Tennessee Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

PAGE 447 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                     COMPLAINT

1558.   Intel's violations present a continuing risk to Plaintiffs and absent Tennessee Subclass members as well as to the general public.

1559.   Plaintiffs and Tennessee Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, actual damages, treble damages for each willful or knowing violation, attorneys' fees and costs, and any other relief that is necessary and proper.

1560.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## TEXAS SUBCLASS, COUNT XLIX

### TEXAS DECEPTIVE TRADE PRACTICES–CONSUMER PROTECTION ACT
### Texas Bus. & Com. Code § 17.41 *et seq.*

1561.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1562.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Texas, and/or on behalf of the Texas Subclass.

1563.   Intel is a "person," as defined by Tex. Bus. & Com. Code § 17.45(3).

1564.   Plaintiffs and absent Texas Subclass members are "consumers," as defined by Tex. Bus. & Com. Code § 17.45(4).

1565.   Intel advertised, offered, or sold goods or services in Texas and engaged in trade or commerce directly or indirectly affecting the people of Texas, as defined by Tex. Bus. & Com. Code § 17.45(6).

PAGE 448 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT

1566.   Intel engaged in false, misleading, or deceptive acts and practices, in violation of Tex. Bus. & Com. Code § 17.46(b), including:  representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; representing that goods or services are of a particular standard, quality or grade, if they are of another; and advertising goods or services with intent not to sell them as advertised.

1567.   Intel intended to mislead Plaintiffs and Texas Subclass members and induce them to rely on its misrepresentations and omissions.

1568.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1569.   Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects; that the CPU Defects allowed unauthorized access to confidential information; that necessary mitigations to address the Defects would result in significant CPU performance degradation; and that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks. These material facts should have been disclosed because both security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial representations as alleged herein.  Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

1570.   Had Intel disclosed to Plaintiffs and Texas Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result

PAGE 449 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Texas Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1571.  Intel engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code Ann. § 17.50(a)(3), including:

a.  Concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

b.  Continuing to sell and distribute chips at a premium price through the time of public disclosure although it knew that its CPUs had the Defects that would continue to be plagued by future exploits and performance impacts resulting from necessary mitigations.  Intel even launched new product to the market that it knew not only had the Defects but were also vulnerable to known Intel CPU Exploits-all while concealing the Defects, the Intel CPU Exploits, and the required mitigations that would substantially degrade performance and functionality.

PAGE 450 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

c.     Launching a broad public relations campaign and issuing statements falsely claiming that the Intel CPU Exploits were an industry-wide problem and not unique to Intel, in an effort to avoid decreased sales, despite its knowledge that only Intel implemented the Unauthorized Access Defect and removed fundamental CPU security.

d.     Pledging to put "security" first and issuing statements promising that future chips would be redesigned at the silicon (or hardware) level to protect against the exploits and their variants, although even its new chip releases have been plagued by the Intel CPU Exploits and performance impacts because Intel has failed and refused to fix the root cause (i.e., the Defects) at the hardware level.   Intel merely provides superficial patches for a specific exploit as researchers demonstrate yet another variant of the Intel CPU Exploits.   Intel knows that, as long as it continues to only respond with symptomatic fixes, additional exploits like the Intel CPU Exploits will keep happening.   The only true fix is to exchange each defective CPU for a device containing a processor not subject to the security and performance Defects.

e.     Misrepresenting and understating the significant performance impacts the mitigations cause.   Intel then attempted to ban users who downloaded its security patches from publishing or providing benchmark testing results showing the true performance impacts.

f.     Manipulating the process for disclosing security exploits.

PAGE 451 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

1572.   Plaintiffs and absent Texas Subclass members lacked knowledge about the above business practices, omissions, and misrepresentations because this information was known exclusively by Intel.

1573.   Intel intended to take advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree, with reckless disregard of the unfairness that would result.  The unfairness resulting from Intel's conduct is glaringly noticeable, flagrant, complete, and unmitigated.

1574.   Intel acted intentionally, knowingly, and maliciously to violate Texas's Deceptive Trade Practices-Consumer Protection Act, and recklessly disregarded Plaintiffs' and absent Texas Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1575.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Texas Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1576.   Intel's violations present a continuing risk to Plaintiffs and Texas Subclass members as well as to the general public.

1577.   Intel received notice pursuant to Tex. Bus. & Com. Code Ann. § 17.505 concerning its wrongful conduct as alleged herein by Plaintiffs and absent Texas Subclass members.  Sending pre-suit notice pursuant to Tex. Bus. & Com. Code Ann. § 17.505, however, is an exercise in futility for Plaintiffs because Intel has already been informed of the allegedly unfair and unlawful conduct

as described herein as of the date of the first-filed action among the cases centralized in this multidistrict litigation and has yet to offer Texas Subclass members remedy in accordance with similar consumer protection statute.

1578.   Plaintiffs and the Texas Subclass seek all monetary and non-monetary relief allowed by law, including economic damages, damages for mental anguish, treble damages for each act committed intentionally or knowingly, court costs, reasonably and necessary attorneys' fees, injunctive relief, and any other relief which the Court deems proper.

1579.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## UTAH SUBCLASS, COUNT L

### UTAH CONSUMER SALES PRACTICES ACT
### Utah Code § 13-11-1 *et seq.*

1580.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1581.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Utah, and/or on behalf of the Utah Subclass.

1582.   Intel is a "person," as defined by Utah Code § 13-11-1(5).

1583.   Intel is a "supplier," as defined by Utah Code § 13-11-1(6), because it regularly solicits, engages in, or enforces "consumer transactions," as defined by Utah Code § 13-11-1(2).

PAGE 453 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

1584.   Intel engaged in deceptive and unconscionable acts and practices in connection with consumer transactions, in violation of Utah Code §§ 13-11-4 and 13-11-5, including:

a.      Concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

b.      Continuing to sell and distribute chips at a premium price through the time of public disclosure although it knew that its CPUs had the Defects that would continue to be plagued by future exploits and performance impacts resulting from necessary mitigations.  Intel even launched new product to the market that it knew not only had the Defects but were also vulnerable to known Intel CPU Exploits-all while concealing the Defects, the Intel CPU Exploits, and the required mitigations that would substantially degrade performance and functionality.

c.      Launching a broad public relations campaign and issuing statements falsely claiming that the Intel CPU Exploits were an industry-wide problem and not unique to Intel, in an effort to avoid decreased sales, despite its knowledge that only Intel implemented the Unauthorized Access Defect and removed fundamental CPU security.

d.      Pledging to put "security" first and issuing statements promising that future chips would be redesigned at the silicon (or hardware) level to protect against the exploits and their variants, although even its new chip releases have been plagued by the Intel

PAGE 454 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

CPU Exploits and performance impacts because Intel has failed and refused to fix the root cause (i.e., the Defects) at the hardware level.  Intel merely provides superficial patches for a specific exploit as researchers demonstrate yet another variant of the Intel CPU Exploits.  Intel knows that, as long as it continues to only respond with symptomatic fixes, additional exploits like the Intel CPU Exploits will keep happening.  The only true fix is to exchange each defective CPU for a device containing a processor not subject to the security and performance Defects.

e.      Misrepresenting and understating the significant performance impacts the mitigations cause.  Intel then attempted to ban users who downloaded its security patches from publishing or providing benchmark testing results showing the true performance impacts.

f.      Manipulating the process for disclosing security exploits.

1585.   Intel intended to mislead Plaintiffs and Utah Subclass members and induce them to rely on its misrepresentations and omissions.

1586.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1587.   Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects; that the CPU Defects allowed unauthorized access to confidential information; that necessary mitigations to address the Defects would result in significant CPU performance degradation; and that, in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks. These material facts should have been disclosed because both

PAGE 455 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial representations as alleged herein.  Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

1588.  Had Intel disclosed to Plaintiffs and Texas Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that, in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Utah Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1589.  Intel intentionally or knowingly engaged in deceptive acts or practices, violating Utah Code § 13-11-4(2) by: indicating that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not; indicating that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not; indicating that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not; indicating that the subject of a consumer transaction will be supplied in greater quantity (e.g., more data security) than the supplier intends.

PAGE 456 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
          COMPLAINT

1590.   Intel engaged in unconscionable acts and practices that were oppressive and led to unfair surprise, as shown in the setting, purpose, and effect of those acts and practices.

1591.   In addition, there was an overall imbalance in the obligations and rights imposed by the consumer transactions in question, based on the mores and industry standards of the time and place where they occurred.  There is a substantial imbalance between the obligations and rights of consumers, such as Plaintiffs and absent Utah Subclass members, who purchase CPUs based upon the publicly-available information in the marketplace, and Intel, which has exclusive or superior knowledge of any Defects in those devices and software developed to address those Defects.

1592.   Intel's acts and practices were also procedurally unconscionable because consumers, including Plaintiffs and absent Utah Subclass members, had no practicable option but to purchase CPUs based upon publicly available information, despite Intel's omissions and misrepresentations.

1593.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Utah Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1594.   Intel's violations present a continuing risk to Plaintiffs and absent Utah Subclass members as well as to the general public.

1595.   Under Utah Code § 13-11-19, Plaintiffs and Utah Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages of $2,000 per violation, amounts necessary to avoid unjust enrichment, injunctive relief, and reasonable attorneys' fees and costs.

PAGE 457 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

1596.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

### VERMONT SUBCLASS, COUNT LI

### VERMONT CONSUMER FRAUD ACT
### VT. Stat. Ann. Tit. 9, § 2451 *et seq.*

1597.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1598.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Vermont, and/or on behalf of the Vermont Subclass.

1599.   Plaintiffs and Vermont Subclass members are "consumers," as defined by Vt. Stat. Ann. tit. 9, § 2451a(a).

1600.   Intel's conduct as alleged herein related to "goods" or "services" for personal, family, or household purposes, as defined by Vt. Stat. Ann. tit. 9, § 2451a(b).

1601.   Intel is a "seller," as defined by Vt. Stat. Ann. tit. 9, § 2451a(c).

1602.   Intel advertised, offered, or sold goods or services in Vermont and engaged in trade or commerce directly or indirectly affecting the people of Vermont.

1603.   Intel engaged in unfair and deceptive acts or practices, in violation of Vt. Stat. tit. 9, § 2453(a), including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information

was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1604.   Intel intended to mislead Plaintiffs and Vermont Subclass members and induce them to rely on its misrepresentations and omissions.

1605.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1606.   Under the circumstances, consumers had a reasonable interpretation of Intel's representations and omissions.

1607.   Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects; that the CPU Defects allowed unauthorized access to confidential information, that necessary mitigations to address the Defects would result in significant CPU performance degradation; and that, in designing its CPUs, Intel failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks. These material facts should have been disclosed because both security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial representations as alleged herein.  Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

1608.  Intel's acts and practices caused or were likely to cause substantial injury to consumers, which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

PAGE 459 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

1609.   The injury to consumers was and is substantial because it was non-trivial and non-speculative; and involved a concrete monetary injury.  The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

1610.   Consumers could not have reasonably avoided injury because Intel's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making.   By withholding important information from consumers, Intel created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

1611.   Intel's business practices had no countervailing benefit to consumers or to competition.

1612.   Intel is presumed, as a matter of law under Vt. Stat. Ann. tit. 9, § 2457, to have intentionally violated the Vermont Consumer Protection Act because it failed to sell goods or services in the manner and of the nature advertised or offered.

1613.   Intel acted intentionally, knowingly, and maliciously to violate Vermont's Consumer Fraud Act, and recklessly disregarded Plaintiffs' and Vermont Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1614.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and Vermont Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the

benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1615.   Plaintiffs and Vermont Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, restitution, actual damages, disgorgement of profits, treble damages, punitive/exemplary damages, and reasonable attorneys' fees and costs.

1616.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## VIRGINIA SUBCLASS, COUNT LII

### VIRGINIA CONSUMER PROTECTION ACT
### VA. Code Ann. § 59.1-196 *et seq.*

1617.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1618.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Virginia, and/or on behalf of the Virginia Subclass.

1619.   The Virginia Consumer Protection Act prohibits "[u]sing any . . . deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."  Va. Code Ann. § 59.1-200(14).

1620.   Intel is a "person" as defined by Va. Code Ann. § 59.1-198.

1621.   Intel is a "supplier," as defined by Va. Code Ann. § 59.1-198.

PAGE 461 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

1622.   Intel engaged in the complained-of conduct in connection with "consumer transactions" with regard to "goods" and "services," as defined by Va. Code Ann. § 59.1-198.  Intel advertised, offered, or sold goods or services used primarily for personal, family or household purposes.

1623.   Intel engaged in deceptive acts and practices by using deception, fraud, false pretense, false promise, and misrepresentation in connection with consumer transactions, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.  Intel intended to mislead Plaintiffs and Virginia Subclass members and induce them to rely on its misrepresentations and omissions.

1624.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1625.   Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects; that the CPU Defects allowed unauthorized access to confidential information; that necessary mitigations to address the Defects would result in significant CPU performance degradation, and that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks. These material facts should have been disclosed because both security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial

PAGE 462 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

representations as alleged herein. Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

1626. Had Intel disclosed to Plaintiffs and Virginia Subclass members material facts, including but not limited to, that: (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold. Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market. Plaintiffs and absent Virginia Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1627. The above-described deceptive acts and practices also violated the following provisions of Va. Code § 59.1-200(A): misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; and advertising goods or services with intent not to sell them as advertised, or with intent not to sell them upon the terms advertised.

1628. Intel acted intentionally, knowingly, and maliciously to violate Virginia's Consumer Protection Act, and recklessly disregarded Plaintiffs' and absent Virginia Subclass members' rights. Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised. An award of punitive damages would serve to punish Intel for its wrongdoing and warn or deter others from engaging in similar conduct.

PAGE 463 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

1629.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Virginia Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1630.   Intel's violations present a continuing risk to Plaintiffs and absent Virginia Subclass members as well as to the general public.

1631.   Plaintiffs and Virginia Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages; statutory damages in the amount of $1,000 per violation if the conduct is found to be willful or, in the alternative, $500 per violation; restitution; injunctive relief; punitive damages; and attorneys' fees and costs.

1632.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## WASHINGTON SUBCLASS, COUNT LIII

### WASHINGTON CONSUMER PROTECTION ACT
### Wash. Rev. Code Ann. § 19.86.020 *et seq.*

1633.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1634.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Washington, and/or on behalf of the Washington Subclass.

PAGE 464 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

1635.   Intel is a "person," as defined by Wash. Rev. Code Ann. § 19.86.010(1).

1636.   Intel advertised, offered, or sold goods or services in Washington and engaged in trade or commerce directly or indirectly affecting the people of Washington, as defined by Wash. Rev. Code Ann. § 19.86.010 (2).

1637.   Intel engaged in unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Wash. Rev. Code Ann. § 19.86.020, including, concealing at all relevant times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1638.   Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects; that the CPU Defects allowed unauthorized access to confidential information; that necessary mitigations to address the Defects would result in significant CPU performance degradation; and that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks. These material facts should have been disclosed because both security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial representations as alleged herein.  Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

1639.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

PAGE 465 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

1640.   Intel acted intentionally, knowingly, and maliciously to violate Washington's Consumer Protection Act, and recklessly disregarded Plaintiffs' and absent Washington Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1641.   Intel's conduct is injurious to the public interest because it violates Wash. Rev. Code Ann. § 19.86.020, violates a statute that contains a specific legislation declaration of public interest impact, and/or injured persons and had and has the capacity to injure persons.  Furthermore, its conduct affected the public interest, including the at least hundreds of thousands of Washingtonians affected by Intel's deceptive business practices.

1642.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and Washington Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1643.   Plaintiffs and Washington Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, injunctive relief, civil penalties, and attorneys' fees and costs.

1644.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

**WEST VIRGINIA SUBCLASS, COUNT LIV**

**WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT**
**W. Va. Code § 46A-6-101 *et seq.***

1645.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1646.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in West Virginia, and/or on behalf of the West Virginia Subclass.

1647.   Plaintiffs and West Virginia Subclass members are "consumers," as defined by W. Va. Code § 46A-6-102(2).

1648.   Intel engaged in "consumer transactions," as defined by W. Va. Code § 46A-6-102(2).

1649.   Intel advertised, offered, or sold goods or services in West Virginia and engaged in trade or commerce directly or indirectly affecting the people of West Virginia, as defined by W. Va. Code § 46A-6-102(6).

1650.   Intel received notice pursuant to W. Va. Code § 46A-6-106(c) concerning its wrongful conduct as alleged herein by Plaintiffs and West Virginia Subclass members.  Sending pre-suit notice pursuant to W. Va. Code § 46A-6-106(c), however, is an exercise in futility for Plaintiffs, because, despite being on knowledge of the deceptive acts and practices complained of herein in this lawsuit as of the date of the first-filed action among the cases centralized in this multidistrict litigation, Intel has not cured its unfair and deceptive acts and practices.

1651.   Intel engaged in unfair and deceptive business acts and practices in the conduct of trade or commerce, in violation of W. Va. Code § 46A-6-104, including, concealing at all relevant

PAGE 467 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

times and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1652.  Intel's unfair and deceptive acts and practices also violated W. Va. Code § 46A-6-102(7), including: representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model if they are of another; advertising goods or services with intent not to sell them as advertised; engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding; using deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; and advertising, displaying, publishing, distributing, or causing to be advertised, displayed, published, or distributed in any manner, statements and representations with regard to the sale of goods that are false, misleading or deceptive or that omit to state material information which is necessary to make the statements therein not false, misleading, or deceptive.

1653.  Intel's unfair and deceptive acts and practices were unreasonable when weighed against the need to develop or preserve business, and were injurious to the public interest, under W. Va. Code § 46A-6-101.

PAGE 468 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                      COMPLAINT

1654.   Intel's acts and practices were additionally "unfair" under W. Va. Code § 46A-6-104 because they caused or were likely to cause substantial injury to consumers, which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

1655.   The injury to consumers from Intel's conduct was and is substantial because it was non-trivial and non-speculative; and involved a monetary injury.  The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

1656.   Consumers could not have reasonably avoided injury because Intel's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making.   By withholding important information from consumers, Intel created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

1657.   Intel's business practices had no countervailing benefit to consumers or to competition.

1658.   Intel's acts and practices were additionally "deceptive" under W. Va. Code § 46A-6-104 because Intel made representations or omissions of material facts that misled or were likely to mislead reasonable consumers, including Plaintiffs and absent West Virginia Subclass members.

1659.   Intel intended to mislead Plaintiffs and absent West Virginia Subclass members and induce them to rely on its misrepresentations and omissions.

1660.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

PAGE 469 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

1661.   Intel had a duty to disclose material facts to consumers, including but not limited to, that the CPUs contained the Defects; that the CPU Defects allowed unauthorized access to confidential information; that necessary mitigations to address the Defects would result in significant CPU performance degradation; and that, in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks. These material facts should have been disclosed because both security and performance are central to CPU functionality; because Intel had exclusive or superior knowledge regarding such facts; and because Intel suppressed these facts while making partial representations as alleged herein.  Moreover, these material facts should have been disclosed because they were contrary to Intel's representations about the CPUs.

1662.   Had Intel disclosed to Plaintiffs and West Virginia Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel had failed to take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent West Virginia Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

PAGE 470 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

1663.   Intel's omissions were legally presumed to be equivalent to active misrepresentations because Intel intentionally prevented Plaintiffs and West Virginia Subclass members from discovering the truth regarding Intel's CPU Defects.

1664.   Intel acted intentionally, knowingly, and maliciously to violate West Virginia's Consumer Credit and Protection Act, and recklessly disregarded Plaintiffs' and West Virginia Subclass members' rights.  Intel's unfair and deceptive acts and practices were likely to cause serious harm, and Intel knew that its deceptive acts would cause harm based upon its business practices and exclusive knowledge of the omissions and misrepresentations herein.

1665.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent West Virginia Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1666.   Intel's violations present a continuing risk to Plaintiffs and absent West Virginia Subclass members as well as to the general public.

1667.   Plaintiffs and West Virginia Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $200 per violation under W. Va. Code § 46A-6-106(a), restitution, injunctive and other equitable relief, punitive damages, and reasonable attorneys' fees and costs.

1668.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as

PAGE 471 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## WISCONSIN SUBCLASS, COUNT LV

## WISCONSIN DECEPTIVE TRADE PRACTICES ACT
### Wis. Stat. § 100.18 *et seq.*

1669.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1670.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Wisconsin, and/or on behalf of the Wisconsin Subclass.

1671.   Intel is a "person, firm, corporation or association," as defined by Wis. Stat. § 100.18(1).

1672.   Plaintiffs and absent Wisconsin Subclass members are members of "the public," as defined by Wis. Stat. § 100.18(1).

1673.   With intent to sell, distribute, or increase consumption of merchandise, services, or anything else offered by Intel to members of the public for sale, use, or distribution, Intel made, published, circulated, placed before the public or caused (directly or indirectly) to be made, published, circulated, or placed before the public in Wisconsin advertisements, announcements, statements, and representations to the public that contained assertions, representations, or statements of fact that were untrue, deceptive, and/or misleading, in violation of Wis. Stat. § 100.18(1).

1674.   Intel also engaged in the above-described conduct as part of a plan or scheme, the purpose or effect of which was to sell, purchase, or use merchandise or services not as advertised, in violation of Wis. Stat. § 100.18(9).

PAGE 472 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

1675.   Those advertisements were placed in Wisconsin by Intel or through retailers and other third parties who sold products containing Intel CPUs and were provided information for advertisements relating to the CPUs.  That Intel placed and made advertisements in Wisconsin is evident by the fact that Intel was able to sell, based upon information and belief, thousands of CPUs in the state.  Indeed, discovery will demonstrate how may advertisements Intel made to or targeted at Wisconsin to the Wisconsin Subclass.

1676.   Intel intended to mislead Plaintiffs and Wisconsin Subclass members and induce them to rely on its misrepresentations and omissions.

1677.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1678.   Intel's had a duty to disclose the above-described facts due to the circumstances of this case, including its exclusive knowledge of the CPU Defects, its concealment regarding same, and its incomplete representations regarding its CPUs.

1679.   Intel's failure to disclose the above-described facts is the same as actively representing that those facts do not exist.

1680.   Intel acted intentionally, knowingly, and maliciously to violate the Wisconsin Deceptive Trade Practices Act, and recklessly disregarded Plaintiffs' and Wisconsin Subclass members' rights.  Intel's knowledge of the CPUs' performance and security issues put it on notice that the CPUs were not as it advertised.

1681.   As a direct and proximate result of Intel's deceptive acts or practices, Plaintiffs and absent Wisconsin Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving

the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with CPU performance and security issues.

1682.   Intel had an ongoing duty to all Intel customers under Wis. Stat. § 100.18 to refrain from deceptive acts, practices, plans, and schemes.

1683.   Plaintiffs and Wisconsin Subclass members seek all monetary and non-monetary relief allowed by law, including damages, reasonable attorneys' fees, and costs under Wis. Stat. § 100.18(11)(b)(2), injunctive relief, and punitive damages.

1684.   The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be a plain and speedy as on order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## WYOMING SUBCLASS, COUNT LVI

### WYOMING CONSUMER PROTECTION ACT
### Wyo. Stat. Ann. § 40-12-101 *et seq.*

1685.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

1686.   Plaintiffs bring this count on behalf of themselves and all members of the Class that purchased or leased one or more Intel CPUs or one or more devices containing an Intel CPU in Wyoming, and/or on behalf of the Wyoming Subclass.

1687.   Intel is a "person" as defined by Wyo. Stat. Ann. § 42-12-102(i).

1688.   Plaintiffs and Wyoming Subclass members engaged in "consumer transactions" as defined by Wyo. Stat. Ann. § 40-12-102(ii).

PAGE 474 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

1689.   Intel is engaged in an "uncured unlawful deceptive trade practice" in accordance with Wyo. Stat. Ann. § 40-12-105 in that it had actual notice of its deceptive acts and practices when the first action of the cases centralized in this multidistrict litigation was file.  It has not, however, offered to adjust or modified the consumer transactions at issue in this case, nor has it offered to rescind the consumer transactions.  Consequently, pre-suit notice to Intel pursuant to Wyo. Stat. Ann. § 40-12-109 was an exercise in futility.

1690.   Intel advertised, offered, or sold goods or services in Wyoming, and engaged in trade or commerce directly or indirectly affecting the people of Wyoming.

1691.   Intel engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the Wyoming Consumer Protection Act, Wyo. Stat. Ann. §§ 40-12-101, *et seq*., including, concealing at all relevant times, and never disclosing that it had implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential.  This information was not available to Plaintiffs, absent Class members, or the public at large.  To date, Intel has not redesigned its CPUs to fix the Defect, despite statements to the contrary.

1692.   Intel's representations and omissions were material because they were likely to deceive reasonable consumers.

1693.   Intel intended to mislead Plaintiffs and Wyoming Subclass members and induce them to rely on its misrepresentations and omissions.

1694.   Had Intel disclosed to Plaintiffs and Wyoming Subclass members material facts, including but not limited to, that:  (i) its CPUs contained the Defects; (ii) the CPU Defects allowed unauthorized access to confidential information; (iii) mitigations to address the Defects would result in significant CPU performance degradation; and (iv) that in designing its CPUs, Intel had failed to

PAGE 475 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT

take measures to protect confidential information from attacks by unauthorized users while knowing that its CPUs were vulnerable to such attacks, Intel would have been unable to sell as many CPUs that it did or at the price such CPUs were sold.  Instead, Intel represented that its CPUs were continually improving in speed and performed better than other processors on the market.  Plaintiffs and absent Wyoming Subclass members acted reasonably in relying on Intel's misrepresentations and omissions, the truth of which they could not have discovered.

1695.   Intel acted intentionally, knowingly, and maliciously to violate the Wyoming Consumer Protection Act, and recklessly disregarded Plaintiffs' and Wyoming Subclass members' rights.  Intel's knowledge of the CPUs' security and performance issues put it on notice that the CPUs were not as it advertised.

1696.   As a direct and proximate result of Intel's deceptive acts and practices, Plaintiffs and absent Wyoming Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the CPUs, and increased time and expense in dealing with performance and security issues.

1697.   Intel's deceptive acts and practices caused substantial injury to Plaintiffs and absent Wyoming Subclass members, which they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

1698.   Plaintiffs and the Wyoming Subclass seek all monetary and non-monetary relief allowed by law, actual damages, injunctive relief, attorneys' fees, costs, and any other relief that is just and proper.

PAGE 476 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
              COMPLAINT

1699.  The claim for injunctive relief is appropriate because, among other things, Intel's misconduct is ongoing and bringing multiple suits to recover damages for future harm will not be as plain and speedy as an order from this Court prohibiting Intel from engaging in the misconduct alleged herein.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all other Class members, respectfully request that the Court enter judgment:

A.     Certifying the Class and/or Subclasses as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

B.     Declaring that Intel has violated the state laws alleged herein and/or that it has been unjustly enriched at the expense of and to the detriment of Plaintiffs and Class members;

C.     Enjoining Intel from continuing the unfair and unjust business practices alleged in this Complaint;

D.     Awarding Plaintiffs and Class members actual and statutory damages (including punitive damages), restitution, and non-restitutionary disgorgement, as allowable by law;

E.     Awarding such equitable relief against Intel as the Court finds necessary to redress the injury to Plaintiffs and Class members resulting from unfair and unjust business practices alleged in this Complaint, but not limited to, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies to the extent legal damages are inadequate to remedy Plaintiffs' losses;

F.     Awarding Plaintiffs and the Class both pre- and post-judgment interest on any amounts awarded;

G.     Awarding Plaintiffs and the Class attorneys' fees and costs of suit; and

PAGE 477 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                       COMPLAINT

H.    Awarding Plaintiffs and the Class such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED this 26th day of May, 2021.

STOLL STOLL BERNE LOKTING
  & SHLACHTER P.C.

By: s/ Jennifer S. Wagner
    **Steve D. Larson**, OSB No. 863540
    **Jennifer S. Wagner**, OSB No. 024470

209 SW Oak Street, Suite 500
Portland, Oregon 97204
Telephone: (503) 227-1600
Email:  slarson@stollberne.com
        jwagner@stollberne.com

*Interim Plaintiffs' Liaison Counsel*

**Christopher A. Seeger** (*pro hac vice*)
SEEGER WEISS LLP
55 Challenger Road
Ridgefield Park, NJ 07660
Telephone: (212) 584-0700
Email: cseeger@seegerweiss.com

**Rosemary M. Rivas** (*pro hac vice*)
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: 510-350-9700
Fax: 510-350-9701
rmr@classlawgroup.com

*Interim Co-Lead Plaintiffs' Counsel*

**Gayle M. Blatt** (*pro hac vice*)
CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD LLP
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811

PAGE 478 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
          COMPLAINT

Email: gmb@cglaw.com

**Stuart A. Davidson** (*pro hac vice*)
ROBBINS GELLER RUDMAN & DOWD
LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Email: sdavidson@rgrdlaw.com

**Melissa R. Emert** (*pro hac vice*)
STULL, STULL, & BRODY
6 East 45th Street
New York City, NY 10017
Telephone: (212) 687-7230
Email: memert@ssbny.com

**Richard M. Hagstrom** (*pro hac vice*)
HELLMUTH & JOHNSON PLLC
8050 West 78th Street
Edina, MN 55439
Telephone: (952) 941-4005
Email: rhagstrom@hjlawfirm.com

**Jennifer L. Joost** (*pro hac vice*)
KESSLER TOPAZ MELTZER & CHECK
LLP
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Email: jjoost@ktmc.com

**Adam J. Levitt** (*pro hac vice*)
DICELLO LEVITT GUTZLER
Ten North Dearborn Street, Eleventh Floor
Chicago, IL 60602
Telephone: (312) 214-7900
Email: alevitt@dicellolevitt.com

**Charles E. Schaffer** (*pro hac vice*)
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
Email: cschaffer@lfsblaw.com

*Interim Plaintiffs' Steering Committee*

PAGE 479 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT