Steven T. Lovett, OSB No. 910701
steve.lovett@stoel.com
Rachel C. Lee, OSB No. 102944
rachel.lee@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  503.224.3380
Facsimile:   503.220.2480

Daniel F. Katz (*pro hac vice*)
dkatz@wc.com
David S. Kurtzer-Ellenbogen (*pro hac vice*)
dkurtzer@wc.com
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  202.434.5000
Facsimile:   202.434.5029

Attorneys for Defendant Intel Corporation

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| In re INTEL CORP. CPU MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No.:  3:18-md-2828-SI |
| This Document Relates to All Actions | DEFENDANT INTEL CORPORATION'S REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION, OR, IN THE ALTERNATIVE, MOTION TO CERTIFY PURSUANT TO 28 U.S.C. § 1292(b)<br><br>*Oral Argument Requested* |

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i
TABLE OF AUTHORITIES ........................................................................................... iii
INTRODUCTION ............................................................................................................1

I.      INTEL HAS SATISFIED THE STANDARD FOR RECONSIDERATION ...................4

II.     THE COURT SHOULD RECONSIDER AND HOLD THAT THE EXPLOITS
        THEORY DOES NOT STATE A CLAIM. .............................................................7

        A.      Plaintiffs Cannot State a Claim Based on Alleged Misrepresentations
                During the Embargo Period. .....................................................................7

        B.      To the Extent the New Exploits Theory Turns on Alleged Omissions,
                Plaintiffs Allege No Central Functional Defect.....................................10

        C.      Intel's Alleged Actions After Plaintiffs' Purchases Cannot Save Their
                Claims from Dismissal.............................................................................11

III.    PLAINTIFFS HAVE NOT STATED A NON-FRAUD-BASED UNFAIRNESS
        CLAIM UNDER THE EXPLOITS THEORY. ......................................................13

        A.      Plaintiffs Cannot Rely on the Rejected Defects Theory. .......................13

        B.      "Premium Pricing" Is Not Actionable. ..................................................14

        C.      Plaintiffs Fail to Allege an Actionable Misrepresentation, Physical Safety
                Hazard, or Breach of Warranty Required by California Law for Product-
                Based UCL Unfair-Prong Claims. .........................................................15

IV.     THE COURT SHOULD CLARIFY THAT NO CLAIMS MAY PROCEED
        AFTER THE WIDESPREAD DISCLOSURE OF SPECTRE AND
        MELTDOWN. ...................................................................................................18

V.      IN THE ALTERNATIVE, THE COURT SHOULD CERTIFY THE ORDER
        FOR IMMEDIATE APPEAL...............................................................................22

        A.      This Protracted and Expensive Litigation Easily Fits Within the Intended
                Scope of Section 1292(b)........................................................................22

        B.      If the Court Does Not Apply *Bardin*, It Should Certify Whether the Lack
                of a Misrepresentation, Physical Safety Hazard, or Breach of Warranty
                Precludes a UCL Unfairness Claim. ......................................................24

        C.      The Court Should Certify Any Embargo-Related Claim that Survives.................25

CONCLUSION................................................................................................................27

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abada v. Charles Schwab & Co.*, 127 F. Supp. 2d 1101 (S.D. Cal. 2000)......................................4

*Ahern v. Apple Inc.*, 411 F. Supp. 3d 541 (N.D. Cal. 2019) .............................................9

*Arizona v. Ideal Basic Industries (In re Cement Antitrust Litigation (MDL No. 296))*, 673 F.2d 1020 (9th Cir. 1982) ......................................................................................23, 24

*Arthur v. Murphy Co.*, 2012 WL 13047758 (D. Or. Jan. 17, 2012) ...............................24

*Belle v. Chrysler Group, LLC*, 2013 WL 949484 (C.D. Cal. Jan. 29, 2013)................................15

*Boyle v. Madigan*, 492 F.2d 1180 (9th Cir. 1974) .........................................................12

*Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008) ...............................16

*Concept Chaser Co. v. Hoyu America Co.*, 2009 WL 10673192 (C.D. Cal. Apr. 3, 2009) ......9, 10

*Couch v. Telescope Inc.*, 611 F.3d 629 (9th Cir. 2010) .............................................24, 25

*Davidson v. Kimberly-Clark Corp.*, 2014 WL 3919857 (N.D. Cal. Aug. 8, 2014)......................20

*Dukes v. Wal-Mart Stores, Inc.*, 2012 WL 6115536 (N.D. Cal. Dec. 10, 2012) ....................26, 27

*FTC v. AT&T Mobility LLC*, 883 F.3d 848 (9th Cir. 2018) (en banc).........................................22

*Hall v. Sea World Entertainment, Inc.*, 2015 WL 9659911 (S.D. Cal. Dec. 23, 2015)................12

*Hauck v. Advanced Micro Devices, Inc. (Hauck II)*, 2019 WL 1493356 (N.D. Cal. Apr. 4, 2019) .............................................................................................................20

*Hauck v. Advanced Micro Devices, Inc. (Hauck III)*, 816 F. App'x 39 (9th Cir. 2020)......9, 10, 20

*Herrera v. Zumiez, Inc.*, 953 F.3d 1063 (9th Cir. 2020).........................................................22, 23

*Hodsdon v. Mars, Inc.*, 891 F.3d 857 (9th Cir. 2018).......................................................10, 13, 16

*Horvath v. LG Electronics Mobilecomm U.S.A., Inc.*, 2012 WL 2861160 (S.D. Cal. Feb. 13, 2012) ...........................................................................................................17

*ICTSI Oregon, Inc. v. International Longshore & Warehouse Union*, 2020 WL 2768683 (D. Or. May 28, 2020) ...........................................................................................26

*ICTSI Oregon, Inc. v. International Longshore & Warehouse Union*, 22 F.4th 1125 (9th Cir. 2022) ...........................................................................................................26

*In re Actimmune Marketing Litigation*, 2010 WL 3463491 (N.D. Cal. Sept. 1, 2010), *aff'd*, 464 F. App'x 651 (9th Cir. 2011)...................................................................7, 9

*In re Cathode Ray Tube Antitrust Litigation*, 308 F.R.D. 606 (N.D. Cal. 2015)..........................20

*In re POM Wonderful LLC Marketing & Sales Practices Litigation*, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) .......................................................................14

*In re Porsche Cars North America Plastic Coolant Tubes Products Liability Litigation*, 880 F. Supp. 2d 801 (S.D. Ohio 2012) ...............................................................17

*In re Sony Grand WEGA KDF-E A10/A20 Series Rear Projection HDTV Television Litigation*, 758 F. Supp. 2d 1077 (S.D. Cal. 2010)..................................................16

*Johannessohn v. Polaris Industries, Inc.*, 450 F. Supp. 3d 931 (D. Minn. 2020), *aff'd*, 9 F.4th 981 (8th Cir. 2021) ...............................................................14

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) .............................................5

*Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877 (9th Cir. 2000) ....................................5

*Kowalsky v. Hewlett-Packard Co.*, 771 F. Supp. 2d 1138, *vacated in part on reconsideration*, 771 F. Supp. 2d 1156 (N.D. Cal. 2011)....................................................6, 17

*Kowalsky v. Hewlett-Packard Co.*, 771 F. Supp. 2d 1156 (N.D. Cal. 2010)............................6, 7

*Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482 (E.D.N.Y. 2017).................................................20

*Lee v. American National Insurance Co.*, 260 F.3d 997 (9th Cir. 2001)......................................23

*Leyva v. Medline Industries, Inc.*, 716 F.3d 510 (9th Cir. 2013)..................................................14

*McClintic v. Lithia Motors, Inc.*, 2011 WL 13127844 (W.D. Wash. Oct. 19, 2011) ...................20

*Northeastern Lumber Manufacturers Ass'n v. Northern States Pallet Co.*, 2009 WL 3246308 (D.N.H. Oct. 2, 2009) ...........................................................17

*Pirani v. Slack Technologies, Inc.*, 2020 WL 7061035 (N.D. Cal. June 5, 2020)........................27

*Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681 (9th Cir. 2011)...................................24, 25

*Robinson v. OnStar, LLC*, 2019 WL 13108704 (S.D. Cal. Mar. 18, 2019)...................................10

*Sanford v. MemberWorks, Inc.*, 2008 WL 4482159 (S.D. Cal. Sept. 29, 2008)...........................13

*Sanford v. MemberWorks, Inc.*, 625 F.3d 550 (9th Cir. 2010) .....................................................12

*Schedler v. FieldTurf USA, Inc.*, 2017 WL 8948593 (D. Or. Oct. 16, 2017) ..............................22

*Silcox v. State Farm Mutual Automobile Insurance Co.*, 2014 WL 7335741 (S.D. Cal. Dec. 22, 2014) ........................................................................................................................10

*Spada Properties, Inc. v. Unified Grocers, Inc.*, 2014 WL 12791943 (D. Or. Sept. 22, 2014) ...........................................................................................................................................5

*Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962 (C.D. Cal. 2014) ...........11

*Taleshpour v. Apple Inc.*, 549 F. Supp. 3d 1033 (N.D. Cal. 2021)................................................16

*U.S. Rubber Co. v. Wright*, 359 F.2d 784 (9th Cir. 1966) ...........................................................23

*Warth v. Seldin*, 422 U.S. 490 (1975) ..........................................................................................12

*Williams v. Apple, Inc.*, 449 F. Supp. 3d 892 (N.D. Cal. 2020)....................................................9

## STATE CASES

*Bardin v. DaimlerChrysler Corp.*, 39 Cal. Rptr. 3d 634 (Ct. App. 2006) ............................. *passim*

*Daugherty v. American Honda Motor Co.*, 51 Cal. Rptr. 3d 118 (Ct. App. 2006).......................16

*Seely v. White Motor Co.*, 403 P.2d 145 (Cal. 1965)..............................................................15, 17

## OTHER AUTHORITIES

28 U.S.C. § 1292(b) .................................................................................................................. *passim*

Strengthening American Cybersecurity Act of 2022, S. 3600, 117th Cong. § 2245(a)(2)(B) (2022) ...........................................................................................................25

S. Rep. No. 85-2434 (1958), *as reprinted in* 1958 U.S.C.C.A.N. 5255 ......................................23

Federal Rule of Appellate Procedure 5(a)(3) ................................................................................22

## INTRODUCTION

In its opening brief, Intel established why the Court should reconsider its Order approving a new "Exploits Theory."  That theory is based on the notion that Intel allegedly acted unfairly or unjustly after learning about Spectre and Meltdown in 2017.  Neither Intel nor the Court had previously understood this new basis of liability to be Plaintiffs' theory, and Plaintiffs repeatedly had disclaimed it.  *See* Mot. (ECF 231) 1-2.  Because this new theory turns on alleged misrepresentations and omissions, it fails for the same reasons the Court articulated in dismissing Plaintiffs' other fraud-based claims.

Plaintiffs' Opposition contains no viable response.  Plaintiffs insist their claims do not sound in fraud, yet they repeatedly describe their allegations using the quintessential language of fraud: during the Spectre/Meltdown embargo and thereafter, Intel falsely "advertised," "touted," "promote[d]," and "market[ed]" the performance of its products; "issued false statements" and "spun [a] false narrative" about the industry-wide nature of the problem; and "conceal[ed]" and "withh[eld]" information from the public.  Opp. (ECF 253) 3-4, 12, 15, 19-20, 22-23, 26, 30. Plaintiffs' suggestion that Intel could have "very easily" avoided liability in this entire MDL simply by "put[ting] out a notice about pending security patches," *id.* 4, 22, confirms that their claim turns on what Intel did or did not say, not any unfair conduct based on something other than fraud.

Intel also showed how Plaintiffs' allegation that Intel improperly manipulated the embargo process is unsustainable under the facts alleged.  Amici, moreover, have now explained the disastrous ramifications of allowing claims based on the duration of security-vulnerability embargoes.  Br. for Cybersecurity Coalition, et al. as Amici Curiae Supporting Defendant (ECF 234-1) 12-15.

In response, Plaintiffs have done a remarkable about-face.  After arguing strenuously in opposition to dismissal that Intel improperly lengthened the "typical" embargo period, Plaintiffs now insist that their claims "are not based on the existence, or even the duration of, embargo periods," and are not about whether Intel "should have disclosed the Intel CPU Exploits sooner." *Compare* MTD Opp. (ECF 215) 6 *with* Opp. 2, 4, 10-11, 13, 22, 33.  Instead, Plaintiffs pivot and say that their claims "are based on actions that Intel took independent of, and ***unrelated to***, the coordinated disclosure process."  Opp. 2.[1]

The Court relied heavily on Plaintiffs' allegations about the duration and "manipulation of the embargo process" in letting this case proceed.  Order (ECF 225) 9 (noting Plaintiffs' allegation "that Intel embargoed information on these security vulnerabilities . . . for significant periods of time"), *id.* 13 (restating Plaintiffs' allegation that "Intel kept the security exploits a secret longer than a normal embargo"), *id.* 14 (stating Plaintiffs' allegation that "Intel manipulated the embargo period process to increase it beyond the normal 90-day period"), *id.* 22 (same), *id.* 25 (same), *id.* 27 (same), *id.* 31 (same), *id.* 33 (noting Plaintiffs' allegation that Intel "intentionally delayed disclosure of the exploits").  Yet Plaintiffs now repudiate the proposition that Intel acted improperly by "manipulating" the embargo's length.  Instead, they say that Intel "abused" that embargo simply by continuing to advertise and sell products (including new ones) while it knew of a security vulnerability that was being investigated and mitigated (under embargo).  Opp. 4, 20.

Selling and advertising an existing or new product is not actionable unless the advertising was fraudulent or the company has a duty to say more.  The Court already dismissed with prejudice all fraud-based claims, so Plaintiffs' new embargo "abuse" theory cannot support their remaining

---

[1] All emphases are added and internal citations and punctuation within quotes are omitted unless noted otherwise.

claims of unfair or unjust conduct for the same reasons,[2] including the lack of any viable allegation of reliance or of a central functional defect that could give rise to a duty to disclose.  Plaintiffs' about-face thus underscores the need for reconsideration of the Court's prior ruling, which constituted clear error resulting from highly unusual circumstances.

Ultimately, even if any of Plaintiffs' allegations sound in unfairness rather than in fraud (none do), Plaintiffs would still fail to meet the standard for product-based unfair prong claims set out in *Bardin v. DaimlerChrysler Corp.*, 39 Cal. Rptr. 3d 634 (Ct. App. 2006).  Plaintiffs not only fail to distinguish *Bardin*, they mischaracterize it as based on the tethering test of unfairness rather than the balancing test adopted by this Court.  *See* Opp. 15.  The *Bardin* court expressly "analyze[d] ***both*** tests, appl[ied] ***each*** to the allegations [before it], and conclude[d] the allegations d[id] not satisfy ***either one***."  39 Cal. Rptr. 3d at 636.

The Court should reconsider and dismiss Plaintiffs' claims altogether.  But even if the Court concludes that Plaintiffs state a claim beginning on September 1, 2017, at a minimum it should clarify that no claims are viable after the Spectre/Meltdown vulnerabilities were publicly disclosed on January 2, 2018.  ***First***, all Named Plaintiffs purchased prior to that time and therefore could not have relied on any of Intel's subsequent actions.  Without claims of their own, dismissal is required and the question of whether they can represent others who purchased later is irrelevant.  ***Second***, no later purchaser could have a valid claim anyway.  Plaintiffs acknowledge that this new class of vulnerabilities was widely and publicly disclosed on January 2, 2018.  In *Hauck*, both the district court and Ninth Circuit rejected post-disclosure unfairness claims against AMD even though, just like here, those plaintiffs expressly alleged the existence of additional variants, with

---

[2] Intel's points with respect to UCL unfair-prong claims apply equally to the unjust enrichment claim, and references to "unfair" or "unfairness" throughout also refer to unjust conduct.

others anticipated. *Third*, Plaintiffs' allegations of supposedly unfair conduct by Intel—such as Intel's alleged "unfair" statements that this new class of vulnerabilities is an "industry-wide problem"—all sound in fraud, yet there is no allegation of reliance. The Court should not permit a theory to proceed under which Intel is allegedly *liable every passing day as to every single processor it sells*, more than four years after Spectre and Meltdown became widespread public knowledge.

Finally, Plaintiffs mount no convincing argument in opposition to Intel's request for Section 1292(b) certification. *First*, if the Court declines to apply *Bardin* to bar Plaintiffs' product-based unfair prong claim under the UCL, that issue should be expressly addressed in the Order and certified. Plaintiffs' sole challenge to certification on this issue—that it does not present an issue about which there is substantial grounds for difference of opinion—defies *Bardin* and other similar authorities. *Second*, if the Court declines to reconsider its holding that extending a security-vulnerability embargo beyond the "normal" 90 days states a plausible claim, the Court should certify its Order. As Amici explain, such an unprecedented holding would put technology companies in an untenable Catch-22 position and could result in serious harm to consumers. Alternatively, recognizing Plaintiffs' new "embargo abuse" theory would present many of the same concerns. Either way, this is a "novel and difficult" issue "sufficiently important" that immediate appellate review is warranted.

## I.    INTEL HAS SATISFIED THE STANDARD FOR RECONSIDERATION.

While Intel recognizes that reconsideration is not the norm, "[a] district court may reconsider and reverse a previous interlocutory decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of controlling law." *Abada v. Charles Schwab & Co.*, 127 F. Supp. 2d 1101, 1102 (S.D. Cal. 2000). As

Plaintiffs' own authorities recognize, "clear error" or "highly unusual circumstances" may justify reconsideration.  *See Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000).[3] This case presents both a clear error and highly unusual circumstances.  Plaintiffs' stunning change of course in their Opposition only heightens the need for reconsideration.[4]

Plaintiffs wrongly contend that Intel is seeking to rehash its prior arguments and that there is nothing new about the Exploits Theory.  Plaintiffs characterize Intel's motion as a "do-over" because, they say, they have "consistently alleged that Intel's CPUs were plagued by two Defects." Opp. 1-2.  But this Defects Theory—that Intel's products were defectively designed back to 2006 or earlier—is decidedly ***not*** the theory on which the Court permitted this case to proceed.  Order 21 ("Plaintiffs do not show how Intel's conduct was unfair based on the alleged defects"); *id.* 33 (dismissing with prejudice all claims "relating to conduct that occurred before September 1,

---

[3] The cases Plaintiffs cite all involved a blatant failure to raise issues or routine circumstances that are far different from those here.  *See, e.g.*, *Kona Enters. v. Estate of Bishop*, 229 F.3d 877, 890-91 (9th Cir. 2000) (choice of law was raised for first time on reconsideration despite numerous prior opportunities to do so); *Spada Props., Inc. v. Unified Grocers, Inc.*, 2014 WL 12791943, at *2 (D. Or. Sept. 22, 2014) (motion for reconsideration raised same arguments squarely presented to and decided by district court in prior briefing).

[4] Plaintiffs challenge Intel's request for the Court to take judicial notice of certain documents cited in its motion that relate to the coordinated disclosure process.  Opp. 20 n.13, 21; Mot. 19 n.11. That challenge appears moot given Plaintiffs' new position that their claims are based on actions "unrelated to" the coordinated disclosure process.  Opp. 2, 10-11, 13.  In any event, several of the documents Intel relies on are incorporated by reference in Plaintiffs' Second Amended Complaint, including Exhibits 3, 4, 5, 6, 8, and 9.  Therefore, the Court may properly consider those documents in determining whether Plaintiffs have pled a plausible claim.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (cited in Opp. 20-21 & n.13) ("The doctrine [of incorporation-by-reference] prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims.").  And, as Plaintiffs acknowledge, Opp. 20 n.13, even for the six exhibits (Exhibits 7, 10, 11, 12, 13, 14) that are not incorporated by reference or otherwise part of the record in this case, the Court is permitted to take notice of their existence.  Intel relied on those exhibits not for their truth but to show the existence and wide acceptance of coordinated disclosure protocols.

2017"). Instead, the Court greenlighted a new theory, unbriefed and unargued, based on Intel's alleged conduct after learning about Spectre and Meltdown. As demonstrated in Intel's opening brief, that is a theory that neither the Court nor Intel had ever previously understood Plaintiffs to be pressing, because Plaintiffs themselves repeatedly and unmistakably disclaimed it. *See* Mot. 1-2. And now Plaintiffs have jettisoned the allegation that Intel "manipulated" the Spectre and Meltdown embargo to lengthen it—the only aspect of the Exploits Theory even arguably capable of supporting claims beginning on September 1, 2017.[5]

Plaintiffs themselves cite *Kowalsky v. Hewlett-Packard Co. ("HP")*, which illustrates well why the standard for reconsideration is met here. 771 F. Supp. 2d 1138, 1148, *vacated in part on reconsideration*, 771 F. Supp. 2d 1156, 1159 (N.D. Cal. 2011). There, the plaintiff argued in opposition to HP's motion to dismiss that HP knew its printers were defective and that the failure to disclose this known defect supported a UCL fraud-prong claim. The district court denied the motion to dismiss despite finding that HP did not have knowledge of the defect. *Id.* Judge Koh then granted HP's motion for reconsideration "based on preexisting and new authority that was not previously brought to the Court's attention, and on grounds that the parties ***did not have an opportunity to fully brief*** the issues raised in those authorities at the time of the Court's prior order." 771 F. Supp. 2d 1159, 1159. On reconsideration, Judge Koh reversed her prior decision

---

[5] Plaintiffs undoubtedly already knew from publicly available information that their embargo "manipulation" theory against Intel was not viable. For example, Apple told a Congressional committee in 2018 that "[m]ultiple stakeholders supported extending the ninety-day period to early January to allow additional time to remediate the vulnerabilities"; that "Apple was among the stakeholders supporting an extension of the period"; and that "Google (Project Zero), as the 'finder' of the vulnerabilities, agreed the extension was in the public interest." February 14, 2018 Letter from Cynthia C. Hogan, VP for Public Policy at Apple Inc., to Members of Congress (Feb. 14, 2018), https://republicans-energycommerce.house.gov/wp-content/uploads/2018/02/Apple-Response-2.14.18.pdf.

and dismissed the UCL fraud claim.  *Id.*  This case presents a similar situation: Plaintiffs insisted

for three years, and even through the December 2021 hearing, that they were pursuing a Defects

Theory dating back to 2006, not the Exploits Theory now in play.  These unusual circumstances,

where neither Intel nor the Court had previously understood Plaintiffs to be pressing the Exploits

Theory as a basis for liability, calls for the same result as in *Kowalsky*.  *See* Mot. 1-2.

## II.    THE COURT SHOULD RECONSIDER AND HOLD THAT THE EXPLOITS THEORY DOES NOT STATE A CLAIM.

### A.    Plaintiffs Cannot State a Claim Based on Alleged Misrepresentations During the Embargo Period.

The Opposition repeatedly claims that during the Spectre/Meltdown embargo Intel falsely

*"advertised," "touted," "promot[ed],"* and *"market[ed]"* the performance of its products.  Opp.

12, 19, 22-23, 26.[6]  Ultimately, Plaintiffs claim that "the processors that Intel sold and distributed

were not of the quality *represented*."  *Id.* 3-4.  No matter what the label, to base a claim

on allegedly false "representations intended to persuade a consumer to purchase a product, . . .

[P]laintiffs must plead actual reliance."  *In re Actimmune Mktg. Litig.*, 2010 WL 3463491, at *8

(N.D. Cal. Sept. 1, 2010) ("[A] consumer's burden of pleading causation in a UCL action should

hinge on the nature of the alleged wrongdoing rather than the specific prong of the UCL the

consumer invokes."), *aff'd*, 464 F. App'x 651 (9th Cir. 2011).  Just as Plaintiffs' allegations of

misrepresentations before September 1, 2017, failed because no Named Plaintiff alleged having

heard or read any actionable misrepresentation—much less relied on one—so too must the

---

[6] All seven Named Plaintiffs purchased devices during that embargo.  Because they could not have relied on any post-embargo statements made after their purchases (such as that Intel "spun [a] false narrative" about whether the vulnerabilities were industry-wide, Opp. 15, 19, 23, 26, 30), they cannot invoke such statements to state a claim.  *See* Section II.C *infra*.  Intel addresses separately how Plaintiffs' own allegations establish that no one who purchased after the Spectre and Meltdown embargo terminated on January 2, 2018, could have a valid claim.  Section IV *infra*.

allegations of misrepresentations after September 1, 2017, fail.[7]  Order 19-21; *see also* 3/29/21

Order (ECF 204) 10 n.3, 29.

Plaintiffs mischaracterize the Court's rejection of their misrepresentation-based unfairness

claim as "clearly addressing the fraud by omission claim," Opp. 12 (citing Order 20).  That is

plainly incorrect.  The relevant discussion was in the section of the Court's opinion addressing

Plaintiffs' unfairness claim, and it clearly addressed Plaintiffs' attempt to ground that unfairness

claim in misrepresentations: Plaintiffs "need to allege that they saw or heard representations by

Intel and relied on those representations to support the conclusion that Intel's conduct was unfair."

Order 19 (emphasis omitted).  The Court's reasoning applies equally to alleged misrepresentations

after September 1, 2017 (i.e., the new Exploits Theory).

Next, Plaintiffs contend that their allegations of Intel's misrepresentations do not sound in

fraud because those allegations are merely "meant to underscore that Plaintiffs had no knowledge

that they were buying defective products, while Intel knew otherwise."  Opp. 12.  The allegations

under review refer to Intel's advertisements.  *Id.* ("Intel advertised the performance and security

of its CPUs even though it was aware that they were vulnerable to Spectre and Meltdown").  Such

statements either allegedly induced reliance, and thus may support a fraud claim, or they are not

---

[7]  Plaintiffs emphasize multiple times that Intel introduced new products during the
Spectre/Meltdown embargo.  Opp. 3, 4, 15-16, 19, 22-24, 26, 30, 34.  But all their allegations
concerning these product launches also turn on alleged misrepresentations or omissions.  *See, e.g.*,
*id.* 3 ("Intel announced that the 'Coffee Lake' processors had 'strong security' and were 40% faster
than the previous generation—all while ***concealing*** that such performance gains would soon be
erased due to the looming need for users to install patches."); *id.* 16 (asserting that it was actionable
"for Intel to have continued marketing (and even releasing new generations of) its CPUs on the
basis of ***superior speed and performance***"); *id.* 23 ("Intel unfairly continued to market its CPUs'
***superior speed and security*** and place new CPU lines in the market."); *id.* 30 (Intel "took
advantage of its ***information asymmetry*** with potential purchasers, including by continuing to
release new generations of CPUs").

actionable.  *See, e.g.*, *In re Actimmune Mktg. Litig.*, 2010 WL 3463491, at *8, *11.  Here, the Court has found these statements not actionable for lack of reliance (and for other reasons).  Order 19-21.  If Plaintiffs now assert that their allegations of Intel's affirmative misrepresentations are merely "meant to underscore" an omission, that allegation fails too.  Opp. 12; Section II.B *infra*.

Finally, Plaintiffs argue that "multifaceted unfair conduct [that] includes misrepresentations or omissions" can support an unfairness claim.  Opp. 12-13 & n.9.  Plaintiffs do not explain how ***failed*** fraud claims could support an unfair-prong claim, even in part.  *See* Mot. 9-10 (citing cases).  *See also Hauck v. Advanced Micro Devices, Inc. (Hauck III)*, 816 F. App'x 39, 43 (9th Cir. 2020) (discussing unfair-prong claim only "[t]o the extent . . . not also grounded in fraud").  Nor do Plaintiffs even attempt to distinguish or explain the many cases Intel cites holding that failed fraud allegations alone cannot support unfairness claims.  *See, e.g.*, *Williams v. Apple, Inc.*, 449 F. Supp. 3d 892, 910 (N.D. Cal. 2020); *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 561 (N.D. Cal. 2019); *In re Actimmune Mktg. Litig.*, 2010 WL 3463491, at *11.  Instead, of the hundreds of reported cases under the UCL, Plaintiffs have located one—a case no other court has ever cited—that (they assert) appeared to allow a UCL unfairness claim to proceed based on misrepresentations while dismissing the corresponding UCL fraud claim.  *See Concept Chaser Co. v. Hoyu Am. Co.*, 2009 WL 10673192 (C.D. Cal. Apr. 3, 2009); Opp. 13 n.9.  But the party asserting that UCL claim alleged unfair ***conduct***, including denying contractual obligations, refusing to provide assurances of contract performance, and assessing usurious late charges.  *See* 2009 WL 10673192, at *4.  Plaintiffs here do not allege any non-fraud ***conduct***, so *Concept Chaser* does not help them.  In addition, the reason the UCL fraud-prong claim failed there was that the

representations were not public, not that the plaintiff never heard or relied on them, as here. *Id.* at *8.[8]

For all these reasons, Plaintiffs fail to state a viable UCL unfair-prong claim under the new Exploits Theory based on Intel's alleged misrepresentations during the Spectre/Meltdown embargo (the period when each of the seven Named Plaintiffs purchased their Intel products).

### B.    To the Extent the New Exploits Theory Turns on Alleged Omissions, Plaintiffs Allege No Central Functional Defect.

Much of the rest of Plaintiffs' Opposition grounds their claims on Intel's alleged omissions, asserting that Intel allegedly "conceal[ed]" and "withh[eld]" information from the public. Opp. 3-4, 20, 30. This includes their newly minted theory of embargo "abuse," which turns largely on the assertion that Intel benefitted from "information asymmetry" during the embargo. *Id.* "Information asymmetry" is not a tort. Manufacturers inevitably know far more about their products than customers, and omissions are actionable only if there is a duty to disclose. *See Hodsdon v. Mars, Inc.*, 891 F.3d 857, 867 (9th Cir. 2018) ("[F]ailure to disclose information [the defendant] had no duty to disclose in the first place is not substantially injurious, immoral, or unethical."). The Court has already held that Plaintiffs failed to state any omission claim because the Named Plaintiffs' devices—even after mitigation patches allegedly hindered their performance—still performed their central function. 3/29/21 Order (ECF 204) 16-17. *See also Hauck III*, 816 F. App'x at 44 (plaintiffs failed to plausibly allege AMD processors were not fit

---

[8] Plaintiffs also cite *Robinson v. OnStar, LLC*, 2019 WL 13108704 (S.D. Cal. Mar. 18, 2019), but that case, too, involved allegedly unfair **conduct**—namely, unauthorized charging of customers' credit cards after the end of a free-trial period. *Id.* at *11. Another case Plaintiffs cite, *Silcox v. State Farm Mut. Auto. Ins. Co.*, 2014 WL 7335741, at *5 (S.D. Cal. Dec. 22, 2014), supports **Intel's** position because it held that the plaintiffs' UCL unfairness claim failed for the same reasons as their fraud-prong claim. *See id.*

for ordinary use).  Plaintiffs have no response to this dispositive point (other than arguing that an unfair-prong claim can be based on failed fraud allegations, which is incorrect for the reasons discussed above).

C.    **Intel's Alleged Actions After Plaintiffs' Purchases Cannot Save Their Claims from Dismissal.**

In opposing dismissal, Plaintiffs rely in part on alleged actions that occurred after they purchased their devices, including Intel's allegedly false statements after the public disclosure of Spectre and Meltdown that the vulnerabilities were an industry-wide problem, Opp. 4, 15, 19, 23, 26, 30; the existence of other vulnerability embargoes months or years later, *id.* 4, 28 n.20, 34; and the supposed "attempts to ban users from publishing test results," *id.* 9.[9]  Plaintiffs cannot base these claims of overpayment on events that took place after they purchased.  *See, e.g.*, *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 974 n.10 (C.D. Cal. 2014) (dismissing putative class action claim where, because the allegedly false statements "were published

---

[9] Plaintiffs' one reference to the suppression of testing results appears to be based on Paragraph 722, where Plaintiffs footnote an archived web link to a software license for a "Memory Latency Checker" tool.  The alleged unfairness is that Intel implemented a restriction on benchmark tests in response to Spectre and Meltdown.  *See, e.g.*, 2AC ¶¶ 19, 914, 932 (references in introduction and California claims to conduct described at paragraph 722).  But this licensing restriction was present in Intel licenses well **before** Google informed Intel of the existence of Spectre and Meltdown.  *See, e.g.*, https://www.dlt.com/sites/default/files/sr/brand/dlt/PDFs/Intel%20Security%20End%20User%20License%20Agreement.pdf ¶ 3(f)(v) (software resale site; April 2016 license agreement).  Nor could any Named Plaintiff have been injured by any such conduct (which allegedly took place after patches were deployed and thus after their purchases), and Plaintiffs articulate no link between this particular tool and any relevant performance testing.  On the contrary, Plaintiffs include numerous allegations about performance testing of Intel's CPUs, using multiple available tools, 2AC ¶¶ 715, 718, 721, 726, 732, and allege affirmatively that a negative impact on performance of Intel's patches was "well known in the market," *e.g.*, 2AC ¶ 61.  In short, not only have Plaintiffs failed to allege that performance testing of Intel CPUs has been hindered in any way, but such an allegation would be implausible and inconsistent with their other allegations and cannot provide a basis for this MDL to proceed.

approximately two years after" purchase, "it would be impossible for [the plaintiff] to claim that he had relied on those statements").

Plaintiffs' suggestion that this is a class-certification question is incorrect. *See* Opp. 27-29. Named Plaintiffs "must allege and show that ***they personally*** have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975). Therefore, "[w]hen a named plaintiff has no cognizable claim for relief, she cannot represent others who may have such a claim." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 560 (9th Cir. 2010) (affirming dismissal; "because the Smiths lack a cognizable EFTA claim, dismissal of their individual claims was proper, and they cannot represent an EFTA class"); *Boyle v. Madigan*, 492 F.2d 1180, 1182 (9th Cir. 1974) (dismissal proper "where the named plaintiffs have failed to state a claim in themselves for the relief they seek," and in the absence of a claim by named plaintiffs, "there is no occasion for the court to wrestle with the problems" associated with class certification). If named plaintiffs' own claims fail because they did not rely on the alleged misstatements, as here, their claims must be dismissed outright. *See, e.g.*, *Hall v. Sea World Ent., Inc.*, 2015 WL 9659911, at *5 (S.D. Cal. Dec. 23, 2015) (granting motion to dismiss where "[b]ecause the complaint does not allege . . . that any of the named plaintiffs saw and relied on SeaWorld's statements about its treatment of whales when purchasing their tickets, the named San Diego Plaintiffs lack standing to bring claims on behalf of the putative San Diego Class").

Plaintiffs suggest they could cure the problem by amending their Complaint to add later-purchasing Named Plaintiffs that they previously dropped for strategic reasons. Opp. 29; *see* Mot. 23-24; 3/27/20 Order (ECF 178) 12. Not only is that patent gamesmanship, but it also founders on the principle that "when the named plaintiffs' claims have been dismissed for failure to state a

claim before a motion for certification has been filed, courts will ordinarily dismiss the entire action without permitting the substitution of additional named plaintiffs." *Sanford v. MemberWorks, Inc.*, 2008 WL 4482159 (S.D. Cal. Sept. 29, 2008). Regardless, no later purchasers could have a claim, for the reasons set forth in Section IV *infra*.

## III. PLAINTIFFS HAVE NOT STATED A NON-FRAUD-BASED UNFAIRNESS CLAIM UNDER THE EXPLOITS THEORY.

Now that Plaintiffs have abandoned the allegation that Intel manipulated the duration of the Spectre/Meltdown embargo (the only example the Court cited of Intel's allegedly unfair conduct during that embargo), it is even more clear that Plaintiffs have stated no plausible unfairness claim. Their effort to resuscitate their Defects Theory, or to ground claims of unfairness in Intel's supposed "premium pricing," both fall far short. Moreover, even if Plaintiffs alleged some form of unfair conduct, their claim still fails to meet the standard for product-based unfair-prong claims set out in *Bardin*, 39 Cal. Rptr. 3d 634. Thus, permitting such a claim to proceed was clear error.[10]

### A. Plaintiffs Cannot Rely on the Rejected Defects Theory.

Plaintiffs assert that "[k]nowingly selling defective products is a quintessential unfair business practice." Opp. 10. Even assuming that statement is true, it has no application here. The Court has never accepted Plaintiffs' "Defects Theory" and instead approved only the "Exploits Theory" beginning on September 1, 2017. Plaintiff's own brief demonstrates that their unfairness

---

[10] Because Plaintiffs have no viable allegations of unfair conduct, they have no plausible claim of conduct that is "substantially injurious, immoral, or unethical," and therefore there is no reason to engage in the UCL balancing test. *See, e.g.*, *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 867 (9th Cir. 2018) (dismissing UCL unfairness claim without engaging in balancing analysis because a defendant's "failure to disclose information it had no duty to disclose in the first place is not substantially injurious, immoral, or unethical").

claim for "[k]nowingly selling defective products" is actually just a fraud claim. Plaintiffs insist that Intel could have kept selling its CPUs and "very easily" avoided liability simply by "put[ting] out a notice about pending security patches that could impact performance and provid[ing] approximate ranges that the patches would slow down systems." *Id.* 22. If such a "notice" would have sufficed for Intel to "very easily" avoid liability altogether, that proves Plaintiffs are basing their unfairness claim on an alleged omission, and not the sale of allegedly defective products.

### B.    "Premium Pricing" Is Not Actionable.

Plaintiffs also complain that Intel "exacted premium prices" for its CPUs during the embargo. Opp. 27; *see id.* 3, 4, 9, 16, 19. But Plaintiffs do not respond to Intel's argument that charging a price premium is not actionable in the absence of fraud or other underlying wrongful conduct. *See* Mot. 10 n.5. Plaintiffs who seek damages under a price premium theory must be able to show that their damages "'stemmed from the defendant's ***actions that created the legal liability***.'" *In re POM Wonderful LLC Mktg. & Sales Prac. Litig.*, 2014 WL 1225184, at *5 (C.D. Cal. Mar. 25, 2014) (quoting *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)). While some courts have found a price premium relevant to standing, injury, or damages under the UCL, none has held that a price premium alone is actionable conduct. *E.g.*, *Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 967 (D. Minn. 2020) (recognizing that "a consumer who pays a premium for a product ***based on a defendant's actionable misrepresentations or omissions*** [or "attributable to a defendant's ***actionable conduct***"] has suffered a legally cognizable injury"), *aff'd*, 9 F.4th 981 (8th Cir. 2021).

Plaintiffs' Opposition makes clear that their premium-pricing allegation is rooted in Intel's alleged omissions and misrepresentations, which supposedly created "the false perception of its CPUs' superior performance and speed." Opp. 3; *see also id.* 4 (alleging Intel "market[ed] its

defective products at a substantial premium that Intel knew the products did not deserve"), 19 (alleging Intel charged "premium prices for its CPUs over those of its competitors based on touted superior performance"), 23 (alleging Intel charged "premium prices that it exacted based on its CPUs' allegedly superior speed and performance").  These fraud-based allegations fail for the same reasons discussed in Section II *supra*.

      **C.**      **Plaintiffs Fail to Allege an Actionable Misrepresentation, Physical Safety Hazard, or Breach of Warranty Required by California Law for Product-Based UCL Unfair-Prong Claims.**

Even if Plaintiffs had made allegations of any "unfair" non-fraud conduct by Intel after September 1, 2017, (and they have not), their UCL "unfair" claim still fails based on governing California precedent, especially *Bardin*, 39 Cal. Rptr. 3d 634.  Although the Court did not consider *Bardin* in earlier rounds of briefing because it dismissed the Defects Theory claims on other grounds, its failure to apply *Bardin* here was clear error.

Plaintiffs begin their response to *Bardin* with a strawman argument suggesting that Intel is invoking the inapposite economic loss doctrine.  Opp. 14.  Not so.  Intel accurately pointed out that *Bardin* applied the "general public policy that a consumer can be 'fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will.'" 39 Cal. Rptr. 3d at 644 (quoting *Seely v. White Motor Co.*, 403 P.2d 145, 151 (Cal. 1965)).  Intel did not assert that Plaintiffs cannot recover **because** they claim only economic losses.  Intel is seeking reconsideration because a product-based claim for economic losses must meet the *Bardin* standard.  The claims here do not.[11]

---

[11] The case Plaintiffs cite, *Belle v. Chrysler Group, LLC*, 2013 WL 949484 (C.D. Cal. Jan. 29, 2013), actually supports Intel.  The plaintiffs there alleged that the braking system in Chrysler vehicles posed "a dangerous safety hazard."  *See id.* at *1.

Plaintiffs next make the incredible argument that *Bardin* is limited to the tethering test of unfairness, rather than the balancing test adopted by this Court.  *See* Opp. 15.  *Bardin* expressly "analyze[d] ***both*** tests, appl[ied] ***each*** to the allegations of the second amended complaint, and conclude[d] the allegations d[id] not satisfy ***either one***." 39 Cal. Rptr. 3d at 636.  The Ninth Circuit cited *Bardin*'s holding under the balancing test (which it referred to as the "*South Bay* test") in *Hodsdon*, 891 F.3d at 867.

Plaintiffs also mischaracterize the *Bardin* line of case law as merely dismissing UCL "unfair" claims where the harm alleged was speculative.  Opp. 16, 18-19.  The harm in these cases was not speculative.  For example, in *Bardin*, the exhaust manifold of the plaintiff's Jeep cracked, costing him $801 to repair.  39 Cal. Rptr. 3d at 637.  In *Daugherty v. American Honda Motor Co.*, a number of the plaintiffs had suffered oil leaks resulting in total engine failure.  51 Cal. Rptr. 3d 118, 121 (Ct. App. 2006).  In *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008), the plaintiff's car had a head-gasket leak, which he was forced to repair himself at a cost of $70. *Id.* at 1021.  In *Taleshpour v. Apple Inc.*, 549 F. Supp. 3d 1033 (N.D. Cal. 2021), the plaintiffs "all experienced issues with their display screens, including the stage lighting effect or 'vertical pink lines,' which ultimately rendered their laptops inoperable." *Id.* at 1038.  And in *In re Sony Grand WEGA KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077 (S.D. Cal. 2010), the Sony TVs exhibited "anomalies, including bright blue, yellow, and green spots, stains, and haze." *Id.* at 1084.  Despite these plainly non-speculative harms, the courts dismissed all of these claims under the *Bardin* rule.

Nor are these precedents distinguishable, as Plaintiffs suggest, because the harm manifested after the expiration of warranties, whereas Intel's products allegedly exhibited

performance impacts "at the time of sale." Opp. 19.[12] The expiration of warranties was important

in these decisions because the warranties were the only way in which the defendants had promised,

for a specified duration, to compensate purchasers for covered economic harm. Here, Intel is not

alleged to have made any promise for **any** period of time to compensate purchasers for any

economic harm they claim to have suffered. Plaintiffs have no answer to the force of the rule,

fully applicable here, that "a consumer can be 'fairly charged with the risk that the product will

not match his economic expectations unless the manufacturer agrees that it will.'" *Bardin*, 39 Cal.

Rptr. 3d at 644 (quoting *Seely*, 403 P.2d at 151).

The handful of cases Plaintiffs cite elsewhere in the Opposition are all consistent with

*Bardin*, as each involved allegations of a physical safety hazard or an actionable misrepresentation.

*See Horvath v. LG Elecs. Mobilecomm U.S.A., Inc.*, 2012 WL 2861160, at *11 (S.D. Cal. Feb. 13,

2012) ("Plaintiff Horvath further alleges **that LG Electronics misled Plaintiff Horvath** when LG

Electronics disclaimed knowledge of the defect and maintained that LG Electronics had no

responsibility to fix it."); *In re Porsche Cars N. Am. Plastic Coolant Tubes Prods. Liab. Litig.*, 880

F. Supp. 2d 801, 830 (S.D. Ohio 2012) (finding "allegations suggesting that a defendant knew of

and failed to disclose **safety risks**" stated unfairness claim); *Kowalsky*, 771 F. Supp. 2d at 1150

(reciting plaintiffs' allegation that the manufacturer led them "to believe that the printers have

qualities and benefits they do not have"); *Ne. Lumber Mfrs. Ass'n v. N. States Pallet Co.*, 2009

WL 3246308, at *1 (D.N.H. Oct. 2, 2009) (not under California law; "NeLMA alleges defendants

---

[12] No Named Plaintiff was impacted by patches "at the time of sale" because all of them bought **before** Plaintiffs allege that any patches were installed. 2AC ¶ 712 (alleging that the mitigations came "after the CPU vulnerabilities were first exposed publicly").

used its trademark without license or other approval to stamp untreated lumber *to misrepresent* that it comported with industry safety standards"). None of those elements is present here.

## IV. THE COURT SHOULD CLARIFY THAT NO CLAIMS MAY PROCEED AFTER THE WIDESPREAD DISCLOSURE OF SPECTRE AND MELTDOWN.

As explained in Section II.C *supra*, the Named Plaintiffs, all of whom allege purchases of Intel CPUs during the Spectre/Meltdown embargo, plainly cannot state a claim based on anything that occurred after they made their purchases. Post-embargo allegations also cannot support a claim as to any other hypothetical plaintiff because of the widespread public disclosure of Spectre and Meltdown (and the performance impact of patches) on January 2, 2018. *See* Mot. 22-26. Plaintiffs underscore that this widespread public disclosure invalidates any subsequent claim by expressly alleging that further variants were "expected." *Id.*; 2AC ¶ 8. No person buying a device containing an Intel CPU *after* public disclosure can claim to have been treated "unfairly" by anticipated further embargoes, variants, and performance impacts. Mot. 22-26. Plaintiffs now respond with three types of alleged unfair conduct by Intel after the public disclosure of Spectre and Meltdown, Opp. 4 ("Facts Pertinent to the Instant Motion"). Each is nothing more than failed fraud allegations repackaged with an "unfair" label.

*First*, Plaintiffs allege Intel "unfairly claim[ed] that [the Intel CPU Exploits] were an industry-wide problem." *Id.* 4. As a threshold matter, it is an undeniable reality that this class of vulnerabilities *is* an industry-wide problem.[13] In any event, any "unfairness" associated with this

---

[13] This is a fact, and it ill-behooves Plaintiffs to have spent four years asserting that it amounts to a massive fraud on the consuming public. The Court knows well that both AMD and Apple (using Arm microarchitecture) have been sued in connection with the same class of vulnerabilities. In successfully seeking appointment to the leadership committee in this MDL, Plaintiffs' own counsel touted the overlap at length. *See* Second Lovett Decl. Ex. 1 (6/15/18 Tr.) at 79:10-14, 80:18-81:1, 83:18-21, 136:6-11, 145:5-7. The Complaint itself acknowledges that AMD chips are susceptible to Spectre, 2AC ¶¶ 677, 694, and AMD itself has publicly disclosed a variant vulnerability to which Intel CPUs are not susceptible. *See* MTD (ECF 213) 7 & n.5; *see also infra* pp. 19-21

allegation is a claimed affirmative misrepresentation.  All affirmative misrepresentation claims have been dismissed with prejudice for lack of reliance.  *See* Section II.A *supra*.

*Second*, according to Plaintiffs, Intel allegedly "unfairly claimed that its mitigations" work. Opp. 4.    That, again, is "unfair" only if Plaintiffs allege an actionable affirmative misrepresentation.  The Court already found that they do not.

*And third*, Intel "deliberately conceal[ed] that [its patches] did not (and do not) fix the underlying Defects."  *Id.* 4-5.  But that conduct is "unfair" only as an alleged omission.  Plaintiffs' omissions-based claims, too, have been dismissed with prejudice.[14]

Faced with the futility of their allegations, Plaintiffs try to recharacterize Intel's argument as a class certification issue, declaring that Plaintiffs are "not obligated to name a representative plaintiff for every conceivable subset of post-June 2017 Intel CPU purchasers."  *Id.* 28.  Plaintiffs' argument is a *non sequitur*.  Intel did not argue that the seven remaining Named Plaintiffs are too differently situated to represent post-January 2018 purchasers who may have valid claims.[15] Rather, Intel has shown that Plaintiffs' own allegations of widespread publicity establish that there are ***no valid claims*** after the existence of the Intel CPU Exploits and the performance impact of mitigations "became well known in the market."  *E.g.*, 2AC ¶ 61.  Once this new class of

---

(discussing how *Hauck* plaintiffs had their claims dismissed despite pleading that new variants were expected where no plausible claim could proceed after the widespread public disclosure of Spectre and Meltdown in January 2018).  Rule 12 does not require the Court credit as well pleaded allegations that flatly contradict not just reality, but what Plaintiffs themselves have put on the record.

[14] As explained in footnote 9 *supra*, the widespread public performance testing of Intel and other CPUs after the disclosure of Spectre and Meltdown means that Plaintiffs cannot have been harmed by the alleged existence of benchmarking limitations in Intel's software license, Opp. 9.

[15] Although if the Named Plaintiffs have no valid claims of their own, they cannot represent others who may have valid claims.  *See* Section II.C *supra*.

vulnerabilities was "made public and discussed extensively in the press" in January 2018, *Hauck v. Advanced Micro Devices, Inc. (Hauck II)*, 2019 WL 1493356, at *13 (N.D. Cal. Apr. 4, 2019), it is facially implausible to contend that every single buyer of an Intel-powered device in the more than four years since that disclosure has been treated "unfairly."[16]

Plaintiffs claim that Intel has "turn[ed] a blind eye" to their allegations of "*numerous additional* Exploits" since 2018.  Opp. 28.  Intel has done nothing of the sort.  Instead, Intel demonstrated that Plaintiffs plead themselves out of court by alleging that these "expected" additional variants all relate to a single "class of exploits."  2AC ¶¶ 5, 8.  Just as in *Hauck*, where those plaintiffs (represented by many of the same counsel here) argued that Spectre was ***"the tip of the iceberg,"*** with other variants anticipated, *see* Decl. of Steven T. Lovett (ECF 232) Ex. 14 ¶¶ 163-64, the "wide publicity" around Spectre and Meltdown renders subsequent claims of unfairness implausible.  *Hauck III*, 816 F. App'x at 43.

Plaintiffs argue that *Hauck* is distinguishable principally because those plaintiffs failed to allege that AMD knew of any relevant security vulnerability in its processors before learning about

---

[16] Plaintiffs' supporting authorities, all of which address whether named plaintiffs with plausible claims could represent differently situated class members, are beside the point.  For example, Plaintiffs identify certain mislabeling cases in which consumers who bought one product were allowed into discovery on class claims encompassing "sufficiently similar" products. *See, e.g.*, *Davidson v. Kimberly-Clark Corp.*, 2014 WL 3919857, at *6-7 (N.D. Cal. Aug. 8, 2014); *see generally* Opp. 28-29 nn.21-22.  In *Davidson*, a plaintiff who bought one "flushable wipe" product sued in connection with other products labeled as "flushable" and made using the same type of paper.  2014 WL 3919857, at *6-7.  These cases are inapposite here.  Plaintiffs' own allegations of security vulnerabilities and performance impacts that were "well known in the market" as of January 2018 conclusively demonstrate that ***no purchaser after January 2, 2018, has a plausible claim***.  Various others of Plaintiffs' authorities address class certification issues.  Those cases are irrelevant because Intel is not making a typicality or adequacy-of-representation argument.  Opp. 28 (citing, *e.g.*, *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 535 (E.D.N.Y. 2017) (class certification decision); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 613 (N.D. Cal. 2015) (same); *McClintic v. Lithia Motors, Inc.*, 2011 WL 13127844, at *8 (W.D. Wash. Oct. 19, 2011) (motion for preliminary approval of class settlement)).

Spectre from Google Project Zero in June 2017.[17]  Opp. 29-30.  This Court already rejected that

purported distinction, observing that it was Google Project Zero (not Intel) that discovered Spectre

and Meltdown, that Intel's generalized knowledge about side-channels is "not the same thing" as

"knowledge of the specific vulnerabilities first discovered in 2017 by Google Project Zero," and

that "[f]ailure to disclose a defect of which Intel was not aware is not unfair conduct."  Order 13,

16, 18.  *Hauck* cannot be distinguished by suggesting that Intel knew about Spectre and Meltdown

before June 2017 while AMD did not, where the Court has expressly found otherwise.  *Hauck*

could not be more on point.

Plaintiffs further demonstrate that no post-January 2018 claim is viable by repeatedly

declaring that Intel could have avoided this entire MDL "very easily," simply by "put[ting] out a

notice about pending security patches that could impact performance and provide approximate

ranges that the patches would slow down systems."  Opp. 4, 22.  But that (and much more detail)

is ***exactly*** the information that indisputably was publicly disclosed starting in January 2018.  *E.g.*,

2AC ¶ 61 ("After disclosure of the Intel CPU Exploits [in January 2018], it became well known in

the market that processor performance of Intel's CPUs would be negatively impacted"); *see id.*

¶ 718 (citing articles published as early as January 2, 2018 that documented alleged performance

impacts).  Plaintiffs therefore admit that the widespread disclosure of Spectre, Meltdown, and the

performance impact of the patches in early January 2018 was more than sufficient to cut off

---

[17] Plaintiffs also allege that in *Hauck*, those plaintiffs "were ***unable to identify*** any security
vulnerabilities affecting AMD's processors other than Spectre" or "***how*** AMD's designs created
those vulnerabilities."  Opp. 30.  But ***every*** computing product may be subject to security
vulnerabilities, and Plaintiffs' own sources (compiled by Plaintiffs' counsel, who notably also
represented the plaintiffs suing AMD in *Hauck*) describe various other AMD vulnerabilities, some
of which have a "very high severity rating."  *See* MTD (ECF 213) 7 & n.5.  *Hauck* cannot be
distinguished on the grounds that it is Intel's CPUs alone that are subject to security vulnerabilities.
The documents incorporated by reference into the Complaint show that is false.

liability from that point forward.  Thus, even if the Court disagrees as to the embargo period, Plaintiffs plainly cannot proceed on claims ***after*** the embargo was lifted and this new class of vulnerabilities was widely and publicly disclosed.

## V.   IN THE ALTERNATIVE, THE COURT SHOULD CERTIFY THE ORDER FOR IMMEDIATE APPEAL.

Certification for appeal is appropriate where the underlying order involves "(i) a 'controlling question of law,' as to which (ii) 'there is substantial ground for difference of opinion,' and (iii) immediate appeal might 'materially advance the ultimate termination of the litigation.'" *See Schedler v. FieldTurf USA, Inc.*, 2017 WL 8948593, at \*2 (D. Or. Oct. 16, 2017) (quoting 28 U.S.C. § 1292(b))).  Plaintiffs effectively concede that Intel's first issue for certification, whether the Court's Order is inconsistent with *Bardin* and cases applying it, satisfies the first and third prongs.  Plaintiffs also do not dispute that Intel's second issue for certification, whether failure to disclose vulnerabilities within 90 days of discovery automatically gives rise to a plausible unfairness claim under the UCL, satisfies the third prong of the Section 1292(b) test.  As to the remaining prongs, the standard is clearly met, as demonstrated below.[18]

### A.   This Protracted and Expensive Litigation Easily Fits Within the Intended Scope of Section 1292(b).

Plaintiffs attempt to argue that Congress did not intend Section 1292(b) to apply to "unfair business practices cases such as this," Opp. 7, but courts frequently grant certification in unfair-business cases.  *See, e.g.*, *FTC v. AT&T Mobility LLC*, 883 F.3d 848, 850-52 (9th Cir. 2018) (en banc) (considering certified appeal in case alleging, *inter alia*, unfair business practices); *Herrera*

---

[18] As noted in Intel's motion, if the Court certifies its Order, the Court should amend the Order to state the basis for certification pursuant to Federal Rule of Appellate Procedure 5(a)(3).  Mot. 26-27 & n.20.

*v. Zumiez, Inc.*, 953 F.3d 1063, 1067-68 (9th Cir. 2020) (same); *Lee v. Am. Nat'l Ins. Co.*, 260 F.3d 997, 999-1000 (9th Cir. 2001) (same).  While the legislative history shows Section 1292(b) should not be used to "grant the certificate in ordinary litigation which could otherwise be promptly disposed of," *U.S. Rubber Co. v. Wright*, 359 F.2d 784, 785 n.2 (9th Cir. 1966) (quoting S. Rep. No. 85-2434, at 7 (1958), *as reprinted in* 1958 U.S.C.C.A.N. 5255, 5260-61), the instant case is far from "ordinary litigation."  *U.S. Rubber*, cited by Plaintiffs, involved "unexceptional contract litigation" that "present[ed], at most, nothing more than an uncertain question of law" where "no disposition [the Ninth Circuit] might make of th[e] appeal on its merits could materially affect the course of the litigation in the district court."  *Id.* at 785.  This case, on the other hand, involves novel, nationwide class claims implicating an entire industry, and has already been protracted.[19] Unlike *U.S. Rubber*, certification might resolve the entire litigation.

Plaintiffs incorrectly assert that "considerations of time, effort, or expense of continued litigation are irrelevant to the section 1292(b) analysis."  Opp. 7-8.  Plaintiffs cite *Arizona v. Ideal Basic Industries (In re Cement Antitrust Litigation (MDL No. 296))*, 673 F.2d 1020, 1027 (9th Cir. 1982), for this proposition.  But there, the movant sought certification of a recusal decision that was entirely "separable from and collateral to the merits of th[e] lawsuit."  *Id.*  Precisely because the recusal issue in *In re Cement* was entirely "collateral" and therefore not controlling, the court had no occasion to address the third prong of the Section 1292(b) analysis.  Further undercutting Plaintiffs' argument, *In re Cement* itself states that "all that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of

---

[19] Plaintiffs, acknowledging that the litigation they initiated "has been protracted," blame Intel for its "serial facial challenges to Plaintiffs' pleadings."  Opp. 8 n.6.  But it is Plaintiffs that repeatedly failed to state viable claims.

litigation in the district court." *Id.* at 1026; *see also Arthur v. Murphy Co.*, 2012 WL 13047758, at *3 (D. Or. Jan. 17, 2012) (stating that the third prong of the Section 1292(b) test is the extent to which certification is "likely to materially speed the termination of the litigation").

### B.      If the Court Does Not Apply *Bardin*, It Should Certify Whether the Lack of a Misrepresentation, Physical Safety Hazard, or Breach of Warranty Precludes a UCL Unfairness Claim.

As described above, under California appellate authority and a long line of cases, a plaintiff seeking to state a product-based unfair prong claim under the UCL must allege an actionable misrepresentation, a physical safety hazard, or a breach of warranty. *See supra* Section III.C; *see also* Mot. 13-15, 27-29. Plaintiffs effectively concede that this issue would be a controlling question of law whose resolution would materially advance this litigation.[20] Plaintiffs dispute only whether this issue presents a substantial ground for difference of opinion.

"A substantial ground for difference of opinion exists where reasonable jurists might disagree on an issue's resolution, not merely where they have already disagreed." *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011). A substantial ground for difference of opinion also exists, as Plaintiffs recognize, where "the controlling law is unclear." Opp. 31. If the Court were to conclude that *Bardin* does not apply here, the decision would be at odds with decisions rendered by other jurists on analogous facts (including in *Bardin* itself), and there would be resulting lack of clarity about the law. Mot. 12-15; *supra* Section III.C. This goes far beyond Intel merely "disagree[ing] with the Court's view of the UCL." Opp. 32. In contrast to *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010), cited by Plaintiffs (Opp. 31-32), where the

---

[20] While Plaintiffs' heading states that this issue "does not present a controlling question of law," Opp. 31, Plaintiffs offer no substantive argument on that point. Any opposition is therefore waived.

movant did "not provide[] a single case that conflict[ed] with the district court's construction or application of" the relevant statute, Intel has identified several precedents—including *Bardin*— that would be contrary to the Court's decision.

### C.    The Court Should Certify Any Embargo-Related Claim that Survives.

If the Court declines to reconsider and dismiss the Exploits Theory, particularly now that Plaintiffs have abandoned their allegations of embargo manipulation/duration, it should certify the Order.  "[C]ourts traditionally will find that a substantial ground for difference of opinion exists where '. . . novel and difficult questions of first impression are presented.'"  *Reese*, 643 F.3d at 688.

If, despite Plaintiffs' abandonment, the Court were to adhere to its ruling that a plaintiff may state an unfairness claim on the basis that the Spectre/Meltdown embargo extended beyond an alleged "typical" length, Amici's concerns would be realized.  A ruling on that ground would force manufacturers into the impossible dilemma of either disclosing vulnerabilities before a patch has been developed, which would impose a significant risk of harm to consumers, or facing the threat of UCL liability.  Alternatively, if the Court were to recognize Plaintiffs' new theory of embargo "abuse," technology companies would face a similar dilemma of choosing between making disclosures that could alert hackers to the issue or ceasing to sell and advertise their products any time they are affected by one of the thousands of vulnerabilities discovered every year.[21]

---

[21] The Cyber Incident Reporting for Critical Infrastructure Act of 2022 (CIRCIA), passed on March 15, 2022, is notable.  It instructs the Director of the Cybersecurity and Infrastructure Security Agency, among other things, to "develop principles that govern the timing and manner in which information relating to security vulnerabilities may be shared, consistent with common industry best practices and United States and international standards."  Strengthening American Cybersecurity Act of 2022, S. 3600, 117th Cong. § 2245(a)(2)(B) (2022).  Congress's recognition of the need for such principles to be developed at a federal level, consistent with best practices and

Plaintiffs' primary challenge to certification on the embargo issue is that it does not present a "pure" question of law. Opp. 33-34. But Plaintiffs fail to identify any material factual issue or dispute that is relevant to the Ninth Circuit's ability to assess the viability of a novel theory of UCL unfair-prong liability based on a manufacturer's non-disclosure of a security vulnerability within a "typical" 90-day period. Likewise, even if the Court were to endorse Plaintiffs' embargo "abuse" theory, Plaintiffs identify no material factual dispute or contested factual question that would require resolution by the Ninth Circuit. The Ninth Circuit would only be required to assess, in the abstract, whether an unfairness claim should be allowed to proceed based on an allegation that the "typical" 90-day embargo period has been exceeded.

Putting aside the absence of any disputed factual issue, Plaintiffs' interpretation of the "controlling question of law" prong is not correct. The Ninth Circuit has never held that only pure questions of law satisfy this prong. *See ICTSI Or., Inc. v. Int'l Longshore & Warehouse Union*, 2020 WL 2768683, at *3 & n.3 (D. Or. May 28, 2020) (collecting cases certified by the Ninth Circuit that involved mixed questions of law and fact).[22] Nor has the Ninth Circuit held that "application of law to a set of facts," Opp. 33, renders a question of law impure. Rather, "the Ninth Circuit has accepted § 1292(b) certifications for mixed questions involving application of law to a particular set of facts where the attendant legal conclusion was ***sufficiently important***."

---

standards, reinforces why this Court should not be the first to endorse a theory that a technology vendor may be liable either because an embargo is extended beyond a "typical" date or for engaging in otherwise ordinary sales and marketing activity while addressing one of the thousands of vulnerabilities discovered every year.

[22] Although the Ninth Circuit later declined to review *ICTSI Oregon, Inc. v. International Longshore & Warehouse Union*, it did so because the main issue presented was a question of fact that had been determined at trial. 22 F.4th 1125, 1132 (9th Cir. 2022). The issues presented here involve no contested questions of fact.

*Dukes v. Wal-Mart Stores, Inc.*, 2012 WL 6115536, at *2 (N.D. Cal. Dec. 10, 2012).  And because the issue arises on a motion to dismiss and Plaintiffs' well-pled factual allegations are assumed to be true, "[t]he Ninth Circuit will be able to decide this question quickly and cleanly without having to study the record" or decide disputed facts.  *Pirani v. Slack Techs., Inc.*, 2020 WL 7061035, at *1 (N.D. Cal. June 5, 2020) (citation omitted).

For all of these reasons, if the Court does not grant reconsideration, it should certify its Order for interlocutory appeal.

## CONCLUSION

The Court should grant Intel's motion for reconsideration.  In the alternative, Intel respectfully requests that the Court certify its Order for appeal pursuant to 28 U.S.C. § 1292(b) and amend its Order accordingly.

DATED:  April 28, 2022.                              Respectfully submitted,

                                                     STOEL RIVES LLP
                                                     /s/ Steven T. Lovett
                                                     Steven T. Lovett, OSB No. 910701
                                                     steve.lovett@stoel.com
                                                     Rachel C. Lee, OSB No. 102944
                                                     rachel.lee@stoel.com
                                                     Telephone:  503.224.3380

                                                     WILLIAMS & CONNOLLY LLP

                                                     Daniel F. Katz (*pro hac vice*)
                                                     dkatz@wc.com
                                                     David S. Kurtzer-Ellenbogen (*pro hac vice*)
                                                     dkurtzer@wc.com
                                                     Telephone: 202.434.5000

                                                     Attorneys for Defendant Intel Corporation