IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE: INTEL CORP. CPU MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | ) Case No. 3:18-md-02828-SI<br>)<br>)<br>) June 15, 2018 |
| _____ | )<br>) |
| This Document Relates to All Actions. | ) Portland, OR |
| _____ | ) |

**Case Management Conference**

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL H. SIMON

UNITED STATES DISTRICT COURT JUDGE

```
 1

 2                              APPEARANCES

 3

 4   FOR THE PLAINTIFFS:      Mr. James E. Cecchi
                             Carella, Byrne, Cecchi, Olstein, Brody
 5                           & Agnello, P.C.
                             5 Becker Farm Road
 6                           Roseland, NJ 07068

 7

 8                           Mr. Israel Klein (by telephone)
                             Imbesi Law, P.C.
                             450 7th Avenue
 9                           New York, NY 10123

10

11                           Mr. Christopher Seeger
                             Mr. Christopher Ayers
                             Seeger Weiss, LLP
12                           55 Challenger Road, 6th Floor
                             Ridgefield Park, NJ 07660

13

14                           Mr. Charles E. Schaffer
                             Levin Sedran & Berman, LLP
15                           510 Walnut Street, Suite 500
                             Philadelphia, PA 19106

16

17                           Mr. Laurence D. King
                             Kaplan Fox & Kilsheimer, LLP
18                           350 Sansome Street, Suite 400
                             San Francisco, CA 94104

19

20                           Mr. Donald R. Hall
                             Kaplan Fox & Kilsheimer, LLP
21                           850 Third Avenue, 14th Floor
                             New York, NY 10022

22

23                           Mr. Nicholas Koluncich III
                             Law Office of Nicholas Koluncich III,
24                           LLC
                             500 Marquette Avenue NW, Suite 1200
25                           Albuquerque, NM 87102
```

```
 1   FOR THE PLAINTIFFS:      Mr. W. Daniel Dee Miles III
     (Cont.)                  Ms. Leslie Pescia
 2                            Beasley, Allen, Crow, Methvin, Portis
                              & Miles, P.C.
 3                            218 Commerce Street
                              Montgomery, AL 36104
 4

 5                            Mr. J. Gerard Stranch IV
                              Mr. Benjamin A. Gastel
 6                            Branstetter Stranch & Jennings, PLLC
                              223 Rosa L. Parks Avenue, Suite 200
 7                            Nashville, TN 37203

 8
                              Mr. Michael E. Jacobs
 9                            Hinkle Shanor, LLP
                              218 Montezuma Avenue
10                            Santa Fe, NM 87501

11                            Mr. Robert J. Gralewski, Jr.
                              Kirby McInerney, LLP
12                            600 B Street, Suite 1900
                              San Diego, CA 92101
13

14                            Mr. Stuart A. Davidson
                              Robbins Geller Rudman & Dowd, LLP
15                            120 East Palmetto Park Road, Suite 500
                              Boca Raton, FL 33432
16

17                            Mr. Richard M. Hagstrom
                              Mr. Michael R. Cashman
18                            Hellmuth & Johnson, PLLC
                              850 West 78th Street
19                            Minneapolis, MN 55439

20                            Mr. John Dunbar
                              Mr. Zachary Kearns
21                            Larkins Vacura Kayser, LLP
                              121 S.W. Morrison Street, Suite 700
22                            Portland, OR 97204

23                            Mr. Michael Fuller
                              Mr. Kelly Jones
24                            Olsen Daines, P.C.
                              111 S.W. Fifth Avenue, Suite 3150
25                            Portland, OR 97204
```

```
 1    FOR THE PLAINTIFFS:      Mr. Steve D. Larson
      (Cont.)                  Ms. Jennifer S. Wagner
 2                             Stoll Stoll Berne Lokting & Shlachter,
                               P.C.
 3                             209 S.W. Oak Street, Suite 500
                               Portland, OR 97204
 4

 5                             Mr. Richard S. Yugler
                               Mr. Thane W. Tienson
 6                             Landye Bennett Blumstein, LLP
                               1300 S.W. Fifth Avenue, Suite 3600
 7                             Portland, OR 97201

 8                             Mr. Gary S. Graifman
                               Kantrowitz, Goldhamer & Graifman, P.C.
 9                             747 Chestnut Ridge Road
                               Chestnut Ridge, NY 10977
10

11                             Mr. Nicholas Migliaccio
                               Migliaccio & Rathod, LLP
12                             412 H Street NE, Suite 302
                               Washington, D.C. 20002
13

14                             Mr. Christopher D. Jennings
                               Johnson Firm
15                             2226 Cottondale Lane, Suite 210
                               Little Rock, AR 72202
16

17                             Ms. Melissa R. Emert
                               Stull, Stull & Brody
18                             6 East 45th Street, Fifth Floor
                               New York, NY 10017
19

20                             Mr. Hirlye Ryan Lutz
                               Cory Watson
21                             231 Magnolia Avenue South
                               Birmingham, AL 35205
22

23                             Mr. Robert Le
                               Law Office of Robert Le
24                             5895 Jean Road, Suite 109
                               Lake Oswego, OR 97035
25
```

```
 1   FOR THE PLAINTIFFS:      Mr. Kelly D. Jones
     (Cont.)                  Law Office of Kelly D. Jones
 2                            819 S.E. Morrison Street, Suite 255
                              Portland, OR 97214
 3

 4                            Mr. Michael P. Canty
                              Labaton Sucharow, LLP
 5                            140 Broadway
                              New York, NY 10005
 6

 7                            Mr. Young Walgenkim
                              Hanson & Walgenkim
 8                            838 Commercial Street NE
                              Salem, OR 97301
 9

10                            Mr. Daniel K. Reising
                              Fuerle & Reising, LLP
11                            800 N.W. Sixth Avenue, Suite 211
                              Portland, OR 97209
12

13                            Mr. Adam J. Levitt
                              DiCello Levitt & Casey
14                            Ten North Dearborn Street, 11th Floor
                              Chicago, IL 60602
15

16                            Ms. Jennifer Joost
                              Kessler Topaz Meltzer & Check, LLP
17                            One Sansome Street, Suite 1850
                              San Francisco, CA 94104
18

19                            Ms. Cari Laufenberg
                              Keller Rohrback LLP
20                            1201 Third Avenue, Suite 3200
                              Seattle, WA 98101
21

22                            Mr. Brian C. Gudmundson
                              Zimmerman Reed, LLP
23                            80 South 8th Street, Suite 1100
                              Minneapolis, MN 55402
24

25
```

```
1   FOR THE PLAINTIFFS:      Ms. Gayle M. Blatt
    (Cont.)                  Casey Gerry Schenk Francavilla Blatt
2                            & Penfield, LLP
                             110 Laurel Street
3                            San Diego, CA 92101

4                            Ms. Rosemary Rivas
                             Levi & Korsinsky, LLP
5                            44 Montgomery Street, Suite 650
                             San Francisco, CA 94104
6

7                            Mr. Gordon M. Fauth
                             Finkelstein Thompson, LLP
8                            100 Pine Street, Suite 1250
                             San Francisco, CA 94111
9

10                           Mr. Daniel C. Hedlund
                             Gustafson Gluek, PLLC
11                           120 South 6th Street, Suite 2600
                             Minneapolis, MN 55402
12

13  FOR THE DEFENDANT:       Mr. Daniel Katz
                             Mr. David S. Kurtzer-Ellenbogen
14                           Williams & Connolly, LLP
                             725 12th Street, NW
15                           Washington, D.C. 20005

16                           Ms. Steven T. Lovett
                             Ms. Rachel C. Lee
17                           Stoel Rives, LLP
                             760 S.W. Ninth Avenue, Suite 3000
18                           Portland, OR 97205

19

20  COURT REPORTER:          Bonita J. Shumway, CSR, RMR, CRR
                             United States District Courthouse
21                           1000 S.W. Third Ave., Room 301
                             Portland, OR  97204
22                           (503) 326-8188

23

24

25
```

```
 1
 2                              I N D E X
 3                             SPEAKERS
 4    James Cecchi                              21
 5    Christopher Seeger                        24
 6    Charles Schaffer                          28
 7    Donald Hall                               35
 8    Nicholas Koluncich                        41
 9    Daniel Dee Miles                          47
10    Gerard Stranch                            53
11    Michael Jacobs                            61
12    Robert Gralewski                          69
13    David Kurtzer                             73
14    Stuart Davidson                           77
15    Richard Hagstrom                          92
16    Richard Yugler                           105
17    Gary Graifman                            108
18    Nicholas Migliaccio                      113
19    Melissa Emert                            116
20    Ryan Lutz                                120
21    Michael Canty                            122
22    Adam Levitt                              126
23    Jennifer Joost                           135
24    Cara Laufenberg                          142
25    Brian Gudmundson                         145
```

1

2                          I N D E X

3                     SPEAKERS (continuing)

4    Steve Larson                              148

5    Gayle Blatt                               154

6    Rosemary Rivas                            157

7    Gordon Fauth                              159

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  (P R O C E E D I N G S)

 2                    (June 15, 2018)

 3          THE COURT:  Good morning.

 4          THE CLERK:  Please be seated.

 5          THE COURT:  We are here in the case of In re: Intel

 6    Corporation CPU Marketing, Sales Practices, and Products

 7    Liability Litigation, Case No. 3:18-md-2828, and this is the

 8    first organizing meeting of this multi-district litigation.  I

 9    think there were 42 cases transferred to me, and then one of

10    them was dismissed, so now I think we have 41 cases.

11          We'll get appearances from the plaintiffs' counsel as

12    they speak later, but now may I please ask for counsel for

13    Intel to introduce themselves.

14          MR. KATZ:  Your Honor, Dan Katz from Williams &

15    Connolly.

16          MR. KURTZER:  David Kurtzer, also from Williams &

17    Connolly.

18          MR. LOVETT:  Steve Lovett from Stoel Rives.

19          MS. LEE:  Rachel Lee, Stoel Rives.

20          THE COURT:  Okay.  And welcome to plaintiffs' counsel

21    here.

22          I have a few preliminary comments about how I'd like

23    to proceed.  Let me begin by saying that I have read all of the

24    motions and all of the case statements, which I found very

25    helpful, and I appreciate that, and I'm inclined to make
```

1   individual appointments to a plaintiffs' steering committee

2   rather than simply accept a proposed slate of attorneys.

3           I'll share with you some of the factors -- it's a

4   non-exhaustive list.  What I generally look for in appointing

5   leadership:  Number one, demonstrated experience in handling

6   complex civil litigation, including MDL and class actions.

7           Two -- I probably should have made this number one,

8   because in my mind, it's a priority -- demonstrated experience

9   in working cooperatively, reasonably, and fairly with

10  co-counsel on the same side and opposing counsel, all to

11  achieve the objectives of Rule 1 of the Federal Rules of Civil

12  Procedure.

13          Number three:  Knowledge of applicable law.

14          Number four:  Knowledge of applicable technology, and

15  the ability to explain complex matters simply yet accurately.

16  I have seen people explain complex technology accurately but

17  not at all simply, and it's hard for me and a jury to follow,

18  and I've seen other people explain things simply, in a way

19  that's easy to follow yet glosses over important nuances.  So I

20  look for the ability to explain complex matters simply yet

21  accurately.

22          Number five:  The ability and willingness to commit

23  resources necessary to accurately represent the plaintiffs in a

24  large, potentially very expensive matter.  And here I am

25  looking, among other things, to how is a leadership member

1   assured that this issue is not in the back of my head or the

2   front of my head.

3          THE COURT:  Although if you are selected to be in

4   leadership, it sounds like you may be facing a motion to

5   disqualify, and I'm certainly not going to entertain that now.

6   If and when it arises, we'll deal with it in good course.

7          MR. DAVIDSON:  And I just don't think that we're

8   there.  I don't think that issue would ever be need to be

9   briefed.

10          Your Honor, the rules of professional conduct --

11          THE COURT:  I don't want to get into that now.  All

12   I'm saying is if a motion is filed, we'll have a response,

13   we'll give a fair hearing and we'll figure it out.

14          MR. DAVIDSON:  And that's what I would appreciate the

15   opportunity to do, because quite frankly we were faced with, at

16   the eleventh hour, we were faced with a motion that took us by

17   complete surprise.  We viewed the law as permitting this

18   situation.

19          THE COURT:  Let's use your time now as to why you

20   should have leadership or even co-lead.

21          MR. DAVIDSON:  Your Honor, we are seeking a co-lead

22   position in this case for many reasons.  The reason why I think

23   what I bring to the table would be important for this case is

24   because one of my true strengths -- and sometimes it can hurt

25   my partners sometimes -- is I'm very efficient, I'm very

1    organized, and what I commit to the Court to do, consistent

2    with Rule 1, is to ensure that this case moves forward in a

3    just, efficient, and speedy way.

4              What I would like to focus on --

5              THE COURT:  You left out inexpensive, but we've got

6    no chance of that happening here.

7              MR. DAVIDSON:  That may be true, Your Honor, but

8    under our case management plan, we don't think this case needs

9    to go to 2021, as defense counsel did.

10             And what I have learned and one of -- I guess one of

11   my strengths that I bring to this case is that I am in the

12   leadership in many technology cases right now, most importantly

13   being the *AMD* case with Ms. Joost from Kessler Topaz, and we

14   just filed our consolidated complaint.

15             THE COURT:  I've seen it.

16             MR. DAVIDSON:  I was going to hand a copy to Your

17   Honor.

18             And as Your Honor probably saw, we spent the last

19   three weeks working with one of the most preeminent computer

20   science and engineering experts to understand to the best of

21   this legal mind's capability what at least the Spectre defect

22   was all about, and that will enure to the benefit of not just

23   this case but the class, whose interests are paramount, without

24   question, because the learning curve is less, because Ms. Joost

25   and I have spent the last three weeks immersed in what the

Stuart Davidson

1    Spectre defect is, which is half of what this case is.

2            And I do believe that --

3            THE COURT:  Spectre is primarily a software issue and

4    Meltdown is primarily a hardware issue.

5            MR. DAVIDSON:  Operating system issue.

6            THE COURT:  And that's why it's primarily an Intel

7    issue and why it's not in *AMD*, right?

8            MR. DAVIDSON:  It is.  And the Spectre defect causes

9    a problem where some of the older legacy processors cannot be

10   patched, so they have that added issue.

11           Your Honor did ask us to address about the Lazy FP

12   Restore issue that just got announced.  Suffice it to say, I

13   have not done a deep dive into that.  I do believe it is

14   similar, in the sense that it deals with side-channel attacks

15   and the vulnerability that allows it to leak data.  But whether

16   the patches that they're going to put out will degrade

17   processor speed, I don't know at this point.

18           But I do think that our experience in the *AMD* case

19   should for efficiency and the lack of learning curve really put

20   us at kind of that top level.  We can, in fact, litigate this

21   case with efficiency, and that will cut down in cost.  It will

22   cut down in expert cost.  If we use the same expert that we

23   used in *AMD*, I mean, the learning curve that he would have has

24   been dissipated.

25           And so I do firmly believe that my experience in the

Stuart Davidson

1    *AMD* case in the leadership should make this an easy issue, but

2    I have the experience even without that, Your Honor.  We are --

3    I'm in the leadership in the *Yahoo Data Breach* case.

4    Mr. Canty -- I don't know where Mr. Canty is, but Mr. Canty's

5    firm and my firm were literally three weeks away from trial in

6    *Facebook*, in the *Facebook Biometric Information Litigation* in

7    front of Judge Donato in San Francisco when the Ninth Circuit

8    took a 23(f) appeal and shut that down.  But we had spent weeks

9    preparing for trial, and we spent the last couple years

10   immersed in the source code.  So we have this deep knowledge

11   about the technology that we can bring to this case.

12             But I really want to bring it back to why I think it

13   would be to the benefit of the class and to this Court to add

14   me to the leadership, and more importantly to the co-lead

15   structure.  My firm is the -- my partner Mark -- and I'm not

16   sure he is enjoying this or not, but he is now the chairman of

17   the executive committee for the Apple processor case, and one

18   of the things that my office is doing -- I don't know if Your

19   Honor knows much about Robbins Geller other than what you've

20   recently read, but we are the largest plaintiffs' side class

21   action firm in the world.  As a result, we've never used

22   third-party funding, and unlike my wonderful friends and

23   colleagues here, we don't even access our credit line to fund

24   our cases.  So --

25             THE COURT:  That's bragging.

```
 1           MR. DAVIDSON:  It is, and I hate doing that, but
 2   because the issue came up and because my friends talked about
 3   access to credit, I say I don't need access to credit because
 4   we really do that well.
 5           But what the size of my firm brings to a case like
 6   this is -- particularly for a co-lead spot, is that we are now
 7   in the Apple processor case collecting, reviewing for
 8   duplication, and processing the time and expense records for 39
 9   law firms.  For reasons I don't necessarily know, Judge Davila
10   appointed 31 firms as the leadership --
11           THE COURT:  That's not going to happen here.
12           MR. DAVIDSON:  I would hope not, because maybe I'd
13   rather not be in that group.
14           THE COURT:  I do have a lot of respect for Judge
15   Davila.
16           MR. DAVIDSON:  As do we, and he's a tremendous
17   jurist.
18           But we are doing that.  We have the infrastructure in
19   place to review for duplication, to input and to -- more
20   importantly, as Your Honor has ordered, to submit to Your Honor
21   timely and appropriate time and expense records.
22           And what I do commit to Your Honor is that if we are
23   successful at the end of this case, whether by trial or by
24   settlements, that I think if Your Honor appoints me to the
25   leadership, that if I am in charge of all the time-and-expense
```

Stuart Davidson

1    records, I am confident at the end of this case, if we seek a

2    fee because we are successful, that Your Honor will have

3    comfort that the fees that were billed in this case were

4    appropriate and necessary for the prosecution and that the

5    class's interests were paramount from day one.  And that's what

6    I would commit and I do commit to Your Honor.

7          THE COURT:  By the way, now that you've raised that

8    issue, let me tell everyone -- because I really try not to

9    nickel and dime anybody -- I do not accept block billing.  And

10   now I've said this, if it becomes necessary for me to make

11   significant reductions at some point in the future because of

12   block billing, you've been warned.

13         MR. DAVIDSON:  If the block billing comes in to me,

14   if I'm on the leadership and block billing comes to me, guess

15   where it goes?  It goes right back to them.  I say, you need to

16   fix this, and fix it ASAP, because we've got to get it for

17   Judge Simon the next day.

18         So, you know, between the *Apple* case and the *AMD*

19   case, Your Honor, I honestly believe that I am well suited, and

20   it would be a tremendous honor to be working alongside any of

21   these lawyers.

22         You know, Your Honor asked -- and to me it is the

23   most important thing -- about working cooperatively with

24   co-counsel and defense counsel.  Ask any of these lawyers in

25   this courtroom, and I think what they would say -- at least I

Stuart Davidson

1    hope what they would say is that I'm one of the most honest and

2    kind lawyers that they have ever worked with, but I'm a good

3    advocate, I work very hard for my clients, I make wonderful

4    presentations to the Court, and I am hopefully successful many

5    more times than I'm not.

6              But a couple other things, Your Honor.  Your Honor

7    asked about what happens with the *Hyundai-Kia* case.  As far as

8    I see it, we don't really have a choice with the way the law is

9    set.  If we have to file a consolidated complaint -- and

10   assuming I'm lucky enough to be on the leadership -- we have to

11   cover the entire country or else those people are not going to

12   be, under Ninth Circuit law, adequately represented in this

13   case.  So that's unfortunately how it would probably have to

14   play out, because you need representation for each state.

15             THE COURT:  What's your view -- I'm not going to do a

16   state-by-state issue, but what's your view on the point we just

17   heard from Mr. Gralewski, that we really need two -- maybe

18   three, but at least two different consolidated master

19   complaints, because the regulated entities just are different,

20   both in terms of when their claims begin, what types of claims

21   they'll be having.  What's your response to that?

22             MR. DAVIDSON:  So I'm a little bit surprised by that

23   simply because if you read the complaints, they're identical.

24   They just are.  They raise the exact same issues.  So I do not

25   think that -- I think the overlap greatly outweighs the

1   non-overlap part.  So I don't think that you need separate

2   tracks.  I do agree that the subclass idea would probably take

3   care of it, but at the end of the day, whatever is the most

4   efficient way, I'm in favor of, if that means two tracks and

5   two master complaints.

6           What I wouldn't present as an option to the Court is

7   that in light of *Hyundai-Kia*, that if we do have to plead legal

8   claims, causes of action for 50 states, one option that has

9   been employed by Judge Koh in several cases in the Northern

10  District of California is to select -- have each side select a

11  few that they litigate through either class certs, summary

12  judgment or whatever.  I do believe that would be helpful.

13          THE COURT:  By the way, since I said it about Judge

14  Davila, I definitely say about Judge Koh.  I have tremendous

15  respect for her as well.

16          MR. DAVIDSON:  I worked with her in the *Yahoo* case

17  and now in the *AMD* case.  What I appreciate the most about

18  Judge Koh is the efficiency in which she works her cases.  We

19  are there, we work very hard, very fast.

20          And I do also appreciate -- and I'm not sure if this

21  is something Your Honor does in the *Premera* case, but what I

22  appreciated most in the MDLs that I've been on the leadership

23  of is routine status conferences.

24          THE COURT:  In *Premera* we have monthly telephone

25  calls, and we're going to do that in this case, too.

Stuart Davidson

```
 1            MR. DAVIDSON:  To me I think it just keeps everybody
 2   on their toes.
 3            The only other thing I would like to talk about, if
 4   Your Honor is interested, is the differences in the case
 5   management orders that were presented by Intel.  Honestly, I
 6   believe that with the leadership we can try --
 7            THE COURT:  The answer is not now.  What my plan is
 8   is to appoint leadership today and then to give leadership an
 9   opportunity to confer with each other, to confer with
10   defendant, and then probably within a few weeks -- I'm not
11   going to make everybody go to the expense of getting back out
12   here -- maybe have a telephone conference to talk about a case
13   management order and schedule.
14            MR. DAVIDSON:  I appreciate that, Your Honor.
15            And with that, unless the Court has any other
16   questions, I do appreciate your time.  Thank you very much.
17            THE COURT:  Thank you.
18            So before we take our lunch break -- and I'd like to
19   keep it brief, so I'll ask our court reporter how much time do
20   you need.
21            (A discussion is held off the record.)
22            THE COURT:  Let me just take a minute of your time,
23   we'll start when we finish with this, but I do want to get a
24   sense of who else wants to speak.  Let me just go through the
25   list and ask you, just yes or no, do you want to speak.
```

Jennifer Joost

```
 1           I think that in that situation, Mr. Graifman's point
 2   that they've put together a complaint with plaintiffs from
 3   30-some-odd states, that this is not a case where it's hard to
 4   find a plaintiff.  You can fall down outside the hallway and
 5   probably you'll get at least one.  So any court-appointed
 6   counsel will ultimately put together a 50-state complaint.
 7           THE COURT:  In almost every voir dire that we do
 8   here, I ask the jury, "Who here has access to get on the
 9   Internet?"  And in probably about 40 trials over the last seven
10   years, I have not had a person yet who did not raise their
11   hand.
12           MR. LEVITT:  I understand, Your Honor.
13           So everything else that I have to say about myself is
14   in my papers or my mom can tell you, but for all those reasons,
15   I think, Your Honor, I think I'm most suited to be one of the
16   co-lead counsel in this case, and I'd like to be -- hope that I
17   can actually do that.
18           THE COURT:  Thank you very much -- is it Levitt?
19           MR. LEVITT:  Yes.
20           THE COURT:  Mr. Levitt, thank you very much, sir.
21           Jennifer Joost.
22           MS. JOOST:  Good afternoon, Your Honor.  Jennifer
23   Joost from Kessler Topaz Meltzer & Check.
24           So just really quickly in terms of my firm, almost
25   100 lawyers, two offices, Pennsylvania, San Francisco, and I
```

Jennifer Joost

1   happen to be in our San Francisco office.

2         We have the resources to litigate this case.  We do

3   not rely on third-party funding.  And you can see our firm

4   successes in the resume and in the brief that we filed with the

5   Stoll Berne group.

6         ==So with respect to myself in particular, my entire==

7   ==career thus far as been devoted to complex class action==

8   ==litigation, and there are two things that I think are very==

9   ==specific, and I haven't heard yet, at least in this==

10  ==combination.  One, I am -- have been appointed by Judge Koh in==

11  ==the *AMD* case.==

12        THE COURT:  I saw that.

13        MR. JOOST:  With my firm, but also along with Robbins

14  Geller.  We filed a complaint, a consolidated complaint.

15        THE COURT:  I remember seeing that.

16        MR. JOOST:  You know, we had to give a lot of thought

17  to all of these issues that are going to come up, at least with

18  respect to Spectre, and one thing I did want to note is that

19  both Spectre and Meltdown are hardware issues.

20        THE COURT:  I thought Spectre was primarily a

21  software issue.

22        MR. JOOST:  It's not.  The issue is CPU architecture,

23  and both Intel and AMD utilize various optimization techniques

24  in order to get things to go faster.  You have speculative

25  execution and branch prediction, which are exploited when you

Jennifer Joost
137

1   use Spectre, and then there is when you check the permissions,

2   and that's the Meltdown issue.  But it's in the CU

3   architecture, which is considered the hardware.

4          And, quite frankly, they were not concerned, experts

5   were not -- the companies, I should say, were not concerned

6   with security, they were looking more at the performance of

7   their chip.

8          THE COURT:  I mentioned that one of the things that I

9   will be expecting from both plaintiffs' steering committee and

10  from defendants at some point at the appropriate time, but

11  probably before I even have to deal with Rule 12 motions, is a

12  neutral tutorial on this technology.  I understand a fraction

13  of it at a 40,000-foot level, and that's about it, and I really

14  need to understand it more.

15         MR. JOOST:  I think that's great, Your Honor.  I

16  think it's really important not just for yourself but also for

17  the litigators.  We all need to be on the same page and using

18  the same terminology where necessary in a neutral manner.

19  Obviously at some point we will be adversaries and utilizing

20  that information to litigate this case, but I think it's

21  important to have a foundation to work from.

22         THE COURT:  You know, whether we deal with this at

23  summary judgment or at trial, there will probably be a fairly

24  small handful of issues, a handful of issues that the parties

25  will disagree about, and they'll probably disagree about it

Jennifer Joost

1   vigorously, and we'll see if there's a genuine issue of fact

2   and we'll see how that pans out.  But my expectation is that

3   there will only be a handful of issues, and we all need to be

4   on the same page with respect to everything else.

5           MR. JOOST:  I think that's right, Your Honor.  In

6   particular, we've been talking a lot about Spectre and Meltdown

7   and when those exploits were identified to the companies here,

8   but I think it's very important to remember that there was

9   academic research talking about this exact security

10  vulnerability going back to the first decade of this

11  millennium.  So this isn't a new issue for these companies -- I

12  mean, they'll obviously argue, but just as the old Spectre and

13  Meltdown were identified in June of 2017, that's the way to

14  exploit the vulnerability that existed long before that.

15          The other, and related --

16          THE COURT:  I also wonder, too, whether or not there

17  was the technological ability to exploit that vulnerability

18  long ago.  Because as I understand it, it takes some pretty

19  sophisticated technology to exploit this vulnerability.  Am I

20  wrong?

21          MS. JOOST:  Well, I think with respect to the

22  specific ways to put into place the side-channel attack, that

23  is true.  The side-channel attack, particularly the cache

24  timing side-channel attack which is utilized in both Spectre

25  and Meltdown has been, as before, at least in university

Jennifer Joost

1   research with respect to hardware security for a while.  So,

2   again, we'll get through all of this.

3            The other piece of this is I actually have a

4   securities fraud class action right now against Qualcomm, and

5   it relates to the microprocessor for a mobile device that would

6   cause the device to overheat and throttle.  And so just some of

7   the same benchmarks we might be using here in order to evaluate

8   the performance speeds of these devices, we've already been

9   looking at in that case.

10           But one thing I haven't really heard much of today --

11  I've heard the acronym ESI used, but I have not heard really

12  much about it, and that's one of the things that I absolutely

13  bring to the table is an expertise in ESI, to understand that

14  when defendants make objections in written requests, if those

15  objections, given the amount of data we have, start getting

16  implemented at the beginning, with the sources that are chosen,

17  how those sources are culled, then how are they searched in a

18  manual review, and making sure that we are on top of that and

19  we understand what's going on, and also how to say, to the

20  extent that we can, in that process --

21           THE COURT:  What's your been your experience with TAR

22  or predictive coding?

23           MS. JOOST:  I will say I'm probably the first person

24  to utter the word at a technology review in a partners' meeting

25  at my law firm.  That is my role at my firm, and we are looking

Jennifer Joost

1    very closely at various different forms of AI in order to

2    better streamline our process, in terms of viewing documents

3    and getting faster to those that matter for the case, but also

4    in trying to work with defense counsel to utilize those in

5    order to cut down on their costs at the front end, and also get

6    the best documents quicker.  There's studies that show if you

7    utilize search terms that you get 20 percent of the relevant

8    documents, but if you use TAR or other types of AI, you could

9    get upwards of 50 percent of the relevant documents.

10              THE COURT:  On the order of that, I do encourage

11   that.  I also frankly encourage both sides to share their

12   entire -- their entire strategy in doing the predictive coding

13   analysis with each other when you work on something.  We'll

14   talk more about that later with the leadership and with

15   defendant.

16              I'll also tell you, too, one of my practices when

17   there's ESI disputes, more often than not I will direct the

18   parties if they can't work it out to schedule a time and we'll

19   have an evidentiary hearing in here where I'm going to be

20   hearing more than just from the lawyers.  I want to hear from

21   IT people, and depending on the size of the case, the CIOs in

22   some cases, but otherwise knowledgeable IT folks.  If the

23   plaintiffs have an IT expert, I'll bring them in because I want

24   to try to find out the most efficient, fair, and cost-effective

25   way to get whoever's seeking the information the information

Jennifer Joost

1    that they're entitled to see without breaking the bank or

2    unreasonably wielding this as a sword over someone who has to

3    respond to the information.

4           And sometimes the lawyers get it and can explain it

5    to me, but more often than not, when they can't work it out

6    themselves, I will ask for an evidentiary hearing with the IT

7    folks, either in-house or third party, and that oftentimes

8    solves the problem.

9           MS. JOOST:  I completely agree that if you have the

10   right people in the room speaking the right language, you can

11   get it done.

12          And I will say that as much as I do consider myself,

13   at least from a legal perspective, somewhat of an expert in

14   terms of ESI, I always encourage my partners to not only bring

15   in the vendor in early, or if you're doing it in-house, to get

16   one of those IT experts in early and consult with them.  And I

17   still consult with them.  I put all my protocols to my vendor,

18   make sure that we're all on the same page.

19          THE COURT:  I encourage the lawyers on both sides of

20   the case to bring their IT vendors or consultants or experts to

21   come together in the same room.  The lawyers can explain

22   generally what information is being requested, and then let the

23   IT experts talk to each other about the most efficient and fair

24   and inexpensive or reasonably expensive way to get that

25   information.

1    MS. JOOST:  Music to my ears, Your Honor.

2    I guess the last thing I'll just focus on is

3  diversity.  We talked about geographical diversity, but I think

4  it's also important just in terms of other types of diversity.

5  Obviously, I'm the second woman to speak today.  I'm also on

6  the younger side.  I think it's important to bring up attorneys

7  and make sure they get the experience.

8    I've already critically run complex discovery in

9  class actions in 10 to 15 different matters.  But, you know, my

10  name is not on the door.  I'm starting to get gray hair, but

11  it's not quite there yet.  But I think it's important to make

12  sure that the next group of people is given the opportunity to

13  take on these important roles and get the experience so that at

14  some point in time we can be the lead counsel in a case like

15  this.

16    And unless Your Honor has any other questions, that's

17  all I have.

18    THE COURT:  Very good.  Thank you, Ms. Joost.

19    MR. JOOST:  Thank you very much.

20    THE COURT:  Cara Laufenberg.

21    MS. LAUFENBERG:  Good afternoon, Your Honor.  I'm

22  Cara Laufenberg from Keller Rohrback in Seattle, Washington.

23  So I'm representing multiple minorities here today from the

24  Pacific Northwest bar.

25    I'm actually here today on behalf of Gretchen Cappio,

Cara Laufenberg

1  who is my partner at Keller Rohrback and is proposed for the

2  plaintiffs' steering committee as part of the Stoll Berne

3  group.  She's profusely apologetic she could not be here today.

4  She was called away on an unexpected and unavoidable

5  professional engagement.

6          But I can speak with a lot of knowledge to

7  Ms Cappio's years of dedication and experience.  We've

8  practiced law together for over 15 years now.  We are both a

9  part of Keller Rohrback's complex litigation group, and we've

10  spent almost all of our careers protecting and fighting for

11  consumers' rights.  So this is much of what we do at our firm,

12  and we have done it in a lot of big cases like this, in a lot

13  of MDL cases, and we've worked with almost all of the firms

14  that are here today.  So we have a track record of working well

15  with others on both sides.

16          I would add that we are involved in appointed and

17  leadership positions in many of the cutting-edge nationwide

18  litigation, many of them MDLs that are going on today.  To name

19  a few, the *Volkswagen "Clean Diesel"* case, which Ms. Cappio was

20  an integral part of our leadership effort; likewise the *Jabbari*

21  *v. Wells Fargo* case, which is the fraudulent account case that

22  was just -- the settlement was just approved by Judge Chhabria

23  in the District of California a day ago, and that is a case

24  that was dismissed on arbitration issues, and we brought it

25  back and were able to settle it.  So that's a great result for

Cara Laufenberg
144

1    the class there.

2            Ms. Cappio is also involved in the *EpiPen* MDL that's

3    currently pending in Kansas; likewise, the *Chrysler EcoDiesel*

4    case in the Northern District of California; and the *National*

5    *Prescription Opiate* case that's ongoing in Ohio.  And all of

6    these are extremely complex and technical cases, much like what

7    this case will be.

8            And I would also stress that we have a lot of

9    technical expertise because of our data breach experience.  We

10   have leadership positions in the *Sony* case that was litigated

11   down in the Central District of California, the settlement of

12   *21st Century Oncology* in Florida, and also *VTech* and *Experian*.

13           We use no third-party financing.

14           I'll try to keep short addressing the other issues

15   that you've raised because I know everyone has been here for

16   some time.

17           I think we're open to representation of different

18   plaintiff groups.  I think the more I hear today, the more it

19   makes a lot of sense.  The only thing that I would implore Your

20   Honor to consider is whether it makes sense to allow the

21   leadership attorneys, once appointed, to confer amongst each

22   other and come up with a management for that issue to propose

23   to Your Honor, and may need to confer with opposing counsel as

24   well.  I think that that may make more sense than making it a

25   part of the leadership decision.

Brian Gudmundson

1      In terms of our involvement in other -- the other

2  sort of potentially related cases that you raised, one of my

3  partners is actually on the fairly large *Apple* committee that

4  has been discussed today, and so we will be able to glean some

5  efficiencies from that.  And we've worked very closely with

6  Mr. Davidson and Ms. Joost on the *AMD* case.  And so we are

7  familiar with vetting, and know that case really well.

8      As to the staged discovery issue, I think again what

9  you've raised made a lot of sense, and I just implore that we

10 have the opportunity to confer about that and make some

11 decisions as a leadership group, and confer with opposing

12 counsel, because I think we'll be able to reach a decision and

13 an agreement which we can then present to Your Honor.

14     Thank you very much.  I'm happy to answer any

15 questions.

16     THE COURT:  Thank you.  Not at this time.  Thank you,

17 Ms. Laufenberg.

18     Brian Gudmundson.

19     MR. GUDMUNDSON:  Good afternoon, Your Honor.  I'll be

20 brief in my remarks, since I know that everybody has been here

21 for some time and very respectfully listened to everyone's

22 presentations.

23     It was a great honor being asked by Mr. Davidson to

24 join the Stoll Berne group as a member of the plaintiffs'

25 steering committee, and what I do most of my legal career is I

1   represent financial institutions in U.S. security cases.  And

2   here I represent the ANECA Federal Credit Union in Shreveport,

3   Louisiana.

4              Our firm was lead counsel in the *Target* case, where

5   we did establish two tracks, I think for one of the first times

6   in the data breach cases.  I have something to say about

7   tracks.

8              I'm on the plaintiffs' steering committee for the

9   *Home Depot Data Breach* case on the financial institution

10  side -- these are all financial institution cases.  I'm co-lead

11  counsel for the *Arby's Data Breach* case; PSC in the *Wendy's*

12  *Data Breach* case; PSC in the *Chipotle Data Breach* case.  I'm

13  also on the PSC of the *Vizio* case down in Southern California,

14  which is not a data breach case but involves the impermissible

15  sharing of -- of personal information on behalf of consumers.

16  My partner Chris Ridout is on the *Apple* steering committee.

17             What all that really means, I think, is that I -- my

18  job really every day, expressed in front of Judge Totenberg in

19  Atlanta, is explaining in simple terms what this is all about,

20  how these technological things come about and why they happen

21  and why they happen in certain ways.  I think I do have a good

22  handle on the area of the law that applies to these areas.

23             I also have a good handle on working with the experts

24  that are needed to explain it both to me and to the Court, both

25  from a technological perspective and from a damages

1

2                                    --oOo--

3

4          I certify, by signing below, that the foregoing is a

5    correct transcript of the record of proceedings in the

6    above-entitled cause.  A transcript without an original

7    signature or conformed signature is not certified.

8

9

    /s/Bonita J. Shumway                June 22, 2018
10   _____             _____
    BONITA J. SHUMWAY, CSR, RMR, CRR    DATE
11   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25